**KESSLER TOPAZ
MELTZER & CHECK, LLP**
Jennifer L. Joost (Bar No. 296164)
jjoost@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

-and-

**KESSLER TOPAZ
MELTZER & CHECK, LLP**
Joseph H. Meltzer
jmeltzer@ktmc.com
Melissa L. Yeates
myeates@ktmc.com
Tyler S. Graden
tgraden@ktmc.com
Jordan E. Jacobson
jjacobson@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Counsel for Plaintiffs and the proposed Classes*

(*Additional Attorneys Listed on Signature Page*)

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| JOHN DOE and JANE DOE, Individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>KAISER FOUNDATION HEALTH PLAN, INC., KAISER FOUNDATION HOSPITALS, and THE PERMANENTE MEDICAL GROUP, INC.,<br><br>Defendants. | Case No. 4:23-cv-02865<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

**TABLE OF CONTENTS**

I. NATURE OF THE ACTION ........................................................................................ 1

II. THE PARTIES ........................................................................................................ 4

    A. Plaintiffs ........................................................................................................ 4

        1. Plaintiff John Doe ............................................................................... 4

        2. Plaintiff Jane Doe ............................................................................... 5

    B. Defendants ..................................................................................................... 5

III. JURISDICTION AND VENUE .............................................................................. 7

IV. FACTUAL ALLEGATIONS ................................................................................... 7

    A. Kaiser Permanente Communicates with Kaiser Plan Members Through
        the Kaiser Permanente Website ....................................................................... 7

    B. Multiple Third Party Wiretappers Intercept Kaiser Plan Members' Information
        Shared with, and Communications with, Kaiser Permanente and Its Providers ....... 14

        1. Kaiser Permanente Allows Quantum Metric to Intercept Kaiser Plan
            Members' Information and Communications ................................................. 14

        2. Kaiser Permanente Allows Adobe to Intercept Kaiser Plan Members'
            Information and Communications ............................................................... 20

        3. Kaiser Permanente Allows Twitter, Bing, and Google to Intercept
            Patients' Communications ........................................................................ 32

    C. Plaintiffs and Class Members Did Not Consent to Kaiser Permanente
        Disclosure of Their Information and Communications to Third Parties ................. 47

    D. Plaintiffs' and Class Members' Health Information Has Actual, Measurable,
        Monetary Value ............................................................................................. 48

    E. Kaiser Permanente's Conduct Violates State and Federal Privacy Laws ............. 48

V. TOLLING ............................................................................................................... 52

VI. CLASS ACTION ALLEGATIONS ......................................................................... 53

VII. CLAIMS FOR RELIEF ........................................................................................ 55

VIII. PRAYER FOR RELIEF ...................................................................................... 78

Plaintiffs[1] John Doe and Jane Doe bring this proposed class action against Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, and The Permanente Medical Group, Inc. (collectively "Kaiser Permanente" or "Defendants"), individually and on behalf of all others similarly situated, upon personal knowledge as to Plaintiffs' own conduct, and on information and belief as to all other matters based on investigation by counsel.[2]

## I.        NATURE OF THE ACTION

1.        As any reasonable patient would expect, Plaintiffs trusted that their medical providers would treat the information that they shared with them as private and confidential.

2.        This expectation extends to Plaintiffs' use of Kaiser Permanente's websites, on which they and other patients schedule appointments, access medical test results, learn about treatment options, order and review prescriptions, exchange messages and healthcare information with providers, participate in online health assessments, pay bills, and research specialists, among other sensitive activities.

3.        Notwithstanding, Plaintiffs' and other patients' reasonable expectation that their interactions and communications through Kaiser Permanente's website would not be shared with third parties, Kaiser Permanente discloses the contents of patients' confidential information and communications with a number of third parties, completely unbeknownst to Plaintiffs and its other patients, while those communications are in transit between Plaintiffs and Class Members on the one hand and Kaiser Permanente on the other.

4.        Specifically, unbeknownst to Plaintiffs and its other patients, Kaiser Permanente has installed code from multiple third parties throughout the Kaiser Permanente website that allows third

---

[1] Plaintiffs seek to proceed anonymously, as other plaintiffs have in other litigation claiming privacy violations involving health care providers. *See, e.g.*, Class Action Complaint & Demand for Jury Trial, *Doe. v. Meta Platforms Inc.*, No. 22-cv-3580 (N.D. Cal. June 17, 2022), ECF No. 1; Class Action Complaint & Demand for Jury Trial, *Doe v. Meta Platforms Inc.*, No. 22-cv-04680 (N.D. Cal. Aug. 15, 2022), ECF No. 1; Complaint, *Doe v. Meta Platforms Inc.*, No. 22-cv-4963 (N.D. Cal. Aug. 30, 2022), ECF No. 1; Class Action Complaint & Demand for Jury Trial, *Doe v. Meta Platforms Inc.*, No. 22-cv-6665 (N.D. Cal. Oct. 28, 2022), ECF No. 1; Complaint, *Doe v. Meta Platforms Inc.*, No. 22-cv-4293 (N.D. Cal. July 25, 2022), ECF No. 1. Plaintiffs are seeking Defendants' consent to proceed anonymously.
[2] Counsel's investigation includes an analysis of publicly available information. Plaintiffs believe that a reasonable opportunity for discovery will provide further support for the claims alleged herein.

CLASS ACTION COMPLAINT
Case No:

party companies such as Quantum Metric, Twitter, Adobe, Bing, and Google (collectively, "Third Party Wiretappers") to intercept the content of Plaintiffs and Class Members' patient status, identifying information, medical topics researched, choices made, information shared and communications with their medical providers, including personally identifiable medical information and other confidential information and communications, when that information is in transit.

5.     The third party code that Kaiser Permanente has installed on its website transmits and redirects the content of Plaintiffs and other Class Members' communications to these Third Party Wiretappers from the very moment that a user first loads Kaiser Permanente's website and continues as the user navigates through the website researching and sharing sensitive information.

6.     Once the website loads, the Third Party Wiretappers continue to intercept the content of patients' communications with Kaiser Permanente in real time as the patient navigates the website to access specific medical information, clicks buttons that divulge sensitive and protected patient status, and personal and health information, and enters information into various fields on Kaiser Permanente's website, such as: (1) signing-up for a patient Portal; (2) signing-in or signing-out of a patient portal; (3) taking actions inside a patient Portal; (4) making, scheduling, or participating in appointments; (5) reviewing and ordering prescriptions; (6) exchanging communications relating to doctors, treatments, payment information, health insurance information, prescription drugs, prescriptions, side effects, conditions, diagnoses, prognoses, or symptoms of health conditions; and (7) providing other information that qualifies as "personal health information" and/or identifying information under federal and state laws.

7.     Kaiser Permanente knew that by embedding the Third Party Wiretappers' code, they were disclosing and permitting these Third Party Wiretappers to intercept and collect information shared by its website users, including the content of Plaintiffs and Class Members' communications, which include identifying information, personal and sensitive information relating to medical treatment, and/or information that Kaiser Permanente was required to protect under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. § 1320d-6.

1    8.    In fact, in December 2022, the United States Department of Health and Human

2    Services ("HHS") issued a bulletin "to highlight the obligations" of health care providers under the

3    HIPAA Privacy Rule "when using online tracking technologies" such as those used by Kaiser

4    Permanente which "collect and analyze information about how internet users are interacting with a

5    regulated entity's website or mobile application."[3]

6    9.    In the bulletin, HHS confirmed that HIPAA applies to health care providers' use of

7    tracking technologies like those developed by the Third Party Wiretappers and used by Kaiser

8    Permanente. Among other things, HHS explained that health care providers violate HIPAA when

9    they use tracking technologies that disclose an individual's identifying information even if no

10   treatment information is included and even if the individual does not have a relationship with the

11   health care provider:

12   How do the HIPAA Rules apply to regulated entities' use of tracking technologies?

13   Regulated entities disclose a variety of information to tracking technology vendors
     through tracking technologies placed on a regulated entity's website or mobile app,
14   including individually identifiable health information (IIHI) that the individual
     provides when they use regulated entities' websites or mobile apps. This
15   information might include an individual's medical record number, home or email
     address, or dates of appointments, as well as an individual's IP address or
16   geographic location, medical device IDs, or any unique identifying code. **All such
     IIHI collected on a regulated entity's website or mobile app generally is PHI,
17   even if the individual does not have an existing relationship with the regulated
     entity and even if the IIHI, such as IP address or geographic location, does not
18   include specific treatment or billing information like dates and types of health
     care services**. This is because, when a regulated entity collects the individual's IIHI
19   through its website or mobile app, the information connects the individual to the
     regulated entity (*i.e.*, it is indicative that the individual has received or will receive
20   health care services or benefits from the covered entity), and thus relates to the
     individual's past, present, or future health or health care or payment for care.

21   10.   HHS further clarified that HIPAA applies to health care providers' webpages with

22   tracking technologies even on webpages that do not require patients to login:

23   Tracking on unauthenticated webpages

24

25   _____

26   [3] Press Release, *HHS Office of Civil Rights Issue Bulletin on Requirements under HIPAA for Online
     Tracking Technologies to Protect the Privacy and Security of Health Information*, HHS (Dec. 1,
     2022),      https://www.hhs.gov/about/news/2022/12/01/hhs-office-for-civil-rights-issues-bulletin-on-
27   requirements-under-hipaa-for-online-tracking-technologies.html;    *Use    of    Online    Tracking
     Technologies by HIPAA Covered Entities and Business Associates*, HHS (Dec. 1, 2022),
28   https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

[T]racking technologies on unauthenticated webpages may have access to PHI, in which case the HIPAA Rules apply to the regulated entities' use of tracking technologies and disclosures to the tracking technology vendors. Examples of unauthenticated webpages where the HIPAA Rules apply include: The login page of a regulated entity's patient portal (which may be the website's homepage or a separate, dedicated login page), or a user registration webpage where an individual creates a login for the patient portal . . . [and pages] that address[] specific symptoms or health conditions, such as pregnancy or miscarriage, or that permits individuals to search for doctors or schedule appointments without entering credentials may have access to PHI in certain circumstances. **For example, tracking technologies could collect an individual's email address and/or IP address when the individual visits a regulated entity's webpage to search for available appointments with a health care provider.** In this example, the regulated entity is disclosing PHI to the tracking technology vendor, and thus the HIPAA Rules apply.

11.     This HHS bulletin did not create any new obligations, but instead highlights obligations that have been in place for decades, with which Kaiser Permanente should have been complying.

12.     Kaiser Permanente's disclosure of patients' patient status, identifying information, and personal and sensitive heath information to the Third Party Wiretappers, including without adequate disclosure of its conduct to Plaintiffs and Class Members, constitutes an egregious invasion of Plaintiffs and Class Members' privacy and violates the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq.*; the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.*; Cal. Const. art. I, § 1;the Washington Privacy Act, Wash. Rev. Code § 9.73, *et seq.*; Washington Health Care Act, Wash. Rev. Code § 70.02.005, *et seq.*, and HIPAA, and constitutes intrusion upon seclusion and breach of Kaiser Permanente's express and implied promises and duties to its patients, including Plaintiffs and members of the Classes.

## II.     THE PARTIES

### A.     Plaintiffs

#### 1.     Plaintiff John Doe

13.     Plaintiff John Doe is a citizen of California, and resides in Victorville, California.

14.     Plaintiff John Doe is a Kaiser Foundation Health Plan member and has received medical treatment through Kaiser Foundation Hospitals and/or the Permanente Medical Group since in or around 2012.

15.      Plaintiff John Doe regularly uses Kaiser Permanente's website and Patient Portal to access medical information and communicate with his health care providers, including making appointments, reviewing and ordering prescriptions, researching providers and medical conditions, communicating with providers, checking medical results, and reviewing his medical history.

16.      Without Plaintiff John Doe's knowledge or consent, Kaiser Permanente allowed the Third Party Wiretappers to intercept, collect, read, attempt to read, and/or learn the contents or meaning of the contents of his patient status, identifying information, personal and sensitive health information, and confidential communications with his health care providers through Kaiser Permanente's website while that information and those messages, reports, and/or communications were in transit.

### 2.      Plaintiff Jane Doe

17.      Plaintiff Jane Doe is a citizen of Washington, and resides in Everett, Washington.

18.      Plaintiff Jane Doe is a Kaiser Foundation Health Plan member and has received medical treatment through Kaiser Foundation Hospitals and/or the Permanente Medical Group since 2018.

19.      Plaintiff Jane Doe regularly uses Kaiser Permanente's website and Patient Portal to access medical information and communicate with her health care providers, including making appointments, researching providers and medical conditions, checking medical results, and reviewing her medical history.

20.      Without Plaintiff Jane Doe's knowledge or consent, Kaiser Permanente allowed the Third Party Wiretappers to intercept, collect, read, attempt to read, and/or learn the contents or meaning of the contents of her patient status, identifying information, personal and sensitive health information, and confidential communications with her health care providers through Kaiser Permanente's website while that information and those messages, reports, and/or communications were in transit.

### B.      Defendants

21.      Defendant Kaiser Foundation Health Plan, Inc. is a health care provider headquartered in Oakland, California.

22.     Kaiser Foundation Health Plan, Inc. has an integrated care model, offering both hospital and physician care through a network of hospitals and physician practices operating under the Kaiser Permanente name. Members of Kaiser Permanente health plans have access to hospitals and hundreds of other health care facilities operated by Kaiser Foundation Hospitals and Permanente Medical Groups across the United States.

23.     Kaiser Foundation Health Plan, Inc. is financially responsible for the payment of medical services provided to its enrollees ("Kaiser Plan Members") or has accepted such financial responsibility under contract with one or more of the Kaiser Permanente entities. Kaiser Foundation Health Plan, Inc. is the largest health care service plan in the United States, with over 11.8 million members in eight states (California, Colorado, Georgia, Hawaii, Maryland, Oregon, Virginia, and Washington) and the District of Columbia.

24.     Kaiser Foundation Hospitals is a non-profit, public-benefit corporation headquartered in Oakland, California. Kaiser Foundation Hospitals operates nearly 40 acute care hospitals and 680 medical offices in eight states (California, Colorado, Georgia, Hawaii, Maryland, Oregon, Virginia, and Washington) and Washington D.C., with its largest presence being in California, where the majority of its hospitals are located, and a significant presence in Washington with more than 35 facilities throughout Western Washington and the Spokane area. Kaiser Foundation Hospitals employs more than 21,000 physicians, representing all medical fields.

25.     The Permanente Medical Group, Inc. is headquartered in Oakland, California and is comprised of physician-owned, for-profit, partnerships, and professional corporations.

26.     Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, and The Permanente Medical Group, Inc. operate under the name "Kaiser Permanente," which is not a legal entity but a registered trademark or trade name that Kaiser Foundation Health Plan, Inc. owns and Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, and The Permanente Medical Group, Inc. use, acting in concert.

CLASS ACTION COMPLAINT
Case No:

III.     **JURISDICTION AND VENUE**

27.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because this suit is brought under the laws of the United States, specifically the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq*. This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) because this a proposed class action in which there are at least 100 Class Members, the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000, and a member of the Class is a citizen of a different State than Defendant.

28.     This Court also has supplemental jurisdiction over the state common law and statutory claims pursuant to 28 U.S.C. § 1367, as these claims are so related to the federal statutory claims over which this Court has original jurisdiction, that they form part of the same case or controversy.

29.     This Court has general personal jurisdiction over Defendants because Defendants have sufficient minimum contacts with this District in that they operate and market their services throughout the region and in this District. Further, this Court has personal jurisdiction over Defendants because Defendants are headquartered in this District.

30.     Venue properly lies in this District pursuant to 28 U.S.C. § 1391(a), (b), and (c) because: a substantial part of the events or omissions giving rise to Plaintiffs and the Classes' claims occurred in this District, Defendants conduct a substantial amount of business in this District, and Defendants are headquartered in this District.

IV.     **FACTUAL ALLEGATIONS**

A.     **Kaiser Permanente Communicates with Kaiser Plan Members Through the Kaiser Permanente Website**

31.     Plaintiffs and members of the Classes are Kaiser Plan Members.

32.     Kaiser Permanente operates a website ("Site"), with a homepage located at https://healthy.kaiserpermanente.org/front-door ("Homepage"), through which Kaiser Plan Members can perform various tasks that traditionally were only available by physically visiting their health care providers' offices or speaking directly to their health care providers, such as scheduling appointments; checking medical results; reviewing medical histories; researching doctors, locations, and medical services; communicating with providers and paying medical bills.

33.     The Site's Homepage provides Kaiser Plan Members and the public with information about the health care services that Kaiser Permanente offers, including links to find doctors and locations, get information about health conditions, and learn more about prescribed medicines.



34.     For example, on the Homepage, Kaiser Plan Members can click "Browse Health Encyclopedia" and access a page that allows them to find health information about certain medical conditions, symptoms and medical procedures, including over 4,000 health topics, by typing their health-related information into a search form. Kaiser Plan Members can also check their symptoms with an interactive "symptom checker" and "determine when to seek care."

35.     As the Site states, these topics and medical information provide Kaiser Plan Members with the information needed to "learn the basics, get self-care, or get care from Kaiser."

CLASS ACTION COMPLAINT
Case No:

36.     On the Homepage, Kaiser Plan Members can also click "Find a doctors or location" and access a form (https://healthy.kaiserpermanente.org/southern-california/doctors-locations#/search-form) where they can input their personal and health information to search for health care providers, including by location, specialty, or provider type or with particular keywords related to medical conditions or symptoms the Kaiser Plan Member is experiencing.



37.     Kaiser Plan Members can also access their medical information, prescription information and test results, pay bills, schedule appointments, order prescriptions, communicate with providers, and perform other actions related to their healthcare after clicking the "Sign In" Link for their region ("Portal Login Page") and accessing a purportedly secure patient Portal (the "Portal"). For example, if the Kaiser Plan Member, like Plaintiff John Doe, is located in Southern California, they can select "California – Southern" from a "Region" pulldown menu, click the "Sign In" link and be taken to the Portal Login page for Southern California located at https://healthy.kaiserpermanente.org/southern-california/consumer-sign-on#/signon:

1
2
3
4
5
6
7
8
9
10
11
12
13



14

15       38.      Kaiser Plan Members in Northern California, or other Regions such as Colorado,

16   Georgia, Hawaii, Maryland/Virginia/Washington, D.C., Oregon/ S.W. Washington, and Washington

17   can similarly select their region from a pulldown menu and access their Portal Login Page:

18
19
20
21
22
23
24
25
26
27



28

CLASS ACTION COMPLAINT
Case No:

39.     After signing into the Portal Login Page and entering the Portal, Kaiser Plan Members can access an array of services and view and provide personal and highly sensitive medical information, including viewing medical history, prescriptions, test results, scheduling appointments, performing online medical evaluations, researching symptoms, and communicating with providers, among other things.

40.     For example, the Portal contains a "Message Center" that allows Kaiser Plan Members to communicate directly with their health care providers:



41.     After selecting a particular department, Kaiser Plan Members can identify specific recipients to whom they choose to communicate with and type out messages in a free form "Messages" box, with replies also sent and received within the Message Center.

CLASS ACTION COMPLAINT
Case No:

1

2

3

4

5

6

7

8

9



10       42.     The bottom of the Portal Login Page also provides: "By signing in, you agree to our

11   website Terms & Conditions and Privacy Statement."

12

13

14

15

16

17



18

19       43.     The Kaiser Permanente Terms & Conditions, available via hyperlink[4] and attached

20   hereto as Exhibit 1, provides: "Any personal information you submit to the Site (for yourself or

21   someone else) is governed by our Website and KP Mobile Application Privacy Statement."

22       44.     The Kaiser Permanente Privacy Statement, also available via hyperlink[5] attached

23   hereto as Exhibit 2, assures Kaiser Plan Members that Kaiser Permanente's data collection "is

24

25

26   _____

27   [4] *See, e.*g., *Terms & Conditions for our Website and Mobile Application*, Kaiser (Updated Jun. 2022), https://healthy.kaiserpermanente.org/southern-california/termsconditions.

28   [5] *See, e.g., Website and mobile application Privacy Statement*, Kaiser, https://healthy.kaiserpermanente.org/southern-california/privacy (last visited June 9, 2023).

collected on an aggregate basis, which means that no personally identifiable information is associated with the data," which is untrue.

45. The Kaiser Permanente Privacy Statement also states that Kaiser Permanente and its service providers may place "cookies" or similar technologies on the computer hard drives of visitors to the Site, but falsely states that information obtained from cookies is only used to help Kaiser Permanente "tailor our Site to be more helpful and efficient for our visitors" when in fact the cookies are also being used for marketing purposes, unbeknownst to Kaiser Plan Members and without their permission or agreement.

46. The Kaiser Permanente Privacy Statement also falsely states that "[t]he cookie consists of a unique identifier that does not contain information about your health history," when in fact the information provided to the Third Party Wiretappers contains information about Kaiser Plan Members' health history.

47. The Kaiser Permanente Privacy Statement also states that Kaiser "may also occasionally use 'Web beacons' (also known as 'clear gifs,' 'Web bugs,' '1-pixel gifs,' etc.)" but falsely claims that Kaiser Permanente does "not collect any personal health information."

