**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Jennifer L. Joost (Bar No. 296164)
jjoost@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

-and-

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Joseph H. Meltzer (appearance *pro hac vice*)
jmeltzer@ktmc.com
Melissa L. Yeates (appearance *pro hac vice*)
myeates@ktmc.com
Tyler S. Graden (appearance *pro hac vice*)
tgraden@ktmc.com
Jordan E. Jacobson (Bar No. 302543)
jjacobson@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Counsel for Plaintiffs and the proposed Classes*
(*Additional Attorneys Listed on Signature Page*)

### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| JOHN DOE, JOHN DOE II, JANE DOE, JANE DOE II, JANE DOE III, JANE DOE IV, and JANE DOE V, Individually and on behalf of all others similarly situated, | Case No. 4:23-cv-02865-EMC |
| Plaintiffs, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| KAISER FOUNDATION HEALTH PLAN, INC., KAISER FOUNDATION HOSPITALS, and THE PERMANENTE MEDICAL GROUP, INC. | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

**TABLE OF CONTENTS**

I.      NATURE OF THE ACTION ........................................................................................... 1
II.     THE PARTIES ............................................................................................................... 5
        A.      Plaintiffs ........................................................................................................... 5
                1.      Plaintiff John Doe ................................................................................. 5
                2.      Plaintiff John Doe II .............................................................................. 6
                3.      Plaintiff Jane Doe .................................................................................. 6
                4.      Plaintiff Jane Doe II .............................................................................. 7
                5.      Plaintiff Jane Doe III ............................................................................ 7
                6.      Plaintiff Jane Doe IV ............................................................................ 8
                7.      Plaintiff Jane Doe V ............................................................................. 8
        B.      Defendants ........................................................................................................ 9
III.    JURISDICTION AND VENUE ................................................................................... 10
IV.     FACTUAL ALLEGATIONS ....................................................................................... 10
        A.      Kaiser Permanente Communicates with Kaiser Plan Members Through
                the Kaiser Permanente Website and Mobile Applications ............................. 11
        B.      Multiple Third Party Wiretappers Intercept Kaiser Plan Members'
                Information Shared with, and Communications with, Kaiser Permanente
                and Its Providers ............................................................................................ 19
                1.      Kaiser Permanente Allows Quantum Metric to Intercept Kaiser Plan
                        Members' Information and Communications from the Site and Portal ........ 19
                2.      Kaiser Permanente Allows Adobe to Intercept Kaiser Plan Members'
                        Information and Communications from the Site and Portal ......................... 25
                3.      Kaiser Permanente Allows Twitter, Bing, and Google to Intercept
                        Patients' Communications from the Site and Portal ..................................... 39
                4.      Kaiser Permanente Allows Its Members' Information and
                        Communications to Be Intercepted While Using Its Mobile
                        Applications ................................................................................................... 55
        C.      Plaintiffs and Class Members Did Not Consent to Kaiser Permanente's
                Disclosure of Their Information and Communications to Third Parties ................. 60
        D.      Plaintiffs' and Class Members' Health Information Has Actual, Measurable,
                Monetary Value ............................................................................................. 61
        E.      Kaiser Permanente's Conduct Violates State and Federal Privacy Laws ................. 62
V.      TOLLING .................................................................................................................... 66
VI.     CLASS ACTION ALLEGATIONS ............................................................................ 67
VII.    CLAIMS FOR RELIEF ............................................................................................... 70
VIII.   PRAYER FOR RELIEF ............................................................................................. 114
IX.     DEMAND FOR JURY TRIAL .................................................................................. 114

Plaintiffs[1] John Doe , John Doe II, Jane Doe, Jane Doe II, Jane Doe III, Jane Doe IV, and Jane Doe V (collectively, "Plaintiffs") bring this proposed class action against Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, and The Permanente Medical Group, Inc. (collectively "Kaiser Permanente" or "Defendants"), individually and on behalf of all others similarly situated, upon personal knowledge as to Plaintiffs' own conduct, and on information and belief as to all other matters based on investigation by counsel.[2]

## I.  NATURE OF THE ACTION

1.  As any reasonable patient would expect, Plaintiffs trusted that their medical providers would treat the information that they shared with them as private and confidential.

2.  This expectation extends to Plaintiffs' use of Kaiser Permanente's websites and mobile applications, on which they and other patients schedule appointments, access medical test results, learn about treatment options, order and review prescriptions, exchange messages and healthcare information with providers, participate in online health assessments, pay bills, obtain insurance information, and research specialists, among other sensitive activities.

3.  Notwithstanding Plaintiffs' and other patients' reasonable expectation that their interactions and communications through Kaiser Permanente's website and mobile applications would not be shared with third parties, Kaiser Permanente discloses the contents of patients' confidential information and communications with a number of third parties, completely unbeknownst to Plaintiffs and its other patients, while those communications are in transit between Plaintiffs and Class Members on the one hand and Kaiser Permanente on the other.

---

[1] Plaintiffs seek to proceed anonymously, as other plaintiffs have in other litigation claiming privacy violations involving health care providers. *See, e.g.*, Class Action Complaint & Demand for Jury Trial, *Doe. v. Meta Platforms Inc.*, No. 22-cv-3580 (N.D. Cal. June 17, 2022), ECF No. 1; Class Action Complaint & Demand for Jury Trial, *Doe v. Meta Platforms Inc.*, No. 22-cv-04680 (N.D. Cal. Aug. 15, 2022), ECF No. 1; Complaint, *Doe v. Meta Platforms Inc.*, No. 22-cv-4963 (N.D. Cal. Aug. 30, 2022), ECF No. 1; Class Action Complaint & Demand for Jury Trial, *Doe v. Meta Platforms Inc.*, No. 22-cv-6665 (N.D. Cal. Oct. 28, 2022), ECF No. 1; Complaint, *Doe v. Meta Platforms Inc.*, No. 22-cv-4293 (N.D. Cal. July 25, 2022), ECF No. 1. Plaintiffs are seeking Defendants' consent to proceed anonymously.

[2] Counsel's investigation includes an analysis of publicly available information. Plaintiffs believe that a reasonable opportunity for discovery will provide further support for the claims alleged herein.

4.      Specifically, unbeknownst to Plaintiffs and its other patients, Kaiser Permanente has installed code from multiple third parties throughout the Kaiser Permanente website and mobile applications that allows third party companies such as Quantum Metric, Twitter[3], Adobe, Bing, and Google[4] (collectively, "Third Party Wiretappers") to intercept the content of Plaintiffs and Class Members' patient status, identifying information, medical topics researched, choices made, information shared and communications with their medical providers, including personally identifiable medical information and other confidential information and communications, when that information is in transit.

5.      The third-party code that Kaiser Permanente has installed on its website and mobile applications transmits and redirects the content of Plaintiffs and other Class Members' communications to these Third Party Wiretappers from the very moment that a user first loads Kaiser Permanente's website or opens its mobile applications, and continues as the user navigates through the website researching and sharing sensitive information.

6.      Once the website loads or the mobile application is launched, the Third Party Wiretappers continue to intercept the content of patients' communications with Kaiser Permanente in real time as the patient navigates the website or mobile application to access specific medical information, clicks buttons that divulge sensitive and protected patient status, and personal and health information, and enters information into various fields on Kaiser Permanente's website or mobile application, such as: (1) signing-up for a patient Portal; (2) signing-in or signing-out of a patient Portal; (3) taking actions inside a patient Portal; (4) making, scheduling, or participating in appointments; (5) reviewing and ordering prescriptions; (6) exchanging communications relating to doctors, treatments, payment information, health insurance information, prescription drugs, prescriptions, side effects, conditions, diagnoses, prognoses, or symptoms of health conditions; and

---

[3] Twitter began rebranding itself as X.com in late July 2023. *See* Ryan Mac & Tiffany Hsu, *From Twitter to X: Elon Musk Begins Erasing an Iconic Internet Brand*, N.Y. Times (Jul. 24, 2023), https://www.nytimes.com/2023/07/24/technology/twitter-x-elon-musk.html. As of the time of this Complaint, the change was ongoing.

[4] For the reasons set forth below, the term "Third Party Wiretappers" also includes Dynatrace, LLC ("Dynatrace") with respect to the Kaiser Permanente Washington App.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO: 4:23-cv-02865-EMC

(7) providing other information that qualifies as "personal health information" and/or identifying information under federal and state laws.

7.     Kaiser Permanente knew that by embedding the Third Party Wiretappers' code, they were disclosing and permitting these Third Party Wiretappers to intercept and collect information shared by its users, including the content of Plaintiffs and Class Members' communications, which include identifying information, personal and sensitive information relating to medical treatment, and/or information that Kaiser Permanente was required to protect under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. § 1320d-6.

8.     In fact, in December 2022, the United States Department of Health and Human Services ("HHS") issued a bulletin "to highlight the obligations" of health care providers under the HIPAA Privacy Rule "when using online tracking technologies" such as those used by Kaiser Permanente which "collect and analyze information about how internet users are interacting with a regulated entity's website or mobile application."[5]

9.     In the bulletin, HHS confirmed that HIPAA applies to health care providers' use of tracking technologies like those developed by the Third Party Wiretappers and used by Kaiser Permanente. Among other things, HHS explained that health care providers violate HIPAA when they use tracking technologies that disclose an individual's identifying information even if no treatment information is included and even if the individual does not have a relationship with the health care provider:

> How do the HIPAA Rules apply to regulated entities' use of tracking technologies?
>
> Regulated entities disclose a variety of information to tracking technology vendors through tracking technologies placed on a regulated entity's website or mobile app, including individually identifiable health information (IIHI) that the individual provides when they use regulated entities' websites or mobile apps. This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, or any unique identifying code. **All such IIHI collected on a regulated entity's website or mobile app generally is PHI,**

---

[5] Press Release, *HHS Office of Civil Rights Issue Bulletin on Requirements under HIPAA for Online Tracking Technologies to Protect the Privacy and Security of Health Information*, HHS (Dec. 1, 2022), https://www.hhs.gov/about/news/2022/12/01/hhs-office-for-civil-rights-issues-bulletin-on-requirements-under-hipaa-for-online-tracking-technologies.html; *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, HHS (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

**even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services.** This is because, when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (*i.e.*, it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.

10.     HHS further clarified that HIPAA applies to health care providers' webpages with tracking technologies even on webpages that do not require patients to login:

> Tracking on unauthenticated webpages
>
> [T]racking technologies on unauthenticated webpages may have access to PHI, in which case the HIPAA Rules apply to the regulated entities' use of tracking technologies and disclosures to the tracking technology vendors. Examples of unauthenticated webpages where the HIPAA Rules apply include: The login page of a regulated entity's patient portal (which may be the website's homepage or a separate, dedicated login page), or a user registration webpage where an individual creates a login for the patient portal . . . [and pages] that address[] specific symptoms or health conditions, such as pregnancy or miscarriage, or that permits individuals to search for doctors or schedule appointments without entering credentials may have access to PHI in certain circumstances. **For example, tracking technologies could collect an individual's email address and/or IP address when the individual visits a regulated entity's webpage to search for available appointments with a health care provider.** In this example, the regulated entity is disclosing PHI to the tracking technology vendor, and thus the HIPAA Rules apply.

11.     This HHS bulletin did not create any new obligations, but instead highlights obligations that have been in place for decades, with which Kaiser Permanente should have been complying.

12.     Kaiser Permanente's disclosure of patients' patient status, identifying information, and personal and sensitive heath information to the Third Party Wiretappers, including without adequate disclosure of its conduct to Plaintiffs and Class Members, constitutes an egregious invasion of Plaintiffs and Class Members' privacy and violates the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq.*; the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.*; Cal. Const. art. I, § 1; California Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*; California Confidentiality of Medical Information Act, Cal. Civ. Code § 56.10; the Washington Privacy Act, Wash. Rev. Code § 9.73, *et seq.*; Washington Health Care Act, Wash. Rev. Code § 70.02.005, *et seq.*, Washington Consumer Protection Act, § 19.86, *et seq.*; District of Columbia

Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq.*; Georgia Uniform Deceptive Trade Practices Act, Georgia Code § 10-1-370, *et seq.*; Georgia Computer Systems Protection Act, Georgia Code § 16-9-93; Georgia Insurance and Information Privacy Protection Act, Georgia Code § 33-39-1, *et seq.*; Maryland Wiretapping and Electronic Surveillance Act, Maryland Code, Courts & Judicial Procedure § 10-401, *et seq.*; Oregon Unlawful Trade Practices Act, Or. Rev. Stat. § 646.605, *et seq.*, Virginia Computer Crimes Act, Va. Code § 18.2-152.1, *et seq.*; Virginia Insurance Information and Privacy Protection Act, Va. Code § 38.2-600, *et seq.* and HIPAA, and constitutes intrusion upon seclusion, negligence per se, Statutory Larceny, Cal. Penal Code §§ 484, 496, and breach of Kaiser Permanente's express and implied promises and duties to its patients, including Plaintiffs and members of the Classes.

## II.    THE PARTIES

### A.    Plaintiffs

#### 1.    Plaintiff John Doe

13.    Plaintiff John Doe is a citizen of California, and resides in Victorville, California.

14.    Plaintiff John Doe is a Kaiser Foundation Health Plan member and has received medical treatment through Kaiser Foundation Hospitals and/or the Permanente Medical Group since in or around 2012.

15.    Plaintiff John Doe regularly uses Kaiser Permanente's website, Patient Portal, and mobile application to access medical information and communicate with his health care providers, including making appointments, reviewing and ordering prescriptions, researching providers and medical conditions, communicating with providers, checking medical results, and reviewing his medical history.

16.    Without Plaintiff John Doe's knowledge or consent, Kaiser Permanente allowed the Third Party Wiretappers to intercept, collect, read, attempt to read, and/or learn the contents or meaning of the contents of his patient status, identifying information, personal and sensitive health information, and confidential communications with his health care providers through Kaiser Permanente's website and mobile application while that information and those messages, reports, and/or communications were in transit.

**2.    Plaintiff John Doe II**

17.    Plaintiff John Doe II is a citizen of Georgia and resides in Loganville, Georgia.

18.    Plaintiff John Doe II is a Kaiser Foundation Health Plan member and has received medical treatment through Kaiser Foundation Hospitals and/or the Permanente Medical Group since 2022.

19.    Plaintiff John Doe II regularly uses Kaiser Permanente's website, Patient Portal, and mobile application to access medical information and communicate with his health care providers, including making appointments, researching providers and medical conditions, checking medical results, and reviewing his medical history.

20.    Without Plaintiff John Doe II's knowledge or consent, Kaiser Permanente allowed the Third Party Wiretappers to intercept, collect, read, attempt to read, and/or learn the contents or meaning of the contents of his patient status, identifying information, personal and sensitive health information, and confidential communications with his health care providers through Kaiser Permanente's website and mobile application while that information and those messages, reports, and/or communications were in transit.

**3.    Plaintiff Jane Doe**

21.    Plaintiff Jane Doe is a citizen of Washington, and resides in Everett, Washington.

22.    Plaintiff Jane Doe is a Kaiser Foundation Health Plan member and has received medical treatment through Kaiser Foundation Hospitals and/or the Permanente Medical Group since 2018.

23.    Plaintiff Jane Doe regularly uses Kaiser Permanente's website, Patient Portal, and mobile application to access medical information and communicate with her health care providers, including making appointments, researching providers and medical conditions, checking medical results, and reviewing her medical history.

24.    Without Plaintiff Jane Doe's knowledge or consent, Kaiser Permanente allowed the Third Party Wiretappers to intercept, collect, read, attempt to read, and/or learn the contents or meaning of the contents of her patient status, identifying information, personal and sensitive health information, and confidential communications with her health care providers through Kaiser

Permanente's website and mobile application while that information and those messages, reports, and/or communications were in transit.

### 4.    Plaintiff Jane Doe II

25.    Plaintiff Jane Doe II is a citizen of the District of Columbia and resides in Washington, D.C..

26.    Plaintiff Jane Doe II is a Kaiser Foundation Health Plan member and has received medical treatment through Kaiser Foundation Hospitals and/or the Permanente Medical Group since 2022.

27.    Plaintiff Jane Doe II regularly uses Kaiser Permanente's website, Patient Portal, and mobile application to access medical information and communicate with her health care providers, including making appointments, researching providers and medical conditions, checking medical results, and reviewing her medical history.

28.    Without Plaintiff Jane Doe II's knowledge or consent, Kaiser Permanente allowed the Third Party Wiretappers to intercept, collect, read, attempt to read, and/or learn the contents or meaning of the contents of her patient status, identifying information, personal and sensitive health information, and confidential communications with her health care providers through Kaiser Permanente's website and mobile application while that information and those messages, reports, and/or communications were in transit.

### 5.    Plaintiff Jane Doe III

29.    Plaintiff Jane Doe III is a citizen of Maryland and resides in West River, Maryland.

30.    Plaintiff Jane Doe III is a Kaiser Foundation Health Plan member and has received medical treatment through Kaiser Foundation Hospitals and/or the Permanente Medical Group since 2017.

31.    Plaintiff Jane Doe III regularly uses Kaiser Permanente's website, Patient Portal, and mobile application to access medical information and communicate with her health care providers, including making appointments, researching providers and medical conditions, checking medical results, and reviewing her medical history.

32.     Without Plaintiff Jane Doe III's knowledge or consent, Kaiser Permanente allowed the Third Party Wiretappers to intercept, collect, read, attempt to read, and/or learn the contents or meaning of the contents of her patient status, identifying information, personal and sensitive health information, and confidential communications with her health care providers through Kaiser Permanente's website and mobile application while that information and those messages, reports, and/or communications were in transit.

### 6.     Plaintiff Jane Doe IV

33.     Plaintiff Jane Doe IV is a citizen of Virginia and resides in Fairfax, Virginia.

34.     Plaintiff Jane Doe IV is a Kaiser Foundation Health Plan member and has received medical treatment through Kaiser Foundation Hospitals and/or the Permanente Medical Group since at least 2006.

35.     Plaintiff Jane Doe IV regularly uses Kaiser Permanente's website, Patient Portal, and mobile application to access medical information and communicate with her health care providers, including making appointments, researching providers and medical conditions, checking medical results, and reviewing her medical history.

36.     Without Plaintiff Jane Doe IV's knowledge or consent, Kaiser Permanente allowed the Third Party Wiretappers to intercept, collect, read, attempt to read, and/or learn the contents or meaning of the contents of her patient status, identifying information, personal and sensitive health information, and confidential communications with her health care providers through Kaiser Permanente's website and mobile application while that information and those messages, reports, and/or communications were in transit.

### 7.     Plaintiff Jane Doe V

37.     Plaintiff Jane Doe V is a citizen of Oregon and resides in Beaverton, Oregon.

38.     Plaintiff Jane Doe V is a Kaiser Foundation Health Plan member and has received medical treatment through Kaiser Foundation Hospitals and/or the Permanente Medical Group since approximately 2010.

39.     Plaintiff Jane Doe V regularly uses Kaiser Permanente's website, Patient Portal, and mobile application to access medical information and communicate with her health care providers,

including making appointments, researching providers and medical conditions, checking medical results, and reviewing her medical history.

40.    Without Plaintiff Jane Doe V's knowledge or consent, Kaiser Permanente allowed the Third Party Wiretappers to intercept, collect, read, attempt to read, and/or learn the contents or meaning of the contents of her patient status, identifying information, personal and sensitive health information, and confidential communications with her health care providers through Kaiser Permanente's website and mobile application while that information and those messages, reports, and/or communications were in transit.

### B.    Defendants

41.    Defendant Kaiser Foundation Health Plan, Inc. is a health care provider headquartered in Oakland, California.

42.    Kaiser Foundation Health Plan, Inc. has an integrated care model, offering both hospital and physician care through a network of hospitals and physician practices operating under the Kaiser Permanente name. Members of Kaiser Permanente health plans have access to hospitals and hundreds of other health care facilities operated by Kaiser Foundation Hospitals and Permanente Medical Groups across the United States.

43.    Kaiser Foundation Health Plan, Inc. is financially responsible for the payment of medical services provided to its enrollees ("Kaiser Plan Members") or has accepted such financial responsibility under contract with one or more of the Kaiser Permanente entities. Kaiser Foundation Health Plan, Inc. is the largest health care service plan in the United States, with over 12.7 million members in eight states (California, Colorado, Georgia, Hawaii, Maryland, Oregon, Virginia, and Washington and the District of Columbia) (collectively, the "Kaiser Operating States").

44.    Kaiser Foundation Hospitals is a non-profit, public-benefit corporation headquartered in Oakland, California. Kaiser Foundation Hospitals operates nearly 40 acute care hospitals and 680 medical offices throughout the Kaiser Operating States, with its largest presence being in California, where the majority of its hospitals are located, and a significant presence in Washington with more than 35 facilities throughout Western Washington and the Spokane area. Kaiser Foundation Hospitals employs more than 21,000 physicians, representing all medical fields.

45.    The Permanente Medical Group, Inc. is headquartered in Oakland, California and is comprised of physician-owned, for-profit, partnerships, and professional corporations.

46.    Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, and The Permanente Medical Group, Inc. operate under the name "Kaiser Permanente," which is not a legal entity but a registered trademark or trade name that Kaiser Foundation Health Plan, Inc. owns and Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, and The Permanente Medical Group, Inc. use, acting in concert.

## III.    JURISDICTION AND VENUE

47.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because this suit is brought under the laws of the United States, specifically the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq*. This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) because this a proposed class action in which there are at least 100 Class Members, the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000, and a member of the Class is a citizen of a different State than Defendant.

48.    This Court also has supplemental jurisdiction over the state common law and statutory claims pursuant to 28 U.S.C. § 1367, as these claims are so related to the federal statutory claims over which this Court has original jurisdiction, that they form part of the same case or controversy.

49.    This Court has general personal jurisdiction over Defendants because Defendants have sufficient minimum contacts with this District in that they operate and market their services throughout the region and in this District. Further, this Court has personal jurisdiction over Defendants because Defendants are headquartered in this District.

50.    Venue properly lies in this District pursuant to 28 U.S.C. § 1391(a), (b), and (c) because: a substantial part of the events or omissions giving rise to Plaintiffs and the Classes' claims occurred in this District, Defendants conduct a substantial amount of business in this District, and Defendants are headquartered in this District.

## IV.    FACTUAL ALLEGATIONS

**A.**    **Kaiser Permanente Communicates with Kaiser Plan Members Through the Kaiser Permanente Website and Mobile Applications**

51.    Plaintiffs and members of the Classes are Kaiser Plan Members.

52.    Kaiser Permanente operates a website ("Site"), with a homepage located at https://healthy.kaiserpermanente.org/front-door ("Homepage"), through which Kaiser Plan Members can perform various tasks that traditionally were only available by physically visiting their health care providers' offices or speaking directly to their health care providers, such as scheduling appointments; checking medical results; reviewing medical histories; researching doctors, locations, and medical services; communicating with providers and paying medical bills.

53.    The Site's Homepage provides Kaiser Plan Members and the public with information



about the health care services that Kaiser Permanente offers, including links to find doctors and locations, get information about health conditions, and learn more about prescribed medicines.

54.     For example, on the Homepage, Kaiser Plan Members can click "Browse Health Encyclopedia" and access a page that allows them to find health information about certain medical conditions, symptoms and medical procedures, including over 4,000 health topics, by typing their health-related information into a search form. Kaiser Plan Members can also check their symptoms with an interactive "symptom checker" and "determine when to seek care."

55.     As the Site states, these topics and medical information provide Kaiser Plan Members with the information needed to "learn the basics, get self-care, or get care from Kaiser."

56.     On the Homepage, Kaiser Plan Members can also click "Find a doctor or location" and access a form (for example at https://healthy.kaiserpermanente.org/southern-california/doctors-locations#/search-form) where they can input their personal and health information to search for health care providers, including by location, specialty, or provider type or with particular keywords related to medical conditions or symptoms the Kaiser Plan Member is experiencing.[6]



57.     Kaiser Plan Members can also access their medical information, prescription information and test results, pay bills, schedule appointments, order prescriptions, communicate with providers, and perform other actions related to their healthcare after clicking the "Sign In" Link for

---

[6] The doctor search functions for the other Kaiser Operating States and regions can be accessed at similarly named page, such as: https://healthy.kaiserpermanente.org/northern-california/doctors-locations#/simple-form.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO: 4:23-cv-02865-EMC

their region ("Portal Login Page") and accessing a purportedly secure patient Portal (the "Portal"). For example, if the Kaiser Plan Member, like Plaintiff John Doe, is located in Southern California, they can select "California – Southern" from a "Region" pulldown menu, click the "Sign In" link and be taken to the Portal Login page for Southern California located at https://healthy.kaiserpermanente.org/southern-california/consumer-sign-on#/signon:



58.     Kaiser Plan Members in Northern California, or other Regions such as Colorado, Georgia, Hawaii, Maryland/Virginia/Washington, D.C., Oregon/ S.W. Washington, and Washington can similarly select their region from a pulldown menu and access their Portal Login Page:



59.    After signing into the Portal Login Page and entering the Portal, Kaiser Plan Members can access an array of services and view and provide personal and highly sensitive medical information, including viewing medical history, prescriptions, test results, scheduling appointments, performing online medical evaluations, researching symptoms, and communicating with providers, among other things.

60.    For example, the Portal contains a "Message Center" that allows Kaiser Plan Members to communicate directly with their health care providers:



61.    After selecting a particular department, Kaiser Plan Members can identify specific recipients to whom they choose to communicate with and type out messages in a free form "Messages" box, with replies also sent and received within the Message Center.

62.  Kaiser Plan Members can also use mobile applications to communicate with their doctor's office, schedule appointments, review information about past appointments, fill or refill prescriptions, view their medical history (including allergies, immunizations, ongoing health conditions, and lab test results), choose a doctor, and receive personalized reminders and health information.

63.  For example, Kaiser Plan Members in California, Colorado, the District of Columbia, Georgia, Hawaii, Maryland, Oregon, Virginia, and Southwest Washington can use the "Kaiser Permanente App," offered through the Apple App Store[7] and the Google Play Store.[8] Kaiser Plan Members in Washington outside of Southwest Washington can use the "Kaiser Permanente Washington App," offered through the Apple App Store[9] and the Google Play Store.[10]

64.  At the bottom of the Portal Login Page, it provides: "By signing in, you agree to our website Terms & Conditions and Privacy Statement."

---

[7] *Kaiser Permanente*, APPLE (last visited Sept. 15, 2023), https://apps.apple.com/us/app/kaiser-permanente/id493390354.
[8] *Kaiser Permanente*, GOOGLE (last visited Sept. 15, 2023), https://play.google.com/store/apps/details?id=org.kp.m.
[9] *Kaiser Permanente Washington*, APPLE (last visited Sept. 15, 2023), https://apps.apple.com/us/app/kaiser-permanente-washington/id445899971.
[10]  *Kaiser Permanente Washington*, GOOGLE (last visited Sept. 15, 2023), https://play.google.com/store/apps/details?id=org.ghc.android.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO: 4:23-cv-02865-EMC

65.     The Kaiser Permanente App's and the Kaiser Permanente Washington App's pages on the Apple App Store and Google Play Store also provide that use of Kaiser Permanente's mobile applications are governed by Kaiser Permanente's privacy policy.[11]

66.     The Kaiser Permanente Terms & Conditions, available via hyperlink[12] and attached hereto as Exhibit 1, provides: "Any personal information you submit to the Site (for yourself or someone else) is governed by our Website and KP Mobile Application Privacy Statement."

67.     The Kaiser Permanente Privacy Statement, also available via hyperlink[13] attached hereto as Exhibit 2, assures Kaiser Plan Members that Kaiser Permanente's data collection "is collected on an aggregate basis, which means that no personally identifiable information is associated with the data," which is untrue.

68.     The Kaiser Permanente Privacy Statement also states that Kaiser Permanente and its service providers may place "cookies" or similar technologies on the computer hard drives of visitors to the Site, but falsely states that information obtained from cookies is only used to help Kaiser Permanente "tailor our Site to be more helpful and efficient for our visitors" when in fact the cookies are also being used for marketing purposes, unbeknownst to Kaiser Plan Members and without their permission or agreement.

---

[11] *See supra* notes 7-10.

[12] *See, e.g., Terms & Conditions for our Website and Mobile Application*, Kaiser (Updated June 2022), https://healthy.kaiserpermanente.org/southern-california/termsconditions.

[13] *See, e.g., Website and mobile application Privacy Statement*, Kaiser, https://healthy.kaiserpermanente.org/southern-california/privacy (last visited Sept. 15, 2023).

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO: 4:23-cv-02865-EMC

69.     The Kaiser Permanente Privacy Statement also falsely states that "[t]he cookie consists of a unique identifier that does not contain information about your health history," when in fact the information provided to the Third Party Wiretappers contains information about Kaiser Plan Members' health history.

70.     The Kaiser Permanente Privacy Statement also states that Kaiser "may also occasionally use 'Web beacons' (also known as 'clear gifs,' 'Web bugs,' '1-pixel gifs,' etc.)" but falsely claims that Kaiser Permanente does "not collect any personal health information."

71.     The Kaiser Permanente Privacy Statement also does not disclose to Kaiser Plan Members that Kaiser Permanente has aided, agreed with, employed, and/or conspired with, third parties that are recording the information that Kaiser Plan Members are sending, accessing, reviewing, or receiving through the Site, Portal, and mobile applications.

72.     Kaiser Permanente's website also contains a HIPAA Notice of Privacy Practices,[14] which purports to describe how and when Kaiser Permanente discloses information covered by HIPAA; however, nowhere in the HIPAA Notice of Privacy Practices does Kaiser Permanente disclose that it is providing HIPAA-protected and other confidential information to the Third Party Wiretappers.

73.     Kaiser Permanente expressly and impliedly promises Kaiser Plan Members that it will maintain the privacy and confidentiality of the information shared, and the communications engaged in, on the Site, Portal, and mobile applications, and that such information and communications will not be disclosed to or tracked by third parties.

74.     Despite its express and implied assurances of privacy, Kaiser Permanente intentionally incorporated the Third Party Wiretappers' code and recording technology on the Kaiser Permanente website and mobile applications, and allowed the tracking and disclosure of Kaiser Plan Members' identifying information, personal and sensitive health information, and private, sensitive, and confidential communications with Kaiser Permanente and its providers to Third Party Wiretappers.

---

[14] *See, e.g.*, *Notice of Privacy Practices*, Kaiser, https://healthy.kaiserpermanente.org/southern-california/privacy-practices (last visited Sept. 15, 2023).

