**KESSLER TOPAZ MELTZER & CHECK, LLP**
Jennifer L. Joost (Bar No. 296164)
jjoost@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

-and-

**KESSLER TOPAZ MELTZER & CHECK, LLP**
Joseph H. Meltzer
jmeltzer@ktmc.com
Melissa L. Yeates
myeates@ktmc.com
Tyler S. Graden
tgraden@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**CARELLA BYRNE CECCHI BRODY & AGNELLO, PC**
James E. Cecchi
jcecchi@carellabyrne.com
Michael A. Innes
minnes@carellabyrne.com
Kevin G. Cooper
kcooper@carellabyrne.com
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744

*Counsel for Plaintiffs and the proposed Classes*
[*Additional Attorneys Listed on Signature Page*]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

JOHN DOE, *et al.*, Individually and on behalf of all others similarly situated,

Plaintiffs,

v.

KAISER FOUNDATION HEALTH PLAN, INC., KAISER FOUNDATION HOSPITALS, and THE PERMANENTE MEDICAL GROUP, INC.,

Defendants.

Case No. 4:23-cv-2865-EMC

CLASS ACTION

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**

Date: November 16, 2023
Time: 1:30 P.M.
Crtrm: 5, 17th Floor
Judge: Hon. Edward M. Chen

**TO THE COURT, ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on November 16, 2023, at 1:30 P.M., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Edward M. Chen of the United States District Court of the Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, 17th Floor, Courtroom 5, or via Zoom platform as circumstances require, Plaintiffs John Doe, John Doe II, Jane Doe, Jane Doe II, Jane Doe III, Jane Doe IV, and Jane Doe V ("Plaintiffs"), will and hereby move the Court for a preliminary injunction. At the time and place set forth above, Plaintiffs will request that the Court, pursuant to Rule 65 of the Federal Rules of Civil Procedure and Civil Local Rules 65-2 and 7-2, issue an order for a preliminary injunction against Defendants Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, and The Permanente Medical Group, Inc. (collectively "Kaiser" or "Defendants"):

1. Prohibiting Kaiser from permitting the Third Party Wiretappers to intrude upon, read, intercept, and/or use Plaintiffs' patient status, identifying information, medical information, and/or communications with Kaiser and providers shared through the Site and Apps;[1]

2. Ordering Kaiser to remove the Third Party Wiretappers' source code embedded in the Site and Apps that allows the Third Party Wiretappers to intrude upon, read, intercept, and/or use personal identifying and medical information and communications; and

[1] Kaiser Permanente operates a website located at https://healthy.kaiserpermanente.org/ (the "Site"). It also offers mobile applications. Kaiser Plan Members in California, Colorado, the District of Columbia, Georgia, Hawaii, Maryland, Oregon, Virginia, and Southwest Washington can use the "Kaiser Permanente App," offered through the Apple App Store and the Google Play Store. *See Kaiser Permanente*, Apple (last visited Oct. 3, 2023), https://apps.apple.com/us/app/kaiser-permanente/id493390354; *Kaiser Permanente*, Google (last visited Oct. 3, 2023), https://play.google.com/store/apps/details ?id=org.kp.m. Kaiser Plan Members in Washington outside of Southwest Washington can use the "Kaiser Permanente Washington App," also offered through the Apple App Store and the Google Play Store (together with the Kaiser Permanente App, the "Apps"). *See Kaiser Permanente Washington*, Apple (last visited Oct. 3, 2023), https://apps.apple.com/us/app/ kaiser-permanente-washington/id445899971; *Kaiser Permanente Washington*, Google (last visited Oct. 3, 2023), https://play.google.com/store/apps/details?id=org.ghc.android.

3. Enjoining Kaiser from altering, destroying or disposing of any evidence, in any form, relating to this litigation.

Kaiser has allowed and continues to allow the Third Party Wiretappers to intrude upon, read, intercept, and/or use medical information and confidential patient communications for the purpose of committing criminal and tortious acts, including accessing and using that information, without consent, in violation of HIPAA. Every day that this unlawful conduct continues, more private, medical information is intercepted. Without this Court's immediate intervention, Kaiser's unlawful conduct will continue to harm Plaintiffs and the public.

Plaintiffs and the public will suffer irreparable harm if Kaiser continues to allow Third Party Wiretappers to intrude upon, read, intercept, and/or use Plaintiffs' and Users'[2] medical information and communications for the purpose of violating civil and criminal laws, including HIPAA. The balance of equities strongly favors Plaintiffs because the Third Party Wiretappers' code embedded in its Site and Apps (which allows the Third Party Wiretappers to intrude upon, intercept and collect personal and medical information shared by Plaintiffs and Users) is not necessary in order for Kaiser to perform its core function as a healthcare provider. By contrast, Plaintiffs and Users have a strong interest in being able to privately access their medical records and communicate with their providers without Third Party Wiretappers accessing those records and communications. The requested injunctive relief serves the public interest because there is a longstanding, recognized protection of privacy in medical information and communications, which Kaiser is violating.

Additionally, Kaiser objects to complying with its duty to preserve relevant evidence relating to this litigation. Accordingly, in order to prevent the irreparable harm of preventing Plaintiffs from obtaining evidence which may support their claims in this litigation, Plaintiffs also seek an injunction preventing Kaiser from altering, destroying or disposing of relevant evidence as it must.

---

[2] Users of the Site and Apps are referred to as "Users."

This Motion is supported by this Notice of Motion, the Memorandum of Points and Authorities in Support thereof, the Declarations of Melissa L. Yeates and Ross A. Malaga filed herewith, all records and papers on file in this action, and such other materials and argument as may be presented before or at the hearing.

DATED: October 4, 2023

**KESSLER TOPAZ MELTZER & CHECK, LLP**

By: *Melissa L. Yeates*
Joseph H. Meltzer (*pro hac vice*)
Melissa L. Yeates (*pro hac vice*)
Tyler S. Graden (*pro hac vice*)
Jordan E. Jacobson (Bar No. 302543)

**KESSLER TOPAZ MELTZER & CHECK, LLP**
Jennifer L. Joost (Bar No. 296164)

**CARELLA BYRNE CECCHI BRODY & AGNELLO, PC**
James E. Cecchi (*pro hac vice*)
Michael A. Innes (*pro hac forthcoming*)
Kevin G. Cooper (*pro hac vice*)
Zachary A. Jacobs (*pro hac vice*)
Jordan M. Steele (*pro hac forthcoming*)

*Attorneys for Plaintiffs and the proposed Classes*

## TABLE OF CONTENTS


I. STATEMENT OF ISSUES TO BE DECIDED .......... 2
II. PRELIMINARY STATEMENT .......... 2
III. STATEMENT OF FACTS .......... 3
A. How the Technology Works .......... 4
B. Allegations Relating to Consent .......... 5
IV. LEGAL STANDARD .......... 6
V. ARGUMENT .......... 6
A. The Court Should Issue a Mandatory Injunction Preventing Further Disclosure of Plaintiffs' Protected Information .......... 6
1. Plaintiffs Will Likely Succeed on the Merits of their Claims .......... 8
2. Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief .......... 20
3. The Balance of Equities Tips in Plaintiffs' Favor .......... 21
4. The Injunctive Relief Sought Is in the Public Interest .......... 24
B. A Prohibitory Injunction Preventing Destruction of Evidence Is Necessary .......... 25
VI. CONCLUSION .......... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apex.AI, Inc. v. Langmead*,
2023 WL 3391962 (N.D. Cal. May 10, 2023) ........ 7, 22, 25

*Apple Inc. v. Samsung Elecs. Co.*,
888 F. Supp. 2d 976 (N.D. Cal. 2012) ........ 25

*Beyond Blond Prods., LLC v. Heldman*,
479 F. Supp. 3d 874 (C.D. Cal. 2020), *aff'd sub nom*. *Beyond Blond Prods., LLC v. ComedyMX, LLC*, 2022 WL 1101756 (9th Cir. Apr. 13, 2022) ........ 7

*Bloom v. City of San Diego*,
2018 WL 9539239 (S.D. Cal. Aug. 21, 2018) ........ 7

