SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
WYNTER L. DEAGLE, Cal Bar No. 296501
wdeagle@sheppardmullin.com
ANNE-MARIE D. DAO, Cal Bar No. 282632
adao@sheppardmullin.com
DANE C. BRODY CHANOVE, Cal Bar No. 345843
dbrodychanove@sheppardmullin.com
12275 El Camino Real, Suite 100
San Diego, California 92130-4092
Telephone: 858.720.8900
Facsimile: 858.509.3691

TENAYA RODEWALD, Cal Bar No. 248563
trodewald@sheppardmullin.com
1540 El Camino Real, Suite 120
Menlo Park, CA 94025
Telephone: 650.815.2600
Facsimile: 650.815.2601

Attorneys for Defendants
Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, and The Permanente Medical Group, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

JOHN DOE, JOHN DOE II, JANE DOE, JANE DOE II, JANE DOE III, JANE DOE IV, and JANE DOE V, Individually and on behalf of all others similarly situated,

Plaintiffs,

v.

KAISER FOUNDATION HEALTH PLAN, INC., KAISER FOUNDATION HOSPITALS, and THE PERMANENTE MEDICAL GROUP, INC.,

Defendants.

Case No. 3:23-cv-02865-EMC

**DECLARATION OF JAMES VINT IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' PRELIMINARY INJUNCTION MOTION**

*Filed concurrently with Opposition, Declaration of Bill Vourthis, and [Proposed] Order*

Date: December 21, 2023
Time: 1:30 p.m.
Courtroom: 5

District Judge: Hon. Edward M. Chen
Magistrate Judge: Hon. Peter H. Kang

FAC Filed: September 15, 2023
Trial Date: Not Set

## DECLARATION OF JAMES VINT

I, James Vint, declare as follows:

1. I am a Managing Director at Secretariat Advisors, LLC, an international consulting firm that specializes in, among other things, advisory and expert services related to data-driven forensic and data privacy investigations, legal matters, and regulatory compliance reviews. I have led hundreds of engagements over the course of my career and have been retained in numerous matters as a testifying expert related to Internet data transmissions, the discovery of structured data, data migrations, data integrity, data workflows, platform assessments, and other data-driven issues.

2. Since 2019, I have performed over 250 investigations into the use of website technologies in various industries.

3. I hold a Bachelor of Business Administration from Loyola University in Maryland and a Master of Business Administration from the Fuqua School of Business at Duke University. A copy of my full CV is attached hereto as **Exhibit A**, including a list of all publications I have authored in the previous 10 years and a list of all other cases in which, during the previous 4 years, I have testified as an expert at trial or by deposition. I am being compensated in this matter at a rate of $700 per hour. I have personal knowledge of the facts contained herein and if called as a witness could and would testify competently thereto.

4. I have been retained by Sheppard, Mullin, Richter & Hampton LLP on behalf of Defendants Kaiser Foundation Health Plan, Inc. ("**KFHP**"), Kaiser Foundation Hospitals, and The Permanente Medical Group, Inc. ("**Defendants**") to (a) conduct a review of the Declaration of Ross A. Malaga in Support of Plaintiffs' Motion for Preliminary Injunction ("the Malaga Declaration" or "the Declaration"), and (b) determine if Mr. Malaga presents any evidence that identifying information was transmitted to third parties, or that third parties could link the data in the examples in Mr. Malaga's declaration to Plaintiffs' identities. I reserve the right to supplement and/or amend this Declaration if and when new information becomes available, and I reserve the right to provide additional opinions on matters on which I may be asked to opine in this litigation.

5. I have received and studied the Malaga Declaration, its Appendices and the

Exhibits. Mr. Malaga provides twenty exhibits (Exhibits 1–20) and forty-eight (48) screenshots of code (in paragraphs 38–106) that he claims represents transmissions of information to six third parties (Adobe, Bing,[1] Google, Twitter,[2] Dynatrace, and Quantum Metric) concerning Plaintiffs' activities on the "**Website**" (with the home page https://healthy.kaiserpermanente.org/front-door) and two mobile applications or "**Apps**".[3] I refer collectively to Mr. Malaga's Exhibits 1–20 and the 48 snapshots of code in his paragraphs 38–106, representing sixty-eight (68) transmissions in total, as the "**Transmissions**." I understand that Mr. Malaga represents his conclusion is that "Kaiser Permanente reveals identifying information concerning Users, including but not limited to their status as patients, medications taken, services provided, treatments searched, vaccines received, as well as other sensitive information (collectively referred to . . . as 'Protected Health Information' or 'PHI') to [the six] third parties through code installed on Kaiser Permanente's Website and Mobile Applications."[4] The facts and data considered in forming my opinions expressed herein are the Malaga Declaration, its Exhibits and Appendices and the sources cited therein, and the public websites https://www.rfc-editor.org/rfc/rfc9110.html#section-3.5, https://www.rfc-editor.org/rfc/rfc9110.html#section-10.1.5 and https://www.quantummetric.com/platform/data-privacy-security/.

## I. SUMMARY OF FINDINGS

6. As explained below, I make three preliminary conclusions:

a. First, Mr. Malaga provides no evidence that communications with health care providers were ever disclosed. Further, Mr. Malaga's use of the term "communication" must be clarified because he provides no evidence that communications or messages between individuals were disclosed.

b. Second, Mr. Malaga's use of the terms "interception" and "redirection"—

[1] "Bing" is not a third party entity. It is a web search engine and related technology owned by Microsoft. For consistency with Mr. Malaga's Declaration, however, I will also use the term "Bing" rather than Microsoft.

[2] Twitter has been rebranded to "X," but I will use Twitter for consistency with Mr. Malaga's Declaration.

[3] The Mobile Applications or Apps are two mobile applications that Mr. Malaga refers to as the Kaiser Permanente App and Kaiser Permanente Washington App. *See* Malaga Declaration, n. 4.

[4] Malaga Declaration ¶ 5.

and his characterization of the Transmissions presented in his Declaration as involving the interception and redirection of communications—do not align with the process as outlined in his Figures 1 and 2, nor the actual sequential transmission process he describes. Specifically, Mr. Malaga does not provide any evidence or support for any conclusion that any data was obtained or diverted while being transmitted between a website visitor's browser or App and the Website, or while being transmitted between any Plaintiff computer or mobile device and any Defendant website or server.

c. Third, Mr. Malaga provides no evidence that his theoretical technique of "Web Fingerprinting" is used by any of the third parties or applies to the data potentially transmitted to the third parties, or that it has any relevance to this litigation.

7. As explained below, my primary conclusion from my analysis of Mr. Malaga's Declaration is that, although Mr. Malaga claims that Defendants disclosed "identifying information," Mr. Malaga fails to provide any evidence to support his claim. First, Mr. Malaga does not provide evidence that Defendants revealed any identifying information concerning Plaintiffs to third parties. Second, he provides no evidence that the third parties could or did link the information Defendants allegedly disclosed to a Plaintiff's real identity.

8. Although Mr. Malaga claims that "identifying information" was disclosed, he does not define this term, or provide an explanation for what he means by it. When I use the term "identifying" information and when I discuss whether information "identifies" someone, I mean information that reveals or discloses a specific individual's real identity, such as first and last name, social security number, or other specific identifiers generally recognized as identifying, or directly tied to, a specific individual's real identity. As I will explain in greater detail below, no such identifying information was contained in the Transmissions, and Mr. Malaga provides no evidence that Defendants disclosed such identifying information to third parties.[5]

---

[5] To the extent that Mr. Malaga intended some other definition of "identifying" he should have provided a definition and explained the relevance of his definition. He did not provide any definition. To the extent that Mr. Malaga would claim that specific pieces of information not included in my definition identify a specific individual's real identity, then he should have provided evidence that such piece of information can identify individuals. He provided no such

9. Second, Mr. Malaga does not provide evidence that any of the third parties could or did link the information Defendants disclosed to a Plaintiff's or an individual's real identity. Therefore, *regardless* of the definition of "identifying," Mr. Malaga provides no evidence that information Defendants disclosed could reveal Plaintiffs' identities, or that the third parties could link the information to Plaintiffs' identities.

