SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
WYNTER L. DEAGLE, Cal Bar No. 296501
wdeagle@sheppardmullin.com
ANNE-MARIE D. DAO, Cal Bar No. 282632
adao@sheppardmullin.com
DANE C. BRODY CHANOVE, Cal Bar No. 345843
dbrodychanove@sheppardmullin.com
12275 El Camino Real, Suite 100
San Diego, California 92130-4092
Telephone: 858.720.8900
Facsimile: 858.509.3691

Attorneys for Defendants
Kaiser Foundation Health Plan, Inc., Kaiser Foundation
Hospitals, and The Permanente Medical Group, Inc.

*[Additional counsel listed on signature page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

JOHN DOE, JOHN DOE II, JANE DOE, JANE DOE II, JANE DOE III, JANE DOE IV, and JANE DOE V, Individually and on behalf of all others similarly situated,

Plaintiffs,

v.

KAISER FOUNDATION HEALTH PLAN, INC., KAISER FOUNDATION HOSPITALS, and THE PERMANENTE MEDICAL GROUP, INC.,

Defendants.

Case No. 3:23-cv-02865-EMC

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO COMPEL ARBITRATION OF PLAINTIFF JOHN DOE'S CLAIMS AGAINST DEFENDANTS AND REQUEST TO STAY**

Date: March 14, 2024
Time: 1:30 p.m.
Crtrm.: 5

District Judge: Hon. Edward M. Chen
Magistrate Judge: Hon. Peter H. Kang

FAC Filed: September 15, 2023
Trial Date: Not Set

# TABLE OF CONTENTS

Page


TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... ii

I. INTRODUCTION ..... 1

II. ARGUMENT ..... 2

A. The EOC's Arbitration Agreement Governs the Claims at Issue. ..... 2

1. The EOC Is the Primary Agreement that Dictates Defendants' Contractual Relationship with John Doe and Governs His Claims. ..... 3

2. The EOC and Terms and Conditions Are Plainly Interrelated. ..... 4

a. The EOC and Terms and Conditions' Plain Language Demonstrates Their Interrelatedness. ..... 4

b. The Ninth Circuit Test for Interrelated Contracts is Satisfied. ..... 6

3. Johnson v. Walmart Is Factually Distinguishable and Inapposite Because of Limiting, Exclusionary Language in the First Contract. ..... 8

B. John Doe's Claims Are Within the Scope of the EOC's Arbitration Agreement. ..... 10

C. The Arbitration Agreement Applies to All of John Doe's Claims. ..... 11

1. John Doe's Claims Accrued After April 1, 2021. ..... 11

2. The EOC's Arbitration Agreement Permits Retroactive Application. ..... 12

D. The EOC Does Not Authorize Class Arbitration. ..... 14

E. The Court Should Stay John Doe's Claims Pending Arbitration ..... 15

III. CONCLUSION ..... 15

# TABLE OF AUTHORITIES

Page(s)

Cases

*23andMe, Inc. v. Davis-Hudson*
No. 5:15-CV-01323-PSG, 2015 WL 6094303 (N.D. Cal. Oct. 16, 2015) ....15

*AT & T Techs., Inc. v. Commc'n Workers of Am.*
475 U.S. 643 (1986)....10

*Axe Enterps., Inc. v. Amscan, Inc.*
No. 3:16-CV-00981, 2017 WL 1479236 (S.D. Cal. Apr. 25, 2017) ....11

*Castro v. ABM Indus., Inc.*
No. 17-CV-3026, 2018 WL 2197527 (N.D. Cal. May 14, 2018)....13

*First Options of Chicago, Inc. v. Kaplan*
514 U.S. 938 (1995)....3

*Gibson v. LeMond*
No. C 06-04220, 2007 WL 9812882 (N.D. Cal. June 26, 2007)....12

*Int'l Ambassador Programs, Inc. v. Archexpo*
68 F.3d 337 (9th Cir. 1995) ....6

*Java Trading Co. v. Performance Food Grp.*
No. C05-1191, 2006 WL 8454756 (W.D. Wash. Feb. 7, 2006)....6

*Jock v. Sterling Jewelers Inc.*
646 F.3d 113 (2d Cir. 2011) ....15

*Johnson v. Walmart Inc.*
57 F.4th 677 (9th Cir. 2023) ....6, 8, 9

*Kashmiri v. Regents of Univ. of Cal.*
156 Cal. App. 4th 809 (2007) ....3

*Long v. Fid. Water Sys., Inc.*
No. C-97-20118, 2000 WL 989914 (N.D. Cal. May 26, 2000)....13

*Morse v. ServiceMaster Glob. Holdings Inc.*
No. C 10-00628, 2012 WL 4755035 (N.D. Cal. Oct. 4, 2012) ....13

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*
460 U.S. 1 (1983)....14

*Navajo Transitional Energy Co., LLC v. BNSF Ry. Co.*
No. CV22146, 2023 WL 4826485 (D. Mont. July 24, 2023)....8

*Navajo Transitional Energy Co. v. Bnsf Ry. Co.*
No. CV 22-146, 2023 WL 5035800 (D. Mont. Aug. 8, 2023) ....8

*Otan Inv., LLC v. Trans Pac. Trading, Ltd.*
No. C05-2135, 2006 WL 1075225 (W.D. Wash. Apr. 20, 2006)....7

*Pac. States Indus. Inc. v. Am. Zurich Ins. Co.*
No. 18-CV-04064-LHK, 2018 WL 6106383 (N.D. Cal. Nov. 21, 2018)....15

