UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DOE, et al.,<br><br>            Plaintiffs,<br><br>       v.<br><br>KAISER FOUNDATION HEALTH PLAN, INC., et al.,<br><br>            Defendants. | Case No.  23-cv-02865-EMC<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO COMPEL ARBITRATION**<br><br>Docket No. 82 |

Plaintiffs are seven individuals. All are proceeding anonymously: John Doe, John Doe II, Jane Doe, Jane Doe II, Jane Doe III, Jane Doe IV, and Jane Doe V. Plaintiffs have sued three Kaiser entities: Kaiser Foundation Health Plan, Inc. ("KFHP"); Kaiser Foundation Hospitals ("Kaiser Hospitals"); and The Permanente Medical Group, Inc. ("TPMG"). The three entities shall be referred to collectively as "Kaiser."

According to Plaintiffs, Kaiser installed code from six different third parties on its website and two mobile applications (*i.e.*, the Kaiser Permanente App and the Kaiser Permanente Washington App), and that code allows the third parties "to intercept the content of [a website/app user's] patient status, identifying information, medical topics researched, choices made, information shared and communications with their medical providers, including personally identifiable medical information and other confidential information and communications, when that information is in transit" (*i.e.*, between the website/app user and Kaiser). FAC ¶ 4. The six third parties at issue are: Quantum Metric, Twitter, Adobe, Bing, Google, and Dynatrace.

Currently pending before the Court is Kaiser's motion to compel arbitration. The motion addresses one plaintiff only: John Doe ("JD"). Having considered the parties' briefs and

accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** Kaiser's motion to compel arbitration.[1]

### I.   FACTUAL & PROCEDURAL BACKGROUND

The evidence submitted by the parties reflects as follows.

A.   Trust Enrollment Form

JD obtains health insurance through the Teamsters and Food Employers Security Trust Fund ("Trust").  "During the annual open enrollment period for benefits, the Trust sends an enrollment package to each of its members."  Osharow Decl. ¶ 3.  The enrollment package includes various documents, including a Trust Enrollment Form.  *See* Osharow Decl. ¶ 3.  A member fills out the Trust Enrollment Form to enroll in a medical plan.  *See* Osharow Decl. ¶ 4.

In February 2021, JD filled out the Trust Enrollment Form, seeking enrollment in a Kaiser health plan.  *See* Osharow Decl. ¶ 8.  Since April 2021, JD has been continuously enrolled in the Kaiser health plan.  *See* Osharow Decl. ¶ 12.

The Trust Enrollment Form that JD signed was only one page in length.  Right above the signature line, there was a paragraph related to arbitration.  It provided as follows:

> Kaiser Foundation Health Plan, Inc. Arbitration Agreement
> I understand that (except for [certain kinds of claims not applicable here]) any dispute between myself . . . on the one hand and Kaiser Foundation Health Plan., Inc. (KFHP), any contracted health providers, [etc.] on the other hand, for alleged violation of any duty arising out of or related to membership in KFHP, including any claim for medical or hospital malpractice . . . , for premises liability, or relating to the coverage for, or delivery or, services or items, irrespective of legal theory, must be decided by binding arbitration under California law and not by lawsuit or resort to judicial process, except as applicable law provides for judicial review of arbitration proceedings.  I agree to give up our right to a jury trial and accept the use of binding arbitration.  I understand that the full arbitration provision is contained in the Evidence of Coverage.

Osharow Decl., Ex. A (Trust Enrollment Form).  The Evidence of Coverage is a document that applies to all Trust enrollees in the health plan.

---

[1] Kaiser has also filed a motion to dismiss which the Court shall address in a separate order.

B.  Evidence of Coverage

The Evidence of Coverage ("EOC") for the relevant time period can be found at Exhibits A-C of the Walker Declaration.  For convenience, the Court focuses on the EOC in place at the time that JD enrolled – *i.e.*, Exhibit A (Kaiser Permanente Traditional HMO Plan, Evidence of Coverage for Teamsters and Food Employers Security Trust Fund).