48. The Kaiser Permanente Privacy Statement also does not disclose to Kaiser Plan Members that Kaiser Permanente has aided, agreed with, employed, and/or conspired with, third parties that are recording the information that Kaiser Plan Members are sending, accessing, reviewing, or receiving through the Site.

49. Kaiser Permanente's website also contains a HIPAA Notice of Privacy Practices,[6] which purports to describe how and when Kaiser Permanente discloses information covered by HIPAA; however, nowhere in the HIPAA Notice of Privacy Practices does Kaiser Permanente disclose that it is providing HIPAA-protected and other confidential information to the Third Party Wiretappers.

50. Kaiser Permanente expressly and impliedly promises Kaiser Plan Members that it will maintain the privacy and confidentiality of the information shared, and the communications engaged

---

[6] *See, e.g.*, *Notice of Privacy Practices*, Kaiser, https://healthy.kaiserpermanente.org/southern-california/privacy-practices (last visited June 9, 2023).

CLASS ACTION COMPLAINT
Case No:

in, on the Site and the Portal and that such information and communications will not be disclosed to or tracked by third parties.

51. Despite its express and implied assurances of privacy, Kaiser Permanente intentionally incorporated the Third Party Wiretappers' code and recording technology on the Kaiser Permanente website, and allowed the tracking and disclosure of Kaiser Plan Members' identifying information, personal and sensitive health information, and private, sensitive, and confidential communications with Kaiser Permanente and its providers to Third Party Wiretappers.

**B.    Multiple Third Party Wiretappers Intercept Kaiser Plan Members' Information Shared with, and Communications with, Kaiser Permanente and Its Providers**

**1.    Kaiser Permanente Allows Quantum Metric to Intercept Kaiser Plan Members' Information and Communications**

52. Unbeknownst to Kaiser Plan Members and against their reasonable expectations, Kaiser Permanente allows Quantum Metric to intercept Kaiser Plan Members' personal and sensitive identifying and medical information and confidential communications from the Site and Portal.

53. Kaiser Permanente has placed Quantum Metric's "Session Replay" code on its Homepage, Portal Login Page, and other pages on the Site—including within the Portal—which intercepts and records the contents of Kaiser Plan Members' information and confidential communications, and sends that information and those communications to Quantum Metric.

54. Quantum Metric collects and saves website communications, including those on the Site and Portal, through a service named "Session Replay." Session Replay captures internet communications between a website user and a website, including those on the Site and Portal, in real time while those communications are in transit.

55. As Quantum Metric explains: "At its core, **session replay** is technology that allows you to watch an end user's session as they experienced it, similar to how you watch a video. You can pause, rewind, and fast-forward the session (just like a YouTube video) to watch how a user interacts with a website or mobile app."[7]

---

[7] *What is Session Replay*, Quantum Metric, https://www.quantummetric.com/enterprise-guide-to-session-replay (last visited June 9, 2023).

CLASS ACTION COMPLAINT
Case No:

56.     Session replay technologies work by using "embedded snippets of code . . . [that] watch and record a visitor's every move on a website, in real time."[8] This was done on the Site and the Portal when used by Kaiser Plan Members.

57.     As illustrated in Quantum Metric's patent, after a user submits a communication to a web server, such as Kaiser Permanente's, Quantum Metric's embedded side capture agent code redirects the communications to Quantum Metric's server-side capture engine, analysis engine, and web session storage:



58.     From the moment a Kaiser Plan Member loads Kaiser Permanente's website, Quantum Metric is intercepting all of the content viewed and communicated, as well as the Kaiser Plan Member's interactions with the website, similar to an individual peering over the user's shoulder and listening in on the patient's conversations with their medical provider.

59.     As Kaiser Plan Members navigate the Kaiser Permanente Site, including accessing the Portal, the Site makes numerous "POST" calls to Quantum Metric, the size of which change based on site activity. A "POST" call is a HTTP method that sends user data to a server.

---

[8] Tomas Foltyn, *What's the Deal with Session-Replay Scripts?*, welivesecurity (Apr. 20, 2018, 1:40 pm), https://www.welivesecurity.com/2018/04/20/whats-deal-session-replay-scripts/.

CLASS ACTION COMPLAINT
Case No:

60.     Thus, by installing the Quantum Metric Replay code on its website, Kaiser Permanente allowed Quantum Metric to intercept and record Kaiser Plan Members' identifying information, personal and sensitive medical information, including HIPAA-protected health information, and confidential communications with Quantum Metric's Session Replay code, in real time.

61.     On information and belief, Kaiser Permanente has been continually allowing Third Party Wiretappers to intercept Kaiser Plan Member's personal information.

62.     By way of example, on May 31, 2023, after Plaintiff Jane Doe logged into the Portal—which displayed her Name, Medical Record Number (Kaiser ID #), Region, and Coverage Status—but performed no further activities, the amount of data intercepted and transferred to Quantum Metric (at kp-app.quantummetric.com) was about 260 bytes. Thereafter, when Plaintiff performed several activities within the Portal, the amount of the data transferred to Quantum Metric increased to over 102 kB, indicating that her activity inside the Portal was being intercepted by Quantum Metric and redirected to kp-app.quantummetric.com.

63.     After Plaintiff Jane Doe logged into the Portal and then accessed the Doctor Search Page and performed no further activities, the amount of data intercepted and transferred to Quantum Metric was 311 bytes. Thereafter, when Plaintiff Jane Doe entered personal medical search information into the Doctor Search page, the amount of data transferred to Quantum Metric increased to over 122 kB, indicating that Plaintiff Jane Doe's medical search information was being intercepted by Quantum Metric and redirected to kp-app.quantummetric.com. Kaiser Permanente allowed Quantum Metric to intercept similar information from Jane Doe in the months and years proceeding her logging in on May 31, 2023, and similarly allowed Quantum Metric to intercept log-in information for Plaintiff John Doe and other members of the Classes.

64.     On June 6, 2023, when Plaintiff John Doe logged into the Portal and accessed recent medical test results, the amount of data transferred to Quantum Metric was over 85 kB, indicating that information about Plaintiff John Doe's personal and sensitive identifying and medical

information, and private and confidential medical test results, was also being intercepted by Quantum Metric and redirected to kp-app.quantummetric.com.

65.     On information and belief, the same type of information tracked, disclosed, and sent to Quantum Metric for Plaintiffs has been tracked, disclosed, and sent to Quantum Metric for other members of the Classes.

66.     Additionally, when Kaiser Plan Members navigate other portions of the Site, Quantum Metric intercepts and receives that content as well. For example, if a patient searches for doctors who specialize in Addiction Medicine, Quantum Metric will receive the search results displaying this sensitive information, as well as data regarding all of the information the Kaiser Plan Members provided and received regarding that topic.

67.     In addition, when Plaintiff Jane Doe accessed her bill pay account, the amount of data transferred to Quantum Metric was over 84 kB, indicating that information about Plaintiff Jane Doe's personal and sensitive identifying health related financial information was also being intercepted by Quantum Metric and redirected to kp-app.quantummetric.com.

68.     When Plaintiff John Doe participated in a Social Health Review inside the Portal the amount of data transferred to Quantum Metric was over 25 kB, indicating that information about Plaintiff John Doe's personal and sensitive identifying and medical information, and private and confidential medical test results, was also being intercepted by Quantum Metric and redirected to kp-app.quantummetric.com.

69.     When Plaintiff John Doe accessed the Message Center inside the Portal, the amount of data transferred to Quantum Metric was over 330.7 kB, indicating that information about Plaintiff John Doe's personal and sensitive identifying and medical information, and private and confidential medical test results, was also being intercepted by Quantum Metric and redirected to kp-app.quantummetric.com.

70.     When Plaintiff John Doe accessed his Medical Summary inside the Portal, the amount of data transferred to Quantum Metric was over 25 kB, indicating that information about Plaintiff John Doe's personal and sensitive identifying and medical information, and private and confidential

medical test results, was also being intercepted by Quantum Metric and redirected to kp-app.quantummetric.com.

71.    When Plaintiff John Doe accessed his bill pay account, the amount of data transferred to Quantum Metric was over 84 kB, indicating that information about Plaintiff John Doe's personal and sensitive identifying health related financial information was also being intercepted by Quantum Metric and redirected to kp-app.quantummetric.com.

72.    When Plaintiff John Doe logged out of the Portal and conducted a search for a neurologist on the Site, the amount of data transferred to Quantum Metric was over 427.1 kB, indicating that information about Plaintiff John Doe's personal and sensitive identifying and medical information, and private and confidential medical test results, was also being intercepted by Quantum Metric and redirected to kp-app.quantummetric.com.

73.    The recordings of Plaintiffs and other Class Members' information and confidential communications on the Site are saved on Quantum Metric's systems and are available for viewing on Quantum Metric's website, an example of which is below:



74.    Kaiser Permanente voluntarily embedded Quantum Metric's software code on the Site, knowing that Quantum Metric's software would intercept, record, and redirect Kaiser Plan Members' Site and Portal activity, including personal health information and/or HIPAA-protected information and communications with Kaiser Permanente and its providers.

75.     Unlike certain other third parties, Quantum Metric does not only receive website analytics data that provides aggregate statistics; rather, the Quantum Metric recording technology utilized by Kaiser Permanente is intended to record and playback individual browsing sessions, as well as the private and confidential information and communications shared in those sessions. The monitoring that Quantum Metric's technology provides extends beyond the computer "cookies" with which ordinary consumers may be familiar.

76.     Moreover, the collection and storage of Kaiser Plan Members' communications with their health care providers may cause sensitive health information and other personal information displayed on a page to leak to additional third parties. This may expose Kaiser Plan Members who use the Site and/or Portal to identity theft, online scams, and other unwanted behavior.

77.     In a 2017 study by Princeton University's Center for Information Technology Policy concerning session recording technologies, the researchers noted "[c]ollection of page content by third-party replay scripts may cause sensitive information such as medical conditions, credit card details and other personal information displayed on a page to leak to the third-party as part of the recording. This may expose users [like Plaintiffs and members of the Classes] to identity theft, online scams, and other unwanted behavior."[9]

78.     The study goes on to state that "the extent of data collected by these services far exceeds user expectations; text typed into forms is collected before the user submits the form, and precise mouse movements are saved, all without any visual indication to the user. This data can't reasonably be expected to be kept anonymous."[10]

79.     As currently deployed, Quantum Metric's recording function, as employed by Kaiser Permanente, functions as a wiretap, and Quantum Metric acts as a third-party wiretapper.

---

[9] Steven Englehardt, *No boundaries: Exfiltration of personal data by session-replay scripts*, Freedom to Tinker (Nov. 15, 2017), https://freedom-to-tinker.com/2017/11/15/no-boundaries-exfiltration-of-personal-data-by-session-replay-scripts/.
[10] *Id.*

CLASS ACTION COMPLAINT
Case No:

1

2

      **2.**      **Kaiser Permanente Allows Adobe to Intercept Kaiser Plan Members' Information and Communications**

3

80.      Unbeknownst to Kaiser Plan Members and against their reasonable expectations,

4

Kaiser Permanente allows Adobe to intercept Kaiser Plan Members' information and

5

communications from the Site and Portal.

6

81.      Kaiser Permanente allows Adobe to intercept Kaiser Plan Members' personal and

7

sensitive identifying and medical information and private and confidential communications through

8

code connected with the Adobe Experience Cloud a/k/a Adobe Marketing Cloud service embedded

9

on the Site, including within the Portal.

10

82.      The Adobe Experience Cloud service is a suite of products offered by Adobe, which

11

allow businesses to personalize and improve their marketing on websites, apps, and social media

12

pages by collecting and analyzing information about website visitors.

13

83.      The Adobe Experience Cloud includes a number of services including: <u>Measurement</u>

14

<u>solutions</u>, which allows companies to measure and understand visitors who use their websites, apps,

15

and social media pages, as well as how they interact with online marketing campaigns;

16

<u>Personalization solutions</u>, which allows companies to test new content and make their websites, apps,

17

social media pages, and emails more relevant to particular visitors; <u>Content management solutions</u>,

18

which allows companies to store, update, and deliver images and other content on their websites,

19

within their apps, and in online marketing materials; and <u>Advertising solutions</u>, which allows

20

companies to improve their online advertising on websites, apps, search engines, and social media,

21

including helping companies send emails, text messages, and other online and offline marketing

22

campaigns.[11]

23

84.      The Adobe Experience Cloud collects an array of information about website visitors,

24

including:

25

- Where you go and what you do on that company's websites, apps, or social media pages

26

27

[11] *Adobe Experience Cloud privacy*, Adobe (Updated Dec. 5, 2022), https://www.adobe.com/privacy/experience-cloud.html.

28

- Your web browsing activity, including the URLs of the company's web pages you visit
- The URL of the page that displayed the link that you clicked on, which brought you to that company's website
- The web search you performed that led you to that company's website
- Information about your web browser and device, such as device type, browser type, advertising identifier, operating system, connection speed, and display settings
- Your IP address (or partial IP address, depending on how the company has configured the solution), which may be used to approximate your general location
- Location information from your mobile device or web browser
- Social media profile information
- Information you may provide on that company's website, app, or when interacting with that company's social media pages, such as information you provide on registration forms
- Ad campaign success rates, such as whether you clicked on a company's ad and whether viewing or clicking on the ad led to your purchase of that company's product or service
- Items you've purchased or placed in your shopping cart on that company's website or app[12]

85.    As part of the Adobe Advertising Cloud solution, Adobe makes available certain health-related segments supplied by third-party data providers to the companies using the Adobe Advertising Cloud, allowing companies to use these segments to target ads when they are using the Adobe Experience Cloud. These data segments generally fall into the following categories: (1) occupation in a health related field, (2) health related topics and conditions, (3) interest in health insurance, (4) diet, fitness, weight-loss, and healthy lifestyles, (5) consumer goods and services for personal healthcare, vision care, grooming, and beauty, (6) over the counter medicines, remedies, and dietary supplements, and (7) health related charities.

86.    The Adobe Experience Cloud collects this information through an array of tracking technologies, including cookies and/or web beacons (also known as tags or pixels), such as the third

---

[12] *Id.*

CLASS ACTION COMPLAINT
Case No:

party cookies omtrdc.net, demdex.net, and the Adobe Experience Platform Launch, which delivers a library containing specified tags for other Adobe Experience Cloud solutions.[13]

87.    As Kaiser Plan Members navigate the Kaiser Permanente Site, the Site makes numerous "POST" calls which send information about Kaiser Plan Members' confidential communications with Kaiser Permanente that are intercepted by Adobe.

88.    Adobe has established subdomains on its own server, such as the subdomain kaiser.tt.omtrdc.net on Adobe's omtrdc.net server, where Adobe receives and stores the communications intercepted from Kaiser Permanente.[14]

89.    For example, on June 6, 2023, after Plaintiff John Doe logged into the Portal, the following data was intercepted by Adobe and sent to Adobe's server at the kaiser.tt.omtrdc.net subdomain, which as detailed below shows that Adobe received a host of personally identifiable health information, including: user data (color coded in blue), the URL of the Website the user is currently browsing (color coded in green), unique IDs (color coded in yellow), customer IDs and status values (color coded in grey),[15] and segmentation values that enable the Website to show personalized content (no color).

{"requestId":"d65c5d634b7d484a9176516962af4071","context":{"userAgent":"Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/113.0.0.0 Safari/537.36","clientHints":{"mobile":false,"platform":"macOS","browserUAWithMajorVersion":"\"Google Chrome\";v=\"113\", \"Chromium\";v=\"113\", \"Not-A.Brand\";v=\"24\""},"timeOffsetInMinutes":-420,"channel":"web","screen":{"width":1512,"height":982,"orientation":"landscape","colorDepth":30,"pixelRatio":2},"window":{"width":1512,"height":871},"browser":{"host":"healthy.kaiserpermanente.org","webGLRenderer":"ANGLE (Apple, Apple M1 Pro, OpenGL 4.1)"},"address":{"url":"https://healthy.kaiserpermanente.org/southern-california/secure/inner-door","referringUrl":"https://healthy.kaiserpermanente.org/southern-california/consumer-interrupt.html"}},"id":{"tntId":"Redacted","thirdPartyId":"Redacted","marketingCloudVisitorId":"Redacted","customerIds":[{"id":"Redacted","integrationCode":"kpaamid

---

[13] This includes cookies identified as "everest_g_v2" and "demdex.net", which aid in tracking users. According to Adobe's marketing materials, the everest_g_v2 cookie is "created after a user initially clicks a client's ad, and used to map the current and subsequent clicks with other events on the client's website."

[14] *Adobe Experience Cloud privacy*, supra note 11.

[15] Specific identifier number has been redacted.

CLASS ACTION COMPLAINT
Case No:

epp","authenticatedState":"authenticated","type":"DS",},{"id":"Redacted integrationCode":"kpaamidudr","authenticatedState":"authenticated","type":"DS"},{"id":"Redacted integrationCode":"kpaamid_One-off-datasets","authenticatedState":"authenticated","type":"DS"},{"id":"Redacted integrationCode":"pzn_crm","authenticatedState":"authenticated","type":"DS"},{"id":"Redacted integrationCode":"mbox3rdPartyId","authenticatedState":"authenticated","type":"DS"}]},"experienceCloud":{"audienceManager":{"locationHint":9,"blob":"6G1ynYcLPuiQxYZrsz_pkqfLG9yMXBpb2zX5dvJdYQJzPXImdj0y"},"analytics":{"logging":"server_side","supplementalDataId":"01AFA18961CACA34-2D8CDB5E307D31FB"}},"execute":{"pageLoad":{"parameters":{"Seg18v":"sca","Seg17v":"sca","Seg55v":"Logged In","Seg181v":"","Seg81v":"kporg:secure:inner-door","Seg114vcookie":"mbr","reEnable":"","throttle-area":"","Seg180v":false,"Seg4":true,"Seg517e":false,"Seg5":false,"Seg6":false,"Seg7":false,"Seg8":false,"Seg440e":false,"Seg9":false,"Seg11":false,"Seg20v":"7692006,"Seg114v":"SUBSCRIBER","Seg13":false,"Seg14":false,"Seg16":false,"Seg19":false,"Seg101v":27,"Seg516e":false,"Seg126v":false,"modval":6,"Seg21":100453,"Seg22":"","Seg24":"urn:kp:prodiem","Seg25":false,"entitlement-446":true,"pLoaded":1,"id":""},"profileParameters":{"region":"","Seg2":"12","Seg56v":"MBR","Seg10":"NOT ENROLLED","Seg20v":7692006,"Seg12":"ACTIVE","Seg101v":27,"Seg15":"true","Seg106v":"KFHP_HMO","Seg6":"false","pzn_id":"Redacted Seg103v":false}}},"prefetch":{"views":[{"parameters":{"Seg18v":"sca","Seg17v":"sca","Seg55v":"Logged In","Seg181v":"","Seg81v":"kporg:secure:inner-door","Seg114vcookie":"mbr","reEnable":"","throttle-area":"","Seg180v":false,"Seg4":true,"Seg517e":false,"Seg5":false,"Seg6":false,"Seg7":false,"Seg8":false,"Seg440e":false,"Seg9":false,"Seg11":false,"Seg20v":"7692006,"Seg114v":"SUBSCRIBER","Seg13":false,"Seg14":false,"Seg16":false,"Seg19":false,"Seg101v":27,"Seg516e":false,"Seg126v":false,"modval":6,"Seg21":100453,"Seg22":"","Seg24":"urn:kp:prodiem","Seg25":false,"entitlement-446":true,"pLoaded":1,"id":""},"profileParameters":{"region":"","Seg2":"12","Seg56v":"MBR","Seg10":"NOT ENROLLED","Seg20v":7692006,"Seg12":"ACTIVE","Seg101v":27,"Seg15":"true","Seg106v":"KFHP_HMO","Seg6":"false","pzn_id":"Redacted Seg103v":false}}]},"telemetry":{"entries":[{"requestId":3198432,"timestamp":1686076871023,"execution":3.6},{"execution":106.5,"parsing":0.2,"request":{"tls":4.2,"timeToFirstByte":88.8,"download":0.7,"responseSize":1534},"telemetryServerToken":"GRgdNPKF2baxcRHAQqAHqyTPswyQefSCMFGH9GY2aUI=","mode":"edge","features":{"executePageLoad":true,"prefetchViewCount":1,"decisioningMethod":"server-side"},"requestId":"2499aa7a302a46319e851646fe207f5f","timestamp":1686076871017}]}}

90.     Similarly, when Plaintiff Jane Doe logged into the Portal on May 31, 2023, the following data was intercepted by Adobe and sent to Adobe's server at the kaiser.tt.omtrdc.net subdomain:

{"requestId":"f33def0d509a49e1beb96b320fcae2fd","context":{"userAgent":"Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/113.0.0.0 Safari/537.36","clientHints":{"mobile":false,"platform":"Windows","browserUAWithMajorVersion":"\"Google Chrome\";v=\"113\", \"Chromium\";v=\"113\",

\"Not-A.Brand\";v=\"24\""},"timeOffsetInMinutes":-420,"channel":"web","screen":{"width":1366,"height":768,"orientation":"landscape","colorDepth":24,"pixelRatio":1},"window":{"width":1349,"height":357},"browser":{"host":"healthy.kaiserpermanente.org","webGLRenderer":"ANGLE (Intel, Intel(R)   HD   Graphics   Direct3D11   vs 5 0   ps 5 0, D3D11)"},"address":{"url":"https://healthy.kaiserpermanente.org/consumer-sign-on#/signon","referringUrl":"https://healthy.kaiserpermanente.org/washington/front-door"},"beacon":true},"id":{"tntId":"Redacted","marketingCloudVisitorId":"Redacted"},"experienceCloud":{"audienceManager":{"locationHint":9,"blob":"6G1ynYcLPuiQxYZrsz_pkqfLG9yMXBpb2zX5dvJdYQJzPXImdj0y"},"analytics":{"logging":"server_side","supplementalDataId":"75CDF51005725EB2-38AA41AF056F9156"}},"telemetry":{"entries":[{"requestId":3198432,"timestamp":1685576844326,"execution":312.9},{"execution":540.4,"parsing":1.1,"request":{"tls":30.3,"timeToFirstByte":171,"download":3.5,"responseSize":1323},"telemetryServerToken":"GRgdNPKF2baxcRHAQqAHq1m+lb9PISy9OC4JmXflkxk=","mode":"edge","features":{"executePageLoad":true,"prefetchViewCount":1,"decisioningMethod":"server-side"},"requestId":"57f7290ecb644e209d081d8859b9dcb3","timestamp":1685576843853}]},"notifications":[{"id":"5aed303df02141b3a56280a73c83f7b3","type":"display","timestamp":1685576849764,"parameters":{"Seg18v":"","Seg17v":"","Seg55v":"Logged           Out","Seg181v":"","Seg81v":"kporg:consumer-sign-on","Seg114vcookie":"","reEnable":"","throttle-area":""},"profileParameters":{"region":"","Seg2":"23"},"view":{"name":"signon"}}],"impressionId":"c1f577b2a5494fd3a0c74f9e6e4ef092"}

91.    The first block color coded in blue is sent as part of the HTTP request header and is used to create a digital fingerprint for the specific user by collecting information about the specific user's browser and device information, including details about the user's browser type, computing device, operating system, screen height and width, and details about the user's graphics card. Together these details create a device fingerprint[16] which allows Adobe to compile and track long-term records of the individual's browsing history (and thus deliver targeted advertising or targeted exploits) even when visitors are attempting to avoid tracking—raising a major concern for internet privacy advocates.