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO: 4:23-cv-02865-EMC

**B.    Multiple Third Party Wiretappers Intercept Kaiser Plan Members' Information Shared with, and Communications with, Kaiser Permanente and Its Providers**

**1.    Kaiser Permanente Allows Quantum Metric to Intercept Kaiser Plan Members' Information and Communications from the Site and Portal**

75.    Unbeknownst to Kaiser Plan Members and against their reasonable expectations, Kaiser Permanente allows Quantum Metric to intercept Kaiser Plan Members' personal and sensitive identifying and medical information and confidential communications from the Site and Portal.

76.    Kaiser Permanente has placed Quantum Metric's "Session Replay" code on its Homepage, Portal Login Page, and other pages on the Site—including within the Portal—which intercepts and records the contents of Kaiser Plan Members' information and confidential communications, and sends that information and those communications to Quantum Metric.

77.    Quantum Metric collects and saves website communications, including those on the Site and Portal, through a service named "Session Replay." Session Replay captures internet communications between a website user and a website, including those on the Site and Portal, in real time while those communications are in transit.

78.    As Quantum Metric explains: "At its core, **session replay** is technology that allows you to watch an end user's session as they experienced it, similar to how you watch a video. You can pause, rewind, and fast-forward the session (just like a YouTube video) to watch how a user interacts with a website or mobile app."[15]

79.    Session replay technologies work by using "embedded snippets of code . . . [that] watch and record a visitor's every move on a website, in real time."[16] This was done on the Site and the Portal when used by Kaiser Plan Members.

80.    As illustrated in Quantum Metric's patent, after a user submits a communication to a web server, such as Kaiser Permanente's, Quantum Metric's embedded side capture agent code redirects the communications to Quantum Metric's server-side capture engine, analysis engine, and web session storage:

---

[15] *What is Session Replay*, Quantum Metric, https://www.quantummetric.com/enterprise-guide-to-session-replay (last visited Sept. 15, 2023).

[16] Tomas Foltyn, *What's the Deal with Session-Replay Scripts?*, welivesecurity (Apr. 20, 2018, 1:40 pm), https://www.welivesecurity.com/2018/04/20/whats-deal-session-replay-scripts/.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO: 4:23-cv-02865-EMC

81.     From the moment a Kaiser Plan Member loads Kaiser Permanente's website, Quantum Metric is intercepting all of the content viewed and communicated, as well as the Kaiser Plan Member's interactions with the website, similar to an individual peering over the user's shoulder and listening in on the patient's conversations with their medical provider.

82.     As Kaiser Plan Members navigate the Kaiser Permanente Site, including accessing the Portal, the Site makes numerous "POST" calls to Quantum Metric, the size of which change based on site activity. A "POST" call is a HTTP method that sends user data to a server.

83.     Kaiser Permanente thus allows Quantum Metric to collect, process, store, and display the customer's interactions with Kaiser's website.[17] Once in Quantum Metric's control, Kaiser Plan Members' communications are further subject to the company's independent processing, analyses,

---

[17] *SaaS End-User License Agreement*, QUANTUM METRIC, https://iam.quantummetric.com/terms-and-conditions ("Subject to the terms of the Agreement, Quantum is provided a limited license to Customer Data for the purpose of providing the Quantum Service, including a license to *collect, process, store, and display* Customer Data to the extent appropriate in providing the Quantum Service to Customer.").

and use of this session replay data.[18] Quantum Metric also uses Kaiser Plan Members' communications for its own research and analysis purposes.[19]

84.    Thus, by installing the Quantum Metric Replay code on its website, Kaiser Permanente allowed Quantum Metric to intercept and record Kaiser Plan Members' identifying information, personal and sensitive medical information, including HIPAA-protected health information, and confidential communications with Quantum Metric's Session Replay code, in real time.

85.    On information and belief, Kaiser Permanente has been continually allowing Third Party Wiretappers to intercept Kaiser Plan Member's personal information.

86.    By way of example, on May 31, 2023, after Plaintiff Jane Doe logged into the Portal—which displayed her Name, Medical Record Number (Kaiser ID #), Region, and Coverage Status—but performed no further activities, the amount of data intercepted and transferred to Quantum Metric (at kp-app.quantummetric.com) was about 260 bytes. Thereafter, when Plaintiff Jane Doe performed several activities within the Portal, the amount of the data transferred to Quantum Metric increased to over 102 kB, indicating that her activity inside the Portal was being intercepted by Quantum Metric and redirected to kp-app.quantummetric.com.

87.    After Plaintiff Jane Doe logged into the Portal and then accessed the Doctor Search Page and performed no further activities, the amount of data intercepted and transferred to Quantum Metric was 311 bytes. Thereafter, when Plaintiff Jane Doe entered personal medical search information into the Doctor Search page, the amount of data transferred to Quantum Metric increased to over 122 kB, indicating that Plaintiff Jane Doe's medical search information was being intercepted by Quantum Metric and redirected to kp-app.quantummetric.com. Kaiser Permanente allowed Quantum Metric to intercept similar information from Jane Doe in the months and years proceeding

---

[18] *See, e.g., What Is Session Replay*, QUANTUM METRIC (last accessed Aug. 24, 2023), https://www.quantummetric.com/enterprise-guide-to-session-replay/ ("More advanced session replay tools can ***automatically identify*** the friction and where it occurred in an application, ***segment all end users*** that experienced that friction, and ***quantify the loss in conversion and revenue***.").

[19] *See supra* note 17 ("Quantum may use certain Aggregated Data in order to perform analysis and statistical reporting and for auditing, research and analysis to operate and improve Quantum technologies and services.").

her logging in on May 31, 2023, and similarly allowed Quantum Metric to intercept log-in information for Plaintiffs John Doe, John Doe II, Jane Doe II, Jane Doe III, Jane Doe IV, Jane Doe V and other members of the Classes.

88.     On June 6, 2023, when Plaintiff John Doe logged into the Portal and accessed recent medical test results, the amount of data transferred to Quantum Metric was over 85 kB, indicating that information about Plaintiff John Doe's personal and sensitive identifying and medical information, and private and confidential medical test results, was also being intercepted by Quantum Metric and redirected to kp-app.quantummetric.com.

89.     On information and belief, the same type of information tracked, disclosed, and sent to Quantum Metric for Plaintiffs has been tracked, disclosed, and sent to Quantum Metric for other members of the Classes.

90.     Additionally, when Kaiser Plan Members navigate other portions of the Site, Quantum Metric intercepts and receives that content as well. For example, if a patient searches for doctors who specialize in Addiction Medicine, Quantum Metric will receive the search results displaying this sensitive information, as well as data regarding all of the information the Kaiser Plan Members provided and received regarding that topic.

91.     In addition, when Plaintiff Jane Doe accessed her bill pay account, the amount of data transferred to Quantum Metric was over 84 kB, indicating that information about Plaintiff Jane Doe's personal and sensitive identifying health related financial information was also being intercepted by Quantum Metric and redirected to kp-app.quantummetric.com.

92.     When Plaintiff John Doe participated in a Social Health Review inside the Portal the amount of data transferred to Quantum Metric was over 25 kB, indicating that information about Plaintiff John Doe's personal and sensitive identifying and medical information, and private and confidential medical test results, was also being intercepted by Quantum Metric and redirected to kp-app.quantummetric.com.

93.     When Plaintiff John Doe accessed the Message Center inside the Portal, the amount of data transferred to Quantum Metric was over 330.7 kB, indicating that information about Plaintiff John Doe's personal and sensitive identifying and medical information, and private and confidential

medical test results, was also being intercepted by Quantum Metric and redirected to kp-app.quantummetric.com.

94.     When Plaintiff John Doe accessed his Medical Summary inside the Portal, the amount of data transferred to Quantum Metric was over 25 kB, indicating that information about Plaintiff John Doe's personal and sensitive identifying and medical information, and private and confidential medical test results, was also being intercepted by Quantum Metric and redirected to kp-app.quantummetric.com.

95.     When Plaintiff John Doe accessed his bill pay account, the amount of data transferred to Quantum Metric was over 84 kB, indicating that information about Plaintiff John Doe's personal and sensitive identifying health related financial information was also being intercepted by Quantum Metric and redirected to kp-app.quantummetric.com.

96.     When Plaintiff John Doe logged out of the Portal and conducted a search for a neurologist on the Site, the amount of data transferred to Quantum Metric was over 427.1 kB, indicating that information about Plaintiff John Doe's personal and sensitive identifying and medical information, and private and confidential medical test results, was also being intercepted by Quantum Metric and redirected to kp-app.quantummetric.com.

97.     When Plaintiffs John Doe II, Jane Doe II, Jane Doe III, Jane Doe IV, and Jane Doe V accessed the Kaiser Permanente website and Patient Portal, their communications were similarly intercepted by Quantum Metric.

98.     On information and belief, the communications of members of the Classes who accessed the Kaiser Permanente website and Patient Portal were also intercepted by Quantum Metric.

99.     The recordings of Plaintiffs and other Class Members' information and confidential communications on the Site are saved on Quantum Metric's systems and are available for viewing on Quantum Metric's website, an example of which is below:



100.     Kaiser Permanente voluntarily embedded Quantum Metric's software code on the Site, knowing that Quantum Metric's software would intercept, record, and redirect Kaiser Plan Members' Site and Portal activity, including personal health information and/or HIPAA-protected information and communications with Kaiser Permanente and its providers.

101.     Quantum Metric does not only receive website analytics data that provides aggregate statistics; rather, the Quantum Metric recording technology utilized by Kaiser Permanente is intended to record and playback individual browsing sessions, as well as the private and confidential information and communications shared in those sessions. The monitoring that Quantum Metric's technology provides extends beyond the computer "cookies" with which ordinary consumers may be familiar.

102.     Moreover, the collection and storage of Kaiser Plan Members' communications with their health care providers may cause sensitive health information and other personal information displayed on a page to leak to additional third parties. This may expose Kaiser Plan Members who use the Site and/or Portal to identity theft, online scams, and other unwanted behavior.

103.    In a 2017 study by Princeton University's Center for Information Technology Policy concerning session recording technologies, the researchers noted "[c]ollection of page content by third-party replay scripts may cause sensitive information such as medical conditions, credit card details and other personal information displayed on a page to leak to the third-party as part of the recording. This may expose users [like Plaintiffs and members of the Classes] to identity theft, online scams, and other unwanted behavior."[20]

104.    The study goes on to state that "the extent of data collected by these services far exceeds user expectations; text typed into forms is collected before the user submits the form, and precise mouse movements are saved, all without any visual indication to the user. This data can't reasonably be expected to be kept anonymous."[21]

105.    As currently deployed, Quantum Metric's recording function, as employed by Kaiser Permanente, functions as a wiretap, and Quantum Metric acts as a third-party wiretapper.

### 2.    Kaiser Permanente Allows Adobe to Intercept Kaiser Plan Members' Information and Communications from the Site and Portal

106.    Unbeknownst to Kaiser Plan Members and against their reasonable expectations, Kaiser Permanente allows Adobe to intercept Kaiser Plan Members' information and communications from the Site and Portal.

107.    Kaiser Permanente allows Adobe to intercept Kaiser Plan Members' personal and sensitive identifying and medical information and private and confidential communications through code connected with the Adobe Experience Cloud a/k/a Adobe Marketing Cloud service embedded on the Site, including within the Portal.

108.    The Adobe Experience Cloud service is a suite of products offered by Adobe, which allow businesses to personalize and improve their marketing on websites, apps, and social media pages by collecting and analyzing information about website visitors.

---

[20] Steven Englehardt, *No boundaries: Exfiltration of personal data by session-replay scripts*, Freedom to Tinker (Nov. 15, 2017), https://freedom-to-tinker.com/2017/11/15/no-boundaries-exfiltration-of-personal-data-by-session-replay-scripts/.
[21] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO: 4:23-cv-02865-EMC

109.    The Adobe Experience Cloud includes a number of services including: Measurement solutions, which allows companies to measure and understand visitors who use their websites, apps, and social media pages, as well as how they interact with online marketing campaigns; Personalization solutions, which allows companies to test new content and make their websites, apps, social media pages, and emails more relevant to particular visitors; Content management solutions, which allows companies to store, update, and deliver images and other content on their websites, within their apps, and in online marketing materials; and Advertising solutions, which allows companies to improve their online advertising on websites, apps, search engines, and social media, including helping companies send emails, text messages, and other online and offline marketing campaigns.[22]

110.    The Adobe Experience Cloud collects an array of information about website visitors, including:

- Where you go and what you do on that company's websites, apps, or social media pages
- Your web browsing activity, including the URLs of the company's web pages you visit
- The URL of the page that displayed the link that you clicked on, which brought you to that company's website
- The web search you performed that led you to that company's website
- Information about your web browser and device, such as device type, browser type, advertising identifier, operating system, connection speed, and display settings
- Your IP address (or partial IP address, depending on how the company has configured the solution), which may be used to approximate your general location
- Location information from your mobile device or web browser
- Social media profile information
- Information you may provide on that company's website, app, or when interacting with that company's social media pages, such as information you provide on registration forms

---

[22] *Adobe Experience Cloud privacy*, Adobe (Updated Dec. 5, 2022), https://www.adobe.com/privacy/experience-cloud.html.

- Ad campaign success rates, such as whether you clicked on a company's ad and whether viewing or clicking on the ad led to your purchase of that company's product or service

- Items you've purchased or placed in your shopping cart on that company's website or app[23]

111.    As part of the Adobe Advertising Cloud solution, Adobe makes available certain health-related segments supplied by third-party data providers to the companies using the Adobe Advertising Cloud, allowing companies to use these segments to target ads when they are using the Adobe Experience Cloud. These data segments generally fall into the following categories: (1) occupation in a health-related field, (2) health related topics and conditions, (3) interest in health insurance, (4) diet, fitness, weight-loss, and healthy lifestyles, (5) consumer goods and services for personal healthcare, vision care, grooming, and beauty, (6) over the counter medicines, remedies, and dietary supplements, and (7) health related charities.

112.    The Adobe Experience Cloud collects this information through an array of tracking technologies, including cookies and/or web beacons (also known as tags or pixels), such as the third-party cookies omtrdc.net, demdex.net, and the Adobe Experience Platform Launch, which delivers a library containing specified tags for other Adobe Experience Cloud solutions.[24]

113.    As Kaiser Plan Members navigate the Kaiser Permanente Site, the Site makes numerous "POST" calls which send information about Kaiser Plan Members' confidential communications with Kaiser Permanente that are intercepted by Adobe.

114.    Adobe has established subdomains on its own server, such as the subdomain kaiser.tt.omtrdc.net on Adobe's omtrdc.net server, where Adobe receives and stores the communications intercepted from Kaiser Permanente.[25]

115.    For example, on June 6, 2023, after Plaintiff John Doe logged into the Portal, the following data was intercepted by Adobe and sent to Adobe's server at the kaiser.tt.omtrdc.net

---

[23] *Id.*

[24] This includes cookies identified as "everest_g_v2" and "demdex.net", which aid in tracking users. According to Adobe's marketing materials, the everest_g_v2 cookie is "created after a user initially clicks a client's ad, and used to map the current and subsequent clicks with other events on the client's website."

[25] *Adobe Experience Cloud privacy*, supra note 22.

subdomain, which as detailed below shows that Adobe received a host of personally identifiable

health information, including: user data (color coded in blue), the URL of the Website the user is

currently browsing (color coded in green), unique IDs (color coded in yellow), customer IDs and

status values (color coded in grey),[26] and segmentation values that enable the Website to show

personalized content (no color).

{"requestId":"d65c5d634b7d484a9176516962af4071","context":{"userAgent":"Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/113.0.0.0 Safari/537.36","clientHints":{"mobile":false,"platform":"macOS","browserUAWithMajorVersion":"\"Google Chrome\";v=\"113\", \"Chromium\";v=\"113\", \"Not-A.Brand\";v=\"24\""},"timeOffsetInMinutes":-420,"channel":"web","screen":{"width":1512,"height":982,"orientation":"landscape","colorDepth":30,"pixelRatio":2},"window":{"width":1512,"height":871},"browser":{"host":"healthy.kaiserpermanente.org","webGLRenderer":"ANGLE (Apple, Apple M1 Pro, OpenGL 4.1)"},"address":{"url":"https://healthy.kaiserpermanente.org/southern-california/secure/inner-door","referringUrl":"https://healthy.kaiserpermanente.org/southern-california/consumer-interrupt.html"}},"id":{"tntId":"Redacted ","thirdPartyId":"Redacted ","marketingCloudVisitorId":"Redacted Redacted ","customerIds":[{"id":"Redacted ","integrationCode":"kpaamidepp","authenticatedState":"authenticated","type":"DS"},{"id":"Redacted ","integrationCode":"kpaamidudr","authenticatedState":"authenticated","type":"DS"},{"id":"Redacted ","integrationCode":"kpaamid_One-off-datasets","authenticatedState":"authenticated","type":"DS"},{"id":"Redacted ","integrationCode":"pzn_crm","authenticatedState":"authenticated","type":"DS"},{"id":"Redacted ","integrationCode":"mbox3rdPartyId","authenticatedState":"authenticated","type":"DS"}]},"experienceCloud":{"audienceManager":{"locationHint":9,"blob":"6G1ynYcLPuiQxYZrsz_pkqfLG9yMXBpb2zX5dvJdYQJzPXImdj0y"},"analytics":{"logging":"server_side","supplementalDataId":"01AFA18961CACA34-2D8CDB5E307D31FB"}},"execute":{"pageLoad":{"parameters":{"Seg18v":"sca","Seg17v":"sca","Seg55v":"Logged In","Seg181v":"","Seg81v":"kporg:secure:inner-door","Seg114vcookie":"mbr","reEnable":"","throttle-area":"","Seg180v":false,"Seg4":true,"Seg517e":false,"Seg5":false,"Seg6":false,"Seg7":false,"Seg8":false,"Seg440e":false,"Seg9":false,"Seg11":false,"Seg20v":7692006,"Seg114v":"SUBSCRIBER","Seg13":false,"Seg14":false,"Seg16":false,"Seg19":false,"Seg101v":27,"Seg516e":false,"Seg126v":false,"modval":6,"Seg21":100453,"Seg22":"","Seg24":"urn:kp:prodiem","Seg25":false,"entitlement-446":true,"pLoaded":1,"id":""},"profileParameters":{"region":"","Seg2":"12","Se

---

[26] Specific identifier number has been redacted.

g56v":"MBR","Seg10":"NOT
ENROLLED","Seg20v":7692006,"Seg12":"ACTIVE","Seg101v":27,"Seg15":"tr
ue","Seg106v":"KFHP_HMO","Seg6":"false","pzn_id":"[Redacted ]","Seg103v":fa
lse}}},"prefetch":{"views":[{"parameters":{"Seg18v":"sca","Seg17v":"sca","Seg
55v":"Logged                                   In","Seg181v":"","Seg81v":"kporg:secure:inner-
door","Seg114vcookie":"mbr","reEnable":"","throttle-
area":"","Seg180v":false,"Seg4":true,"Seg517e":false,"Seg5":false,"Seg6":false,"
Seg7":false,"Seg8":false,"Seg440e":false,"Seg9":false,"Seg11":false,"Seg20v":76
92006,"Seg114v":"SUBSCRIBER","Seg13":false,"Seg14":false,"Seg16":false,"S
eg19":false,"Seg101v":27,"Seg516e":false,"Seg126v":false,"modval":6,"Seg21":1
00453,"Seg22":"","Seg24":"urn:kp:prodiem","Seg25":false,"entitlement-
446":true,"pLoaded":1,"id":""},"profileParameters":{"region":"","Seg2":"12","Se
g56v":"MBR","Seg10":"NOT
ENROLLED","Seg20v":7692006,"Seg12":"ACTIVE","Seg101v":27,"Seg15":"tr
ue","Seg106v":"KFHP_HMO","Seg6":"false","pzn_id":"[Redacted ]","Seg103v":fa
lse}}},"telemetry":{"entries":[{"requestId":3198432,"timestamp":168607687102
3,"execution":3.6},{"execution":106.5,"parsing":0.2,"request":{"tls":4.2,"timeTo
FirstByte":88.8,"download":0.7,"responseSize":1534},"telemetryServerToken":"
GRgdNPKF2baxcRHAQqAHqyTPswyQefSCMFGH9GY2aUI=","mode":"edge",
"features":{"executePageLoad":true,"prefetchViewCount":1,"decisioningMethod"
:"server-
side"},"requestId":"2499aa7a302a46319e851646fe207f5f","timestamp":1686076
871017}]}}

116.    Similarly, when Plaintiff Jane Doe logged into the Portal on May 31, 2023, the
following data was intercepted by Adobe and sent to Adobe's server at the kaiser.tt.omtrdc.net
subdomain:

{"requestId":"f33def0d509a49e1beb96b320fcae2fd","context":{"userAgent":"Mo
zilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like
Gecko)                                                                   Chrome/113.0.0.0
Safari/537.36","clientHints":{"mobile":false,"platform":"Windows","browserUA
WithMajorVersion":"\"Google       Chrome\";v=\"113\",   \"Chromium\";v=\"113\",
\"Not-A.Brand\";v=\"24\""},"timeOffsetInMinutes":-
420,"channel":"web","screen":{"width":1366,"height":768,"orientation":"landsca
pe","colorDepth":24,"pixelRatio":1},"window":{"width":1349,"height":357},"bro
wser":{"host":"healthy.kaiserpermanente.org","webGLRenderer":"ANGLE (Intel,
Intel(R)      HD      Graphics      Direct3D11      vs_5_0      ps_5_0,
D3D11)"},"address":{"url":"https://healthy.kaiserpermanente.org/consumer-sign-
on#/signon","referringUrl":"https://healthy.kaiserpermanente.org/washington/fron
t-
door"},"beacon":true},"id":{"tntId":"[Redacted
]","marketingCloudVisitorId":"[Redacted                                                           ]"},"
experienceCloud":{"audienceManager":{"locationHint":9,"blob":"6G1ynYcLPui
QxYZrsz_pkqfLG9yMXBpb2zX5dvJdYQJzPXImdj0y"},"analytics":{"logging":
"server_side","supplementalDataId":"75CDF51005725EB2-
38AA41AF056F9156"}},"telemetry":{"entries":[{"requestId":3198432,"timestam

p":1685576844326,"execution":312.9},{"execution":540.4,"parsing":1.1,"request":{"tls":30.3,"timeToFirstByte":171,"download":3.5,"responseSize":1323},"telemetryServerToken":"GRgdNPKF2baxcRHAQqAHq1m+lb9PISy9OC4JmXflkxk=","mode":"edge","features":{"executePageLoad":true,"prefetchViewCount":1,"decisioningMethod":"server-side"},"requestId":"57f7290ecb644e209d081d8859b9dcb3","timestamp":1685576843853}]},"notifications":[{"id":"5aed303df02141b3a56280a73c83f7b3","type":"display","timestamp":1685576849764,"parameters":{"Seg18v":"","Seg17v":"","Seg55v":"Logged Out","Seg181v":"","Seg81v":"kporg:consumer-sign-on","Seg114vcookie":"","reEnable":"","throttle-area":""},"profileParameters":{"region":"","Seg2":"23"},"view":{"name":"signon"}}],"impressionId":"c1f577b2a5494fd3a0c74f9e6e4ef092"}

117.    The first block color coded in blue is sent as part of the HTTP request header and is used to create a digital fingerprint for the specific user by collecting information about the specific user's browser and device information, including details about the user's browser type, computing device, operating system, screen height and width, and details about the user's graphics card. Together these details create a device fingerprint[27] which allows Adobe to compile and track long-term records of the individual's browsing history (and thus deliver targeted advertising or targeted exploits) even when visitors are attempting to avoid tracking—raising a major concern for internet privacy advocates.

118.    The second block (green) indicates the URL for the Webpage currently visited by the user. Here, Adobe is receiving information that Plaintiffs logged-into the Portal, signifying that Plaintiffs are Kaiser Plan Members and Kaiser Permanente Patients—information which Kaiser Permanente is prohibited from disclosing under HIPAA and other state and federal laws.

119.    The third block (yellow) includes two identifiers set by Adobe: (1) marketingCloudVisitorID and (2) tntID. These identifiers work in tandem with the demdex.net server and the AMCV cookie to help specifically identify users.

120.    When a user first visits a site with the Adobe Experience Cloud installed, like when Kaiser Plan Members visit the Site and/or Portal, Adobe checks to see if the AMCV cookie is set. This cookie stores the marketingCloudVisitorID (also known as Experience Cloud ID). According to Adobe, the marketingCloudVisitorID "is a universal and persistent ID that identifies your visitors

---

[27] *Fingerprinting*, web.dev, https://web.dev/learn/privacy/fingerprinting/ (last visited Sept. 15, 2023).

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO: 4:23-cv-02865-EMC

across all solutions in the Experience Cloud."[28] In the POST calls referenced above the marketingCloudVisitorID for Plaintiffs are assigned specific numeric values (█████████████████████████ for Plaintiff Jane Doe and █████████████████████████ for Plaintiff John Doe). This in turn allows for tracking of Kaiser Plan Members across Kaiser Permanente sites and across devices.

121.    If the AMCV cookie is not set, the Adobe code places a call to the demdex.net server, which generates a marketingCloudVisitorID and sets the AMCV cookie with that value. It also sets a demdex ID cookie which is persistent.[29] Since the marketingCloudVisitorID is stored in the AMCV cookie, it will remain the same for anyone using the browser for that specific site. When a user visits another site with Adobe Experience Cloud installed, a new marketingCloudVisitorID will be generated, but the demdex ID will remain the same. According to Adobe, "the demdex ID remains the same . . . because it's contained in a third-party cookie and persists across different domains."[30] This in turn allows Adobe to track specific devices across sites.

122.    According to Adobe the tntID, "can be seen as a device ID."[31] As detailed above, device IDs use the unique setup of a user's computer and browser to establish a device fingerprint. This fingerprint can track users across various Websites to build a profile based on their Web browsing habits. In the POST calls referenced above the tntID is assigned a specific numeric value (█████████████████████████ for Plaintiff Jane Doe and █████████████████████████ for Plaintiff John Doe). The tntID is stored in the persistent mbox cookie. Adobe uses the tntID as the main identifier for its Adobe Target solution.[32] The Adobe Target system is used to personalize a user's experience on a website, like Kaiser Plan Members on the Site and Portal. By default, Adobe Target captures the following data, which in turn allows the website to serve personalized and targeted information to specific users:

---

[28] *Adobe Target Delivery API (1.0.0) Terms of Service*, Adobe, https://developers.adobetarget. com/api/delivery-api/#section/Identifying-Visitors (last visited Sept. 15, 2023).
[29] *How the Experience Cloud Identity Service requests and sets IDs*, Adobe (Updated Nov. 10, 2022), https://experienceleague.adobe.com/docs/id-service/using/intro/id-request.html?lang=en.
[30] *Id.*
[31] *Adobe Target Delivery API (1.0.0) Terms of Service*, supra note 28.
[32] *Id.*

| Data category | Description |
|---|---|
| Environment parameters | Information about a user's environment, including operating system, browser, and time of day/day of week. |
| Geography | Information about a user's geography, obtained via IP lookup. |
| Mobile device | Information about a user's mobile device. |
| Target reporting segments | Reporting segments configured in Target reporting. |
| Session behavior | Information about user behavior, such as number of pages viewed.[33] |

123.     According to Adobe, the thirdPartyID "is a persistent ID that your business utilizes to identify an end-user regardless of whether they are interacting with your business from web, mobile, or IoT channels. In other words, the thirdPartyId will reference user profile data that can be utilized across channels."[34] In John Doe's POST call referenced above, the thirdPartyId is assigned a specific numeric value (Redacted ). This ID can be used to identify return users once they have logged into the Portal. This in turn allows Adobe's customers to associate the thirdPartyID with a specific individual, the third party here being Kaiser Permanente's patients.

124.     The fourth block (grey) includes customerIds that can be, "added and associated with an Experience Cloud Visitor ID."[35] In the case of the POST call above, the additional data includes the fact the user is authenticated (logged in), again signifying that Plaintiff is a Kaiser Plan Member and Kaiser Permanente patient—information which Kaiser Permanente is prohibited from disclosing under HIPAA and other state and federal laws and its express and implied contracts with Kaiser Plan Members.

---

[33] Adapted from: *Data used by Target machine-learning algorithms*, Adobe (Updated Apr. 23, 2023), https://experienceleague.adobe.com/docs/target/using/activities/automated-personalization/ap-data.html.
[34] *Adobe Target Delivery API (1.0.0) Terms of Service*, *supra* note 28.
[35] *Id.*

125.    Similar POST calls to kaiser.tt.omtrdc.net were found on all examined pages, including main page for the Kaiser Operating States, doctor search, retrieving test results, and the bill pay page.