*Boardman v. Pac. Seafood Grp.*,
822 F.3d 1011 (9th Cir. 2016) ........ 20

*Brooks v. Thomson Reuters Corp.*,
2021 WL 3621837 (N.D. Cal. Aug. 16, 2021) (Chen, J.) ........ 21

*Brown v. Google LLC*,
2023 WL 5029899 (N.D. Cal. Aug. 7, 2023) ........ 13

*Brown v. Google LLC*,
525 F. Supp. 3d 1049 (N.D. Cal. 2021) ........ 14, 16, 20

*Campbell v. Facebook, Inc.*,
951 F.3d 1106 (9th Cir. 2020) ........ 23, 24

*In re Carrier IQ, Inc.*,
78 F. Supp. 3d 1051 (N.D. Cal. 2015) ........ 14, 15

*Doe I v. Sutter Health*,
2021 Cal. Super. LEXIS 105128 (Cal. Super. Ct. Nov. 16, 2021) ........ 18

*Doe v. Medstar*,
Case No. 24-C-20-000591 (Baltimore City, Md.) ........ 16

*Doe v. Mercy Health*,
Case No. A 2002633 (Hamilton Cnty., Ohio) ........ 16

*Doe v. Meta Platforms, Inc.*,
2023 WL 5837443 (N.D. Cal. Sept. 7, 2023) .......... 14, 15

*Doe v. Partners*,
Case No. 1984-CV-01651 (Suffolk Cnty., Mass.) .......... 16

*Doe v. Regents of Univ. of Cal.*,
2023 WL 3316766 (N.D. Cal. May 8, 2023) .......... 20

*Doe v. Sutter Health*,
Case No. 34-2019-00258072-CU-BT-GDS (Sacramento Cnty., Cal.) (Mot. J. Pleadings Order, June 9, 2022) .......... 16, 18

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) .......... *passim*

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) .......... 6

*In re Google RTB Consumer Priv. Litig.*,
606 F. Supp. 3d 935 (N.D. Cal. 2022) .......... *passim*

*Info Up, LLC v. Success for Life, Inc.*,
2020 WL 7414746 (C.D. Cal. Nov. 20, 2020) .......... 7

*Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc.*,
725 F.3d 940 (9th Cir. 2013) .......... 24

*L.A. Unified Sch. Dist. v. S&W Atlas Iron & Metal Co.*,
506 F. Supp. 3d 1018 (C.D. Cal. 2020) .......... 23, 24

*In re Meta Pixel Healthcare Litig.*,
2022 WL 17869218 (N.D. Cal. Dec. 22, 2022) .......... 9, 19, 21, 22

*Meyer v. Portfolio Recovery Assocs., LLC*,
707 F.3d 1036 (9th Cir. 2012) .......... 21

*Noel v. Hall*,
568 F.3d 743 (9th Cir. 2009) .......... 10

*Norman-Bloodsaw v. Lawrence Berkeley Lab.*,
135 F.3d 1260 (9th Cir. 1998) .......... 9, 24

*In re Pharmatrak, Inc.*,
329 F.3d 9 (1st Cir. 2003) .......... 13, 14

*Revitch v. New Moosejaw, LLC*,
2019 WL 5485330 (N.D. Cal. Oct. 23, 2019) .... 18, 20

*Sussman v. ABC, Inc.*,
186 F.3d 1200 (9th Cir. 1999) .... 15, 16

*Tsao v. Desert Palace, Inc.*,
698 F.3d 1128 (9th Cir. 2012) .... 9

*United States v. Smith*,
155 F.3d 1051 (9th Cir. 1998) .... 10

*United States v. Szymuszkiewicz*,
622 F.3d 701 (7th Cir. 2010), *as amended* (Nov. 29, 2010) .... 14

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008) .... 6, 20, 21, 25

*Youngevity Int'l, Corp. v. Smith*,
224 F. Supp. 3d 1022 (S.D. Cal. 2016), *modified on reconsideration*, 2016 WL 7626585 (S.D. Cal. Dec. 9, 2016) .... 7, 23

**Statutes**

18 U.S.C. § 2510 .... *passim*

18 U.S.C. §§ 2511 .... 9, 10, 15

42 U.S.C. § 1320d-6 .... 8, 15

43 U.S.C. § 1320(d)(6) .... 10

Cal. Civ. Code § 56.10 .... 24

Cal. Civ. Code § 1798.91 .... 20

Cal. Penal Code § 631(a) .... 17, 18

Ga. Code Ann. § 16-9-93 .... 24

Md. Code Ann., Cts. & Jud. Proc. § 10-401, *et seq.* .... 24

Cal. Penal Code § 631 .... 2, 18, 24

Wa. Rev. Code § 9.73, *et seq.* .... 24

Wash. Rev. Code § 70.02.005, *et seq.* .... 24

**Other Authorities**

45 C.F.R. § 164.508 .... 6, 19

45 C.F.R. § 164.514(b)(2)(i) .... 15

45 CFR § 160.103 .... 8

78 Fed. Reg. 5566, 5598 (Jan. 25, 2013) .... 8

Cal. Const. Art. 1, § 1 .... 24

## I. STATEMENT OF ISSUES TO BE DECIDED

Plaintiffs respectfully request the Court decide the following issues such that an order granting Plaintiffs' Motion for Preliminary Injunction may issue:

1. Whether Plaintiffs have a likelihood of success in demonstrating violations of the Electronic Communications Privacy Act, 18 U.S.C. § 2511 (the "ECPA") (Count I), violations of the California Invasion of Privacy Act, Cal. Penal Code § 631 ("CIPA") (Count II), and intrusion upon seclusion and violations of Article I, Section 1 of the California Constitution (Counts III & IV);
2. Whether Plaintiffs will likely suffer irreparable harm absent injunctive relief;
3. Whether the balance of equities tips in Plaintiffs' favor;
4. Whether an injunction is in the public interest; and
5. Whether Kaiser should be enjoined from destroying or disposing of relevant evidence.

## II. PRELIMINARY STATEMENT

In violation of federal and state laws, Kaiser[3] has embedded code in Kaiser's Website, including the patient portal, and Mobile Applications[4] that allows social media and other companies, without patients' consent, to intrude upon, read, intercept, and/or use patient medical information and records and the contents of patients' communications with Kaiser and providers. Indeed, even after the original Complaint was filed in June, Kaiser continues to allow third-party companies, namely Quantum Metric, Twitter,[5] Adobe, Bing, Google, and Dynatrace (collectively,

---

[3] "Kaiser" or "Defendants" refers to Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, and The Permanente Medical Group, Inc. collectively. "Plaintiffs" refers to John Doe, John Doe II, Jane Doe, Jane Doe II, Jane Doe III, Jane Doe IV, and Jane Doe V. Unless otherwise noted, all citations and quotations are omitted and all emphasis are added.

[4] Kaiser Permanente operates a website located at https://healthy.kaiserpermanente.org/ (the "Site"). It also offers mobile applications. Kaiser Plan Members in California, Colorado, the District of Columbia, Georgia, Hawaii, Maryland, Oregon, Virginia, and Southwest Washington can use the "Kaiser Permanente App," offered through the Apple App Store and the Google Play Store. Kaiser Plan Members in Washington outside of Southwest Washington can use the "Kaiser Permanente Washington App," also offered through the Apple App Store and the Google Play Store (together with the Kaiser Permanente App, the "Apps").

[5] Twitter began rebranding itself as X.com in late July 2023. *See* Ryan Mac & Tiffany Hsu, *From Twitter to X: Elon Musk Begins Erasing an Iconic Internet Brand*, N.Y. Times (Jul. 24, 2023),

"Third Party Wiretappers") to intrude upon, read, intercept, and/or use sensitive, protected personal and medical information and contents of communications, including, *inter alia*, Plaintiffs' and users of the Site and Apps' ("Users") patient status, health conditions, allergies, medications, vaccinations, medical test information and other communications with Kaiser and providers and choices made and information shared on the Site and Apps.