## II. PRELIMINARY MATTERS

### A. Mr. Malaga Provides No Evidence of Communications with Healthcare Providers

10. Mr. Malaga insinuates that communications with healthcare providers were disclosed to third parties. For example, in his paragraph 4, he claims Kaiser "has allowed certain third parties to intercept Users' communications with Kaiser Permanente providers on the Kaiser Permanente Website and Mobile Applications." In his paragraph 108, he claims the information transmitted included "healthcare-related communications between patients and their providers." In multiple other locations in his Declaration, Mr. Malaga uses the term "communications" and asserts that "communications" were "intercepted and redirected." For example, in his paragraph 35, Mr. Malaga claims that "Users' communications with Kaiser Permanente to Adobe, Google, Quantum Metric, and Dynatrace through POST requests" were intercepted or redirected.

11. Mr. Malaga provides no evidence and no support for any claim that communications between individuals and healthcare providers, or to or from healthcare providers, were disclosed to third parties from the Website or Apps. He also provides no support for any claim that communications or messages between two individuals were disclosed.

12. I reviewed all 68 Transmissions in Mr. Malaga's Declaration, and none of them contained any communications or messages between an individual and a healthcare provider, to or from a healthcare provider, or by and between two individuals. Mr. Malaga also never points to any Transmission that contains a communication between any individual and a healthcare provider or to or from a healthcare provider. As I also explain in Section III.D below, Mr. Malaga provides

---

evidence. He simply uses the term "identifying information" without establishing what it means or that it applies to any information in the Transmissions.

no evidence that Quantum Metric receives any information containing a communication between two individuals, between any individual and a healthcare provider or to or from a healthcare provider.

13. Instead, the Transmissions contained only limited information about website activities. The information from the various GET and POST requests represented by the Transmissions only contain parameters reflecting website actions such as (a) log-in events (*e.g.*, confirmation of a log in to the authenticated website, not any information used to log in); (b) webpage visits (*e.g.*, that test results were available, not the test results themselves, or that a page relating to a condition or medication had been viewed); and (c) search parameters (*e.g.*, searches from the public website for a condition or physician), among other events. The Transmissions did not contain any communications or messages with healthcare providers, or any messages between individuals or from a Plaintiff to a Kaiser Permanente provider.

14. Therefore, Mr. Malaga provides no evidence or support for a claim that communications by or between individuals or with healthcare providers were ever disclosed.

**B. Mr. Malaga's Use of the Terms "Interception" and "Redirection"**

15. Mr. Malaga's use of the terms "interception" and "redirection" also needs to be clarified.

16. In various paragraphs in his Declaration, Mr. Malaga claims that the Transmissions presented involve the "interception" and "redirection" of website visitor "communications." For example, in his paragraph 30 (referencing his Figure 1), Mr. Malaga states that "These additional, [sic] GET requests from the User's browsers or mobile applications (B) to the third party's servers (E) intercept the User's communications with Kaiser Permanente before they reach their final destination and command the User's browser or mobile application (B) to redirect specific information about the GET request to the third parties, which is included in detailed URL headers." Mr. Malaga also states, for example, that "POST requests command the User's browser to intercept and redirect subsequent communications from the User to Kaiser Permanente."[6] He uses the term "interception" numerous times in his Declaration.

[6] Malaga Declaration ¶ 36.

17. However, Mr. Malaga's use of the words "intercept" and "redirect," and his claims that communications to Kaiser are "intercept[ed]" "before they reach their final destination," do not align with the process as outlined in his Figures 1 and 2, nor the actual sequential transmission process he describes. As shown in Mr. Malaga's Figures 1 and 2, the GET and POST requests (that he says form the Transmissions) do not result in any information being obtained or diverted while being transmitted between a website visitor's browser or App and the Website (or between the website visitor's browser or App and Kaiser Permanente).

18. Rather, what Mr. Malaga shows and describes is a set of sequential transmissions of information between a Website visitor's internet browser or App and KFHP's Website servers on the one hand, *and a set of different sequential transmissions* of other information between the Website visitor's internet browser or App and the third parties. This is illustrated in Mr. Malaga's Figures 1 and 2, which show one set of sequential transmissions between his "B" (the "Web Browser or App") and his "C" (the "Kaiser Web Site"), *and a different set of transmissions* between his "B" (the "Web Browser or App") and his "E" (the "Third Party Server"). Thus, in paragraph 29, Mr. Malaga says more accurately that in response to the initial GET request, "additional code . . . directs the User's browser or mobile applications (B) ***to generate new GET requests*** to the third party's servers (from B to E)" (emphasis added). And, as mentioned above, in his Figure 2, Mr. Malaga also shows that POST requests also involve new and separate transmissions between a website visitor's browser (which Mr. Malaga labels "B") and a third-party server (which Mr. Malaga labels "E").

19. Thus, Mr. Malaga's Figures 1 and 2 represent a three-step process. First, the browser makes a request of the Kaiser web server. Second, the web server responds by sending packets of data back to the browser. Third, once those packets are reassembled, allowing the page to operate, the "additional code," as referenced by Mr. Malaga in paragraph 29, allows these new GET and POST requests to be sent to the respective third parties.

20. As a result, Mr. Malaga's Figures demonstrate that the process he is discussing does ***not*** involve the third parties capturing, obtaining, or diverting any information while it is being transmitted between a website visitor's browser or App and the Website. Mr. Malaga does

not provide any support for use of the terms "intercept" or "redirect" to mean capture or diversion of any information while it is in transit between Plaintiffs and Defendants. Rather the GET and POST Transmissions involve entirely separate transmissions, with a subset of data, from a website visitor's browser or App to the third parties.

### C. Mr. Malaga Provides No Evidence of Any Relevance or Use of the Theoretical Technique "Web Fingerprinting"

21. In his Section E, paragraphs 17–22, Mr. Malaga outlines a theory of what he calls "Web Fingerprinting also known as device- or browser-fingerprinting." Mr. Malaga provides no evidence that his discussion of "Web Fingerprinting" is relevant to the remainder of his Declaration or any data collected from Defendants' Websites or Apps.

22. First, Mr. Malaga's discussion of Web Fingerprinting is theoretical only. In other words, he discusses a theoretical technique, in a purely hypothetical manner, without showing that it has an application in this matter or in his Declaration. Mr. Malaga does not provide evidence, examples, citations, or references demonstrating that any third party discussed in his Declaration implements this theoretical concept. He further provides no evidence that any of the third parties implemented Web Fingerprinting with respect to data collected from Defendants' website, or that any of the third parties could have used any such technique to identify any of the Plaintiffs.

23. Even at a theoretical level, Mr. Malaga does not show that "Web Fingerprinting" can be used to identify individuals. Rather, even if it were implemented and actually worked in practice,[7] his theoretical outline of this technique would result in nothing more than distinguishing different device-browser combinations—a way to distinguish one computer-browser combination from another[8]—but this is not unique or identifiable to a specific person. For example, under Mr. Malaga's theory, a third-party website might be able to determine that a specific combination of computer and browser had or had not visited a particular website before, but Mr. Malaga does not

---

[7] Mr. Malaga provides no evidence that the technique has been successfully implemented.