*Pauma Band of Luiseno Mission Indians of Pauma & Yuima Rsrv. v. California*
813 F.3d 1155 (9th Cir. 2015) ....3

*Revitch v. DIRECTV, LLC*
977 F.3d 713 (9th Cir. 2020) ....3

*Rice v. Downs*
248 Cal. App. 4th 175 (2016) ....10

*Shivkov v. Artex Risk Sols., Inc.*
974 F.3d 1051 (9th Cir. 2020) ....14

*Simula, Inc. v. Autoliv, Inc.*
175 F.3d 716 (9th Cir. 1999) ....10

*SMMHC Inc. v. Aprima Med. Software, Inc.*
No. CV-13-02160, 2014 WL 1116996 (D. Ariz. Mar. 14, 2014)....7

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*
559 U.S. 662 (2010)....14

*United Steelworkers of Am. v. Am. Mfg. Co.*
363 U.S. 564 (1960)....10

*Vazquez v. ServiceMaster Glob. Holding Inc.*
No. C 09-05148 SI, 2011 WL 2565574 (N.D. Cal. June 29, 2011) ....15

*In re Verisign, Inc. Derivative Litig.*
531 F. Supp. 2d 1173 (N.D. Cal. 2007)....12

*Wilson v. Kaiser Found. Hosps.*
141 Cal. App. 3d 891 (1983) ....12

Statutes

9 U.S.C. § 3....15

Other Authorities

Black's Law Dictionary, Integration Clause (11th ed. 2019) ....4

## I. INTRODUCTION

The Court should grant Defendants' Motion to Compel Arbitration and stay John Doe's claims. John Doe's claims are subject to individual arbitration because: (1) the Evidence of Coverage ("EOC") contains a valid arbitration agreement that governs John Doe's claims; (2) his claims are within the scope of the EOC's arbitration agreement; (3) the EOC applies to all of his claims as pled in the FAC, and—even if it did not—the arbitration agreement applies retroactively, and (4) KFHP and John Doe did not agree to class arbitration.[1] John Doe's arguments to the contrary and efforts to evade the binding arbitration agreement in the EOC are unavailing.

First, John Doe's attempt to limit the scope of the EOC and its arbitration agreement contravenes the plain language of the EOC and its broad application. John Doe contends that the Terms and Conditions [2] (which does not have an arbitration agreement) solely governs his claims. *See* Opp'n at 7 (arguing the EOC "only covers claims arising from or related to insurance coverage and medical care Kaiser Plan Members receive when visiting Kaiser physicians or hospitals, such as claims for medical or hospital malpractice, premises liability, or coverage disputes"). Not so. For example, the EOC directs members to the Site and to the KP App (the "App") in over forty different places.[3] The EOC also includes "Privacy Practices" that set forth KFHP's privacy obligations to members and expressly references key privacy practices that are listed outside of the EOC, including online on the Site. Walker Decl. ¶ 3, Exh. A at A-91. Thus, the EOC—which contemplates telehealth, home visits, and other online resources—is not solely brick-and-mortar

---

[1] As used in this Reply, "Defendants" refers to Defendants Kaiser Foundation Health Plan, Inc. ("KFHP"), Kaiser Foundation Hospitals ("Hospitals"), and The Permanente Medical Group, Inc. ("TPMG"), collectively.

[2] Terms and Conditions refers to Exhibit 1 to the First Amended Complaint ("FAC"). John Doe incorrectly asserts that the Terms and Conditions incorporates the Privacy Statement. Opposition to Defendants' Motion to Compel Arbitration ("Opposition" or "Opp'n") at 2. It does not. The Terms and Conditions provides that, to the extent there is an inconsistency between these separate documents, the Terms and Conditions governs. (FAC, Exh. 1 at 1.)

[3] Kp.org, as listed in the EOC, is the same website as https://healthy.kaiserpermanente.org/front-door, the Site at issue in the FAC. (FAC ¶ 52.) The Terms and Conditions and Privacy Statement classify kp.org as the Site. (FAC, Exh. 1 at 1; *id.* Exh. 2 at 1.) Both the Terms and Conditions and the Privacy Statement refer to kp.org throughout. *E.g.*, *id.* Exh. 1 at 9, 11, 13; *id.* Exh. 2 at 6, 10. Lastly, the FAC cites links with "kp.org" embedded within. *E.g.*, *id.* ¶ 166.

focused, as John Doe contends. (Opp'n at 13.) The Terms and Conditions and the EOC are interrelated contracts, and the arbitration agreement in the EOC applies to John Doe's claims.

Second, John Doe disregards the "relationship" prong of the applicability clause in the EOC's arbitration agreement in an attempt to further constrict its reach. The arbitration agreement, however, applies to claims "arising from" or "related to an alleged violation of any duty incident to or arising out of or relating to" the EOC, and also applies to claims arising from John Doe's "***relationship to*** [*KFHP*]." Walker Decl. ¶ 3, Exh. A at A-83. As a Kaiser Plan Member, John Doe has an ongoing relationship with KFHP and expressly pleads that he uses the Site and App ***because of that relationship***. Accordingly, all his claims are subject to, and governed by, the EOC's arbitration agreement.