The Introduction section for the EOC describes the EOC as follows:

> This *Evidence of Coverage* ("*EOC*") describes the health care coverage of "Kaiser Permanente Traditional HMO Plan" provided under the *Group Agreement* ("*Agreement*") between Kaiser Foundation Health Plan, Inc. ("Health Plan") and the entity with which Health Plan has entered into the *Agreement* (your "Group").
>
> This *EOC* is part of the *Agreement* between Health Plan and your Group.  The *Agreement* contains additional terms such as Premiums, when coverage can change, the effective date of coverage, and the effective date of termination.

Walker Decl., Ex. A (EOC at 17).

"Member" is defined in the EOC as "[a] person who is eligible and enrolled under this *EOC*, and for whom we have received applicable premiums."  Walker Decl., Ex. A (EOC at 19). "As a Member, you are selecting our medical care program to provide your health care." Walker Decl., Ex. A (EOC at 27).

The EOC contains a lengthy section on benefits.  *See* Walker Decl., Ex. A (EOC at 35).

It also contains a section on dispute resolution, including binding arbitration (as referenced in the Trust Enrollment Form).  The arbitration clause states:

> For all claims subject to this "Binding Arbitration" section, both Claimants and Respondents give up the right to a jury or court trial and accept the use of binding arbitration.  Insofar as this "Binding Arbitration" section applies to claims asserted by Kaiser Permanente Parties, it shall apply retroactively to all unresolved claims that accrued before the effective date of this EOC.  Such retroactive application shall be binding only on the Kaiser Permanente Parties.

Walker Decl., Ex. A (EOC at 72).

The scope of arbitration is described as follows:

> Any dispute shall be submitted to binding arbitration if all of the following requirements are met:

3

- The claim arises from or is related to an alleged violation of any duty incident to or arising out of or relating to this *EOC* or a Member Party's relationship to [KFHP], including any claim for medical or hospital malpractice . . . , for premises liability, or relating to the coverage for, or delivery of, services or items, irrespective of the legal theories upon which the claim is asserted.

- The claim is asserted by one or more Member Parties against one or more Kaiser Permanente Parties or by one or more Kaiser Permanente parties against one or more Member Parties.

- Governing law does not prevent the use of binding arbitration to resolve the claim.

Walker Decl., Ex. A (EOC at 72).[2]

In addition, the EOC contains a subsection on privacy practices. This subsection also refers a Member to a document that elaborates on privacy practices and that is available online at kp.org. *See* Walker Decl., Ex. A (EOC at 81).

Finally, the EOC contains a subsection on online tools and resources that a Member may use. It states in relevant part:

> Here are some tools and resources available on our website at **kp.org**:
>
> - How to use our Services and make appointments
> - Tools you can use to email your doctor's office, view test results, refill prescriptions, and schedule routine appointments
> - Health education resources
> - Preventive care guidelines
> - Member rights and responsibilities
>
> You can also access tools and resources using the KP app on your smartphone or other mobile device.

Walker Decl., Ex. A (EOC at 82). Hence, the EOC makes express reference to the Kaiser website and mobile applications.

C.   Website and Mobile Application

Within Kaiser's website and mobile application, there are specific "Terms and

---

[2] The Group Agreement (of which the EOC is a part) also contains a section on binding arbitration (on the Group Agreement signature page near the end of the contract). *See, e.g.*, Walker Decl., Ex. D (Grp. Agmt.).

4

1   Conditions" ("TAC").  The website and mobile application are collectively referred to in the TAC

2   as the "Site."  As stated in the TAC:

3     The Site allows users to:

4   - view health-related information
    - communicate with our practitioners and our staff
5   - arrange for clinical and health plan services
    - access additional services
6   - consent to receive important communications and documents (such as notices, videos and telephony) regarding their health
7     plan coverage electronically through the email address and/or mobile number specified by the user for this purpose.
8

9   FAC, Ex. 1 (TAC at 1).

10      The TAC specify: "BY USING THE SITE OR BY CLICKING 'I ACCEPT' BELOW,

11  YOU SIGNIFY YOUR AGREEMENT TO THESE TERMS AND CONDITIONS.  IF YOU DO

12  NOT AGREE TO THESE TERMS AND CONDITIONS, DO NOT USE THE SITE."  FAC, Ex.

13  1 (TAC at 2).