92.    The second block (green) indicates the URL for the Webpage currently visited by the user. Here, Adobe is receiving information that Plaintiffs logged-into the Portal, signifying that Plaintiffs are Kaiser Plan Members and Kaiser Permanente Patients—information which Kaiser Permanente is prohibited from disclosing under HIPAA and other state and federal laws.

---

[16] *Fingerprinting*, web.dev, https://web.dev/learn/privacy/fingerprinting/ (last visited June 9, 2023).

CLASS ACTION COMPLAINT
Case No:

93.     The   third   block   (yellow)   includes   two   identifiers   set   by   Adobe:   (1) marketingCloudVisitorID and (2) tntID. These identifiers work in tandem with the demdex.net server and the AMCV cookie to help specifically identify users.

94.     When a user first visits a site with the Adobe Experience Cloud installed, like when Kaiser Plan Members visit the Site and/or Portal, Adobe checks to see if the AMCV cookie is set. This cookie stores the marketingCloudVisitorID (also known as Experience Cloud ID). According to Adobe, the marketingCloudVisitorID "is a universal and persistent ID that identifies your visitors across   all   solutions   in   the   Experience   Cloud."[17]   In   the   POST   calls   referenced   above   the marketingCloudVisitorID   for   Plaintiffs   are   assigned   specific   numeric   values (█████████████████████                                     for     Plaintiff     Jane     Doe     and ██████████████████  for Plaintiff John Doe). This in turn allows for tracking of Kaiser Plan Members across Kaiser Permanente sites and across devices.

95.     If the AMCV cookie is not set, the Adobe code places a call to the demdex.net server, which generates a marketingCloudVisitorID and sets the AMCV cookie with that value. It also sets a demdex ID cookie which is persistent.[18] Since the marketingCloudVisitorID is stored in the AMCV cookie, it will remain the same for anyone using the browser for that specific site. When a user visits another   site   with   Adobe   Experience   Cloud   installed,   a   new   marketingCloudVisitorID   will   be generated, but the demdex ID will remain the same. According to Adobe, "the demdex ID remains the same . . . because it's contained in a third-party cookie and persists across different domains."[19] This in turn allows Adobe to track specific devices across sites.

96.     According to Adobe the tntID, "can be seen as a device ID."[20] As detailed above, device IDs use the unique setup of a user's computer and browser to establish a device fingerprint. This fingerprint can track users across various Websites to build a profile based on their Web browsing habits. In the POST calls referenced above the tntID is assigned a specific numeric value

---

[17] *Adobe Target Delivery API (1.0.0) Terms of Service*, Adobe, https://developers.adobetarget. com/api/delivery-api/#section/Identifying-Visitors (last visited June 9, 2023).
[18] *How the Experience Cloud Identity Service requests and sets IDs*, Adobe (Updated Nov. 10, 2022), https://experienceleague.adobe.com/docs/id-service/using/intro/id-request.html?lang=en.
[19] *Id.*
[20] *Adobe Target Delivery API (1.0.0) Terms of Service*, supra note 17.

CLASS ACTION COMPLAINT
Case No:

██████████████████████ for  Plaintiff  Jane  Doe  and ██████████████████████ for Plaintiff John Doe). The tntID is stored in the persistent mbox cookie. Adobe uses the tntID as the main identifier for its Adobe Target solution.[21] The Adobe Target system is used to personalize a user's experience on a website, like Kaiser Plan Members on the Site and Portal. By default, Adobe Target captures the following data, which in turn allows the website to serve personalized and targeted information to specific users:

| Data category | Description |
| --- | --- |
| Environment parameters | Information about a user's environment, including operating system, browser, and time of day/day of week. |
| Geography | Information about a user's geography, obtained via IP lookup. |
| Mobile device | Information about a user's mobile device. |
| Target reporting segments | Reporting segments configured in Target reporting. |
| Session behavior | Information about user behavior, such as number of pages viewed.[22] |

97.     According to Adobe, the thirdPartyID "is a persistent ID that your business utilizes to identify an end-user regardless of whether they are interacting with your business from web, mobile, or IoT channels. In other words, the thirdPartyId will reference user profile data that can be utilized across channels."[23] In John Doe's POST call referenced above, the thirdPartyId is assigned a specific numeric value (██████████ This ID can be used to identify return users once they have logged into the Portal. This in turn allows Adobe's customers to associate the thirdPartyID with a specific individual, the third party here being Kaiser Permanente's patients.

---

[21] *Id.*

[22] Adapted from: *Data used by Target machine-learning algorithms*, Adobe (Updated Apr. 23, 2023), https://experienceleague.adobe.com/docs/target/using/activities/automated-personalization/ap-data.html.

[23] *Adobe Target Delivery API (1.0.0) Terms of Service*, *supra* note 17.

CLASS ACTION COMPLAINT
Case No:

98.     The fourth block (grey) includes customerIds that can be, "added and associated with an Experience Cloud Visitor ID."[24] In the case of the POST call above, the additional data includes the fact the user is authenticated (logged in), again signifying that Plaintiff is a Kaiser Plan Member and Kaiser Permanente patient—information which Kaiser Permanente is prohibited from disclosing under HIPAA and other state and federal laws and its express and implied contracts with Kaiser Plan Members.

99.     Similar POST calls to kaiser.tt.omtrdc.net were found on all examined pages, including main page (Southern California and Washington), doctor search, retrieving test results, and the bill pay page.

100.    After Plaintiff Jane Doe logged into the Portal and accessed test results on May 31, 2023, Adobe intercepted and received information about the fact Plaintiff Jane Doe had lab test results available (see green highlight), which was transmitted to Adobe and stored on Adobe's kaiser.tt.omtrdc.net server:

{"requestId":"e89a72b9d34c409ebbeec86e8d421e30","context":{"userAgent":"Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/113.0.0.0 Safari/537.36","clientHints":{"mobile":false,"platform":"Windows","browserUAWithMajorVersion":"\"Google Chrome\";v=\"113\", \"Chromium\";v=\"113\", \"Not-A.Brand\";v=\"24\""},"timeOffsetInMinutes":-420,"channel":"web","screen":{"width":1366,"height":768,"orientation":"landscape","colorDepth":24,"pixelRatio":1},"window":{"width":1349,"height":357},"browser":{"host":"wa-member2.kaiserpermanente.org","webGLRenderer":"ANGLE (Intel, Intel(R) HD Graphics Direct3D11 vs_5_0 ps_5_0, D3D11)"},"address":{"url":"https://wa-member2.kaiserpermanente.org/MyChart/inside.asp?mode=labdetail&eorderid=WP-24dwjwXsqOLR9HkFJIJ-2BBnKA9ug2421MnQJWoSc-2Bc79kw-3D-24kgLeo5NOVUqzvhbO5PbT2bSZ1zLoJ7dRShqNeRddSXk-3D","referringUrl":"https://wa-member2.kaiserpermanente.org/mychart/Clinical/TestResults"}},"id":{"tntId":"Redacted","thirdPartyId":"132259249","marketingCloudVisitorId":"Redacted","customerIds":[{"id":"132259249","integrationCode":"kpaamidepp","authenticatedState":"authenticated","type":"DS"},{"id":"132259249","integrationCode":"kpaamidudr","authenticatedState":"authenticated","type":"DS"},{"id":"132259249","integrationCode":"kpaamid_One-off-datasets","authenticatedState":"authenticated","type":"DS"},{"id":"132259249","integrationCode":"pzn_crm","authenticatedState":"authenticated","type":"DS"},{"id":"132259249","integrationCode":"mbox3rdPartyId","authenticatedState":"authenticated","type":"DS"}]},"experienceCloud":{"audienceManager":{"locationHint":9,"blob":"6G1ynYcLPuiQxYZrsz_pkqfLG9yMXBpb2zX5dvJdYQJzPXImdj0y"},"analytics":{"logging":"server_side","supplementalDataId":"1926210C0731CEF9-0CC37604F49C1490"}},"execute":{"pageLoad":{"parameters":{"Seg18v":"wa","Seg17v":"

[24] *Id.*

wa","Seg55v":"Logged In","Seg181v":"","Seg81v":"","Seg114vcookie":"mbr","reEnable":"","throttle-area":""},"profileParameters":{"region":"","Seg2":"20"}}},"prefetch":{"views":[{"parameters":{"Seg18v":"wa","Seg17v":"wa","Seg55v":"Logged In","Seg181v":"","Seg81v":"","Seg114vcookie":"mbr","reEnable":"","throttle-area":""},"profileParameters":{"region":"","Seg2":"20"}}]},"telemetry":{"entries":[{"requestId":3198432,"timestamp":1685577421980,"execution":194.1},{"execution":226.7,"parsing":0.3,"request":{"tls":27.7,"timeToFirstByte":55.3,"download":6.1,"responseSize":1005},"telemetryServerToken":"GRgdNPKF2baxcRHAQqAHq1m+lb9PISy9OC4JmXflkxk=","mode":"edge","features":{"executePageLoad":true,"prefetchViewCount":1,"decisioningMethod":"server-side"},"requestId":"43b0d783fec64ed0a8f15aa346982faa","timestamp":1685577421736}]}
}

101.    After Plaintiff John Doe accessed his medical history from within the Portal, Adobe intercepted and received information about the fact Plaintiff John Doe suffers from headaches (see green highlight), which was transmitted to Adobe and stored on Adobe's kaiser.tt.omtrdc.net server:

{"requestId":"8e07062bb9e84eadb2bb393dac657698","context":{"userAgent":"Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/113.0.0.0 Safari/537.36","clientHints":{"mobile":false,"platform":"macOS","browserUAWithMajorVersion":"\"Google Chrome\";v=\"113\", \"Chromium\";v=\"113\", \"Not-A.Brand\";v=\"24\""},"timeOffsetInMinutes":-420,"channel":"web","screen":{"width":1512,"height":982,"orientation":"landscape","colorDepth":30,"pixelRatio":2},"window":{"width":1512,"height":559},"browser":{"host":"healthy.kaiserpermanente.org","webGLRenderer":"ANGLE (Apple, Apple M1 Pro, OpenGL 4.1)"},"address":{"url":"https://healthy.kaiserpermanente.org/southern-california/secure/search-medical-record?uri=search%3ahealth-encyclopedia&type=ICD&queryICD10=R51.9&label=HEADACHE&groupName=Health+summary","referringUrl":"https://healthy.kaiserpermanente.org/hconline/ie/inside.asp?lang=english&mode=snapshot"}},"id":{"tntId":"Redacted thirdPartyId":"Redacted marketingCloudVisitorId":"Redacted customerIds":[{"id":"Redacted integrationCode":"kpaamidepp","authenticatedState":"authenticated","type":"DS"},{"id":"Redacted integrationCode":"kpaamidudr","authenticatedState":"authenticated","type":"DS"},{"id":"Redacted integrationCode":"kpaamid_One-off-datasets","authenticatedState":"authenticated","type":"DS"},{"id":"Redacted integrationCode":"pzn_crm","authenticatedState":"authenticated","type":"DS"},{"id":"Redacted integrationCode":"mbox3rdPartyId","authenticatedState":"authenticated","type":"DS"}]},"experienceCloud":{"audienceManager":{"locationHint":9,"blob":"6G1ynYcLPuiQxYZrsz_pkqfLG9yMXBpb2zX5dvJdYQJzPXImdj0y"},"analytics":{"logging":"server_side","supplementalDataId":"0E8C61D7B797A752-08C07E6DBCFCCB5A"}},"execute":{"pageLoad":{"parameters":{"Seg18v":"sca","Seg17v":"sca","Seg55v":"Logged In","Seg181v":"","Seg81v":"kporg:secure:search-medical-record","Seg114vcookie":"mbr","reEnable":"","throttle-area":"","Seg180v":false,"Seg4":true,"Seg517e":false,"Seg5":false,"Seg6":false,"Seg7":false,"Seg8":false,"Seg440e":false,"Seg9":false,"Seg11":false,"Seg20v":7692006,"Seg114v":"SUBSCRIBER","Seg13":false,"Seg14":false,"Seg16":false,"Seg19":false,"Seg101v":27,"Seg516e":false,"Seg126v":false,"modval":6,"Seg21":100453,"Seg22":"","Seg24":"urn:kp:prodiem","Seg25":false,"entitlement-446":true,"pLoaded":1,"id":""},"profileParameters":{"region":"","Seg2":"12","Seg56v":"MBR","Seg10":"NOT

CLASS ACTION COMPLAINT
Case No:

1  ENROLLED","Seg20v":7692006,"Seg12":"ACTIVE","Seg101v":27,"Seg15":"true","Seg10
6v":"KFHP_HMO","Seg6":"false","pzn_id":Redacted  Seg103v":false}}},"prefetch":{"v
2  iews":[{"parameters":{"Seg18v":"sca","Seg17v":"sca","Seg55v":"Logged
In","Seg181v":"","Seg81v":"kporg:secure:search-medical-
3  record","Seg114vcookie":"mbr","reEnable":"","throttle-
area":"","Seg180v":false,"Seg4":true,"Seg517e":false,"Seg5":false,"Seg6":false,"Seg7":fals
4  e,"Seg8":false,"Seg440e":false,"Seg9":false,"Seg11":false,"Seg20v":7692006,"Seg114v":"S
UBSCRIBER","Seg13":false,"Seg14":false,"Seg16":false,"Seg19":false,"Seg101v":27,"Seg
5  516e":false,"Seg126v":false,"modval":6,"Seg21":100453,"Seg22":"","Seg24":"urn:kp:prodi
em","Seg25":false,"entitlement-
6  446":true,"pLoaded":1,"id":""},"profileParameters":{"region":"","Seg2":"12","Seg56v":"M
BR","Seg10":"NOT
7  ENROLLED","Seg20v":7692006,"Seg12":"ACTIVE","Seg101v":27,"Seg15":"true","Seg10
6v":"KFHP_HMO","Seg6":"false","pzn_id":Redacted  Seg103v":false}}]},"telemetry":{
8  "entries":[{"requestId":3198432,"timestamp":1686077690690,"execution":12.7},{"executio
n":120.9,"parsing":0.1,"request":{"tls":1.8,"timeToFirstByte":93.3,"download":0.8,"respons
9  eSize":1658},"telemetryServerToken":"GRgdNPKF2baxcRHAQqAHqyTPswyQefSCMFG
H9GY2aUI=","mode":"edge","features":{"executePageLoad":true,"prefetchViewCount":1,"
10  decisioningMethod":"server-
side"},"requestId":"30377aef3045436aa832ba402fe7c5ca","timestamp":1686077690672}]]
11  }

12      102.    Similarly, after Plaintiff John Doe accessed his medical history from within the Portal,

13  Adobe intercepted and received information about the fact Plaintiff John Doe suffers from kidney

14  stones (see green highlight), which was transmitted to Adobe and stored on Adobe's

15  kaiser.tt.omtrdc.net server:

16  {"requestId":"c7c2f6533c974a37bf18df244b7860ac","context":{"userAgent":"Mozilla/5.0
(Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko)
17  Chrome/113.0.0.0
Safari/537.36","clientHints":{"mobile":false,"platform":"macOS","browserUAWithMajorV
18  ersion":"\"Google Chrome\";v=\"113\", \"Chromium\";v=\"113\", \"Not-
A.Brand\";v=\"24\""},"timeOffsetInMinutes":-
19  420,"channel":"web","screen":{"width":1512,"height":982,"orientation":"landscape","color
Depth":30,"pixelRatio":2},"window":{"width":1512,"height":732},"browser":{"host":"healt
20  hy.kaiserpermanente.org","webGLRenderer":"ANGLE (Apple, Apple M1 Pro, OpenGL
4.1)"},"address":{"url":"https://healthy.kaiserpermanente.org/southern-
21  california/pages/search?query=kidney+stones&category=global&global-
region=sca&language=english&region=sca","referringUrl":"https://healthy.kaiserpermanent
22  e.org/southern-california/front-
door"}},"id":{"tntId":"Redacted  marketingCloudVisito
23  rId":"Redacted  experienceCloud":{"audienceMana
ger":{"locationHint":9,"blob":"RKhpRz8krg2tLO6pguXWp5olkAcUniQYPHaMWWgdJ3x
24  zPWQmdj0y"},"analytics":{"logging":"server_side","supplementalDataId":"1385A481D13
4AE9C-
25  5442EE55E30D9036"}},"execute":{"pageLoad":{"parameters":{"Seg18v":"sca","Seg17v":
"","Seg55v":"Logged
26  Out","Seg181v":"","Seg81v":"kporg:pages:search","Seg114vcookie":"","reEnable":"","throt
tle-
27  area":""},"profileParameters":{"region":"","Seg2":"12"}}},"prefetch":{"views":[{"paramete
rs":{"Seg18v":"sca","Seg17v":"","Seg55v":"Logged
28  Out","Seg181v":"","Seg81v":"kporg:pages:search","Seg114vcookie":"","reEnable":"","throt

tle-
area":""},"profileParameters":{"region":"","Seg2":"12"}}]},"telemetry":{"entries":[{"reque
stId":3198432,"timestamp":1686079858947,"execution":31},{"execution":347.9,"parsing":
0.1,"request":{"tls":1.4,"timeToFirstByte":301.7,"download":0.3,"responseSize":3542},"tel
emetryServerToken":"13OD8mmKQLOFlv9DVqEli/66cI/n43cYFW7Bbdgc7oQ=","mode"
:"edge","features":{"executePageLoad":true,"prefetchViewCount":1,"decisioningMethod":"
server-
side"},"requestId":"d1ee96fe7bc44f32a598fa3fa6301fec","timestamp":1686079858912}]}}

103.    In another example, when Plaintiff John Doe accessed his medications from within

the Portal, Adobe intercepted and received information about the fact Plaintiff John Doe takes a

certain medication (see green highlight), which was transmitted to Adobe and stored on Adobe's

kaiser.tt.omtrdc.net server:

{"requestId":"4b353a7157fe4afb994b10217d877637","context":{"userAgent":"Mozilla/5.0
(Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko)
Chrome/113.0.0.0
Safari/537.36","clientHints":{"mobile":false,"platform":"macOS","browserUAWithMajorV
ersion":"\"Google Chrome\";v=\"113\", \"Chromium\";v=\"113\", \"Not-
A.Brand\";v=\"24\""},"timeOffsetInMinutes":-
420,"channel":"web","screen":{"width":1512,"height":982,"orientation":"landscape","color
Depth":30,"pixelRatio":2},"window":{"width":1512,"height":559},"browser":{"host":"healt
hy.kaiserpermanente.org","webGLRenderer":"ANGLE (Apple, Apple M1 Pro, OpenGL
4.1)"},"address":{"url":"https://healthy.kaiserpermanente.org/southern-california/health-
wellness/drug-
encyclopedia/drug.259872","referringUrl":"https://healthy.kaiserpermanente.org/hconline/ie
/inside.asp?lang=english&mode=snapshot"}},"id":{"tntId":"Redacted                    ",
"thirdPartyId":"Redacted          ,"marketingCloudVisitorId":"Redacted
          ,"customerIds":[{"id":"Redacted          ,"integrationCode":"kpaamide
pp","authenticatedState":"authenticated","type":"DS"},{"id":"Redacted     ,"integrationCode":
"kpaamidudr","authenticatedState":"authenticated","type":"DS"},{"id":"Redacted     ,"integra
tionCode":"kpaamid_One-off-
datasets","authenticatedState":"authenticated","type":"DS"},{"id":"Redacted     ,"integrationC
ode":"pzn_crm","authenticatedState":"authenticated","type":"DS"},{"id":"Redacted     ,"integ
rationCode":"mbox3rdPartyId","authenticatedState":"authenticated","type":"DS"}]},"experi
enceCloud":{"audienceManager":{"locationHint":9,"blob":"6G1ynYcLPuiQxYZrsz_pkqfL
G9yMXBpb2zX5dvJdYQJzPXImdj0y"},"analytics":{"logging":"server_side","supplementa
lDataId":"1EE577E8629305D2-
08A3CF719904939A"}},"execute":{"pageLoad":{"parameters":{"Seg18v":"sca","Seg17v":
"sca","Seg55v":"Logged In","Seg181v":"","Seg81v":"kporg:health-wellness:drug-
encyclopedia:drug.259872","Seg114vcookie":"mbr","reEnable":"","throttle-
area":"","Seg180v":false,"Seg4":true,"Seg517e":false,"Seg5":false,"Seg6":false,"Seg7":fals
e,"Seg8":false,"Seg440e":false,"Seg9":false,"Seg11":false,"Seg20v":7692006,"Seg114v":"S
UBSCRIBER","Seg13":false,"Seg14":false,"Seg16":false,"Seg19":false,"Seg101v":27,"Seg
516e":false,"Seg126v":false,"modval":6,"Seg21":100453,"Seg22":"","Seg24":false,"Seg25"
:false,"entitlement-
446":"","entity.id":"%monograph_id%","pLoaded":1,"id":""},"profileParameters":{"region"
:"","Seg2":"12","Seg56v":"MBR"},"Seg10":"NOT
ENROLLED","Seg20v":7692006,"Seg12":"ACTIVE","Seg101v":27,"Seg15":"true","Seg10
6v":"KFHP_HMO","Seg6":"false","pzn_id":"Redacted     ,"Seg103v":false}}},"prefetch":{"v
iews":[{"parameters":{"Seg18v":"sca","Seg17v":"sca","Seg55v":"Logged
In","Seg181v":"","Seg81v":"kporg:health-wellness:drug-

encyclopedia:drug.259872","Seg114vcookie":"mbr","reEnable":"","throttle-
area":"","Seg180v":false,"Seg4":true,"Seg517e":false,"Seg5":false,"Seg6":false,"Seg7":fals
e,"Seg8":false,"Seg440e":false,"Seg9":false,"Seg11":false,"Seg20v":7692006,"Seg114v":"S
UBSCRIBER","Seg13":false,"Seg14":false,"Seg16":false,"Seg19":false,"Seg101v":27,"Seg
516e":false,"Seg126v":false,"modval":6,"Seg21":100453,"Seg22":"","Seg24":false,"Seg25"
:false,"entitlement-
446":"","entity.id":"%monograph_id%","pLoaded":1,"id":""},"profileParameters":{"region"
:"","Seg2":"12","Seg56v":"MBR","Seg10":"NOT
ENROLLED","Seg20v":7692006,"Seg12":"ACTIVE","Seg101v":27,"Seg15":"true","Seg10
6v":"KFHP_HMO","Seg6":"false","pzn_id":"Redacted         Seg103v":false}}]},"telemetry":{
"entries":[{"requestId":3198432,"timestamp":1686077727535,"execution":13.1},{"executio
n":536,"parsing":0.1,"request":{"tls":29.6,"timeToFirstByte":453.5,"download":9,"response
Size":1652},"telemetryServerToken":"ytSZo63c32LTWU3OagsNm4f2oPeqNn97fefLHdLz
nd4=","mode":"edge"},"features":{"executePageLoad":true,"prefetchViewCount":1,"decisio
ningMethod":"server-
side"},"requestId":"de495a765e94495db656689de5179016","timestamp":1686077727519}]
}}

104.    When Plaintiff Jane Doe logged out of the Portal and conducted a search for a doctor

using the keyword "mental health" on the Site, the POST to kaiser.tt.omtrdc.net revealed the search

term as shown below (green highlight):

{"requestId":"f42ffe0b90c141e6836a7006c18a6965","context":{"userAgent":"Mozilla/5.0
(Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko)
Chrome/113.0.0.0
Safari/537.36","clientHints":{"mobile":false,"platform":"Windows","browserUAWithMajor
Version":"\"Google Chrome\";v=\"113\", \"Chromium\";v=\"113\", \"Not-
A.Brand\";v=\"24\""},"timeOffsetInMinutes":-
420,"channel":"web","screen":{"width":1366,"height":768,"orientation":"landscape","color
Depth":24,"pixelRatio":1},"window":{"width":1349,"height":584},"browser":{"host":"healt
hy.kaiserpermanente.org","webGLRenderer":"ANGLE (Intel, Intel(R) HD Graphics
Direct3D11 vs_5_0 ps_5_0,
D3D11)"},"address":{"url":"https://healthy.kaiserpermanente.org/washington/doctors-
locations#/facility-
results?zipcode=98203&keyword=mental%20health","referringUrl":"https://healthy.kaiserp
ermanente.org/doctors-
locations"},"beacon":true},"id":{"tntId":"Redacted              ma
rketingCloudVisitorId":"Redacted                              "},"experienceClou
d":{"audienceManager":{"locationHint":9,"blob":"RKhpRz8krg2tLO6pguXWp5olkAcUni
QYPHaMWWgdJ3xzPWQmdj0y"},"analytics":{"logging":"server_side","supplementalDat
aId":"16848F6EF92A646D-
091DAB5A2A2A31A4"}},"notifications":[{"id":"12516194156946319b158793ad9744d1",
"type":"display","timestamp":1685579001396,"parameters":{"Seg18v":"wa","Seg17v":"","
Seg55v":"Logged Out","Seg181v":"","Seg81v":"kporg:doctors-
locations","Seg114vcookie":"","reEnable":"","throttle-
area":""},"profileParameters":{"region":"","Seg2":"23"},"view":{"name":"facility-
results"}}]},"impressionId":"2017e8f257b548dbb2e29e2e51bcdc38"}

105.    Similarly, when Plaintiff John Doe logged out of the Portal and conducted a search

for a neurologist on the Site, the POST to kaiser.tt.omtrdc.net revealed the search term and Plaintiff's

zip code as shown below (green highlight):

{"requestId":"c059ddb0f7ee4602ad5c1cf0e72e6e0f","context":{"userAgent":"Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/113.0.0.0 Safari/537.36","clientHints":{"mobile":false,"platform":"macOS","browserUAWithMajorVersion":"\"Google Chrome\";v=\"113\", \"Chromium\";v=\"113\", \"Not-A.Brand\";v=\"24\""},"timeOffsetInMinutes":-420,"channel":"web","screen":{"width":1512,"height":982,"orientation":"landscape","colorDepth":30,"pixelRatio":2},"window":{"width":1512,"height":769},"browser":{"host":"healthy.kaiserpermanente.org","webGLRenderer":"ANGLE (Apple, Apple M1 Pro, OpenGL 4.1)"},"address":{"url":"https://healthy.kaiserpermanente.org/southern-california/doctors-locations#/providers?zipcode=92395&medical_specialty_label=Psychiatry%20%26%20Neurology:%20Neurology,Psychiatry%20%26%20Neurology:%20Psychiatry","referringUrl":"https://healthy.kaiserpermanente.org/southern-california/doctors-locations"}},"id":{"tntId":"Redacted marketingCloudVisitorId":"Redacted experienceCloud":{"audienceManager":{"locationHint":9,"blob":"RKhpRz8krg2tLO6pguXWp5olkAcUniQYPHaMWWgdJ3xzPWQmdj0y"}},"analytics":{"logging":"server_side","supplementalDataId":"2B0396D39B44DC65-28244F36559B11C5"}},"execute":{"pageLoad":{"parameters":{"Seg18v":"sca","Seg17v":"","Seg55v":"Logged Out","Seg181v":"","Seg81v":"kporg:doctors-locations","Seg114vcookie":"","reEnable":"","throttle-area":"","providerType":"","keyword":"","specialty":"Psychiatry & Neurology: Neurology,Psychiatry & Neurology: Psychiatry","healthPlan":""},"profileParameters":{"region":"","Seg2":"12"}}},"prefetch":{"views":[{"parameters":{"Seg18v":"sca","Seg17v":"","Seg55v":"Logged Out","Seg181v":"","Seg81v":"kporg:doctors-locations","Seg114vcookie":"","reEnable":"","throttle-area":"","providerType":"","keyword":"","specialty":"Psychiatry & Neurology: Neurology,Psychiatry & Neurology: Psychiatry","healthPlan":""},"profileParameters":{"region":"","Seg2":"12"}}]}}

106.   On information and belief, the same type of information tracked, disclosed, and sent to Adobe for Plaintiffs has been tracked, disclosed, and sent to Adobe for other members of the Classes.

**3.   Kaiser Permanente Allows Twitter, Bing, and Google to Intercept Patients' Communications**

107.   Kaiser Permanente, on its Home Page, Portal Login Page, and other pages on the Site—including within the Portal—also uses code that sends confidential and protected health information to Twitter, Bing, and Google.

108.   Google and Bing are the most widely used search engines, and Twitter is one of the largest social media sites in the world. Generally, Google, Bing, and Twitter do not charge to use their services because they are able to generate billions of dollars in revenue each year by selling targeted advertising.

CLASS ACTION COMPLAINT
Case No:

109.    For example, if a user tweets about a current event in the news or about their job, Twitter and advertisers can understand a user's political leanings or job type. This information is valuable to Twitter because it helps advertisers understand who Twitter users are so that Twitter can sell advertisements targeting that particular user's Twitter timelines.[25]

110.    Twitter also tracks browsing activity outside of Twitter, for both Twitter users and people who have never created an account on the Twitter platform, including browser type, the device and operating system, the mobile carrier, IP address, and browsing activity.[26] Twitter can also learn information about websites visited before landing on the referring website and what websites were visited after leaving the site.[27]

111.    Google and Bing sell ads based on a user's search. So, a search for a medical condition such as cancer, would show ads for cancer treatment centers.

112.    Google and Bing are also widely used ad platforms that provide ad remarketing. Remarketing shows ads based on sites a user has previously visited. For example, a user who visits a website with Google or Bing code, and searches on pregnancy related topics, might then see ads for a Google or Bing advertiser's pregnancy related services on other websites.

113.    A main goal for Google, Bing, and Twitter is to develop a profile of users to better target them with ads. Therefore, all these sites offer free analytics tools. These tools are useful to advertisers as they can show how effective certain ads are. Web analytics tools also provide general information about who is visiting the website and what those users are doing on the Site.

114.    The Kaiser Permanente Website, including inside the Portal, also tracks views via integration with Doubleclick, which is owned by Google and allows companies pay for clicks and track ad effectiveness.

115.    Bing, Google, and Twitter send data to their respective servers via HTTP GET request parameters.

---

[25]    Mehak Siddiqui, *What Does Twitter Know About Me?*, vpnoverview (Sept. 9, 2022), https://vpnoverview.com/privacy/social-media/what-does-twitter-know-about-me/.
[26] *Id.*
[27] *Id.*

CLASS ACTION COMPLAINT
Case No:

116.   The HTTP GET method requests data from a server. This request can include additional parameters that are sent as part of the request URL. For example, take the request "www.example.com ?utm_source=google." In this case, everything after the "?" is used to track where the site visitor came from, in this case showing that the visitor came from Google before accessing the www.example.com.

### a)   Portal Login

117.   On May 31, 2023, when Plaintiff Jane Doe logged into the Portal, Bing sent the following GET request to bat.bing.com (color coded here and described in more detail below):

https://bat.bing.com/action/0?ti=5715144&Ver=2&mid=0449eabe-5045-4f9c-8768-afbe69c3f01a&sid=147515f0000b11ee937705de2bc479d9&vid=147628d0000b11eeabace7b017e63252&vids=0&msclkid=N&uach=pv%3D10.0.0&pi=918639831&lg=en-US&sw=1366&sh=768&sc=24&tl=Sign%20in&p=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fconsumer-sign-on%23%2Fsignon&r=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fwashington%2Ffront-door&lt=22894&mtp=10&evt=pageLoad&sv=1&rn=404848

118.   On June 6, 2023, when Plaintiff John Doe logged into the Portal, Bing sent the following GET request to bat.bing.com (color coded here and described in more detail below):

https://bat.bing.com/action/0?ti=5715144&Ver=2&mid=a57ffab9-4695-4ca1-967a-8733b98911d6&sid=9e997de0049911ee92ef43fd7e01cd75&vid=9e99a6f0049911ee89feed6f1e2c50f5&vids=0&msclkid=N&pi=918639831&lg=en-US&sw=1512&sh=982&sc=30&tl=My%20Health%20%7C%20Kaiser%20Permanente&p=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Fsecure%2Finner-door&r=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Fconsumer-interrupt.html&lt=1125&evt=pageLoad&sv=1&rn=258023

119.   The Bing GET request includes temporary and session IDs (mid, sid, vid)—highlighted in yellow above, an indication that the page loaded (green highlight), the URL of the page (blue highlight), and information about the browser and device (grey highlight). The data sent to Bing indicates the user successfully logged into the Portal.

120.   According to Bing documentation, "the cookie in the relevant domain and IP address are always passed with every http request and not just via UET."[28] UET is Universal Event Tagging and it's the method used by Bing to report advertiser activity on a Website. UET was installed on all pages viewed on the Kaiser Website, including within the Portal.

---

[28]   *FAQ: Universal Event Tracking*, Microsoft, https://help.ads.microsoft.com/apex/index/3/en/53056/ (last visited June 9,2023).

121.    When Plaintiff Jane Doe logged into the Portal, Google also sent multiple GET requests to both googleads.g.doubleclick.net and google.com. These requests are essentially similar in nature. For example, the data sent via GET to Google servers at googleads.g.doubleclick.net is below:

> https://googleads.g.doubleclick.net/pagead/viewthroughconversion/881418786/?random=1685576958827&cv=11&fst=1685576958827&bg=ffffff&guid=ON&async=1&gtm=45be35v0&u_w=1366&u_h=768&url=https%3A%2F%2Fwa-member.kaiserpermanente.org%2Fhome%2F&ref=https%3A%2F%2Fhealthy.kaiserpermanente.org%2F&label=Ump9CM7hr3IQosSlpAM&hn=www.googleadservices.com&frm=0&tiba=Secure%20Member%20Site%20%7C%20Kaiser%20Permanente%20Washington&auid=2067634156.1685575801&uaa=x86&uab=64&uafvl=Google%2520Chrome%3B113.0.5672.127%7CChromium%3B113.0.5672.127%7CNot-A.Brand%3B24.0.0.0&uamb=0&uap=Windows&uapv=10.0.0&uaw=0&data=event%3Dconversion&rfmt=3&fmt=4

122.    When Plaintiff John Doe logged into the Portal, Google also sent multiple GET requests to both googleads.g.doubleclick.net and google.com. These requests are essentially similar in nature. For example, the data sent via GET to Google servers at googleads.g.doubleclick.net is below:

> https://googleads.g.doubleclick.net/pagead/viewthroughconversion/881418786/?random=1686076950094&cv=11&fst=1686076950094&bg=ffffff&guid=ON&async=1&gtm=45be35v0&u_w=1512&u_h=982&url=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Fsecure%2Fmedical-record&ref=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Fsecure%2Finner-door&label=Ump9CM7hr3IQosSlpAM&hn=www.googleadservices.com&frm=0&tiba=Medical%20Record%20%7C%20Kaiser%20Permanente&auid=1088085833.1686076832&uaa=arm&uab=64&uafvl=Google%2520Chrome%3B113.0.5672.126%7CChromium%3B113.0.5672.126%7CNot-A.Brand%3B24.0.0.0&uamb=0&uap=macOS&uapv=13.3.1&uaw=0&data=event%3Dconversion&rfmt=3&fmt=4

123.    The above GET requests includes the URL of the current site (blue highlight), the event type (highlighted in green)—in this case a conversion, as well as data about the browser and device that allows Google to produce a device fingerprint (highlighted in grey). The data sent to Google indicates the user successfully logged into the Portal.

124.    When Plaintiff Jane Doe logged into the Portal, Google used the POST method to transmit the following data to Google servers at www.google-analytics.com:

> https://www.google-analytics.com/g/collect?v=2&tid=G-ENXTD8TZ70&gtm=45je35v0&_p=1252165919&cid=657412457.1685575799&ul=en-us&sr=1366x768&uaa=x86&uab=64&uafvl=Google%2520Chrome%3B113.0.5672.127%7CChromium%3B113.0.5672.127%7CNot-

A.Brand%3B24.0.0.0&uamb=0&uam=&uap=Windows&uapv=10.0.0&uaw=0&ngs=1&_s
=1&sid=1685575799&sct=1&seg=1&dl=https%3A%2F%2Fwa-
member.kaiserpermanente.org%2Fhome%2F&dr=https%3A%2F%2Fhealthy.kaiserperman
ente.org%2F&dt=Secure%20Member%20Site%20%7C%20Kaiser%20Permanente%20Was
hington&en=page_view&_ee=1&_et=1

125.    When Plaintiff John Doe logged into the Portal, Google used the POST method to transmit the following data to Google servers at www.google-analytics.com:

https://www.google-analytics.com/g/collect?v=2&tid=G-
ENXTD8TZ70&gtm=45je35v0&_p=78753540&cid=1504176517.1686076832&ul=en-
us&sr=1512x982&uaa=arm&uab=64&uafvl=Google%2520Chrome%3B113.0.5672.126%7
CChromium%3B113.0.5672.126%7CNot-
A.Brand%3B24.0.0.0&uamb=0&uam=&uap=macOS&uapv=13.3.1&uaw=0&ngs=1&_s=1
&sid=1686076832&sct=1&seg=1&dl=https%3A%2F%2Fhealthy.kaiserpermanente.org%2
Fsouthern-california%2Fsecure%2Finner-
door&dr=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-
california%2Fconsumer-
interrupt.html&dt=My%20Health%20%7C%20Kaiser%20Permanente&en=page_view&_e
e=1

126.    The POST above includes temporary and session IDs (cid, sid)—highlighted in yellow, an indication that the page loaded (green highlight), the URL of the current page (blue highlight), and information about the browser and device (grey highlight). As discussed above, device data allows Google to establish a device fingerprint to track devices across multiple websites. The data sent to Google indicates the user successfully logged into the Portal.

127.    When Plaintiff Jane Doe accessed the Portal, Twitter sent two GET requests—one to analytics.twitter.com and one to t.co. Except for the base domain, both GET requests were the same as follows:

https://analytics.twitter.com/1/i/adsct?bci=4&eci=3&event=%7B%7D&event_id=5f8ad0cc-
d7e4-4c79-be40-
b2476d38e9c6&integration=advertiser&p_id=Twitter&p_user_id=0&pl_id=751184a7-
0132-46b9-80db-fa67ceecceec&tw_document_href=https%3A%2F%2Fwa-
member.kaiserpermanente.org%2Fhome%2F&tw_iframe_status=0&txn_id=o2f67&type=ja
vascript&version=2.3.29

128.    When Plaintiff John Doe accessed the Portal, Twitter sent two GET requests—one to analytics.twitter.com and one to t.co. Except for the base domain, both GET requests were the same as follows:

https://t.co/1/i/adsct?bci=4&eci=3&event=%7B%7D&event_id=23676916-ed52-496b-
be38-e9067f36cf37&integration=advertiser&p_id=Twitter&p_user_id=0&pl_id=eb369f6b-
bab7-443a-abfd-
6a18f78ec1e2&tw_document_href=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fso

uthern-california%2Fsecure%2Finner-door&tw_iframe_status=0&txn_id=o2f67&type=javascript&version=2.3.29

129.    As reflected above, highlighted in blue, the Twitter GET requests were used to indicate a page view of the Portal—indicating the user successfully logged in.

**b)    Inside the Portal—Accessing Medical Records**

130.    On June 6, 2023, when Plaintiff John Doe accessed his medical records from within the Portal, Bing, Google, and Twitter all transmitted the fact that Plaintiff John Doe suffers from headaches and kidney stones in their GET requests back to their respective servers. Google also transmitted information about Plaintiff John Doe's physician back to its server.