126.    After Plaintiff Jane Doe logged into the Portal and accessed test results on May 31, 2023, Adobe intercepted and received information about the fact Plaintiff Jane Doe had lab test results available (see green highlight), which was transmitted to Adobe and stored on Adobe's kaiser.tt.omtrdc.net server:

{"requestId":"e89a72b9d34c409ebbeec86e8d421e30","context":{"userAgent":"Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/113.0.0.0 Safari/537.36","clientHints":{"mobile":false,"platform":"Windows","browserUAWithMajorVersion":"\"Google Chrome\";v=\"113\", \"Chromium\";v=\"113\", \"Not-A.Brand\";v=\"24\""},"timeOffsetInMinutes":-420,"channel":"web","screen":{"width":1366,"height":768,"orientation":"landscape","colorDepth":24,"pixelRatio":1},"window":{"width":1349,"height":357},"browser":{"host":"wa-member2.kaiserpermanente.org","webGLRenderer":"ANGLE (Intel, Intel(R) HD Graphics Direct3D11 vs_5_0 ps_5_0, D3D11)"},"address":{"url":"https://wa-member2.kaiserpermanente.org/MyChart/inside.asp?mode=labdetail&eorderid=WP-24dwjwXsqOLR9HkFJIJ-2BBnKA9ug2421MnQJWoSc-2Bc79kw-3D-24kgLeo5NOVUqzvhbO5PbT2bSZ1zLoJ7dRShqNeRddSXk-3D","referringUrl":"https://wa-member2.kaiserpermanente.org/mychart/Clinical/TestResults"}},"id":{"tntId":"Redacted Redacted","thirdPartyId":"132259249","marketingCloudVisitorId":"Redacted","customerIds":[{"id":"132259249","integrationCode":"kpaamidepp","authenticatedState":"authenticated","type":"DS"},{"id":"132259249","integrationCode":"kpaamidudr","authenticatedState":"authenticated","type":"DS"},{"id":"132259249","integrationCode":"kpaamid_One-off-datasets","authenticatedState":"authenticated","type":"DS"},{"id":"132259249","integrationCode":"pzn_crm","authenticatedState":"authenticated","type":"DS"},{"id":"132259249","integrationCode":"mbox3rdPartyId","authenticatedState":"authenticated","type":"DS"}]},"experienceCloud":{"audienceManager":{"locationHint":9,"blob":"6G1ynYcLPuiQxYZrsz_pkqfLG9yMXBpb2zX5dvJdYQJzPXImdj0y"},"analytics":{"logging":"server_side","supplementalDataId":"1926210C0731CEF9-0CC37604F49C1490"}},"execute":{"pageLoad":{"parameters":{"Seg18v":"wa","Seg17v":"wa","Seg55v":"Logged In","Seg181v":"","Seg81v":"","Seg114vcookie":"mbr","reEnable":"","throttle-area":""},"profileParameters":{"region":"","Seg2":"20"}}},"prefetch":{"views":[{"parameters":{"Seg18v":"wa","Seg17v":"wa","Seg55v":"Logged In","Seg181v":"","Seg81v":"","Seg114vcookie":"mbr","reEnable":"","throttle-area":""},"profileParameters":{"region":"","Seg2":"20"}}]},"telemetry":{"entries":[{"requestId":3198432,"timestamp":1685577421980,"execution":194.1},{"execution":226.7,"parsing":0.3,"request":{"tls":27.7,"timeToFirstByte":55.3,"download":6.1,"responseSize":1005},"telemetryServerToken":"GRgdNPKF2baxcRHAQqAHq1m+b9PISy9OC4JmXflkxk=","mo

de":"edge","features":{"executePageLoad":true,"prefetchViewCount":1,"decisioningMetho
d":"server-
side"},"requestId":"43b0d783fec64ed0a8f15aa346982faa","timestamp":1685577421736}]]}
}

127.    After Plaintiff John Doe accessed his medical history from within the Portal, Adobe

intercepted and received information about the fact Plaintiff John Doe suffers from headaches (see

green highlight), which was transmitted to Adobe and stored on Adobe's kaiser.tt.omtrdc.net server:

{"requestId":"8e07062bb9e84eadb2bb393dac657698","context":{"userAgent":"Mozilla/5.0
(Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko)
Chrome/113.0.0.0
Safari/537.36","clientHints":{"mobile":false,"platform":"macOS","browserUAWithMajorV
ersion":"\"Google Chrome\";v=\"113\", \"Chromium\";v=\"113\", \"Not-
A.Brand\";v=\"24\""},"timeOffsetInMinutes":-
420,"channel":"web","screen":{"width":1512,"height":982,"orientation":"landscape","color
Depth":30,"pixelRatio":2},"window":{"width":1512,"height":559},"browser":{"host":"healt
hy.kaiserpermanente.org","webGLRenderer":"ANGLE (Apple, Apple M1 Pro, OpenGL
4.1)"},"address":{"url":"https://healthy.kaiserpermanente.org/southern-
california/secure/search-medical-record?uri=search%3ahealth-
encyclopedia&type=ICD&queryICD10=R51.9&label=HEADACHE&groupName=Health+
summary","referringUrl":"https://healthy.kaiserpermanente.org/hconline/ie/inside.asp?lang=
english&mode=snapshot"}},"id":{"tntId":"Redacted","thi
rdPartyId":"Redacted","marketingCloudVisitorId":"Redacted
Redacted","customerIds":[{"id":"Redacted","integrationCode":"kpaamidepp","authenticated
State":"authenticated","type":"DS"},{"id":"Redacted","integrationCode":"kpaamidudr","au
thenticatedState":"authenticated","type":"DS"},{"id":"Redacted","integrationCode":"kpaa
mid_One-off-
datasets","authenticatedState":"authenticated","type":"DS"},{"id":"Redacted","integrationC
ode":"pzn_crm","authenticatedState":"authenticated","type":"DS"},{"id":"Redacted","integ
rationCode":"mbox3rdPartyId","authenticatedState":"authenticated","type":"DS"}]},"experi
enceCloud":{"audienceManager":{"locationHint":9,"blob":"6G1ynYcLPuiQxYZrsz_pkqfL
G9yMXBpb2zX5dvJdYQJzPXImdj0y"},"analytics":{"logging":"server_side","supplementa
lDataId":"0E8C61D7B797A752-
08C07E6DBCFCCB5A"}},"execute":{"pageLoad":{"parameters":{"Seg18v":"sca","Seg17
v":"sca","Seg55v":"Logged In","Seg181v":"","Seg81v":"kporg:secure:search-medical-
record","Seg114vcookie":"mbr","reEnable":"","throttle-
area":"","Seg180v":false,"Seg4":true,"Seg517e":false,"Seg5":false,"Seg6":false,"Seg7":fals
e,"Seg8":false,"Seg440e":false,"Seg9":false,"Seg11":false,"Seg20v":7692006,"Seg114v":"S
UBSCRIBER","Seg13":false,"Seg14":false,"Seg16":false,"Seg19":false,"Seg101v":27,"Seg
516e":false,"Seg126v":false,"modval":6,"Seg21":100453,"Seg22":"","Seg24":"urn:kp:prodi
em","Seg25":false,"entitlement-
446":true,"pLoaded":1,"id":""},"profileParameters":{"region":"","Seg2":"12","Seg56v":"M
BR","Seg10":"NOT
ENROLLED","Seg20v":7692006,"Seg12":"ACTIVE","Seg101v":27,"Seg15":"true","Seg10
6v":"KFHP_HMO","Seg6":"false","pzn_id":"Redacted","Seg103v":false}}},"prefetch":{"v
iews":[{"parameters":{"Seg18v":"sca","Seg17v":"sca","Seg55v":"Logged

In","Seg181v":"","Seg81v":"kporg:secure:search-medical-record","Seg114vcookie":"mbr","reEnable":"","throttle-area":"","Seg180v":false,"Seg4":true,"Seg517e":false,"Seg5":false,"Seg6":false,"Seg7":false,"Seg8":false,"Seg440e":false,"Seg9":false,"Seg11":false,"Seg20v":7692006,"Seg114v":"SUBSCRIBER","Seg13":false,"Seg14":false,"Seg16":false,"Seg19":false,"Seg101v":27,"Seg516e":false,"Seg126v":false,"modval":6,"Seg21":100453,"Seg22":"","Seg24":"urn:kp:prodiem","Seg25":false,"entitlement-446":true,"pLoaded":1,"id":""},"profileParameters":{"region":"","Seg2":"12","Seg56v":"MBR","Seg10":"NOT ENROLLED","Seg20v":7692006,"Seg12":"ACTIVE","Seg101v":27,"Seg15":"true","Seg106v":"KFHP_HMO","Seg6":"false","pzn_id":"[Redacted]","Seg103v":false}}]},"telemetry":{"entries":[{"requestId":3198432,"timestamp":1686077690690,"execution":12.7},{"execution":120.9,"parsing":0.1,"request":{"tls":1.8,"timeToFirstByte":93.3,"download":0.8,"responseSize":1658},"telemetryServerToken":"GRgdNPKF2baxcRHAQqAHqyTPswyQefSCMFGH9GY2aUI=","mode":"edge","features":{"executePageLoad":true,"prefetchViewCount":1,"decisioningMethod":"server-side"},"requestId":"30377aef3045436aa832ba402fe7c5ca","timestamp":1686077690672}}]}
}

128.    Similarly, after Plaintiff John Doe accessed his medical history from within the Portal, Adobe intercepted and received information about the fact Plaintiff John Doe suffers from kidney stones (see green highlight), which was transmitted to Adobe and stored on Adobe's kaiser.tt.omtrdc.net server:

{"requestId":"c7c2f6533c974a37bf18df244b7860ac","context":{"userAgent":"Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/113.0.0.0 Safari/537.36","clientHints":{"mobile":false,"platform":"macOS","browserUAWithMajorVersion":"\"Google Chrome\";v=\"113\", \"Chromium\";v=\"113\", \"Not-A.Brand\";v=\"24\""},"timeOffsetInMinutes":-420,"channel":"web","screen":{"width":1512,"height":982,"orientation":"landscape","colorDepth":30,"pixelRatio":2},"window":{"width":1512,"height":732},"browser":{"host":"healthy.kaiserpermanente.org","webGLRenderer":"ANGLE (Apple, Apple M1 Pro, OpenGL 4.1)"},"address":{"url":"https://healthy.kaiserpermanente.org/southern-california/pages/search?query=kidney+stones&category=global&global-region=sca&language=english&region=sca","referringUrl":"https://healthy.kaiserpermanente.org/southern-california/front-door"}},"id":{"tntId":"[Redacted]","marketingCloudVisitorId":"[Redacted]8"},"experienceCloud":{"audienceManager":{"locationHint":9,"blob":"RKhpRz8krg2tLO6pguXWp5olkAcUniQYPHaMWWgdJ3xzPWQmdj0y"},"analytics":{"logging":"server_side","supplementalDataId":"1385A481D134AE9C-5442EE55E30D9036"}},"execute":{"pageLoad":{"parameters":{"Seg18v":"sca","Seg17v":"","Seg55v":"Logged Out","Seg181v":"","Seg81v":"kporg:pages:search","Seg114vcookie":"","reEnable":"","throttle-

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO: 4:23-cv-02865-EMC

area":""},"profileParameters":{"region":"","Seg2":"12"}}},"prefetch":{"views":[{"paramete
rs":{"Seg18v":"sca","Seg17v":"","Seg55v":"Logged
Out","Seg181v":"","Seg81v":"kporg:pages:search","Seg114vcookie":"","reEnable":"","throt
tle-
area":""},"profileParameters":{"region":"","Seg2":"12"}}]},"telemetry":{"entries":[{"reque
stId":3198432,"timestamp":1686079858947,"execution":31},{"execution":347.9,"parsing":
0.1,"request":{"tls":1.4,"timeToFirstByte":301.7,"download":0.3,"responseSize":3542},"tel
emetryServerToken":"13OD8mmKQLOFlv9DVqEli/66cI/n43cYFW7Bbdgc7oQ=","mode"
:"edge","features":{"executePageLoad":true,"prefetchViewCount":1,"decisioningMethod":"
server-
side"},"requestId":"d1ee96fe7bc44f32a598fa3fa6301fec","timestamp":1686079858912}]}}

129.    In another example, when Plaintiff John Doe accessed his medications from within

the Portal, Adobe intercepted and received information about the fact Plaintiff John Doe takes a

certain medication (see green highlight), which was transmitted to Adobe and stored on Adobe's

kaiser.tt.omtrdc.net server:

{"requestId":"4b353a7157fe4afb994b10217d877637","context":{"userAgent":"Mozilla/5.0
(Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko)
Chrome/113.0.0.0
Safari/537.36","clientHints":{"mobile":false,"platform":"macOS","browserUAWithMajorV
ersion":"\"Google Chrome\";v=\"113\", \"Chromium\";v=\"113\", \"Not-
A.Brand\";v=\"24\""},"timeOffsetInMinutes":-
420,"channel":"web","screen":{"width":1512,"height":982,"orientation":"landscape","color
Depth":30,"pixelRatio":2},"window":{"width":1512,"height":559},"browser":{"host":"healt
hy.kaiserpermanente.org","webGLRenderer":"ANGLE (Apple, Apple M1 Pro, OpenGL
4.1)"},"address":{"url":"https://healthy.kaiserpermanente.org/southern-california/health-
wellness/drug-
encyclopedia/drug.259872","referringUrl":"https://healthy.kaiserpermanente.org/hconline/ie
/inside.asp?lang=english&mode=snapshot"}},"id":{"tntId":"[Redacted]
[Redacted]","thirdPartyId":"[Redacted]","marketingCloudVisitorId":"[Redacted]
[Redacted]","customerIds":[{"id":"[Redacted]","integrationCode":"kpaamide
pp","authenticatedState":"authenticated","type":"DS"},{"id":"[Redacted]","integrationCode":
"kpaamidudr","authenticatedState":"authenticated","type":"DS"},{"id":"[Redacted]","integra
tionCode":"kpaamid_One-off-
datasets","authenticatedState":"authenticated","type":"DS"},{"id":"[Redacted]","integrationC
ode":"pzn_crm","authenticatedState":"authenticated","type":"DS"},{"id":"[Redacted]","integ
rationCode":"mbox3rdPartyId","authenticatedState":"authenticated","type":"DS"}]},"experi
enceCloud":{"audienceManager":{"locationHint":9,"blob":"6G1ynYcLPuiQxYZrsz_pkqfL
G9yMXBpb2zX5dvJdYQJzPXImdj0y"},"analytics":{"logging":"server_side","supplementa
lDataId":"1EE577E8629305D2-
08A3CF719904939A"}},"execute":{"pageLoad":{"parameters":{"Seg18v":"sca","Seg17v":
"sca","Seg55v":"Logged In","Seg181v":"","Seg81v":"kporg:health-wellness:drug-
encyclopedia:drug.259872","Seg114vcookie":"mbr","reEnable":"","throttle-
area":"","Seg180v":false,"Seg4":true,"Seg517e":false,"Seg5":false,"Seg6":false,"Seg7":fals
e,"Seg8":false,"Seg440e":false,"Seg9":false,"Seg11":false,"Seg20v":7692006,"Seg114v":"S

UBSCRIBER","Seg13":false,"Seg14":false,"Seg16":false,"Seg19":false,"Seg101v":27,"Seg516e":false,"Seg126v":false,"modval":6,"Seg21":100453,"Seg22":"","Seg24":false,"Seg25":false,"entitlement-446":"","entity.id":"%monograph_id%","pLoaded":1,"id":""},"profileParameters":{"region":"","Seg2":"12","Seg56v":"MBR","Seg10":"NOT ENROLLED","Seg20v":7692006,"Seg12":"ACTIVE","Seg101v":27,"Seg15":"true","Seg106v":"KFHP_HMO","Seg6":"false","pzn_id":"Redacted ","Seg103v":false}}},"prefetch":{"views":[{"parameters":{"Seg18v":"sca","Seg17v":"sca","Seg55v":"Logged In","Seg181v":"","Seg81v":"kporg:health-wellness:drug-encyclopedia:drug.259872","Seg114vcookie":"mbr","reEnable":"","throttle-area":"","Seg180v":false,"Seg4":true,"Seg517e":false,"Seg5":false,"Seg6":false,"Seg7":false,"Seg8":false,"Seg440e":false,"Seg9":false,"Seg11":false,"Seg20v":7692006,"Seg114v":"SUBSCRIBER","Seg13":false,"Seg14":false,"Seg16":false,"Seg19":false,"Seg101v":27,"Seg516e":false,"Seg126v":false,"modval":6,"Seg21":100453,"Seg22":"","Seg24":false,"Seg25":false,"entitlement-446":"","entity.id":"%monograph_id%","pLoaded":1,"id":""},"profileParameters":{"region":"","Seg2":"12","Seg56v":"MBR","Seg10":"NOT ENROLLED","Seg20v":7692006,"Seg12":"ACTIVE","Seg101v":27,"Seg15":"true","Seg106v":"KFHP_HMO","Seg6":"false","pzn_id":"Redacted ","Seg103v":false}}},"telemetry":{"entries":[{"requestId":3198432,"timestamp":1686077727535,"execution":13.1},{"execution":536,"parsing":0.1,"request":{"tls":29.6,"timeToFirstByte":453.5,"download":9,"responseSize":1652},"telemetryServerToken":"ytSZo63c32LTWU3OagsNm4f2oPeqNn97fefLHdLznd4=","mode":"edge","features":{"executePageLoad":true,"prefetchViewCount":1,"decisioningMethod":"server-side"},"requestId":"de495a765e94495db656689de5179016","timestamp":1686077727519}]}}

130.    When Plaintiff Jane Doe logged out of the Portal and conducted a search for a doctor using the keyword "mental health" on the Site, the POST to kaiser.tt.omtrdc.net revealed the search term as shown below (green highlight):

{"requestId":"f42ffe0b90c141e6836a7006c18a6965","context":{"userAgent":"Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/113.0.0.0 Safari/537.36","clientHints":{"mobile":false,"platform":"Windows","browserUAWithMajorVersion":"\"Google Chrome\";v=\"113\", \"Chromium\";v=\"113\", \"Not-A.Brand\";v=\"24\""},"timeOffsetInMinutes":-420,"channel":"web","screen":{"width":1366,"height":768,"orientation":"landscape","colorDepth":24,"pixelRatio":1},"window":{"width":1349,"height":584},"browser":{"host":"healthy.kaiserpermanente.org","webGLRenderer":"ANGLE (Intel, Intel(R) HD Graphics Direct3D11 vs_5_0 ps_5_0, D3D11)"},"address":{"url":"https://healthy.kaiserpermanente.org/washington/doctors-locations#/facility-results?zipcode=98203&keyword=mental%20health","referringUrl":"https://healthy.kaiserpermanente.org/doctors-locations"},"beacon":true},"id":{"tntId":"Redacted ","marketingCloudVisitorId":"Redacted "},"experienceClou

d":{"audienceManager":{"locationHint":9,"blob":"RKhpRz8krg2tLO6pguXWp5olkAcUni QYPHaMWWgdJ3xzPWQmdj0y"},"analytics":{"logging":"server_side","supplementalDat aId":"16848F6EF92A646D-091DAB5A2A2A31A4"}},"notifications":[{"id":"12516194156946319b158793ad9744d1", "type":"display","timestamp":1685579001396,"parameters":{"Seg18v":"wa","Seg17v":"", "Seg55v":"Logged Out","Seg181v":"","Seg81v":"kporg:doctors-locations","Seg114vcookie":"","reEnable":"","throttle-area":""},"profileParameters":{"region":"","Seg2":"23"},"view":{"name":"facility-results"}}],"impressionId":"2017e8f257b548dbb2e29e2e51bcdc38"}

131.     Similarly, when Plaintiff John Doe logged out of the Portal and conducted a search for a neurologist on the Site, the POST to kaiser.tt.omtrdc.net revealed the search term and Plaintiff's zip code as shown below (green highlight):

{"requestId":"c059ddb0f7ee4602ad5c1cf0e72e6e0f","context":{"userAgent":"Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/113.0.0.0 Safari/537.36","clientHints":{"mobile":false,"platform":"macOS","browserUAWithMajorV ersion":"\"Google Chrome\";v=\"113\", \"Chromium\";v=\"113\", \"Not-A.Brand\";v=\"24\""},"timeOffsetInMinutes":-420,"channel":"web","screen":{"width":1512,"height":982,"orientation":"landscape","color Depth":30,"pixelRatio":2},"window":{"width":1512,"height":769},"browser":{"host":"healt hy.kaiserpermanente.org","webGLRenderer":"ANGLE (Apple, Apple M1 Pro, OpenGL 4.1)"},"address":{"url":"https://healthy.kaiserpermanente.org/southern-california/doctors-locations#/providers?zipcode=92395&medical_specialty_label=Psychiatry%20%26%20Ne urology:%20Neurology,Psychiatry%20%26%20Neurology:%20Psychiatry","referringUrl":" https://healthy.kaiserpermanente.org/southern-california/doctors-locations"}},"id":{"tntId":"Redacted","marketingCloudV isitorId":"Redacted"},"experienceCloud":{"audience Manager":{"locationHint":9,"blob":"RKhpRz8krg2tLO6pguXWp5olkAcUniQYPHaMWW gdJ3xzPWQmdj0y"},"analytics":{"logging":"server_side","supplementalDataId":"2B0396D 39B44DC65-28244F36559B11C5"}},"execute":{"pageLoad":{"parameters":{"Seg18v":"sca","Seg17v":" ","Seg55v":"Logged Out","Seg181v":"","Seg81v":"kporg:doctors-locations","Seg114vcookie":"","reEnable":"","throttle-area":"","providerType":"","keyword":"","specialty":"Psychiatry & Neurology: Neurology,Psychiatry & Neurology: Psychiatry","healthPlan":""},"profileParameters":{"region":"","Seg2":"12"}}},"prefetch":{" views":[{"parameters":{"Seg18v":"sca","Seg17v":"","Seg55v":"Logged Out","Seg181v":"","Seg81v":"kporg:doctors-locations","Seg114vcookie":"","reEnable":"","throttle-area":"","providerType":"","keyword":"","specialty":"Psychiatry & Neurology: Neurology,Psychiatry & Neurology: Psychiatry","healthPlan":""},"profileParameters":{"region":"","Seg2":"12"}}]}}

132.    When Plaintiffs John Doe II, Jane Doe II, Jane Doe III, Jane Doe IV, and Jane Doe V accessed the Kaiser Permanente website and Patient Portal, their communications were similarly intercepted by Adobe.

133.    On information and belief, the same type of information tracked, disclosed, and sent to Adobe for Plaintiffs has been tracked, disclosed, and sent to Adobe for other members of the Classes.

### 3. Kaiser Permanente Allows Twitter, Bing, and Google to Intercept Patients' Communications from the Site and Portal

134.    Kaiser Permanente, on its Home Page, Portal Login Page, and other pages on the Site—including within the Portal—also uses code that sends confidential and protected health information to Twitter, Bing, and Google.

135.    Google and Bing are the most widely used search engines, and Twitter is one of the largest social media sites in the world. Generally, Google, Bing, and Twitter do not charge to use their services because they are able to generate billions of dollars in revenue each year by selling targeted advertising.

136.    For example, if a user tweets about a current event in the news or about their job, Twitter and advertisers can understand a user's political leanings or job type. This information is valuable to Twitter because it helps advertisers understand who Twitter users are so that Twitter can sell advertisements targeting that particular user's Twitter timelines.[36]

137.    Twitter also tracks browsing activity outside of Twitter, for both Twitter users and people who have never created an account on the Twitter platform, including browser type, the device and operating system, the mobile carrier, IP address, and browsing activity.[37] Twitter can also learn information about websites visited before landing on the referring website and what websites were visited after leaving the site.[38]

---

[36] Mehak Siddiqui, *What Does Twitter Know About Me?*, vpnoverview (Sept. 9, 2022), https://vpnoverview.com/privacy/social-media/what-does-twitter-know-about-me/.
[37] *Id.*
[38] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO: 4:23-cv-02865-EMC

138.    Twitter also tracks user information provided by ad partners, such as Kaiser Permanente, that embed code on their website and in the mobile applications.  Twitter's Privacy Policy describes the user information received from partners as well as how it uses that information:

Ad Partners, Developers, Publishers.

Our ad and business partners share information with us such as browser cookie IDs, X-generated identifiers, mobile device IDs, hashed user information like email addresses, demographic or interest data, and content viewed or actions taken on a website or app. Some of our ad partners, particularly our advertisers, also enable us to collect similar information directly from their website or app by integrating our advertising technology. Information shared by ad partners and affiliates or collected by X from the websites and apps of ad partners and affiliates may be combined with the other information you share with X and that X receives, generates, or infers about you described elsewhere in this Privacy Policy.[39]

139.    Google and Bing sell ads based on a user's search. So, a search for a medical condition such as cancer, would show ads for cancer treatment centers.

140.    Google and Bing are also widely used ad platforms that provide ad remarketing. Remarketing shows ads based on sites a user has previously visited. For example, a user who visits a website with Google or Bing code, and searches on pregnancy related topics, might then see ads for a Google or Bing advertiser's pregnancy related services on other websites.

141.    A main goal for Google, Bing, and Twitter is to develop a profile of users to better target them with ads. Therefore, all these sites offer free analytics tools. These tools are useful to advertisers as they can show how effective certain ads are. Web analytics tools also provide general information about who is visiting the website and what those users are doing on the Site.  Part of the implicit cost of these tools is the ability to use the information received to supplement user profiles for better targeting.[40]

---

[39] Twitter Privacy Policy, effective September 11, 2023, https://twitter.com/en/privacy.

[40] *See e.g., How Google Uses Conversion Event Data*, https://support.google.com/google-ads/answer/93148 ("Google uses aggregated conversion event data for the overall benefit of advertisers. For example, features such as automated bidding and smart pricing rely on aggregate advertiser conversion event data to improve their overall quality and accuracy."); *Microsoft Advertising Agreement, Section 8*, https://about.ads.microsoft.com/en-us/resources/policies/microsoft-advertising-agreement ("[W]e own and control all information we collect from users in connection with our advertising services, including user information collected from Microsoft online properties, apps, and other technology like our tags, pixels, or other unique tracking codes ("Microsoft Advertising User Data"). Microsoft uses such Microsoft Advertising User Data for the purposes of delivering Microsoft Advertising, including, where applicable, retargeting and conversions. You understand and acknowledge that Microsoft uses Microsoft Advertising User

142.    Twitter summarizes how partners, such as Kaiser Permanente, can use its analytic tools for marketing.  These tools "are powered by the X website tag, a snippet of code that you place on pages of your website. Once placed, the website tag begins to collect the cookie IDs of visitors and matches them to X users. Once an audience has been created, you can target X Ads campaigns to those recent website visitors."[41] This process "allow[s] you to leverage your off-platform customer information to create unique audience segments that can be used for targeting, exclusion, and lookalike expansion."[42]

143.    The Kaiser Permanente Website, including inside the Portal, also tracks views via integration with Doubleclick, which is owned by Google and allows companies pay for clicks and track ad effectiveness.

144.    Bing, Google, and Twitter send data to their respective servers via HTTP GET request parameters.

145.    The HTTP GET method requests data from a server. This request can include additional parameters that are sent as part of the request URL. For example, take the request "www.example.com ?utm_source=google." In this case, everything after the "?" is used to track additional data, such as where the site visitor came from, in this case showing that the visitor came from Google before accessing the www.example.com.

### a)    Portal Login

146.    On May 31, 2023, when Plaintiff Jane Doe logged into the Portal, Bing sent the following GET request to bat.bing.com (color coded here and described in more detail below):

https://bat.bing.com/action/0?ti=5715144&Ver=2&mid=0449eabe-5045-4f9c-8768-afbe69c3f01a&sid=147515f0000b11ee937705de2bc479d9&vid=147628d0000b11eeabace7b017e63252&vids=0&msclkid=N&uach=pv%3D10.0.0&pi=918639831&lg=en-US&sw=1366&sh=768&sc=24&tl=Sign%20in&p=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fconsumer-sign-on%23%2Fsignon&r=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fwashington%2Ffront-door&lt=22894&mtp=10&evt=pageLoad&sv=1&rn=404848

---

Data for its own purposes, including to improve its services. In addition, Microsoft may use Microsoft Advertising User Data for purposes related to reporting and performance analysis.")

[41] *See*        https://business.twitter.com/en/help/campaign-setup/campaign-targeting/custom-audiences/website-activity.html.

[42] *Id.*

147.    On June 6, 2023, when Plaintiff John Doe logged into the Portal, Bing sent the following GET request to bat.bing.com (color coded here and described in more detail below):

https://bat.bing.com/action/0?ti=5715144&Ver=2&mid=a57ffab9-4695-4ca1-967a-8733b98911d6&sid=9e997de0049911ee92ef43fd7e01cd75&vid=9e99a6f0049911ee89feed6f1e2c50f5&vids=0&msclkid=N&pi=918639831&lg=en-US&sw=1512&sh=982&sc=30&tl=My%20Health%20%7C%20Kaiser%20Permanente&p=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Fsecure%2Finner-door&r=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Fconsumer-interrupt.html&lt=1125&evt=pageLoad&sv=1&rn=258023

148.    The Bing GET request includes temporary and session IDs (mid, sid, vid)—highlighted in yellow above, an indication that the page loaded (green highlight), the URL of the page (blue highlight), and information about the browser and device (grey highlight). The data sent to Bing indicates the user successfully logged into the Portal.

149.    According to Bing documentation, "the cookie in the relevant domain and IP address are always passed with every http request and not just via UET."[43] UET is Universal Event Tagging and it's the method used by Bing to report advertiser activity on a Website. UET was installed on all pages viewed on the Kaiser Website, including within the Portal.

150.    When Plaintiff Jane Doe logged into the Portal, Google also sent multiple GET requests to both googleads.g.doubleclick.net and google.com. These requests are essentially similar in nature. For example, the data sent via GET to Google servers at googleads.g.doubleclick.net is below:

https://googleads.g.doubleclick.net/pagead/viewthroughconversion/881418786/?random=1685576958827&cv=11&fst=1685576958827&bg=ffffff&guid=ON&async=1&gtm=45be35v0&u_w=1366&u_h=768&url=https%3A%2F%2Fwa-member.kaiserpermanente.org%2Fhome%2F&ref=https%3A%2F%2Fhealthy.kaiserpermanente.org%2F&label=Ump9CM7hr3IQosSlpAM&hn=www.googleadservices.com&frm=0&tiba=Secure%20Member%20Site%20%7C%20Kaiser%20Permanente%20Washington&auid=2067634156.1685575801&uaa=x86&uab=64&uafvl=Google%2520Chrome%3B113.0.5672.127%7CChromium%3B113.0.5672.127%7CNot-A.Brand%3B24.0.0.0&uamb=0&uap=Windows&uapv=10.0.0&uaw=0&data=event%3Dconversion&rfmt=3&fmt=4

---

[43]    *FAQ: Universal Event Tracking*,    Microsoft,    https://help.ads.microsoft.com/apex/index/3/en/53056/ (last visited Sept. 15,2023).

151.    When Plaintiff John Doe logged into the Portal, Google also sent multiple GET requests to both googleads.g.doubleclick.net and google.com. These requests are essentially similar in nature. For example, the data sent via GET to Google servers at googleads.g.doubleclick.net is below:

https://googleads.g.doubleclick.net/pagead/viewthroughconversion/881418786/?random=1686076950094&cv=11&fst=1686076950094&bg=ffffff&guid=ON&async=1&gtm=45be35v0&u_w=1512&u_h=982&url=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Fsecure%2Fmedical-record&ref=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Fsecure%2Finner-door&label=Ump9CM7hr3IQosSlpAM&hn=www.googleadservices.com&frm=0&tiba=Medical%20Record%20%7C%20Kaiser%20Permanente&auid=1088085833.1686076832&uaa=arm&uab=64&uafvl=Google%2520Chrome%3B113.0.5672.126%7CChromium%3B113.0.5672.126%7CNot-A.Brand%3B24.0.0.0&uamb=0&uap=macOS&uapv=13.3.1&uaw=0&data=event%3Dconversion&rfmt=3&fmt=4

152.    The above GET requests includes the URL of the current site (blue highlight), the event type (highlighted in green)—in this case a conversion, as well as data about the browser and device that allows Google to produce a device fingerprint (highlighted in grey). The data sent to Google indicates the user successfully logged into the Portal.