Plaintiffs are likely to prevail on the merits of their wiretapping and privacy claims—and the injunctive relief sought is necessary—because three central facts are indisputable: (1) Kaiser permits the Third Party Wiretappers to intrude upon, read, intercept, and/or use Users' patient status, identifying and medical information and communications through embedded source code on the Site and Apps; (2) Users have not consented to the intrusion, reading, interception, and/or use of their private and sensitive personal and medical information and communications by Third Party Wiretappers; and (3) the Third Party Wiretappers' interception is for the purpose of committing criminal and/or tortious acts, including violating federal and state laws, including HIPAA. Plaintiffs and Users are suffering irreparable harm as a result of Kaiser's ongoing, unlawful conduct and privacy violations such that Kaiser must be enjoined in order to protect Plaintiffs and the public. Additionally, Kaiser objects to the preservation of relevant materials, purportedly due to cost.

Accordingly, Plaintiffs seek an order (i) enjoining Kaiser from permitting the Third Party Wiretappers to intrude upon, read, intercept, and/or use Plaintiffs' patient status, identifying information, medical information, and/or communications with Kaiser and providers shared through the Site and Apps; (ii) directing Kaiser to remove the Third Party Wiretappers' source code embedded in the Site and Apps that allows the Third Party Wiretappers to intrude upon, read, intercept, and/or use personal identifying and medical information and communications; and (iii) preventing Kaiser from altering, destroying, or disposing of relevant evidence.

## III. STATEMENT OF FACTS

---

https://www.nytimes.com/2023/07/24/technology/twitter-x-elon-musk.html. As of the time of filing this brief, the change was ongoing.

### A. How the Technology Works

Users visit the Site and Apps to schedule appointments, access medical test results, learn about treatment options, order and review prescriptions, exchange messages and healthcare information with providers, participate in online health assessments, pay bills, obtain insurance information, and research specialists, among other sensitive activities. Unbeknownst to them and against their reasonable expectations, Kaiser embedded code throughout the Site and Apps that allows Third Party Wiretappers to intrude upon, read, intercept, and/or use the content of this information and communications while in transit. ¶¶4, 5, 75-212.[6] For example, Kaiser has placed Quantum Metric's "Session Replay" code on throughout the Site—including within the purportedly "secure" Portal—that intercepts and allows Quantum Metric to record the contents of personal and medical communications between Users and Kaiser. ¶¶76-78. This software captures internet communications in real-time while those communications are in transit, and continues to do so as Users move throughout the Site. ¶¶4, 77, 79-84.

Session replay technologies work by using "embedded snippets of code . . . [that] watch and record a visitor's every move on a website, in real time."[7] ¶79. Quantum Metric's use of "Session Replay's" capabilities is indisputable, as Quantum Metric itself explains:

> At its core, session replay is technology that allows you to watch an end user's session as they experienced it, similar to how you watch a video. You can pause, rewind, and fast-forward the session (just like a YouTube video) to watch how a user interacts with a website or mobile app.

¶78. As explained in more technical detail in the attached Declaration of Ross Malaga ("Malaga Decl."), the moment a User begins loading Kaiser's Site, Quantum Metric intercepts all of the content viewed and communicated, and Users' interactions with the Site, similar to an individual peering over a User's shoulder and listening in on the patient's conversations with their medical provider. Malaga Decl. ¶¶ 44-47. On the Apps, Kaiser has disabled Quantum Metric's Session Replay function, but continues to allow Quantum Metric to intercept patient information and communications. *Id.* ¶50. And, because Quantum Metric's POST requests on the Apps contain an

---

[6] All references to ¶ herein refer to paragraphs in Plaintiffs' Amended Complaint (ECF No. 44).
[7] Tomas Foltyn, *What's the Deal with Session-Replay Scripts?*, WELIVESECURITY (Apr. 20, 2018, 1:40 pm), https://www.welivesecurity.com/2018/04/20/whats-deal-session-replay-scripts/.

Adobe Marketing ID, Users can be tracked across platforms. *Id*; Am. Compl. ¶206.

Similarly, Kaiser permits Adobe to intercept Users' personal and sensitive identifying and medical information and private and confidential communications through code connected with the Adobe Experience Cloud a/k/a Adobe Marketing Cloud service embedded on the Site, the Portal, and the Kaiser Permanente App. ¶¶107, 112, 200-01. The code Kaiser embedded allows the Adobe Experience Cloud to collect an array of information about Users, including activity and searches on the Site, information about the device and browser, and IP and location information. ¶110.

Likewise, code Kaiser embedded on its Site's Home Page, Portal Login Page, and other pages on the Site, sends confidential and protected medical information to third parties such as Twitter, Bing, Google, and Dynatrace. *See* Malaga Decl.; Am. Compl. ¶¶134-94. The reason for these intrusions is as simple as it is impermissible: to violate state law and HIPAA and monetize Users' personal and medical information and communications. ¶¶68, 108, 109, 140-43.

***None*** of the foregoing is disclosed to Users, and no reasonable consumer would assume that the entity they entrust with medical care would allow third parties to intrude on their private personal communications and medical information for financial gain. ¶¶12, 71-73. Kaiser has been and continues to deliberately allow Third Party Wiretappers to intrude upon, read, intercept, and/or use Users' personal and medical information every time they use the Site or Apps for medical care and thus an injunction is necessary to protect Plaintiffs and the public from ongoing and future wiretapping and privacy violations. ¶74.

### B. Allegations Relating to Consent

Kaiser does not disclose this conduct and does not obtain the consent of Users to allow Third Party Wiretappers to intrude upon, read, intercept, and/or use their medical information or the contents of their communications with their healthcare providers. ¶213-20, 228. To the contrary, Kaiser states in its Privacy Policy, that it *may* use "cookies" or similar technology but "[t]he cookie consists of a unique identifier that does not contain information about your health history" and any information Kaiser obtains "helps [Kaiser] tailor our Site to be more helpful and

efficient[.]" ¶¶68-69, 214, 334-35. Kaiser does not disclose the presence and application of other technologies, such as Session Replay and other code embedded in the Site and Apps and used by Third Party Wiretappers, which redirects Users' sensitive, personal communications to external servers as they navigate the purportedly "secure" Portal and Apps, and which cannot be easily disabled by Users, if it can be disabled at all. ¶¶99, 219. Nowhere does Kaiser disclose that personal and medical information and communications may be intercepted and monetized, in violation of HIPAA and other federal and state laws. ¶¶215-20, 342.

Moreover, the type of medical information at issue here is not subject to consent on notice. HHS guidance is unequivocal that healthcare providers, such as Kaiser, may not share patient data for the purposes of marketing without patients' explicit authorization.[8] Indeed, HIPAA-protected information requires specific authorizations when used in connection with marketing activities, requiring disclosure of and consent to what information may be shared, as well as by whom, to whom, for what purpose, and for how long, along with the dated signature of the individual whose data is being shared. 45 C.F.R. § 164.508. *Id.* No such HIPAA-complaint authorizations have been sought or provided here. ¶193.

## IV. LEGAL STANDARD

Injunctive relief is appropriate where the plaintiff establishes: (1) it is likely to succeed on the merits of its claims; (2) it will likely suffer irreparable harm in the absence of injunctive relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). If the relief requested is a mandatory injunction requiring a party to take "affirmative action," the "facts and law" must "clearly favor the moving party." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015).

## V. ARGUMENT

### A. The Court Should Issue a Mandatory Injunction Preventing Further Disclosure of Plaintiffs' Protected Information

Mandatory injunctive relief is appropriate because all of the *Winter* factors clearly weigh

[8] Office for Civil Rights (Rev. Apr. 3, 2003), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf; ¶¶241-43.

in favor of Plaintiffs. Plaintiffs are likely to succeed on their privacy and wiretapping claims, the balance of equities favor Plaintiffs, and the public interest favors an injunction where Kaiser is continuing to violate privacy rights. *See Youngevity Int'l, Corp. v. Smith*, 224 F. Supp. 3d 1022, 1028 (S.D. Cal. 2016), *modified on reconsideration*, 2016 WL 7626585 (S.D. Cal. Dec. 9, 2016) (ordering Defendants to cease operation of websites and 1-800 number).