[8] Mr. Malaga's method would not even result in being able to recognize computers. Rather, at best, it only involves recognizing ***a browser*** on a computer. For example, under Mr. Malaga's theory, a laptop that has two different browsers installed (*e.g.*, Google Chrome and Mozilla Firefox) would have two distinct device-browser pairings that are not linked to each other. It would not appear as a single computer, but rather as two computers.

show or explain how this information can be linked to *any person's identity*. Put another way, according to Mr. Malaga, a hypothetical third party using "Web Fingerprinting" might be able to recognize computer-browser A and computer-browser B. But this does not mean that a third party has any information that computer-browser A or computer-browser B belongs to any specific person. Thus, even at a theoretical level, Mr. Malaga's "Web Fingerprinting" theory does not demonstrate that any information can be linked to any person, let alone reveal their identity.[9]

## III. INABILITY TO IDENTIFY INDIVIDUALS AND PLAINTIFFS FROM THE DATA TRANSMISSIONS TO THIRD PARTIES

24. In his Declaration, Mr. Malaga alleges that "Kaiser Permanente reveals identifying information concerning Users"[10] and that "Kaiser Permanente has and continues to reveal personal, identifying and medical information and communications of Users."[11] However, Mr. Malaga does not provide any evidence supporting these assertions that information was "identifying."

25. As explained above, Mr. Malaga provides twenty exhibits (Exhibits 1–20) and forty-eight (48) screenshots of code (in paragraphs 38–106) representing a total of sixty-eight (68) Transmissions. Mr. Malaga claims that the Transmissions represent the data collected by the six third parties, Adobe, Bing, Google, Twitter, Dynatrace, and Quantum Metric, when Doe Plaintiffs took certain actions on the Website or Apps, such as logging in, searching for a doctor, or viewing

---

9 Mr. Malaga does not establish the relevance of his mention, in his paragraph 16, of what he calls the "HTTP User-Agent." For the avoidance of any doubt, however, Mr. Malaga's claim in his paragraph 16 that the "HTTP User Agent" is "sent to the server to identify the person or entity making a request" is also unsupported by any evidence, citation or references, and is incorrect. As explained by the Internet Engineering Task Force, the premier standards development organization for the Internet, the "user agent" is the program (the piece of software such as a web browser) that initiates an HTTP request. *See* https://www.rfc-editor.org/rfc/rfc9110.html#section-3.5. Further, "[t]he 'User-Agent' header field contains information about the user agent [the program] originating the request, which is often used by servers to help identify the scope of reported interoperability problems, to work around or tailor responses to avoid particular user agent limitations, and for analytics regarding browser or operating system use." *See* https://www.rfc-editor.org/rfc/rfc9110.html#section-10.1.5. In other words, the User-Agent header field contains information about the *browser program* making a GET or POST request, and does not identify a person or entity making a request.

10 Malaga Declaration ¶ 5.

11 Malaga Declaration ¶ 26.

pages with information about medical topics.

26. I examined each of the Transmissions in Mr. Malaga's Declaration. Mr. Malaga does not point to any identifying information in the Transmissions or provide any evidence to show that the Transmissions contain any identifying information for any Plaintiff. The Transmissions provided by Mr. Malaga do not identify an individual or reveal an individual's identity. The Transmissions do not include information such as a first and last name, social security number, or other identifying information. I am unable to determine who the various unnamed Plaintiffs are due to the lack of any identifying information.

27. Moreover, Mr. Malaga does not provide any evidence to show that any of the Transmissions can be linked to the identity of any Plaintiff. Thus, he does not show that any of the third parties could or did link any of the information in the Transmissions to any Plaintiff's identity. Mr. Malaga does not claim to have provided such evidence with respect to any of the Transmissions.

28. As previously explained, the information from the various GET and POST requests represented by the Transmissions only contains limited information about website actions such as (a) log-in events (*e.g.*, confirmation of a log in to the authenticated website, not any information used to log in); (b) webpage visits (*e.g.*, that test results were available, not the test results themselves, or that a page relating to a condition or medication had been viewed); and (c) search parameters (*e.g.*, searches from the public website for a condition or physician).

29. However, as explained, Mr. Malaga does not show that any of the Transmissions contained any data that identifies Plaintiffs, that reveals their identities, or that could be linked to Plaintiffs as identifiable individuals. As a result, Mr. Malaga has not provided any evidence of identifiable data. Rather at most his evidence is that nonidentifiable information about limited actions on the Website or Apps was disclosed.

30. Indeed, the Transmissions also do not contain any information indicating or confirming that they were in fact captured when the Does were using the website and App. For example, Mr. Malaga claims that Exhibits 1–7 were obtained when Plaintiff John Doe was using the Website. However, the Transmissions in Exhibits 1–7 do not contain any information

confirming this. The same is true for all the Transmissions. For the purposes of this declaration only, I accept Mr. Malaga's assertions that the Transmissions were captured when the Doe Plaintiffs were using the Website or Apps, and his assertions as to which Doe Plaintiff was using the Website or App when each Transmission occurred. However, such information is not reflected in any of the Transmissions in Mr. Malaga's Declaration.[12]

31. In the Sections below, I further explain that Mr. Malaga provides no evidence that the Transmissions with respect to each of the third parties (in this order: Bing, Google, Twitter, Adobe, Dynatrace, and Quantum Metric) contain identifiers or information that reveals or can be linked to Plaintiffs' identities. In **Exhibit B,** attached to this declaration, I also provide a table containing a complete list of all the Transmissions in Mr. Malaga's Declaration, together with a reference to my analysis below that Mr. Malaga provides no evidence that any Transmission contains identifiers or reveals any Plaintiffs' identity, or that the third parties could link the Transmissions to a Plaintiff's identity.

### A. The Transmissions to Bing, Google and Twitter Are Not "Identifying," and There Is No Evidence These Transmissions Can Be Linked to Any Plaintiff's Identity

32. This section explains that Mr. Malaga provides no evidence or basis to believe that any of the Transmissions he claims were made to Bing, Google, or Twitter contained any of Plaintiffs' identifying information or that they could be linked to any Plaintiffs' identity.

33. In paragraph 31, Mr. Malaga claims that "when Users like Plaintiffs log into the Portal, the code that Kaiser Permanente embedded in its Website and Mobile Applications commands the User's browser or mobile applications to send detailed URLs to Bing, Google, and Twitter informing these third parties that the Users had signed into the Portal or Mobile Applications." He cites to his Exhibits 1–7 to support this claim and asserts that each of the Transmissions in Exhibits 1–7 indicate that Plaintiff "John Doe" had logged into the Kaiser Portal.

[12] Many of the Transmissions also do not contain information identifying the third party that Mr. Malaga says received the Transmission. As one example, Mr. Malaga claims that the Transmission in Exhibit 4 was a GET request to Bing. However, none of the information in the Transmission in Exhibit 4 indicates that it was sent to Bing (or any other third party).

34. However, none of the information in Exhibits 1–7 identifies any person. Mr. Malaga does not provide any evidence (or claim to provide any evidence) that any of the information in Exhibits 1–7 identifies John Doe, or that any of the recipient third parties could use the information in these Transmissions to identify John Doe. Moreover, Mr. Malaga provides no evidence that any of the recipient third parties could link the information in Exhibits 1–7 to John Doe's identity. Thus, with respect to these Exhibits, Mr. Malaga provides no evidence that Bing, Google, or Twitter received information that identifies, or could be linked to the identity of, any of the Plaintiffs.