Third, John Doe asserts—contrary to the allegations in the FAC—that some of his claims accrued prior to April 1, 2021 (the effective date of the EOC). This is plainly false. The FAC only pleads that John Doe used the Site and App in 2023. The FAC lacks any facts to support John Doe's contention that his claims accrued prior to the effective date of the EOC. In any event, pleading such facts is futile, as the arbitration provision would apply to those claims retroactively.

Fourth, there is no merit to John Doe's argument that the EOC contains an "affirmative contractual basis" for class-wide arbitration. The plain language of the EOC demonstrates otherwise. The EOC does not permit class arbitration—expressly or impliedly.

## II. ARGUMENT

### A. The EOC's Arbitration Agreement Governs the Claims at Issue.

John Doe's attempts to narrow the scope of the EOC's arbitration agreement and confine his claims to the Terms and Conditions fail for two separate and independent reasons: (1) the EOC is the primary agreement that dictates the contractual relationship between Defendants and John Doe and governs his claims; and (2) the Terms and Conditions and EOC are interrelated. When interpreting a contract, courts discern the mutual intention of the parties "from the written terms [of the contract] alone," so long as the "contract language is clear and explicit and does not lead to

absurd results." *Kashmiri v. Regents of Univ. of Cal.*, 156 Cal. App. 4th 809, 831 (2007);[4] *see also Revitch v. DIRECTV, LLC*, 977 F.3d 713, 717 (9th Cir. 2020). Further, "[a] written contract must be read as a whole and every part interpreted with reference to the whole, with preference given to reasonable interpretations." *Pauma Band of Luiseno Mission Indians of Pauma & Yuima Rsrv. v. California*, 813 F.3d 1155, 1170 (9th Cir. 2015). "An interpretation which gives effect to all provisions of the contract is preferred to one which renders part of the writing superfluous, useless or inexplicable." *Id.* at 1171 (internal quotations omitted).

### 1. The EOC Is the Primary Agreement that Dictates Defendants' Contractual Relationship with John Doe and Governs His Claims.

Under the plain language of the EOC, the EOC (which includes the arbitration agreement) is the primary agreement that dictates the contractual relationship between John Doe and Defendants and governs John Doe's claims.

*First*, in over forty instances, the EOC directs members (like John Doe) to the Site and App to review and access benefits and services provided under the EOC. *E.g.*, Walker Decl. ¶ 3, Exh. A at A-39 ("To learn how to select or change to a different personal Plan Physician, visit our website at kp.org[.]");[5] *id.* at A-40 ("For the complete list of Services that require prior authorization, and the criteria that are used to make authorization decisions, please visit our website at kp.org/UM[.]"); *id.* at A-50 ("To see how close you are to reaching your Plan Out-of-Pocket Maximum, use our online Out-of-Pocket Summary tool at kp.org/outofpocket[.]"); *id.* at A-62 ("To order online, visit kp.org/rxrefill (you can register for a secure account at kp.org/registernow) or use the KP app from your smartphone or other mobile device[.]"); *id.* at A-75–A-77, A-79 ("To file a grievance online, use the grievance form on our website at kp.org."); *id.* at A-92–A-93 (stating that kp.org contains a provider directory, allows members to schedule "routine appointments" with "personal Plan Physician[s] or another Primary Care Physician," and contains estimates, bills, and statements). Thus, the EOC provides John Doe with the right and ability to meaningfully use the Site, the patient

---

[4] Courts apply state contract law to determine whether the parties agreed to arbitrate. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).

[5] When a user enters attempts to visit kp.org, they are redirected to the Site—healthy.kaiserpermanente.org.

Portal, and the App to access and manage ***benefits provided under the EOC***.

*Second*, the EOC governs John Doe's key interactions with the Site and App. The EOC repeatedly directs members to access the Site, including the patient portal (the "Portal") and characterizes the Site and App as tools through which members interact with KFHP and their plans. For example, the EOC provides for members to use the Site and App in its "Online Tools and Resources" section. *Id.* at A-92. Specifically, the Online Tools and Resources section states that the following "tools and resources" are "available on our website at kp.org: How to use our Services and make appointments[,] Tools you can use to email your doctor's office, view test results, refill prescriptions, and schedule routine appointments[,] Health education resources[,] Preventive care guidelines[, and] Member rights and responsibilities[.]" *Id.* The EOC also states that members "can also access tools and resources using the KP app" on a smartphone or other mobile device. *Id.* Simply put, the EOC provides John Doe with the right and ability to meaningfully use the Site, the Portal, and the App to access and manage ***benefits provided under the EOC***.

*Third*, the EOC contains a substantive section titled "Privacy Practices" stating several privacy obligations and incorporating "key privacy practices" located online. *Id.* at A-91. The EOC also specifically contemplates and references additional privacy practices not listed in the EOC, including those available on the Site. *Id.* Thus, the EOC—not any other agreement—creates the prime privacy obligations between KFHP and John Doe.[6]

### 2. The EOC and Terms and Conditions Are Plainly Interrelated.

#### a. The EOC and Terms and Conditions' Plain Language Demonstrates Their Interrelatedness.

The plain language of the Terms and Conditions establishes that it is interrelated with the EOC. The Terms and Conditions contemplates that Kaiser Plan Members, subject to their

[6] Neither the EOC nor the Terms and Conditions contains an integration clause. *See generally* Walker Decl. ¶ 3, Exh. A; FAC, Exh. A. *See also* Black's Law Dictionary, Integration Clause, (11th ed. 2019) (defining integration clause as a "contractual provision stating that the contract represents the parties' complete and final agreement and supersedes all informal understandings and oral agreements relating to the subject matter of the contract"). The lack of an integration clause in either contract further shows that the privacy provisions in the Terms and Conditions are encompassed under, and an extension of, the EOC's Privacy Practices.