14      The TAC also state:

15      Please note: if you register for the Website before your coverage has started, you will have access to only a limited set of functions prior
16      to when your full coverage begins.  If you're registered for the Website, but do not have active coverage, you will have access to
17      records of your past care and coverage, if any.

18  FAC, Ex. 1 (TAC at 2).

19      Regarding privacy practices, the TAC note: "Any personal information you submit to the

20  Site . . . is governed by our Website and KP Mobile Application Privacy Statement."  FAC, Ex. 1

21  (TAC at 3); *see also* FAC, Ex. 2 (Website and mobile application Privacy Statement).

22      Finally, the TAC take note that, "[i]n consideration of being allowed to use the Site

23  interactive services, you agree that the following actions shall constitute a material breach of these

24  Terms and Conditions."  FAC, Ex. 1 (TAC at 4).  This includes, *inter alia*, "collecting information

25  about others, including email addresses" and "attempting to . . . probe, scan, 'hack,' or test the

26  vulnerability of the Site or any Kaiser Permanente system or network."  FAC, Ex. 1 (TAC at 4).

27      Unlike the EOC, the TAC do not contain an arbitration provision.  Nor is there an

28  arbitration provision in the referenced Privacy Statement.

5

## II. DISCUSSION

### A. Legal Standard

Both parties agree that the Federal Arbitration Act ("FAA") applies to the instant case. Under the FAA,

> [a] written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract or as otherwise provided in chapter 4.

9 U.S.C. § 2.

> In deciding whether to compel arbitration under the FAA, a court's inquiry is limited to two "gateway" issues: "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." If both conditions are met, "the [FAA] requires the court to enforce the arbitration agreement in accordance with its terms."

*Lim v. TForce Logistics, LLC*, 8 F.4th 992, 999 (9th Cir. 2021).

### B. Agreement to Arbitrate

The parties' first dispute concerns whether there was an agreement to arbitrate. Kaiser argues that JD "agreed to arbitrate his claims by enrolling in the health plan and accepting benefits under the stipulations provided in the Trust Enrollment Form and his Evidence of Coverage, including the arbitration agreement." Mot. at 11. JD admits there is an agreement to arbitrate in his Trust Enrollment Form and related EOC. *See* Opp'n at 3 n.6. However, he contends that the TAC for the website and mobile application is the only contract that governs his use of the website and mobile application, and the TAC do not contain an arbitration provision. Essentially, JD takes the position that his Trust Enrollment Form and the related EOC govern the provision of health care which is a separate matter from the use of the website and mobile application.

#### 1. Ninth Circuit Case Law

As an initial matter, the Court takes note that there are two Ninth Circuit cases that provide some guidance on the parties' dispute: *International Ambassador Programs v. Archexpo*, 68 F.3d

6

337 (9th Cir. 1995), and *Johnson v. Walmart Inc.*, 57 F.4th 677 (9th Cir. 2023).

In *International Ambassador*, the plaintiff was a nonprofit that arranged tours and informational visits in foreign countries, including Russia. The defendant was a company that facilitated and expedited tours such as those sponsored by the plaintiff. *See Int'l Ambassador*, 68 F.3d at 338. The plaintiff and the defendant entered into several agreements relating to tours in Russia. This included (1) an April 1989 agreement that called for the defendant to perform services in connection with the plaintiff's Citizen Ambassador Program ("CAP") tours and (2) a July 1989 agreement that called for the defendant to perform services in connection with the plaintiff's State Leader Initiative tours. The April 1989 agreement contained an arbitration clause, but not the July 1989 agreement. *See id.* at 339.

The Ninth Circuit was asked to decide whether the arbitration provision in the April 1989 agreement encompassed any later contracts, including the July 1989 agreement. The court noted:

> If the July agreement is a *discrete* agreement, the lack of an arbitration clause means disputes over the agreement are not subject to arbitration. On the other hand, if the two agreements are merely *interrelated contracts* in an ongoing series of transactions, [then the plaintiff] should have submitted its claim under the July agreement to . . . arbitration.

*Id.* at 340 (emphasis added). Ultimately, the Ninth Circuit concluded that there was "substantial evidence" that the two agreements were "independent" and not interrelated:

> The agreements concern two separate types of tours and completely different groups of tourists. The July agreement contains no arbitration clause, indicating an intent to treat it differently than the April agreement. Moreover, the proof necessary to establish [the defendant's] arbitration claims under the April agreement has nothing to do with the dispute under the July agreement.