131.    For example, Bing's GET requests from the medical records pages were:

https://bat.bing.com/action/0?ti=5715144&Ver=2&mid=98019729-0e18-4699-bd10-1af56bb6e602&sid=9e997de0049911ee92ef43fd7e01cd75&vid=9e99a6f0049911ee89feed6f1e2c50f5&vids=0&msclkid=N&pi=918639831&lg=en-US&sw=1512&sh=982&sc=30&tl=Search%20medical%20records&p=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Fsecure%2Fsearch-medical-record%3Furi%3Dsearch%253ahealth-encyclopedia%26type%3DICD10%3DR51.9%26label%3DHEADACHE%26groupName%3DHealth%2Bsummary&r=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fhconline%2Fie%2Finside.asp%3Flang%3Denglish%26mode%3Dsnapshot&lt=1469&evt=pageLoad&sv=1&rn=848129

https://bat.bing.com/action/0?ti=5715144&Ver=2&mid=5e099d19-6039-4641-8440-aa961649664c&sid=9e997de0049911ee92ef43fd7e01cd75&vid=9e99a6f0049911ee89feed6f1e2c50f5&vids=0&msclkid=N&pi=918639831&lg=en-US&sw=1512&sh=982&sc=30&tl=Search%20%7C%20Kaiser%20Permanente&p=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Fpages%2Fsearch%3Fquery%3Dkidney%2Bstones%26category%3Dglobal%26global-region%3Dsca%26language%3Denglish%26region%3Dsca&r=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Ffront-door&lt=1013&evt=pageLoad&sv=1&rn=975174

132.    The Bing GET request above includes the same temporary and session IDs (mid, sid, vid) as the Portal page (yellow highlight), an indication that the page loaded (green highlight), and information about the browser and device (grey highlight), which identifies the computing device and allows for long term tracking. The GET request also transmitted to Bing, the URL of the page (blue highlight), which in this case also includes the fact that Plaintiff John Doe suffers from headaches (first GET request above) and kidney stones (second GET request above). This data can be used to better target ads.

133.    Doubleclick's (and Google.com which was essentially similar) GET requests from the medical records page were:

https://googleads.g.doubleclick.net/pagead/viewthroughconversion/881418786/?random=1686077690514&cv=11&fst=1686077690514&bg=ffffff&guid=ON&async=1&gtm=45be35v0&u_w=1512&u_h=982&url=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Fsecure%2Fmedical-record%2Fhealth-summary&ref=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Fsecure%2Fsearch-medical-record%3Furi%3Dsearch%253ahealth-encyclopedia%26type%3DICD%26queryICD10%3DR51.9%26label%3DHEADACHE%26groupName%3DHealth%2Bsummary&hn=www.googleadservices.com&frm=0&tiba=Health%20Summary%20%7C%20Medical%20Record%20%7C%20Kaiser%20Permanente&auid=1088085833.1686076832&uaa=arm&uab=64&uafvl=Google%2520Chrome%3B113.0.5672.126%7CChromium%3B113.0.5672.126%7CNot-A.Brand%3B24.0.0.0&uamb=0&uap=macOS&uapv=13.3.1&uaw=0&data=event%3Dtag.config&rfmt=3&fmt=4

https://googleads.g.doubleclick.net/pagead/viewthroughconversion/881418786/?random=1686079885283&cv=11&fst=1686079885283&bg=ffffff&guid=ON&async=1&gtm=45be35v0&u_w=1512&u_h=982&url=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Fpages%2Fsearch%3Fquery%3Dkidney%2Bstones%26category%3Dglobal%26global-region%3Dsca%26language%3Denglish%26region%3Dsca&ref=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Ffront-door&hn=www.googleadservices.com&frm=0&tiba=Search%20%7C%20Kaiser%20Permanente&auid=875947082.1686079450&uaa=arm&uab=64&uafvl=Google%2520Chrome%3B113.0.5672.126%7CChromium%3B113.0.5672.126%7CNot-A.Brand%3B24.0.0.0&uamb=0&uap=macOS&uapv=13.3.1&uaw=0&data=event%3Dtag.config&rfmt=3&fmt=4

134.    The above GET requests includes data about the browser and device (grey highlight) and URL data (blue highlight) reveals Plaintiff John Doe suffers from headaches (first GET data above) and kidney stones (second GET data above). This data can be used to better target ads.

135.    While Plaintiff John Doe was accessing the medical records page, Google also used the POST method to transmit the following data to Google servers at www.google-analytics.com:

https://www.google-analytics.com/g/collect?v=2&tid=G-ENXTD8TZ70&gtm=45je35v0&_p=527624076&cid=1504176517.1686076832&ul=en-us&sr=1512x982&uaa=arm&uab=64&uafvl=Google%2520Chrome%3B113.0.5672.126%7CChromium%3B113.0.5672.126%7CNot-A.Brand%3B24.0.0.0&uamb=0&uam=&uap=macOS&uapv=13.3.1&uaw=0&_eu=AEA&ngs=1&_s=2&sid=1686076832&sct=1&seg=1&dl=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Fsecure%2Fsearch-medical-record%3Furi%3Dsearch%253ahealth-encyclopedia%26type%3DICD%26queryICD10%3DR51.9%26label%3DHEAD

ACHE%26groupName%3DHealth%2Bsummary&dr=https%3A%2F%2Fhealthy.
kaiserpermanente.org%2Fhconline%2Fie%2Finside.asp%3Flang%3Denglish%26
mode%3Dsnapshot&dt=Search%20medical%20records&en=scroll&epn.percent_
scrolled=90

https://www.google-analytics.com/g/collect?v=2&tid=G-
ENXTD8TZ70&gtm=45je3650&_p=200520362&cid=1743351272.1686079450
&ul=en-
us&sr=1512x982&uaa=arm&uab=64&uafvl=Google%2520Chrome%3B113.0.56
72.126%7CChromium%3B113.0.5672.126%7CNot-
A.Brand%3B24.0.0.0&uamb=0&uam=&uap=macOS&uapv=13.3.1&uaw=0&ng
s=1&sid=1686079449&sct=1&seg=1&dl=https%3A%2F%2Fhealthy.kaiserperm
anente.org%2Fsouthern-
california%2Fpages%2Fsearch%3Fquery%3Dkidney%2Bstones%26category%3
Dglobal%26global-
region%3Dsca%26language%3Denglish%26region%3Dsca&dr=https%3A%2F%
2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Ffront-
door&dt=Search%20%7C%20Kaiser%20Permanente&_s=1

136.    The POSTs above include a temporary session ID (cid)—highlighted in yellow, and information about the browser and device (grey highlight). The URLs of the current page (blue highlight) reveals Plaintiff John Doe suffers from headaches (first POST above) and kidney stones (second POST above). The data sent to Google can be used to better target ads.

137.    On June 7, 2023 when Plaintiff John Doe requested an electronic copy of his medical records Google used the POST method to transmit data to sb-ssl.google.com, including the following which specifically disclosed Plaintiff John Doe's name and other personally identifying information:

https://healthy.kaiserpermanente.org/ie/Documents/Released/Download?releaseId=WP-
24F8cOV-2F43chhwz40hINz9AQ-3D-3D-
24MVZtUU8nDZTmc44v1yuQuiofNjaDbbZ495l9c4zOCgI-3D&docId=WP-
24wUdukuLzxp-2FfzWRYqPN1og-3D-3D-24gBNgJlReE8-2BNQgnAhLwt-2BrLft-
2Bk2Dbuv2Y72rrLmVfs-
3D&downloadedFileName=HealthSummary_Jun_07_2023.zip&idx=0"
°https://healthy.kaiserpermanente.org/ie/Documents/Released/Download?releaseId=WP-
24F8cOV-2F43chhwz40hINz9AQ-3D-3D-
24MVZtUU8nDZTmc44v1yuQuiofNjaDbbZ495l9c4zOCgI-3D&docId=WP-
24wUdukuLzxp-2FfzWRYqPN1og-3D-3D-24gBNgJlReE8-2BNQgnAhLwt-2BrLft-
2Bk2Dbuv2Y72rrLmVfs-
3D&downloadedFileName=HealthSummary_Jun_07_2023.zip&idx=0
    127.0.0.1"Phttps://healthy.kaiserpermanente.org/ie/Documents/Released?from=Dow
nloadMyRecord"R
Nhttps://healthy.kaiserpermanente.org/southern-california/secure/medical-
record————————————————"U
Qhttps://healthy.kaiserpermanente.org/southern-california/secure/my-medical-
record————————————————"†
• https://healthy.kaiserpermanente.org/southern-california/support/medical-
requests.html?kp_shortcut_referrer=kp.org/requestrecords————————————————"q
mhttps://healthy.kaiserpermanente.org/support/medical-
requests.html?kp_shortcut_referrer=kp.org/requestrecords————————————————"3

/https://www.kaiserpermanente.org/requestrecords————————————"!
https://kp.org/requestrecords————————————"¹
ehttps://healthy.kaiserpermanente.org/southern-california/secure/medical-record/download-
health-record"Nhttps://healthy.kaiserpermanente.org/southern-california/secure/medical-
record* 0JHealthSummary_ `Jun_07_2023` .zipP————————————Zen-
IHE_XDM/Redacted 1/STYLE.XSL
IHE_XDM/Redacted 1/DOC0038.XML
O-1 of 1 - My Health Summary.PDF
INDEX.HTM "
IHE_XDM/Redacted 1/DOC0024.XML
IHE_XDM/Redacted 1/DOC0001.XML
IHE_XDM/Redacted 1/DOC0005.XML
IHE_XDM/Redacted 1/DOC0006.XML
IHE_XDM/Redacted 1/DOC0007.XML
IHE_XDM/Redacted 1/DOC0008.XML
‚F2pt¢• MGôàõ†ÆléÙ+• Æ"CLµ}S„Å ‰´8 @Â5(0 8 @ J-Chrome/113.0.5672.126/Mac
OS XPX`•  Đà ø
¢"

ºhttps://healthy.kaiserpermanente.org/ie/Documents/Released/Download?releaseId=WP-
24F8cOV-2F43chhwz40hINz9AQ-3D-3D-
24MVZtUU8nDZTmc44v1yuQuiofNjaDbbZ495l9c4zOCgI-3D&docId=WP-
24wUdukuLzxp-2FfzWRYqPN1og-3D-3D-24gBNgJlReE8-2BNQgnAhLwt-2BrLft-
2Bk2Dbuv2Y72rrLmVfs-
3D&downloadedFileName=HealthSummary_Jun_07_2023.zip&idx=0
        127.0.0.1"Phttps://healthy.kaiserpermanente.org/ie/Documents/Released?from=Dow
nloadMyRecord*ehttps://healthy.kaiserpermanente.org/southern-california/secure/medical-
record/download-health-record0 9 ã•‰xBP————————————X p
¢• ————————————
Phttps://healthy.kaiserpermanente.org/ie/Documents/Released?from=DownloadMyRecord
        127.0.0.1"Ohttps://healthy.kaiserpermanente.org/ie/Documents/DownloadMyRecord
?lang=english*ehttps://healthy.kaiserpermanente.org/southern-california/secure/medical-
record/download-health-record0 9  ì•‰xBJehttps://healthy.kaiserpermanente.org/southern-
california/secure/medical-record/download-health-recordP————————————X p
¢Š————————————
Ohttps://healthy.kaiserpermanente.org/ie/Documents/DownloadMyRecord?lang=english
————————————        127.0.0.1 9 9 °•‰xBB
]https://healthy.kaiserpermanente.org/hconline/ie/inside.asp?lang=english&mode=download
summaryBQ
Ohttps://healthy.kaiserpermanente.org/ie/Documents/DownloadMyRecord?lang=englishJeht
tps://healthy.kaiserpermanente.org/southern-california/secure/medical-record/download-
health-recordP

138.    The above POST data includes the fact that Plaintiff John Doe requested an electronic

copy of his medical records on June 7, 2023 (highlighted in green) and Plaintiff John Doe's first name

(redacted above).

139.    Twitter's (both analytics.twitter.com and t.co) GET request from the medical records

page was:

https://t.co/1/i/adsct?bci=4&eci=3&event=%7B%7D&event_id=305bd815-e13e-
4eae-ab1e-

0fd5d4dfea93&integration=advertiser&p_id=Twitter&p_user_id=0&pl_id=85138
e85-2f71-4efc-ae39-
6cb490e93e87&tw_document href=https%3A%2F%2Fhealthy.kaiserpermanente
.org%2Fsouthern-california%2Fsecure%2Fsearch-medical-
record%3Furi%3Dsearch%253ahealth-
encyclopedia%26type%3DICD%26queryICD10%3DR51.9%26label%3DHEAD
ACHE%26groupName%3DHealth%2Bsummary&tw_iframe_status=0&txn_id=o
2f67&type=javascript&version=2.3.29

https://t.co/1/i/adsct?bci=4&eci=3&event=%7B%7D&event_id=bdd9fe2d-11a0-
4c14-9ea9-
075f29bd4fe4&integration=advertiser&p_id=Twitter&p_user_id=0&pl_id=3e2eb
f5e-3ab3-4c45-8573-
df51ad40350a&tw_document_href=https%3A%2F%2Fhealthy.kaiserpermanente.
org%2Fsouthern-
california%2Fpages%2Fsearch%3Fquery%3Dkidney%2Bstones%26category%3
Dglobal%26global-
region%3Dsca%26language%3Denglish%26region%3Dsca&tw_iframe_status=0
&txn_id=o2f67&type=javascript&version=2.3.29

140.   The Twitter GET requests reveal in the current site URL (highlighted in blue) that Plaintiff John Doe suffers from headaches (first GET above) and kidney stones (second GET above). This data can be used to better target ads, in this case showing, for example, headaches so that Plaintiff John Doe could be targeted for such things as pain medication.

141.   On information and belief, similar information about other Class Members is also transmitted to Bing, Google, and Twitter when Class Members access their medical records and/or request their medical records on the Portal.

### c)   Other Activities Within the Portal

142.   On June 6, 2023 when Plaintiff John Doe accessed the prescriptions page from within the Portal Bing's GET request was:

https://bat.bing.com/action/0?ti=5715144&Ver=2&mid=b5c83174-b4ea-4868-b60f-
99002dea9a80&sid=9e997de0049911ee92ef43fd7e01cd75&vid=9e99a6f0049911ee89feed6
f1e2c50f5&vids=0&msclkid=N&pi=918639831&lg=en-
US&sw=1512&sh=982&sc=30&tl=omeprazole%2020%20mg%20capsule,delayed%20relea
se%20%7C%20Kaiser%20Permanente&p=https%3A%2F%2Fhealthy.kaiserpermanente.org
%2Fsouthern-california%2Fhealth-wellness%2Fdrug-
encyclopedia%2Fdrug.259872&r=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fhco
nline%2Fie%2Finside.asp%3Flang%3Denglish%26mode%3Dsnapshot&lt=670&evt=pageL
oad&sv=1&rn=325466

143.   The Bing GET request above includes the same temporary and session IDs (mid, sid, vid) as the Portal page (yellow highlight), an indication that the page loaded (green highlight), and information about the browser and device (grey highlight), which identifies the computing device and

allows for long term tracking. The GET request also transmitted to Bing, the fact that John Doe has been prescribed Omerprazole 20mg delayed release (pink highlight). This data can be used to better target ads.

144.    Doubleclick and Google (which are essentially the same) GET request from the medications page within the Portal was:

https://googleads.g.doubleclick.net/pagead/viewthroughconversion/881418786/?random=16 86077807673&cv=11&fst=1686077807673&bg=ffffff&guid=ON&async=1&gtm=45be35v 0&u_w=1512&u_h=982&url=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouther n-california%2Fhealth-wellness%2Fdrug-encyclopedia%2Fdrug.259872&ref=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fh conline%2Fie%2Finside.asp%3Flang%3Denglish%26mode%3Dsnapshot&hn=www.google adservices.com&frm=0&tiba=omeprazole%2020%20mg%20capsule%2Cdelayed%20releas e%20%7C%20Kaiser%20Permanente&auid=1088085833.1686076832&uaa=arm&uab=64 &uafvl=Google%2520Chrome%3B113.05672.126%7CChromium%3B113.0.5672.126%7 CNot-A.Brand%3B24.0.0.0&uamb=0&uap=macOS&uapv=13.3.1&uaw=0&data=event%3Dgtag. config&rfmt=3&fmt=4

145.    The above GET requests includes data about the browser and device (grey highlight), the current URL (blue), and data (pink) that reveals Plaintiff John Doe was prescribed Omeprazole 20mg delayed release. This data can be used to better target ads.

146.    While Plaintiff John Doe was accessing the medications page, Google also used the POST method to transmit the following data to Google servers at www.google-analytics.com:

https://www.google-analytics.com/g/collect?v=2&tid=G-ENXTD8TZ70&gtm=45je35v0&_p=2017317913&cid=1504176517.1686076832&ul=en-us&sr=1512x982&uaa=arm&uab=64&uafvl=Google%2520Chrome%3B113.05672.126%7 CChromium%3B113.0.5672.126%7CNot-A.Brand%3B24.0.0.0&uam=&uap=macOS&uapv=13.3.1&uaw=0&ngs=1&_s=1 &sid=1686076832&sct=1&seg=1&dl=https%3A%2F%2Fhealthy.kaiserpermanente.org%2 Fsouthern-california%2Fhealth-wellness%2Fdrug-encyclopedia%2Fdrug.259872&dr=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fhc online%2Fie%2Finside.asp%3Flang%3Denglish%26mode%3Dsnapshot&dt=omeprazole% 2020%20mg%20capsule%2Cdelayed%20release%20%7C%20Kaiser%20Permanente&en= page_view&_ee=1

147.    The above POST includes data about the browser and device (grey highlight), the current URL (blue) and data (pink) that reveals Plaintiff John Doe was prescribed Omeprazole 20mg delayed release. This data can be used to better target ads.

148.    Twitter's (both analytics.twitter.com and t.co) GET request from the medications page was:

https://t.co/1/i/adsct?bci=4&eci=3&event=%7B%7D&event_id=b343cdf0-a3db-4b81-b74c-34a88cc9960f&integration=advertiser&p_id=Twitter&p_user_id=0&pl_id=8ce3fde0-7770-42d2-a833-f63cc049e2f5&tw_document_href=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Fhealth-wellness%2Fdrug-encyclopedia%2Fdrug.259872&tw_iframe_status=0&txn_id=o2f67&type=javascript&version=2.3.29

149.    The Twitter GET request includes the current URL (blue) which includes the drug encyclopedia link for the drug 259872 which is Omeprazole 20mg delayed release.

150.    When Plaintiff John Doe conducted a physician search from within the Portal the following GET request was sent to www.google-analytics.com:

https://www.google-analytics.com/g/collect?v=2&tid=G-ENXTD8TZ70&gtm=45je3650&_p=786057931&cid=1743351272.1686079450&ul=en-us&sr=1512x982&uaa=arm&uab=64&uafvl=Google%2520Chrome%3B113.0.5672.126%7CChromium%3B113.0.5672.126%7CNot-A.Brand%3B24.0.0.0&uamb=0&uam=&uap=macOS&uapv=13.3.1&uaw=0&ngs=1&_s=2&sid=1686079449&sct=1&seg=1&dl=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Fphysicians%2Fevan-mosier-9630484&dr=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Fdoctors-locations&dt=Evan%20Alan%20Mosier%2C%20MD%20-%20Gastroenterology%20%7C%20Kaiser%20Permanente&en=user_engagement&_et=20792

151.    GET request above includes temporary and session IDs (yellow highlight), information about the browser and device (grey highlight), the current URL (blue highlight), and addition data (pink highlight) which reveals Plaintiff John Doe searched for a gastroenterologist. This data can reveal Plaintiff John Doe's medical condition and can be used for better ad targeting. For example, the data can result in third parties serving ads for antacids or other digestive medications.

### d)      Other Searches on the Site

152.    On May 31, 2023 after Plaintiff Jane Doe logged out of the Portal, Plaintiff Jane Doe conducted a search using the search feature found on the upper right of the main page (Washington) of the Site. On the search results page, Bing sent the following GET request:

https://bat.bing.com/action/0/?ti=5715144&Ver=2&mid=fc8ef6c7-b66b-406b-b1e5-506f755f7359&sid=147515f0000b11ee937705de2bc479d9&vid=147628d0000b11eeabace7b017e63252&vids=0&msclkid=N&uach=pv%3D10.0.0&pi=918639831&lg=en-US&sw=1366&sh=768&sc=24&tl=Search%20%7C%20Kaiser%20Permanente&p=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fpages%2Fsearch%3Fquery%3Dmental%2Bhealth%26category%3Dglobal%26global-region%3Dsca%26language%3Denglish%26region%3Dsca&r=https%3A%2F%2Fhealthy.kaiserpermanente.org%2F&lt=8071&mtp=10&evt=pageLoad&sv=1&rn=424250

153.    The Bing GET request above includes temporary and session IDs (mid, sid, vid) (yellow highlight), an indication that the page loaded (green highlight), and information about the browser and device (grey highlight). The GET request also transmitted to Bing the URL of the page (blue highlight), which reveals Plaintiff Jane Doe's search on the term "mental health." Notably, although Plaintiff Jane Doe was logged out of the Portal, Bing was still able to connect the fact that Plaintiff Jane Doe had communicated with Kaiser Permanente about mental health because it had created a digital fingerprint. This data can be used to better target ads.