153.    When Plaintiff Jane Doe logged into the Portal, Google used the POST method to transmit the following data to Google servers at www.google-analytics.com:

https://www.google-analytics.com/g/collect?v=2&tid=G-ENXTD8TZ70&gtm=45je35v0&_p=1252165919&cid=657412457.1685575799&ul=en-us&sr=1366x768&uaa=x86&uab=64&uafvl=Google%2520Chrome%3B113.0.5672.127%7CChromium%3B113.0.5672.127%7CNot-A.Brand%3B24.0.0.0&uamb=0&uam=&uap=Windows&uapv=10.0.0&uaw=0&ngs=1&_s=1&sid=1685575799&sct=1&seg=1&dl=https%3A%2F%2Fwa-member.kaiserpermanente.org%2Fhome%2F&dr=https%3A%2F%2Fhealthy.kaiserpermanente.org%2F&dt=Secure%20Member%20Site%20%7C%20Kaiser%20Permanente%20Washington&en=page_view&_ee=1&_et=1

154.    When Plaintiff John Doe logged into the Portal, Google used the POST method to transmit the following data to Google servers at www.google-analytics.com:

https://www.google-analytics.com/g/collect?v=2&tid=G-ENXTD8TZ70&gtm=45je35v0&_p=78753540&cid=1504176517.1686076832&ul=en-us&sr=1512x982&uaa=arm&uab=64&uafvl=Google%2520Chrome%3B113.0.5672.126%7CChromium%3B113.0.5672.126%7CNot-A.Brand%3B24.0.0.0&uamb=0&uam=&uap=macOS&uapv=13.3.1&uaw=0&ngs=1&_s=1&sid=1686076832&sct=1&seg=1&dl=https%3A%2F%2Fhealthy.kaiserpermanente.org%2

Fsouthern-california%2Fsecure%2Finner-
door&dr=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-
california%2Fconsumer-
interrupt.html&dt=My%20Health%20%7C%20Kaiser%20Permanente&en=page_view&_e
e=1

155.    The POST above includes temporary and session IDs (cid, sid)—highlighted in
yellow, an indication that the page loaded (green highlight), the URL of the current page (blue
highlight), and information about the browser and device (grey highlight). As discussed above, device
data allows Google to establish a device fingerprint to track devices across multiple websites. The
data sent to Google indicates the user successfully logged into the Portal.

156.    When Plaintiff Jane Doe accessed the Portal, Twitter sent two GET requests—one to
analytics.twitter.com and one to t.co. Except for the base domain, both GET requests were the same
as follows:

> https://analytics.twitter.com/1/i/adsct?bci=4&eci=3&event=%7B%7D&event_id=5f8ad0cc-
> d7e4-4c79-be40-
> b2476d38e9c6&integration=advertiser&p_id=Twitter&p_user_id=0&pl_id=751184a7-
> 0132-46b9-80db-fa67ceecceec&tw_document_href=https%3A%2F%2Fwa-
> member.kaiserpermanente.org%2Fhome%2F&tw_iframe_status=0&txn_id=o2f67&type=ja
> vascript&version=2.3.29

157.    When Plaintiff John Doe accessed the Portal, Twitter sent two GET requests—one to
analytics.twitter.com and one to t.co. Except for the base domain, both GET requests were the same
as follows:

> https://t.co/1/i/adsct?bci=4&eci=3&event=%7B%7D&event_id=23676916-ed52-496b-
> be38-e9067f36cf37&integration=advertiser&p_id=Twitter&p_user_id=0&pl_id=eb369f6b-
> bab7-443a-abfd-
> 6a18f78ec1e2&tw_document_href=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fso
> uthern-california%2Fsecure%2Finner-
> door&tw_iframe_status=0&txn_id=o2f67&type=javascript&version=2.3.29

158.    As reflected above, highlighted in blue, the Twitter GET requests were used to indicate
a page view of the Portal—indicating the user successfully logged in.

**b)    Inside the Portal—Accessing Medical Records**

159.    On June 6, 2023, when Plaintiff John Doe accessed his medical records from within
the Portal, Bing, Google, and Twitter all transmitted the fact that Plaintiff John Doe suffers from
headaches and kidney stones in their GET requests back to their respective servers. Google also
transmitted information about Plaintiff John Doe's physician back to its server.

160.    For example, Bing's GET requests from the medical records pages were:
https://bat.bing.com/action/0?ti=5715144&Ver=2&mid=98019729-0e18-4699-bd10-1af56bb6e602&sid=9e997de0049911ee92ef43fd7e01cd75&vid=9e99a6f0049911ee89feed6f1e2c50f5&vids=0&msclkid=N&pi=918639831&lg=en-US&sw=1512&sh=982&sc=30&tl=Search%20medical%20records&p=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Fsecure%2Fsearch-medical-record%3Furi%3Dsearch%253ahealth-encyclopedia%26type%3DICD%26queryICD10%3DR51.9%26label%3DHEADACHE%26groupName%3DHealth%2Bsummary&r=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fhconline%2Fie%2Finside.asp%3Flang%3Denglish%26mode%3Dsnapshot&lt=1469&evt=pageLoad&sv=1&rn=848129

https://bat.bing.com/action/0?ti=5715144&Ver=2&mid=5e099d19-6039-4641-8440-aa961649664c&sid=9e997de0049911ee92ef43fd7e01cd75&vid=9e99a6f0049911ee89feed6f1e2c50f5&vids=0&msclkid=N&pi=918639831&lg=en-US&sw=1512&sh=982&sc=30&tl=Search%20%7C%20Kaiser%20Permanente&p=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Fpages%2Fsearch%3Fquery%3Dkidney%2Bstones%26category%3Dglobal%26global-region%3Dsca%26language%3Denglish%26region%3Dsca&r=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Ffront-door&lt=1013&evt=pageLoad&sv=1&rn=975174

161.    The Bing GET request above includes the same temporary and session IDs (mid, sid, vid) as the Portal page (yellow highlight), an indication that the page loaded (green highlight), and information about the browser and device (grey highlight), which identifies the computing device and allows for long term tracking. The GET request also transmitted to Bing, the URL of the page (blue highlight), which in this case also includes the fact that Plaintiff John Doe suffers from headaches (first GET request above) and kidney stones (second GET request above). This data can be used to better target ads.

162.    Doubleclick's (and Google.com which was essentially similar) GET requests from the medical records page were:
https://googleads.g.doubleclick.net/pagead/viewthroughconversion/881418786/?random=1686077690514&cv=11&fst=1686077690514&bg=ffffff&guid=ON&async=1&gtm=45be35v0&u_w=1512&u_h=982&url=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Fsecure%2Fmedical-health-summary&ref=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Fsecure%2Fsearch-medical-record%3Furi%3Dsearch%253ahealth-encyclopedia%26type%3DICD%26queryICD10%3DR51.9%26label%3DHEADACHE%26groupName%3DHealth%2Bsummary&hn=www.googleadservices.com&frm=0&tiba=Health%20Summary%20%7C%20Medical%20Record%20%7C

%20Kaiser%20Permanente&auid=1088085833.1686076832&uaa=arm&uab=64
&uafvl=Google%2520Chrome%3B113.0.5672.126%7CChromium%3B113.0.5672.126%7CNot-
A.Brand%3B24.0.0.0&uamb=0&uap=macOS&uapv=13.3.1&uaw=0&data=event
%3Dgtag.config&rfmt=3&fmt=4

https://googleads.g.doubleclick.net/pagead/viewthroughconversion/881418786/?r
andom=1686079885283&cv=11&fst=1686079885283&bg=ffffff&guid=ON&async
nc=1&gtm=45be35v0&u_w=1512&u_h=982&url=https%3A%2F%2Fhealthy.kai
serpermanente.org%2Fsouthern-
california%2Fpages%2Fsearch%3Fquery%3Dkidney%2Bstones%26category%3
Dglobal%26global-
region%3Dsca%26language%3Denglish%26region%3Dsca&ref=https%3A%2F
%2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Ffront-
door&hn=www.googleadservices.com&frm=0&tiba=Search%20%7C%20Kaiser
%20Permanente&auid=875947082.1686079450&uaa=arm&uab=64&uafvl=Goo
gle%2520Chrome%3B113.0.5672.126%7CChromium%3B113.0.5672.126%7CN
ot-
A.Brand%3B24.0.0.0&uamb=0&uap=macOS&uapv=13.3.1&uaw=0&data=event
%3Dgtag.config&rfmt=3&fmt=4

163.    The above GET requests includes data about the browser and device (grey highlight)

and URL data (blue highlight) reveals Plaintiff John Doe suffers from headaches (first GET data

above) and kidney stones (second GET data above). This data can be used to better target ads.

164.    While Plaintiff John Doe was accessing the medical records page, Google also used

the POST method to transmit the following data to Google servers at www.google-analytics.com:

https://www.google-analytics.com/g/collect?v=2&tid=G-
ENXTD8TZ70&gtm=45je35v0&_p=527624076&cid=1504176517.1686076832
&ul=en-
us&sr=1512x982&uaa=arm&uab=64&uafvl=Google%2520Chrome%3B113.0.56
72.126%7CChromium%3B113.0.5672.126%7CNot-
A.Brand%3B24.0.0.0&uamb=0&uam=&uap=macOS&uapv=13.3.1&uaw=0&_e
u=AEA&ngs=1&_s=2&sid=1686076832&sct=1&seg=1&dl=https%3A%2F%2F
healthy.kaiserpermanente.org%2Fsouthern-california%2Fsecure%2Fsearch-
medical-record%3Furi%3Dsearch%253ahealth-
encyclopedia%26type%3DICD%26queryICD10%3DR51.9%26label%3DHEAD
ACHE%26groupName%3DHealth%2Bsummary&dr=https%3A%2F%2Fhealthy.
kaiserpermanente.org%2Fhconline%2Fie%2Finside.asp%3Flang%3Denglish%26
mode%3Dsnapshot&dt=Search%20medical%20records&en=scroll&epn.percent_
scrolled=90

https://www.google-analytics.com/g/collect?v=2&tid=G-
ENXTD8TZ70&gtm=45je3650&_p=200520362&cid=1743351272.1686079450
&ul=en-
us&sr=1512x982&uaa=arm&uab=64&uafvl=Google%2520Chrome%3B113.0.56

72.126%7CChromium%3B113.0.5672.126%7CNot-
A.Brand%3B24.0.0.0&uamb=0&uam=&uap=macOS&uapv=13.3.1&uaw=0&ngs
=1&sid=1686079449&sct=1&seg=1&dl=https%3A%2F%2Fhealthy.kaiserperma
nente.org%2Fsouthern-
california%2Fpages%2Fsearch%3Fquery%3Dkidney%2Bstones%26category%3
Dglobal%26global-
region%3Dsca%26language%3Denglish%26region%3Dsca&dr=https%3A%2F%
2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Ffront-
door&dt=Search%20%7C%20Kaiser%20Permanente&_s=1

165.    The POSTs above include a temporary session ID (cid)—highlighted in yellow, and
information about the browser and device (grey highlight). The URLs of the current page (blue
highlight) reveals Plaintiff John Doe suffers from headaches (first POST above) and kidney stones
(second POST above). The data sent to Google can be used to better target ads.

166.    On June 7, 2023 when Plaintiff John Doe requested an electronic copy of his medical
records Google used the POST method to transmit data to sb-ssl.google.com, including the following
which specifically disclosed Plaintiff John Doe's name and other personally identifying information:

https://healthy.kaiserpermanente.org/ie/Documents/Released/Download?releaseId=WP-
24F8cOV-2F43chhwz40hINz9AQ-3D-3D-
24MVZtUU8nDZTmc44v1yuQuiofNjaDbbZ495l9c4zOCgI-3D&docId=WP-
24wUdukuLzxp-2FfzWRYqPN1og-3D-3D-24gBNgJlReE8-2BNQgnAhLwt-2BrLft-
2Bk2Dbuv2Y72rrLmVfs-
3D&downloadedFileName=HealthSummary_Jun_07_2023.zip&idx=0"
ºhttps://healthy.kaiserpermanente.org/ie/Documents/Released/Download?releaseId=WP-
24F8cOV-2F43chhwz40hINz9AQ-3D-3D-
24MVZtUU8nDZTmc44v1yuQuiofNjaDbbZ495l9c4zOCgI-3D&docId=WP-
24wUdukuLzxp-2FfzWRYqPN1og-3D-3D-24gBNgJlReE8-2BNQgnAhLwt-2BrLft-
2Bk2Dbuv2Y72rrLmVfs-
3D&downloadedFileName=HealthSummary_Jun_07_2023.zip&idx=0
127.0.0.1"Phttps://healthy.kaiserpermanente.org/ie/Documents/Released?from=Dow
nloadMyRecord"R
Nhttps://healthy.kaiserpermanente.org/southern-california/secure/medical-record———
"U
Qhttps://healthy.kaiserpermanente.org/southern-california/secure/my-medical-record———
"†
• https://healthy.kaiserpermanente.org/southern-california/support/medical-
requests.html?kp_shortcut_referrer=kp.org/requestrecords———————————"q
mhttps://healthy.kaiserpermanente.org/support/medical-
requests.html?kp_shortcut_referrer=kp.org/requestrecords———————————"3
/https://www.kaiserpermanente.org/requestrecords———————————"!
https://kp.org/requestrecords———————————"1
ehttps://healthy.kaiserpermanente.org/southern-california/secure/medical-record/download-
health-record"Nhttps://healthy.kaiserpermanente.org/southern-california/secure/medical-

record* 0JHealthSummary_Jun_07_2023.zipP————————————Zen-
IHE_XDM/Redacted/STYLE.XSL
IHE_XDM/Redacted/DOC0038.XML
O-1 of 1 - My Health Summary.PDF
INDEX.HTM "
IHE_XDM/Redacted/DOC0024.XML
IHE_XDM/Redacted/DOC0001.XML
IHE_XDM/Redacted/DOC0005.XML
IHE_XDM/Redacted/DOC0006.XML
IHE_XDM/Redacted/DOC0007.XML
IHE_XDM/Redacted/DOC0008.XML
 ,F2p¢•´ MGõàõ†ÆÌéÙ+□Æ"CLµ }S„Å ‰´8 @Â5(0 8 @ J-Chrome/113.0.5672.126/Mac
OS XPX`• Ðà ø ¢'——————————————————————————
°https://healthy.kaiserpermanente.org/ie/Documents/Released/Download?releaseId=WP-
24F8cOV-2F43chhwz40hINz9AQ-3D-3D-
24MVZtUU8nDZTmc44v1yuQuiofNjaDbbZ495l9c4zOCgI-3D&docId=WP-
24wUdukuLzxp-2FfzWRYqPN1og-3D-3D-24gBNgJlReE8-2BNQgnAhLwt-2BrLft-
2Bk2Dbuv2Y72rrLmVfs-
3D&downloadedFileName=HealthSummary_Jun_07_2023.zip&idx=0
         127.0.0.1"Phttps://healthy.kaiserpermanente.org/ie/Documents/Released?from=Dow
nloadMyRecord*ehttps://healthy.kaiserpermanente.org/southern-california/secure/medical-
record/download-health-record0 9 ã•‰xBP——————————X p ¢•
Phttps://healthy.kaiserpermanente.org/ie/Documents/Released?from=DownloadMyRecord
         127.0.0.1"Ohttps://healthy.kaiserpermanente.org/ie/Documents/DownloadMyRecord
?lang=english*ehttps://healthy.kaiserpermanente.org/southern-california/secure/medical-
record/download-health-record0 9  i•‰xBJehttps://healthy.kaiserpermanente.org/southern-
california/secure/medical-record/download-health-recordP——————————————X p
¢Š——————
Ohttps://healthy.kaiserpermanente.org/ie/Documents/DownloadMyRecord?lang=english——
         127.0.0.10 9 °•‰xBB_
 ]https://healthy.kaiserpermanente.org/hconline/ie/inside.asp?lang=english&mode=download
summaryBQ
Ohttps://healthy.kaiserpermanente.org/ie/Documents/DownloadMyRecord?lang=englishJeht
tps://healthy.kaiserpermanente.org/southern-california/secure/medical-record/download-
health-recordP

167.    The above POST data includes the fact that Plaintiff John Doe requested an electronic

copy of his medical records on June 7, 2023 (highlighted in green) and Plaintiff John Doe's first name

(redacted above).

168.    Twitter's (both analytics.twitter.com and t.co) GET request from the medical records

page was:

         https://t.co/1/i/adsct?bci=4&eci=3&event=%7B%7D&event_id=305bd815-e13e-
4eae-ab1e-
0fd5d4dfea93&integration=advertiser&p_id=Twitter&p_user_id=0&pl_id=85138
e85-2f71-4efc-ae39-

6cb490e93e87&tw_document_href=https%3A%2F%2Fhealthy.kaiserpermanente
.org%2Fsouthern-california%2Fsecure%2Fsearch-medical-
record%3Furi%3Dsearch%253ahealth-
encyclopedia%26type%3DICD%26queryICD10%3R51.9%26label%3DHEAD
ACHE%26groupName%3DHealth%2Bsummary&tw_iframe_status=0&txn_id=o
2f67&type=javascript&version=2.3.29

https://t.co/1/i/adsct?bci=4&eci=3&event=%7B%7D&event_id=bdd9fe2d-11a0-
4c14-9ea9-
075f29bd4fe4&integration=advertiser&p_id=Twitter&p_user_id=0&pl_id=3e2eb
f5e-3ab3-4c45-8573-
df51ad40350a&tw_document_href=https%3A%2F%2Fhealthy.kaiserpermanente.
org%2Fsouthern-
california%2Fpages%2Fsearch%3Fquery%3Dkidney%2Bstones%26category%3
Dglobal%26global-
region%3Dsca%26language%3Denglish%26region%3Dsca&tw_iframe_status=0
&txn_id=o2f67&type=javascript&version=2.3.29

169.    The Twitter GET requests reveal in the current site URL (highlighted in blue) that Plaintiff John Doe suffers from headaches (first GET above) and kidney stones (second GET above). This data can be used to better target ads, in this case showing, for example, headaches so that Plaintiff John Doe could be targeted for such things as pain medication.

170.    On information and belief, similar information about other Class Members is also transmitted to Bing, Google, and Twitter when Class Members access their medical records and/or request their medical records on the Portal.

### c)    Other Activities Within the Portal

171.    On June 6, 2023 when Plaintiff John Doe accessed the prescriptions page from within the Portal Bing's GET request was:

https://bat.bing.com/action/0?ti=5715144&Ver=2&mid=b5c83174-b4ea-4868-b60f-
99002dea9a80&sid=9e997de0049911ee92ef43fd7e01cd75&vid=9e99a6f0049911ee89feed6
f1e2c50f5&vids=0&msclkid=N&pi=918639831&lg=en-
US&sw=1512&sh=982&sc=30&tl=omeprazole%2020%20mg%20capsule,delayed%20relea
se%20%7C%20Kaiser%20Permanente&p=https%3A%2F%2Fhealthy.kaiserpermanente.org
%2Fsouthern-california%2Fhealth-wellness%2Fdrug-
encyclopedia%2Fdrug.259872&r=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fhco
nline%2Fie%2Finside.asp%3Flang%3Denglish%26mode%3Dsnapshot&lt=670&evt=pageL
oad&sv=1&rn=325466

172.    The Bing GET request above includes the same temporary and session IDs (mid, sid, vid) as the Portal page (yellow highlight), an indication that the page loaded (green highlight), and

information about the browser and device (grey highlight), which identifies the computing device and allows for long term tracking. The GET request also transmitted to Bing, the fact that John Doe has been prescribed Omerprazole 20mg delayed release (pink highlight). This data can be used to better target ads.

173.     Doubleclick and Google (which are essentially the same) GET request from the medications page within the Portal was:

https://googleads.g.doubleclick.net/pagead/viewthroughconversion/881418786/?random=1686077807673&cv=11&fst=1686077807673&bg=ffffff&guid=ON&async=1&gtm=45be35v0&u_w=1512&u_h=982&url=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Fhealth-wellness%2Fdrug-encyclopedia%2Fdrug.259872&ref=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fhconline%2Fie%2Finside.asp%3Flang%3Denglish%26mode%3Dsnapshot&hn=www.googleadservices.com&frm=0&tiba=omeprazole%2020%20mg%20capsule%2Cdelayed%20release%20%7C%20Kaiser%20Permanente&auid=1088085833.1686076832&uaa=arm&uab=64&uafvl=Google%2520Chrome%3B113.0.5672.126%7CChromium%3B113.0.5672.126%7CNot-A.Brand%3B24.0.0.0&uamb=0&uap=macOS&uapv=13.3.1&uaw=0&data=event%3Dgtag.config&rfmt=3&fmt=4

174.     The above GET requests includes data about the browser and device (grey highlight), the current URL (blue), and data (pink) that reveals Plaintiff John Doe was prescribed Omeprazole 20mg delayed release. This data can be used to better target ads.

175.     While Plaintiff John Doe was accessing the medications page, Google also used the POST method to transmit the following data to Google servers at www.google-analytics.com:

https://www.google-analytics.com/g/collect?v=2&tid=G-ENXTD8TZ70&gtm=45je35v0&_p=2017317913&cid=1504176517.1686076832&ul=en-us&sr=1512x982&uaa=arm&uab=64&uafvl=Google%2520Chrome%3B113.0.5672.126%7CChromium%3B113.0.5672.126%7CNot-A.Brand%3B24.0.0.0&uamb=0&uam=&uap=macOS&uapv=13.3.1&uaw=0&ngs=1&_s=1&sid=1686076832&sct=1&seg=1&dl=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Fhealth-wellness%2Fdrug-encyclopedia%2Fdrug.259872&dr=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fhconline%2Fie%2Finside.asp%3Flang%3Denglish%26mode%3Dsnapshot&dt=omeprazole%2020%20mg%20capsule%2Cdelayed%20release%20%7C%20Kaiser%20Permanente&en=page_view&_ee=1

176.     The above POST includes data about the browser and device (grey highlight), the current URL (blue) and data (pink) that reveals Plaintiff John Doe was prescribed Omeprazole 20mg delayed release. This data can be used to better target ads.

177.    Twitter's (both analytics.twitter.com and t.co) GET request from the medications page was:

https://t.co/1/i/adsct?bci=4&eci=3&event=%7B%7D&event_id=b343cdf0-a3db-4b81-b74c-34a88cc9960f&integration=advertiser&p_id=Twitter&p_user_id=0&pl_id=8ce3fde0-7770-42d2-a833-f63cc049e2f5&tw_document_href=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Fhealth-wellness%2Fdrug-encyclopedia%2Fdrug.259872&tw_iframe_status=0&txn_id=o2f67&type=javascript&version=2.3.29

178.    The Twitter GET request includes the current URL (blue) which includes the drug encyclopedia link for the drug 259872 which is Omeprazole 20mg delayed release.

179.    When Plaintiff John Doe conducted a physician search from within the Portal the following GET request was sent to www.google-analytics.com:

https://www.google-analytics.com/g/collect?v=2&tid=G-ENXTD8TZ70&gtm=45je3650&_p=786057931&cid=1743351272.1686079450&ul=en-us&sr=1512x982&uaa=arm&uab=64&uafvl=Google%2520Chrome%3B113.0.5672.126%7CChromium%3B113.0.5672.126%7CNot-A.Brand%3B24.0.0.0&uamb=0&uam=&uap=macOS&uapv=13.3.1&uaw=0&ngs=1&_s=2&sid=1686079449&sct=1&seg=1&dl=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Fphysicians%2Fevan-mosier-9630484&dr=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Fdoctors-locations&dt=Evan%20Alan%20Mosier%2C%20MD%20-%20Gastroenterology%20%7C%20Kaiser%20Permanente&en=user_engagement&_et=20792

180.    GET request above includes temporary and session IDs (yellow highlight), information about the browser and device (grey highlight), the current URL (blue highlight), and addition data (pink highlight) which reveals Plaintiff John Doe searched for a gastroenterologist. This data can reveal Plaintiff John Doe's medical condition and can be used for better ad targeting. For example, the data can result in third parties serving ads for antacids or other digestive medications.

### d)    Other Searches on the Site

181.    On May 31, 2023 after Plaintiff Jane Doe logged out of the Portal, Plaintiff Jane Doe conducted a search using the search feature found on the upper right of the main page (Washington) of the Site. On the search results page, Bing sent the following GET request:

https://bat.bing.com/action/0?ti=5715144&Ver=2&mid=fc8ef6c7-b66b-406b-b1e5-506f755f7359&sid=147515f0000b11ee937705de2bc479d9&vid=147628d0000b11eeabace7b017e63252&vids=0&msclkid=N&uach=pv%3D10.0.0&pi=918639831&lg=en-US&sw=1366&sh=768&sc=24&tl=Search%20%7C%20Kaiser%20Permanente&p=https%

3A%2F%2Fhealthy.kaiserpermanente.org%2Fpages%2Fsearch%3Fquery%3Dmental%2Bhealth%26category%3Dglobal%26global-region%3Dsca%26language%3Denglish%26region%3Dsca&r=https%3A%2F%2Fhealthy.kaiserpermanente.org%2F&lt=8071&mtp=10&evt=pageLoad&sv=1&rn=424250

182.   The Bing GET request above includes temporary and session IDs (mid, sid, vid) (yellow highlight), an indication that the page loaded (green highlight), and information about the browser and device (grey highlight). The GET request also transmitted to Bing the URL of the page (blue highlight), which reveals Plaintiff Jane Doe's search on the term "mental health." Notably, although Plaintiff Jane Doe was logged out of the Portal, Bing was still able to connect the fact that Plaintiff Jane Doe had communicated with Kaiser Permanente about mental health because it had created a digital fingerprint. This data can be used to better target ads.

183.   Doubleclick's (and Google.com which was essentially similar) GET request from the search results page was:

https://googleads.g.doubleclick.net/pagead/viewthroughconversion/881418786/?random=1685578748182&cv=11&fst=1685578748182&bg=ffffff&guid=ON&async=1&gtm=45be35v0&u_w=1366&u_h=768&url=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fpages%2Fsearch%3Fquery%3Dmental%2Bhealth%26category%3Dglobal%26global-region%3Dsca%26language%3Denglish%26region%3Dsca&ref=https%3A%2F%2Fhealthy.kaiserpermanente.org%2F&hn=www.googleadservices.com&frm=0&tiba=Search%20%7C%20Kaiser%20Permanente&auid=1628977230.1685578549&uaa=x86&uab=64&uafvl=Google%2520Chrome%3B113.0.5672.127%7CChromium%3B113.0.5672.127%7CNot-A.Brand%3B24.0.0.0&uamb=0&uap=Windows&uapv=10.0.0&uaw=0&data=event%3Dtag.config&rfmt=3&fmt=4

184.   The above GET request includes data about the browser and device (grey highlight) and the URL of the page (blue highlight) reveals Plaintiff Jane Doe searched on the term "mental health." This data can similarly be used to better target ads.

185.   When Plaintiff Jane Doe conducted a search for "mental health" on the Site, Google used the POST method to transmit the following data to Google servers at www.google-analytics.com:

https://www.google-analytics.com/g/collect?v=2&tid=G-ENXTD8TZ70&gtm=45je35v0&_p=1051056236&cid=1313346476.1685578546&ul=en-us&sr=1366x768&uaa=x86&uab=64&uafvl=Google%2520Chrome%3B113.0.5672.127%7CChromium%3B113.0.5672.127%7CNot-A.Brand%3B24.0.0.0&uamb=0&uam=0&uap=Windows&uapv=10.0.0&uaw=0&ngs=1&_s=1&sid=1685578545&sct=1&seg=1&dl=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fhealth-wellness%2Fmental-health%2Fhow-to-get-

care&dr=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fpages%2Fsearch%3Fquery%3Dmental%2Bhealth%26category%3Dglobal%26global-region%3Dsca%26language%3Denglish%26region%3Dsca&dt=How%20to%20get%20mental%20health%20care%20%7C%20Kaiser%20Permanente&en=page_view&_ee=1

186.    The POST above includes temporary and session IDs (tid, cid, sid), highlighted in yellow, and information about the browser and device (grey highlight). The URL of the current page (blue highlight) reveals Plaintiff Jane Doe searched for the term "mental health." The data sent to Google can be similarly be used to better target ads.

187.    Twitter's (both analytics.twitter.com and t.co) GET request from the search results page was:

https://analytics.twitter.com/1/i/adsct?bci=4&eci=3&event=%7B%7D&event_id=40e2b65d-4a2e-4272-a887-d0a74c97457c&integration=advertiser&p_id=Twitter&p_user_id=0&pl_id=bea70ac7-252c-4537-9a9d-754bd29d7111&tw_document_href=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fpages%2Fsearch%3Fquery%3Dmental%2Bhealth%26category%3Dglobal%26global-region%3Dsca%26language%3Denglish%26region%3Dsca&tw_iframe_status=0&txn_id=o2f67&type=javascript&version=2.3.29

188.    The Twitter GET request in the current site URL (highlighted in blue) reveals that Plaintiff Jane Doe searched on the term "mental health." This data can similarly be used to better target ads.

189.    Similarly, when Plaintiff John Doe logged out of the Portal and conducted a search for a physician on the Site the following GET request was sent to Bing:

https://bat.bing.com/action/0?ti=5715144&Ver=2&mid=9f6a61d7-6328-4bd6-b325-0e5914ecbd5d&sid=9e997de0049911ee92ef43fd7e01cd75&vid=9e99a6f0049911ee89feed6f1e2c50f5&vids=0&msclkid=N&pi=918639831&lg=en-US&sw=1512&sh=982&sc=30&tl=Find%20Doctors%20and%20Locations%20in%20Southern%20California%20%7C%20Kaiser%20Permanente&p=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Fdoctors-locations%23%2Fproviders%3Fzipcode%3D92395%26medical_specialty_label%3DPsychiatry%2520%2526%2520Neurology%3A%2520Neurology%2CPsychiatry%2520%2526%2520Neurology%3A%2520Psychiatry&r=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Fdoctors-locations&lt=712&evt=pageLoad&sv=1&rn=110568

190.    The Bing GET request above includes temporary and session IDs (mid, sid, vid) (yellow highlight), an indication that the page loaded (green highlight), and information about the browser and device (grey highlight). The GET request also transmitted to Bing the URL of the page

(blue highlight), which reveals Plaintiff John Doe's search for a neurologist or psychiatrist in the 92395 zip code.

191.    When Plaintiffs John Doe II, Jane Doe II, Jane Doe III, Jane Doe IV, and Jane Doe V accessed the Kaiser Permanente website and Patient Portal, their communications were similarly intercepted by Twitter, Bing, and Google.

192.    On information and belief, the same type of information tracked, disclosed, and sent to Bing, Google, and Twitter for Plaintiffs has been tracked, disclosed, and sent to Bing, Google, and Twitter for other members of the Classes.

193.    Whenever Kaiser Plan Members use Kaiser Permanente's website, Kaiser Permanente allows Bing, Google, and Twitter to intercept the contents of their communications—including personal information, identifying information, and sensitive medical information—without their knowledge, consent, or authorization.