A mandatory injunction is required to protect Plaintiffs and the public here because Kaiser continues to allow Third Party Wiretappers to intrude upon, read, intercept, and/or use Users' private and sensitive medical information and communications from the Site and Apps. *See Apex.AI, Inc. v. Langmead*, 2023 WL 3391962, at *5 (N.D. Cal. May 10, 2023) (granting mandatory injunctive relief requiring defendants to return trade secrets, "confidential information, property, and data."); *Bloom v. City of San Diego*, 2018 WL 9539239, at *2 (S.D. Cal. Aug. 21, 2018) (granting mandatory injunction covering Class). This conduct is ongoing and irreparably harms Plaintiffs and Users, who are losing their ability to protect and control their private medical information and communications on a daily basis. *See, e.g.*, *Apex.AI, Inc.*, 2023 WL 3391962, at *4 ("[C]ourts in this district have presumed that Plaintiff will suffer irreparable harm if its proprietary information is misappropriated."). While Users need to be able to access their medical information and communicate with providers in a confidential manner, Kaiser has no competing interest in allowing interception of this information by Third Party Wiretappers. Indeed, this conduct is wholly antagonistic to Kaiser's obligation to maintain the confidentiality of its members' healthcare information and an injunction would not prevent Kaiser from performing its core business operations of providing care. Further, it is in the public's interest to protect the privacy rights of Users who visit the Site and Apps, including Plaintiffs.

Accordingly, the facts and the law here clearly favor Plaintiffs and the injunction should be granted. *See Beyond Blond Prods., LLC v. Heldman*, 479 F. Supp. 3d 874, 890 (C.D. Cal. 2020), *aff'd sub nom. Beyond Blond Prods., LLC v. ComedyMX, LLC*, 2022 WL 1101756 (9th Cir. Apr. 13, 2022) (ordering mandatory injunction compelling defendants to withdraw intellectual rights notices or takedown notices); *Info Up, LLC v. Success for Life, Inc.*, 2020 WL

7414746, at *6 (C.D. Cal. Nov. 20, 2020) (issuing mandatory injunction enjoining defendant from using certain website domains and trade dress).

### 1. Plaintiffs Will Likely Succeed on the Merits of their Claims

#### a) Plaintiffs and Users Did Not Consent or Authorize Kaiser's Unlawful Conduct

Patient status, medical information, and healthcare communications are specifically protected by federal law. Under HIPAA, Kaiser may not permit Third Party Wiretappers to "obtain[] individually identifiable health information relating to an individual" without ***express*** authorization. 42 U.S.C. § 1320d-6. Federal law is clear that patient status alone is protected information. ¶¶241-43; *see also Joint Letter Re: Use of Online Tracking Technologies*, HHS & FTC (Jul. 20, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf ("Recent research, news reports, FTC enforcement actions, and an OCR bulletin have highlighted risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities . . . Impermissible disclosures of an individual's personal health information to third parties may result in a wide range of harms to an individual or others. Such disclosures can reveal sensitive information including . . . where an individual seeks medical treatment."). In addition, "[i]f [patient identifiers are] listed with [a] health condition, health care provision or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI ["Protected Health Information"]."[9] Data that identifies a particular user as a patient of or seeking treatment by Kaiser, or reveals an interest in a particular treatment or service of Kaiser while on its Site or Apps is HIPAA protected. *See* 45 CFR § 160.103.[10] Thus, by knowingly

[9] *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule* at 5, HHS (Nov. 26,2012),https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

[10] *See also Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, HHS (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html; 78 Fed. Reg. 5566, 5598 (Jan. 25, 2013) ("[P]rotected health information created, received, maintained, or transmitted . . . may not necessarily include diagnosis-specific information, such as information about the treatment of an individual, and may be limited to demographic or other information not indicative of the type of health care services provided to an

allowing the intrusion upon, reading, interception and/or use of patient information and communications from the Site and Apps, including, *inter alia*, information relating to Portal logins and logouts, and communications with providers, Kaiser discloses to Third Party Wiretappers that Users are patients of Kaiser as well as indicia of certain treatments sought or received.

Kaiser "bears the burden of proof on consent." *In re Google RTB Consumer Priv. Litig.*, 606 F. Supp. 3d 935, 949 (N.D. Cal. 2022) "Consent 'can be explicit or implied, but any consent must be actual." *Id*. To be actual, "the disclosures must 'explicitly notify' users of the practice at issue" (*id*.) and "must have only one plausible interpretation." *In re Meta Pixel Healthcare Litig*., 2022 WL 17869218, at *10 (N.D. Cal. Dec. 22, 2022) ("*Meta Pixel*"). As explained by the Ninth Circuit, "[t]o be effective, consent must be . . . to the particular conduct, or substantially the same conduct." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1149 (9th Cir. 2012).

Here, there has been no express consent by Plaintiffs. And no reasonable User, including Plaintiffs, would believe they had consented to Kaiser permitting Third Party Wiretappers to intrude upon, read, intercept, and/or use their patient status and medical information and communications. *Meta Pixel* at *9-10 (finding "it is unlikely that [defendant] will be able to establish that plaintiffs consented to the . . . collection" of "health data obtained from . . . users' interactions with their medical providers' websites."). *See also Norman-Bloodsaw v. Lawrence Berkeley Lab.*, 135 F.3d 1260, 1264-65 (9th Cir. 1998) (finding despite plaintiffs expressly consenting to periodic health examinations about certain diseases, they had not consented to test blood samples for those diseases).

**b) Plaintiffs Are Likely to Prevail on Their ECPA Claim**

A violation of the ECPA occurs where any person "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral or electronic communication." 18 U.S.C. §§ 2511(1)(a). Plaintiffs are likely to prevail on their ECPA

individual. If the information is tied to a covered entity, then it is protected health information by definition since it is indicative that the individual received health care services or benefits from the covered entity, and therefore it must be protected.").

claim because Kaiser intentionally intercepted and/or procured the Third Party Wiretappers to intercept or endeavor to intercept Users' electronic communications on the Site and Apps. Specifically, when Users communicate with Kaiser or providers, Kaiser, through the source code it intentionally embedded and runs on the Site and Apps, contemporaneously redirects the contents of Users' electronic communications while they are in transmission to the Third Party Wiretappers, without authorization. This violates the ECPA.

While the ECPA provides an exception to liability where one "party" to the communication has consented to the interception, or where the interception is made by a "party" to the communication, this exception does not apply where the interceptor acts "for the purpose of committing any criminal or tortious act." 18 U.S.C. § 2511(2)(d). Accordingly, because the purpose of the interception was tortious and criminal (i.e., to hand over confidential and HIPAA-protected information to Third Party Wiretappers without Users' authorization),[11] this exception does not apply and the law and facts clearly favor enjoining this conduct.

**(1) Interception**

"Intercept" is defined under the Wiretap Act as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(f). "Acquisition" is the "act of acquiring, or coming into possession of." *United States v. Smith*, 155 F.3d 1051, 1055 n.7 (9th Cir. 1998). "Such acquisition occurs 'when the contents of a wire communication are captured or redirected in any way.'" *Noel v. Hall*, 568 F.3d 743, 749 (9th Cir. 2009).

Here, there is no question that the Third Party Wiretappers "intercepted" Plaintiffs' communications. As described in the Malaga Declaration, when Site and Apps Users communicate with Kaiser, Third Party Wiretappers' code that Kaiser embedded in the Site and Apps directs the Users' web browsers or Apps to simultaneously redirect those communications to the Third Party Wiretappers through GET and POST requests before they reach Kaiser or the

[11] *See* 43 U.S.C. § 1320(d)(6) (providing criminal penalties for the "wrongful disclosure of individually identifiable health information").

User – the intended final destination.[12] Malaga Decl. ¶¶27-34. As Malaga explains, when a User wants to access a particular page on the Site, or communicate through the Apps, the User's browser or App sends a GET request to the Kaiser servers asking to load the particular page. *Id.* The Kaiser server then sends back to the User's browser or App all of the code necessary to load the particular webpage with the information that the User requested. *Id.* However, that is not all that is sent back. In addition to sending code necessary to load the webpage, Kaiser also embedded code that directs the User's browsers or Apps to redirect the communications to Third Party Wiretappers through GET and POST requests before those communications reach their intended, final destination—all without the User's consent. *Id*.