35. In paragraphs 32 and 33, Mr. Malaga claims that his Exhibits 8–16 were captured while John Doe was using the Website, and that they show that once John Doe logged into the Portal, there were transmissions concerning his website actions to "Bing, Google and Twitter" indicating that "John Doe" clicked on specific health related links.

36. However, none of the information in Exhibits 8–16 identifies any person. Mr. Malaga does not provide any evidence (or claim to provide any evidence) that any of the information in Exhibits 8–16 identifies John Doe, or that any of the recipient third parties could use the information in these Transmissions to identify John Doe. Moreover, Mr. Malaga provides no evidence that any of the recipient third parties could link the information in Exhibits 8–16 to John Doe's identity. Thus, with respect to these exhibits, Mr. Malaga provides no evidence that Bing, Google, or Twitter received information that identifies or could be linked to the identity of the Plaintiffs.

37. In paragraph 34, Mr. Malaga claims Exhibits 17–19 show that when John Doe performed a search for a doctor outside of the Portal[13] there were transmissions to Bing, Google, and Twitter that "revealed the name (and in some cases the medical specialty – gastroenterology) *of the physician viewed*" (italics added).

38. However, none of the information in Exhibits 17–19 identifies any person, other than a doctor listed on a public website. None of these Transmissions contain information

[13] "Outside of the Portal" means that John Doe performed the search when he was not logged in and was simply viewing the public areas of Defendants' website.

identifying John Doe. Mr. Malaga does not provide any evidence (or claim to provide any evidence) that any of the information in Exhibits 17–19 identifies John Doe, or that any of the recipient third parties could use the information in these Transmissions to identify John Doe. Moreover, Mr. Malaga provides no evidence that any of the recipient third parties could link the information in Exhibits 17–19 to John Doe's identity. Thus, with respect to these exhibits, Mr. Malaga provides no evidence that Bing, Google, or Twitter received information that identifies, or could be linked to the identity of, any of the Plaintiffs.

39. The Malaga Declaration provides thirty (30) additional examples of Transmissions that he claims were sent to Google, Bing, and Twitter. He claims that these were captured while various unnamed Plaintiffs were using the Website and Apps in different scenarios. I have listed these 30 additional Transmissions below grouped by Mr. Malaga's representations as to which Doe Plaintiff was using the Website or App when each Transmission occurred, and to which third party the Transmissions were directed:

| **Computer web browser Transmissions to Google (including DoubleClick)[14]** |
|---|
| • Jane Doe II – Paragraphs 54, 55<br>• Jane Doe III – Paragraphs 61, 62<br>• John Doe II – Paragraphs 73, 74, 75<br>• Jane Doe IV – Paragraphs 90, 91, 92<br>• Jane Doe V – Paragraph 105 |
| **Computer web browser Transmissions to Bing** |
| • Jane Doe II – Paragraph 56<br>• Jane Doe III – Paragraph 63<br>• John Doe II – Paragraph 72<br>• Jane Doe IV – Paragraph 89<br>• Jane Doe V – Paragraph 104 |
| **Computer web browser Transmissions to Twitter** |
| • Jane Doe II – Paragraph 57<br>• Jane Doe III – Paragraph 64<br>• John Doe II – Paragraphs 76, 77 |

[14] "DoubleClick" is not a separate third party but a technology and service offered by Google.

| |
|---|
| • Jane Doe IV – Paragraph 93<br>• Jane Doe V – Paragraph 106 |
| **Mobile App Transmissions to Google / DoubleClick, Bing and Twitter** |
| • Jane Doe III – Paragraph 68 (Google), Paragraph 67 (Bing)<br>• John Doe II – Paragraph 83 (Bing), Paragraph 84 (Google / DoubleClick), Paragraph 85 (Twitter)<br>• Jane Doe IV – Paragraph 99 (Bing), Paragraph 100 (Google / DoubleClick), Paragraph 101 (Twitter) |

40. I examined each of the 30 Transmissions listed in the table above and Mr. Malaga's discussion of these Transmissions. None of the information in any of the 30 Transmissions listed above identifies any person. None of these Transmissions contain information identifying any of the Does' identities. Mr. Malaga does not provide any evidence (or claim to provide any evidence) that any of the information in these examples identify the Doe, or that any of the recipient third parties could use the information in these Transmissions to identify the Doe. Moreover, Mr. Malaga provides no evidence that any of the recipient third parties could link the information in the Transmissions to any Doe's identity.

41. To summarize, in total, Mr. Malaga provides examples of forty-nine (49) purported Transmissions to Bing, Google and Twitter, with respect to the Website or Apps, (19 Exhibits and 30 additional Transmissions included in paragraphs of his Declaration), and all of these Transmissions are discussed in the paragraphs above. Mr. Malaga never provides any evidence that Bing, Google, or Twitter received any information from the Website or Apps that identifies, or could be linked to the identity of, any of the Plaintiffs.

**B. <u>The Transmissions to Adobe Are Not "Identifying," and There Is No Evidence These Transmissions Can Be Linked to Any Plaintiff's Identity</u>**

42. Just as he failed to provide support for his claims that identifying information was transmitted to Bing, Google/DoubleClick, and Twitter, Mr. Malaga fails to provide any evidence that any Transmissions to Adobe contained any of Plaintiffs' identifying information or that they could be linked to any Plaintiff's identity. I explain this in more detail in this section.

43. In paragraph 38, Mr. Malaga includes a snapshot of a Transmission (the code

snapshot) that he claims disclosed to Adobe that "Plaintiff Jane Doe had lab test results available."

44. However, none of the information in the Transmission discussed in Paragraph 38 identifies any person. Mr. Malaga does not provide any evidence that any information in the Transmission contained in Paragraph 38 identifies Jane Doe, or that Adobe could use the information in the code snapshot to identify Jane Doe. Moreover, Mr. Malaga provides no evidence that Adobe could link the information in the Transmission to Jane Doe's identity.

45. In Paragraph 39, Mr. Malaga claims (with respect to the Transmission in paragraph 38) that the "data also includes device id (highlighted above in blue), which identifies the device being used by Plaintiff Jane Doe, and an Adobe Marketing ID (highlighted above in green) that is connected with the Adobe Experience Cloud a/k/a Adobe Marketing Cloud service, and allows cross-tracking across platforms."

46. However, Mr. Malaga provides no evidence that any device or other ID in this Transmission can be linked to Jane Does' identity. The IDs Mr. Malaga references are a string of numbers and letters, and a string of numbers, respectively. Mr. Malaga provides no evidence (and does not claim to provide any evidence) that these strings of letters and numbers reveal Jane Does' identity, or that Adobe can link these strings of letters and numbers to Jane Doe's identity or to Jane Doe as a person.

47. In his footnote 11, Mr. Malaga claims (with respect to the Transmission in paragraph 38), "The type of information that ***can*** be used for digital fingerprinting is also highlighted above in grey" (emphasis added). However, as explained in Section II.C above, Mr. Malaga does not provide any evidence that his theoretical technique of "digital fingerprinting" or "Web Fingerprinting" is employed by any of the third parties he discusses. In his footnote 11, Mr. Malaga similarly provides no evidence that Adobe has used any such technique, or that it did so with respect to data collected from Kaiser's website.