agreements with the plan, will use the Site and App for purposes relating to their status as a member—i.e., to perform the types of activities expressly mentioned in the EOC. Specifically, on its first page, similar to the EOC's stated purposes for using the Site and App, the Terms and Conditions states, "[t]his Site allows users to: view health-related information[,] communicate with our practitioners and staff[,] arrange for clinical and health plan services[,] access additional services[, and] consent to receive important communications and documents (such as notices, videos and telephony) regarding their health plan coverage[.]" (FAC, Exh. A at 1.) Similar to the provisions of the EOC regarding scheduling and messaging, the Terms and Conditions states that members may use secure messaging to "email the doctor's office[,] ask a pharmacist[, or make] appointment requests." *Id.* The Terms and Conditions states that it provides access to "only a limited set of functions prior to when . . . full coverage begins." *Id.* at 2. It also contemplates users receiving information pursuant to their status as a plan member under the paragraph regarding text message communications. *Id.* at 6 (stating that users may receive text messages relating to "[g]eneral health communications from Kaiser Permanente providers including but not limited to notifications regarding upcoming or scheduled appointments, checkups and exams, hospital pre-registration instructions, pre-operative instructions, lab results, post-discharge follow-up, prescription notifications or reminders, or home healthcare instructions."). And regarding terms applicable to the App, the Terms and Conditions tells users they "have the option to choose which health plan coverage communications and/or documents [they] receive electronically." *Id.* at 9.

Finally, John Doe's allegations regarding the purpose of the Site and App and his use of them further establish interrelatedness. For example, John Doe alleges that Kaiser Plan Members use the Site to "perform various tasks that traditionally were only available by physically visiting their health care providers' offices or speaking directly to their health care providers, such as scheduling appointments; checking medical results; reviewing medical histories; researching doctors, locations, and medical services; communicating with providers and paying medical bills." (FAC ¶ 52.) Indeed, these alleged uses of the Site by John Doe in June and July 2023 are the sources of liability purportedly underpinning his claims. *Id.* ¶¶ 88–95, 115, 127–29, 147, 157, 159, 166, 171, 200–06 (describing specific instances of John Doe's use of the Site and App).

**b. The Ninth Circuit Test for Interrelated Contracts is Satisfied.**

In addition, the EOC and Terms and Conditions satisfy Ninth Circuit tests for interrelatedness. Factors relevant to whether two contracts are interrelated, or closely intertwined, include: (1) whether they were negotiated and entered into separately; (2) whether they involve separate consideration; and (3) whether proof of damages and claims under the contracts overlaps. *E.g.*, *Int'l Ambassador Programs, Inc. v. Archexpo*, 68 F.3d 337, 340 (9th Cir. 1995); *Johnson v. Walmart Inc.*, 57 F.4th 677, 683 (9th Cir. 2023). Each of these factors supports the interrelatedness of the EOC and the Term and Conditions.

*First*, the EOC and Terms and Conditions were not negotiated and entered into separately. As discussed above, the EOC contains language directing Kaiser Plan Members to use the Site and App—including the Portal—and contains a designated "Privacy Practices" section applicable to Kaiser Plan Members' use of Site and App. This establishes that John Doe ***did not need to negotiate*** separately to be able to use the Site and App. Indeed, it is his status as a Kaiser Plan Member through the EOC that allows him to progress beyond the "sign-in" page to use the Portal. (FAC ¶¶ 56–64.) In any event, John Doe almost exclusively relies upon information allegedly shared or disclosed *after* a log-in to the Portal. *E.g.*, *id.* ¶ 88 ("On June 6, 2023, when Plaintiff John Doe logged into the Portal and accessed recent medical test results . . . ."); *id.* ¶ 93 ("When Plaintiff John Doe accessed the Message Center inside the Portal . . . ."); *id.* ¶ 94 ("When Plaintiff John Doe accessed his Medical Summary inside the Portal . . . ."); *id.* ¶ 95 ("When Plaintiff John Doe accessed his bill pay account . . . ."). It would be nonsensical to suggest that, each time John Doe logs in to the Portal, he separately negotiates and enters into new and unrelated contracts. Because his use of the Site, Portal, and App is how he continues to "transact" with KFHP and how his benefits are effectuated, the EOC and Terms and Conditions are linked. *Java Trading Co. v. Performance Food Grp.*, No. C05-1191, 2006 WL 8454756, at *4 (W.D. Wash. Feb. 7, 2006) (holding contracts were interrelated when the second contracts were "merely mechanisms by which the [contract containing the arbitration agreement was] effectuated"). At bottom, when John Doe uses the Site and App, he simply avails himself of the EOC's benefits.