*Id.*

In *Johnson*, the plaintiff brought a class action against Walmart for breach of contract and breach of the implied covenant of good faith and fair dealing based on a lifetime tire balancing and rotation service agreement that he purchased from a Walmart Auto Care Center. *See Johnson*, 57 F.4th at 679. Before he purchased this tire servicing agreement from the Walmart Auto Care Center – a physical store – the plaintiff had bought a set of tires from Walmart.com, Walmart's

7

online platform. By making the online purchase, the plaintiff agreed to the website's Terms of Use, and the Terms of Use included an arbitration provision. *See id.*

On appeal to the Ninth Circuit, Walmart argued that, "because [the plaintiff] agreed to the arbitration provision of the Terms of Use when he purchased a set of tires from Walmart.com, those Terms encompass this lawsuit, which concerns his in-store purchase of a tire servicing agreement." *Id.* at 680. The court rejected the argument:

> The Terms of Use have a clear, delineated purpose – to regulate use of Walmart's online resources and content. The introductory text of the Terms of Use provides: "These Terms of Use govern your access to and use of all Walmart Sites." The agreement's provisions, therefore, apply only to a consumer's use of and access to Walmart Sites. . . . A Walmart Auto Care Center is not a "Walmart Site" [which was expressly defined to mean the website, mobile site, and apps]. Moreover, the Terms of Use concern subject matter such as online user accounts, the content of Walmart Site and their use, monitoring of user activity on Walmart Sites, the placing of online transactions, and the shipping and delivery of online orders. No provision of the Terms of Use addresses any form of in-store engagement with Walmart.

*Id.* at 682 (also stating that "the Terms of Use cover a defined subset of consumer interaction with Walmart – access to and use of Walmart Sites").

The court also noted that there was "[s]ubstantial evidence" establishing that the online purchase agreement and the in-store tire servicing agreement were "separate, independent agreements." *Id.* at 683.

> First, although the receipt [the plaintiff] received documenting his purchase of the Service Agreement notes the tires as "PREPAID" online, [the plaintiff's] purchase of the Service Agreement was "*negotiated and entered into separately*" from his initial purchase of tires from Walmart.com. Second, the two contracts involved *separate consideration*, as the first contract was for the purchase of goods while the second was for the performance of services. And third, while Walmart points out that [the plaintiff] references the original cost of the tires to calculate damages, the *proof* [the plaintiff] requires to establish his underlying claim for breach of contract involves neither a breach of his initial tire-purchase agreement nor an interpretation of the Walmart.com Terms of Use, but rather depends exclusively on the terms of the Service Agreement. [The plaintiff] would rely on the original value of his tires before he was denied the rotation and balancing services regardless of whether he purchased the tires from Walmart or another retailer.

*Id.* (emphasis added).

8

The question then is whether the EOC and TAC are independent or interrelated.

2.      Relationship Between the EOC and the TAC

In his papers, JD argues that the EOC and the TAC should be deemed separate, independent agreements under *International Ambassador* and *Johnson*:

> The EOC . . . has a clear, delineated purpose – to regulate Kaiser Plan Members' insurance coverage and health care provided at Kaiser facilities. At nearly 100 pages, the EOC . . . covers multiple topics, including insurance deductibles, premiums, how to obtain routine and urgent care, getting a referral or second opinion, plan facilities, specific health benefits, coordination of benefits, post-service claims and appeals, and termination or continuation of membership.

Opp'n at 9. In contrast, JD contends, the TAC "govern [Kaiser's] provision of online functionalities to Users in exchange for increased efficiencies and cost reduction for Kaiser." Opp'n at 8-9 n.10.