154.    Doubleclick's (and Google.com which was essentially similar) GET request from the search results page was:

> https://googleads.g.doubleclick.net/pagead/viewthroughconversion/881418786/?random=16 85578748182&cv=11&fst=1685578748182&bg=ffffff&guid=ON&async=1&gtm=45be35v 0&u_w=1366&u_h=768&url=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fpages% 2Fsearch%3Fquery%3Dmental%2Bhealth%26category%3Dglobal%26global-region%3Dsca%26language%3Denglish%26region%3Dsca&ref=https%3A%2F%2Fhealth y.kaiserpermanente.org%2F&hn=www.googleadservices.com&frm=0&tiba=Search%20%7 C%20Kaiser%20Permanente&auid=1628977230.1685578549&uaa=x86&uab=64&uafvl=G oogle%2520Chrome%3B113.0.5672.127%7CChromium%3B113.0.5672.127%7CNot-A.Brand%3B24.0.0.0&uamb=0&uap=Windows&uapv=10.0.0&uaw=0&data=event%3Dgta g.config&rfmt=3&fmt=4

155.    The above GET request includes data about the browser and device (grey highlight) and the URL of the page (blue highlight) reveals Plaintiff Jane Doe searched on the term "mental health." This data can similarly be used to better target ads.

156.    When Plaintiff Jane Doe conducted a search for "mental health" on the Site, Google used the POST method to transmit the following data to Google servers at www.google-analytics.com:

> https://www.google-analytics.com/g/collect?v=2&tid=G-ENXTD8TZ70&gtm=45je35v0&_p=1051056236&cid=1313346476.1685578546&ul=en-us&sr=1366x768&uaa=x86&uab=64&uafvl=Google%2520Chrome%3B113.0.5672.127%7 CChromium%3B113.0.5672.127%7CNot-A.Brand%3B24.0.0.0&uamb=0&uam=&uap=Windows&uapv=10.0.0&uaw=0&ngs=1&_s =1&sid=1685578545&sct=1&seg=1&dl=https%3A%2F%2Fhealthy.kaiserpermanente.org %2Fhealth-wellness%2Fmental-health%2Fhow-to-get-care&dr=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fpages%2Fsearch%3Fquery% 3Dmental%2Bhealth%26category%3Dglobal%26global-region%3Dsca%26language%3Denglish%26region%3Dsca&dt=How%20to%20get%20me ntal%20health%20care%20%7C%20Kaiser%20Permanente&en=page_view&_ee=1

157.    The POST above includes temporary and session IDs (tid, cid, sid), highlighted in yellow, and information about the browser and device (grey highlight). The URL of the current page (blue highlight) reveals Plaintiff Jane Doe searched for the term "mental health." The data sent to Google can be similarly be used to better target ads.

158.    Twitter's (both analytics.twitter.com and t.co) GET request from the search results page was:

> https://analytics.twitter.com/1/i/adsct?bci=4&eci=3&event=%7B%7D&event_id=40e2b65d-4a2e-4272-a887-d0a74c97457c&integration=advertiser&p_id=Twitter&p_user_id=0&pl_id=bea70ac7-252c-4537-9a9d-754bd29d7111&tw_document_href=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fpages%2Fsearch%3Fquery%3Dmental%2Bhealth%26category%3Dglobal%26global-region%3Dsca%26language%3Denglish%26region%3Dsca&tw_iframe_status=0&txn_id=o2f67&type=javascript&version=2.3.29

159.    The Twitter GET request in the current site URL (highlighted in blue) reveals that Plaintiff Jane Doe searched on the term "mental health." This data can similarly be used to better target ads.

160.    Similarly, when Plaintiff John Doe logged out of the Portal and conducted a search for a physician on the Site the following GET request was sent to Bing:

> https://bat.bing.com/action/0?ti=5715144&Ver=2&mid=9f6a61d7-6328-4bd6-b325-0e5914ecbd5d&sid=9e997de0049911ee92ef43fd7e01cd75&vid=9e99a6f0049911ee89feed6f1e2c50f5&vids=0&msclkid=N&pi=918639831&lg=en-US&sw=1512&sh=982&sc=30&tl=Find%20Doctors%20and%20Locations%20in%20Southern%20California%20%7C%20Kaiser%20Permanente&p=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Fdoctors-locations%23%2Fproviders%3Fzipcode%3D92395%26medical_specialty_label%3DPsychiatry%2520%2526%2520Neurology%3A%2520Neurology%2CPsychiatry%2520%2526%2520Neurology%3A%2520Psychiatry&r=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Fdoctors-locations&lt=712&evt=pageLoad&sv=1&rn=110568

161.    The Bing GET request above includes temporary and session IDs (mid, sid, vid) (yellow highlight), an indication that the page loaded (green highlight), and information about the browser and device (grey highlight). The GET request also transmitted to Bing the URL of the page (blue highlight), which reveals Plaintiff John Doe's search for a neurologist or psychiatrist in the 92395 zip code.

162.   On information and belief, the same type of information tracked, disclosed, and sent to Bing, Google, and Twitter for Plaintiffs has been tracked, disclosed, and sent to Bing, Google, and Twitter for other members of the Classes.

163.   Whenever Kaiser Plan Members use Kaiser Permanente's website, Kaiser Permanente allows Bing, Google, and Twitter to intercept the contents of their communications—including personal information, identifying information, and sensitive medical information—without their knowledge, consent, or authorization.

164.   Kaiser Permanente knowingly redirects and discloses Kaiser Plan Members' personally identifiable patient data, including their status as patients and the contents of their communications with Kaiser Permanente to Bing, Google, and Twitter.

165.   Despite its legal obligations to keep this information and these communications private and confidential, Kaiser Permanente's use of Bing, Google, and Twitter analytics causes the redirection, interception, and transmission of the precise content of patients' communication with Kaiser Permanente to Bing, Google, and Twitter.

166.   Kaiser Permanente's unauthorized redirection and disclosures to Bing, Google, and Twitter includes information that identifies Plaintiffs and Class Members as patients of Kaiser Permanente, and aids in receiving and recording patient communications pertaining to or about specific medical conditions, health services, and specific doctors.

167.   Kaiser Permanente's disclosures to Bing, Google, and Twitter occur because Kaiser Permanente intentionally deploys Bing, Google, and Twitter code on its website, and that code commandeers Kaiser Plan Members' web-browsers and causes personally identifiable patient data, as well as the contents of communications exchanged between Kaiser Permanente and its patients, to be redirected and sent to Bing, Google, and Twitter.

168.   As currently deployed, Bing, Google, and Twitter analytics, as employed by Kaiser Permanente, functions as a wiretap, and Bing, Google, and Twitter as third-party wiretappers.

**C.** **Plaintiffs and Class Members Did Not Consent to Kaiser Permanente Disclosure of Their Information and Communications to Third Parties**

169. Kaiser Permanente does not ask Kaiser Plan Members who use its Site and Portal, including Plaintiffs and members of the Classes, whether they consent to having the contents of their information and communications with Kaiser Permanente disclosed to the Third Party Wiretappers. Kaiser Plan Members are never actively told that their electronic communications are being wiretapped by Third Party Wiretappers.

170. Kaiser Permanente states in its Privacy Policy, under the heading "Internet Cookies," that:

> We and our service providers *may* place Internet "cookies" or similar technologies (JavaScript, HTML5, ETag) on the computer hard drives of visitors to the Site. Information we obtain helps us to tailor our Site to be more helpful and efficient for our visitors. For example, we are able to see the navigation path taken by users, and that information allows us to understand user success or challenges with the web experience. *The cookie consists of a unique identifier that does not contain information about your health history.* We use two types of cookies, 'session' cookies and "persistent" cookies, along with other similar technologies.

Website and mobile application Privacy Statement, Kaiser, https://healthy.kaiserpermanente.org/ privacy (last visited June 9, 2023) (emphasis added).

171. This does not disclose that Kaiser Permanente sends Plaintiffs and Class Members' information and communications to the Third Party Wiretappers.

172. First, these "third parties" are not defined in the Website Privacy Policy.

173. Second, disclosing that others *may* monitor certain information is not the same as disclosing that others *do in fact* collect user data in real time.

174. Third, Kaiser Permanente falsely claims that information about Kaiser Plan Members' health history is not being transmitted.

175. Fourth, alerting users to the possible use of "cookies . . . and other tracking technologies" does not put Kaiser Plan Members on notice of the use of technology like Session Replay, and other technology used by the Third Party Wiretappers, which, unlike first party cookies, (1) communicate information to an external server as a user navigates a website; (2) track users across devices; (3) are not easily disabled by users; and/or (4) essentially creates a recording of all the information that visitors provide or receive from Kaiser Permanente on the Site.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

176.    Fifth, disclosures to the Third Party Wiretappers are not made only for the purpose of tailoring the Kaiser Permanente website to be more helpful and efficient for Kaiser Plan Members who use the Site and Portal, but is instead used for marketing purposes, including to produce targeted advertising for third parties.

**D.    Plaintiffs' and Class Members' Health Information Has Actual, Measurable, Monetary Value**

177.    Kaiser Plan Members' confidential communications and information that Kaiser Permanente allows the Third Party Wiretappers to intercept has monetary value.

178.    For example, one recent study asked over a thousand consumers from around the world what price they would demand of third parties for access to their data and found that passwords would fetch $75.80; health information and medical records themselves average $59.80; and in third, Social Security numbers were valued at $55.70.[29]

179.    Some companies, such as Prognos Health, sell what they purport to be de-identified health information from millions of patients.[30]

180.    Due to the difficulty in obtaining health information, illegal markets also exist for such data, with some reporting that health data can be "more expensive than stolen credit card numbers."[31]

**E.    Kaiser Permanente's Conduct Violates State and Federal Privacy Laws**

181.    Kaiser Plan Members have a reasonable expectation of privacy in their identifying information, personal and sensitive medical information and communications with Kaiser Permanente and its providers, rooted in state and federal privacy laws as well as Kaiser Permanente's express and implied contracts and disclosures. This includes a reasonable expectation that Kaiser Plan Members' identifying information, personal and sensitive medical information and communications

---

[29] Jonathan Weicher, *Healthcare hacks—how much is your personal information worth?*, Netlib Security, https://netlibsecurity.com/articles/healthcare-hacks-how-much-is-your-personal-information-worth/ (last visited June 9, 2023).

[30] Press Release, *Prognos Health Announces Patent-Pending Technology* (Apr. 6, 2021), https://prognoshealth.com/about-us/news/press-release/prognos-health-announces-patent-pending-technology.

[31] Aarti Shahani, *The Black Market For Stolen Health Care Data*, NPR (Feb. 13, 2015, 4:55 am), https://www.npr.org/sections/alltechconsidered/2015/02/13/385901377/the-black-market-for-stolen-health-care-data.

CLASS ACTION COMPLAINT
Case No:

with Kaiser Permanente and its providers will not be disclosed to or tracked by Third Party Wiretappers and will not be disclosed to third parties for marketing purposes.

182.    Plaintiffs and Class Members reasonably believed their interactions with Kaiser Permanente on the Site and Portal were private and would not be transmitted to third parties, recorded, or monitored for a later playback.

183.    The data collected by Kaiser Permanente identified specific web pages navigated and content viewed, and thus revealed personalized and sensitive information about Plaintiffs and Class Members, including sensitive personal and medical information.

184.    Plaintiffs and Class Members did not have a reasonable opportunity to discover Defendants' unlawful and unauthorized connections and conduct because Kaiser Permanente did not disclose its actions nor seek consent from Plaintiffs or Class Members prior to making the transmissions to third parties.

185.    Privacy polls and studies uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' personal data.

186.    For example, a study by Pew Research Center indicated that an overwhelming majority of Americans—approximately 79%—are concerned about how data is collected about them by companies.[32]

187.    As Kaiser Plan Members, Plaintiffs and Class Members have a reasonable expectation of privacy that Kaiser Permanente, their health care provider, will not disclose the content of their personal and medical information and confidential communications with Kaiser Permanente and its providers to third parties without their express authorization.

188.    Plaintiffs and Class Members' reasonable expectation of privacy in their personally identifiable data and communications exchanged with Kaiser Permanente and its providers is derived from several sources, including:

---

[32] Brooke Auxier et al., *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, Pew Research Center (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

CLASS ACTION COMPLAINT
Case No:

a.   Kaiser Permanente's status as Kaiser Plan Members' health care provider;

b.   Kaiser Permanente's common law obligation to maintain confidentiality of patient data and communications;

c.   State and federal laws and regulations protecting the confidentiality of medical information;

d.   State and federal laws protecting the confidentiality of communication and computer data;

e.   Defendants' express promises of privacy and confidentiality; and

f.   Defendants' implied promises of privacy and confidentiality.

189.   Significantly, patient health care data in the United States is protected by federal law under HIPAA and its implementing regulations, which are promulgated by the HHS.

190.   The HIPAA Privacy Rule, located at 45 CFR § 160 and Subparts A and E of § 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[33]

191.   The Privacy Rule broadly defines "protected health information" ("PHI") as "individually identifiable health information" ("IIHI") that is "(i) [t]ransmitted by electronic media; (ii) [m]aintained in electronic media; or (iii) [t]ransmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

192.   IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

---

[33] *The HIPAA Privacy Rule*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html (last visited June 9, 2023).

CLASS ACTION COMPLAINT
Case No:

193.    The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ § 160.103, 164.502.

194.    An individual or corporation violates the HIPAA Privacy Rule if it knowingly: "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." 42 U.S.C. § 1320d-6. The statute states that a "person . . . shall be considered to have obtained or disclosed individually identifiable health information . . . if the information is maintained by a covered entity . . . and the individual obtained or disclosed such information without authorization." *Id.*

195.    The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Kaiser Permanente when it knowingly disclosed individually identifiable health information relating to an individual, as those terms are defined under HIPAA.

196.    Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." *Id.* In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both." *Id.*

197.    Guidance from HHS confirms that patient status is protected by HIPAA, which provides

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data. . . . ***If such information was listed with health condition, health care provision or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.***[34]

---

[34] *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule* at 5, HHS (Nov. 26, 2012), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/

198.    HHS' guidance for marketing communications states that health care providers may not provide patient lists for marketing purposes without the consent of every included patient:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. **Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list.**[35]

199.    HHS has previously instructed that patient status is protected by the HIPAA Privacy Rule:

    a.  "[T]he sale of a patient list to a marketing firm" is not permitted under HIPAA. 65 Fed. Reg. 82717 (Dec. 28, 2000);

    b.  "[A] covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," which includes disclosure of mere patient status through a patient list. 67 Fed. Reg. 53186 (Aug. 14, 2002);

    c.  It would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 Fed. Reg. 5642 (Jan. 25, 2013); and

    d.  The only exception permitting a hospital to identify patient status without express written authorization is to "maintain a directory of individuals in its facility" that includes name, location, general condition, and religious affiliation when used or disclosed to "members of the clergy" or "other persons who ask for the individual by name." 45 C.F.R. § 164.510(1). Even then, patients must be provided an opportunity to object to the disclosure of the fact that they are a patient. 45 C.F.R. § 164.510(2).

## V.    TOLLING

200.    Plaintiffs repeat and incorporate all other paragraphs as if fully set forth herein.

201.    The statutes of limitations applicable to Plaintiffs' and the Classes' claims were tolled by Defendants' conduct and Plaintiffs and Class Members' delayed discovery of their claims.

202.    As alleged above, Plaintiffs and members of the Classes did not know and could not have known when they used the Kaiser Permanente Site and/or Portal that Kaiser Permanente was

---

coveredentities/De-identification/hhs_deid_guidance.pdf. (emphasis added) (last visited June 9, 2023).

[35]    *Marketing* at 1-2, Office for Civil Rights (Rev. Apr. 3, 2003), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf. (emphasis added).

CLASS ACTION COMPLAINT
Case No:

disclosing their information and communications to third parties. Plaintiffs and members of the Classes could not have discovered Kaiser Permanente's unlawful conduct with reasonable diligence.

203. Kaiser Permanente secretly incorporated the Third Party Wiretappers' code into the Site, including the Portal, providing no indication to Kaiser Plan Members and Site users that their communications would be disclosed to these third parties.

204. Kaiser Permanente had exclusive and superior knowledge that the Third Party Wiretappers' code incorporated on its Site would disclose Kaiser Plan Members' protected and private information and confidential communications, yet failed to disclose to Kaiser Plan Members and Site users, including Plaintiffs and members of the Classes, that by interacting with the Kaiser Permanente Site and/or Portal that Plaintiffs and Class Members' patient status, personal information, sensitive health information, and confidential communications would be disclosed to third parties.

205. Plaintiffs and members of the Classes could not with due diligence have discovered the full scope of Kaiser Permanente's conduct because the incorporation of the Third Party Wiretappers' code is highly technical and there were no disclosures or other indication that would inform a reasonable consumer or Site user that Kaiser Permanente was disclosing and allowing the interception of such information to these third parties.

206. The earliest Plaintiffs and Class Members could have known about Defendants' conduct was shortly before the filing of this Complaint.

## VI. CLASS ACTION ALLEGATIONS

207. Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and/or (b)(3) on behalf of the following Class and Sub-Classes:

**Nationwide Class:** All Kaiser Plan Members in the United States who used the Kaiser Permanente website.

**California Sub-Class:** All Kaiser Plan Members who are residents of the State of California and used the Kaiser Permanente website.

**Washington Sub-Class:** All Kaiser Plan Members who are residents of the State of Washington and used the Kaiser Permanente website.

**Nationwide Breach of Contract Sub-Class:** All Kaiser Plan Members who used the Portal on the Kaiser Permanente website.

**California Breach of Contract Sub-Class**: All Kaiser Plan Members who are residents of the State of California and used the Portal on the Kaiser Permanente website.

**Washington Breach of Contract Sub-Class**: All Kaiser Plan Members who are residents of the State of Washington and used the Portal on the Kaiser Permanente website.

208.    Excluded from the Class and Sub-Classes are Defendants and their parents, subsidiaries, and corporate affiliates. Plaintiffs reserve the right to revise the definition of the Class and Sub-Classes based upon subsequently discovered information and reserves the right to establish additional Sub-Class where appropriate. The Class and Sub-Classes are collectively referred to herein as the "Class" or "Classes."

209.    The Classes are so numerous that joinder of all members is impracticable. Plaintiffs believe that there are at least tens of thousands of proposed members of the Classes throughout the United States.

210.    Common questions of law and fact exist as to all members of the Classes and predominate over any issues solely affecting individual members of the Classes. The common and predominating questions of law and fact include, but are not limited to:

- Whether Defendants' acts and practices violated the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq.*;
- Whether Defendants' acts and practices violated the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.*;
- Whether Defendants' acts and practices violated California's Constitution, Art. 1, § 1;
- Whether Defendants' acts and practices violated the Washington Privacy Act Rev. Code of Washington § 9.73, *et seq*;
- Whether Defendants' acts and practices violated the Washington Health Care Information Act Rev. Code of Washington § 70.02.005, *et seq*;
- Whether Defendants' acts and practices violations Plaintiffs and Class Members' common law privacy rights;
- Whether Defendants breached a express contract;
- Whether Defendants breached an implied contract; and
- Whether damages, restitution, equitable, injunctive, compulsory, or other relief is warranted.

211.    Plaintiffs' claims are typical of the claims of the Classes that Plaintiffs seek to represent. As alleged herein, Plaintiffs and the Classes sustained damages arising out of the same unlawful actions and conduct by Defendants.

212.    Plaintiffs are willing and prepared to serve the Classes in a representative capacity with all of the obligations and duties material thereto. Plaintiffs will fairly and adequately protect the

interests of the Classes and has no interest adverse to or in conflict with the interests of the other members of the Classes.

213.    Plaintiffs' interests are co-extensive with and are not antagonistic to those of absent members within the Classes. Plaintiffs will undertake to represent and protect the interests of absent members within the Classes and will vigorously prosecute this action.

214.    Plaintiffs have engaged the services of the undersigned counsel. Counsel is experienced in complex litigation, will adequately prosecute this action and will assert and protect the rights of, and otherwise represent, Plaintiffs and absent members of the Classes.

215.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiffs know of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

216.    Class action status is warranted under Federal Rule of Civil Procedure 23(b)(3) because questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

217.    The Classes may also be certified under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted on grounds generally applicable to the Classes, thereby making it appropriate to award final injunctive relief or corresponding declaratory relief with respect to the Classes.

218.    The interest of members within the Classes individually controlling the prosecution of separate actions is theoretical and not practical. The Classes have a high degree of similarity and are cohesive, and Plaintiffs anticipate no difficulty in the management of this matter as a class action.

219.    The nature of notice to the proposed Classes is contemplated to be by direct mail and/or email upon certification of the Classes or, if such notice is not practicable, by the best notice practicable under the circumstance including, *inter alia*, email, publication in major newspapers, and/or on the internet.