194.    Kaiser Permanente knowingly redirects and discloses Kaiser Plan Members' personally identifiable patient information, including their status as patients and the contents of their communications with Kaiser Permanente to Bing, Google, and Twitter.

195.    Despite its legal obligations to keep this information and these communications private and confidential, Kaiser Permanente's use of Bing, Google, and Twitter causes the redirection, interception, and transmission of the precise content of patients' communication with Kaiser Permanente to Bing, Google, and Twitter.

196.    Kaiser Permanente's unauthorized redirection and disclosures to Bing, Google, and Twitter includes information that identifies Plaintiffs and Class Members as patients of Kaiser Permanente, and aids in receiving and recording patient communications pertaining to or about specific medical conditions, health services, and specific doctors.

197.    Kaiser Permanente's disclosures to Bing, Google, and Twitter occur because Kaiser Permanente intentionally deploys Bing, Google, and Twitter code on its website, and that code "bugs" Kaiser Plan Members' web-browsers and causes personally identifiable patient information, as well as the contents of communications exchanged between Kaiser Permanente and its patients, to be redirected and sent to Bing, Google, and Twitter.

198.    As currently deployed, Bing, Google, and Twitter analytics, as employed by Kaiser Permanente, functions as a wiretap, and Bing, Google, and Twitter as third-party wiretappers.

**4.    Kaiser Permanente Allows Its Members' Information and Communications to Be Intercepted While Using Its Mobile Applications**

199.    Unbeknownst to Kaiser Plan Members and against their reasonable expectations, Kaiser Permanente allows Quantum Metric, Adobe, Bing, Google, Twitter, and Dynatrace to intercept Kaiser Plan Members' information and communications from its mobile applications.[44]

**a)    The Kaiser Permanente App**

200.    On July 5, 2023, after Plaintiff John Doe was logged into the Kaiser Permanente App, Adobe, Bing, Google, and Twitter all transmitted the fact that Plaintiff John Doe had a shoulder X-Ray in their GET requests back to their respective servers.

201.    For example, Adobe's POST request was:

{"requestId":"6472f0d6b00f42a08237efb30a436208","context":{"userAgent":"Mozilla/5.0 (iPhone; CPU iPhone OS 16_5_1 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Mobile/15E148","clientHints":{},"timeOffsetInMinutes":-240,"channel":"web","screen":{"width":320,"height":693,"orientation":"portrait","colorDepth":32,"pixelRatio":3},"window":{"width":320,"height":523},"browser":{"host":"healthy.kaiserpermanente.org","webGLRenderer":"Apple GPU"},"address":{"url":"https://healthy.kaiserpermanente.org/southern-california/secure/search-medical-record?uri=search%3ahealth-encyclopedia&type=CPT&query=73030&label=X%2DRAY+SHOULDER","referringUrl":"https://healthy.kaiserpermanente.org/ie/inside.asp?mode=labdetail&eorderid=WP-24JO3eR3UxDisHiv7Y0JwpouLMwYNTlfWVwRYdzHiISmc-3D-240Wm-2BEg0CTZw6JiwFiZUTx5YqL6-2Bpia0C87YcG8EHhV4-3D"}},"id":{"marketingCloudVisitorId":"22568469190539506242433917920530928434"},"experienceCloud":{"audienceManager":{"locationHint":7,"blob":"6G1ynYcLPuiQxYZrsz_pkqfLG9yMXBpb2zX5dvJdYQJzPXImdj0y"},"analytics":{"logging":"server_side","supplementalDataId":"376DCC2C0069726A-059CD1F32377CB5D"}},"execute":{"pageLoad":{"parameters":{"Seg18v":"sca","Seg17v":"sca","Seg55v":"Logged In","Seg181v":"","Seg81v":"kporg:secure:search-medical-record","Seg114vcookie":"mbr","reEnable":"","throttle-

---

[44] Similar to Quantum Metric, Bing, Google, and Twitter, both Adobe and Dynatrace may use the information received by their services for their own purposes. *See, e.g., Dynatrace Subscription Agreement*, https://assets.dynatrace.com/global/legal/Online-SA-April-2023-English.pdf ("Dynatrace may monitor and collect Usage Data to improve Dynatrace's current and future offerings, and if aggregated and not identifying Customer or any individual, for industry analysis, benchmarking, and analytics."); Adobe Experience Cloud Privacy, https://www.adobe.com/privacy/experience-cloud.html ("The companies that use the Adobe Experience Cloud advertising services may use Adobe's technologies to collect data, or, as explained below, add additional information to the information they collect using the Adobe Experience Cloud. In these situations, Adobe retains data in accordance with the company's instructions.").

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO: 4:23-cv-02865-EMC

area":"","Seg180v":false,"Seg4":true,"Seg517e":false,"Seg5":false,"Seg6":false,"Seg7":false,"Seg8":false,"Seg440e":false,"Seg9":false,"Seg11":false,"Seg20v":7692006,"Seg114v":"SUBSCRIBER","Seg13":false,"Seg14":false,"Seg16":false,"Seg19":false,"Seg101v":27,"Seg516e":false,"Seg126v":false,"modval":6,"Seg21":100453,"Seg22":"","Seg24":"urn:kp:prodiem","Seg25":false,"Seg26":true,"entitlement-446":true,"pLoaded":1,"id":""},"profileParameters":{"region":"","Seg2":"25","Seg56v":"MBR","Seg10":"NOT ENROLLED","Seg20v":7692006,"Seg12":"ACTIVE","Seg101v":27,"Seg15":"true","Seg106v":"KFHP_HMO","Seg6":"false","Seg103v":false}}},"prefetch":{"views":[{"parameters":{"Seg18v":"sca","Seg17v":"sca","Seg55v":"Logged In","Seg181v":"","Seg81v":"kporg:secure:search-medical-record","Seg114vcookie":"mbr","reEnable":"","throttle-area":"","Seg180v":false,"Seg4":true,"Seg517e":false,"Seg5":false,"Seg6":false,"Seg7":false,"Seg8":false,"Seg440e":false,"Seg9":false,"Seg11":false,"Seg20v":7692006,"Seg114v":"SUBSCRIBER","Seg13":false,"Seg14":false,"Seg16":false,"Seg19":false,"Seg101v":27,"Seg516e":false,"Seg126v":false,"modval":6,"Seg21":100453,"Seg22":"","Seg24":"urn:kp:prodiem","Seg25":false,"Seg26":true,"entitlement-446":true,"pLoaded":1,"id":""},"profileParameters":{"region":"","Seg2":"25","Seg56v":"MBR","Seg10":"NOT ENROLLED","Seg20v":7692006,"Seg12":"ACTIVE","Seg101v":27,"Seg15":"true","Seg106v":"KFHP_HMO","Seg6":"false","Seg103v":false}}}}

202.    Bing's GET request transmitted this same information to Microsoft, where it was stored on the company's bat.bing.com server:

GET /action/0?ti=5715144&Ver=2&mid=0fa19f20-cc67-481d-b44f-56a0eeb90d86&sid=eced51101b5111eebd4de38c20a30e4e&vid=eced67701b5111eea6131b899915cb55&vids=1&msclkid=N&pi=918639831&lg=en-US&sw=320&sh=693&sc=32&tl=Search%20medical%20records&p=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Fsecure%2Fsearch-medical-record%3Furi%3Dsearch%253ahealth-encyclopedia%26type%3DCPT%26query%3D73030%26label%3DX%252DRAY%2BSHOULDER&r=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fie%2Finside.asp%3Fmode%3Dlabdetail%26eorderid%3DWP-24JO3eR3UxDisHiv7Y0JwpouLMwYNTlfWVwRYdzHiISmc-3D-240Wm-2BEg0CTZw6JiwFiZUTx5YqL6-2Bpia0C87YcG8EHhV4-3D&lt=2127&mtp=5&evt=pageLoad&sv=1&rn=699864 HTTP/1.1

203.    Google's    GET    request    transmitted    this    same    information    via googleads.g.doubleclick.net:

GET /pagead/viewthroughconversion/881418786/?random=1688574917452&cv=11&fst=1688574917452&bg=ffffff&guid=ON&async=1&gtm=45be36s0&u_w=320&u_h=693&url=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-california%2Fsecure%2Fsearch-medical-record%3Furi%3Dsearch%253ahealth-encyclopedia%26type%3DCPT%26query%3D73030%26label%3DX%252DRAY%2BSHOULDER&ref=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fie%2Finside.asp%3Fmo

de%3Dlabdetail%26eorderid%3DWP-
24JO3eR3UxDisHiv7Y0JwpouLMwYNTlfWVwRYdzHiISmc-3D-240Wm-
2BEg0CTZw6JiwFiZUTx5YqL6-2Bpia0C87YcG8EHhV4-
3D&hn=www.googleadservices.com&frm=0&tiba=Search%20medical%20records&auid=1
025871031.1688574917&data=event%3Dgtag.config&rfmt=3&fmt=4 HTTP/1.1

204.    Twitter's GET request transmitted this same information via analytics.twitter.com and
t.co:

GET /1/i/adsct?bci=4&eci=3&event=%7B%7D&event_id=d69ef292-e13b-41d1-86a7-
7f70854dbd6a&integration=advertiser&p_id=Twitter&p_user_id=0&pl_id=14371743-
a364-4c10-a8fc-
c8cd0c09515b&tw_document_href=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fso
uthern-california%2Fsecure%2Fsearch-medical-record%3Furi%3Dsearch%253ahealth-
encyclopedia%26type%3DCPT%26query%3D73030%26label%3DX%252DRAY%2BSHO
ULDER&tw_iframe_status=0&txn_id=o2f67&type=javascript&version=2.3.29 HTTP/1.1

205.    Adobe, Bing, Google, and Twitter all used GET and/or POST requests to transmit
additional information about Plaintiff John Doe from within the Kaiser Permanente App, including
the fact that Plaintiff John Doe is allergic to non-steroidal anti-inflammatory agents, that he suffers
from headaches, and that he requires a vision prescription.

206.    While Plaintiff John Doe was logged into the Kaiser Permanente App, Quantum
Metric also intercepted and received information. Data was transmitted to Quantum Metric, including
the fact that Plaintiff John Doe requires a vision prescription. Quantum Metric's POST request also
contained an Adobe Marketing ID, allowing Plaintiff John Doe to be tracked across multiple
platforms:

POST /?T=B&u=https%3A%2F%2Fhealthy.kaiserpermanente.org%2Fsouthern-
california%2Fsecure%2Fmedical-record%2Fvision-
prescriptions.mobile.html%3Flang%3Denglish%26stop_mobi%3Dyes%26adobe_mc%3DT
S%253D1688575756%257CMCMID%253D32798239231981822676624807922574616483
5%257CMCORGID%253D9644AD4E5628B1ED7F000101%2540AdobeOrg&t=16885757
79959&v=1688575780612&z=1&S=0&N=0&P=0 HTTP/1.1

207.    Based on information and belief, when Plaintiffs John Doe II, Jane Doe II, Jane Doe
III, Jane Doe IV, and Jane Doe V accessed the Kaiser Permanente mobile application, their
communications were similarly intercepted by Adobe, Bing, Google, Twitter, and Quantum Metric.

208.    On information and belief, the same type of information tracked, disclosed, and sent
to Adobe, Bing, Google, Twitter, and Quantum Metric is tracked, disclosed, and sent to these
companies when other members of the Classes use the Kaiser Permanente App.

**b)      The Kaiser Permanente Washington App**

209.      On July 5, 2023, when Plaintiff Jane Doe was logged into the Kaiser Permanente

Washington App, Dynatrace intercepted and received information disclosing the fact that Plaintiff

Jane Doe had a shoulder X-Ray. This information was intercepted by Dynatrace and sent to

bf12660qqg.bf.dynatrace.com:

```
vv=3&va=8.241.1.1013&ap=591e7dfd-540c-4414-9bc0-
8274741cd848&an=GroupHealth&ai=org.ghc.MyGroupHealth.Mobile&vn=5.2.1&vb=502
01002&tv=1688580245590&tx=1688581822941&vi=93584938323505&sn=1&rm=3660&
cp=ARM_64E&os=iOS%2016.5.1&mf=Apple&md=iPhone14%2C4&rj=g&ul=en_US&sw
=960&sh=2079&sd=3&so=p&bl=77&fm=1&cr=T-
Mobile&ct=m&np=5G&pt=0&tt=maios&dl=2&cl=2&mp=1&vs=1&fv=pl&et=30&na=http
s%3A%2F%2Fsmetrics.kaiserpermanente.org%2Fb%2Fss%2Fkfhkfhkpwamobileprod%2F
0%2FIOSN020504020907%2Fs60219791&it=6&pa=0&s0=1088&t0=1481366&s1=0&t1=
181&rc=200&bs=979&br=555&et=30&na=https%3A%2F%2Fwa-
member2.kaiserpermanente.org%2FInterconnect-MyChartMobile-
PRD%2FWCF%2FEpic.MyChartMobile.svc%2Frest_2017%2F0%2F
TestResults%2FList&it=1&pa=0&s0=1091&t0=1481395&s1=0&t1=875&rc=200&bs=579
6&br=22139&et=30&na=https%3A%2F%2Fwa-
member2.kaiserpermanente.org%2FInterconnect-MyChartMobile-
PRD%2FWCF%2FEpic.MyChartMobile.svc%2Frest_2018%2FGetMy
ChartUrl&it=1&pa=179&s0=1110&t0=1518572&s1=0&t1=1139&rc=200&bs=5948&br=1
472&et=6&na=Touch%20on%20Ask%20a%20question&it=1&mo=0&ca=179&pa=0&s0=
1106&t0=1518531&s1=1111&t1=1180&et=6&na=Touch%20on%20TableViewCell%20X-
RAY%20shoulder%203V%20%400%3A3&it=1&mo=0&ca=178&pa=0&s0=1103&t0=151
4139&s1=1105&t1=0&et=6&na=Touch%20on%20navigation%20back&it=1&mo=0&ca=1
77&pa=0&s0=1101&t0=1506019&s1=1102&t1=0&et=6&na=Touch%20on%20TableView
Cell%20X-
RAY%20shoulder%203V%20%400%3A3&it=1&mo=0&ca=176&pa=0&s0=1092&t0=148
9670&s1=1094&t1=0&et=6&na=Loading%20GroupHealth.GroupHealthUITabBarControll
er&it=1&mo=0&ca=173&pa=0&s0=1082&t0=1467076&s1=1085&t1=0&et=22&na=Grou
pHealth.HomeViewController&it=1&ca=175&pa=173&s0=1083&t0=1341984&s2=1084&
t2=125100&s3=1087&t3=125711&et=22&na=GroupHealth.GroupHealthUITabBarControll
er&it=1&ca=174&pa=173&s0=1080&t0=1341984&s2=1081&t2=125091&s3=1086&t3=1
25700
```

210.      Dynatrace also intercepted and received information disclosing the fact Plaintiff Jane

Doe had a mammogram, which was transmitted to Dynatrace at bf12660qqg.bf.dynatrace.com:

```
vv=3&va=8.241.1.1013&ap=591e7dfd-540c-4414-9bc0-
8274741cd848&an=GroupHealth&ai=org.ghc.MyGroupHealth.Mobile&vn=5.2.1&vb=502
01002&tv=1688580245590&tx=1688581943016&vi=93584938323505&sn=1&rm=3660&
cp=ARM_64E&os=iOS%2016.5.1&mf=Apple&md=iPhone14%2C4&rj=g&ul=en_US&sw
=960&sh=2079&sd=3&so=p&bl=77&fm=0&cr=T-
Mobile&ct=m&np=5G&pt=0&tt=maios&dl=2&cl=2&mp=1&vs=1&fv=pl&et=30&na=http
s%3A%2F%2Fwa-member2.kaiserpermanente.org%2FInterconnect-MyChartMobile-
```

PRD%2FWCF%2FEpic.MyChartMobile%2FMyChartMobile.svc%2Frest_2017%2F0%2F
TestResults%2FList&it=1&pa=0&s0=1133&t0=1683274&s1=0&t1=1002&rc=200&bs=61
33&br=18544&et=6&na=Touch%20on%20TableViewCell%20EKG%20%400%3A21&it=
1&mo=0&ca=185&pa=0&s0=1134&t0=1683806&s1=1136&t1=0&et=6&na=Touch%20on
%20navigation%20back&it=1&mo=0&ca=184&pa=0&s0=1131&t0=1674266&s1=1132&t
1=0&et=6&na=Touch%20on%20TableViewCell%<mark>20MAMMOGRAPHY%20SCREENIN
G%203D%2C%20BILATERAL</mark>%20%400%3A17&it=1&mo=0&ca=183&pa=0&s0=1122
&t0=1652016&s1=1124&t1=0&et=6&na=Touch%20on%20navigation%20back&it=1&mo
=0&ca=182&pa=0&s0=1120&t0=1629868&s1=1121&t1=0&et=6&na=Loading%20Group
Health.GroupHealthUITabBarController&it=1&mo=0&ca=180&pa=0&s0=1117&t0=1626
769&s1=1119&t1=562&et=22&na=GroupHealth.GroupHealthUITabBarController&it=1&
ca=181&pa=180&s0=1115&t0=1519083&s2=1116&t2=107685&s3=1118&t3=108248

211.    The fact that Plaintiff Jane Doe suffers from restless leg syndrome was also intercepted

and transmitted to Dynatrace at bf12660qqg.bf.dynatrace.com:

vv=3&va=8.241.1.1013&ap=591e7dfd-540c-4414-9bc0-
8274741cd848&an=GroupHealth&ai=org.ghc.MyGroupHealth.Mobile&vn=5.2.1&vb=502
01002&tv=1688580245590&tx=1688582667197&vi=93584938323505&sn=1&rm=3660&
<mark>cp=ARM_64E&os=iOS%2016.5.1&mf=Apple&md=iPhone14%2C4&rj=g&ul=en_US&sw
=960&sh=2079&sd=3&so=p&bl=75&fm=2&ct=T-
Mobile&ct=m&np=5G&pt=0&tt=maios</mark>&dl=2&cl=2&mp=1&vs=1&fv=pl&et=30&na=http
s%3A%2F%2Fwa-member2.kaiserpermanente.org%2FInterconnect-MyChartMobile-
PRD%2FWCF%2FEpic.MyChartMobile%2FMyChartMobile.svc%2Frest_2018%2FGetMy
ChartUrl&it=1&pa=0&s0=1543&t0=2318841&s1=0&t1=726&rc=200&bs=6005&br=1474
&et=30&na=https%3A%2F%2Fsmetrics.kaiserpermanente.org%2Fb%2Fss%2Fkfhkfhkpwa
mobileprod%2F0%2FIOSN020504020907%2Fs76716014&it=6&pa=0&s0=1574&t0=2382
147&s1=0&t1=188&rc=200&bs=1002&br=555&et=30&na=https%3A%2F%2Fwa-
member2.kaiserpermanente.org%2FInterconnect-MyChartMobile-
PRD%2FWCF%2FEpic.MyChartMobile%2FMyChartMobile.svc%2Frest_2018%2FGetMy
ChartUrl&it=1&pa=0&s0=1577&t0=2382191&s1=0&t1=617&rc=200&bs=5844&br=1374
&et=30&na=https%3A%2F%2Fsmetrics.kaiserpermanente.org%2Fb%2Fss%2Fkfhkfhkpwa
mobileprod%2F0%2FIOSN020504020907%2Fs13525271&it=6&pa=0&s0=1593&t0=2410
086&s1=0&t1=146&rc=200&bs=1005&br=555&et=30&na=https%3A%2F%2Fwa-
member2.kaiserpermanente.org%2FInterconnect-MyChartMobile-
PRD%2FWCF%2FEpic.MyChartMobile%2FMyChartMobile.svc%2Frest_2018%2FGetMy
ChartUrl&it=1&pa=0&s0=1594&t0=2410130&s1=0&t1=619&rc=200&bs=5839&br=1332
&et=6&na=Loading%20GroupHealth.GroupHealthUITabBarController&it=1&mo=0&ca=2
79&pa=0&s0=1584&t0=2401338&s1=1589&t1=568&et=22&na=GroupHealth.MyHealthV
iewController&it=1&ca=281&pa=279&s0=1585&t0=2382710&s2=1586&t2=18635&s3=1
588&t3=19196&et=22&na=GroupHealth.GroupHealthUITabBarController&it=1&ca=280
&pa=279&s0=1582&t0=2382710&s2=1583&t2=18628&s3=1587&t3=19186&et=6&na=T
ouch%20on%20navigation%20back&it=1&mo=0&ca=277&pa=0&s0=1568&t0=2374384
&s1=1571&t1=0&et=6&na=Touch%20on%20TableViewCell%20Essential%20hypertensio
n%2C%20benign%20%400%3A1&it=1&mo=0&ca=276&pa=0&s0=1566&t0=2369408&s
1=1567&t1=0&et=6&na=Touch%20on%20TableViewCell%20RLS%20%28restless%20le
gs%20syndrome%29%20%400%3A8&it=1&mo=0&ca=275&pa=0&s0=1559&t0=2359563
&s1=1559&t1=0&et=6&na=Touch%20on%20TableViewCell%20RLS%20%<mark>28restless%2</mark>

0legs%20syndrome%29%20%20400%3A8&it=1&mo=0&ca=274&pa=0&s0=1556&t0=2357
113&s1=1557&t1=0&et=6&na=Touch%20on%20Health%20Issues&it=1&mo=0&ca=273
&pa=0&s0=1554&t0=2344436&s1=1555&t1=0&et=6&na=Loading%20GroupHealth.Grou
pHealthUITabBarController&it=1&mo=0&ca=271&pa=0&s0=1551&t0=2334328&s1=155
3&t1=0&et=22&na=GroupHealth.MyHealthViewController&it=1&ca=278&pa=277&s0=1
569&t0=2319355&s2=1570&t2=55044&s3=1572&t3=55598&et=22&na=GroupHealth.Gr
oupHealthUITabBarController&it=1&ca=272&pa=271&s0=1549&t0=2319355&s2=1550&
t2=14972&s3=1552&t3=15557&et=6&na=Loading%20GroupHealth.GroupHealthUITabBar
rController&it=1&mo=0&ca=269&pa=0&s0=1537&t0=2310411&s1=1538&t1=0&et=22&
na=GroupHealth.GroupHealthUITabBarController&it=1&ca=270&pa=269&s0=1535&t0=
2284688&s2=1536&t2=25722&s3=1539&t3=26309

212.    On information and belief, Dynatrace intercepts similar information when other members of the Classes use the Kaiser Permanente Washington App.

**C.    Plaintiffs and Class Members Did Not Consent to Kaiser Permanente's Disclosure of Their Information and Communications to Third Parties**

213.    Kaiser Permanente does not ask Kaiser Plan Members who use its Site, Portal, and mobile applications, including Plaintiffs and members of the Classes, whether they consent to having the contents of their information and communications with Kaiser Permanente disclosed to the Third Party Wiretappers. Kaiser Plan Members are never actively told that their electronic communications are being wiretapped by Third Party Wiretappers.

214.    Kaiser Permanente states in its Privacy Policy, under the heading "Internet Cookies," that:

> We and our service providers *may* place Internet "cookies" or similar technologies (JavaScript, HTML5, ETag) on the computer hard drives of visitors to the Site. Information we obtain helps us to tailor our Site to be more helpful and efficient for our visitors. For example, we are able to see the navigation path taken by users, and that information allows us to understand user success or challenges with the web experience. *The cookie consists of a unique identifier that does not contain information about your health history.* We use two types of cookies, 'session' cookies and "persistent" cookies, along with other similar technologies.

Website and mobile application Privacy Statement, Kaiser, https://healthy.kaiserpermanente.org/privacy (last visited June 9, 2023) (emphasis added).

215.    This does not disclose that Kaiser Permanente sends Plaintiffs and Class Members' information and communications to the Third Party Wiretappers.

216.    First, these "third parties" are not defined in the Website Privacy Policy.

217.    Second, disclosing that others *may* monitor certain information is not the same as disclosing that others *do in fact* collect user data in real time.

218.    Third, Kaiser Permanente falsely claims that information about Kaiser Plan Members' health history is not being transmitted.

219.    Fourth, alerting users to the possible use of "cookies . . . and other tracking technologies" does not put Kaiser Plan Members on notice of the use of technology like Session Replay, and other technology used by the Third Party Wiretappers, which, unlike first party cookies, (1) communicate information to an external server as a user navigates a website; (2) track users across devices; (3) are not easily disabled by users; and/or (4) essentially creates a recording of all the information that visitors provide or receive from Kaiser Permanente on the Site.

220.    Fifth, disclosures to the Third Party Wiretappers are not made only for the purpose of tailoring the Kaiser Permanente website and mobile applications to be more helpful and efficient for Kaiser Plan Members who use the Site, Portal, and mobile applications, but are instead used for marketing purposes, including to produce targeted advertising for third parties.

**D.    Plaintiffs' and Class Members' Health Information Has Actual, Measurable, Monetary Value**

221.    Kaiser Plan Members' confidential communications and information that Kaiser Permanente allows the Third Party Wiretappers to intercept has monetary value.

222.    For example, one recent study asked over a thousand consumers from around the world what price they would demand of third parties for access to their data and found that passwords would fetch $75.80; health information and medical records themselves average $59.80; and in third, Social Security numbers were valued at $55.70.[45]

223.    Some companies, such as Prognos Health, sell what they purport to be de-identified health information from millions of patients.[46]

---

[45] Jonathan Weicher, *Healthcare hacks—how much is your personal information worth?*, Netlib Security,  https://netlibsecurity.com/articles/healthcare-hacks-how-much-is-your-personal-information-worth/ (last visited Sept. 15, 2023).
[46] Press Release, *Prognos Health Announces Patent-Pending Technology* (Apr. 6, 2021), https://prognoshealth.com/about-us/news/press-release/prognos-health-announces-patent-pending-technology.

224.    Due to the difficulty in obtaining health information, illegal markets also exist for such data, with some reporting that health data can be "more expensive than stolen credit card numbers."[47]

### E.    Kaiser Permanente's Conduct Violates State and Federal Privacy Laws

225.    Kaiser Plan Members have a reasonable expectation of privacy in their identifying information, personal and sensitive medical information and communications with Kaiser Permanente and its providers, rooted in state and federal privacy laws as well as Kaiser Permanente's express and implied contracts and disclosures. This includes a reasonable expectation that Kaiser Plan Members' identifying information, personal and sensitive medical information and communications with Kaiser Permanente and its providers will not be disclosed to or tracked by Third Party Wiretappers and will not be disclosed to third parties for marketing purposes.

226.    Plaintiffs and Class Members reasonably believed their interactions with Kaiser Permanente on the Site, Portal, and mobile applications were private and would not be transmitted to third parties, recorded, or monitored for a later playback.

227.    The data collected by Kaiser Permanente identified specific web pages navigated and content viewed, and thus revealed personalized and sensitive information about Plaintiffs and Class Members, including sensitive personal and medical information.

228.    Plaintiffs and Class Members did not have a reasonable opportunity to discover Defendants' unlawful and unauthorized connections and conduct because Kaiser Permanente did not disclose its actions nor seek consent from Plaintiffs or Class Members prior to making the transmissions to third parties.

229.    Privacy polls and studies uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' personal data.

---

[47] Aarti Shahani, *The Black Market For Stolen Health Care Data*, NPR (Feb. 13, 2015, 4:55 am), https://www.npr.org/sections/alltechconsidered/2015/02/13/385901377/the-black-market-for-stolen-health-care-data.

230.    For example, a study by Pew Research Center indicated that an overwhelming majority of Americans—approximately 79%—are concerned about how data is collected about them by companies.[48]

231.    As Kaiser Plan Members, Plaintiffs and Class Members have a reasonable expectation of privacy that Kaiser Permanente, their health care provider, will not disclose the content of their personal and medical information and confidential communications with Kaiser Permanente and its providers to third parties without their express authorization.

232.    Plaintiffs and Class Members' reasonable expectation of privacy in their personally identifiable data and communications exchanged with Kaiser Permanente and its providers is derived from several sources, including:

    a.    Kaiser Permanente's status as Kaiser Plan Members' health care provider;

    b.    Kaiser Permanente's common law obligation to maintain confidentiality of patient data and communications;

    c.    State and federal laws and regulations protecting the confidentiality of medical information;

    d.    State and federal laws protecting the confidentiality of communication and computer data;

    e.    Defendants' express promises of privacy and confidentiality; and

    f.    Defendants' implied promises of privacy and confidentiality.

233.    Significantly, patient health care data in the United States is protected by federal law under HIPAA and its implementing regulations, which are promulgated by the HHS.

234.    The HIPAA Privacy Rule, located at 45 CFR § 160 and Subparts A and E of § 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[49]

---

[48] Brooke Auxier et al., *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, Pew Research Center (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

[49] *The HIPAA Privacy Rule*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html (last visited Sept. 15, 2023).

235.     The Privacy Rule broadly defines "protected health information" ("PHI") as "individually identifiable health information" ("IIHI") that is "(i) [t]ransmitted by electronic media; (ii) [m]aintained in electronic media; or (iii) [t]ransmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

236.     IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

237.     The HIPAA Privacy Rule requires any "covered entity"—which includes health care providers—to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without authorization. 45 C.F.R. §§ § 160.103, 164.502.

238.     An individual or corporation violates the HIPAA Privacy Rule if it knowingly: "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." 42 U.S.C. § 1320d-6. The statute states that a "person . . . shall be considered to have obtained or disclosed individually identifiable health information . . . if the information is maintained by a covered entity . . . and the individual obtained or disclosed such information without authorization." *Id*.

239.     The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Kaiser Permanente when it knowingly disclosed individually identifiable health information relating to an individual, as those terms are defined under HIPAA.

240.     Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." *Id.* In such cases, the entity that knowingly obtains individually identifiable health

information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both." *Id.*

241.    Guidance from HHS confirms that patient status is protected by HIPAA, which provides

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data. . . . *If such information was listed with health condition, health care provision or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.*[50]

242.    HHS' guidance for marketing communications states that health care providers may not provide patient lists for marketing purposes without the consent of every included patient:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. **Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list**.[51]

243.    HHS has previously instructed that patient status is protected by the HIPAA Privacy Rule:

    a.    "[T]he sale of a patient list to a marketing firm" is not permitted under HIPAA. 65 Fed. Reg. 82717 (Dec. 28, 2000);

    b.    "[A] covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," which includes disclosure of mere patient status through a patient list. 67 Fed. Reg. 53186 (Aug. 14, 2002);

    c.    It would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 Fed. Reg. 5642 (Jan. 25, 2013); and

    d.    The only exception permitting a hospital to identify patient status without express written authorization is to "maintain a directory of individuals in its facility" that

---

[50] *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule* at 5, HHS (Nov. 26, 2012), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf. (emphasis added) (last visited June 9, 2023).