For example, in the code sent back to load the webpage, Kaiser has embedded code that commands the User's web browser to simultaneously send GET requests to Bing, Google, and Twitter through separate URLs that include specific information about the User's communications with Kaiser. *Id*. As a result, when Plaintiffs access the purportedly "secure" Kaiser Portal, or log into the Apps, this embedded code commands their browsers or Apps to send URLs and data to Third Party Wiretappers, informing them that Plaintiffs signed into the Apps, thereby revealing their patient status and allowing the Third Party Wiretappers to intercept HIPAA-protected and confidential information and communications. *Id.* ¶31. Similarly, after Users enter the Portal or Apps, Kaiser continues to respond to Users' GET requests to the Kaiser servers with code that commands their browsers or Apps to send additional information about their activity within the Portal or Apps to third parties. As Malaga explains, these GET requests to Bing, Google, and Twitter include sensitive PHI, such as the Users' medical diagnoses, prescription information, and immunization details, among other information. *Id.* ¶¶ 33-34; 53-

---

[12] As the Ninth Circuit has explained: "When an individual internet user visits a web page, his or her browser sends a message called a "GET request" to the web page's server. The GET request serves two purposes: it first tells the website what information is being requested and then instructs the website to send the information back to the user. The GET request also transmits a referer header containing the personally-identifiable URL information. Typically, this communication occurs only between the user's web browser and the third-party website." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 607 (9th Cir. 2020).

105.

Kaiser has also embedded code that commands a User's web browser or App to send information to Adobe, Google, Quantum Metric, and Dynatrace[13] through POST code when the User attempts to further communicate with Kaiser. *Id.* ¶¶ 35-50. Whereas the GET requests to the Third Party Wiretappers include information about the User's initial GET requests, the embedded POST code commands the User's browsers or Apps to redirect subsequent User activity to be intercepted by these Third Party Wiretappers. *Id.* As a result, because Kaiser embedded POST code in the Portal that commands Plaintiffs' browsers to send Session Replay information to Quantum Metric, Quantum Metric essentially received a "live stream" of all of their activities inside the Portal. *Id.* ¶¶ 44-47. Similarly, Adobe, Google, and Dynatrace receive sensitive information through POST requests after Users enter the Portal, such as prescription information, immunization details, and medical procedures performed, among other information. *Id.* ¶¶ 38-43; 53-105. Additionally, although Kaiser chose not to install Session Reply on the Apps, it still embedded Quantum Metric code on the Apps with send Users' communications on the Apps to Quantum Metric through POST requests. *Id.* ¶ 50.

As the Ninth Circuit has recognized, the "simultaneous, unknown duplication and communication of GET requests" give rise to claims for unlawful "interception" under the ECPA. *In re Facebook*, 956 F.3d at 608. This is because "[p]ermitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion." *Id.* POST requests are no different, similarly redirecting Users' communications with Kaiser as Users continue to navigate the Site and Apps. Malaga Decl. ¶¶36-37. Accordingly, the undisputable facts and Ninth Circuit precedent clearly favor Plaintiffs on their ECPA claim because Kaiser has embedded code in the Site and Apps that allows the Third Party Wiretappers to "intercept" Users' communications with Kaiser.

**(2) Electronic Communications**

Likewise, Kaiser cannot credibly dispute that the Third Party Wiretappers intercepted the

[13] References to Dynatrace are with respect to the Washington App only.

"contents" of "electronic communications" on "devices."

***First***, the ECPA defines "content" as "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8). "In other words, content means 'a person's intended message to another.'" *Brown v. Google LLC*, 2023 WL 5029899, at *15 (N.D. Cal. Aug. 7, 2023). The Ninth Circuit recognizes that electronic communications, such as the GET and POST requests here, may "divulge a user's personal interests, queries, and habits" and thus qualify as "content" under the ECPA. *In re Facebook*, 956 F.3d at 605.[14]

Here, Kaiser acquires the actual content of Plaintiffs' and other Users' communications as they are made. As described in the Malaga Declaration, this includes details about medical procedures, immunizations, prescription information, and medical diagnoses sent through GET and POST requests, and with respect to Quantum Metric's Session Replay code, includes a User's every interaction and communication through the Site. This is precisely the type of information the Ninth Circuit recognizes goes beyond merely "record" information similar to that on the outside of an envelope and constitutes "content" under the ECPA. *In re Facebook*, 956 F.3d at 605. *See also In re Google RTB Consumer Priv. Litig.*, 606 F. Supp. 3d at 949 (holding information Google collected and then disseminated through Google's Real-Time Bidding system qualifies as "content' under the ECPA).

***Second***, Plaintiffs' communications with Kaiser through the Site and Apps fall squarely within the broad definition of "electronic communication" which the ECPA defines as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interest or foreign commerce" with exceptions that do not apply here. 18 U.S.C. § 2510(12). The ECPA adopts a "broad, functional" definition of an electronic communication. *In re Pharmatrak, Inc.*, 329 F.3d 9, 18 (1st Cir. 2003). As multiple cases have held, users' communications through or with web browsers constitutes "electronic communications" under

[14] The definition of "contents" is similar under both the CIPA and the ECPA. *In re Google RTB Consumer Priv. Litig.*, 606 F. Supp. 3d at 949.

the ECPA. *See, e.g.*, *Doe v. Meta Platforms, Inc*., 2023 WL 5837443, at *4 (N.D. Cal. Sept. 7, 2023) (information transmitted to the defendant from the websites of the plaintiffs' healthcare providers were communications under ECPA); *In re Google RTB Consumer Priv. Litig*., 606 F. Supp. 3d at 949 (data disclosed by Google through its Real-Time Bidding system, "including data that identifies the individual being targeted through unique identifiers, device identifiers, geolocation, IP address, cookie match, and other information," were communications under ECPA); *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1072 (N.D. Cal. 2021); (internet communications intercepted by Google while the plaintiffs were in private browsing mode were communications under ECPA); *In re Facebook, Inc. Internet Tracking Litig*., 956 F.3d at 596 (URLs, which include "significant information regarding the user's browsing history, including the identity of the individual internet user and the web server, as well as the name of the web page and the search terms that the user used to find it," were communications under ECPA). Mobile applications, such as the Apps, "function as Web browsers and the underlying interactions with the World Wide Web are similar," including through the use of GET and POST requests. Malaga Decl. ¶11. This Court has also recognized that communications through mobile phones, which is where the Apps are found, constitute "electronic communications" under the ECPA. *In re Carrier IQ, Inc*., 78 F. Supp. 3d 1051 (N.D. Cal. 2015).

***Third***, Kaiser's actions occur through the use of several "devices" within the meaning of 18 U.S.C. § 2510(5). As noted above, the ECPA defines interception as acquiring the contents of a communication "through the use of any electronic, mechanical or other device." 18 U.S.C. § 2510(4). "Electronic, mechanical, or other device" is, in turn, defined as "any device or apparatus which can be used to intercept a wire, oral, or electronic communication" with limited exceptions. *Id*. § 2510(5). Courts routinely apply the ECPA where, as here, the interception is made through the use of computer code, software and servers. *See, e.g.*, *Brown*, 525 F. Supp. 3d at 1071; *United States v. Szymuszkiewicz*, 622 F.3d 701, 703 (7th Cir. 2010), *as amended* (Nov. 29, 2010); *In re Pharmatrak, Inc*., 329 F.3d at 18 (recognizing that that defendant accused of using "cookies" in violation of ECPA appropriately "has not contested whether it used a device or obtained the

contents of an electronic communication”). Additionally, as this Court recognized in *In re Carrier IQ*, a software application, once installed on users’ phones, that “surreptitiously intercept[s]” personal data and communications qualifies as a “device” for purposes of the Wiretap Act. 78 F. Supp. 3d at 1084. *See also Doe v. Meta Platforms, Inc.*, 2023 WL 5837443, at *7 (following this Court’s reasoning in *In re Carrier IQ* and finding that code embedded in website qualifies as a “device”).