48. The Malaga Declaration provides eight (8) additional examples of Transmissions that he says were sent to Adobe when the various unnamed Plaintiffs were using the Website or Apps in different scenarios. I have listed these eight additional Transmissions below based on Mr. Malaga's representations as to which Doe Plaintiffs were using the Website or App when the

Transmissions occurred:

| Computer web browser Transmissions to Adobe |
|---|
| • John Doe – Paragraph 43<br>• Jane Doe II – Paragraph 53<br>• Jane Doe III – Paragraph 60<br>• John Doe II – Paragraph 71<br>• Jane Doe IV – Paragraph 88<br>• Jane Doe V – Paragraph 103 |
| **Mobile App Transmissions to Adobe** |
| • John Doe II – Paragraph 82<br>• Jane Doe IV – Paragraph 98 |

49. I examined each of the eight Transmissions listed in the table above and Mr. Malaga's discussion of these Transmissions. None of the information in any of the eight Transmissions listed above identifies any person. None of these Transmissions contain information identifying any of the Does' identities. Mr. Malaga does not provide any evidence (or claim to provide any evidence) that any of the information in these examples identify the Doe, or that Adobe could use the information in these Transmissions to identify the Doe. Moreover, Mr. Malaga provides no evidence that Adobe could link the information in the Transmissions to any Doe's identity.

50. To summarize, in total, Mr. Malaga provides examples of nine (9) Transmissions he claims were to Adobe, with respect to the Website or Apps, and all of these Transmissions are discussed in the paragraphs above. Mr. Malaga never provides any evidence that Adobe received any information from the Website or Apps that identifies, or could be linked to the identity of, any of the Plaintiffs.

### C. <u>The Transmissions to Dynatrace Are Not "Identifying," and There Is No Evidence These Transmissions Can Be Linked to Any Plaintiff's Identity</u>

51. Just as he failed to provide support for his claims that identifying information was transmitted to Bing, Google/DoubleClick, Twitter, and Adobe, Mr. Malaga fails to provide any evidence that any Transmissions to Dynatrace contained any of Plaintiffs' identifying information

or that they could be linked to any Plaintiff's identity. I explain this in more detail in this section.

52. In paragraph 40, Mr. Malaga claims that "after Plaintiff Jane Doe was logged into the Kaiser Permanente Washington App, the code that Kaiser Permanente embedded in the Washington App commanded Jane Doe's Washington App to send a POST Request to Dynatrace informing Dynatrace that Plaintiff Jane Doe had successfully logged into the Washington Mobile Application." He cites to Exhibit 20 to his Declaration to support this claim, and asserts that this Transmission indicates that Plaintiff "Jane Doe" had logged into the Washington App.

53. However, the information in Exhibit 20 fails to identify any person. Mr. Malaga does not provide any evidence (or claim to provide any evidence) that any of the information in this Transmission identifies Jane Doe, or that Dynatrace could use the information in this Transmission to identify Jane Doe. Moreover, Mr. Malaga provides no evidence that Dynatrace could link the information in the Transmission to her identity. Thus, with respect to Exhibit 20, Mr. Malaga provides no evidence that Dynatrace received information that identifies, or could be linked to the identity of, Jane Doe or any of the Plaintiffs.

54. The Malaga Declaration provides two (2) additional examples of Transmissions that he claims were sent to Dynatrace when Jane Doe was using the Washington App. I have listed these two additional Transmissions below:

| **Mobile App Transmissions to Dynatrace** |
| --- |
| • Jane Doe – Paragraphs 41, 42 |

55. I examined the two Transmissions listed in the table above and Mr. Malaga's discussion of these Transmissions. None of the information in these two Transmissions identifies any person. Neither of these Transmissions contain information identifying Jane Doe's identity. Mr. Malaga does not provide any evidence (or claim to provide any evidence) that Dynatrace could use the information in these Transmissions to identify Jane Doe. Moreover, Mr. Malaga provides no evidence that Dynatrace could link the information in the two Transmissions to Jane Doe's identity.

56. To summarize, in total, Mr. Malaga provides three (3) example Transmissions he

claims were sent to Dynatrace when Jane Doe was using the Washington App, and all of these Transmissions are discussed in the paragraphs above. Mr. Malaga never provides any evidence that Dynatrace received any information from the Washington App that identifies, or could be linked to the identity of Jane Doe.

**D. <u>The Transmissions to Quantum Metric Are Not "Identifying," and There Is No Evidence These Transmissions Can Be Linked to Any Plaintiff's Identity</u>**

57. Just as he failed to provide support for his claims that identifying information was transmitted to Bing, Google/DoubleClick, Twitter, Adobe, and Dynatrace, Mr. Malaga fails to provide any evidence that any Transmissions to Quantum Metric contained any of Plaintiffs' identifying information or that they could be linked to any Plaintiff's identity. I explain this in more detail in this section. Mr. Malaga also makes a number of unsupported claims about Kaiser's alleged use of Quantum Metric's technology which I also explain.

58. First, in paragraph 44–50, Mr. Malaga claims Quantum Metric's technology captures "all"[15] of a website visitor's interactions with a website; that it is "the technological equivalent of peering over the User's shoulder and listening in on the patients' communications with their medical providers;"[16] and that "[t]he Session Replay code allows Quantum Metric to intercept all of the content the User views, all of their communications with their healthcare providers, and all of their interactions as they navigate the Website, including within the Portal."[17]

59. However, Mr. Malaga does not provide any evidence for these claims. Quantum Metric's website explains that Quantum Metric's code is highly configurable and customizable and that users choose what specific types of information is captured. Users can additionally use "do not capture" settings to prevent transmission of various pieces and types of data, and to mask any user input (if applicable).[18] Thus, without examining the specific, non-public settings used on any website, it is not possible to tell what information Quantum Metric's code is or is not capturing.

---

[15] Malaga Declaration ¶ 45.
[16] Malaga Declaration ¶ 47.
[17] Malaga Declaration ¶ 48.
[18] https://www.quantummetric.com/platform/data-privacy-security/

60. Mr. Malaga cannot know what information Quantum Metric's code was or was not capturing with respect to the Website because he only identifies the alleged size of the Transmissions to Quantum Metric (in kB). Apparently, he was not able to view or examine any of the data that was potentially transmitted with respect to the Website and discussed in his paragraphs 44–50. In his paragraph 49, Mr. Malaga states that there were alleged transmissions of 85 kB, 25kB, 330.7kB and 84 kB, but Mr. Malaga provides no information about what those Transmissions contained. He provides no information or evidence that the Transmissions contained anything more than unidentifiable and generic information. He provides no information or evidence that the Transmissions contained information that could be classified as sensitive. He provides no information or evidence that the Transmissions contained content that was viewed on the Website. He provides no information or evidence that the Transmissions contained communications with medical or healthcare providers. All of Mr. Malaga's claims about how Quantum Metric allegedly functioned on Defendants' websites is unsupported. It is based solely on the premise that Quantum Metric *could* operate in such a manner, without evidence of how it actually functioned with respect to the KFHP Website.

61. Furthermore, Mr. Malaga provides no evidence that any information he discusses in his paragraphs 44–50 as allegedly being transmitted to Quantum Metric identified John Doe. He provides no evidence that information transmitted to Quantum Metric identified any of the other Plaintiffs, or that Quantum Metric could use any information transmitted to identify a Plaintiff. Moreover, Mr. Malaga provides no evidence that Quantum Metric could link the information in the Transmissions to John Doe, or any of the other Plaintiffs. He does not claim to have provided such evidence.

62. In paragraph 58, Mr. Malaga provides a Transmission he claims was made to Quantum Metric after Jane Doe II logged into the Portal. However, none of the information in the Transmission identifies any person. Mr. Malaga does not provide any evidence (or claim to provide any evidence) that this Transmission identifies Jane Doe II, or that Quantum Metric could use the information in this Transmission to identify Jane Doe II. Moreover, Mr. Malaga provides no evidence that Quantum Metric could link the information in the Transmission to her identity.