*Second*, the EOC and Terms and Conditions do not involve separate consideration. In the

FAC, under his breach of express contract claim, John Doe identifies the relevant consideration as the "Kaiser Permanente patient Portal and mobile applications" and "increased efficiency, optimized workflow, cost reduction, and receipt of incentive payments from the federal government . . . ." (FAC ¶ 346.) John Doe also alleges that "Kaiser Permanente benefits from Breach of Contract Sub-Class Members' use of their online Portal and mobile applications by: (1) making their provision of healthcare services more efficient, and (2) reducing the costs associated with managing their members' medical conditions." *Id.* ¶ 348. And, similarly, under his breach of implied contract claims, John Doe identifies the relevant consideration as "the patient Portal and mobile applications" and "increased efficiency, optimized workflow, cost reduction, and receipt of incentive payments from the federal government," as well as "Kaiser Permanente being freed up from performing such tasks of scheduling and reporting on test results for patients, thereby cutting down on long phone calls or in-office communications, increasing efficiency and decreasing costs." (FAC ¶¶ 362–63.) The Site, including the Portal and the App, are not ***separate*** benefits or consideration under the Terms and Conditions. *SMMHC Inc. v. Aprima Med. Software, Inc.*, No. CV-13-02160, 2014 WL 1116996, at *7 (D. Ariz. Mar. 14, 2014) (finding two contracts were interrelated when the performance under the second contract could not have been possible without a license to operate under the first contract); *see also* Walker Decl. ¶ 3, Exh. A at A-92.

In addition, because the EOC directs and allows John Doe to use the Site and App, the Terms and Conditions does not confer any separate benefits on John Doe. *Otan Inv., LLC v. Trans Pac. Trading, Ltd.*, No. C05-2135, 2006 WL 1075225, at *3 (W.D. Wash. Apr. 20, 2006) ("The Second Agreement, which covers Trans-Pacific's obligations as to '*the total production*' from the Lesosibirsk sawmill, is related, if not wholly intertwined, with the First Agreement that directs Trans-Pacific to market products from the very same facility."). Finally, when identifying his performance under his breach of express and implied contract claims, John Doe alleges he performed "under the express contract" and "under the implied contract" without identifying any performance at all, let alone any distinct performance under the Terms and Conditions. (FAC ¶¶ 349, 365.) This factor favors interrelatedness.

*Third*, the proof of breach of the Terms and Conditions and John Doe's other claims

overlaps with breach of the EOC. In *Navajo Transitional Energy Co., LLC v. BNSF Ry. Co.*, the court found that two contracts governing coal rail-shipments were "closely intertwined" for legal and practical purposes when they "both involve[d] the same parties[ and] transportation of the same material from the same origin to the same destination," and where adjudicating the claim and factual allegations under the contract *without* an arbitration agreement required an interpretation of the contract *with* an arbitration agreement—as well as detailed discovery regarding performance under both contracts. No. CV22146, 2023 WL 4826485, at *4 (D. Mont. July 24, 2023), *adopted*, *Navajo Transitional Energy Co. v. Bnsf Ry. Co.*, No. CV 22-146, 2023 WL 5035800 (D. Mont. Aug. 8, 2023). The party seeking relief claimed it sought no relief or damages whatsoever under the contract containing an arbitration agreement. *Id.* But this ultimately did not alter the court's determination that the factual allegations in the complaint were equally relevant to ***both*** contracts, which were further "operationally linked." *Id.* at *5.

Here, a similar finding of overlapping proof and damages is appropriate. The actions John Doe took on the Site and App that he argues give rise to his claims were actions recommended by, and enabled by, his status under the EOC as a Kaiser Plan Member. *E.g.*, FAC ¶¶ 88, 93–96. These are the exact activities and types of activities referenced throughout the EOC. *See supra* pp. 3–4. Thus, John Doe used the online tools, including the Site and the App, at the direction and recommendation of the EOC—which governs the various services, information, and records he was accessing and utilizing. Moreover, his claims are based, in large part, on principles of privacy, privacy invasion, and data protection or disclosure. (FAC ¶¶ 264–422.) The EOC contains privacy protection obligations and incorporates the Notice of Privacy Practices posted online. Walker Decl. ¶ 3, Exh. A at A-91. Allegations and discovery relating to whether KFHP violated privacy obligations, misused or mishandled data, or breached contractual privacy duties necessarily relate to the EOC. Accordingly, this final factor weighs in favor of finding the EOC and Terms and Conditions interrelated.

### 3. *Johnson v. Walmart* Is Factually Distinguishable and Inapposite Because of Limiting, Exclusionary Language in the First Contract.

John Doe's reliance on *Johnson v. Walmart Inc.*, 57 F.4th 677 (9th Cir. 2023) is misplaced.

He cites this case to support his argument that the EOC does not apply to the Site and App because its "clear, delineated purpose" is "to regulate Kaiser Plan Members' insurance coverage and health care provided at Kaiser facilities." (Opp'n at 13.) Not only is that an overly narrow reading of the EOC, *Johnson* is readily distinguishable and inapposite.

In *Johnson*, the earlier-in-time contract, Terms of Use governing an *online* purchase of tires, stated that it only "govern[ed] . . . access to and use of all Walmart Sites," and also included an arbitration agreement. *Johnson*, 57 F.4th at 682. "Walmart Sites" did ***not*** include physical Walmart locations. *Id.* Thus, a claim arising out of a later-in-time Service Agreement purchased ***in-person at a physical Walmart store*** was clearly excluded from the Terms of Use's scope by its exclusionary language. *Id.*