Although JD's position is not without any merit, it is not persuasive. First, the EOC provided the overarching agreement governing the relationship between a Member and Kaiser while the TAC was in essence a subsidiary agreement. This is evidenced in the nature of the EOC which broadly covers the relationship between Kaiser and its members in the provision of medical services. *Cf. Java Trading Co. v. Performance Food Grp.*, No. C05-1191MJP, 2006 U.S. Dist. LEXIS 106278, at *14-15 (W.D. Wash. Feb. 7, 2006) (finding three contracts interrelated with another contract – the latter, which contained an arbitration clause unlike the former, providing "the main framework of the parties' relationship"; "the [three] equipment program contracts are the mechanisms by which the Supply Agreement is fully effectuated – the equipment program contracts would not exist if the Supply Agreement did not establish the parameters of JTC and PFG's relationship and the goals of the Supply Agreement would not be met without the equipment program contracts"); *In re Hops Antitrust Litig.*, 655 F. Supp. 169, 172-73 (E.D. Mo. 1987) (noting that "there is not one general contract, containing an arbitration clause, that clearly covers the parties' ongoing relationship, with separate agreements amending, supplementing, or incorporated into the 'umbrella' contract[;] [i]n such a situation, disputes regarding the latter agreements may be subject to arbitration").

9

Second, as Kaiser argues, it is clear that the website and mobile application are used *in conjunction* with the provision of health care to members of the health plan, and thus fall within the broad purview of the EOC's subject matter. As Kaiser argues:

> [I]n over forty instances, the EOC directs members (like John Doe) to the Site and App to review and access benefits and services provided under the EOC. *E.*g., Walker Decl. ¶ 3, Exh. A at A-39 ("To learn how to select or change to a different personal Plan Physician, visit our website at kp.org[.]"); *id.* at A-40 ("For the complete list of Services that require prior authorization, and the criteria that are used to make authorization decisions, please visit our website at kp.org/UM[.]"); *id.* at A-50 ("To see how close you are to reaching your Plan Out-of-Pocket Maximum, use our online Out-of-Pocket Summary tool at kp.org/outofpocket[.]"); *id.* at A-62 ("To order online, visit kp.org/rxrefill (you can register for a secure account at kp.org/registernow) or use the KP app from your smartphone or other mobile device[.]"); *id.* at A-75−A-77, A-79 ("To file a grievance online, use the grievance form on our website at kp.org."); *id.* at A-92−A-93 (stating that kp.org contains a provider directory, allows members to schedule "routine appointments" with "personal Plan Physician[s] or another Primary Care Physician," and contains estimates, bills, and statements). Thus, the EOC provides John Doe with the right and ability to meaningfully use the Site, the patient Portal, and the App to access and manage **benefits provided under the EOC**.

Reply at 3-4 (emphasis in original).

Third, contrary to what JD suggests, the EOC *expressly* addresses the Kaiser website and mobile application. As noted above, the EOC contains a subsection on online tools and resources that a Member may use.

> Here are some tools and resources available on our website at **kp.org**:
>
> - How to use our Services and make appointments
> - Tools you can use to email your doctor's office, view test results, refill prescriptions, and schedule routine appointments
> - Health education resources
> - Preventive care guidelines
> - Member rights and responsibilities
>
> You can also access tools and resources using the KP app on your smartphone or other mobile device.

10

Walker Decl., Ex. A (EOC at 82).[3]  This further substantiates that the website and mobile application fall within the overarching purview of the EOC.

Fourth, JD does not dispute that, upon entering into his contractual relationship with Kaiser, the EOC governed, which was prior to his use of the Kaiser website or mobile application. In other words, the EOC preceded the TAC.  That being the case, the EOC including its broad arbitration clause governed, *see* note 3, *supra*, *unless* JD can establish that the TAC effectively constituted an implied repeal of the EOC (at least with respect to the arbitration clause).  JD failed to do so.  For example, the TAC do not on their face state that the EOC does not apply or that the TAC, unlike the EOC, do not contain an agreement to arbitrate.  It is also notable that neither the EOC nor the TAC contain an integration clause which would have effectively partitioned one agreement from the other; the absence of an integration clause permits an inference that the two are interrelated, as Kaiser contends.  *See Willamette Biomass Processors, Inc. v. Perdue Agribusiness LLC*, No. 3:19-cv-01677-AC, 2020 U.S. Dist. LEXIS 87560, at *13, 17-18 (D. Or. Apr. 13, 2020) (rejecting defendant's argument that two agreements it entered into with plaintiff were interrelated agreements such that the arbitration clause in one agreement extended the other; noting that the agreement with the arbitration clause "contained a provision that stated its express terms constituted the 'entire agreement,' and prohibited any oral modifications or amendments").