CLASS ACTION COMPLAINT
Case No:

## VII.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of the Electronic Communications Privacy Act, 18 U.S.C §§ 2510, *et seq.*
### (On Behalf of the Nationwide Class)

220.    Plaintiffs repeat and incorporate all other paragraphs as if fully set forth herein.

221.    Plaintiffs bring this claim individually and on behalf of the Nationwide Class.

222.    The Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2510, *et seq.*, prohibits the interception of any wire, oral, or electronic communications without the consent of at least one authorized party to the communication.

223.    The ECPA confers a civil cause of action on "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

224.    The ECPA protects both the sending and receipt of communications.

225.    A violation of the ECPA occurs where any person "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . . electronic communication" or "intentionally discloses, or endeavors to disclose, to any other person the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication" or "intentionally uses, or endeavors to use, the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication." 18 U.S.C. §§ 2511(1)(a), (c)-(d).

226.    In addition, "a person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication . . . while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient." 18 U.S.C. § 2511(3)(a).

227.    "Intercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

228.   "Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

229.   "Contents" includes "any information concerning the substance, purport, or meaning" of the communication at issue. 18 U.S.C. § 2510(8).

230.   An "electronic communication service" means "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

231.   Plaintiffs and Nationwide Class Members' communications with Kaiser Permanente through the Site, including the Portal, are electronic communications under the ECPA.

232.   Whenever Plaintiffs and Nationwide Class Members communicated with Kaiser Permanente and/or their health care providers on the Site, Third Party Wiretappers, through the source code Kaiser Permanente embedded and ran on its website, contemporaneously and intentionally intercepted, and endeavored to intercept Plaintiffs and Nationwide Class Members' electronic communications without authorization or consent.

233.   Whenever Plaintiffs and Nationwide Class Members communicated with Kaiser Permanente and/or their health care providers on the Site, Kaiser Permanente, through the source code it imbedded and ran on its website, contemporaneously and intentionally disclosed, and endeavored to disclose the contents of Plaintiffs and Nationwide Class Members' electronic communications to the Third Party Wiretappers, without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA.

234.   Whenever Plaintiffs and Nationwide Class Members communicated with Kaiser Permanente and/or their health care providers on the Site, Kaiser Permanente, through the source code it embedded and ran on the Site, contemporaneously and intentionally used, and endeavored to use and allow the contents of Plaintiffs and Nationwide Class Members' electronic communications to be disclosed and used for purposes other than providing health care services to Plaintiffs and

Nationwide Class Members without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA.

235.    Whenever Plaintiffs and Nationwide Class Members communicated with Kaiser Permanente and/or their health care providers on the Site, Kaiser Permanente, through the source code it embedded and ran on the Site, contemporaneously and intentionally redirected the contents of Plaintiffs and Nationwide Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, namely the Third Party Wiretappers.

236.    Whenever Plaintiffs and Nationwide Class Members communicated with Kaiser Permanente and/or their health care providers on the Site, Kaiser Permanente, through the source code it embedded and ran on the Site, contemporaneously and intentionally divulged the contents of Plaintiffs and Nationwide Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, namely the Third Party Wiretappers.

237.    The Third Party Wiretappers intentionally intercepted and used the contents of Plaintiffs and Nationwide Class Members' electronic communications for the unauthorized purpose of profiting from Plaintiffs and Nationwide Class Members' communications, including by generating advertising revenue.

238.    Plaintiffs and Nationwide Class Members did not authorize Kaiser Permanente to disclose the content of their communications with Kaiser Permanente to the Third Party Wiretappers.

239.    Plaintiffs and Nationwide Class Members did not authorize the Defendants' interception, redirection, disclosure, and/or use of their sensitive, private health information and communications in their electronic communications with Kaiser Permanente. The Third Party Wiretappers are not party to these communications.

240.    Because the interception of Plaintiffs and Nationwide Class Members' communications was without authorization and consent from Plaintiffs and Nationwide Class

1  Members, and included confidential information protected under HIPAA, the interception was

2  unlawful, tortious, and/or constituted a criminal act.

3      241.    Defendants' actions were at all relevant times knowing, willful, and intentional.

4      242.    Pursuant to 18 U.S.C. § 2520, Plaintiffs and Nationwide Class Members have been

5  damaged by the interception, disclosure, and/or use of their communications in violation of the ECPA

6  and are entitled to: (1) appropriate equitable or declaratory relief; (2) damages, in an amount to be

7  determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiffs

8  and the Class and any profits made as a result of the violation, or (b) statutory damages of whichever

9  is the greater of $100 per day per violation or $10,000; and (3) reasonable attorneys' fees and other

10  litigation costs reasonably incurred.

11  **SECOND CLAIM FOR RELIEF**
**Violation of the California Invasion of Privacy Act**
**Cal. Penal Code §§ 630, *et seq*. ("CIPA")**
12  **(On Behalf of the Nationwide Class, or alternatively, On Behalf of the California Sub-Class)**

13      243.    Plaintiffs repeat and incorporate all other paragraphs as if fully set forth herein.

14      244.    Plaintiffs bring this claim individually and on behalf of the Nationwide Class, or

15  alternatively, on behalf of the California Sub-Class.

16      245.    The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal

17  Code §§ 630, *et seq*., to address "advances in science and technology [that] have led to the

18  development of new devices and techniques for the purpose of eavesdropping upon private

19  communications and that the invasion of privacy resulting from the continual and increasing use of

20  such devices and techniques has created a serious threat to the free exercise of personal liberties and

21  cannot be tolerated in a free and civilized society." *Id.* § 630. CIPA is intended "to protect the right

22  of privacy of the people of this state." *Id.*

23      246.    To establish liability under section 631(a), Plaintiffs need only establish that a

24  Defendant, "by means of any machine, instrument, or contrivance, or in any other manner," did any

25  of the following:

26      [i] [I]ntentionally taps, or makes any unauthorized connection, whether physically,
electrically, acoustically, inductively or otherwise, with any telegraph or telephone
27  wire, line, cable, or instrument, including the wire, line, cable, or instrument of any
internal telephonic communication system,

28

Or

[ii] [W]illfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

Or

[iii] [U]ses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

Or

[iv] [A]ids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

247.     Under § 631, a defendant must show it had the consent of all parties to a communication.

248.     Kaiser Permanente and the Third Party Wiretappers are each a "person" for the purposes of CIPA.

249.     Defendants maintain their headquarters in California, where they designed, contrived, agreed, conspired, effectuated, aided, and/or received the interception and use of the contents of Plaintiffs and Class Members' communications.

250.     The Third Party Wiretappers' code, Quantum Metric's recording code, Plaintiffs and Class Members' browsers and Plaintiffs and Class Members' computing and mobile devices are all a "machine, instrument, or contrivance, or . . . other manner" used to engaged in the prohibited conduct at issue here. Cal. Penal Code § 631.

251.     Kaiser Permanente installed the Third Party Wiretappers' code to automatically and secretly spy on, and intercept Plaintiffs and Class Members' communications with Kaiser Permanente through the Kaiser Permanente website in real time.

252.     At all relevant times, Kaiser Permanente's disclosure of Plaintiffs and Class Members' internet communications to Third Party Wiretappers was without Plaintiffs and Class Members' authorization or consent.

253.    By installing the Third Party Wiretappers' code on its website, Kaiser Permanente intentionally caused Plaintiffs and Class Members' communications to be intercepted, recorded, stored, and transmitted to the Third Party Wiretappers.

254.    At all relevant times, the Third Party Wiretappers intentionally tapped or made unauthorized connections with, the lines of internet communication between Plaintiffs and Class Members and Kaiser Permanente's Site without the consent of all parties to the communication.

255.    The Third Party Wiretappers willfully read or attempt to read or learn the contents or meaning of Plaintiffs and Class Members' communications to Kaiser Permanente's Site while the communications are in transit or passing over any wire, line, or cable, or were being received at any place within California when it intercepted Plaintiffs and Class Members' communications with Kaiser Permanente's Site in real time.

256.    By embedding the Third Party Wiretappers' technology on its website, Kaiser Permanente aided, agreed with, employed, and conspired with Third Party Wiretappers to carry out the wrongful conduct alleged herein in violation of Cal. Penal Code § 631(a)[iv].

257.    Plaintiffs and the Class Members seek statutory damages in accordance with § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Class in an amount to be proven at trial, as well as injunctive or other equitable relief.

### THIRD CLAIM FOR RELIEF
### Common Law Invasion of Privacy—Intrusion Upon Seclusion
### (On Behalf of the Nationwide Class, or alternatively, On Behalf of the California Sub-Class)

258.    Plaintiffs repeat and incorporate all other paragraphs as if fully set forth herein.

259.    Plaintiffs bring this claim individually and on behalf of the Nationwide Class, or alternatively, on behalf of the California Sub-Class.

260.    Intrusion upon seclusion has occurred when (1) Defendants intruded and/or aided, agreed with, employed, and/or conspired with the Third Party Wiretappers to intrude into a private place, conversation, matter; (2) in a manner was highly offensive to a reasonable person.

261.    Kaiser Permanente intentionally intruded upon Plaintiffs and Class Members' solitude or seclusion when it disclosed communications it received from Plaintiffs and Class Members, which was intended to stay private, to Third Party Wiretappers.

262.    Plaintiffs and Class Members did not consent to or authorize, nor were they aware of (1) Kaiser Permanente's disclosure to Third Party Wiretappers of information that it received from Plaintiffs and Class Members through its Site or (2) the Third Party Wiretappers' collection of information concerning Plaintiffs and Class Members' activity on the Kaiser Permanente website at the time that the disclosure occurred. Plaintiffs and Class Members never agreed that Kaiser Permanente could disclose their communications to Third Party Wiretappers, nor did they agree that the Third Party Wiretappers could collect such information.

263.    Plaintiffs and Class Members had a reasonable expectation of privacy over their communications with Kaiser Permanente, including information obtained from their use of Kaiser Permanente's Site, including the Portal.

264.    Kaiser Permanente's and the Third Party Wiretappers' intentional intrusion into Plaintiffs and Class Member's communications with Kaiser Permanente, including information obtained from their use of Kaiser Permanente's Site, was highly offensive to a reasonable person in that it violated federal and state criminal and civil laws designed to protect individual privacy.

265.    The disclosure and collection of communications with Kaiser Permanente, including information obtained from their use of Kaiser Permanente's Site through deceit is highly offensive to a reasonable person. Plaintiffs and Class Members reasonably expected that their communications with Kaiser Permanente, including information obtained from their use of Kaiser Permanente's Site would not be disclosed to third parties.

266.    Secret disclosure and collection of Plaintiffs and Class Members' communications with Kaiser Permanente, including information of thousands of individuals obtained from their use of Kaiser Permanente's Site is highly offensive to a reasonable person. Privacy polls and studies show that the overwhelming majority of Americans believe one of the most important privacy rights is the need for an individual's affirmative consent before personal information is collected or shared.

CLASS ACTION COMPLAINT
Case No:

267.    Plaintiffs and Class Members have suffered harm and injury as a direct and proximate result of Kaiser Permanente's invasion of their privacy.

268.    Plaintiffs and Class Members are entitled to reasonable compensation, including but not limited to monetary damages.

269.    Plaintiffs and Class Members seek appropriate relief for that injury, including, but not limited to injunctive relief and damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as well as a disgorgement of profits earned as a result of its intrusions upon Plaintiffs and Class Members' privacy.

270.    Plaintiffs also seek such other relief as the Court may deem just and proper.

**FOURTH CLAIM FOR RELIEF**
**Invasion of Privacy and Violation of the California Constitution, Art. 1, § 1**
**(On Behalf of the Nationwide Class, or alternatively, On Behalf of the California Sub-Class)**

271.    Plaintiffs repeat and incorporate all other paragraphs as if fully set forth herein.

272.    Plaintiffs bring this claim individually and on behalf of the Nationwide Class, or alternatively, on behalf of the California Sub-Class.

273.    Kaiser Permanente is headquartered in California and its conduct took place in California.

274.    Article I, section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Cons. art. I, § 1.

275.    The right to privacy in California's constitution creates a right of action against private entities such as Kaiser Permanente.

276.    To state a California constitutional privacy claim, a plaintiff must establish (1) a legally protected privacy interest; (2) where the plaintiff had a reasonable expectation of privacy; and (3) conduct by the defendant constituting an intrusion of privacy so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms.

277.    Plaintiffs and Class Members possess a legally protected interest in their communications with Kaiser Permanente, including information derived from their use of Kaiser

1   Permanente's Site, and in providing such information to Kaiser (and receiving information from

2   Kaiser Permanente) without that information being disclosed to Third Party Wiretappers. This

3   legally-protected interest is derived from the common law, the California Constitution's article I,

4   section 1 guarantee of the right to privacy, the ECPA, CIPA, and HIPAA.

5   278.   Plaintiffs and Class Members had a reasonable expectation of privacy under the

6   circumstances, including that: (i) the information Kaiser Permanente disclosed to Third Party

7   Wiretappers included information related to patient status, health conditions, identifying information,

8   personal and sensitive information, information related to medical treatment, and confidential

9   communications with Kaiser Permanente and its providers; and (ii) Plaintiffs and Class Members did

10  not consent or otherwise authorize Kaiser Permanente to disclose this private information and these

11  confidential communications to the Third Party Wiretappers.

12  279.   Defendants' conduct constituted a serious invasion of privacy that would be highly

13  offensive to a reasonable person in that: (i) the information disclosed by Kaiser Permanente and

14  collected by Third Party Wiretappers was highly sensitive and personal, as protected by the California

15  Constitution; (ii) Kaiser Permanente did not have authorization or consent to disclose this information

16  to any third party, including Third Party Wiretappers, and the Third Party Wiretappers did not have

17  authorization to collect this information; and (iii) the invasion deprived Plaintiffs and Class Members

18  the ability to control the circulation of said information, which is considered a fundamental right to

19  privacy.

20  280.   Defendants' invasion violated the privacy rights of thousands of Class Members,

21  including Plaintiffs, without authorization or consent. Their conduct constitutes a severe and

22  egregious breach of social norms.

23  281.   As a direct and proximate result of Defendants' actions, Plaintiffs and Class Members

24  have had their privacy invaded and sustained damages and will continue to suffer damages.

25  282.   Plaintiffs and Class Members seek appropriate relief for that injury, including but not

26  limited to injunctive relief and damages that will reasonably compensate Plaintiffs and Class

27

28

Members for the harm to their privacy interests as well as a disgorgement of profits earned as a result of their intrusions upon Plaintiffs and Class Members' privacy.

283.    Plaintiffs also seek such other relief as the Court may deem just and proper.

**FIFTH CLAIM FOR RELIEF**
**Breach of Express Contract**
**(On Behalf of the Nationwide Breach of Contract Sub-Class or alternatively, On Behalf of the California Breach of Contract Sub-Class and the Washington Breach of Contract Sub-Class)**

284.    Plaintiffs repeat and incorporate all other paragraphs as if fully set forth herein.

285.    Plaintiffs bring this claim individually and on behalf of the Nationwide Breach of Contract Sub-Class, or alternatively, on behalf of the California Breach of Contract Sub-Class and the Washington Breach of Contract Sub-Class.

286.    There exists an express contract between Plaintiffs and the Breach of Contract Sub-Class Members on the one side, and Kaiser Permanente on the other, when Plaintiffs and Breach of Contract Sub-Class Members accessed information on the Kaiser Permanente Portal, namely the Terms and Conditions and Privacy Policy for the Kaiser Permanente website (hereinafter referred to as the "express contract" or "Site Terms and Conditions"). A true and correct copy of the Site Terms and Conditions[36] currently in effect is attached hereto as Exhibit 1, and a copy of the Privacy Statement, incorporated into the Terms and Conditions, is attached as Exhibit 2.

287.    Specifically, at the bottom of the Portal Login Page, Kaiser Permanente agrees, contracts, and warrants that: "By signing in, you agree to our website Terms & Conditions and Privacy Statement." https://healthy.kaiserpermanente.org/southern-california/register (last visited June 9, 2023).

288.    The Kaiser Permanente Terms & Conditions, available via hyperlink, provides: "Any personal information you submit to the Site (for yourself or someone else) is governed by our Website and KP Mobile Application Privacy Statement." *Terms & Conditions for our Website and Mobile Application*, *supra* note 4.

289.    In the Kaiser Permanente Privacy Statement, also available via hyperlink, Kaiser Permanente also agrees, contracts, and warrants that Kaiser Permanente's data collection "is collected

---

[36] The Terms and Conditions are materially identical for all Kaiser Permanente Regions.

on an aggregate basis, which means that no personally identifiable information is associated with the data."

290.    In the Kaiser Permanente Privacy Statement, Kaiser Permanente states that Kaiser Permanente and its service providers may place "cookies" or similar technologies on the computer hard drives of visitors to the Site, and further agrees, contracts, and warrants that information obtained from cookies is only used to help Kaiser Permanente "tailor our Site to be more helpful and efficient for our visitors."

291.    In the Kaiser Permanente Privacy Statement, Kaiser Permanente agrees, contracts, and warrants that "[t]he cookie consists of a unique identifier that does not contain information about your health history."

292.    The Kaiser Permanente Privacy Statement also states that Kaiser "may also occasionally use 'Web beacons' (also known as 'clear gifs,' 'Web bugs,' '1-pixel gifs,' etc.)" and Kaiser Permanente also agrees, contracts, and warrants that Kaiser Permanente Kaiser will "not collect any personal health information" through this technology.

293.    Kaiser Permanente then makes the following promises in the Privacy Statement, which is incorporated as part of the express contract:

- "Use and disclosure of health information includes using the information to provide treatment to the individual, to make payments for such treatment, and to conduct ongoing quality improvement activities. Our use and disclosure of an individual's personal information (including health information) is limited as required by state and federal law."

- "In addition to web logs, described below, Kaiser Permanente routinely gathers data on Site activity, such as how many people visit the Site, the web pages or mobile screens they visit, where they come from, how long they stay, etc. *The data is collected on an aggregate basis, which means that no personally identifiable information is associated with the data.* This data helps us improve our content and overall usage. The information is not shared with other organizations for their independent use." (emphasis added).

294.    In addition, Kaiser promises that "we do not collect any personally identifiable information about visitors to the Site. The policies, sources, uses and disclosures of information are outlined in Sections 1 through 20 that follow."

295.    Sections 2, 3, and 4 address "Web logs," "Internet cookies," and "Web Beacons," however, neither section describes the extensive information collection to which patient information is subjected by the Kaiser website.

296.    The Kaiser Permanente Privacy Statement does not disclose to Kaiser Plan Members that Kaiser Permanente has aided, agreed with, employed, and/or conspired with third parties that are recording all of the information that Kaiser Plan Members' are sending, accessing, reviewing, or receiving through the Site.

297.    These terms create a contractual relationship between Kaiser Permanente and any patient to whom it gives access to the Portal, including Plaintiffs and Breach of Contract Sub-Class Members.

298.    Despite its assurances of privacy and confidentiality, Kaiser Permanente intentionally incorporated the Third Party Wiretappers' code and recording technology on the Kaiser Permanente Site, including the Portal, disclosing the contents of Plaintiffs and Breach of Contract Sub-Class Members' information and confidential communications with Kaiser Permanente and its providers to Third Party Wiretappers, including for advertising purposes.

299.    In exchange for Kaiser Permanente's provision of a secure website and patient Portal, Plaintiffs and Breach of Contract Sub-Class Members were able to make appointments, view medical history, get test results, and find and communicate with doctors, among other things, by way of the patient Portal, instead of doing so by other means, such as by phone or in person.

<strong>Consent</strong>

300.    Kaiser Permanente requires Kaiser Plan Members to consent to the Site Terms and Conditions in the process of signing up for, and using, the patient Portal.

301.    Plaintiffs  and Breach of Contract Sub-Class Members consented to the Site Terms and Conditions by signing up for, and using, the Kaiser Permanente patient Portal.

<strong>Consideration</strong>

302.    The Kaiser Permanente patient Portal is not a service Kaiser provides without receiving anything from Plaintiffs and Breach of Contract Sub-Class Members in return. To the contrary, Plaintiffs and Breach of Contract Sub-Class Members' use of the patient Portal confers

significant benefit upon Kaiser Permanente—a benefit to which Kaiser Permanente is not entitled—including, but not limited to, increased efficiency, optimized workflow, cost reduction, and receipt of incentive payments from the federal government (HHS) via the Meaningful Use Program. As just one example, Breach of Contract Sub-Class Members use of the patient Portal, to access test results and make appointments, results in Kaiser Permanente being freed up from performing such tasks of scheduling and reporting on test results for patients, thereby cutting down on long phone calls or in-office communications, increasing efficiency and decreasing costs.

303.    In fact, according to a blog post on the health policy website, Health Affairs,[37] Kaiser Permanente offers "the largest private-sector patient portal in the U.S.," which "help[s] our health care system improve outcomes and manage resources." The Portal has led to a "2 to 6.5 percent improvement in Healthcare Effectiveness Data and Information Set (HEDIS) performance measures," improved patient loyalty by making portal uses "2.6 times more likely to remain Kaiser Permanente members," and shifted patient interactions from in-person to secure messenger.