[51]    *Marketing* at 1-2, Office for Civil Rights (Rev. Apr. 3, 2003), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf. (emphasis added).

includes name, location, general condition, and religious affiliation when used or disclosed to "members of the clergy" or "other persons who ask for the individual by name." 45 C.F.R. § 164.510(1). Even then, patients must be provided an opportunity to object to the disclosure of the fact that they are a patient. 45 C.F.R. § 164.510(2).

## V. TOLLING

244.    Plaintiffs repeat and incorporate all other paragraphs as if fully set forth herein.

245.    The statutes of limitations applicable to Plaintiffs' and the Classes' claims were tolled by Defendants' conduct and Plaintiffs and Class Members' delayed discovery of their claims.

246.    As alleged above, Plaintiffs and members of the Classes did not know and could not have known when they used the Kaiser Permanente Site and/or Portal that Kaiser Permanente was disclosing their information and communications to third parties. Plaintiffs and members of the Classes could not have discovered Kaiser Permanente's unlawful conduct with reasonable diligence.

247.    Kaiser Permanente secretly incorporated the Third Party Wiretappers' code into the Site, Portal, and mobile applications, providing no indication to Kaiser Plan Members and Site users that their communications would be disclosed to these third parties.

248.    Kaiser Permanente had exclusive and superior knowledge that the Third Party Wiretappers' code incorporated on its Site, Portal, and mobile applications would disclose Kaiser Plan Members' protected and private information and confidential communications, yet failed to disclose to Kaiser Plan Members and Site and mobile application users, including Plaintiffs and members of the Classes, that by interacting with the Kaiser Permanente Site, Portal, or mobile applications that Plaintiffs and Class Members' patient status, personal information, sensitive health information, and confidential communications would be disclosed to third parties.

249.    Plaintiffs and members of the Classes could not with due diligence have discovered the full scope of Kaiser Permanente's conduct because the incorporation of the Third Party Wiretappers' code is highly technical and there were no disclosures or other indication that would inform a reasonable consumer or user that Kaiser Permanente was disclosing and allowing the interception of such information to these third parties.

250.    The earliest Plaintiffs and Class Members could have known about Defendants' conduct was shortly before the filing of this Complaint.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VI.   CLASS ACTION ALLEGATIONS

251.   Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a) and

23(b)(2) and/or (b)(3) on behalf of the following Class and Sub-Classes:

**Kaiser Operating States Class:** All Kaiser Plan Members in the Kaiser Operating States who used the Kaiser Permanente website or mobile applications.

**California Sub-Class:** All Kaiser Plan Members who are residents of the State of California and used the Kaiser Permanente website or mobile applications.

**District of Columbia Sub-Class:** All Kaiser Plan Members who are residents of the District of Columbia and used the Kaiser Permanente website or mobile applications.

**Georgia Sub-Class:** All Kaiser Plan Members who are residents of the State of Georgia and used the Kaiser Permanente website or mobile applications.

**Maryland Sub-Class:** All Kaiser Plan Members who are residents of the State of Maryland and used the Kaiser Permanente website or mobile applications.

**Oregon Sub-Class:** All Kaiser Plan Members who are residents of the State of Oregon and used the Kaiser Permanente website or mobile applications.

**Virginia Sub-Class:** All Kaiser Plan Members who are residents of the Commonwealth of Virginia and used the Kaiser Permanente website or mobile applications.

**Washington Sub-Class:** All Kaiser Plan Members who are residents of the State of Washington and used the Kaiser Permanente website or mobile applications.

**Kaiser Operating States Breach of Contract Sub-Class:** All Kaiser Plan Members in the Kaiser Operating States who used the Portal on the Kaiser Permanente website or mobile applications.

**California Breach of Contract Sub-Class**: All Kaiser Plan Members who are residents of the State of California and used the Portal on the Kaiser Permanente website or mobile application.

**District of Columbia Breach of Contract Sub-Class:** All Kaiser Plan Members who are residents of the District of Columbia and used the Portal on the Kaiser Permanente website or mobile application.

**Georgia Breach of Contract Sub-Class:** All Kaiser Plan Members who are residents of the State of Georgia and used the Portal on the Kaiser Permanente website or mobile applications.

**Maryland Breach of Contract Sub-Class:** All Kaiser Plan Members who are residents of the State of Maryland and used the Portal on the Kaiser Permanente website or mobile application.

**Oregon Breach of Contract Sub-Class:** All Kaiser Plan Members who are residents of the State of Oregon and used the Portal on the Kaiser Permanente website or mobile application.

**Virginia Breach of Contract Sub-Class:** All Kaiser Plan Members who are residents of the Commonwealth of Virginia and used the Portal on the Kaiser Permanente website or mobile application.

**Washington Breach of Contract Sub-Class**: All Kaiser Plan Members who are residents of the State of Washington and used the Portal on the Kaiser Permanente website or mobile applications.

252.   Excluded from the Class and Sub-Classes are Defendants and their parents,

subsidiaries, and corporate affiliates. Plaintiffs reserve the right to revise the definition of the Class

67

and Sub-Classes based upon subsequently discovered information and reserves the right to establish additional Sub-Class where appropriate. The Class and Sub-Classes are collectively referred to herein as the "Class" or "Classes."

253.    The Classes are so numerous that joinder of all members is impracticable. Plaintiffs believe that there are at least tens of thousands of proposed members of the Classes throughout the United States.

254.    Common questions of law and fact exist as to all members of the Classes and predominate over any issues solely affecting individual members of the Classes. The common and predominating questions of law and fact include, but are not limited to:

- Whether Defendants' acts and practices violated the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq.*;
- Whether Defendants' acts and practices violated the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.*;
- Whether Defendants' acts and practices violated California's Constitution, Art. 1, § 1;
- Whether Defendants' acts and practices violated California Consumers Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*;
- Whether Defendants' acts and practices violated California Confidentiality of Medical Information Act, Cal. Civ. Code § 56.10;
- Whether Defendants' acts and practices violated District of Columbia Consumer Protection Procedures Act, D.C. Code § 28-3901, *et seq.;*
- Whether Defendants' acts and practices violated Georgia Uniform Deceptive Trade Practices Act, Ga. Code Ann. § 10-1-370, *et seq.*;
- Whether Defendants' acts and practices violated Georgia Computer Systems Protection Act, Ga. Code Ann. § 16-9-93;
- Whether Defendants' acts and practices violated Georgia Insurance and Information Privacy Protection Act, Ga. Code Ann. § 33-39-1, *et seq.*;
- Whether Defendants' acts and practices violated Maryland Wiretapping and Electronic Surveillance Act, Md. Code, Cts. & Jud. Proc. § 10-401, *et seq.*;
- Whether Defendants' acts and practices violated Oregon Unlawful Trade Practices Act, Or. Rev. Stat. § 646.605, *et seq.*,
- Whether Defendants' acts and practices violated Virginia Computer Crimes Act, Va. Code Ann. § 18.2-152.1, *et seq.*;
- Whether Defendants' acts and practices violated Virginia Insurance Information and Privacy Protection Act, Va. Code Ann. § 38.2-600, *et seq.*;
- Whether Defendants' acts and practices violated the Washington Privacy Act, Wash. Rev. Code § 9.73, *et seq*;

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO: 4:23-cv-02865-EMC

- Whether Defendants' acts and practices violated the Washington Health Care Information Act, Wash. Rev. Code § 70.02.005, *et seq*;
- Whether Defendants' acts and practices violated the Washington Consumer Protection Act, § 19.86, et seq.;
- Whether Defendants' acts and practices constitute negligence *per se*;
- Whether Defendants' acts and practices constitute Statutory Larceny, Cal. Penal Code §§ 484, 496;
- Whether Defendants' acts and practices violated the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. § 1320d-6;
- Whether Defendants' acts and practices violated Plaintiffs and Class Members' common law privacy rights;
- Whether Defendants breached an express contract;
- Whether Defendants breached an implied contract; and
- Whether Defendants' unlawful conduct should be enjoined;
- Whether damages, restitution, equitable, injunctive, compulsory, or other relief is warranted.

255.    Plaintiffs' claims are typical of the claims of the Classes that Plaintiffs seek to represent. As alleged herein, Plaintiffs and the Classes sustained damages arising out of the same unlawful actions and conduct by Defendants.

256.    Plaintiffs are willing and prepared to serve the Classes in a representative capacity with all of the obligations and duties material thereto. Plaintiffs will fairly and adequately protect the interests of the Classes and has no interest adverse to or in conflict with the interests of the other members of the Classes.

257.    Plaintiffs' interests are co-extensive with and are not antagonistic to those of absent members within the Classes. Plaintiffs will undertake to represent and protect the interests of absent members within the Classes and will vigorously prosecute this action.

258.    Plaintiffs have engaged the services of the undersigned counsel. Counsel is experienced in complex litigation, will adequately prosecute this action and will assert and protect the rights of, and otherwise represent, Plaintiffs and absent members of the Classes.

259.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiffs know of no difficulty to be encountered in the management of this litigation that would preclude its maintenance as a class action.

260.     Class action status is warranted under Federal Rule of Civil Procedure 23(b)(3) because questions of law or fact common to the members of the Classes predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

261.     The Classes may also be certified under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted on grounds generally applicable to the Classes, thereby making it appropriate to award final injunctive relief or corresponding declaratory relief with respect to the Classes.

262.     The interest of members within the Classes individually controlling the prosecution of separate actions is theoretical and not practical. The Classes have a high degree of similarity and are cohesive, and Plaintiffs anticipate no difficulty in the management of this matter as a class action.

263.     The nature of notice to the proposed Classes is contemplated to be by direct mail and/or email upon certification of the Classes or, if such notice is not practicable, by the best notice practicable under the circumstance including, *inter alia*, email, publication in major newspapers, and/or on the internet.

## VII.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq.*
### On Behalf of the Kaiser Operating States Class
### (Against All Defendants)

264.     Plaintiffs repeat and incorporate all other paragraphs as if fully set forth herein.

265.     Plaintiffs bring this claim individually and on behalf of the Kaiser Operating States Class.

266.     The Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. §§ 2510, *et seq.*, prohibits the interception of any wire, oral, or electronic communications without the consent of at least one authorized party to the communication.

267.     The ECPA confers a civil cause of action on "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

268.    The ECPA protects both the sending and receipt of communications.

269.    A violation of the ECPA occurs where any person "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any . . . electronic communication" or "intentionally discloses, or endeavors to disclose, to any other person the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication" or "intentionally uses, or endeavors to use, the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication." 18 U.S.C. §§ 2511(1)(a), (c)-(d).

270.    In addition, "a person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication . . . while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient." 18 U.S.C. § 2511(3)(a).

271.    "Intercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

272.    "Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

273.    "Contents" includes "any information concerning the substance, purport, or meaning" of the communication at issue. 18 U.S.C. § 2510(8).

274.    An "electronic communication service" means "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

275.    Plaintiffs and Kaiser Operating States Class Members' communications with Kaiser Permanente through the Site, Portal, and mobile application are electronic communications under the ECPA.

276.     Whenever Plaintiffs and Kaiser Operating States Class Members communicated with Kaiser Permanente and/or their health care providers on the Site or mobile applications, Third Party Wiretappers, through the source code Kaiser Permanente embedded and ran on its website, contemporaneously and intentionally intercepted, and endeavored to intercept Plaintiffs' and Kaiser Operating States Class Members' electronic communications without authorization or consent.

277.     Whenever Plaintiffs and Kaiser Operating States Class Members communicated with Kaiser Permanente and/or their health care providers on the Site or mobile applications, Kaiser Permanente, through the source code it imbedded and ran on its website, contemporaneously and intentionally disclosed, and endeavored to disclose the contents of Plaintiffs' and Kaiser Operating States Class Members' electronic communications to the Third Party Wiretappers, without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA.

278.     Whenever Plaintiffs and Kaiser Operating States Class Members communicated with Kaiser Permanente and/or their health care providers on the Site or mobile applications, Kaiser Permanente, through the source code it embedded and ran on the Site, contemporaneously and intentionally used, and endeavored to use and allow the contents of Plaintiffs' and Kaiser Operating States Class Members' electronic communications to be disclosed and used for purposes other than providing health care services to Plaintiffs and Kaiser Operating States Class Members without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the ECPA.

279.     Whenever Plaintiffs and Kaiser Operating States Class Members communicated with Kaiser Permanente and/or their health care providers on the Site or mobile applications, Kaiser Permanente, through the source code it embedded and ran on the Site, contemporaneously and intentionally redirected the contents of Plaintiffs' and Kaiser Operating States Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, namely the Third Party Wiretappers.

280.    Whenever Plaintiffs and Kaiser Operating States Class Members communicated with Kaiser Permanente and/or their health care providers on the Site or mobile applications, Kaiser Permanente, through the source code it embedded and ran on the Site, contemporaneously and intentionally divulged the contents of Plaintiffs' and Kaiser Operating States Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, namely the Third Party Wiretappers.

281.    The Third Party Wiretappers intentionally intercepted and used the contents of Plaintiffs' and Kaiser Operating States Class Members' electronic communications for the unauthorized purpose of profiting from Plaintiffs and Kaiser Operating States Class Members' communications, including by generating advertising revenue.

282.    Plaintiffs and Kaiser Operating States Class Members did not authorize Kaiser Permanente to disclose the content of their communications with Kaiser Permanente to the Third Party Wiretappers.

283.    Plaintiffs and Kaiser Operating States Class Members did not authorize the Defendants' interception, redirection, disclosure, and/or use of their sensitive, private health information and communications in their electronic communications with Kaiser Permanente. The Third Party Wiretappers are not party to these communications.

284.    Because the interception of Plaintiffs and Kaiser Operating States Class Members' communications was without authorization and consent from Plaintiffs and Kaiser Operating States Class Members, and included confidential information protected under HIPAA, the interception was unlawful, tortious, and/or constituted a criminal act.

285.    Defendants' actions were at all relevant times knowing, willful, and intentional.

286.    Pursuant to 18 U.S.C. § 2520, Plaintiffs and Kaiser Operating States Class Members have been damaged by the interception, disclosure, and/or use of their communications in violation of the ECPA and are entitled to: (1) appropriate equitable or declaratory relief; (2) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiffs and the Class and any profits made as a result of the violation, or (b) statutory damages

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO: 4:23-cv-02865-EMC

of whichever is the greater of $100 per day per violation or $10,000; and (3) reasonable attorneys'

fees and other litigation costs reasonably incurred.

**SECOND CLAIM FOR RELIEF**
**Violation of the California Invasion of Privacy Act**
**Cal. Penal Code §§ 631**
**On Behalf of the Kaiser Operating States Class, or alternatively, On Behalf of the California Sub-Class**
**(Against All Defendants)**

287.    Plaintiffs repeat and incorporate all other paragraphs as if fully set forth herein.

288.    Plaintiffs bring this claim individually and on behalf of the Kaiser Operating States

Class, or alternatively, on behalf of the California Sub-Class.

289.    The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal

Code §§ 630, *et seq*. ("CIPA"), to address "advances in science and technology [that] have led to the

development of new devices and techniques for the purpose of eavesdropping upon private

communications and that the invasion of privacy resulting from the continual and increasing use of

such devices and techniques has created a serious threat to the free exercise of personal liberties and

cannot be tolerated in a free and civilized society." *Id.* § 630. CIPA is intended "to protect the right

of privacy of the people of this state." *Id.*

290.    To establish liability under section 631(a), Plaintiffs need only establish that a

Defendant, "by means of any machine, instrument, or contrivance, or in any other manner," did any

of the following:

> [i] [I]ntentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> Or
>
> [ii] [W]illfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> Or
>
> [iii] [U]ses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> Or

[iv] [A]ids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

291.    Under § 631, a defendant must show it had the consent of all parties to a communication.

292.    Kaiser Permanente and the Third Party Wiretappers are each a "person" for the purposes of CIPA.

293.    Defendants maintain their headquarters in California, where they designed, contrived, agreed, conspired, effectuated, aided, and/or received the interception and use of the contents of Plaintiffs and Class Members' communications.

294.    The Third Party Wiretappers' code, Quantum Metric's recording code, Plaintiffs and Class Members' browsers and Plaintiffs and Class Members' computing and mobile devices are all a "machine, instrument, or contrivance, or . . . other manner" used to engaged in the prohibited conduct at issue here. Cal. Penal Code § 631.

295.    Kaiser Permanente installed the Third Party Wiretappers' code to automatically and secretly spy on, and intercept Plaintiffs and Class Members' communications with Kaiser Permanente through the Kaiser Permanente website in real time.

296.    At all relevant times, Kaiser Permanente's disclosure of Plaintiffs and Class Members' internet communications to Third Party Wiretappers was without Plaintiffs and Class Members' authorization or consent.

297.    By installing the Third Party Wiretappers' code on its website, Kaiser Permanente intentionally caused Plaintiffs and Class Members' communications to be intercepted, recorded, stored, and transmitted to the Third Party Wiretappers.

298.    At all relevant times, the Third Party Wiretappers intentionally tapped or made unauthorized connections with, the lines of internet communication between Plaintiffs and Class Members and Kaiser Permanente's Site or mobile applications without the consent of all parties to the communication.

299.     The Third Party Wiretappers willfully read or attempt to read or learn the contents or meaning of Plaintiffs and Class Members' communications to Kaiser Permanente's Site or mobile applications while the communications are in transit or passing over any wire, line, or cable, or were being received at any place within California when it intercepted Plaintiffs and Class Members' communications with Kaiser Permanente's Site or mobile applications in real time.

300.     By embedding the Third Party Wiretappers' technology on its website, Kaiser Permanente aided, agreed with, employed, and conspired with Third Party Wiretappers to carry out the wrongful conduct alleged herein in violation of Cal. Penal Code § 631(a)[iv].

301.     Plaintiffs and the Class Members seek statutory damages in accordance with § 637.2(a), which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiffs and the Class in an amount to be proven at trial, as well as injunctive or other equitable relief.

**THIRD CLAIM FOR RELIEF**
**Common Law Invasion of Privacy—Intrusion Upon Seclusion**
**On Behalf of the Kaiser Operating States Class, or alternatively, On Behalf of the California Sub-Class, District of Columbia Sub-Class, Georgia Sub-Class, Maryland Sub-Class, Oregon-Sub-Class, and Washington Sub-Class**
**(Against All Defendants)**

302.     Plaintiffs repeat and incorporate all other paragraphs as if fully set forth herein.

303.     Plaintiffs bring this claim individually and on behalf of the Kaiser Operating States Class, or alternatively, on behalf of the California Sub-Class, District of Columbia Sub-Class, Georgia Sub-Class, Maryland Sub-Class, Oregon-Sub-Class, and Washington Sub-Class.

304.     Intrusion upon seclusion has occurred when (1) Defendants intruded and/or aided, agreed with, employed, and/or conspired with the Third Party Wiretappers to intrude into a private place, conversation, matter; (2) in a manner was highly offensive to a reasonable person.

305.     Kaiser Permanente intentionally intruded upon Plaintiffs and Class Members' solitude or seclusion when it disclosed communications it received from Plaintiffs and Class Members, which was intended to stay private, to Third Party Wiretappers.

306.     Plaintiffs and Class Members did not consent to or authorize, nor were they aware of (1) Kaiser Permanente's disclosure to Third Party Wiretappers of information that it received from

Plaintiffs and Class Members through its Site or mobile applications or (2) the Third Party Wiretappers' collection of information concerning Plaintiffs and Class Members' activity on the Kaiser Permanente website or mobile applications at the time that the disclosure occurred. Plaintiffs and Class Members never agreed that Kaiser Permanente could disclose their communications to Third Party Wiretappers, nor did they agree that the Third Party Wiretappers could collect such information.

307.    Plaintiffs and Class Members had a reasonable expectation of privacy over their communications with Kaiser Permanente, including information obtained from their use of Kaiser Permanente's Site, Portal, or mobile applications.

308.    Kaiser Permanente's and the Third Party Wiretappers' intentional intrusion into Plaintiffs and Class Member's communications with Kaiser Permanente, including information obtained from their use of Kaiser Permanente's Site or mobile applications, was highly offensive to a reasonable person in that it violated federal and state criminal and civil laws designed to protect individual privacy.

309.    The disclosure and collection of communications with Kaiser Permanente, including information obtained from their use of Kaiser Permanente's Site or mobile applications through deceit is highly offensive to a reasonable person. Plaintiffs and Class Members reasonably expected that their communications with Kaiser Permanente, including information obtained from their use of Kaiser Permanente's Site or mobile applications would not be disclosed to third parties.

310.    Secret disclosure and collection of Plaintiffs and Class Members' communications with Kaiser Permanente, including information of thousands of individuals obtained from their use of Kaiser Permanente's Site or mobile applications is highly offensive to a reasonable person. Privacy polls and studies show that the overwhelming majority of Americans believe one of the most important privacy rights is the need for an individual's affirmative consent before personal information is collected or shared.

311.    Plaintiffs and Class Members have suffered harm and injury as a direct and proximate result of Kaiser Permanente's invasion of their privacy.

312.     Plaintiffs and Class Members are entitled to reasonable compensation, including but not limited to monetary damages.

313.     Plaintiffs and Class Members seek appropriate relief for that injury, including, but not limited to injunctive relief and damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as well as a disgorgement of profits earned as a result of its intrusions upon Plaintiffs and Class Members' privacy.

314.     Plaintiffs also seek such other relief as the Court may deem just and proper.

**FOURTH CLAIM FOR RELIEF**
**Invasion of Privacy and Violation of the California Constitution, Art. 1, § 1**
**On Behalf of the Kaiser Operating States Class, or alternatively, On Behalf of the California Sub-Class**
**(Against All Defendants)**

315.     Plaintiffs repeat and incorporate all other paragraphs as if fully set forth herein.

316.     Plaintiffs bring this claim individually and on behalf of the Kaiser Operating States Class, or alternatively, on behalf of the California Sub-Class.

317.     Kaiser Permanente is headquartered in California and its conduct took place in California.

318.     Article I, section 1 of the California Constitution provides: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy." Cal. Cons. art. I, § 1.

319.     The right to privacy in California's constitution creates a right of action against private entities such as Kaiser Permanente.

320.     To state a California constitutional privacy claim, a plaintiff must establish (1) a legally protected privacy interest; (2) where the plaintiff had a reasonable expectation of privacy; and (3) conduct by the defendant constituting an intrusion of privacy so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms.

321.     Plaintiffs and Class Members possess a legally protected interest in their communications with Kaiser Permanente, including information derived from their use of Kaiser

Permanente's Site or mobile applications, and in providing such information to Kaiser (and receiving information from Kaiser Permanente) without that information being disclosed to Third Party Wiretappers. This legally-protected interest is derived from the common law, the California Constitution's article I, section 1 guarantee of the right to privacy, the ECPA, CIPA, and HIPAA.

322.    Plaintiffs and Class Members had a reasonable expectation of privacy under the circumstances, including that: (i) the information Kaiser Permanente disclosed to Third Party Wiretappers included information related to patient status, health conditions, identifying information, personal and sensitive information, information related to medical treatment, and confidential communications with Kaiser Permanente and its providers; and (ii) Plaintiffs and Class Members did not consent or otherwise authorize Kaiser Permanente to disclose this private information and these confidential communications to the Third Party Wiretappers.

323.    Defendants' conduct constituted a serious invasion of privacy that would be highly offensive to a reasonable person in that: (i) the information disclosed by Kaiser Permanente and collected by Third Party Wiretappers was highly sensitive and personal, as protected by the California Constitution; (ii) Kaiser Permanente did not have authorization or consent to disclose this information to any third party, including Third Party Wiretappers, and the Third Party Wiretappers did not have authorization to collect this information; and (iii) the invasion deprived Plaintiffs and Class Members the ability to control the circulation of said information, which is considered a fundamental right to privacy.

324.    Defendants' invasion violated the privacy rights of thousands of Class Members, including Plaintiffs, without authorization or consent. Their conduct constitutes a severe and egregious breach of social norms.

325.    As a direct and proximate result of Defendants' actions, Plaintiffs and Class Members have had their privacy invaded and sustained damages and will continue to suffer damages.

326.    Plaintiffs and Class Members seek appropriate relief for that injury, including but not limited to injunctive relief and damages that will reasonably compensate Plaintiffs and Class Members for the harm to their privacy interests as well as a disgorgement of profits earned as a result of their intrusions upon Plaintiffs and Class Members' privacy.

327.    Plaintiffs also seek such other relief as the Court may deem just and proper.

**FIFTH CLAIM FOR RELIEF**
**Breach of Express Contract**
**On Behalf of the Kaiser Operating States Breach of Contract Sub-Class or alternatively, On Behalf of the California Breach of Contract Sub-Class, the District of Columbia Breach of Contract Sub-Class, the Georgia Breach of Contract Sub-Class, the Maryland Breach of Contract Sub-Class, the Oregon Breach of Contract Sub-Class, the Virginia Breach of Contract Sub-Class, and the Washington Breach of Contract Sub-Class**
**(Against All Defendants)**

328.    Plaintiffs repeat and incorporate all other paragraphs as if fully set forth herein.

329.    Plaintiffs bring this claim individually and on behalf of the Kaiser Operating States Breach of Contract Sub-Class, or alternatively, on behalf of the California Breach of Contract Sub-Class, the District of Columbia Breach of Contract Sub-Class, the Georgia Breach of Contract Sub-Class, the Maryland Breach of Contract Sub-Class, the Oregon Breach of Contract Sub-Class, the Virginia Breach of Contract Sub-Class, and the Washington Breach of Contract Sub-Class.

330.    There exists an express contract between Plaintiffs and the Breach of Contract Sub-Class Members on the one side, and Kaiser Permanente on the other, when Plaintiffs and Breach of Contract Sub-Class Members accessed information on the Kaiser Permanente Portal or its mobile applications, namely the Terms and Conditions and Privacy Policy for the Kaiser Permanente website (hereinafter referred to as the "express contract" or "Site Terms and Conditions"). A true and correct copy of the Site Terms and Conditions[52] currently in effect is attached hereto as Exhibit 1, and a copy of the Privacy Statement, incorporated into the Terms and Conditions, is attached as Exhibit 2.

331.    Specifically, at the bottom of the Portal Login Page, Kaiser Permanente agrees, contracts, and warrants that: "By signing in, you agree to our website Terms & Conditions and Privacy Statement." https://healthy.kaiserpermanente.org/southern-california/register (last visited June 9, 2023). The relevant app store pages for the Kaiser Permanente App and Kaiser Permanente Washington App also provide that use of each app is governed by Kaiser Permanente Terms & conditions and the Kaiser Permanente Privacy Statement.

332.    The Kaiser Permanente Terms & Conditions, available via hyperlink, provides: "Any personal information you submit to the Site (for yourself or someone else) is governed by our Website

---

[52] The Terms and Conditions are materially identical for all Kaiser Permanente Regions.

and KP Mobile Application Privacy Statement." *Terms & Conditions for our Website and Mobile Application*, *supra* note 12.

333.    In the Kaiser Permanente Privacy Statement, also available via hyperlink, Kaiser Permanente also agrees, contracts, and warrants that Kaiser Permanente's data collection "is collected on an aggregate basis, which means that no personally identifiable information is associated with the data."

334.    In the Kaiser Permanente Privacy Statement, Kaiser Permanente states that Kaiser Permanente and its service providers may place "cookies" or similar technologies on the computer hard drives of visitors to the Site, and further agrees, contracts, and warrants that information obtained from cookies is only used to help Kaiser Permanente "tailor our Site to be more helpful and efficient for our visitors."

335.    In the Kaiser Permanente Privacy Statement, Kaiser Permanente agrees, contracts, and warrants that "[t]he cookie consists of a unique identifier that does not contain information about your health history."

336.    The Kaiser Permanente Privacy Statement also states that Kaiser "may also occasionally use 'Web beacons' (also known as 'clear gifs,' 'Web bugs,' '1-pixel gifs,' etc.)" and Kaiser Permanente also agrees, contracts, and warrants that Kaiser Permanente Kaiser will "not collect any personal health information" through this technology.

337.    Kaiser Permanente then makes the following promises in the Privacy Statement, which is incorporated as part of the express contract:

- "Use and disclosure of health information includes using the information to provide treatment to the individual, to make payments for such treatment, and to conduct ongoing quality improvement activities. Our use and disclosure of an individual's personal information (including health information) is limited as required by state and federal law."

- "In addition to web logs, described below, Kaiser Permanente routinely gathers data on Site activity, such as how many people visit the Site, the web pages or mobile screens they visit, where they come from, how long they stay, etc. ***The data is collected on an aggregate basis, which means that no personally identifiable information is associated with the data.*** This data helps us improve our content and overall usage. The information is not shared with other organizations for their independent use." (emphasis added).

338.    In addition, Kaiser promises that "we do not collect any personally identifiable information about visitors to the Site. The policies, sources, uses and disclosures of information are outlined in Sections 1 through 20 that follow."

339.    Sections 2, 3, and 4 address "Web logs," "Internet cookies," and "Web Beacons," however, neither section describes the extensive information collection to which patient information is subjected by the Kaiser website.

340.    The Kaiser Permanente Privacy Statement does not disclose to Kaiser Plan Members that Kaiser Permanente has aided, agreed with, employed, and/or conspired with third parties that are recording all of the information that Kaiser Plan Members' are sending, accessing, reviewing, or receiving through the Site or mobile applications.

341.    These terms create a contractual relationship between Kaiser Permanente and any patient to whom it gives access to the Portal or mobile applications, including Plaintiffs and Breach of Contract Sub-Class Members.

342.    Despite its assurances of privacy and confidentiality, Kaiser Permanente intentionally incorporated the Third Party Wiretappers' code and recording technology on the Kaiser Permanente Site, Portal, and mobile applications, disclosing the contents of Plaintiffs and Breach of Contract Sub-Class Members' information and confidential communications with Kaiser Permanente and its providers to Third Party Wiretappers, including for advertising purposes.

343.    In exchange for Kaiser Permanente's provision of a secure website, patient Portal, and mobile applications, Plaintiffs and Breach of Contract Sub-Class Members were able to make appointments, view medical history, get test results, and find and communicate with doctors, among other things, by way of the patient Portal, instead of doing so by other means, such as by phone or in person.

### Consent

344.    Kaiser Permanente requires Kaiser Plan Members to consent to the Site Terms and Conditions in the process of signing up for, and using, the patient Portal or mobile applications.

345.    Plaintiffs and Breach of Contract Sub-Class Members consented to the Site Terms and Conditions by signing up for, and using, the Kaiser Permanente patient Portal or mobile applications.

**Consideration**

346.    The Kaiser Permanente patient Portal and mobile applications are not services Kaiser provides without receiving anything from Plaintiffs and Breach of Contract Sub-Class Members in return. To the contrary, Plaintiffs and Breach of Contract Sub-Class Members' use of the patient Portal and mobile applications confers significant benefit upon Kaiser Permanente—a benefit to which Kaiser Permanente is not entitled—including, but not limited to, increased efficiency, optimized workflow, cost reduction, and receipt of incentive payments from the federal government (HHS) via the Meaningful Use Program. As just one example, Breach of Contract Sub-Class Members use of the patient Portal and mobile applications to access test results and make appointments results in Kaiser Permanente being freed up from performing such tasks of scheduling and reporting on test results for patients, thereby cutting down on long phone calls or in-office communications, increasing efficiency and decreasing costs.

347.    In fact, according to a blog post on the health policy website, Health Affairs,[53] Kaiser Permanente offers "the largest private-sector patient portal in the U.S.," which "help[s] our health care system improve outcomes and manage resources." The Portal has led to a "2 to 6.5 percent improvement in Healthcare Effectiveness Data and Information Set (HEDIS) performance measures," improved patient loyalty by making portal uses "2.6 times more likely to remain Kaiser Permanente members," and shifted patient interactions from in-person to secure messenger.

348.    Thus, Kaiser Permanente benefits from Breach of Contract Sub-Class Members' use of their online Portal and mobile applications by: (1) making their provision of healthcare services more efficient, and (2) reducing the costs associated with managing their members' medical conditions. Importantly, as an integrated managed care consortium, Kaiser Permanente is both a healthcare provider and insurer—thus, they are in a position to realize any savings generated by reducing patient costs.

---

[53] Terhilda Garrido, Brian Raymond, & Ben Wheatley, *Lessons From More Than A Decade In Patient Portals*, Health Affairs (Apr. 7, 2016), https://www.healthaffairs.org/do/10.1377/forefront.20160407.054362.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO: 4:23-cv-02865-EMC

**Performance**

349.    Plaintiffs and Breach of Contract Sub-Class Members performed under the express contract.

**Kaiser Permanente's Breach of the Express Contract**

350.    Kaiser Permanente materially breached its express contract with Plaintiffs and Breach of Contract Sub-Class Members by disclosing to the Third Party Wiretappers, Plaintiffs and Breach of Contract Sub-Class Members' patient status, personally identifiable data, and confidential communications with Kaiser Permanente, thereby failing to provide Plaintiffs and Breach of Contract Sub-Class Members with the secure method of communication it agreed to provide.

351.    The patient health information Kaiser Permanente used and disclosed to unauthorized third parties includes:

    a.   Breach of Contract Sub-Class Members' IP addresses, User-Agent data, persistent cookie identifiers, device identifiers, and/or browser fingerprint information—all of which constitute personally identifiable data both alone and in combination with other data;

    b.   the date and time of Breach of Contract Sub-Class Members' registration for the Portal;

    c.   the date and time of every Breach of Contract Sub-Class Members' sign-in and logoff of the "secure" the Portal and mobile applications;

    d.   the contents of communications Breach of Contract Sub-Class Members' exchange inside the "secure" Portal and mobile applications;

    e.   the contents of communications Breach of Contract Sub-Class Members' exchange after they have logged off the Portal;

    f.   the contents of communications Breach of Contract Sub-Class Members' exchange with Kaiser Permanente seeking providers who accept specific insurance products while still signed in to the "secure" Portal and mobile applications; and

    g.   all other HTTPS communications patients exchange with Kaiser Permanente and its providers on the Site and mobile applications that Kaiser Permanente has permitted the third parties to correlate with the patient's status as a patient, and the particular dates and times for which they access the "secure" Portal and mobile applications.

352.    The patient data Kaiser Permanente discloses (Plaintiffs and Breach of Contract Sub-Class Members' patient status, personally identifiable data, and confidential communications with Kaiser Permanente and its providers) is not aggregated as specified in the Privacy Statement.

353. Nevertheless, information that Plaintiffs and Breach of Contract Sub-Class Members reasonably thought was being transmitted "securely" to Kaiser Permanente was being disclosed by Kaiser Permanente to unauthorized third parties as follows:

    a. A Kaiser Plan Member signs in to the "secure" patient Portal and mobile applications;

    b. On sign-in, Kaiser Permanente discloses the fact of the sign in to the Third Party Wiretappers;

    c. Once signed-in, if a Kaiser Plan Member clicked to, for example:

        i. view tests, a disclosure of that action was made to the Third Party Wiretappers of the specific tests; or,

        ii. Find-A-Doctor, or set an appointment, a disclosure of that action was made to Third Party Wiretappers .

        iii. The above examples of patient communications about the doctor or the appointment was shared with Third Party Wiretappers while the Kaiser Plan Member was still logged-in to the "secure" patient Portal or mobile application; and

    d. On logoff, Kaiser Permanente discloses this action to the Third Party Wiretappers.

354. Kaiser Permanente has failed to cure these breaches and continues to disclose to Third Party Wiretappers Plaintiffs and Breach of Contract Sub-Class Members' personally identifiable data and communications with Kaiser Permanente.

**Plaintiffs and Breach of Contract Sub-Class Members Were Damaged**

355. Defendants' breach caused Plaintiffs and Breach of Contract Sub-Class Members the following damages, among others:

    a. Nominal damages for each breach of contract by Defendants;

    b. General damages for invasion of their rights in an amount to be determined by a jury without reference to specific pecuniary harm;

    c. Sensitive and confidential information that Plaintiffs and Breach of Contract Sub-Class Members intended to remain private is no longer private;

    d. Defendants eroded the essential confidential nature of the provider-patient relationship;

    e. Defendants took something of value from Plaintiffs and Breach of Contract Sub-Class Members and derived a benefit therefrom without Plaintiffs and Breach of Contract Sub-Class Members' knowledge or informed consent and without sharing the benefit of such value;

    f. Plaintiffs and Breach of Contract Sub-Class Members did not get the full value of the medical services for which they paid, which included Defendants' duty to maintain confidentiality;

    g. Defendants' actions diminished the value of Plaintiffs and Breach of Contract Sub-

Class Members' personal information;

h.  Defendants' actions violated the property rights that Plaintiffs and Breach of Contract Sub-Class Member enjoy in their private communications; and

i.  Defendants' actions violated the property rights that Plaintiffs and Breach of Contract Sub-Class Members enjoy in their personally identifiable medical data and communication.

356.  Plaintiffs and Breach of Contract Sub-Class Members also seek attorney's fees and costs on this claim to the extent allowable.

**SIXTH CLAIM FOR RELIEF**
**Breach of Implied Contract**
**On Behalf of the Kaiser Operating States Breach of Contract Sub-Class, or Alternatively, On Behalf of the California Breach of Contract Sub-Class, the District of Columbia Breach of Contract Sub-Class, the Georgia Breach of Contract Sub-Class, the Maryland Breach of Contract Sub-Class, the Oregon Breach of Contract Sub-Class, the Virginia Breach of Contract Sub-Class, and the Washington Breach of Contract Sub-Class**
**(Against All Defendants)**

357.  Plaintiffs repeat and incorporate all other paragraphs as if fully set forth herein.

358.  Plaintiffs bring this claim on behalf of themselves and the Kaiser Operating States Breach of Contract Sub-Class, or alternatively on behalf of the California Breach of Contract Sub-Class, the District of Columbia Breach of Contract Sub-Class, the Georgia Breach of Contract Sub-Class, the Maryland Breach of Contract Sub-Class, the Oregon Breach of Contract Sub-Class, the Virginia Breach of Contract Sub-Class, and the Washington Breach of Contract Sub-Class.

359.  An implied contract was created between Kaiser Permanente, on the one side, and Plaintiffs and Breach of Contract Sub-Class Members, on the other hand, whereby Kaiser Permanente offered to provide Plaintiffs and Breach of Contract Sub-Class Members what it represented to be a secure Portal and secure mobile applications through which Plaintiffs and Breach of Contract Sub-Class Members could confidentially make appointments, review medical history, get test results, communicate with providers, and find doctors, among other things, and Plaintiffs and Breach of Contract Sub-Class Members agreed to use the purportedly secure Portal and mobile applications to make appointments, view medical history, get test results, and find and communicate with doctors, among other things, instead of doing so by other means, such as by phone or in person.

**Mutual Assent**

360. Such implied contract was created by virtue of the relationship and conduct of the parties, as well as the surrounding circumstances, including, but not limited to:

    a. The confidential nature of the medical-provider/patient relationship between Kaiser Permanente and Plaintiffs and Breach of Contract Sub-Class Members;

    b. Kaiser Permanente's express promises, as noted above, to maintain the privacy and confidentiality of patients' personally identifiable data and communications that Plaintiffs and Breach of Contract Sub-Class Members exchange with Kaiser Permanente at the Site and mobile applications;

    c. Kaiser Permanente's creation of purportedly secure patient Portal and mobile applications that requires a sign-in with a user name and password, which would lead a reasonable person to believe that their communications with Kaiser Permanente while signed in to the Portal would not be shared outside of Kaiser Permanente; and

    d. Plaintiffs and Breach of Contract Sub-Class Members' use of the purportedly secure Portal and mobile applications to make appointments, get test results, and find doctors, among other things, instead of doing so by other means, such as by phone or in person.

361. Kaiser Permanente knew, or had reason to know, that Plaintiffs and Breach of Contract Sub-Class Members would interpret the parties' relationship and conduct as an agreement to keep Plaintiffs and Breach of Contract Sub-Class Members' patient status, personally identifiable data, and communications with Kaiser Permanente inside the Portal and mobile applications confidential when Plaintiffs and Breach of Contract Sub-Class Members used Kaiser Permanente's patient Portal and mobile applications.

**Consideration**

362. The patient Portal and mobile applications are not services Kaiser Permanente provides without receiving anything from Plaintiffs and other patients in return. To the contrary, Plaintiffs and Breach of Contract Sub-Class Members' use of the Portal and mobile applications confers significant benefit upon Kaiser Permanente—a benefit to which Kaiser Permanente is not entitled—including, but not limited to, increased efficiency, optimized workflow, cost reduction, and receipt of incentive payments from the federal government (United States Department of Health and Human Services) via the Meaningful Use Program.

363. As just one example, patients' use of the patient Portal and mobile applications to access test results and make appointments results in Kaiser Permanente being freed up from

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO: 4:23-cv-02865-EMC

performing such tasks of scheduling and reporting on test results for patients, thereby cutting down on long phone calls or in-office communications, increasing efficiency and decreasing costs.

364.    As a result, and as further noted above, Kaiser Permanente is able to more efficiently allocate resources and benefits from improved—and, thus, less costly—patient outcomes and increased patient loyalty.

## Performance

365.    Plaintiffs and Breach of Contract Sub-Class Members performed under the implied contract.

## Kaiser Permanente's Breach of the Implied Contract

366.    Kaiser Permanente materially breached its implied contract with Plaintiffs and Breach of Contract Sub-Class Members, by disclosing to third-party companies, Plaintiffs and Breach of Contract Sub-Class Members' patient status, personally identifiable data, and confidential communications with Kaiser Permanente made within the patient Portal and mobile applications, thereby failing to provide Plaintiffs and Class Members with the secure site and mobile applications it agreed to provide.

367.    The patient health information Kaiser Permanente used and disclosed to unauthorized third parties for marketing includes:

    a.  Breach of Contract Sub-Class Members' IP addresses, User-Agent data, persistent cookie identifiers, device identifiers, and/or browser fingerprint information—all of which constitute personally identifiable data both alone and in combination with other data;

    b.  the date and time of Breach of Contract Sub-Class Members' registration for the Portal;

    c.  the date and time of every Breach of Contract Sub-Class Member's sign-in and logoff of the "secure" Portal and mobile applications;

    d.  the contents of communications Breach of Contract Sub-Class Members exchange inside the "secure" Portal and mobile applications;

    e.  the contents of communications Breach of Contract Sub-Class Members exchange after they have logged off the Portal and mobile applications;

    f.  the contents of communications Breach of Contract Sub-Class Members exchange with Kaiser Permanente seeking providers who accept specific insurance products while still signed in to the "secure" Portal and mobile applications; and

    g.  all other HTTPS communications patients exchange with Kaiser Permanente at the

Site that Kaiser Permanente has permitted the third parties to correlate with the Breach of Contract Sub-Class Members' status as a patient and the particular dates and times for which they access the "secure" Portal and mobile applications.

368. The patient data Kaiser Permanente discloses (Plaintiffs and Breach of Contract Sub-Class Members patient status, personally identifiable data, and confidential communications with Kaiser Permanente and its providers) is not aggregated as specified in the Privacy Statement.

369. Nevertheless, information that Plaintiffs and Breach of Contract Sub-Class Members reasonably thought was being transmitted "securely" to Kaiser Permanente within the patient Portal and mobile applications was being disclosed by Kaiser Permanente to unauthorized third parties as follows:

    a. A patient signs in to the "secure" patient Portal and mobile applications;

    b. On sign-in, Kaiser Permanente discloses the fact of the sign in to the Third Party Wiretappers;

    c. Once signed-in, if a patient clicked to, for example:

        i. view tests, a disclosure of that action was made to the Third Party Wiretappers of the specific tests; or,

        ii. Find-A-Doctor, or set an appointment, a disclosure of that action was made to the Third Party Wiretappers.

        iii. The above examples of patient communications about the doctor or the appointment was shared with the Third Party Wiretappers while the patient was still logged-in to the "secure" patient Portal and mobile applications; and

    d. On logoff, Kaiser Permanente discloses this action to the Third Party Wiretappers.

370. Kaiser Permanente has failed and refused to cure these breaches and continues to disclose to unauthorized third parties, Plaintiffs and Breach of Contract Sub-Class Members' patient status, personally identifiable data, and communications with Kaiser Permanente and its providers exchanged on the Site, Portal, and mobile applications.

**Plaintiffs and Breach of Contract Sub-Class Members Were Damaged**

371. Defendants' breach caused Plaintiffs and Breach of Contract Sub-Class Members the following damages, among others:

    a. Nominal damages for each breach of contract by Defendants;

    b. General damages for invasion of their rights in an amount to be determined by a jury without reference to specific pecuniary harm;

c.  Sensitive and confidential information that Plaintiffs and Breach of Contract Sub-Class Members intended to remain private is no longer private;

d.  Defendants eroded the essential confidential nature of the provider-patient relationship;

e.  Defendants took something of value from Plaintiffs and Breach of Contract Sub-Class Members and derived benefit therefrom without Plaintiffs and Breach of Contract Sub-Class Members' knowledge· or informed consent and without sharing the benefit of such value;

f.  Plaintiffs and Breach of Contract Sub-Class Members did not get the full value of the medical services for which they paid, which included Defendants' duty to maintain confidentiality;

g.  Defendants' actions diminished the value of Plaintiffs and Breach of Contract Sub-Class Members' personal information;

h.  Defendants' actions violated the property rights Plaintiffs and Breach of Contract Sub-Class Members enjoy in their private communications; and

i.  Defendants' actions violated the property rights Plaintiffs and Breach of Contract Sub-Class Members enjoy in their personally identifiable medical data and communication.

372.    Plaintiffs and Breach of Contract Sub-Class Members also seek attorneys' fees and costs on this claim to the extent allowable.

### SEVENTH CLAIM FOR RELIEF
#### Negligence Per Se
**On Behalf of the Kaiser Operating States Class, or alternatively, On Behalf of the California Sub-Class, District of Columbia Sub-Class, Georgia Sub-Class, Maryland Sub-Class, Oregon-Sub-Class, Virginia Sub-Class, and Washington Sub-Class**
**(Against All Defendants)**

373.    Plaintiffs repeat and incorporate all other paragraphs as if fully set forth herein.

374.    Plaintiffs bring this claim individually and on behalf of the Kaiser Operating States Class, or alternatively, on behalf of the California Sub-Class, District of Columbia Sub-Class, Georgia Sub-Class, Maryland Sub-Class, Oregon-Sub-Class, Virginia Sub-Class, and Washington Sub-Class.

375.    At all times, Kaiser Permanente had an obligation to comply with all applicable statutes, including ECPA and HIPAA, as well as state laws governing: wiretapping, computer crimes, insurance information, medical and health information, and larceny.

376.    Pursuant to ECPA, 18 U.S.C. §§ 2510, *et seq.*, Kaiser Permanente was prohibited from unlawfully intercepting, disclosing, or using Plaintiffs' and Class Members' electronic communications.

377.    Pursuant to HIPAA, 42 U.S.C. §§ 1320d, *et seq.*, and regulations passed pursuant to the Act, Kaiser Permanente had a duty to implement reasonable safeguards to protect Plaintiffs' and Class Members' Protected Health Information.

378.    Pursuant to state wiretapping laws—specifically, the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.*, and the Maryland Wiretap Act, Md. Code Ann., Cts. & Jud. Proc. § 10-401—Kaiser Permanente was prohibited from unlawfully intercepting, disclosing, or using Plaintiffs' and Class Members' electronic communications.

379.    Pursuant to state computer crime statutes—specifically, the Georgia Computer Systems Protection Act, Ga. Code Ann. § 16-9-93, and the Virginia Computer Crimes Act, Va. Code Ann. § 18.2-152.1, *et seq.*—Kaiser Permanente was prohibited from, *inter alia*, using computers or computer networks for the unauthorized, fraudulent, or deceitful copy, collection, taking, appropriation, or conversion of computer data or property.

380.    Pursuant to state insurance information statutes—specifically, the Georgia Insurance and Information Privacy Act, Ga. Code Ann. §§ 33-39-1, et seq., and the Virginia Insurance Information and Privacy Protection Act, Va. Code Ann. § 38.2-600, *et seq.*—Kaiser Permanente was prohibited from disclosing Plaintiffs' and Class Members' personal or privileged information without authorization.

381.    Pursuant to state medical and health information statutes—specifically the California Confidentiality of Medical Information Act, Cal. Civ. Code § 56.10, and the Washington Health Care Information Act, Wash. Rev. Code § 70.02.005, *et seq.*—Kaiser Permanente was prohibited from disclosing Plaintiffs' and Class Members' medical information without authorization.

382.    Pursuant to California's Larceny statute, Cal. Penal Code §§ 484, 496, Kaiser Permanente was prohibited from obtaining Plaintiffs' and Class Members' private health information in a manner constituting theft.

383.    Plaintiffs and Class Members are within the class of persons that these statutes are intended to protect.

384.    Plaintiffs' and Class Members' injuries are the type of harm that these statutes are intended to prevent.

385.    Defendants' failure to comply with the above statutes constitutes negligence per se.

386.    But for Defendants' wrongful and negligent breach of their duties owed to Plaintiffs and Class Members, Plaintiffs and Class Members would not have been injured.

387.    The injury and harm suffered by Plaintiffs and Class Members was the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known that they were failing to comply with the applicable statutes governing their conduct, and that Defendants' breach would cause Plaintiffs and Class Members to experience foreseeable harms associated with the unauthorized interception, disclosure, and use of their personal health information by the Third Party Wiretappers.

388.    Accordingly, Plaintiffs and Class Members are entitled to: (1) actual damages, in an amount to be proven at trial; (2) punitive damages; (3) equitable relief; and (4) any other relief the Court deems just.

**EIGHTH CLAIM FOR RELIEF**
**Violation of the California Consumer Legal Remedies Act (CLRA)**
**Cal. Civ. Code § 1750, *et seq.***
**On Behalf of the Kaiser Operating States Class, or alternatively, On Behalf of the California Sub-Class**
**(Against All Defendants)**

389.    Plaintiffs repeat and incorporate all other paragraphs as if fully set forth herein.

390.    Plaintiffs bring this claim individually and on behalf of the Kaiser Operating States Class, or alternatively, on behalf of the California Sub-Class.

391.    Plaintiffs and members of the Kaiser Operating States Class—or, alternatively, the California Sub-Class—are "consumers" within the meaning of Cal. Civ. Code § 1761(d).

392.    Defendants are "persons" within the meaning of Cal. Civ. Code § 1761(c).

393.    The California Consumer Legal Remedies Act (CLRA) provides that "[t]he unfair methods of competition and unfair or deceptive acts or practices listed in this subdivision undertaken

by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer are unlawful," and prohibits: (1) "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;" or (2) "[r]epresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not." Cal. Civ. Code § 1770(a)(5), (16).

394.    Kaiser Permanente's installation of the Third Party Wiretappers' code on its website, Patient Portal, and mobile applications allowing it to, without authorization and contrary to its representation in the Site Terms and Conditions, intercept, disclose, and transfer private health information belonging to Plaintiff and members of the Kaiser Operating States Class—or, alternatively, the California Sub-Class—to the Third Party Wiretappers is an unfair or deceptive act or practice under Cal. Civ. Code § 1770.

395.    Kaiser Permanente acted willfully in engaging in trade practices, knowing they are deceptive, by engaging in unauthorized interception, disclosure, and transfer of private health information in violation of its own Site Terms and Conditions.

396.    Pursuant to Cal. Civ. Code § 1780, Plaintiffs and members of the Kaiser Operating States Class—or, alternatively, the California Sub-Class—are consumers who have suffered damage as a result of Kaiser Permanente's use or employment of a method, act or practice declared unlawful by Section 1770, and are entitled to: (1) an order enjoining Kaiser Permanente's methods, acts, or practices; (2) reasonable attorneys' fees; (3) court costs, (4) actual damages not less than one thousand dollars ($1,000), (5) punitive damages, and (6) any other relief that the court deems proper.

### NINTH CLAIM FOR RELIEF
#### Violation of the California Confidentiality of Medical Information Act
#### Cal. Civ. Code § 56.10
#### On Behalf of the Kaiser Operating States Class, or alternatively, On Behalf of the California Sub-Class
#### (Against All Defendants)

397.    Plaintiffs repeat and incorporate all other paragraphs as if fully set forth herein.

398.    Plaintiffs bring this claim individually and on behalf of the Kaiser Operating States Class, or alternatively, on behalf of the California Sub-Class.

399.    The Confidentiality of Medical Information Act (CMIA) provides that a "provider of healthcare, health care services plan, or contractor shall not disclose medical information regarding a patient of the provider of healthcare or an enrollee or subscriber of a health care service plan without first obtaining an authorization." Cal. Civ. Code § 56.10(a).

400.    "Authorization" means "permission granted in accordance with Section 56.11 or 56.21 for the disclosure of medical information." Cal. Civ. Code § 56.05(a).

401.    "Medical information" means "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care, health care service plan, pharmaceutical company, or contractor regarding a patient's medical history, mental health application information, mental or physical condition, or treatment." Cal. Civ. Code § 56.05(i).

402.    "Individually identifiable" means "that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual," and includes "the patient's name, address, electronic mail address, telephone number, or social security number, or other information that, alone or in combination with other publicly available information, reveals the identity of the individual." Cal. Civ. Code § 56.05(i).

403.    California Civil Code Section 56.11 provides criteria for a valid authorization for disclosure of medical information protected by Section 56.10, including that it:

404.    "Is handwritten by the person who signs it or is in a typeface no smaller than 14-point type."

405.    "Is clearly separate from any other language present on the same page and is executed by a signature which serves no other purpose than to execute the authorization."

406.    "Is signed and dated by one of the following: (1) The patient . . . (2) The legal representative of the patient . . . (3) The spouse of the patient or the person financially responsible for the patient . . . (4) The beneficiary or personal representative of a deceased patient."

407.    "States the specific uses and limitations on the types of medical information to be disclosed."

408.    "States the name or functions of the provider of health care, health care service plan, pharmaceutical company, or contractor that may disclose the medical information."

409.    "States the name or functions of the persons or entities authorized to receive the medical information."

410.    "States the specific uses and limitations on the use of the medical information by the persons or entities authorized to receive the medical information."

411.    "States a specific date after which the provider of health care, health care service plan, pharmaceutical company, or contractor is no longer authorized to disclose the medical information."

412.    "Advises the person signing the authorization of the right to receive a copy of the authorization."

413.    Kaiser Permanente's installation of the Third Party Wiretappers' code on its website, Patient Portal, and mobile applications disclosed medical information, without authorization, belonging to Plaintiffs, members of the Kaiser Operating States Class, and members of the California Sub-Class, in violation of Cal. Civ. Code § 56.10.

414.    Kaiser Permanente knowingly and willfully disclosed medical information without consent to the Third Party Wiretappers, in violation of Cal. Civ. Code § 56.10, for marketing purposes, including to produce targeted advertising for third parties.

415.    Pursuant to Cal. Civ. Code § 56.35, Plaintiffs and Kaiser Operating States Class Members—or, alternatively, California Sub-Class Members—have had their medical information disclosed in violation of Section 56.10, sustained economic loss therefrom, and are entitled to: (1) compensatory damages, in an amount to be determined at trial; (2) punitive damages; (3) attorneys' fees; and (4) the costs of litigation.

### TENTH CLAIM FOR RELIEF
### Statutory Larceny
### Cal. Penal Code §§ 484, 496
### On Behalf of the Kaiser Operating States Class, or alternatively, On Behalf of the California Sub-Class
### (Against All Defendants)

416.    Plaintiffs repeat and incorporate all other paragraphs as if fully set forth herein.

417.    Plaintiffs bring this claim individually and on behalf of the Kaiser Operating States Class, or alternatively, on behalf of the California Sub-Class.

418.    Cal. Penal Code § 496(a) prohibits the obtaining of property "in any manner constituting theft."

419.    "Theft" is prohibited by Cal. Penal Code § 484(a), and a person is guilty of theft, inter alia, where they "fraudulently appropriate property which has been entrusted to him or her, or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of . . . personal property."

420.    Kaiser Permanente acted in a matter constituting theft pursuant to Cal. Penal Code § 484(a), through its installation of the Third Party Wiretappers' code on its website, Patient Portal, and mobile applications, allowing it to, without consent and contrary to its representations in its Terms and Conditions, appropriate or acquire through fraud Plaintiffs' and Kaiser Operating States Class Members', or California Sub-Class Members', private health information.

421.    Kaiser Permanente knew they obtained Plaintiffs' and Kaiser Operating States Class Members', or California Sub-Class Members', private health information in a manner constituting theft, because it installed the code on its website, Patient Portal, and mobile application, and did so without informing its members of this data collections or seeking their authorization.

422.    Pursuant to Cal. Penal Code § 496(c), Plaintiffs and Kaiser Operating States Class Members—or, alternatively, California Sub-Class Members—have been injured by a violation of § 496(a), and are entitled to: (1) treble damages; (2) attorneys' fees reasonably incurred; and (3) costs of suit.

**ELEVENTH CLAIM FOR RELIEF**
**Violation of the District of Columbia Consumer Protection Procedures Act**
**D.C. Code § 28-3901, *et seq.***
**On Behalf of the District of Columbia Sub-Class**
**(Against All Defendants)**

423.    Plaintiff Jane Doe II ("Plaintiff" for purposes of this subsection) repeats and incorporates all other paragraphs as if fully set forth herein.

424.    Plaintiff brings this claim individually and on behalf of the District of Columbia Sub-Class (the "Sub-Class" for purposes of this subsection).

425.    Plaintiff and members of the District of Columbia Sub-Class are "persons" within the meaning of D.C. Code § 28-3901(a)(1).

426.    Plaintiff and members of the District of Columbia Sub-Class are "consumers" within the meaning of D.C. Code § 28-3901(a)(2)(A).

427.    Defendants are "persons" within the meaning of D.C. Code § 28-3901(a)(1).

428.    The District of Columbia Consumer Protection Procedures Act (DCCPPA) provides that "It shall be a violation of this chapter for any person to engage in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived, or damaged thereby, including to:" (1) "represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have;" (2) "misrepresent as to a material fact which has a tendency to mislead;" (3) "fail to state a material fact if such failure tends to mislead;" or (4) "use innuendo or ambiguity as to a material fact, which has a tendency to mislead." D.C. Code § 28-3904(a), (e), (f), and (f-1).

429.    Kaiser Permanente's installation of the Third Party Wiretappers' code on its website, Patient Portal, and mobile applications allowing it to, without authorization and contrary to its representation in the Site Terms and Conditions, intercept, disclose, and transfer private health information belonging to Plaintiff and members of the District of Columbia Sub-Class to the Third Party Wiretappers is a deceptive trade practices under D.C. Code § 28-3904.

430.    Kaiser Permanente acted willfully in engaging in trade practices, knowing they are deceptive, by engaging in unauthorized interception, disclosure, and transfer of private health information in violation of its own Site Terms and Conditions.

431.    Pursuant to D.C. Code § 28-3905(k), Plaintiff and members of the District of Columbia Sub-Class are consumers seeking relief from the use of a trade practice in violation of the law of the District, and are entitled to: (1) an injunction against the use of Defendants' unlawful trade practices; (2) attorneys' fees reasonably incurred, (3) punitive damages, (4) treble damages, or $1,500 per violation, whichever is greater, (5) additional relief as may be necessary to restore to the Sub-Class members money or property acquired by means of the unlawful trade practice, and (6) any other relief which the Court determines proper.

**TWELFTH CLAIM FOR RELIEF**
**Violation of the Georgia Uniform Deceptive Trade Practices Act**
**Ga. Code Ann. § 10-1-370,** *et seq.*
**On Behalf of the Georgia Sub-Class**
**(Against All Defendants)**

432.    Plaintiff John Doe II ("Plaintiff" for purposes of this subsection) repeats and incorporates all other paragraphs as if fully set forth herein.

433.    Plaintiff brings this claim individually and on behalf of the Georgia Sub-Class (the "Sub-Class" for purposes of this subsection).

434.    Plaintiff and members of the Georgia Sub-Class are "persons" within the meaning of Ga. Code Ann. § 10-1-371.

435.    Defendants are "persons" within the meaning of Ga. Code Ann. § 10-1-371.

436.    The Georgia Uniform Deceptive Trade Practices Act (GUDTPA) provides that "a person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he . . . Represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have;" or "Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Ga. Code Ann. § 10-1-372(a)(5), (12).

437.    Kaiser Permanente's installation of the Third Party Wiretappers' code on its website, Patient Portal, and mobile applications allowing it to, without authorization and contrary to its representation in the Site Terms and Conditions, intercept, disclose, and transfer private health information belonging to Plaintiff and members of the Georgia Sub-Class to the Third Party Wiretappers is a deceptive trade practices under Ga. Code Ann. § 10-1-372.

438.    Kaiser Permanente acted willfully in engaging in trade practices, knowing they are deceptive, by engaging in unauthorized interception, disclosure, and transfer of private health information in violation of its own Site Terms and Conditions.

439.    Pursuant to Ga. Code Ann. § 10-1-373, Plaintiff and members of the Georgia Sub-Class are persons likely to be damaged by a deceptive trade practice, and are entitled to: (1) an

injunction against Kaiser Permanente's deceptive trade practices; (2) litigation costs reasonably incurred; and (3) reasonable attorneys' fees.

**THIRTEENTH CLAIM FOR RELIEF**
**Violation of the Georgia Computer Systems Protection Act**
**Ga. Code Ann. § 16-9-93 ("GCSPA")**
**On Behalf of the Georgia Sub-Class**
**(Against All Defendants)**

440.    Plaintiff John Doe II ("Plaintiff" for purposes of this subsection) repeats and incorporates all other paragraphs as if fully set forth herein.

441.    Plaintiff brings this claim individually and on behalf of the Georgia Sub-Class (the "Sub-Class" for purposes of this subsection).

442.    The Georgia Computer Systems Protection Act (GCSPA) proscribes a number of computer related offenses, including "computer theft" and "computer invasion of privacy." Ga. Code Ann. § 16-9-93(a), (c).

443.    The statute provides that "any person who uses a computer or computer network with knowledge that such use is without authority and with the intention of: (1) Taking or appropriating any property of another, whether or not with the intention of depriving the owner of possession; (2) Obtaining property by any deceitful means or artful practice; or (3) Converting property to such person's use in violation of an agreement or other known legal obligation to make a specified application or disposition of such property shall be guilty of computer theft." Ga. Code Ann. § 16-9-93(a).

444.    It further provides that "Any person who uses a computer or computer network with the intention of examining any employment, medical, salary, credit, or any other financial or personal data relating to any other person with knowledge that such examination is without authority shall be guilty of the crime of computer invasion of privacy." Ga. Code Ann. § 16-9-93(c).

445.    "Without authority" includes "the use of a computer or computer network in a manner that exceeds any right or permission granted by the owner of the computer or computer network." Ga. Code § Ann. 16-9-92(18).

446.    Kaiser Permanente's installation of the Third Party Wiretappers' code on its website, Patient Portal, and mobile applications allowing it to, without authorization and contrary to its representation in the Site Terms and Conditions, intercept, disclose, and transfer private health information belonging to Plaintiff and members of the Georgia Sub-Class is use of a computer network with the intention of taking or appropriating the property of Plaintiff and members of the Georgia Sub-Class, and constitutes computer theft under the GCSPA. Ga. Code Ann. § 16-9-93(a)(1).

447.    Kaiser Permanente's installation of the Third Party Wiretappers' code on its website, Patient Portal, and mobile applications allowing it to, without authorization and contrary to its representation in the Site Terms and Conditions, intercept, disclose, and transfer private health information belonging to Plaintiff and members of the Georgia Sub-Class in violation of the Site Terms and Conditions is use of a computer network with the intention of obtaining Plaintiff's and Georgia Sub-Class members' property by deceitful means, and constitutes computer theft under the GCSPA. Ga. Code Ann. § 16-9-93(a)(2).

448.    Kaiser Permanente's installation of the Third Party Wiretappers' code on its website, Patient Portal, and mobile applications allowing it to, without authorization and contrary to its representation in the Site Terms and Conditions, intercept, disclose, and transfer private health information belonging to Plaintiff and members of the Georgia Sub-Class in violation of the Site Terms and Conditions and HIPAA is use of a computer network with the intention of converting Plaintiff's and Georgia Sub-Class members' property to Kaiser Permanente's use in violation of an agreement or other known legal obligation, and constitutes computer theft under the GCSPA. Ga. Code Ann. § 16-9-93(a)(3).

449.    Kaiser Permanente's installation of the Third Party Wiretappers' code on its website, Patient Portal, and mobile applications allowing it to, without authorization and contrary to its representation in the Site Terms and Conditions, intercept, disclose, and transfer private health information belonging to Plaintiff and members of the Georgia Sub-Class to or personal data with knowledge that such examination is unauthorized, and constitutes computer invasion of privacy under the GCSPA. Ga. Code Ann. § 16-9-93(c).

450.    Pursuant to Ga. Code Ann. § 16-9-93(g)(1), Plaintiff and Georgia Sub-Class Members have been injured by reason of a violation of provisions of the GCSPA and are entitled to: (1) damages, in an amount to be determined at trial; and (2) the costs of suit.

**FOURTEENTH CLAIM FOR RELIEF**
**Violation of the Georgia Insurance and Information Privacy Protection Act**
**Ga. Code Ann. § 33-39-1, *et seq*.**
**On Behalf of the Georgia Sub-Class**
**(Against Kaiser Foundation Health Plan, Inc.)**

451.    Plaintiff John Doe II ("Plaintiff" for purposes of this subsection) repeats and incorporates all other paragraphs as if fully set forth herein.

452.    Plaintiff brings this claim individually and on behalf of the Georgia Sub-Class (the "Sub-Class" for purposes of this subsection).

453.    The Georgia Insurance and Information Privacy Protection Act establishes "standards for the collection, use, and disclosure of information gathered in connection with insurance transactions by insurance institutions," and seeks to "maintain a balance between the need for information by those conducting the business of insurance and the public's need for fairness in insurance information practices, including the need to minimize intrusiveness" and "limit the disclosure of information collected in connection with insurance transactions." Ga. Code Ann. § 33-39-1.

454.    The Act provides that "an insurance institution . . . shall not disclose any personal or privileged information about an individual collected or received in connection with an insurance transaction unless the disclosure is . . . with the written authorization of the individual." Ga. Code Ann. § 33-39-14.

455.    "Insurance institution" means "any corporation, association, partnership, reciprocal exchange, interinsurer, Lloyd's insurer, fraternal benefit society, or other person engaged in the business of insurance, including health care plans and health maintenance organizations as defined in Chapters 20 and 21 of this title." Ga. Code Ann. § 33-39-3(11).

456.    "Insurance transaction" means "any transaction involving insurance primarily for personal, family, or household needs rather than business or professional needs which entails: (A)

The individual determination of an individual's eligibility for an insurance coverage, benefit, or payment; or (B) The servicing of an insurance application, policy, contract, or certificate." Ga. Code Ann. § 33-39-3(13).

457.    Kaiser Foundation Health Plan, Inc. is an insurance institution under the Act.

458.    Given Kaiser Permanente's integrated care model, Plaintiff's and Georgia Sub-Class members' communications with Kaiser Permanente through the Kaiser Permanente website, Patient Portal, and mobile applications constitute personal or privileged information collected or received in connection with an insurance transaction.

459.    Kaiser Permanente's installation of the Third Party Wiretappers' code on its website, Patient Portal, and mobile applications allowing it to, without authorization, disclose Plaintiffs' and Georgia Sub-Class members' personal or privileged information to the Third Party Wiretappers is a violation of Ga. Code Ann. § 33-39-14.

460.    Pursuant to Ga. Code Ann. § 33-39-21(b) and (c), Plaintiff and Georgia Sub-Class Members are entitled to: (1) damages sustained as a result of Kaiser Health Plan Inc.'s violation of Section 33-39-14, in an amount to be determined at trial; and (2) reasonable attorneys' fees and other litigation costs reasonably incurred.

**FIFTEENTH CLAIM FOR RELIEF**
**Violation of the Maryland Wiretapping and Electronic Surveillance Act**
**Md. Code Ann., Cts. & Jud. Proc. § 10-401, *et seq*.**
**On Behalf of the Maryland Sub-Class**
**(Against All Defendants)**

461.    Plaintiff Jane Doe III ("Plaintiff" for purposes of this subsection) repeats and incorporates all other paragraphs as if fully set forth herein.

462.    Plaintiff brings this claim individually and on behalf of the Maryland Sub-Class (the "Sub-Class" for purposes of this subsection).

463.    The Maryland Wiretapping and Electronic Surveillance Act ("Maryland Wiretap Act"), Md. Code Ann., Cts. & Jud. Proc. § 10-401, *et seq.*, prohibits the interception of any wire, oral, or electronic communications without the consent of all of the parties to the communication.

464.    The Act confers a civil cause of action on "any person whose wire, oral, or electronic communication is intercepted, disclosed, or used in violation of this subtitle." Md. Code Ann., Cts. & Jud. Proc. § 10-410(a).

465.    The Maryland Wiretap Act provides that it is unlawful for any person to "willfully intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication," or "willfully disclose, or endeavor to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subtitle," or "willfully use, or endeavor to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subtitle." Md. Code Ann., Cts. & Jud. Proc. § 10-402(a)(1)-(3).

466.    In addition, "a person or entity providing an electronic communication service to the public may not intentionally divulge the contents of any communication . . . while in transmission on that service to any person or entity other than an addressee or intended recipient of the communication or an agent of the addressee or intended recipient." Md. Code Ann., Cts. & Jud. Proc. § 10-402(d)(1).

467.    "Intercept" means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Md. Code Ann., Cts. & Jud. Proc. § 10-401(10).

468.    "Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system." Md. Code Ann., Cts. & Jud. Proc. § 10-401(5)(i).

469.    "Contents" includes "any information concerning the identity of the parties to the communication or the existence, substance, purport, or meaning of that communication." Md. Code Ann., Cts. & Jud. Proc. § 10-401(4).

470.    An "electronic communication service" means "any service that provides to users of the service the ability to send or receive wire or electronic communications." Md. Code Ann., Cts. & Jud. Proc. § 10-401(6).

471.    Plaintiff's and Maryland Sub-Class Members' communications with Kaiser Permanente through the Site, Portal, and mobile application are electronic communications under the Maryland Wiretap Act.

472.    Whenever Plaintiff and Maryland Sub-Class Members communicated with Kaiser Permanente and/or their health care providers on the Site or mobile application, Third Party Wiretappers, through the source code Kaiser Permanente embedded and ran on its website, contemporaneously and intentionally intercepted, and endeavored to intercept Plaintiff's and Maryland Sub-Class Members' electronic communications without authorization or consent.

473.    Whenever Plaintiff and Maryland Sub-Class Members communicated with Kaiser Permanente and/or their health care providers on the Site or mobile applications, Kaiser Permanente, through the source code it imbedded and ran on its website, contemporaneously and intentionally disclosed, and endeavored to disclose the contents of Plaintiff's and Maryland Sub-Class Members' electronic communications to the Third Party Wiretappers, without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the Maryland Wiretap Act.

474.    Whenever Plaintiff and Maryland Sub-Class Members communicated with Kaiser Permanente and/or their health care providers on the Site or mobile applications, Kaiser Permanente, through the source code it embedded and ran on the Site, contemporaneously and intentionally used, and endeavored to use and allow the contents of Plaintiff's and Maryland Sub-Class Members' electronic communications to be disclosed and used for purposes other than providing health care services to Plaintiff and Maryland Sub-Class Members without authorization or consent, and knowing or having reason to know that the electronic communications were obtained in violation of the Maryland Wiretap Act.

475.    Whenever Plaintiff and Maryland Sub-Class Members communicated with Kaiser Permanente and/or their health care providers on the Site or mobile applications, Kaiser Permanente,

through the source code it embedded and ran on the Site, contemporaneously and intentionally redirected the contents of Plaintiff's and Maryland Sub-Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, namely the Third Party Wiretappers.

476.   Whenever Plaintiff and Maryland Sub-Class Members communicated with Kaiser Permanente and/or their health care providers on the Site or mobile applications, Kaiser Permanente, through the source code it embedded and ran on the Site, contemporaneously and intentionally divulged the contents of Plaintiff's and Maryland Sub-Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, namely the Third Party Wiretappers.

477.   The Third Party Wiretappers intentionally intercepted and used the contents of Plaintiff's and Maryland Sub-Class Members' electronic communications for the unauthorized purpose of profiting from Plaintiff and Maryland Sub-Class Members' communications, including by generating advertising revenue.

478.   Plaintiff and Maryland Sub-Class Members did not authorize Kaiser Permanente to disclose the content of their communications with Kaiser Permanente to the Third Party Wiretappers.

479.   Plaintiff and Maryland Sub-Class Members did not authorize the Defendants' interception, redirection, disclosure, and/or use of their sensitive, private health information and communications in their electronic communications with Kaiser Permanente. The Third Party Wiretappers are not party to these communications.

480.   The interception of Plaintiff's and Maryland Sub-Class Members' communications was without authorization and consent from Plaintiffs and Maryland Sub-Class Members, and thus lacked the prior consent of all parties to the communication. *See* Md. Code Ann., Cts. & Jud. Proc. § 10-402(c)(3).

481.   Defendants' actions were at all relevant times knowing, willful, and intentional.

482.   Pursuant to Md. Code Ann., Cts. & Jud. Proc. § 10-410(a), Plaintiff and Maryland Sub-Class Members have been damaged by the interception, disclosure, and/or use of their communications in violation of the Maryland Wiretap Act and are entitled to: (1) damages, in an

amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiffs and the Class, or (b) liquidated damages of whichever is the greater of $100 per day per violation or $1,000; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

**SIXTEENTH CLAIM FOR RELIEF**
**Violation of the Oregon Unlawful Trade Practices Act, Or. Rev. Stat. § 646.605, et seq.**
**On Behalf of the Oregon Sub-Class**
**(Against All Defendants)**

483.    Plaintiff Jane Doe V ("Plaintiff" for purposes of this subsection) repeats and incorporates all other paragraphs as if fully set forth herein.

484.    Plaintiff brings this claim individually and on behalf of the Oregon Sub-Class (the "Sub-Class" for purposes of this subsection).

485.    Plaintiff and members of the Georgia Sub-Class are "persons" within the meaning of Or. Rev. Stat. § 646.605(4).

486.    Defendants are "persons" within the meaning of Or. Rev. Stat. § 646.605(4).

487.    The Oregon Unlawful Trade Practices Act provides that "[a] person engages in an unlawful practice if in the course of the person's business, vocation or occupation the person does any of the following:" (1) [r]epresents that real estate, goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or qualities that the real estate, goods or services do not have," or (2) "[e]ngages in any other unfair or deceptive conduct in trade or commerce." Or. Rev. Stat. § 646.608(e), (u).

488.    Kaiser Permanente's installation of the Third Party Wiretappers' code on its website, Patient Portal, and mobile applications allowing it to, without authorization and contrary to its representation in the Site Terms and Conditions, intercept, disclose, and transfer private health information belonging to Plaintiff and members of the Oregon Sub-Class to the Third Party Wiretappers is an unlawful trade practice under Or. Rev. Stat. § 646.607(1).

489.    Kaiser Permanente acted willfully in engaging in trade practices, knowing they are deceptive, by engaging in unauthorized interception, disclosure, and transfer of private health information in violation of its own Site Terms and Conditions.

490.    Pursuant to Or. Rev. Stat. § 646.638, Plaintiff and members of the Oregon Sub-Class are entitled to: (1) an injunction against Kaiser Permanente's deceptive trade practices; (2) reasonable attorneys' fees; (3) litigation costs reasonably incurred; (4) actual damages or statutory damages of $200, whichever is greater; (5) punitive damages; and (6) any other equitable relief the court considers necessary or proper.

**SEVENTEENTH CLAIM FOR RELIEF**
**Violation of the Virginia Computer Crimes Act**
**Va. Code Ann. § 18.2-152.1, *et seq.***
**On Behalf of the Virginia Sub-Class**
**(Against All Defendants)**

491.    Plaintiff Jane Doe IV ("Plaintiff" for purposes of this subsection) repeats and incorporates all other paragraphs as if fully set forth herein.

492.    Plaintiff brings this claim individually and on behalf of the Virginia Sub-Class (the "Sub-Class" for purposes of this subsection).

493.    The Virginia Computer Crimes Act (VCCA) proscribes a number of computer related offenses, including computer trespass. Va. Code Ann. § 18.2-152.4.

494.    The statute provides that "[i]t is unlawful for any person, with malicious intent, or through intentionally deceptive means and without authority, to:" (1) "[u]se a computer or computer network to make or cause to be made an unauthorized copy, in any form, including, but not limited to, any printed or electronic form of computer data, computer programs or computer software residing in, communicated by, or produced by a computer or computer network;" and (2) "[i]nstall or cause to be installed, or collect information through, computer software that records all or a majority of the keystrokes made on the computer of another." Va. Code Ann. § 18.2-152.4(A)(6), (8).

495.    "Computer" means "a device that accepts information in digital or similar form and manipulates it for a result based on a sequence of instructions." Va. Code Ann. § 18.2-152.2.

496.    "Computer network" means "two or more computers connected by a network." Va. Code Ann. § 18.2-152.2.

497.    "Computer data" means "any representation of information, knowledge, facts, concepts, or instructions which is being prepared or has been prepared and is intended to be processed,

is being processed, or has been processed in a computer or computer network." Va. Code Ann. § 18.2-152.2.

498.     Kaiser Permanente's installation of the Third Party Wiretappers' code on its website, Patient Portal, and mobile applications allowing it to, without authorization and contrary to its representation in the Site Terms and Conditions, intercept, disclose, and transfer private health information belonging to Plaintiff and members of the Virginia Sub-Class is use of a computer network to make or cause to be made an unauthorized copy of computer data in violation of Va. Code Ann. § 18.2-152.4(A)(6).

499.     Kaiser Permanente's installation of Third Party Wiretapper Quantum Metric's code on its website and Patient Portal, allowing it to capture and record all communications between Kaiser Permanente Members and the Kaiser Permanente Site and Patient Portal is collection of information through computer software that records all or a majority of the keystrokes made on the computer of another, in violation of Va. Code Ann. § 18.2-152.4(A)(8).

500.     Pursuant to Va. Code Ann. § 18.2-152.12, Plaintiff and Virginia Sub-Class Members have been injured by reason of computer trespass in violation of the VCCA, and are entitled to: (1) damages, in an amount to be proven at trial; and (2) the costs of suit.

**EIGHTEENTH CLAIM FOR RELIEF**
**Violation of the Virginia Insurance Information and Privacy Protection Act**
**Va. Code Ann. § 38.2-600,** *et seq.*
**On Behalf of the Virginia Sub-Class**
**(Against Kaiser Foundation Health Plan, Inc.)**

501.     Plaintiff Jane Doe IV ("Plaintiff" for purposes of this subsection) repeats and incorporates all other paragraphs as if fully set forth herein.

502.     Plaintiff brings this claim individually and on behalf of the Virginia Sub-Class (the "Sub-Class" for purposes of this subsection).

503.     The Virginia Insurance Information and Privacy Protection Act establishes "standards for the collection, use, and disclosure of information gathered in connection with insurance transactions by insurance institutions, agents or insurance-support organizations," and seeks to "maintain a balance between the need for information by those conducting the business of insurance

and the public's need for fairness in insurance information practices, including the need to minimize intrusiveness" and "limit the disclosure of information collected in connection with insurance transactions." Va. Code Ann. § 38.2-600.

504.    The Act provides that "an insurance institution . . . shall not disclose any medical-record information or privileged information about an individual collected or received in connection with an insurance transaction unless the disclosure is with the written authorization of the individual." Va. Code Ann. § 38.2-613(A).

505.    "Insurance institution" means "any corporation, association, partnership, reciprocal exchange, inter-insurer, Lloyd's type of organization, fraternal benefit society, or other person engaged in the business of insurance, including health maintenance organizations, and health, legal, dental, and optometric service plans." Va. Code Ann. § 38.2-602.

506.    "Insurance transaction" means "any transaction involving insurance primarily for personal, family, or household needs rather than business or professional needs that entails: 1. The determination of an individual's eligibility for an insurance coverage, benefit or payment; or 2. The servicing of an insurance application, policy, contract, or certificate." Va. Code Ann. § 38.2-602.

507.    Kaiser Foundation Health Plan, Inc. is an insurance institution under the Act.

508.    Given Kaiser Permanente's integrated care model, Plaintiff's and Virginia Sub-Class Members' communications with Kaiser Permanente through the Kaiser Permanente website, Patient Portal, and mobile applications constitute personal or privileged information collected or received in connection with an insurance transaction.

509.    Kaiser Permanente's installation of the Third Party Wiretappers' code on its website, Patient Portal, and mobile applications allowing it to, without authorization, disclose Plaintiffs' and Virginia Sub-Class members' personal or privileged information to the Third Party Wiretappers is a violation of Va. Code Ann. § 38.2-613(A).

510.    Pursuant to Va. Code Ann. § 38.2-617(B), Plaintiff and Virginia Sub-Class Members are entitled to: (1) damages sustained as a result of Kaiser Health Plan, Inc.'s violation of Section 38.2-613, in an amount to be determined at trial; and (2) reasonable attorneys' fees and other litigation costs reasonably incurred.

**NINTEENTH CLAIM FOR RELIEF**
**Violation of the Washington Consumer Protection Act**
**Wash. Rev. Code § 19.86,** *et seq***. (WCPA)**
**On Behalf of the Washington Sub-Class**
**(Against All Defendants)**

511.    Plaintiff Jane Doe ("Plaintiff" for purposes of this subsection) repeats and incorporates all other paragraphs as if fully set forth herein.

512.    Plaintiff brings this claim individually and on behalf of the Washington Sub-Class (the "Sub-Class" for purposes of this subsection).

513.    Plaintiff and members of the Washington Sub-Class are "persons" within the meaning of Wash. Rev. Code § 19.86.010(1).

514.    Defendants are "persons" within the meaning of Wash. Rev. Code § 19.86.010(1).

515.    The Washington Consumer Protection Act (WCPA) provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Wash. Rev. Code. § 19.86.020.

516.    "Trade" and "commerce" mean "the sale of assets or services, and any commerce directly or indirectly affecting the people of the state of Washington." Wash. Rev. Code § 19.86.010(2).

517.    Kaiser Permanente's installation of the Third Party Wiretappers' code on its website, Patient Portal, and mobile applications allowing it to, without authorization and contrary to its representation in the Site Terms and Conditions, intercept, disclose, and transfer private health information belonging to Plaintiff and members of the Washington Sub-Class to the Third Party Wiretappers is an unfair or deceptive act or practice under Wash. Rev. Code § 19.86.020.

518.    Kaiser Permanente acted willfully in engaging in trade practices, knowing they are deceptive, by engaging in unauthorized interception, disclosure, and transfer of private health information in violation of its own Site Terms and Conditions.

519.    Pursuant to Wash. Rev. Code § 19.86.090, Plaintiff and members of the Washington Sub-Class are persons who are injured in their business or property by a violation of § 19.86.020, and

are entitled to: (1) enjoin further violations by Kaiser Permanente; (2) reasonable attorneys' fees; (3) litigation costs reasonably incurred; (4) actual damages; and (5) treble damages.

**TWENTIETH CLAIM FOR RELIEF**
**Violation of the Washington Privacy Act**
**Wa. Rev. Code § 9.73, *et seq.* ("WPA")**
**On Behalf of the Washington Sub-Class**
**(Against All Defendants)**

520.    Plaintiff Jane Doe ("Plaintiff" for purposes of this subsection) repeats and incorporates all other paragraphs as if fully set forth herein.

521.    Plaintiff brings this claim individually and on behalf of the Washington Sub-Class (the "Sub-Class" for purposes of this subsection).

522.    Under Sections 9.73.030(1) and 9.73.030(1)(a) of the Washington Privacy Act ("WPA"), it is unlawful "for any individual, partnership, corporation, association, or the state of Washington, its agencies, and political subdivisions to intercept, or record any . . . [p]rivate communication transmitted by telephone, telegraph, radio, or other device between two or more individuals between points within or without the state by any device electronic or otherwise designed to record and/or transmit said communication regardless how such device is powered or actuated, without first obtaining the consent of all the participants in the communication."

523.    Under Section 9.73.030(1)(a) of the WPA, a defendant must show it had the consent of all parties to a communication.

524.    Kaiser Permanente and the Third Party Wiretappers are each a "person" for the purposes of the WPA.

525.    Kaiser Permanente treats patients in Washington and provides access to its website, Patient Portal, and mobile applications to patients in Washington, where Kaiser Permanente and the Third Party Wiretappers intercepted Plaintiff and Sub-Class Members' communications.

526.    The Third Party Wiretappers' code, Quantum Metric's recording code, Plaintiff's and Sub-Class Members' browsers and Plaintiff and Sub-Class Members' computing and mobile devices are all "device[s] electronic or otherwise designed to record and/or transmit said communication" used to engaged in the prohibited conduct at issue here. Wash. Rev. Code § 9.73.030(1)(a).

527.    Kaiser Permanente installed the Third Party Wiretappers' code to automatically and secretly spy on, and intercept Plaintiffs and Sub-Class Members' communications with Kaiser Permanente through the Kaiser Permanente website in real time.

528.    At all relevant times, Kaiser Permanente's disclosure of Plaintiff and Sub-Class Members' internet communications to Third Party Wiretappers was without Plaintiff and Sub-Class Members' authorization or consent.

529.    By installing the Third Party Wiretappers' code on its website and mobile applications, Kaiser Permanente intentionally caused Plaintiff and Sub-Class Members' communications to be intercepted, recorded, stored, and transmitted to the Third Party Wiretappers.

530.    At all relevant times, the Third Party Wiretappers intentionally tapped or made unauthorized connections with, the lines of internet communication between Plaintiff and Sub-Class Members and Kaiser Permanente's Site and mobile applications without the consent of all parties to the communication.

531.    The Third Party Wiretappers willfully read or attempt to read or learn the contents or meaning of Plaintiff and Sub-Class Members' communications to Kaiser Permanente's Site and mobile applications while the communications are in transit or passing over any wire, line, or cable, or were being received at any place within California when it intercepted Plaintiffs and Sub-Class Members' communications with Kaiser Permanente's Site and mobile applications in real time.

532.    By embedding the Third Party Wiretappers' technology on its website, Kaiser Permanente aided, agreed with, employed, and conspired with Third Party Wiretappers to carry out the wrongful conduct alleged herein in violation of Wash. Rev. Code §§ 9.73.030 and 9.73.060.

533.    Plaintiff and the Sub-Class Members seek statutory damages in accordance with Wash. Rev. Code § 9.73.060, which provides for damages sustained by Plaintiff and the Sub-Class in an amount to be proven at trial, as well as injunctive or other equitable relief.

**TWENTY-FIRST CLAIM FOR RELIEF**
**Violation of the Washington Health Care Information Act**
**Wash. Rev. Code § 70.02.005, *et seq*. ("HCIA")**
**On Behalf of the Washington Sub-Class**
**(Against All Defendants)**

534.    Plaintiff Jane Doe ("Plaintiff" for purposes of this subsection) repeats and incorporates all other paragraphs as if fully set forth herein.

535.    Plaintiff brings this claim individually and on behalf of the Washington Sub-Class (the "Sub-Class" for purposes of this subsection).

536.    The Washington Health Care Information Act, Wash. Rev. Code §§ 70.2.005, *et seq*., states that "a health care provider, an individual who assists a health care provider in the delivery of health care, or an agent and employee of a health care provider may not disclose health care information about a patient to any other person without the patient's written authorization."

537.    The Act defines "health care information" to mean "any information, whether oral or recorded in any form or medium, that identifies or can readily be associated with the identity of a patient and directly relates to the patient's health care . . . ." Wash. Rev. Code § 70.02.010(17).

538.    Kaiser Permanente is a health care facility as defined by Wash. Rev. Code § 70.010(16).

539.    By deploying code on its website and mobile applications to capture and transmit its patients' personally identifiable and health information to third parties, Kaiser Permanente discloses Plaintiff and Sub-Class Members' health care information without their written authorization.

540.    As a direct and proximate cause of Kaiser Permanente's actions, Plaintiff and Sub-Class Members were damaged in that:

541.    Sensitive, confidential, and/or protected information that Plaintiff and Sub-Class Members intended to remain private is no more;

542.    Kaiser Permanente took something of value from Plaintiffs and Sub-Class Members and derived benefit therefrom without Plaintiff and Sub-Class Members' knowledge or informed consent and without sharing the benefit of such value;

543.    Plaintiff and Sub-Class Members did not get the full value of the medical services for which they paid, which included Kaiser Permanente's duty to maintain confidentiality of patient data and communications; and

544.    Kaiser Permanente's actions diminished the value of Plaintiff and Sub-Class Members' personally identifiable information, patient data and communications.

545.    Plaintiff and Sub-Class Members seek an order requiring Kaiser Permanente to comply with the Act, actual damages, and attorney's fees and costs.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the proposed Classes, respectfully requests that the Court enter an order:

A.    Certifying this case as a class action on behalf of the Classes defined above, appointing Plaintiffs as the representatives of the Classes, and appointing Plaintiffs' counsel as the Class Counsel for the Classes;

B.    Declaring that Defendants' conduct, as set forth above, violates the laws cited herein;

C.    Enjoining Defendants' unlawful conduct;

D.    Awarding damages, including nominal, actual, statutory, and punitive damages where applicable, to Plaintiffs and the Classes in an amount to be determined at trial;

E.    Awarding Plaintiffs and the Classes their reasonable litigation expenses, costs and attorneys' fees;

F.    Awarding Plaintiffs and the Classes pre- and post-judgment interest, to the extent allowable;

G.    Awarding such other further injunctive and declaratory relief as is necessary to protect the interests of Plaintiffs and the Classes; and

H.    Awarding such other and further relief as the Court deems reasonable and just.

## IX.    DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

DATED: September 15, 2023

Respectfully submitted,

**KESSLER TOPAZ**
   **MELTZER & CHECK, LLP**

*/s/ Melissa L. Yeates*
Joseph H. Meltzer (appearance *pro hac vice*)
jmeltzer@ktmc.com
Melissa L. Yeates (appearance *pro hac vice*)
myeates@ktmc.com
Tyler S. Graden (appearance *pro hac vice*)
tgraden@ktmc.com
Jordan E. Jacobson (Bar No. 302543)
jjacobson@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

-and-

Jennifer L. Joost (Bar No. 296164)
jjoost@ktmc.com
**KESSLER TOPAZ**
   **MELTZER & CHECK, LLP**
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001
-and-

James E. Cecchi (appearance *pro hac vice*)
jcecchi@carellabyrne.com
Michael A. Innes  (*pro hac vice* forthcoming)
minnes@carellabyrne.com
Kevin G. Cooper (appearance *pro hac vice*)
kcooper@carellabyrne.com
**CARELLA, BYRNE, CECCHI,**
**OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973)-994-1700
Facsimile: (973)-994-1744

-and-

Zachary Jacobs (*pro hac vice* forthcoming)
zjacobs@carellabyrne.com
**CARELLA, BYRNE, CECCHI,**
**OLSTEIN, BRODY & AGNELLO, P.C.**
222 S Riverside Plaza
Chicago, Illinois 06606

*Counsel for Plaintiffs and the proposed Classes*

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO: 4:23-cv-02865-EMC