**(3) The Interception Was Without Authorization or Consent**

As noted above, Third Party Wiretappers’ interception of the contents of Plaintiffs’ communications was without authorization or consent. Third Party Wiretappers are not parties to Plaintiffs’ communications with Kaiser and they only are able to intercept the content of these communications as a result of Kaiser’s embedding of code to surreptitiously and secretly redirect the communications from Plaintiffs’ devices. Malaga Decl. ¶¶27-30; 36-37. The Ninth Circuit has explained that the “simultaneous, unknown duplication and communication” of an Internet user’s requests to a website “do not exempt a defendant from liability under the party exception.” *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 607-08. Additionally, as explained above, because the nature of the intercepted communications involves protected health information (“PHI”), disclosure to third parties is strictly prohibited absent adequate consent. *See* 45 C.F.R. § 164.514(b)(2)(i). Adequate consent in the context of communications with a medical provider, like Kaiser, regarding medical information requires a HIPAA-compliant authorization, which was never sought or given here. *See* 42 U.S.C. § 1320d-6. To the contrary, Plaintiffs did not provide any consent or authorization for the conduct described herein. ¶¶213-20, 234-38.

Furthermore, Kaiser’s own consent to the interception of Plaintiffs’ PHI by Third Party Wiretappers is not a defense where the “communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.” 18 U.S.C. § 2511(2)(d). In *Sussman v. ABC, Inc.*, the Ninth Circuit explained this exception to the party exception focuses “upon whether the purpose for the

interception—its intended use—was criminal or tortious . . . Where the tapping is legal, but is done for the purpose of facilitating some further impropriety . . . section 2511 applies." 186 F.3d 1200, 1202 (9th Cir. 1999). Here, the purpose of the interception was tortious and criminal—to hand over confidential and HIPAA-protected information to Third Party Wiretappers, without authorization in violation of federal and state laws.[15] As such, the party exception does not apply and the law and facts clearly favor enjoining Kaiser from continuing to commit this ongoing ECPA violation. *See Brown*, 525 F. Supp. 3d at 1068 (intercepting information for the "purpose of associating [the] data with user profiles . . . is a criminal or tortious act in violation of the Constitution or laws of the United States or of any State").

**c) Plaintiffs Are Likely to Prevail on Their CIPA Claim**

Kaiser must comply with CIPA because it is headquartered in California, directs its Internet tracking activities from California, receives tracked Internet communications in California, and utilizes a binding Privacy Policy directing any questions, complaints, and contacts to its privacy office in California. ¶¶41, 44, 45. Moreover, Kaiser has its largest presence in California, where the majority of its hospitals are located. *Id*. As such, Kaiser is subject to California law for its unlawful conduct allowing Third Party Wiretappers to read and/or use personal and medical information and communications shared by Users on its Site and Apps and for using that personal and medical information for its own financial gain. CIPA provides:

> Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so

[15] Deployment of code on a medical provider website to intercept personal and medical information and/or communications sets forth a viable claim against medical providers for violation of state criminal laws. *See Doe v. Partners*, Case No. 1984-CV-01651 (Suffolk Cnty., Mass.) (actionable for violation of state Wiretap Act and Intrusion Upon Seclusion), Yeates Decl. ¶ 2, Ex. A; *Doe v. Medstar*, Case No. 24-C-20-000591 (Baltimore City, Md.) (actionable for violation of state Wiretap Act, Intrusion Upon Seclusion), *id.* ¶ 3, Ex. B; *Doe v. Mercy Health*, Case No. A 2002633 (Hamilton Cnty., Ohio)), *id.* ¶ 4, Ex. C; *Doe v. Sutter Health*, Case No. 34-2019-00258072-CU-BT-GDS (Sacramento Cnty., Cal.) (Mot. J. Pleadings Order, June 9, 2022) (actionable under CIPA), *id.* ¶ 5, Ex. D.

> obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars.

Cal. Penal Code § 631(a).

While CIPA mirrors the ECPA, there are important nuances that make it even more likely that Plaintiffs will prevail on their CIPA claim. First, CIPA requires Kaiser to obtain the consent of ***all parties*** to a communication before it can allow Third Party Wiretappers to "read[], attempt[] to read, or to learn the contents or meaning of any message, report, or communication" and before it and/or the Third Party Wiretappers "use[], or attempt[] to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained." *Id*. Kaiser did not have Plaintiffs' consent—let alone a HIPAA-compliant authorization—to share their medical records and communications with Third Party Wiretappers or to use the information and communications for its own purposes, unrelated to providing healthcare. Second, CIPA explicitly does not require Kaiser to use a device. Instead, it prohibits activity "by means of any machine, instrument, or contrivance, or in any other manner[.]" *Id*.

Kaiser embedded Third Party Wiretappers' code on its Site and Apps to automatically spy on and intercept Users' medical information and communications with Kaiser and providers in real time. By embedding Third Party Wiretappers' code on its Sites and Apps, Kaiser intentionally caused Plaintiffs medical information and communications to be intercepted, recorded, stored, and transmitted to Third Party Wiretappers, which tapped or made unauthorized connections with the lines of internet communication between Plaintiffs and the Site and/or Apps, without authorization. Kaiser also conspired with and allowed Third Party Wiretappers to willfully read or attempt to read or learn the contents or meaning of Users' medical information and communications with Kaiser and providers. Kaiser also used and conspired with and allowed Third Party Wiretappers to "use[], or attempt[] to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained." *Id*. By embedding Third Party Wiretappers' source code on its Site and Apps, Kaiser aided, agreed with, employed, and conspired with Third Party Wiretappers to carry out the wrongful conduct alleged herein in

violation of Cal. Penal Code § 631(a)[iv]. *Doe I v. Sutter Health*, 2021 Cal. Super. LEXIS 105128, *13-24 (Cal. Super. Ct. Nov. 16, 2021) (finding plaintiffs stated a CIPA Section 631 claim where healthcare provider redirected contents of patient communications to third parties while in transit); *Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, at *1 (N.D. Cal. Oct. 23, 2019) (sustaining Section 631 CIPA claim where defendant "embedded into its webpages a mechanism that allowed [a third party] to eavesdrop").

Therefore, Plaintiffs have a likelihood of success on their CIPA claim and the facts and the law clearly favor Plaintiffs. Indeed, a California state court has already agreed that plaintiffs in a similar action could proceed with a similar CIPA claim against their medical provider due to it making unauthorized disclosures to third parties. *See* Yeates Decl. ¶ 6, Ex. D (*Doe*, Mot. J. Pleadings Order, June 9, 2022).

#### d) Plaintiffs Are Likely to Prevail on Their Invasion of Privacy and Intrusion Upon Seclusion Claims

Invasion of privacy and intrusion upon seclusion claims are routinely considered together. To state a claim for invasion of privacy under the California Constitution, Plaintiffs must show: (1) a legally protected privacy interest; (2) where they had a reasonable expectation of privacy; and (3) conduct by Kaiser constituting an intrusion that is highly offensive. *In re Google RTB Consumer Priv. Litig.*, 606 F. Supp. 3d at 945. Similarly, to show intrusion upon seclusion under common law, Plaintiffs must show that: (1) Kaiser intruded and/or aided, agreed with, employed, and/or conspired with Third Party Wiretappers to intrude into a private place, conversation, or matter; (2) in a manner was highly offensive to a reasonable person. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 601. "Because of the similarity of the tests, courts consider the claims together and ask whether: (1) there exist a reasonable expectation of privacy, and (2) the intrusion was highly offensive." *In re Google RTB Consumer Priv. Litig.*, 606 F. Supp. 3d at 946.

It is axiomatic that Plaintiffs had an objectively reasonable expectation of privacy here because the information Kaiser disclosed to Third Party Wiretappers included information related to patient status, health conditions, allergies, medications, vaccinations, medical tests, and other

confidential communications between patients and their providers—this is highly sensitive and personal information. *Meta Pixel*, 2022 WL 17869218, at *15 ("[P]laintiffs will likely be able to show that they had an objectively reasonable expectation that their communications with their medical providers were confidential based on the laws and regulations protecting the confidentiality of medical information.").

In addition, Kaiser's Privacy Policy, as well as federal and state laws, afford protections to Plaintiffs' medical information and communications with healthcare providers. The Kaiser Privacy Policy specifically promises that "we do not collect any personally identifiable information about visitors to the Site", "that no personally identifiable information is associated with the data [gathered on Site activity]" and concerning the cookies placed by its services providers that "[t]he cookie consists of a unique identifier that does not contain information about your health history." ¶¶ 214, 333, 335, 338. This promise creates a legally enforceable expectation for Users that their personal information and communications will not be intercepted by third parties absent consent—which was not given here. Indeed, HIPAA requires covered entities, including Kaiser, to "obtain an authorization for any use or disclosure of [PHI] for marketing" and "for any disclosure of [PHI] which is a sale of protected health information." 45 C.F.R. § 164.508. Thus, Kaiser promised to and was legally required to not disclose personal information, medical information, and communications with their providers, absent authorization. However, in violation of HIPAA and other federal and state laws, Kaiser has shared and continues to share this information with Third Party Wiretappers, without consent or authorization, thereby violating Plaintiffs' reasonable expectation of privacy. *See, e.g., In re Google RTB Consumer Priv. Litig.*, 606 F. Supp. 3d at 946 ("The 'critical fact [that] [Google] represented to the plaintiffs that their information would not be [sold] but then proceeded to [sell] it anyways' undermines Google's argument that plaintiffs lack a reasonable expectation of privacy.").

Moreover, this invasion of privacy would be highly offensive to a reasonable person because (i) the information disclosed by Kaiser and collected by Third Party Wiretappers was highly sensitive and personal, as protected by federal and state laws; (ii) Kaiser did not have

consent or authorization to disclose this information to Third Party Wiretappers, and Third Party Wiretappers did not have consent or authorization to collect this information; and (iii) the invasion deprived Plaintiffs of the ability to control the circulation of their personal and medical information and communications, which is considered a fundamental right to privacy. Criminal and civil statutes forbidding the practices at issue confirm that this type of conduct is highly offensive to a reasonable person. *See, e.g.*, ECPA, CIPA, HIPAA, Cal. Civ. Code § 1798.91.

Kaiser's invasion of privacy and instruction upon seclusion, without authorization, not only effects Plaintiffs, but all Users seeking confidential medical information, communications, and care.[16] This constitutes a severe and egregious breach of social norms and is highly offensive to a reasonable person. *Revitch*, 2019 WL 5485330, at *3 ("A jury could conclude that this intrusion, which allegedly allowed [a third party] to associate [plaintiff's] browsing habits with his identity, is a highly offensive breach of norms.").

As such, Plaintiffs have a likelihood of success on the merits of their invasion of privacy and intrusion upon seclusion claims and the facts and the law clearly favor Plaintiffs. *See Doe v. Regents of Univ. of Cal.*, 2023 WL 3316766, at *6 (N.D. Cal. May 8, 2023) (sustaining invasion of privacy and intrusion claims and finding "[p]ersonal medical information is understood to be among the most sensitive information that could be collected about a person"); *Brown*, 525 F. Supp. 3d at 1080 (sustaining intrusion upon seclusion and invasion of privacy claims and finding similar intrusions could be considered highly offensive).

**2. Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief**

Given Kaiser's egregious conduct and violation of basic privacy rights, "irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 8. To show irreparable harm, a Plaintiff must demonstrate immediate threatened injury. *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1022 (9th Cir. 2016).

Here, the ongoing irreparable harm is Kaiser's continuing interference with Users' right

[16] Kaiser Foundation Health Plan, Inc. is the largest health care service plan in the United States, with over 12.7 million members in the Kaiser Operating States. ¶43.

to confidential medical care and communications. *Meta Pixel*, 2022 WL 17869218, at *17. This harm is actual and not theoretical. Plaintiffs' expert has shown that Kaiser's conduct has not changed from before the filing of the initial complaint in this matter through present. Malaga Decl. ¶52. Rather, Kaiser has continued to allow unauthorized intrusion upon, reading, interception of, and unauthorized use of Users' patient status and medical information and communications. Users are being irreparably harmed every time they use the Site and Apps to access their medication information and communicate with providers. Kaiser patients, including Plaintiffs, should be able to perform these basic functions necessary to their medical care without being subject to Kaiser's wiretapping and invasion of privacy in violation of federal and state laws. *See, e.g.*, *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1045 (9th Cir. 2012) (finding that continued violation of the plaintiffs' privacy constituted irreparable harm).

Although Plaintiffs seek and can recover monetary damages, such damages are not sufficient to remedy the invasions of privacy at issue in this case. *See, e.g.*, *Meta Pixel*, 2022 WL 17869218, at *17 ("The invasion of privacy triggered by the [Defendants'] allegedly ongoing disclosure of plaintiffs' medical information is precisely the kind of intangible injury that cannot be remedied by damages."); *see also Brooks v. Thomson Reuters Corp.*, 2021 WL 3621837, at *11 (N.D. Cal. Aug. 16, 2021) (Chen, J.) (permitting plaintiffs to seek injunctive relief because damages "will not compensate them adequately for the irreparable loss of their privacy"). Because Plaintiffs have suffered and continue to suffer imminent, actual and irreparable harm caused by Kaiser's actions, injunctive relief is appropriate.

### 3. The Balance of Equities Tips in Plaintiffs' Favor

Here, the "balance of equities tips in [Plaintiffs'] favor." *Winter*, 555 U.S. at 20. The injury to Plaintiffs absent injunctive relief clearly outweighs Kaiser's interest in allowing Users' private and medical information and communications to be intercepted. *See id.* at 24. The harm Plaintiffs face from Kaiser's continued conduct is serious and unique, because "the injury here is an invasion of privacy that can never be fully remedied through damages" and once it is lost, it cannot be recovered. *Brooks*, 2021 WL 3621837, at *11.

The preliminary injunction decision in *Meta Pixel* is instructive, both for its factual similarities and marked differences. *Meta Pixel* concerned Meta Platform, Inc.'s ("Meta") alleged use of proprietary computer code to obtain certain healthcare-related information of Facebook users. 2022 WL 17869218, at *1. According to plaintiffs, the Meta Pixel allowed Meta to intercept personally identifiable medical information and the content of patient communications for Facebook users, which Meta then monetized for its financial gain. *Id.* The plaintiffs sought to enjoin Meta from intercepting and disseminating their patient information. *Id.* The court found that "plaintiffs will likely be able to show that the communications at issue here were confidential under the CIPA," that "plaintiffs have made a strong showing as to each of the elements of their [ECPA] claim" and that "case law also supports plaintiffs' position that individuals maintain a reasonable expectation of privacy in detailed URLs." *Id.* at *12, *15.

Indeed, where *Meta Pixel* departs from the present matter illustrates why the balance of equites weighs in favor of Plaintiffs and an injunction is necessary here. The court in *Meta Pixel* ultimately declined to issue the injunction because Meta purportedly "ha[d] already gone to some lengths to address these issues" including by redesigning and "implement[ing] the systems which it believes are the 'most effective and feasible methods' to address the receipt of sensitive information." 2022 WL 17869218, at *20. This stands in stark contrast to Kaiser's inaction here, where it continues *to this day* to utilize Third Party Wiretappers source code on its Sites and Apps—and to this day Users continue to be harmed by Kaiser's unlawful conduct. *See* Malaga Decl. ¶ 52. As such, the balance of equities here weighs in favor of granting injunctive relief to stop Kaiser's unlawful wiretapping and invasion of privacy and allow Users to continue to access their medical information and communicate with their providers without fear of that information and those communications being intercepted, read and/or used without their consent. *See Apex.AI, Inc*., 2023 WL 3391962, at *4 ("Based on the record evidence, it appears that Defendants have misappropriated [plaintiff's] trade secrets and are attempting to market them for their own benefit. Defendants do not appear to have any legitimate competing interest in the trade secrets.").

Third Party Wiretappers are receiving sensitive health information each time Plaintiffs

access the Site and Apps. *See, e.g.*, Malaga Decl. ¶ 33 (revealing kidney stone diagnosis to Adobe, Bing, Google, and Twitter); *id*. ¶ 34 (revealing information about physician to Adobe and Bing); *id*. ¶ 41-42 (revealing shoulder x-ray and mammogram to Dynatrace); *id.* ¶¶ 102-106 (revealing major depressive disorder diagnosis to Adobe, Bing, Google, and Twitter); *id*. ¶¶ 87-94 (revealing anxiety disorder diagnosis to Adobe, Bing, Google, Twitter, and Quantum Metric); *id*. ¶ 33 (revealing prescription for omeprazole, including the precise dosage, to Bing, Google and Twitter); *id*. ¶¶ 70-78 (revealing prescriptions for lisinopril hydrochlorothiazide to Adobe, Bing, Google, Twitter, and Quantum Metric). And because Kaiser continues to transmit PHI to Third Party Wiretappers, *see id*. ¶ 52, Plaintiffs cannot currently access their own health information without transmitting it to Third Party Wiretappers—this harm is irreparable.

By contrast, Kaiser's operations would be, at most, minimally effected by an order enjoining its unlawful conduct. Kaiser has been on notice since at least June that its conduct violates Users' privacy rights as well as federal and state laws and has chosen not to change its conduct. Plaintiffs simply request Kaiser be prohibited from sharing personal and medical information with Third Party Wiretappers consistent with its pre-existing obligation to maintain patient confidentiality. An injunction would not limit Kaiser's ability to perform is core function of providing care to patients. Thus, the equities clearly favor Plaintiffs. *See L.A. Unified Sch. Dist. v. S&W Atlas Iron & Metal Co.*, 506 F. Supp. 3d 1018, 1037 (C.D. Cal. 2020) (ordering mandatory injunction and finding balance of equities favored plaintiff where plaintiff did "not seek a complete halt of [defendant's] operations"). Moreover, in the absence of an injunction, violations of Users' privacy rights will continue to mount. *See Campbell v. Facebook, Inc.*, 951 F.3d 1106, 1117 (9th Cir. 2020) ("[U]nder the privacy torts that form the backdrop for these modern statutes, '[t]he intrusion itself makes the defendant subject to liability.'"). Indeed, with "*every* violation of the provisions of ECPA and CIPA," as well as other statutes and common law claims, the harm inflicted by Kaiser on Plaintiffs grows. *Id.* at 1118. Accordingly, the balance of equities falls sharply in favor of Plaintiffs. *See Youngevity Int'l, Corp.*, 224 F. Supp. 3d at 1028 (issuing mandatory injunction where "Plaintiffs right to safeguard its reputation and goodwill through

control of their likenesses simply trumps Defendants' desire to use the search engine optimal websites and 1–800 number to quickly move any residual product").

### 4. The Injunctive Relief Sought Is in the Public Interest

The public interest also favors issuance of an injunction. *See Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc.*, 725 F.3d 940, 946 (9th Cir. 2013) ("Where a valid law speaks to the proper level of deference to a particular public interest, it controls."). Congress and state legislatures of numerous states, including California, have acted to give effect to longstanding privacy rights provided for by the common law, recognizing the public interest in privacy rights. *See, e.g.*, 18 U.S.C. §§ 2510, *et seq.*; Cal. Penal Code § 631; Cal. Const., Art. 1, § 1; Cal. Civ. Code § 56.10; Ga. Code Ann. § 16-9-93; Md. Code Ann., Cts. & Jud. Proc. § 10-401, *et seq.*; Wa. Rev. Code § 9.73, *et seq.*; Wash. Rev. Code § 70.02.005, *et seq*. These laws reflect a legislative determination that prohibitions on invasions of privacy must keep apace with changes in technology and are an important societal goal. *See Campbell*, 951 F.3d at 1118 ("The purpose of ECPA includes creating '[f]ederal statutory standards,' analogous to the 'protection against unauthorized opening' of mail, 'to protect the privacy and security of communications' made using newer technology. . . . CIPA's purpose similarly includes 'protect[ing] the right of privacy of the people of [California],' because 'the invasion of privacy' resulting from the use of new technology to 'eavesdrop[ ] upon private communications' causes 'a serious threat to the free exercise of personal liberties.'"). In addition to the clear statement of public interest by federal and state governments, the proposed injunction would also serve to protect members of the public, including Users, from the surreptitious harvesting of their private health information. As detailed in the Amended Complaint, Third Party Wiretappers track activity even where Users are not logged in. *See* ¶¶ 96, 182. *See Norman-Bloodsaw*, 135 F.3d at 1269 ("One can think of few subject areas more personal and more likely to implicate privacy interests than that of one's health."). Given the robust and longstanding privacy protections at issue and the fact that an injunction would protect Plaintiffs as well as the public, the public interest clearly favors issuance of the preliminary injunction. *Los Angeles Unified Sch. Dist.*, 506 F. Supp. 3d at 1037 (finding

preventing public harm public favors injunction and ordering defendants to cease conduct).

**B. A Prohibitory Injunction Preventing Destruction of Evidence Is Necessary**

Plaintiffs also seek a prohibitory injunction preventing Kaiser from altering, destroying, or disposing of any evidence, in any form, relating to this litigation. Such relief is necessary because Kaiser objects to complying with its duty to preserve relevant evidence relating to this litigation, purportedly due to cost. *See Apex.AI, Inc.*, 2023 WL 3391962, at *6 (issuing prohibitory injunction enjoining defendants "from altering, destroying, or disposing of any evidence.").

All of the *Winter* factors demonstrate that this prohibitory injunction is warranted. Notably, because this form of relief is prohibitory, Plaintiffs need only show that they are likely to succeed on the merits and not that the law clearly favors their position. *See id.* Here, Plaintiffs are likely to succeed on the merits of a motion to compel Kaiser to preserve evidence relevant to this litigation because Kaiser has an ongoing duty to "suspend any existing policies related to deleting or destroying files and preserve all relevant documents related to this litigation." *Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 991 (N.D. Cal. 2012). Further, Plaintiffs will suffer irreparable harm absent a prohibitory injunction because, if Kaiser destroys relevant evidence, Plaintiffs will never be able to obtain such evidence, which may be necessary to support their claims. Additionally, the balance of equities tips in Plaintiffs' favor—Kaiser is a sophisticated business entity with robust resources that can bear preservation costs. Finally, this prohibitory injunction is in the public interest because it will permit Plaintiffs to pursue their claims that seek to redress a wrong being perpetuated against the public, including millions of Users. Therefore, the Court should issue a prohibitory injunction preventing Kaiser from altering, destroying, or disposing of any evidence, in any form, relating to this litigation. *Apex.AI, Inc.*, 2023 WL 3391962, at *6 (enjoining defendants "from altering, destroying, or disposing of any evidence or other materials, in any form, relating to this action.").

## VI. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court grant the Motion.

DATED: October 4, 2023

**KESSLER TOPAZ MELTZER & CHECK, LLP**

*/s/ Melissa L. Yeates*
Joseph H. Meltzer (appearance *pro hac vice*)
jmeltzer@ktmc.com
Melissa L. Yeates (appearance *pro hac vice*)
myeates@ktmc.com
Tyler S. Graden (appearance *pro hac vice*)
tgraden@ktmc.com
Jordan E. Jacobson (Bar No. 302543)
jjacobson@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056

-and-

**KESSLER TOPAZ MELTZER & CHECK, LLP**
Jennifer L. Joost (Bar No. 296164)
jjoost@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel: (415) 400-3000
Fax: (415) 400-3001

James E. Cecchi (appearance *pro hac vice*)
jcecchi@carellabyrne.com
Michael A. Innes (*pro hac vice* forthcoming)
minnes@carellabyrne.com
Kevin G. Cooper (appearance *pro hac vice*)
kcooper@carellabyrne.com
Jordan M. Steele (*pro hac* forthcoming)
jsteele@carellabyrne.com
**CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973)-994-1700
Facsimile: (973)-994-1744

-and-

Zachary Jacobs (appearance *pro hac vice*)
zjacobs@carellabyrne.com
**CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.**
222 S Riverside Plaza
Chicago, Illinois 06606

*Counsel for Plaintiffs and the proposed Classes*