63. Mr. Malaga provides six (6) additional examples of Transmissions that he claims were sent to Quantum Metric when various unnamed Plaintiffs were using the Website or Apps in different scenarios. I have listed these six additional Transmissions below based on Mr. Malaga's representations as to which Doe Plaintiff was using the Website or App when the Transmissions occurred:

| **Computer web browser Transmissions to Quantum Metric**[19] |
| --- |
| Jane Doe III – Paragraph 65<br>John Doe II – Paragraph 78<br>Jane Doe IV – Paragraphs 94 |
| **Mobile App Transmissions to Quantum Metric** |
| Jane Doe III – Paragraph 69<br>John Doe II – Paragraph 80<br>Jane Doe IV – Paragraph 96 |

64. I examined each of the six Transmissions listed in the table above and Mr. Malaga's discussion of these Transmissions. None of the information in any of the six Transmissions listed above identifies any person. None of these Transmissions contain information identifying any of the Does' identities. Mr. Malaga does not provide any evidence (or claim to provide any evidence) that any of the information in these examples identify the Doe, or that Quantum Metric could use the information in these Transmissions to identify any Doe. Moreover, Mr. Malaga provides no evidence that Quantum Metric could link the information in the Transmissions to any Doe's identity.

65. To summarize, in total, Mr. Malaga provides seven (7) example Transmissions he claims were sent to Quantum Metric and also makes unsupported statements about Quantum Metric in other paragraphs of his Declaration. All of the example Transmissions he says were sent to Quantum Metric are discussed in the paragraphs above. Mr. Malaga never provides any evidence that Quantum Metric received information about "all" interactions with the Website or

19 In his paragraph 102 Mr. Malaga claims that there was a transmission to Quantum Metric with respect to Jane Doe V, but in the following paragraphs of his declaration, he never provides any snapshot of a transmission to Quantum Metric. Therefore, I have not listed this paragraph in my table above.

all content viewed. Mr. Malaga never provides any evidence that Quantum Metric received any communications with medical or healthcare providers. Mr. Malaga never provides any evidence that Quantum Metric received any information that identifies, or could be linked to the identity of, any of the Plaintiffs.

## IV. CONCLUSIONS

66. Based on my review of the Declaration, and in particular the 68 Transmissions provided in Mr. Malaga's Exhibits and paragraphs 38–106 of his Declaration, and Mr. Malaga's discussion of these Transmissions, Mr. Malaga provides no evidence that identifying information was disclosed to any third parties. Mr. Malaga provides no evidence that any information disclosed could be linked to Plaintiffs' identities, or to any person's identity. Mr. Malaga also does not claim to have provided such evidence with respect to any of the third parties or Transmissions discussed in his declaration.

67. In addition, Mr. Malaga provides no evidence that any communications to medical or healthcare providers were disclosed. Furthermore, he provides no evidence that "communications" or messages between individuals were disclosed.

68. Finally, Mr. Malaga does not provide any evidence or support for any conclusion that any data was obtained or diverted while being transmitted between a website visitor's browser or App and the Website, or while being transmitted between any Plaintiff computer or mobile device and any Defendant website or server. Rather, the process Mr. Malaga describes and illustrates in his Figures 1 and 2 involves sequential transmissions between a website visitor's browser or App and the Website on the one hand, and on the other hand, separate transmissions of other information between the website visitor's browser or App and the third parties.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 21st day of November, 2023, at Chicago, IL.

James Vint

# EXHIBIT A

EXHIBIT A

**Jim Vint**
500 W. Madison St, 10th Floor Chicago, IL 60661
Managing Director – Secretariat Advisors
jvint@secretariat-intl.com
+1 (312) 286-5706
https://www.linkedin.com/in/jim-vint-2726161

## PROFESSIONAL OVERVIEW

Mr. Vint is a data expert with over 25 years of experience specializing in data-driven disputes. He has been recognized numerous times in "Who's Who" listing for Data, Litigation, and Investigation sections. He has worked on hundreds of matters during his career across a variety of industries addressing numerous data sources, formats, and structures including documents, communication medium, transactional data, chat data, social media, internet transmissions, and publicly available data sources. His experience includes structured data systems such as SQL Server, accounting systems, CRMs, ERPs, and other business platforms, and has led teams in leveraging scripting languages such as Python, PHP, C++ and Java Script for custom solutions. Additionally, he has led the development of Artificial Intelligence, Machine Learning and Robot Processing Automation processes, specifically within the legal community addressing email, documents, social media, texting, and instant messaging. He has extensive experience in IT due diligence, risk control evaluation, system performance improvement, and data quality and governance.

## EDUCATION

**May 2007** — **Duke University Fuqua School of Business,** Durham, NC; Seoul, Korea; Moscow, Russia; Sao Paolo, Brazil; Frankfurt, Germany
M.B.A, Focus on Global Management and Strategy

**May 1998** — **Loyola University Maryland**, Baltimore, MD
B.S. in Finance and Marketing
Minor in German

## PROFESSIONAL EXPERIENCE

**2023 – Present** — **Secretariat Advisors,** Chicago, IL
**Managing Director**

- Retained in technical expert and lead consulting roles for over 250 healthcare clients related to Meta pixel class action litigations, Office of Civil Rights investigations, and Department of Justice inquiries. Allegations relate to HIPAA violations, wiretapping violations, invasions of privacy, and other data privacy-related claims.
- Retained in technical expert and lead consulting roles for over 50 content provider, streaming services and other video hosting providers related to claims alleging violation of the US Video Privacy Protection Act.
- Retained as testifying expert to evaluate develop a process to analyze data from client and counterparty sources of information related to the presence of client map information in counterparty sales files.

**2020 – 2022** — **Breakwater Solutions,** Chicago, IL; New York, NY
**Chief Client Officer, Managing Director, Co-Founder**

- C-Suite role and founding member of firm focused on data risk identification, mitigation, and remediation. Market offerings include product and consulting services around disputes and investigations, regulatory compliance, cybersecurity, data privacy, and information governance.
- Retained in technical expert and lead consulting roles for numerous hospitals related to Meta pixel class action litigations, Office of Civil Rights investigations, and Department of Justice inquiries. Allegations relate to HIPAA violations, wiretapping violations, invasions of privacy, and other data privacy-related claims.
- Retained in lead technical consulting and advisory roles in multiple class action litigations brought under the Video Privacy Protection Act against global brand media outlets. Engagements relate to data flow from user devices to third parties while viewing video content on media websites.
- Retained to lead general consulting engagements related to data preservation, data workflow through organizations, and aggregation and analysis of disparate data sources for proactive and reactive matters.
- Responsible for firmwide client delivery.

**2018 – 2020** — **Ankura Consulting,** Chicago, IL
**Senior Managing Director, Data & Technology Lead**

- In August of 2018, Navigant sold the Disputes, Forensics and Legal Technology business to

Madison Dearborn Partners. That business was merged with an existing holding, Ankura Consulting.

- Retained as an expert to assist in the defense of a financial services client to aid in the definition of 'complete set of information' and the burden assessment to gather any additional sources of data that may or may not have relevant information.
- Retained as an expert to provide opinions on the applicability of a data archiving solution as it related to legal proceedings and the preservation of data, full text search capabilities, and mitigation of spoliation issues for email, transactions, and associated metadata. Dispute was between archiving platform software company and an insurance firm.
- Retained to perform a technical assessment on behalf of a global smart television manufacturer into data collection processes employed by a third party vendor. Review included opt-in/opt-out notification, protection and encryption of information collected, anonymization techniques of data used for resale to marketing agencies, and data disposition processes. Special attention was given to directives in the GDPR and CCPA rules.
- Retained by a financial services client to implement a data strategy within the legal and compliance group. The team was employed to develop a framework for an automated future state such that case specific data sources can be identified programmatically, accurately, and defensibly from a single data virtualization layer. Work included the development of policies and procedures to address data privacy, data security and governance around third party data sharing agreements, and data quality rules for critical data elements.

**2011 – 2018** **Navigant Consulting Inc.,** Chicago, IL
**Managing Director, Global Technology Solutions Practice Lead**

- Key relationship owner of C-suite executives, senior partners at law firms, and Global 1000 / Fortune 100 corporations to develop long- and short-term strategies to address and manage risk related to their specific portfolio of disputes, investigations, commercial disputes and cyber and information security, including financial, forensics, and technology needs.
- Retained as a technical expert to assist in the defense of a financial services client against allegations of incomplete productions of structured data from multiple systems to plaintiffs. Specific issues involved historic migration of data fields from mainframe systems to structured databases, maintenance of specific fields and other data migration issues and allegations of data loss.
- Retained to lead the discovery and technical elements of re-underwriting processes for a global financial institution for over 100 mortgage-backed security litigations. Discovery involved over 50 transactional systems of record (underwriting, origination, and servicing) as well as multiple document and image data repositories. Data from the systems was reviewed and incorporated into the re-underwriting processes for validation to contemporaneous underwriting guidelines to assess risk, accuracy, and causation impact for non-performing loans in a number of MBS vehicles.
- Retained as 30(b)(6) witness and led the process that identified, extracted, and reported on specific information in the investigation of alleged bribes paid to Asian officials for preferable contract and import tax terms. Sources included JD Edwards, SAP, PeopleSoft (HR) and "Home-grown" systems. Transactional reporting solutions across systems allowed counsel and experts to view cash disbursement transactions, and expense detail information through a front-end user interface.
- Retained to lead multiple technical workstreams for a major insurance carrier related to a compliance review. Integrated five disparate data systems including policy information, loss data, actuarial assessments, and hard copy files and photos to assess compliance with statutory requirements related to discounts and premiums based on historic performance and premium information.

**2004 – 2011** **FTI Consulting, Inc.,** Chicago, IL; London, UK
**Managing Director, Financial & Litigation Consulting**

- EMEA lead responsible for opening offices in London, Dublin, Brussels, Paris, Frankfurt, Munich, Milan, Barcelona, and Dubai.
- Retained to lead review of a custodial bank's foreign exchange transactions over a 24-month period. Each client transaction from all trading desks was evaluated against both Reuters and Bloomberg tick-by-tick data for the prevailing time-period to assess range of day clustering, conformance to stated trade times, prevailing market rates, and any uplift or discount to trades for various client bases. Determined that many of the allegations in the press were non-specific to the trading attributes of the client. Demonstrated the work and results to the SEC in mitigating claims against the client and its competitors. Subsequently retained as 30(b)(6) witness following receipt of subpoena for information from multiple regulatory authorities.
- Retained to lead the development, creation, and implementation of a global compliance platform for anti-corruption risk mitigation related to the disbursement of Gifts, Hosting and Charitable Contributions to a global beauty products distributer and reseller.
- Retained to lead an internal review for the trading desk of a major energy company, including systems for over 25 products traded by 120 traders. Assessment included a RAG review of invalid or risky trades in accordance with energy company's "black book" as well as internally stipulated covenants on debt and equity balances for large institutional investors (positions in futures, options,

raw product, etc.) and buyers (clients of natural gas, oil and energy). Additional compliance requests included an assessment to Special Designated Nationals (SDN's) as well as OFAC and other public restricted lists.

- Retained to lead the development of an automated integrated loan valuation data management system incorporating over 300 data points from at least 18 sources for a bad bank asset purchase arrangement. Development included automated reformation of source data, integration, and alignment of data points for each loan, consolidation of loans for bundle assessments, profiling and application of government regulated rates, re-underwriting of loans and trader positions, as well as equity and debt holdings by institutional investors.
- Retained to manage the recreation of a "live" trading environment and monthly reporting process for a failed financial institution to determine the scope of fraud and the method by which the events were performed. Project involved the analysis of over 200 programs and validation of results to known client reports for trend analysis, trade profiling, and stratification of the trade population. Determined the duplication of programs for tiers investors to allow for favorable returns over other tiers. Additionally, facilitated the review of transactions to uncover hidden assets located throughout the world including cars, houses, investments, and accounts.

**2002 – 2004** **AlixPartners,** Chicago, IL
**Manager, Financial Advisory Services**

- Responsible for managing the day-to-day engagement requirements for client matters in bankruptcy with a heavy focus on performance improvement, balance sheet and cost management, and developing 18-month plans for revival of operating profits.
- Typical engagements required integration of disparate sources of company data as well as publicly available data sources to reduce costs, drive revenue, and provide insights into operating case flow for underperforming and / or bankrupt organizations.

**1998 –2002** **Arthur Andersen / Andersen**, Washington, DC; Chicago, IL
**Manager, Business Consulting**

- Developed and delivered analyses and presentations that addressed client-specific issues related to regulatory compliance, litigation or other disputes, and investigations.
- Created functionality in SQL scripts and stored procedures to address specific needs of client settlement requirements for insurance buy-back and recovery disputes.

**LITIGATION SUPPORT/EXPERT WITNESS EXPERIENCE**

- Testifying Expert, Wiretapping and Privacy Breach
  - Jane Doe v. Medstar Health, Inc
  - Circuit Court for Baltimore City
  - Case No. 24-C-20-000591 OG
- Testifying Expert, Data Breach
  - Jane Doe v. Virginia Mason Medical Center, and Virginia Mason Health Systems
  - Superior Court of the State of Washington, King County
  - Case No. 19-2-26674-1 SEA
- Testifying Expert, Data Source Comparison (Settled)
  - Under Seal
- Testifying Expert, Data Matching
  - The Sanborn Library LLC v. ERIS Information Inc., Eco Log Environmental Risk Information Services LTD., and ERIS Information Limited Partnerships and counterclaimants
  - United States District Court – Southern District of New York;
  - Case No. 19 Civ. 02049 (LAK) (OTW)
- Expert Declaration Submitted, Opposition to Class Certification (Settlement in process)
  - Kyla Feldman v. Star Tribune Media Company,
  - United States District Court - District of Minnesota
  - Case 0:22-cv-01731-ECT-TNL
- Expert Declaration Submitted, Video Privacy Protection Act (Settled)
  - Cieara Munoz v. Paula's Choice LLC
  - United States District Court – Central District of California
  - Case No. 2:23-cv-3426

**PUBLICATIONS AND SPEAKING ENGAGEMENTS**

- Privacy and Security Fall Forum; Washington DC; November 2023 “Pixels, Session Replay, and Website Advertising Technology: Update on Litigation Trends”
- NetDiligence® Cyber Risk Summit Fort Lauderdale 2023 “Website Tracking Technology: The Next Class Action Wave”
- Beazley East Coast Cyber Retreat – “Website AdTech: What Every Broker Needs to Know”, May 23-24, 2003
- Practicing Law Institute: “Website Privacy Litigation 2022: Mitigating the Hidden Risks of Everyday Website Technology”, November 2022
- Artificial Intelligence and the General Counsel, Bloomberg.com, ABA.com, May 2018
- Embracing the Next Wave of Legal AI, Bloomberg.com, March 2018
- Investigators Beware! Pertinent Electronic Data Comes in Many Shapes and Sizes. IQ Quarterly, Volume 1, Issue 15 – Dec 2013
- Databases Lie! Successfully Managing Structured Data, the Oft-Overlooked ESI, Richmond. Journal of Law & Technology, Vol 9 (2013)

**AFFILIATIONS**

- Bloomberg Leadership Forums Advisory Board; 2016-2020
- Forbes Business Counsel; 2020-2022
- American Bar Association (ABA); Annually
- International Bar Association (IBA); Annually
- Member of Who’s Who Legal, Investigations; Data Annually

# EXHIBIT B

EXHIBIT B

**Vint Declaration**
**Exhibit A**

| *Malaga Declaration* | | | | | *Vint Declaration Response* | |
|---|---|---|---|---|---|---|
| **Malaga Paragraph No.** | **Malaga Exhibit No.** | **Website or App** | **Alleged Third Party Recipient** | **Alleged Doe** | **Section** | **Paragraph No.** |
| 31 | 1 | Website | Bing | John Doe | **III.A** | **32-34** |
| 31 | 2 | Website | Google | John Doe | **III.A** | **32-34** |
| 31 | 3 | Website | Twitter | John Doe | **III.A** | **32-34** |
| 31 | 4 | Mobile Application | Bing | John Doe | **III.A** | **32-34** |
| 31 | 5 | Mobile Application | Google | John Doe | **III.A** | **32-34** |
| 31 | 6 | Mobile Application | Twitter | John Doe | **III.A** | **32-34** |
| 31 | 7 | Mobile Application | Bing | John Doe | **III.A** | **32-34** |
| 33 | 8 | Website | Bing | John Doe | **III.A** | **35-36** |
| 33 | 9 | Website | Google | John Doe | **III.A** | **35-36** |
| 33 | 10 | Website | Twitter | John Doe | **III.A** | **35-36** |
| 33 | 11 | Website | Bing | John Doe | **III.A** | **35-36** |
| 33 | 12 | Website | Google | John Doe | **III.A** | **35-36** |
| 33 | 13 | Website | Twitter | John Doe | **III.A** | **35-36** |
| 33 | 14 | Website | Bing | John Doe | **III.A** | **35-36** |
| 33 | 15 | Website | Google | John Doe | **III.A** | **35-36** |
| 33 | 16 | Website | Twitter | John Doe | **III.A** | **35-36** |
| 34 | 17 | Website | Bing | John Doe | **III.A** | **37-38** |
| 34 | 18 | Website | Google | John Doe | **III.A** | **37-38** |
| 34 | 19 | Website | Twitter | John Doe | **III.A** | **37-38** |
| 38 | N/A* | Website | Adobe | Jane Doe | **III.B** | **42-47** |
| 40 | 20 | Mobile Application | Dynatrace | Jane Doe | **III.C** | **51-53** |
| 41 | N/A | Mobile Application | Dynatrace | Jane Doe | **III.C** | **54-56** |
| 42 | N/A | Mobile Application | Dynatrace | Jane Doe | **III.C** | **54-56** |
| 43 | N/A | Website | Adobe | John Doe | **III.B** | **48-50** |
| 53 | N/A | Website | Adobe | Jane Doe II | **III.B** | **48-50** |
| 54 | N/A | Website | Google (DoubleClick) | Jane Doe II | **III.A** | **39-41** |
| 55 | N/A | Website | Google | Jane Doe II | **III.A** | **39-41** |
| 56 | N/A | Website | Bing | Jane Doe II | **III.A** | **39-41** |
| 57 | N/A | Website | Twitter | Jane Doe II | **III.A** | **39-41** |
| 58 | N/A | Website | Quantum Metric | Jane Doe II | **III.D** | **57-62** |
| 60 | N/A | Website | Adobe | Jane Doe III | **III.B** | **48-50** |
| 61 | N/A | Website | Google (DoubleClick) | Jane Doe III | **III.A** | **39-41** |
| 62 | N/A | Website | Google | Jane Doe III | **III.A** | **39-41** |
| 63 | N/A | Website | Bing | Jane Doe III | **III.A** | **39-41** |
| 64 | N/A | Website | Twitter | Jane Doe III | **III.A** | **39-41** |
| 65 | N/A | Website | Quantum Metric | Jane Doe III | **III.D** | **63-65** |
| 67 | N/A | Mobile Application | Bing | Jane Doe III | **III.A** | **39-41** |
| 68 | N/A | Mobile Application | Google (DoubleClick) | Jane Doe III | **III.A** | **39-41** |
| 69 | N/A | Mobile Application | Quantum Metric | Jane Doe III | **III.D** | **63-65** |
| 71 | N/A | Website | Adobe | John Doe II | **III.B** | **48-50** |
| 72 | N/A | Website | Bing | John Doe II | **III.A** | **39-41** |
| 73 | N/A | Website | Google (DoubleClick) | John Doe II | **III.A** | **39-41** |

**Vint Declaration**
**Exhibit A**

| *Malaga Declaration* | | | | | *Vint Declaration Response* | |
|---|---|---|---|---|---|---|
| **Malaga Paragraph No.** | **Malaga Exhibit No.** | **Website or App** | **Alleged Third Party Recipient** | **Alleged Doe** | **Section** | **Paragraph No.** |
| 74 | N/A | Website | Google | John Doe II | **III.A** | **39-41** |
| 75 | N/A | Website | Google | John Doe II | **III.A** | **39-41** |
| 76 | N/A | Website | Twitter | John Doe II | **III.A** | **39-41** |
| 77 | N/A | Website | Twitter | John Doe II | **III.A** | **39-41** |
| 78 | N/A | Website | Quantum Metric | John Doe II | **III.D** | **63-65** |
| 80 | N/A | Mobile Application | Quantum Metric | John Doe II | **III.D** | **63-65** |
| 82 | N/A | Mobile Application | Adobe | John Doe II | **III.B** | **48-50** |
| 83 | N/A | Mobile Application | Bing | John Doe II | **III.A** | **39-41** |
| 84 | N/A | Mobile Application | Google (DoubleClick) | John Doe II | **III.A** | **39-41** |
| 85 | N/A | Mobile Application | Twitter | John Doe II | **III.A** | **39-41** |
| 88 | N/A | Website | Adobe | Jane Doe IV | **III.B** | **48-50** |
| 89 | N/A | Website | Bing | Jane Doe IV | **III.A** | **39-41** |
| 90 | N/A | Website | Google (DoubleClick) | Jane Doe IV | **III.A** | **39-41** |
| 91 | N/A | Website | Google | Jane Doe IV | **III.A** | **39-41** |
| 92 | N/A | Website | Google | Jane Doe IV | **III.A** | **39-41** |
| 93 | N/A | Website | Twitter | Jane Doe IV | **III.A** | **39-41** |
| 94 | N/A | Website | Quantum Metric | Jane Doe IV | **III.D** | **63-65** |
| 96 | N/A | Mobile Application | Quantum Metric | Jane Doe IV | **III.D** | **63-65** |
| 98 | N/A | Mobile Application | Adobe | Jane Doe IV | **III.B** | **48-50** |
| 99 | N/A | Mobile Application | Bing | Jane Doe IV | **III.A** | **39-41** |
| 100 | N/A | Mobile Application | Google (DoubleClick) | Jane Doe IV | **III.A** | **39-41** |
| 101 | N/A | Mobile Application | Twitter | Jane Doe IV | **III.A** | **39-41** |
| 103 | N/A | Website | Adobe | Jane Doe V | **III.B** | **48-50** |
| 104 | N/A | Website | Bing | Jane Doe V | **III.A** | **39-41** |
| 105 | N/A | Website | Google (DoubleClick) | Jane Doe V | **III.A** | **39-41** |
| 106 | N/A | Website | Twitter | Jane Doe V | **III.A** | **39-41** |

*"N/A" means that the Transmission snapshot was included only in the referenced paragraph of Mr. Malaga's declaration, not in an exhibit.