In contrast, the EOC here includes no such language ***excluding*** its application to any online activities, including the Site and the App. Quite the opposite is true—the EOC references the Site and App throughout and contemplates its members' use of the Site and App to partake in, receive, and use the contractual benefits of the EOC. In an attempt to shoehorn the facts of the instant matter within the online vs. in-store distinction present in *Johnson*, John Doe styles the EOC's arbitration agreement as having a "clear, delineated purpose" of "regulat[ing] Kaiser Plan Members' insurance coverage and health care provided ***at Kaiser facilities***." (Opp'n at 13.) However, no plain reading of the EOC supports limiting its purpose to Kaiser facilities. The EOC clearly considers that its members need not be at a Kaiser facility to manage insurance coverage, access information, make appointments, or order prescriptions. Walker Decl. ¶ 3, Exh. A at A-92. In addition, the EOC covers certain telehealth visits, which by their virtual nature, necessarily do not require a member to be at a Kaiser facility. *Id.* at A-68. Many of the topics that John Doe states the EOC covers, "including insurance deductibles, premiums, how to obtain routine and urgent care, getting a referral or second opinion, plan facilities, specific health benefits, coordination of benefits, post-service claims and appeals, and termination or continuation of membership[,]" are accessible, viewable, or manageable on the Site or App as explicitly provided for in the EOC. Thus, it is simply incorrect to say the EOC "does not cover the use of the Site and App." (Opp'n at 13.)

In sum, KFHP has established by a preponderance of the evidence that a valid arbitration

agreement exists governing the Terms and Conditions. John Doe never disputes the validity of the EOC's arbitration agreement or otherwise contends it is unconscionable. In addition, the Terms and Conditions fail to expressly modify the EOC. *See generally* FAC at Exh. 1. The rules of contract construction and the interrelatedness of the EOC and Terms and Conditions establish that the EOC governs the Terms and Conditions.

**B. John Doe's Claims Are Within the Scope of the EOC's Arbitration Agreement.**

In determining whether an arbitration agreement governs claims at issue, courts look to "whether the party seeking arbitration is making a claim which on its face is governed by the contract." *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 568 (1960). To assess whether a dispute falls within the scope of an arbitration agreement, a court examines the factual allegations raised in the complaint. *See, e.g.*, *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721 (9th Cir. 1999). A dispute is arbitrable if it "touch[es] matters" covered by the arbitration agreement, whether the claims asserted are themselves based in contract or tort. *See Rice v. Downs*, 248 Cal. App. 4th 175, 186 (2016). Due to the liberal policy favoring arbitration, doubts as to whether a claim is covered by an arbitration agreement "should be resolved in favor of coverage." *AT & T Techs., Inc. v. Commc'n Workers of Am.*, 475 U.S. 643, 650 (1986) (citations omitted).

The EOC's broad arbitration agreement encompasses claims not only "arising from" or "related to an alleged violation of any duty incident to or arising out of or relating to" the EOC, but also applies to claims arising from John Doe's "***relationship** to* [*KFHP*]." Walker Decl. ¶ 3, Exh. A at A-83 (emphasis added). The Ninth Circuit has held that where an arbitration agreement includes language such as "arising out of or relating to" the relationship between the parties, the agreement should be interpreted broadly. *See Simula, Inc.*, 175 F.3d at 721. Here, the crux of John Doe's claims are assertions that Defendants violated a duty to maintain the confidentiality of his information—a contractual duty under the EOC. *Compare* FAC ¶¶ 195, 225, 355(f), 371(f), 543, *with* Walker Decl. ¶ 3, Exh. A at A-91. Similarly, his invasion of privacy, CLRA, CMIA, ECPA, CIPA, negligence per se, and breach of contract claims are also premised on alleged violations of privacy duties or mishandling or disclosure of his data. (Mem. in Supp. Mot. to Compel ("MTC") at 14.) Moreover, they arise out of John Doe's use of the Site, Portal, and App to manage his

healthcare and avail himself of the plan benefits—which are privileges granted to him and resources made available to him by the EOC and his member status thereunder. Thus, all John Doe's claims touch on matters under the EOC, and more broadly, under his relationship with KFHP as a plan member. And to the extent there is any doubt (there is not), this scope determination should be resolved in favor of arbitration.

### C. The Arbitration Agreement Applies to All of John Doe's Claims.

John Doe contends that the Court should maintain jurisdiction over his claims to the extent those claims accrued prior to April 1, 2021, because he has "used the Site and/or App since in and around 2012" and the arbitration agreement cannot be applied retroactively. (Opp'n at 13.) These arguments fail because: (1) John Doe has not alleged that he used the Site or App prior to April 1, 2021, and (2) even if John Doe had pled any claims that could have accrued prior to April 1, 2021, the arbitration provision permits retroactive application.

#### 1. John Doe's Claims Accrued After April 1, 2021.

All John Doe's claims are subject to arbitration because the FAC does not allege that John Doe ever used the Site or App before April 1, 2021. John Doe baldly claims that he has used the Site and App "since in and around 2012," but the FAC lacks any facts to support such a contention.[7] In the FAC, John Doe pleads only that he is currently a Kaiser Plan Member, "regularly uses" the Site and App, and "has received medical treatment through Kaiser Foundation Hospitals and or the Permanente Medical Group since in and around 2012." (FAC ¶14.) The only allegations in the FAC regarding John Doe's use of the Site or App and the disclosure of his information and communications all state that ***John Doe accessed the Site, the Portal, and the App in 2023***. *See id.* ¶¶ 88–95, 115, 127–29, 147, 157, 159, 166, 171, 200–06. As a result, based on the facts pleaded in the FAC, none of John Doe's claims could have accrued prior to June 2023—well after he became

[7] The Opposition does not cite to any provision of the FAC for its assertion that John Doe has used the Site or Apps since 2012 and cannot now try to introduce new unsupported facts in its Opposition memorandum. Indeed, the Opposition is unsupported by any non-pleading evidence *at all*—it attaches no declarations, affidavits, or other documentary evidence. Under these circumstances, any new factual assertions, including those inconsistent with or not pleaded in the FAC, should be disregarded. *E.g.*, *Axe Enterps., Inc. v. Amscan, Inc.*, No. 3:16-CV-00981, 2017 WL 1479236, at *4 (S.D. Cal. Apr. 25, 2017).

subject to the EOC's arbitration agreement.[8]

**2. The EOC's Arbitration Agreement Permits Retroactive Application.**

The arbitration agreement's provision on retroactive application states as follows: "[i]nsofar as this 'Binding Arbitration' section applies to claims asserted by Kaiser Permanente Parties, it shall apply retroactively to all unresolved claims that accrued before the effective date of this *EOC*. Such retroactive application shall be binding only on the Kaiser Permanente Parties." Walker Decl. ¶ 3, Exh. A at A-83. Because the arbitration agreement applies to claims arising from John Doe's relationship to KFHP, the agreement necessarily includes claims accruing during John Doe's long relationship with KFHP but prior to the EOC's effective date.

Courts have found claims occurring before the effective date of an arbitration agreement to be ***within*** the scope of an arbitration agreement that "is not limited to claims arising under the agreement itself." *In re Verisign, Inc. Derivative Litig.*, 531 F. Supp. 2d 1173, 1224 (N.D. Cal. 2007). In *Gibson v. LeMond*, the court applied an arbitration agreement to a fraud counterclaim arising prior to execution of the contract containing the arbitration agreement. No. C 06-04220, 2007 WL 9812882, at *3 (N.D. Cal. June 26, 2007) (holding that various cases refusing to apply arbitration agreements retroactively "do not stand for a general principle that arbitration agreements have no retroactive application irrespective of their literal terms" because "the literal language of the clause [in those cases] makes clear that it does not apply to claims arising before a contract was formed, as such claims cannot reasonably be construed as having 'arisen' from the contract" (citation omitted)).

A similar result is required here. The EOC's arbitration agreement requires a dispute to be submitted to binding arbitration if the "claim arises from or is related to an alleged violation of any duty incident to or arising out of or relating to this *EOC* ***or a Member Party's relationship to***

[8] Even if he had pleaded claims accruing prior to April 1, 2021, John Doe would be bound by the virtually identical binding arbitration agreements applicable to those claims. *See* Suppl. Walker Decl. ¶ 3 & Exhs. H–N. John Doe is also bound by those arbitration agreements. *Wilson v. Kaiser Found. Hosps.*, 141 Cal. App. 3d 891, 899–900 (1983) (finding a child who did not become a Kaiser Plan Member until the time of his birth, was bound by his parent's agreement to arbitrate claims against Hospitals and TPMG).

***Kaiser Foundation Health Plan, Inc.*** . . . ." Walker Decl. ¶ 3, Exh. A at A-8 (emphasis added). Thus, not only do claims arising out of the EOC require arbitration, claims arising out of John Doe's "relationship to Kaiser Foundation Health Plan, Inc." do as well. And, as John Doe admits, he "has received medical treatment through Kaiser Foundation Hospitals and/or the Permanente Medical Group since in or around 2012." (Opp'n at 8 ("Plaintiff has been a Kaiser Plan Member since 2012); *id.* at 13 ("Plaintiff has used the Site and/or App since in or around 2012[.]")); *see also* FAC ¶ 15; Walker Decl. ¶ 10.

In the Opposition, John Doe applies an overly onerous standard. *See* Opp'n at 18 (stating it must have a "clear and unequivocable statement of retroactive applicability[.]") John Doe relies primarily on *Long v. Fid. Water Sys., Inc.*, which addressed an arbitration agreement that was purely forward-looking by operation of its terms. No. C-97-20118, 2000 WL 989914, at *2 (N.D. Cal. May 26, 2000). Specifically, the agreement in that case stated that "[a]ny claim, dispute, or controversy (whether in contract, tort, or otherwise) ***arising from or relating to this Agreement or the relationship which result* [*sic*] *from this Agreement*** . . . shall be resolved . . . by binding arbitration . . ." and was therefore limited to claims arising from the relevant agreement and the after-the-fact relationship that resulted from entering into the agreement. *Id.* Here, in contrast, the EOC's arbitration agreement does not contain the "relationship which result[s] from" limitation but instead covers claims that arise out of Member Party's relationship to KFHP ***generally***. John Doe's other authorities are similarly inapposite given the vastly different arbitration agreements at issue in those cases. *See, e.g.*, *Morse v. ServiceMaster Glob. Holdings Inc.*, No. C 10-00628, 2012 WL 4755035, at *1 (N.D. Cal. Oct. 4, 2012) (involving a relevant agreement that was contained within an employment agreement prior to which work under the agreement *could not* have been performed and "work-related disputes/concerns" *could not* have arisen); *Castro v. ABM Indus., Inc.,* No. 17-CV-3026, 2018 WL 2197527, at *4 (N.D. Cal. May 14, 2018) (finding agreement's use of the term "*whenever*" was a temporal limitation). Here, the EOC's arbitration agreement contains no temporal limitation of "whenever" or any other similar timing-based descriptor. In any event, the EOC's arbitration agreement contains past-tense language, because it can apply to "a claim that medical services or items ***were*** unnecessary or ***were*** improperly, negligently, or incompetently

***rendered***[.]" Walker Decl. ¶ 3, Exh. A at A-83 (emphasis added).

Finally, to the extent the Court finds the retroactive application clause conflicts with the applicability clause, the Court should resolve any conflict between these clauses in favor of arbitration. Under the FAA "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

**D. The EOC Does Not Authorize Class Arbitration.**

The EOC does not permit class arbitration—expressly or impliedly. When parties do not agree to authorize class arbitration, they cannot be "compelled to submit their dispute to class arbitration." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 687 (2010). "Neither silence nor ambiguity provides a sufficient basis for concluding that parties to an arbitration agreement agreed to undermine the central benefits of arbitration itself, namely, the individualized form of arbitration envisioned by the FAA." *Shivkov v. Artex Risk Sols., Inc.*, 974 F.3d 1051, 1069 (9th Cir. 2020) (internal citations and quotations omitted). John Doe does not dispute that the EOC does not expressly permit class arbitration. *See* Opp'n at 19. Accordingly, because the EOC's arbitration agreement does not expressly permit class arbitration, the Court should compel individual arbitration on that basis.

Moreover, even if the Court finds that, under some circumstances, contracts can impliedly authorize class arbitrations, the EOC here does not. An "implicit agreement to authorize class-action arbitration" cannot be inferred "solely from the fact of the parties' agreement to arbitrate." *Stolt-Nielsen*, 559 U.S. at 685. *Stolt-Nielsen* notes the "fundamental changes brought about by the shift from bilateral arbitration to class-action arbitration[,]" including burden on the arbitrator(s), the potential for the arbitral award to bind absent parties, and the high commercial stakes accompanied by a narrower scope of judicial review of arbitration awards. *Id.* at 686–87. Nothing in the EOC implies an intent to apply those dramatic shifts to the narrower arbitration actually required here.

John Doe wrongly contends that the EOC's arbitration agreement's use of plural terms,

specifically "one or more Member Parties" and "Claimants," implies class arbitration authorization. (Opp'n at 19.) To the extent the EOC contemplates multiple claimants joined in the same arbitration, allowing for more than one claimant is not tantamount to a *class* authorization. Instead, the EOC considers simple joinder of claimants, akin to permissive joinder of parties under Federal Rule of Civil Procedure 20. Second, each authority John Doe relies upon did not actually determine that the relevant arbitration agreements implicitly authorized class arbitration. *Jock v. Sterling Jewelers Inc.*, 646 F.3d 113, 127 (2d Cir. 2011) (deferring to a prior arbitral determination on class certification under onerous standards for vacating arbitration awards); *23andMe, Inc. v. Davis-Hudson*, No. 5:15-CV-01323-PSG, 2015 WL 6094303, at *3–4 (N.D. Cal. Oct. 16, 2015) (same); *Vazquez v. ServiceMaster Glob. Holding Inc.*, No. C 09-05148 SI, 2011 WL 2565574, at *3 (N.D. Cal. June 29, 2011) (deferring question of class arbitration to arbitrator). Accordingly, the Court should compel individual arbitration.

**E. The Court Should Stay John Doe's Claims Pending Arbitration**

John Doe's claims should be stayed pending resolution of his claims in arbitration. 9 U.S.C. § 3. In addition, John Doe failed to establish that any of his claims arose prior to April 1, 2021 and can be severed to proceed before the Court. *Pac. States Indus. Inc. v. Am. Zurich Ins. Co.*, No. 18-CV-04064-LHK, 2018 WL 6106383, at *7 (N.D. Cal. Nov. 21, 2018) (staying claims and rejecting plaintiff's contentions that claims outside the 2014–2017 timeframe of the relevant arbitration agreement had to be litigated before the court because the complaint failed to "specify that certain causes of action relate only to [defendant's] conduct from 2004 to 2013"). The FAC does not specify that certain causes of action relate only to conduct occurring before April 21, 2021. Thus, *all* John Doe's claims should be stayed.

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion to Compel Arbitration and Request for Stay should be granted.

/ / /

/ / /

/ / /

Dated: February 14, 2024

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By /s/ *Wynter L. Deagle*

WYNTER L. DEAGLE, Cal Bar No. 296501
wdeagle@sheppardmullin.com
ANNE-MARIE D. DAO, Cal Bar No. 282632
adao@sheppardmullin.com
DANE C. BRODY CHANOVE, Cal Bar No. 345843
dbrodychanove@sheppardmullin.com
12275 El Camino Real, Suite 100
San Diego, California 92130-4092
Telephone: 858.720.8900
Facsimile: 858.509.3691

TENAYA RODEWALD, Cal Bar No. 248563
trodewald@sheppardmullin.com
1540 El Camino Real, Suite 120
Menlo Park, CA 94025
Telephone: 650.815.2600
Facsimile: 650.815.2601

KARI M. ROLLINS *(Pro Hac Vice)*
krollins@sheppardmullin.com
CHARLES L. GLOVER (*Pro Hac Vice*)
cglover@sheppardmullin.com
30 Rockefeller Plaza
New York, New York 10112-0015
Telephone: 212.653.8700
Facsimile: 212.653.8701

NOLAN J. WALTER, Cal Bar No. 325021
nwalter@sheppardmullin.com
KEVIN MURPHY, Cal Bar No. 346041
kemurphy@sheppardmullin.com
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6055
Telephone: 310.228.3700
Facsimile: 310.228.3701

Attorneys for Defendants
Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, and The Permanente Medical Group, Inc.