Fifth, the factors identified by the Ninth Circuit in *Johnson* also support the EOC and the TAC being interrelated agreements.

- *Negotiation.*  JD does not explain how the TAC were negotiated and entered into separately from the EOC.  As noted above, the EOC explains that the website and mobile application are resources that Members can use in getting healthcare, thereby indicating that there was no separate negotiation for use of the website and mobile application.  To be sure, the TAC do specify: "BY USING THE SITE OR

---

[3] This fact also counters JD's suggestion that nothing in the EOC contemplates a dispute between a Member and Kaiser related to the website and mobile applications. *See* Opp'n at 9.  In fact, the arbitration clause itself states that claims subject to arbitration include claims for medical or hospital malpractice, claims for premises liability, *and* claims relating to the coverage for or delivery of services or items.

11

BY CLICKING 'I ACCEPT' BELOW, YOU SIGNIFY YOUR AGREEMENT TO THESE TERMS AND CONDITIONS.  IF YOU DO NOT AGREE TO THESE TERMS AND CONDITIONS, DO NOT USE THE SITE." FAC, Ex. 1 (TAC at 2).  However, like the EOC, the TAC make clear that the website and mobile application are for use *because* a Member has or has had health care coverage under a Kaiser health plan.  The TAC state: "Please note: if you register for the Website before your coverage has started, you will have access to only a limited set of functions prior to when your full coverage begins.  If you're registered for the Website, but do not have active coverage, you will have access to records of your past care and coverage, if any." FAC, Ex. 1 (TAC at 2).[4]

- *Consideration.* JD argues that the EOC and TAC are discrete agreements because there was separate consideration for each.  For example, JD claims that the consideration exchanged between the parties for the TAC was (1) JD getting the use of the website and mobile application; and (2) Kaiser getting cost savings and efficiencies through JD's use of the website and mobile application.  But this position strains credulity given that, as noted above, the EOC expressly call out the website and mobile application as resources that a Member may use as a part of getting health care coverage.  In other words, the website and mobile application were part of the consideration exchanged with the EOC.

- *Proof.*  With respect to proof, it is true that JD will rely on the TAC and referenced Privacy Statement in litigating his claims against Kaiser.  However, that is a function of how JD has framed his complaint; it does not thereby mean that the EOC will be irrelevant.  Indeed, the EOC contains a subsection on privacy practices (which also refers a Member to a document that elaborates on privacy practices and

---

[4] Plaintiffs note that the public in general can access the website and the mobile application – *i.e.*, a non-Member can use the website and the mobile application in certain ways.  *See, e.g.*, FAC ¶ 53 (indicating that the public can search health topics on the website).  While there might be room to argue that a non-Member has negotiated an independent agreement (indeed, a singular agreement), JD is not a non-Member.

12

that is available online at kp.org).  *See* Walker Decl., Ex. A (EOC at 81).

The Court therefore finds that the arbitration agreement in the EOC extends to the TAC.

C. <u>Scope of Arbitration Agreement</u>

The scope of arbitration is described as follows:

> Any dispute shall be submitted to binding arbitration if all of the following requirements are met:
>
> - The claim arises from or is related to an alleged violation of any duty incident to or arising out of or relating to this *EOC* or a Member Party's relationship to [KFHP], including any claim for medical or hospital malpractice . . . , for premises liability, or relating to the coverage for, or delivery of, services or items, irrespective of the legal theories upon which the claim is asserted.
>
> - The claim is asserted by one or more Member Parties against one or more Kaiser Permanente Parties or by one or more Kaiser Permanente parties against one or more Member Parties.
>
> - Governing law does not prevent the use of binding arbitration to resolve the claim.

Walker Decl., Ex. A (EOC at 72).

As an initial matter, JD contends his claims against Kaiser do not fall within the scope of the arbitration clause:

> The EOC clearly does not encompass Plaintiff's claims arising out of his use of the Site and App.  This agreement resulted from Plaintiff joining the Trust, opting in to health care coverage from KFHP that was offered by the Trust, signing the benefits enrollment package, and becoming enrolled in a Kaiser health plan.  The EOC and the EOC Clause is thus singularly focused on Plaintiff's insurance coverage and the healthcare he receives at Kaiser hospitals and physicians' offices through that coverage.  By contrast, Plaintiff's claims at issue here involve Kaiser's maintenance and conduct on the Site and App, and Kaiser's relationship with the Third Party Wiretappers.

Opp'n at 11.  This argument essentially rehashes the argument that JD made above (*i.e.*, that the EOC and the TOC are separate, discrete agreements).  The Court therefore rejects it here as well.

This is especially true given that the arbitration clause as worded is quite broad – covering claims related to an alleged violation of a duty related to the EOC as well as claims related to a Member's relationship to Kaiser.  The claims here fall within that broad language.  Furthermore,

13

one of the examples given of an arbitrable claim is a claim relating to the coverage for or delivery of services or item. The website and mobile application fall under that category.

JD, however, raises a second argument related to the scope of the arbitration clause that warrants more consideration. JD was enrolled in the Kaiser health plan – after he signed the Trust Enrollment Form – as of April 2021. Thus, JD argues that any claims he has that *predated* April 2021 are not subject to arbitration. JD indicates that he has claims that predated his enrollment because he used the website and mobile application prior to April 2021. *See* Opp'n at 13. Although JD does not explain, in his papers, how he could have claims prior to his enrollment in April 2021, Kaiser suggests in its reply papers that this may be because, before April 2021, JD was "provided coverage as a dependent through his father's membership in KFHP's health plans." Walker Reply Decl. ¶ 4.

The Court agrees with Kaiser that, as the FAC is pled, JD is not clearly asserting any claims based on pre-April 2021 conduct. *See, e.g.*, FAC ¶ 88 (alleging that JD logged into the Kaiser portal on June 6, 2023); FAC ¶ 115 (same); FAC ¶ 147 (same); FAC ¶ 159 (same); FAC ¶ 171 (same); *see also* FAC ¶ 166 (referring to activity on June 7, 2023); FAC ¶ 200 (referring to activity on July 5, 2023). Thus, the Court cannot hold that JD has any claims that would not be subject to the arbitration agreement in the EOC. The Court acknowledges Kaiser's contention that any such claims would also be subject to arbitration (*e.g.*, because his father's contract with Kaiser also had an arbitration clause), but, without more information about the claims (*i.e.*, how did JD have claims prior to his enrollment in April 2021), the Court is not in a position to opine one way or another.

In any event, at this juncture, based on the allegations in the FAC as pled, JD's claims fall within the scope of the arbitration agreement.

D.  <u>Class Arbitration</u>

The final issue for the Court is whether, if JD is compelled to arbitration, whether he could proceed with a class arbitration. This issue has arisen because the arbitration clause in the EOC

14

does not expressly forbid class arbitration.[5]

To a certain extent, one could argue that this issue is moot because there are other plaintiffs in this case beside JD, and Kaiser has not moved to compel them to arbitration. In other words, there will be a court suit – a putative class action – addressing the privacy dispute at issue. On the other hand, there will likely be individuals like JD who did agree to arbitrate, and therefore JD will probably want to argue that he can represent these individuals in an arbitration.

According to Kaiser, "a party cannot be compelled to submit to class arbitration where an arbitration provision is entirely silent or ambiguous regarding whether class action claims can be pursued in arbitration." Mot. at 16. In support, Kaiser cites *Stolt-Nielsen S. A. v. AnimalFeeds International Corp.*, 559 U.S. 662, 684 (2010), and *Lamps Plus*, 139 S. Ct. at 1407. Kaiser's characterizations of these two Supreme Court cases is correct.

In *Stolt-Neilsen*, the Supreme Court held that "a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so." *Stolt-Nielsen*, 559 U.S. at 684 (emphasis in original).

> An implicit agreement to authorize class-action arbitration . . . is not a term that the arbitrator may infer solely from the fact of the parties' agreement to arbitrate. This is so because class-action arbitration changes the nature of arbitration to such a degree that it cannot be presumed the parties consented to it by simply agreeing to submit their disputes to an arbitrator.

*Id.* at 685. The Court added: "the differences between bilateral and class-action arbitration are too great for arbitrators to presume, consistent with their limited powers under the FAA, that the parties' *mere silence* on the issue of class-action arbitration constitutes consent to resolve their disputes in class proceedings." *Id.* at 687 (emphasis added).

In *Lamps Plus*, the Supreme Court took *Stolt-Nielsen* one step further, holding that the FAA bars an order requiring class arbitration when the agreement is *ambiguous* (and not just

---

[5] Neither party has argued that this issue should be decided by the arbitrator. The Supreme Court has left open the issue of who should decide whether class arbitration is available. *See Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1417 n.4 (2019) (noting that the Supreme Court "has not decided whether the availability of class arbitration is a so-called 'question of arbitrability,' which includes . . . gateway matters"; here, "the parties agreed that a court, not an arbitrator, should resolve the question about class arbitration").

silent) about the availability of class arbitration. *See Lamps Plus*, 139 S. Ct. at 1412. In other words, an "ambiguous agreement can[not] provide the necessary 'contractual basis' for compelling class arbitration." *Id.* at 1415.

> Class arbitration is not only markedly different from the "traditional individualized arbitration" contemplated by the FAA, it also undermines the most important benefits of that familiar form of arbitration. The statute therefore requires more than ambiguity to ensure that the parties actually agreed to arbitrate on a classwide basis.

*Id.*

Thus, effectively, under *Stolt-Nielsen* and *Lamps Plus*, an agreement must contain a clear indication that there is an intent to allow for class arbitration in order for a class arbitration to proceed; such cannot be implied from silence. Here, JD contends that the EOC contemplates class arbitration based on the bolded language below from the arbitration clause:

> Any dispute shall be submitted to binding arbitration if all of the following requirements are met:
>
> - The claim arises from or is related to an alleged violation of any duty incident to or arising out of or relating to this *EOC* or a Member Party's relationship to [KFHP], including any claim for medical or hospital malpractice . . . , for premises liability, or relating to the coverage for, or delivery of, services or items, irrespective of the legal theories upon which the claim is asserted.
>
> - The claim is asserted by **one or more Member Parties** against one or more Kaiser Permanente Parties or by one or more Kaiser Permanente parties against one or more Member Parties.
>
> - Governing law does not prevent the use of binding arbitration to resolve the claim.

Walker Decl., Ex. A (EOC at 72) (emphasis added; also stating that "**Claimants** shall initiate arbitration by serving a Demand for Arbitration") (emphasis added).

This is a thin reed on which to assert that the parties contractually agreed to class arbitration. As Kaiser notes in its reply, that claims can be asserted by more than one Member does not mean that a *class* is thereby authorized. *See* Reply at 15. At best, JD would have established some ambiguity (under California law, *see* Walker Decl., Ex. A (EOC at 79-80)

16

(stating that, "[e]xcept as preempted by federal law, this *EOC* will be governed in accord with California law"), but, under *Lamps Plus*, ambiguity is not enough to support availability of class arbitration.

### III.  CONCLUSION

For the foregoing reasons, the Court grants Kaiser's motion to compel arbitration. The arbitration clause in the EOC applies, even though the conduct at issue concerns Kaiser's website and mobile application which is also governed by the TAC. JD has not pled that he has any pre-April 2021 claims against Kaiser (*i.e.*, claims before he enrolled in the Kaiser health plan himself). The EOC does not contemplate class arbitration so JD will be able to assert individual claims only in the arbitration.

To the extent JD wishes to amend his claims so that he can plead pre-April 2021 claims, the Court shall permit him to amend. However, in any such amendment, he should make clear the basis of his claims (*e.g.*, was his use of the website and mobile application based on his status as a dependent under his father's health plan?). He should also consider whether there is an arbitration provision that applies to him through his father's health plan.

At this juncture, the Court does not set a specific date by which JD should amend because of the pending motion to dismiss. It is possible that the Court will grant or grant in part the motion to dismiss, but with leave to amend. Rather than have successive amendments, the Court expects that the parties will meet and confer on a date for amendment for JD after the Court rules on the motion to dismiss.

This order disposes of Docket No. 82.

**IT IS SO ORDERED**.

Dated: March 26, 2024

_____
EDWARD M. CHEN
United States District Judge