304.    Thus, Kaiser Permanente benefits from Breach of Contract Sub-Class Members' use of their online Portal by: (1) making their provision of healthcare services more efficient, and (2) reducing the costs associated with managing their members' medical conditions. Importantly, as an integrated managed care consortium, Kaiser Permanente is both a healthcare provider and insurer—thus, they are in a position to realize any savings generated by reducing patient costs.

### Performance

305.    Plaintiffs and Breach of Contract Sub-Class Members performed under the express contract.

### Kaiser Permanente's Breach of the Express Contract

306.    Kaiser Permanente materially breached its express contract with Plaintiffs and Breach of Contract Sub-Class Members by disclosing to the Third Party Wiretappers, Plaintiffs and Breach of Contract Sub-Class Members' patient status, personally identifiable data, and confidential

---

[37] Terhilda Garrido, Brian Raymond, & Ben Wheatley, *Lessons From More Than A Decade In Patient Portals*, Health Affairs (Apr. 7, 2016), https://www.healthaffairs.org/do/10.1377/forefront .20160407.054362.

CLASS ACTION COMPLAINT
Case No:

communications with Kaiser Permanente, thereby failing to provide Plaintiffs and Breach of Contract Sub-Class Members with the secure method of communication it agreed to provide.

307.   The patient health information Kaiser Permanente used and disclosed to unauthorized third parties includes:

    a.   Breach of Contract Sub-Class Members' IP addresses, User-Agent data, persistent cookie identifiers, device identifiers, and/or browser fingerprint information—all of which constitute personally identifiable data both alone and in combination with other data;

    b.   the date and time of Breach of Contract Sub-Class Members' registration for the Portal;

    c.   the date and time of every Breach of Contract Sub-Class Members' sign-in and logoff of the "secure" Portal;

    d.   the contents of communications Breach of Contract Sub-Class Members' exchange inside the "secure" Portal;

    e.   the contents of communications Breach of Contract Sub-Class Members' exchange after they have logged off the Portal;

    f.   the contents of communications Breach of Contract Sub-Class Members' exchange with Kaiser Permanente seeking providers who accept specific insurance products while still signed in to the "secure" Portal; and

    g.   all other HTTPS communications patients exchange with Kaiser Permanente and its providers on the Site that Kaiser Permanente has permitted the third parties to correlate with the patient's status as a patient, and the particular dates and times for which they access the "secure" Portal.

308.   The patient data Kaiser Permanente discloses (Plaintiffs and Breach of Contract Sub-Class Members' patient status, personally identifiable data, and confidential communications with Kaiser Permanente and its providers) is not aggregated as specified in the Privacy Statement.

309.   Nevertheless, information that Plaintiffs and Breach of Contract Sub-Class Members reasonably thought was being transmitted "securely" to Kaiser Permanente was being disclosed by Kaiser Permanente to unauthorized third parties as follows:

    a.   A Kaiser Plan Member signs in to the "secure" patient Portal;

    b.   On sign-in, Kaiser Permanente discloses the fact of the sign in to Adobe, Bing, Google, Quantum Metric, and Twitter;

    c.   Once signed-in, if a Kaiser Plan Member clicked to, for example:

    e.   view tests, a disclosure of that action was made to Adobe, Bing, Google, Quantum Metric, and Twitter of the specific tests; or,

f.  Find-A-Doctor, or set an appointment, a disclosure of that action was made to Adobe, Bing, Google, Quantum Metric, and Twitter.

d.  The above examples of patient communications about the doctor or the appointment was shared with Adobe, Bing, Google, Quantum Metric, and Twitter while the Kaiser Plan Member was still logged-in to the "secure" patient Portal; and

e.  On logoff, Kaiser Permanente discloses this action to Adobe, Bing, Google, Quantum Metric, and Twitter.

310.  Kaiser Permanente has failed to cure these breaches and continues to disclose to Third Party Wiretappers Plaintiffs and Breach of Contract Sub-Class Members' personally identifiable data and communications with Kaiser Permanente.

**Plaintiffs and Breach of Contract Sub-Class Members Were Damaged**

311.  Defendants' breach caused Plaintiffs and Breach of Contract Sub-Class Members the following damages, among others:

a.  Nominal damages for each breach of contract by Defendants;

b.  General damages for invasion of their rights in an amount to be determined by a jury without reference to specific pecuniary harm;

c.  Sensitive and confidential information that Plaintiffs and Breach of Contract Sub-Class Members intended to remain private is no longer private;

d.  Defendants eroded the essential confidential nature of the provider-patient relationship;

e.  Defendants took something of value from Plaintiffs and Breach of Contract Sub-Class Members and derived a benefit therefrom without Plaintiffs and Breach of Contract Sub-Class Members' knowledge or informed consent and without sharing the benefit of such value;

f.  Plaintiffs and Breach of Contract Sub-Class Members did not get the full value of the medical services for which they paid, which included Defendants' duty to maintain confidentiality;

g.  Defendants' actions diminished the value of Plaintiffs and Breach of Contract Sub-Class Members' personal information;

h.  Defendants' actions violated the property rights that Plaintiffs and Breach of Contract Sub-Class Member enjoy in their private communications; and

i.  Defendants' actions violated the property rights that Plaintiffs and Breach of Contract Sub-Class Members enjoy in their personally identifiable medical data and communication.

312.  Plaintiffs and Breach of Contract Sub-Class Members also seek attorney's fees and costs on this claim to the extent allowable.

CLASS ACTION COMPLAINT
Case No:

**SIXTH CLAIM FOR RELIEF**
**Breach of Implied Contract**
**(On Behalf of the Nationwide Breach of Contract Sub-Class, or Alternatively, On Behalf of the California Breach of Contract Sub-Class and the Washington Breach of Contract Sub-Class)**

313.   Plaintiffs repeat and incorporate all other paragraphs as if fully set forth herein.

314.   Plaintiffs bring this claim on behalf of themselves and the Nationwide Breach of Contract Sub-Class, or alternatively on behalf of the California Breach of Contract Sub-Class and the Washington Breach of Contract Sub-Class.

315.   An implied contract was created between Kaiser Permanente, on the one side, and Plaintiffs and Breach of Contract Sub-Class Members, on the other hand, whereby Kaiser Permanente offered to provide Plaintiffs and Breach of Contract Sub-Class Members what it represented to be a secure Portal through which Plaintiffs and Breach of Contract Sub-Class Members could confidentially make appointments, review medical history, get test results, communicate with providers, and find doctors, among other things, and Plaintiffs and Breach of Contract Sub-Class Members agreed to use the purportedly secure Portal to make appointments, view medical history, get test results, and find and communicate with doctors, among other things, instead of doing so by other means, such as by phone or in person.

**Mutual Assent**

316.   Such implied contract was created by virtue of the relationship and conduct of the parties, as well as the surrounding circumstances, including, but not limited to:

   a.   The confidential nature of the medical-provider/patient relationship between Kaiser Permanente and Plaintiffs and Breach of Contract Sub-Class Members;

   b.   Kaiser Permanente's express promises, as noted above, to maintain the privacy and confidentiality of patients' personally identifiable data and communications that Plaintiffs and Breach of Contract Sub-Class Members exchange with Kaiser Permanente at the Site;

   c.   Kaiser Permanente's creation of a purportedly secure patient Portal that requires a sign-in with a user name and password, which would lead a reasonable person to believe that their communications with Kaiser Permanente while signed in to the Portal would not be shared outside of Kaiser Permanente; and

   d.   Plaintiffs and Breach of Contract Sub-Class Members' use of the purportedly secure Portal to make appointments, get test results, and find doctors, among other things, instead of doing so by other means, such as by phone or in person.

317. Kaiser Permanente knew, or had reason to know, that Plaintiffs and Breach of Contract Sub-Class Members would interpret the parties' relationship and conduct as an agreement to keep Plaintiffs and Breach of Contract Sub-Class Members' patient status, personally identifiable data, and communications with Kaiser Permanente inside the Portal confidential when Plaintiffs and Breach of Contract Sub-Class Members used Kaiser Permanente's patient Portal.

### Consideration

318. The patient Portal is not a service Kaiser Permanente provides without receiving anything from Plaintiffs and other patients in return. To the contrary, Plaintiffs and Breach of Contract Sub-Class Members' use of the Portal confers significant benefit upon Kaiser Permanente—a benefit to which Kaiser Permanente is not entitled—including, but not limited to, increased efficiency, optimized workflow, cost reduction, and receipt of incentive payments from the federal government (United States Department of Health and Human Services) via the Meaningful Use Program.

319. As just one example, patients' use of the patient Portal to access test results and make appointments results in Kaiser Permanente being freed up from performing such tasks of scheduling and reporting on test results for patients, thereby cutting down on long phone calls or in-office communications, increasing efficiency and decreasing costs.

320. As a result, and as further noted above, Kaiser Permanente is able to more efficiently allocate resources and benefits from improved—and, thus, less costly—patient outcomes and increased patient loyalty.

### Performance

321. Plaintiffs and Breach of Contract Sub-Class Members performed under the implied contract.

### Kaiser Permanente's Breach of the Implied Contract

322. Kaiser Permanente materially breached its implied contract with Plaintiffs and Breach of Contract Sub-Class Members, by disclosing to third-party companies, Plaintiffs and Breach of Contract Sub-Class Members' patient status, personally identifiable data, and confidential communications with Kaiser Permanente made within the patient Portal, thereby failing to provide Plaintiffs and Class Members with the secure site it agreed to provide.

323.    The patient health information Kaiser Permanente used and disclosed to unauthorized third parties for marketing includes:

a.    Breach of Contract Sub-Class Members' IP addresses, User-Agent data, persistent cookie identifiers, device identifiers, and/or browser fingerprint information—all of which constitute personally identifiable data both alone and in combination with other data;

b.    the date and time of Breach of Contract Sub-Class Members' registration for the Portal;

c.    the date and time of every Breach of Contract Sub-Class Member's sign-in and logoff of the "secure" Portal;

d.    the contents of communications Breach of Contract Sub-Class Members exchange inside the "secure" Portal;

e.    the contents of communications Breach of Contract Sub-Class Members exchange after they have logged off the Portal;

f.    the contents of communications Breach of Contract Sub-Class Members exchange with Kaiser Permanente seeking providers who accept specific insurance products while still signed in to the "secure" Portal; and

g.    all other HTTPS communications patients exchange with Kaiser Permanente at the Site that Kaiser Permanente has permitted the third parties to correlate with the Breach of Contract Sub-Class Members' status as a patient and the particular dates and times for which they access the "secure" Portal

324.    The patient data Kaiser Permanente discloses (Plaintiffs and Breach of Contract Sub-Class Members patient status, personally identifiable data, and confidential communications with Kaiser Permanente and its providers) is not aggregated as specified in the Privacy Statement.

325.    Nevertheless, information that Plaintiffs and Breach of Contract Sub-Class Members reasonably thought was being transmitted "securely" to Kaiser Permanente within the patient Portal was being disclosed by Kaiser Permanente to unauthorized third parties as follows:

a.    A patient signs in to the "secure" patient Portal;

b.    On sign-in, Kaiser Permanente discloses the fact of the sign in to Adobe, Bing, Google, Quantum Metric, and Twitter;

c.    Once signed-in, if a patient clicked to, for example:

d.    view tests, a disclosure of that action was made to Adobe, Bing, Google, Quantum Metric, and Twitter of the specific tests; or,

e.    Find-A-Doctor, or set an appointment, a disclosure of that action was made to Adobe, Bing, Google, Quantum Metric, and Twitter.

f.    The above examples of patient communications about the doctor or the appointment

was shared with Adobe, Bing, Google, Quantum Metric, and Twitter while the patient was still logged-in to the "secure" patient Portal; and

 g. On logoff, Kaiser Permanente discloses this action to Adobe, Bing, Google, Quantum Metric, and Twitter.

326. Kaiser Permanente has failed and refused to cure these breaches and continues to disclose to unauthorized third parties, Plaintiffs and Breach of Contract Sub-Class Members' patient status, personally identifiable data, and communications with Kaiser Permanente and its providers exchanged on the Site, including the Portal.

**Plaintiffs and Breach of Contract Sub-Class Members Were Damaged**

327. Defendants' breach caused Plaintiffs and Breach of Contract Sub-Class Members the following damages, among others:

 a. Nominal damages for each breach of contract by Defendants;

 b. General damages for invasion of their rights in an amount to be determined by a jury without reference to specific pecuniary harm;

 c. Sensitive and confidential information that Plaintiffs and Breach of Contract Sub-Class Members intended to remain private is no longer private;

 d. Defendants eroded the essential confidential nature of the provider-patient relationship;

 e. Defendants took something of value from Plaintiffs and Breach of Contract Sub-Class Members and derived benefit therefrom without Plaintiffs and Breach of Contract Sub-Class Members' knowledge· or informed consent and without sharing the benefit of such value;

 f. Plaintiffs and Breach of Contract Sub-Class Members did not get the full value of the medical services for which they paid, which included Defendants' duty to maintain confidentiality;

 g. Defendants' actions diminished the value of Plaintiffs and Breach of Contract Sub-Class Members' personal information;

 h. Defendants' actions violated the property rights Plaintiffs and Breach of Contract Sub-Class Members enjoy in their private communications; and

 i. Defendants' actions violated the property rights Plaintiffs and Breach of Contract Sub-Class Members enjoy in their personally identifiable medical data and communication.

328. Plaintiffs and Breach of Contract Sub-Class Members also seek attorney's fee and costs on this claim to the extent allowable.

### SEVENTH CLAIM FOR RELIEF
**Violation of the Washington Privacy Act**
**Washington Revised Code § 9.73, *et seq*. ("WPA")**
**(On Behalf of the Washington Sub-Class)**

329. Plaintiff Jane Doe ("Plaintiff" for purposes of this subsection) repeats and incorporates all other paragraphs as if fully set forth herein.

330. Plaintiff brings this claim individually and on behalf of the Washington Sub-Class (the "Sub-Class" for purposes of this subsection).

331. Under Sections 9.73.030(1) and 9.73.030(1)(a) of the Washington Privacy Act ("WPA"), it is unlawful "for any individual, partnership, corporation, association, or the state of Washington, its agencies, and political subdivisions to intercept, or record any . . . [p]rivate communication transmitted by telephone, telegraph, radio, or other device between two or more individuals between points within or without the state by any device electronic or otherwise designed to record and/or transmit said communication regardless how such device is powered or actuated, without first obtaining the consent of all the participants in the communication."

332. Under Section 9.73.030(1)(a) of the WPA, a defendant must show it had the consent of all parties to a communication.

333. Kaiser Permanente and the Third Party Wiretappers are each a "person" for the purposes of the WPA.

334. Kaiser Permanente treats patients in Washington and provides access to its website and Patient Portal to patients in Washington, where Kaiser Permanente and the Third Party Wiretappers intercepted Plaintiff and Sub-Class Members' communications.

335. The Third Party Wiretappers' code, Quantum Metric's recording code, Plaintiff's and Sub-Class Members' browsers and Plaintiff and Sub-Class Members' computing and mobile devices are all "device[s] electronic or otherwise designed to record and/or transmit said communication" used to engaged in the prohibited conduct at issue here. Wash. Rev. Code § 9.73.030(1)(a).

336. Kaiser Permanente installed the Third Party Wiretappers' code to automatically and secretly spy on, and intercept Plaintiffs and Sub-Class Members' communications with Kaiser Permanente through the Kaiser Permanente website in real time.

337.   At all relevant times, Kaiser Permanente's disclosure of Plaintiff and Sub-Class Members' internet communications to Third Party Wiretappers was without Plaintiff and Sub-Class Members' authorization or consent.

338.   By installing the Third Party Wiretappers' code on its website, Kaiser Permanente intentionally caused Plaintiff and Sub-Class Members' communications to be intercepted, recorded, stored, and transmitted to the Third Party Wiretappers.

339.   At all relevant times, the Third Party Wiretappers intentionally tapped or made unauthorized connections with, the lines of internet communication between Plaintiff and Sub-Class Members and Kaiser Permanente's Site without the consent of all parties to the communication.

340.   The Third Party Wiretappers willfully read or attempt to read or learn the contents or meaning of Plaintiff and Sub-Class Members' communications to Kaiser Permanente's Site while the communications are in transit or passing over any wire, line, or cable, or were being received at any place within California when it intercepted Plaintiffs and Sub-Class Members' communications with Kaiser Permanente's Site in real time.

341.   By embedding the Third Party Wiretappers' technology on its website, Kaiser Permanente aided, agreed with, employed, and conspired with Third Party Wiretappers to carry out the wrongful conduct alleged herein in violation of Rev. Wash Code §§ 9.73.030 and 9.73.060.

342.   Plaintiff and the Sub-Class Members seek statutory damages in accordance with Wash. Rev. Code § 9.73.060, which provides for damages sustained by Plaintiff and the Sub-Class in an amount to be proven at trial, as well as injunctive or other equitable relief.

**EIGHTH CLAIM FOR RELIEF**
**Violation of the Washington Health Care Information Act**
**Washington Revised Code § 70.02.005, *et seq*. ("HCIA")**
**(On Behalf of the Washington Sub-Class)**

343.   Plaintiff Jane Doe ("Plaintiff" for purposes of this subsection) repeats and incorporates all other paragraphs as if fully set forth herein.

344.   Plaintiff brings this claim individually and on behalf of the Washington Sub-Class (the "Sub-Class" for purposes of this subsection).

345.    The Washington Health Care Information Act, Washington Revised Code Sections 70.2.005, *et seq*., states that "a health care provider, an individual who assists a health care provider in the delivery of health care, or an agent and employee of a health care provider may not disclose health care information about a patient to any other person without the patient's written authorization."

346.    The Act defines "health care information" to mean "any information, whether oral or recorded in any form or medium, that identifies or can readily be associated with the identity of a patient and directly relates to the patient's health care . . . ." Wash. Rev. Code § 70.02.010(17).

347.    Kaiser Permanente is a health care facility as defined by Wash. Rev. Code § 70.010(16).

348.    By deploying code on its website to capture and transmit its patients' personally identifiable and health information to third parties, Kaiser Permanente discloses Plaintiff and Sub-Class Members' health care information without their written authorization.

349.    As a direct and proximate cause of Kaiser Permanente's actions, Plaintiff and Sub-Class Members were damaged in that:

350.    Sensitive, confidential, and/or protected information that Plaintiff and Sub-Class Members intended to remain private is no more;

351.    Kaiser Permanente took something of value from Plaintiffs and Sub-Class Members and derived benefit therefrom without Plaintiff and Sub-Class Members' knowledge or informed consent and without sharing the benefit of such value;

352.    Plaintiff and Sub-Class Members did not get the full value of the medical services for which they paid, which included Kaiser Permanente's duty to maintain confidentiality of patient data and communications; and

353.    Kaiser Permanente's actions diminished the value of Plaintiff and Sub-Class Members' personally identifiable information, patient data and communications.

354.    Plaintiff and Sub-Class Members seek an order requiring Kaiser Permanente to comply with the Act, actual damages, and attorney's fees and costs.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Classes, respectfully requests that the Court enter an order:

A. Certifying this case as a class action on behalf of the Classes defined above, appointing Plaintiffs as the representative of the Classes, and appointing Plaintiffs' counsel as the Class Counsel for the Classes;

B. Declaring that Defendants' conduct, as set forth above, violates the laws cited herein;

C. Awarding damages, including nominal, actual, statutory, and punitive damages where applicable, to Plaintiffs and the Classes in an amount to be determined at trial;

D. Awarding Plaintiffs and the Classes their reasonable litigation expenses, costs and attorneys' fees;

E. Awarding Plaintiffs and the Classes pre- and post-judgment interest, to the extent allowable;

F. Awarding such other further injunctive and declaratory relief as is necessary to protect the interests of Plaintiffs and the Classes; and

G. Awarding such other and further relief as the Court deems reasonable and just.

## IX.   DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

DATED: June 9, 2023                              Respectfully submitted,

**KESSLER TOPAZ**
  **MELTZER & CHECK, LLP**

*/s/ Jennifer L. Joost*
Jennifer L. Joost (Bar No. 296164)
jjoost@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

-and-

**KESSLER TOPAZ**
  **MELTZER & CHECK, LLP**
Joseph H. Meltzer
jmeltzer@ktmc.com
Melissa L. Yeates
myeates@ktmc.com
Tyler S. Graden

CLASS ACTION COMPLAINT
Case No:

tgraden@ktmc.com
Jordan E. Jacobson
jjacobson@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

-and-

James E. Cecchi
Michael A. Innes
Kevin G. Cooper
**CARELLA, BYRNE, CECCHI,**
**OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973)-994-1700
Facsimile: (973)-994-1744
jcecchi@carellabyrne.com
minnes@carellabyrne.com
kcooper@carellabyrne.com

-and-

Zachary Jacobs
**CARELLA, BYRNE, CECCHI,**
**OLSTEIN, BRODY & AGNELLO, P.C.**
222 S Riverside Plaza
Chicago, Illinois 06606
zjacobs@carellabyrne.com

*Counsel for Plaintiffs and the proposed Classes*

CLASS ACTION COMPLAINT
Case No: