SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
WYNTER L. DEAGLE, Cal Bar No. 296501
wdeagle@sheppardmullin.com
KRISTIN P. HOUSH, Cal Bar No. 286651
khoush@sheppardmullin.com
ANNE-MARIE D. DAO, Cal Bar No. 282632
adao@sheppardmullin.com
DANE C. BRODY CHANOVE, Cal Bar No. 345843
dbrodychanove@sheppardmullin.com
12275 El Camino Real, Suite 100
San Diego, California 92130-4092
Telephone: 858.720.8900
Facsimile: 858.509.3691

Attorneys for Defendants
Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, and Kaiser Foundation Health Plan of Washington

*[Additional counsel listed on signature page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| JOHN DOE, JOHN DOE II, JANE DOE, JANE DOE II, JANE DOE III, JANE DOE IV, and JANE DOE V, Individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>KAISER FOUNDATION HEALTH PLAN, INC., KAISER FOUNDATION HOSPITALS, and KAISER FOUNDATION HEALTH PLAN OF WASHINGTON,<br><br>Defendants. | Case No. 3:23-cv-02865-EMC<br><br>**DECLARATION OF WYNTER L. DEAGLE IN SUPPORT OF DEFENDANTS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**<br><br>*Filed concurrently with Notice of Motion and Motion, Request for Judicial Notice and Proposed Order, and Proposed Order*<br><br>Judge: Hon. Edward Chen<br>Date: October 10, 2024<br>Time: 1:30 p.m.<br>Crtrm.: 5<br><br>District Judge: Hon. Edward M. Chen<br>Magistrate Judge: Hon. Peter H. Kang<br><br>SAC Filed: May 9, 2024<br>Trial Date: July 20, 2026 |

# DECLARATION OF WYNTER L. DEAGLE

I, Wynter L. Deagle, declare as follows:

1. I am an attorney duly admitted to practice before this Court. I am a partner with Sheppard, Mullin, Richter & Hampton LLP, attorneys of record for Defendants Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, and The Permanente Medical Group.

2. If called as a witness, I could and would competently testify to all facts within my personal knowledge except where stated upon information and belief.

3. This declaration is submitted in support of Defendants' Request for Judicial Notice.

4. Attached hereto as **Exhibit A** is a true and correct copy of the Google Cloud Master Agreement referenced in paragraph 233 of the Second Amended Complaint, which I caused to be downloaded on or about July 2, 2024.

5. Attached hereto as **Exhibit B** is a true and correct copy of an Opinion and Order issued by the United States District Court for the Northern District of Texas in the matter *American Hospital Association, et al. v. Xavier Becerra*, *et al* (Case No. 4:23-cv-01110-P).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 3rd day of July, 2024, at San Diego, California.

*/s/ Wynter L. Deagle*
Wynter L. Deagle

# EXHIBIT A

EXHIBIT A

DocuSign Envelope ID: 00490E9E-E4E2-4686-B5ED-9BA513013340

# GOOGLE CLOUD MASTER AGREEMENT
# ORDER FORM – GOOGLE MAPS CORE SERVICES

| GOOGLE INFORMATION | | |
|---|---|---|
| **GOOGLE:** | **Full Legal Name:** | Google LLC |
| | **Street Address:** | 1600 Amphitheatre Parkway, Mountain View, CA 94043 |

| CUSTOMER INFORMATION | | |
|---|---|---|
| **CUSTOMER:** | **Full Legal Name:** | Kaiser Foundation Hospitals |
| | **Street Address (including City; State or Area; Postal Code; Country):** | 1 Kaiser Plaza<br>Oakland, CA 94612,<br>United States |
| **Invoice Delivery Contact Information** | **Name:** | Kaiser Foundation Hospitals |
| | **Street Address (including City; State or Area; Postal Code; Country):** | 1 Kaiser Plaza<br>Oakland, CA 94612,<br>United States |
| | **Email:** | KP-AP-INVOICE@KP.ORG |
| **Billing Account Administrator**<br>*(Contact will become the initial billing account administrator who can manage other user roles on the billing account in the Admin Console.)* | **Name:** | Liju Oommen |
| | **Email:** | Liju.P.Oommen@kp.org |

DocuSign Envelope ID: 00490E9E-E4E2-4686-B5ED-9BA513013340

## ORDER INFORMATION

**Services:** Google Maps Core Services
**Order Term:** 12 months

**Google Customer ID:** 6747-9660-3785

**Customer Billing Account:**
(leave blank to create new Billing Account)

**Purchase Order Required:** ☐ Yes ☒ No
**If Yes, Purchase Order #:**

**Currency:** United States Dollars (USD)

**Price List Effective Date:**
☒ Within 5 business days of the Order Form Effective Date
☐ Specific future date: YYYY-MM-DD

**Tax Exempt:** ☐ Yes ☒ No
(Non-EMEA customers only. If Yes is checked, please provide certificate)

**VAT or applicable Tax #:**
(If applicable)

### MAPS CORE SERVICES PRICES

| Service Description | Volume Pricing Tiers: Cost per Thousand (CPM) By Monthly Usage Volume (Prices shown in USD) | | | | | | |
|---|---|---|---|---|---|---|---|
| **Maps Services** | **1 to 100,000** | **100,001 to 500,000** | **500,001 to 1,000,000** | **1,000,001 to 5,000,000** | **5,000,001 to 10,000,000** | **10,000,001 to 20,000,000** | **20,000,001 and beyond** |
| Mobile Native Static Maps | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Mobile Native Dynamic Maps | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Embed | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Embed Advanced | $14.00 | $11.20 | $8.40 | $4.20 | $1.06 | $0.31 | $0.11 |
| Static Maps | $2.00 | $1.60 | $1.20 | $0.60 | $0.15 | $0.05 | $0.02 |
| Dynamic Maps | $7.00 | $5.60 | $4.20 | $2.10 | $0.53 | $0.16 | $0.06 |
| Static Street View | $7.00 | $5.60 | $4.20 | $2.10 | $0.53 | $0.16 | $0.06 |
| Dynamic Street View | $14.00 | $11.20 | $8.40 | $4.20 | $1.05 | $0.32 | $0.11 |
| **Routes Services** | | | | | | | |
| Directions | $5.00 | $4.00 | $3.00 | $1.50 | $0.38 | $0.11 | $0.04 |
| Directions Advanced | $10.00 | $8.00 | $6.00 | $3.00 | $0.75 | $0.23 | $0.08 |
| Distance Matrix | $5.00 | $4.00 | $3.00 | $1.50 | $0.38 | $0.11 | $0.04 |
| Distance Matrix Advanced | $10.00 | $8.00 | $6.00 | $3.00 | $0.75 | $0.23 | $0.08 |
| Roads - Route Traveled | $10.00 | $8.00 | $6.00 | $3.00 | $0.76 | $0.22 | $0.08 |
| Roads - Nearest Road | $10.00 | $8.00 | $6.00 | $3.00 | $0.76 | $0.22 | $0.08 |
| Roads - List Speed Limits | $20.00 | $16.00 | $12.00 | $12.00 | $12.00 | $12.00 | $12.00 |

| | **1 to 100,000** | **100,001 to 500,000** | **500,001 to 1,000,000** | **1,000,001 to 5,000,000** | **5,000,001 to 10,000,000** | **10,000,001 to 20,000,000** | **20,000,001 and beyond** |
|---|---|---|---|---|---|---|---|
| **Places Services** | | | | | | | |
| Autocomplete - Per Request | $2.83 | $2.27 | $1.70 | $0.85 | $0.21 | $0.17 | $0.17 |
| Autocomplete without Places Details - Per Session | $17.00 | $13.60 | $10.20 | $5.10 | $1.28 | $1.00 | $1.00 |
| Autocomplete (included with Places Details) - Per Session | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 |
| Query Autocomplete - Per Request | $2.83 | $2.27 | $1.70 | $0.85 | $0.21 | $0.17 | $0.17 |
| Places Details - Basic | $17.00 | $13.60 | $10.20 | $5.10 | $1.28 | $1.00 | $1.00 |
| Places Details - Basic + Contact | $20.00 | $16.00 | $12.00 | $6.00 | $1.51 | $1.23 | $1.23 |
| Places Details - Basic + Atmosphere | $22.00 | $17.60 | $13.20 | $6.60 | $2.05 | $1.77 | $1.77 |
| Places Details - Basic + Contact + Atmosphere | $25.00 | $20.00 | $15.00 | $7.50 | $2.28 | $2.00 | $2.00 |
| Places Photo | $7.00 | $5.60 | $4.20 | $2.10 | $0.53 | $0.16 | $0.06 |
| Find Place - Basic | $17.00 | $13.60 | $10.20 | $5.10 | $1.28 | $1.00 | $1.00 |
| Find Place - Basic + Contact | $20.00 | $16.00 | $12.00 | $6.00 | $1.51 | $1.23 | $1.23 |
| Find Place - Basic + Atmosphere | $22.00 | $17.60 | $13.20 | $6.60 | $2.05 | $1.77 | $1.77 |
| Find Place - Basic + Contact + Atmosphere | $25.00 | $20.00 | $15.00 | $7.50 | $2.28 | $2.00 | $2.00 |
| Places - Nearby Search - Basic + Contact + Atmosphere | $40.00 | $32.00 | $24.00 | $12.00 | $3.40 | $2.90 | $2.90 |
| Places - Text Search - Basic + Contact + Atmosphere | $40.00 | $32.00 | $24.00 | $12.00 | $3.40 | $2.90 | $2.90 |
| Geocoding | $5.00 | $4.00 | $3.00 | $1.50 | $0.38 | $0.11 | $0.04 |
| Geolocation | $5.00 | $4.00 | $3.00 | $1.50 | $0.38 | $0.11 | $0.04 |
| Time Zone | $5.00 | $4.00 | $3.00 | $1.50 | $0.38 | $0.11 | $0.04 |
| Elevation | $5.00 | $4.00 | $3.00 | $1.50 | $0.38 | $0.11 | $0.04 |

**ADDITIONAL TERMS.**

1. **Structure.** This Order Form is incorporated by reference into the Google Cloud Master Agreement entered into between Google and Customer, and is issued under the Google Maps Core Services Schedule to the Google Cloud Master Agreement. Terms defined in the Google Cloud Master Agreement apply to this Order Form.



Legal Dept JK Google

2. **Prices Availability.** Google will apply Prices specified in this Order Form only to the Customer Billing Account starting on the Price List Effective Date until the end of the Order Term. If a Customer Billing Account is not specified on this Order Form, Google will create a Customer Billing Account within 5 business days of the Order Form Effective Date to apply the Prices listed herein.

3. **Invoice Issuance.** Google will send Customer a monthly invoice for Fees accrued during the previous month.

4. **Usage Calculation.** Each Google Maps Core Service Price is determined on a cost per 1,000 queries ("CPM"). The Price for each defined usage range is in the table above. Service usage is calculated on a monthly basis. To determine the applicable volume pricing tier, Google aggregates Service usage for all Projects linked to the Customer Billing Account listed on this Order Form (the "Customer Billing Account") for the prior month. For example, if Customer consumes 500,000 Directions in January and 40,000 Directions in February, Fees will be calculated as follows:
   January: Fees = $2,100.00 for 500,000 Directions requests: ((100,000/1,000) * $5.00) + ((400,000/1,000) * $4.00).
   February: Fees = $200.00 for 40,000 Directions requests: ((40,000/1,000) * $5.00)

5. **Order Form Term.** This Order Form is effective on the date of last signature below ("Order Form Effective Date") and will continue for the Order Term, subject to earlier termination in accordance with the Agreement.

6. **Automatic Renewal.** At the end of each Order Term, this Order Form will automatically renew for an additional Order Term of 12 months, unless either party provides the other party with notice of non-renewal at least 30 days prior to the end of the then-current Order Term.

7. **Signature.** By signing this Order Form, each party represents and warrants that it has full power and authority to enter into the Order Form.

Signed by the parties' authorized representatives on the dates below.

| **Google** | **Customer** |
|---|---|
| Philipp Schindler<br>Philipp Schindler<br>Authorized Signatory<br>2019.07.22 16:05:34 -07'00' | By: DocuSigned by: Earl London<br>EF09B5D1A654405... |
| | Print Name: Earl London |
| Title: | Title: Sourcing Director |
| Date: | Date: 07/22/2019 |



Legal Dept JK Google

DocuSign Envelope ID: 0BD42EBB-335B-4713-86AA-96B68FE315EC

# Google Cloud Master Agreement

This Google Cloud Master Agreement is comprised of the Google Cloud Master Agreement General Terms ("General Terms"), and all Services Schedules and Order Forms that are incorporated by reference into the Google Cloud Master Agreement (collectively, the "Agreement"), and is entered into by Google LLC, with offices at 1600 Amphitheatre Parkway, Mountain View, CA 94043 ("Google") and Kaiser Foundation Hospitals, with offices at 1 Kaiser Plaza Oakland, CA 94612, United States ("Customer").

## Google Cloud Master Agreement General Terms

**1. Services.** After the parties complete and execute an Order Form, (a) Google will provide the Services to Customer in accordance with the Agreement, including the SLAs, and (b) Customer may use the Services in accordance with the applicable Services Schedule.

**2. Customer Obligations.**

2.1 Consents. Customer is responsible for any consents and notices required to permit (a) Customer's use and receipt of the Services and (b) Google's accessing, storing, and processing of data provided by Customer (including Customer Data, if applicable) under the Agreement.

2.2 Compliance. Customer will (a) ensure that Customer and its End Users' use of the Services complies with the Agreement, (b) use commercially reasonable efforts to prevent and terminate any unauthorized access or use of the Services, and (c) promptly notify Google of any unauthorized use of, or access to, the Services of which Customer becomes aware.

2.3 Use Restrictions. Customer will not, and will not allow End Users to, (a) copy, modify, create a derivative work of, reverse engineer, decompile, translate, disassemble, or otherwise attempt to extract any of the source code of the Services (except to the extent such restriction is expressly prohibited by applicable law); (b) sell, resell, sublicense, transfer, or distribute the Services; or (c) access or use the Services (i) in a manner intended to avoid incurring Fees; (ii) for materials or activities that are subject to the International Traffic in Arms Regulations (ITAR) maintained by the United States Department of State; (iii) in a manner that breaches, or causes the breach of, Export Control Laws; or (iv) to transmit, store, or process health information subject to United States HIPAA regulations except as permitted by an executed HIPAA BAA.

**3. Payment Terms.**

3.1 Payment. Google will invoice Customer for the Fees. Customer will pay Google all invoiced amounts by the Payment Due Date. All payments are due in the currency described in the invoice. Wire transfer payments must include the bank information described in the invoice.

3.2 Taxes. Google will itemize any invoiced Taxes. Customer will pay invoiced Taxes unless Customer provides a valid tax exemption certificate. Customer may withhold Taxes if Customer provides a valid receipt evidencing the taxes withheld.

3.3 Invoice Disputes. Customer must submit any invoice disputes to collections@google.com before the Payment Due Date. If the parties determine that Fees were incorrectly invoiced, Google will issue a credit equal to the agreed amount.

DocuSign Envelope ID: 0BD42EBB-335B-4713-86AA-96B68FE315EC

3.4 Overdue Payments.

(a) Customer's payment of Fees is overdue if Google has not received it by the Payment Due Date. If Customer's payment is overdue, then Google may (i) charge interest on overdue amounts at 1.5% per month (or the highest rate permitted by law, if less) from the Payment Due Date until paid in full, and (ii) Suspend the Services or terminate the applicable Order Form.

(b) Customer will reimburse Google for all reasonable expenses (including attorneys' fees) incurred by Google in collecting overdue payments except where such payments are due to Google's billing inaccuracies.

3.5 Purchase Orders. If Customer requires a purchase order number on its invoice, Customer will provide a purchase order number in the Order Form. If Customer does not provide a purchase order number, then (a) Google will invoice Customer without a purchase order number, and (b) Customer will pay invoices without a purchase order number referenced. Any terms on a purchase order are void.

**4. Intellectual Property.**

4.1 Intellectual Property Rights. Except as expressly described in the Agreement, the Agreement does not grant either party any rights, implied or otherwise, to the other's content or Intellectual Property. As between the parties, Customer retains all Intellectual Property Rights in Customer Data and Customer Applications, and Google retains all Intellectual Property Rights in the Services and Software.

4.2 Feedback. At its option, Customer may provide feedback and suggestions about the Services to Google ("Feedback"). If Customer provides Feedback, then Google and its Affiliates may use that Feedback without restriction and without obligation to Customer.

**5. Confidentiality.**

5.1 Confidentiality Obligations. Subject to Section 5.2 (Disclosure of Confidential Information), the recipient will use the other party's Confidential Information only to exercise its rights and fulfill its obligations under the Agreement. The recipient will use reasonable care to protect against disclosure of the other party's Confidential Information to parties other than the recipient's employees, Affiliates, agents, or professional advisors ("Delegates") who need to know it and who have a legal obligation to keep it confidential. The recipient will ensure that its Delegates are also subject to the same non-disclosure and use obligations.

5.2 Disclosure of Confidential Information.

(a) General. Regardless of any other provision in the Agreement, the recipient and its Delegates may disclose the other party's Confidential Information (i) with the other party's written consent or (ii) in accordance with a Legal Process request, subject to Section 5.2(b) (Legal Process Notification).

(b) Legal Process Notification. The recipient will use commercially reasonable efforts to notify the other party before disclosing that party's Confidential Information in accordance with Legal Process. Notice is not required before disclosure if the recipient is informed that (i) it is legally prohibited from giving notice or (ii) the Legal Process relates to exceptional circumstances involving danger of death or serious physical injury.

DocuSign Envelope ID: 0BD42EBB-335B-4713-86AA-96B68FE315EC

(c) Opposition. The recipient will, and will ensure that its Delegates will, comply with the other party's reasonable requests to oppose disclosure of its Confidential Information.

**6. Marketing and Publicity.** Each party may use the other party's Brand Features in connection with the Agreement as permitted in the Agreement. Customer may state publicly that it is a Google customer and display Google Brand Features in accordance with the Trademark Guidelines. Additionally, with prior written consent, the parties may engage in joint marketing activities such as customer testimonials, press engagements, public speaking events, and analyst interviews. A party may revoke the other party's right to use its Brand Features with 30 days' written notice. Any use of a party's Brand Features will inure to the benefit of the party holding Intellectual Property Rights to those Brand Features.

**7. Representations and Warranties.** Each party represents and warrants that it (a) has full power and authority to enter into the Agreement and (b) will comply with all laws and regulations applicable to its provision, receipt, or use of the Services, as applicable.

**8. Disclaimer. Except as expressly provided for in the Agreement, to the fullest extent permitted by applicable law, Google (a) does not make any warranties of any kind, whether express, implied, statutory, or otherwise, including warranties of merchantability, fitness for a particular use, noninfringement, or error-free or uninterrupted use of the Services or Software and (b) makes no representation about content or information accessible through the Services. The Services are not intended to be used for High Risk Activities. Any use of the Services for High Risk Activities by Customer or its End Users will be at Customer's own risk, and Customer will be solely liable for the results of any failure of the Services when used for High Risk Activities.**

**9. Indemnification.**

9.1 Google Indemnification Obligations. Google will defend Customer and its Affiliates participating under the Agreement ("Customer Indemnified Parties"), and indemnify them against Indemnified Liabilities in any Third-Party Legal Proceeding to the extent arising from an allegation that the Customer Indemnified Parties' use of Google Indemnified Materials infringes the third party's Intellectual Property Rights.

9.2 Customer Indemnification Obligations. Customer will defend Google and its Affiliates and indemnify them against Indemnified Liabilities in any Third-Party Legal Proceeding to the extent arising from (a) any Customer Indemnified Materials or (b) Customer's or an End User's use of the Services in breach of the AUP or the Use Restrictions.

9.3 Indemnification Exclusions. Sections 9.1 (Google Indemnification Obligations) and 9.2 (Customer Indemnification Obligations) will not apply to the extent the underlying allegation arises from (a) the indemnified party's breach of the Agreement or (b) a combination of the Google Indemnified Materials or Customer Indemnified Materials (as applicable) with materials not provided by the indemnifying party under the Agreement, unless the combination is required by the Agreement.

9.4 Indemnification Conditions. Sections 9.1 (Google Indemnification Obligations) and 9.2 (Customer Indemnification Obligations) are conditioned on the following:

(a) The indemnified party must promptly notify the indemnifying party in writing of any allegation(s) that preceded the Third-Party Legal Proceeding and cooperate reasonably with the indemnifying party to resolve the allegation(s) and Third-Party

DocuSign Envelope ID: 0BD42EBB-335B-4713-86AA-96B68FE315EC

Legal Proceeding. If breach of this Section 9.4(a) prejudices the defense of the Third-Party Legal Proceeding, the indemnifying party's obligations under Section 9.1 (Google Indemnification Obligations) or 9.2 (Customer Indemnification Obligations) (as applicable) will be reduced in proportion to the prejudice.

(b) The indemnified party must tender sole control of the indemnified portion of the Third-Party Legal Proceeding to the indemnifying party, subject to the following: (i) the indemnified party may appoint its own non-controlling counsel, at its own expense; and (ii) any settlement requiring the indemnified party to admit liability, pay money, or take (or refrain from taking) any action, will require the indemnified party's prior written consent, not to be unreasonably withheld, conditioned, or delayed.

9.5 Remedies.

(a) If Google reasonably believes the Services might infringe a third party's Intellectual Property Rights, then Google may, at its sole option and expense, (i) procure the right for Customer to continue using the Services, (ii) modify the Services to make them non-infringing without materially reducing their functionality, or (iii) replace the Services with a non-infringing, functionally equivalent alternative.

(b) If Google does not believe the remedies in Section 9.5(a) are commercially reasonable, then Google may Suspend or terminate the impacted Services.

9.6 Sole Rights and Obligations. Without affecting either party's termination rights, this Section 9 (Indemnification) states the parties' sole and exclusive remedy under the Agreement for any third-party allegations of Intellectual Property Rights infringement covered by this Section 9 (Indemnification).

**10. Liability.**

**10.1 Limited Liabilities.**

**(a) To the extent permitted by applicable law and subject to Section 10.2 (Unlimited Liabilities), neither party will have any Liability arising out of or relating to the Agreement for any**
**(i) indirect, consequential, special, incidental, or punitive damages or**
**(ii) lost revenues, profits, savings, or goodwill.**

**(b) Each party's total aggregate Liability for damages arising out of or relating to the Agreement is limited to the Fees Customer paid under the applicable Services Schedule during the 12 month period before the event giving rise to Liability.**

**10.2 Unlimited Liabilities. Nothing in the Agreement excludes or limits either party's Liability for:**

**(a) subject to Section 8 (Disclaimer), death, personal injury, or tangible personal property damage resulting from its negligence or the negligence of its employees or agents;**
**(b) its fraud or fraudulent misrepresentation;**
**(c) its obligations under Section 9 (Indemnification);**
**(d) its infringement of the other party's Intellectual Property Rights;**
**(e) its payment obligations under the Agreement; or**
**(f) matters for which liability cannot be excluded or limited under applicable law.**

DocuSign Envelope ID: 0BD42EBB-335B-4713-86AA-96B68FE315EC

**11. Term and Termination.**

11.1 Agreement Term. The Agreement will remain in effect for the Term unless it expires or is terminated in accordance with the Agreement.

11.2 Termination for Convenience. Subject to any financial commitments in an Order Form or addendum to the Agreement, Customer may terminate the Agreement or an Order Form for convenience with 30 days' prior written notice to Google.

11.3 Termination for Breach.

(a) Termination of an Order Form. Either party may terminate an Order Form if the other party is in material breach of the applicable Services Schedule and fails to cure that breach within 30 days after receipt of written notice.

(b) Termination of the Agreement. Either party may terminate the Agreement if the other party (i) is in material breach of the Agreement and fails to cure that breach within 30 days after receipt of written notice, (ii) ceases its business operations, or (iii) becomes subject to insolvency proceedings and such proceedings are not dismissed within 90 days.

11.4 Effects of Termination. If the Agreement terminates or expires, then all Services Schedules and Order Forms also terminate or expire. If an Order Form terminates or expires, then after that Order Form's termination or expiration effective date, (a) all rights and access to the Services under that Order Form will terminate (including access to Customer Data, if applicable), unless otherwise described in the applicable Services Schedule, and (b) Google will send Customer a final invoice (if applicable) for payment obligations under that Order Form. Termination or expiration of one Order Form will not affect other Order Forms.

11.5 Survival. The following Sections will survive expiration or termination of the Agreement: Section 3 (Payment Terms), Section 4 (Intellectual Property), Section 5 (Confidentiality), Section 8 (Disclaimer), Section 9 (Indemnification), Section 10 (Liability), Section 11.4 (Effects of Termination), Section 12 (Miscellaneous), Section 13 (Definitions), and any additional sections specified in the applicable Services Schedule.

**12. Miscellaneous.**

12.1 Notices. Google will provide notices under the Agreement to Customer by sending an email to the Notification Email Address. Customer will provide notices under the Agreement to Google by sending an email to legal-notices@google.com. Notice will be treated as received when the email is sent. Customer is responsible for keeping its Notification Email Address current throughout the Term.

12.2 Emails. The parties may use emails to satisfy written approval and consent requirements under the Agreement.

12.3 Assignment. Neither party may assign the Agreement without the written consent of the other, except to an Affiliate where (a) the assignee has agreed in writing to be bound by the terms of the Agreement, (b) the assigning party remains liable for obligations under the Agreement if the assignee defaults on them, and (c) the assigning party has notified the other party of the assignment. Any other attempt to assign is void.

12.4 Change of Control. If a party experiences a change of Control other than an internal restructuring or reorganization, then (a) that party will give written notice to the other

party within 30 days after the change of Control and (b) the other party may immediately terminate the Agreement any time within 30 days after it receives that written notice.

12.5 Force Majeure. Neither party will be liable for failure or delay in performance of its obligations to the extent caused by circumstances beyond its reasonable control, including acts of God, natural disasters, terrorism, riots, or war.

12.6 Subcontracting. Google may subcontract obligations under the Agreement but will remain liable to Customer for any subcontracted obligations.

12.7 No Agency. The Agreement does not create any agency, partnership, or joint venture between the parties.

12.8 No Waiver. Neither party will be treated as having waived any rights by not exercising (or delaying the exercise of) any rights under the Agreement.

12.9 Severability. If any part of the Agreement is invalid, illegal, or unenforceable, the rest of the Agreement will remain in effect.

12.10 No Third-Party Beneficiaries. The Agreement does not confer any rights or benefits to any third party unless it expressly states that it does.

12.11 Equitable Relief. Nothing in the Agreement will limit either party's ability to seek equitable relief.

12.12 Governing Law. All claims arising out of or relating to the Agreement or the Services will be governed by California law, excluding that state's conflict of laws rules, and will be litigated exclusively in the federal or state courts of Santa Clara County, California; the parties consent to personal jurisdiction in those courts.

12.13 Amendments. Except as specifically described otherwise in the Agreement, any amendment to the Agreement must be in writing, expressly state that it is amending the Agreement, and be signed by both parties.

12.14 Independent Development. Nothing in the Agreement will be construed to limit or restrict either party from independently developing, providing, or acquiring any materials, services, products, programs, or technology that are similar to the subject of the Agreement, provided that the party does not breach its obligations under the Agreement in doing so.

12.15 Entire Agreement. The Agreement states all terms agreed between the parties, and supersedes any prior or contemporaneous agreements between the parties relating to the subject matter of the Agreement. In entering into the Agreement, neither party has relied on, and neither party will have any right or remedy based on, any statement, representation, or warranty (whether made negligently or innocently), except those expressly described in the Agreement. The Agreement includes URL links to other terms (including the URL Terms), which are incorporated by reference into the Agreement.

12.16 Conflicting Terms. If there is a conflict among the documents that make up the Agreement, then the documents will control in the following order: the applicable Order Form, the applicable Services Schedule, the General Terms, and the URL Terms.

12.17 Conflicting Languages. If the Agreement is translated into any other language, and there is a discrepancy between the English text and the translated text, the English text will control.



Legal Dept JK Google

DocuSign Envelope ID: 0BD42EBB-335B-4713-86AA-96B68FE315EC

12.18 Counterparts. The parties may execute the Agreement in counterparts, including facsimile, PDF, and other electronic copies, which taken together will constitute one instrument.

12.19 Electronic Signatures. The parties consent to electronic signatures.

12.20 Headers. Headings and captions used in the Agreement are for reference purposes only and will not have any effect on the interpretation of the Agreement.

**13. Definitions.**

"Affiliate" means any entity that directly or indirectly Controls, is Controlled by, or is under common Control with a party.

"AUP" means Google's acceptable use policy as defined in the applicable Services Schedule.

"BAA" or "Business Associate Agreement" is an amendment to the Agreement covering the handling of Protected Health Information (as defined in HIPAA).

"Brand Features" means each party's trade names, trademarks, logos, domain names, and other distinctive brand features.

"Confidential Information" means information that one party (or an Affiliate) discloses to the other party under the Agreement, and that is marked as confidential or would normally be considered confidential information under the circumstances. Customer Data is Customer's Confidential Information. Confidential Information does not include information that is independently developed by the recipient, is shared with the recipient by a third party without confidentiality obligations, or is or becomes public through no fault of the recipient.

"Control" means control of greater than 50% of the voting rights or equity interests of a party.

"Customer Application" has the meaning described in the Services Schedule.

"Customer Data" has the meaning described in the Services Schedule (if applicable).

"Customer Indemnified Materials" has the meaning described in the applicable Services Schedule.

"Effective Date" means the date of the last party's signature of the General Terms.

"End User" or "Customer End User" means an individual that Customer permits to use the Services or a Customer Application.

"Export Control Laws" means all applicable export and re-export control laws and regulations, including (i) the Export Administration Regulations ("EAR") maintained by the U.S. Department of Commerce, (ii) trade and economic sanctions maintained by the U.S. Treasury Department's Office of Foreign Assets Control, and (iii) the International Traffic in Arms Regulations ("ITAR") maintained by the U.S. Department of State.

"Fees" means the product of the amount of Services used or ordered by Customer multiplied by the Prices, plus any applicable Taxes.

"Google Indemnified Materials" has the meaning described in the applicable Services Schedule.

DocuSign Envelope ID: 0BD42EBB-335B-4713-86AA-96B68FE315EC

"High Risk Activities" means activities where the failure of the Services could lead to death, serious personal injury, or severe environmental or property damage.

"HIPAA" means the Health Insurance Portability and Accountability Act of 1996 as it may be amended from time to time, and any regulations issued under it.

"including" means including but not limited to.

"Indemnified Liabilities" means any (i) settlement amounts approved by the indemnifying party, and (ii) damages and costs finally awarded against the indemnified party and its Affiliates by a court of competent jurisdiction.

"Intellectual Property" or "IP" means anything protectable by an Intellectual Property Right.

"Intellectual Property Right(s)" means all patent rights, copyrights, trademark rights, rights in trade secrets (if any), design rights, database rights, domain name rights, moral rights, and any other intellectual property rights (registered or unregistered) throughout the world.

"Legal Process" means an information disclosure request made under law, governmental regulation, court order, subpoena, warrant, governmental regulatory or agency request, or other valid legal authority, legal procedure, or similar process.

"Liability" means any liability, whether under contract, tort (including negligence), or otherwise, regardless of whether foreseeable or contemplated by the parties.

"Notification Email Address" has the meaning described in the applicable Services Schedule.

"Order Form" has the meaning described in the applicable Services Schedule.

"Order Term" means the period of time starting on the Services Start Date for the Services and continuing for the period indicated on the Order Form unless terminated in accordance with the Agreement.

"Payment Due Date" means 30 days from the invoice date.

"Prices" has the meaning described in the applicable Services Schedule. Unless described otherwise in the applicable Services Schedule, Prices do not include Taxes.

"Service Level Agreement" or "SLA" has the meaning described in the Services Schedule.

"Services" has the meaning described in the applicable Services Schedule.

"Services Schedule(s)" means a schedule to the Agreement with terms that apply only to the services and software (if applicable) described in that schedule.

"Services Start Date" means either the start date described in the Order Form or, if none is specified in the Order Form, the date Google makes the Services available to Customer.

"Software" has the meaning described in the Services Schedule (if applicable).

"Suspend" or "Suspension" means disabling access to or use of the Services or components of the Services.

"Taxes" means all government-imposed taxes, except for taxes based on Google's net income, net worth, asset value, property value, or employment.



Legal Dept JK Google

"Term" means the period starting on the Effective Date and continuing until the expiration or termination of all Order Terms.

"Third-Party Legal Proceeding" means any formal legal proceeding filed by an unaffiliated third party before a court or government tribunal (including any appellate proceeding).

"Trademark Guidelines" means Google's Brand Terms and Conditions described at https://www.google.com/permissions/trademark/brand-terms.html.

"URL" means a uniform resource locator address to a site on the internet.

"URL Terms" has the meaning described in the Services Schedule.

"Use Restrictions" means the restrictions in Section 2.3 (Use Restrictions) of these General Terms and any additional restrictions on the use of Services described in a section entitled "Additional Use Restrictions" in the applicable Services Schedule.

Signed by the parties' authorized representatives on the dates below.

| **Google** | **Customer** |
|---|---|
| Philipp Schindler<br>Philipp Schindler<br>Authorized Signatory<br>2019.07.22 16:05:55 -07'00' | By: DocuSigned by: Ken Mudge 977C3FCAE9264B4... |
| | Print Name: Ken Mudge |
| Title: | Title: VP Strategic Technology |
| Date: | Date: 07/22/2019 |





Legal Dept JK Google

**Google Cloud Master Agreement**
**Google Maps Core Services Schedule**

This Google Maps Core Services Schedule (the "Services Schedule") supplements and is incorporated by reference into the Google Cloud Master Agreement. This Services Schedule applies solely to the services identified in this Services Schedule and is effective so long as there is an active Order Form. Terms defined in the General Terms apply to this Services Schedule.

**1. Administering the Services.**

1.1 Accounts. Customer must have an Account. Customer is responsible for (a) the information it provides in connection with the Account, (b) maintaining the confidentiality and security of the Account and associated passwords, and (c) any use of its Account.

1.2 Admin Console; Projects; API Keys. Customer will administer the Services through the online Admin Console. To access the Services, Customer must create Project(s) and use its API key(s) in accordance with the Documentation.

1.3 Customer Domains and Applications. Customer must list in the Admin Console each authorized domain and application that uses the Services. Customer is responsible for ensuring that only authorized domains and applications use the Services.

**2. Using the Services.**

2.1 License Grant. Subject to the Agreement's terms, Google grants to Customer a non-sublicensable, non-transferable, non-exclusive license to use the Services in Customer Application(s).

2.2 License Requirements and Restrictions. The following are conditions of the license granted in Section 2.1 (License Grant). In this Section 2.2 (License Requirements and Restrictions), the phrase "Customer will not" means "Customer will not, and will not permit a third party to".

2.2.1 Requirements for Using the Services.

(a) Terms of Service and Privacy Policy.

(i) The Customer Application's terms of service will (A) notify users that the Customer Application includes Google Maps features and content; and (B) state that use of Google Maps features and content is subject to the then-current versions of the:

(1) Google Maps/Google Earth Additional Terms of Service at https://maps.google.com/help/terms_maps.html; and

(2) Google Privacy Policy at https://www.google.com/policies/privacy/.

(ii) If the Customer Application allows users to include the Google Maps Core Services in Downstream Products, then Customer will contractually require that all Downstream Products' terms of service satisfy the same notice and flow-down requirements that apply to the Customer Application under Section 2.2.1(a)(i) (Terms of Service and Privacy Policy).

(iii) If users of the Customer Application (and Downstream Products, if any) fail to comply with applicable terms of the Google Maps/Google Earth Additional Terms of Service, then Customer will take appropriate enforcement action, including

DocuSign Envelope ID: 0BD42EBB-335B-4713-86AA-96B68FE315EC

suspending or terminating those users' use of Google Maps features and content in the Customer Application or Downstream Products.

(b) Attribution. Customer will display all attribution that (i) Google provides through the Services (including branding, logos, and copyright and trademark notices); or (ii) is specified in the Maps Service Specific Terms. Customer will not modify, obscure, or delete such attribution.

(c) Search Results Integrity. Customer will notify End Users if Customer modifies any of the search results from the Services.

(d) Review of Customer Applications. At Google's request, Customer will submit Customer Application(s) and Project(s) to Google for review to ensure compliance with the Agreement (including the AUP).

2.2.2 Restrictions against Misusing the Services (Additional Use Restrictions).

(a) No Scraping. Customer will not export, extract, or otherwise scrape Google Maps Content for use outside the Services. For example, Customer will not:

(i) download Google Maps tiles, Street View images, geocodes, directions, distance matrix results, roads information, places information, elevation values, and time zone details; or

(ii) save business names, addresses, or user reviews in Customer's database.

(b) No Caching. Customer will not cache Google Maps Content except as expressly permitted under the Maps Service Specific Terms.

(c) No creating content from Google Maps Content. Customer will not create content based on Google Maps Content. For example, Customer will not:

(i) trace or digitize roadways, building outlines, utility posts, or electrical lines from the Maps JavaScript API Satellite base map type;

(ii) create 3D building models from 45° Imagery from Maps JavaScript API;

(iii) build terrain models based on elevation values from the Elevation API;

(iv) use latitude/longitude values from the Places API as an input for point-in-polygon analysis;

(v) construct an index of tree locations within a city from Street View imagery; or

(vi) convert text-based driving times into synthesized speech results.

(d) No Re-Creating Google Products or Features. Customer will not use the Services to create a product or service with features that are substantially similar to or that re-create a Google product or service. Customer's product or service must contain substantial, independent value and features beyond the Google products or services. For example, Customer will not:

(i) redistribute the Google Maps Core Services or pass them off as if they were Customer's services;

(ii) create a substitute of the Google Maps Core Services, Google Maps, or Google Maps mobile apps, or their features;

(iii) use the Google Maps Core Services in a listings or directory service or to create or augment an advertising product;

DocuSign Envelope ID: 0BD42EBB-335B-4713-86AA-96B68FE315EC

(iv) combine data from the Google Directions API, Google Geolocation API, and Maps SDK for Android to create real-time navigation functionality substantially similar to the functionality provided by the Google Maps for Android mobile app.

(e) No Use with Non-Google Maps. Customer will not use the Google Maps Core Services in a Customer Application that contains a non-Google map. For example, Customer will not (i) display Places listings on a non-Google map, or (ii) display Street View imagery and non-Google maps in the same Customer Application.

(f) No Circumventing Fees. Customer will not circumvent the applicable Fees. For example, Customer will not create multiple billing accounts or Projects to avoid incurring Fees, prevent Google from accurately calculating Customer's Service usage levels, abuse any free Service quotas, or offer access to the Services under a "time-sharing" or "service bureau" model.

(g) No use in Prohibited Territories. Customer will not distribute or market in a Prohibited Territory any Customer Application(s) that use the Google Maps Core Services.

(h) No use in embedded vehicle systems. Customer will not use the Google Maps Core Services in connection with any Customer Application or device embedded in a vehicle. For example, Customer will not create a Customer Application that (i) is embedded in an in-dashboard automotive infotainment system and (ii) allows End Users to request driving directions from the Directions API.

(i) No Use for High Risk Activities. Customer will not use the Google Maps Core Services for High Risk Activities. In connection with the Google Maps Core Services, "High Risk Activities" include (1) emergency response services; (2) autonomous and semi-autonomous vehicle or drone control; (3) vessel navigations; and (4) aviation.

2.2.3 Temporary Suspension.

(a) For License Restrictions Breaches. If Google becomes aware that Customer is in breach of Section 2.2 (License Requirements and Restrictions), Google will notify Customer of the breach. If Customer fails to correct the breach within 24 hours after notification, Google may Suspend the Services.

(b) For AUP Breaches or Emergency Suspension. Google may Suspend Services as described in Subsections (i) (AUP Breaches) and (ii) (Emergency Suspension) below. Any Suspension under those Subsections will be to the minimum extent and for the shortest duration required to (1) prevent or terminate the offending use, (2) prevent or resolve the Emergency Security Issue, or (3) comply with applicable law.

(i) AUP Breaches. If Google becomes aware that Customer's or any End User's use of the Services breaches the AUP, Google will give Customer notice of such breach by requesting that Customer correct the breach. If Customer fails to correct such breach within 24 hours, or if Google is otherwise required by applicable law to take action, then Google may Suspend all or part of Customer's use of the Services.

(ii) Emergency Suspension. Google may immediately Suspend Customer's use of the Services if (1) there is an Emergency Security Issue or (2) Google is required to Suspend such use to comply with applicable law. At Customer's request, unless prohibited by applicable law, Google will notify Customer of the basis for the Suspension as soon as is reasonably possible.

DocuSign Envelope ID: 0BD42EBB-335B-4713-86AA-96B68FE315EC

(c) For Alleged Third-Party Intellectual Property Rights Infringement. If the Customer Application is alleged to infringe a third party's Intellectual Property Rights, Google may require Customer to suspend all use of the Google Maps Core Services in the Customer Application with 30 days' written notice until such allegation is fully resolved. In any event, this Section 2.2.3(c) does not reduce Customer's obligations under General Terms Section 9 (Indemnification).

**3. Data Use, Protection, and Privacy.**

3.1 Data Use and Retention. To provide the Services through the Customer Application(s), Google collects and receives data from Customer and End Users (and End Users' End Users, if any), including search terms, IP addresses, and latitude/longitude coordinates. Customer acknowledges and agrees that Google and its Affiliates may use and retain this data to provide and improve Google products and services, subject to the then-current Google Privacy Policy at https://www.google.com/policies/privacy/.

3.2 European Data Protection Terms. Google and Customer agree to the then-current Google Maps Controller-Controller Data Protection Terms at https://cloud.google.com/maps-platform/terms/maps-controller-terms.

3.3 End User Privacy Requirements.

(a) End User Privacy. Customer's use of the Services in the Customer Application will comply with applicable privacy laws, including laws regarding Services that store and access Cookies on End Users' devices. If Customer has End Users in the European Economic Area, Customer will comply with the then-current EU End User Consent Policy at https://www.google.com/about/company/user-consent-policy.html.

(b) End User Personal Data. Through the normal functioning of the Google Maps Core Services, End Users provide certain personally identifiable information or Personal Data directly to Google, subject to the then-current Google Privacy Policy at https://www.google.com/policies/privacy/. However, Customer will not provide to Google (i) any End User's personally identifiable information; or (ii) any European End User's Personal Data (where "European" means "European Economic Area or Switzerland").

(c) End User Location Privacy Requirements. To safeguard End Users' location privacy, Customer will ensure that the Customer Application(s):

(i) notify End Users in advance of (1) the type(s) of data that Customer intends to collect from the End Users or the End Users' devices, and (2) the combination and use of End User's location with any other data provider's data; and

(ii) will not obtain or cache any End User's location except with the End User's express, prior, revocable consent.

**4. Intellectual Property Ownership.** As between the parties, Customer owns all Intellectual Property Rights in the Customer Application, and Google owns all Intellectual Property Rights in the Services.

**5. Third-Party Legal Notices and License Terms.** Certain components of the Services (including open source software) are subject to third-party copyright and other intellectual property rights, as specified in:

DocuSign Envelope ID: 0BD42EBB-335B-4713-86AA-96B68FE315EC

(a) the then-current Google Maps/Google Earth Legal Notices at https://www.google.com/help/legalnotices_maps.html; and

(b) separate, publicly-available third-party license terms, which Google will provide to Customer on request.

**6. Modifications.**

6.1 Modifications to URL Terms. Google may change the URL Terms, subject to the following:

(a) Notification of Material Changes. Google will notify Customer of any material change to the URL Terms.

(b) When Changes take Effect. Material changes to the URL Terms will become effective 30 days after notice is given, except that (i) materially adverse SLA changes will become effective 90 days after notice is given; and (ii) changes applicable to new Services or functionality, or required by a court order or applicable law, will be effective immediately.

(c) Objection to Changes.

(i) If a change to the URL Terms (other than as described in Section 6.1(b)(ii)) has a material adverse impact on Customer, then Customer may object to the change by notifying Google within 30 days after Google provides notice.

(ii) If Customer so notifies Google, then Customer will remain governed by the URL Terms in effect immediately before the change until the earlier of (1) the end of the then-current Order Term, or (2) 12 months after the notice was given.

6.2 Modifications to Services.

(a) Deprecation Policy. Google will notify Customer at least 12 months before a Significant Deprecation unless Google reasonably determines that (i) Google is not permitted to do so by law or by contract (including if there is a change in applicable law or contract) or (ii) continuing to provide the Service that is subject to the Significant Deprecation could create a security risk or substantial economic or technical burden.

(b) Other Modifications. Subject to Section 6.2(a) (Deprecation Policy), Google may make changes to the Services, which may include adding, updating, or discontinuing any Services or portion or feature(s) of the Services. Google will notify Customer of any material change to the Services.

**7. Technical Support.**

(a) By Google. Google will provide Maps Technical Support Services to Customer in accordance with the Google Maps Technical Support Services Guidelines.

(b) By Customer. Customer is responsible for technical support of its Customer Applications and Projects.

**8. Additional Payment Terms.**

(a) Usage Amount. Google's measurement tools will be used to determine Customer's usage of the Services.

(b) Price Revisions. Google may revise the Prices at any time unless otherwise expressly agreed in an addendum or Order Form to the Agreement. Google will notify Customer at least 30 days in advance of any Price increases.

**9. Advertising.** In its sole discretion, Customer may configure the Service to either display or not display advertisements served by Google.

**10. Benchmarking.** Customer may only publicly disclose (directly or through a third party) the results of any comparative or compatibility testing, benchmarking, or evaluation (each, a "Test") of the Services, if the disclosure includes all information reasonably necessary for Google or a third party to replicate the Test. If Customer conducts, or directs a third party to conduct, a Test of the Services and publicly discloses the results directly or through a third party, then Google (or a Google-directed third party) may conduct Tests of any publicly-available cloud products or services provided by Customer and publicly disclose the results of any such Test (which disclosure will include all information necessary for Customer or a third party to replicate the Test).

**11. Amendments to General Terms.** For purposes of this Services Schedule only:

(a) Publicity and Trademarks.

(i) General Terms Section 6 (Marketing and Publicity) is amended by adding the following sentence at the end of the paragraph:

Where applicable, Customer may use Google Maps Content in accordance with the then-current "Using Google Maps, Google Earth and Street View" permissions page at https://www.google.com/permissions/geoguidelines.html#geotrademarkpolicy, which will be considered "Google's prior written consent" for the permitted uses.

(ii) The definition of "Trademark Guidelines" in General Terms Section 13 (Definitions) is replaced with the following:

"Trademark Guidelines" means (1) the then-current Google's Brand Terms and Conditions at https://www.google.com/permissions/trademark/brand-terms.html; and (2) the "Use of Trademarks" section of the then-current "Using Google Maps, Google Earth and Street View" permissions page at https://www.google.com/permissions/geoguidelines.html#geotrademarkpolicy.

(b) Applicable Laws. For purposes of General Terms Section 7 (Representations and Warranties), the laws and regulations that are applicable to the Google Maps Core Services are limited to (i) applicable export and re-export control laws and regulations, including any applicable munitions- or defense-related regulations (for example, the International Traffic in Arms Regulations maintained by the U.S. Department of State); and (ii) applicable commercial and public anti-bribery laws (for example, the U.S. Foreign Corrupt Practices Act of 1977 and the UK Bribery Act 2010), which prohibit corrupt offers of anything of value, either directly or indirectly, to anyone, including government officials, to obtain or keep business or to secure any other improper commercial advantage. "Government officials" include any government employee; candidate for public office; and employee of government-

DocuSign Envelope ID: 0BD42EBB-335B-4713-86AA-96B68FE315EC

owned or government-controlled companies, public international organizations, and political parties.

(c) Disclaimer. General Terms Section 8 (Disclaimer) is amended to include the following additional disclaimer:

**Google Maps Core Services are provided for planning purposes only. Information from the Google Maps Core Services may differ from actual conditions, and may not be suitable for the Customer Application. Customer must exercise independent judgment when using the Services to ensure that (a) Google Maps are suitable for the Customer Application; and (b) the Customer Application is safe for End Users and other third parties.**

(d) Limitation of Liability. For the Google Maps Core Services, Google's indemnity obligations under General Terms Section 9 (Indemnification) will be subject to the liability cap in General Terms Section 10.1(b) (Limited Liabilities).

**12. Survival.** The following sections of this Services Schedule will survive expiration or termination of this Services Schedule: Section 3 (Data Use, Protection, and Privacy), Section 4 (Intellectual Property Ownership), Section 5 (Third-Party Legal Notices and License Terms), Section 8 (Additional Payment Terms), Section 10 (Benchmarking), Section 11 (Amendments to General Terms), and Section 14 (Additional Definitions).

**13. Termination of Previous Agreements.** If Google and Customer have previously entered into a Maps APIs Agreement, that agreement will terminate on the Effective Date and be replaced with the Agreement.

**14. Additional Definitions.**

"Account" means Customer's Google Account.

"Admin Console" means the online console(s) and tool(s) provided by Google to Customer for administering the Services.

"AUP" means the then-current Acceptable Use Policy for the Services at https://cloud.google.com/maps-platform/terms/aup/.

"Committed Purchase(s)" has the meaning described in the Maps Service Specific Terms.

"Customer Application" means any web domain or application (including all source code and features) owned or controlled by Customer, or that Customer is authorized to use.

"Customer Data" is not applicable under this Services Schedule.

"Customer Indemnified Materials" means the Customer Application and Customer Brand Features.

"Documentation" means the then-current Service documentation described at https://developers.google.com/maps/documentation.

"Downstream Products" are Customer's users' websites, applications, or other products. For example, if the Customer Application is a platform that helps users build their own websites and embed Google Maps in those websites, then those users' websites are "Downstream Products."

DocuSign Envelope ID: 0BD42EBB-335B-4713-86AA-96B68FE315EC

"Emergency Security Issue" means either (a) Customer's or an End User's use of the Services in breach of the AUP, where such use could disrupt (i) the Services, (ii) other customers' or their customer end users' use of the Services, or (iii) the Google network or servers used to provide the Services; or (b) unauthorized third-party access to the Services.

"Google Indemnified Materials" means Google's technology used to provide the Services (excluding any open source software) and Google's Brand Features.

"Google Maps Content" means any content provided through the Services (whether created by Google or its third-party licensors), including map and terrain data, imagery, traffic data, and places data (including business listings).

"Google Maps Core Services" means the then-current services described at https://cloud.google.com/maps-platform/terms/maps-services/. The Google Maps Core Services include the Google Maps Content and the Software.

"Maps Service Specific Terms" means the then-current terms specific to one or more Services described at https://cloud.google.com/maps-platform/terms/maps-service-terms/.

"Maps Technical Support Services" or "TSS" means the technical support service provided by Google to Customer under the then-current Maps Technical Support Services Guidelines.

"Maps Technical Support Services Guidelines" or "TSS Guidelines" means the then-current technical support service guidelines described at https://cloud.google.com/maps-platform/terms/tssg/.

"Notification Email Address" means the email address(es) designated by Customer in the Admin Console.

"Order Form" means an order form issued by Google and executed by Customer and Google specifying the Services Google will provide to Customer under this Services Schedule.

"Package Purchase" has the meaning described in the Maps Service Specific Terms.

"Personal Data" has the meaning provided in the General Data Protection Regulation (EU) 2016/679 of the European Parliament and of the Council of April 27, 2016.

"Prices" means the amounts agreed to in an Order Form under this Services Schedule.

"Prohibited Territory" means the then-current countries listed at https://cloud.google.com/maps-platform/terms/maps-prohibited-territories/.

"Project" means a Customer-selected grouping of Google Maps Core Services resources for a particular Customer Application.

"Services" means the Google Maps Core Services as defined above.

"Significant Deprecation" means a material discontinuance or backwards incompatible change to the Services described at https://cloud.google.com/maps-platform/terms/maps-deprecation/.

"SLA" means each of the then-current service level agreements described at https://cloud.google.com/maps-platform/terms/sla/.

"Software" means any downloadable tools, software development kits, or other computer software provided by Google for use as part of the Services, including updates.

DocuSign Envelope ID: 0BD42EBB-335B-4713-86AA-96B68FE315EC

"URL Terms" means the following, which will control in the following order if there is a conflict:

(a) the Maps Service Specific Terms;

(b) the SLA;

(c) the AUP;

(d) the Maps Technical Support Services Guidelines;

(e) the Prohibited Territory;

(f) the Google Maps/Google Earth Legal Notices described at https://www.google.com/help/legalnotices_maps.html; and

(g) the Google Maps/Google Earth Additional Terms of Service described at https://maps.google.com/help/terms_maps.html.

Signed by the parties' authorized representatives on the dates below.

| **Google: Google LLC** | **Customer: Kaiser Foundation Hospitals** |
| --- | --- |
| Philipp Schindler<br>Authorized Signatory<br>2019.07.22 16:06:07 -07'00' | By: DocuSigned by: Ken Mudge 977C3FCAE9264B4... |
| | Print Name: Ken Mudge |
| Title: | Title: VP Strategic Technology |
| Date: | Date: 07/22/2019 |



Legal Dept JK Google

# EXHIBIT B

EXHIBIT B

Cited
As of: July 3, 2024 11:05 PM Z

# AHA v. Becerra

United States District Court for the Northern District of Texas, Fort Worth Division

June 20, 2024, Decided; June 20, 2024, Filed

No. 4:23-cv-01110-P

**Reporter**
2024 U.S. Dist. LEXIS 108847 *; __ F.Supp.3d __; 2024 WL 3075865

AMERICAN HOSPITAL ASSOCIATION, ET AL., Plaintiffs, v. XAVIER BECERRA, ET AL., Defendants.

**Counsel:** **[*1]** For American Hospital Association, Plaintiff: Jonathan David Guynn, LEAD ATTORNEY, Jones Day, Dallas, TX; Audrey Beck, PRO HAC VICE, Washington, DC; Hashim M Mooppan, PRO HAC VICE, Jones Day - Washington, Washington, DC; Jason Owen Barnes, Simmons Hanly Conroy, St. Louis, MO; Rebekah B Kcehowski, PRO HAC VICE, Jones Day, Pittsburgh, PA.

For Texas Hospital Association, Texas Health Resources, United Regional Health Care System, Plaintiffs: Jonathan David Guynn, LEAD ATTORNEY, Jones Day, Dallas, TX; Audrey Beck, Washington, DC; Hashim M Mooppan, PRO HAC VICE, Jones Day - Washington, Washington, DC; Rebekah B Kcehowski, PRO HAC VICE, Jones Day, Pittsburgh, PA.

For Xavier Becerra, In his official capacity as secretary of U.S. Department of Health and Human Services, Melanie Fontes Rainer, In her official capacity as director of Office for Civil Rights, U.S. Department of Health and Human Services, United States of America, Defendants: Leslie Cooper Vigen, LEAD ATTORNEY, Civ, Civil Division, Federal Programs Branch, Washington, DC.

**Judges:** MARK T. PITTMAN, UNITED STATES DISTRICT JUDGE.

**Opinion by:** MARK T. PITTMAN

## Opinion

### OPINION & ORDER

Before the Court are cross-motions for summary judgment. ECF Nos. 24, 50. Having considered **[*2]** the motions, briefs, and applicable law, the Court **GRANTS in part** and **DENIES in part** Plaintiffs' motion (ECF No. 24) and **DENIES** Defendants' motion (ECF No. 50).

### BACKGROUND

Congress passed the Health Insurance Portability and Accountability Act ("HIPAA") in 1996 because health information needed more protections and the world needed more acronyms. HIPAA seeks to "assure that individuals' health information is properly protected" while "allowing the flow of health information needed to provide and promote high quality healthcare." The Department of Health and Human Services ("HHS") enforces this mandate. Violations are reported to HHS's Office for Civil Rights ("OCR"), who investigates reports and recommends corrective action. This case involves HIPAA's confidentiality protections (the "Privacy Rule") for "protected health information" ("PHI"). More specifically, the case concerns the Rule's applicability to one subset of PHI: "individually identifiable health information" ("IIHI"). HIPAA defines IIHI as information that

(1) "relates to" an individual's healthcare and (2) "identifies the individual" or provides "a reasonable basis to believe that the information can be used to identify **[*3]** the individual."

Like many decades-old definitions, the Act's definition of IIHI has evolved awkwardly with the times. A lot has changed between 1996 and 2024. In 1996, an American with health concerns would likely consult a library or other repository for things called "books," which would contain information potentially relevant to their condition. Thereafter, the individual would consult something called the "Yellowpages," which was a book that listed phone numbers for local clinicians. They would then call nearby clinics and speak with a human being to inquire about availability. After a trial-and-error process, the individual would squeeze in a visit for the (hopefully) near future. Twenty percent of the population had internet, so those fortunate few could scour the nascent digital landscape for this information and cut down on required steps. For the rest, this process could take several days.

Today, an American with health concerns will reach in their pocket, grab a phone, and with the click of a button connect themselves to more information than an American in 1996 could access in a lifetime. Based on their query, algorithms will autopopulate the most relevant resources first, **[*4]** which an "AI overview" will conveniently distill. After reviewing WebMD, the individual will ill-advisedly self-diagnose and search for nearby providers. Based on their location, a list of nearby clinics will appear, categorized by projected wait time. For the ninety-six percent of Americans with internet, this process will take roughly ten minutes.

Differences between 1996 and today are further seen in the patients' clinic experience. For one, folks in 1996 would drive to a physical location to speak with a healthcare provider; today we just schedule a telemedicine appointment. And in 1996, the patient's intake paperwork and clinician notes would be transcribed on paper and stored in a Hollinger box, or perhaps transferred to a CD or floppy disk. Most patients today will fill out a digital intake form, which will be incorporated with clinician notes in "electronic patient records" ("EPRs") maintained in the Cloud or in auxiliary servers/data centers.

By aggregating and storing EPRs digitally, healthcare providers can securely maintain troves of PHI, most of which can be "de-identified" to protect patients' identities. They can then share such data with technology vendors and other third **[*5]** parties, gaining valuable data-analytics insights and facilitating better cross-platform collaboration. HIPAA provides robust protections for PHI in this context, including the Privacy Rule, along with the Security Rule (requiring "reasonable and appropriate" administrative safeguards), required SSL encryption, obligatory Business Associate Agreements ("BAAs") for outside providers, and a host of other obligations. Subject to certain restrictions, providers can provide information that is not IIHI on "unauthenticated public webpages" ("UPWs")—websites that don't require login credentials or user verification. In doing so, healthcare providers increase the public's access to important health-related information.

While the benefits abound, this trend is not without drawbacks. In recent years, the OCR has received a surge of complaints from citizens concerned that UPWs might disclose their IIHI. For instance, say a provider utilizes third-party technology vendors for its UPW. Many vendors use a page visitor's IP address to create a more bespoke user experience (e.g., using user location/maps to populate a menu of nearby providers or suggest clinics with lower wait times). Every click of **[*6]** the mouse or swipe of the phone thus increases the relevance of information the UPW provides. In theory, a third party could connect the dots between a person's IP address and the searches performed: if an IP address corresponds to Person A, and Person A looks up symptoms of Condition B, one might conclude Person A has Condition B.

IIHI's broad definition seemed sufficiently

malleable to progress with the times, giving providers a clear rubric for information that can and can't be shared. Indeed, inferences aside, the above scenario would never reveal that Person A affirmatively had Condition B. But HHS thought otherwise. Accordingly, in 2022, the Department gave the definition a clandestine facelift. In December of that year, HHS issued a guidance document (the "Original Bulletin") to address potential privacy concerns. Like most guidance documents, the Original Bulletin reminded covered entities of their obligation to protect IIHI. But it did more than that, too. In particular, the Original Bulletin appeared to shoehorn additional information into the IIHI definition. The Original Bulletin provided several hypotheticals that trigger HIPAA obligations, including circumstances where **[*7]** an online technology connects (1) an individual's IP address with (2) a visit to a UPW addressing specific health conditions or healthcare providers. HHS says this new rule (the "Proscribed Combination") was an example to highlight privacy concerns; covered entities saw it as an entirely new obligation.

The Plaintiffs here (collectively, "the Hospitals") are two hospital associations and a regional healthcare system. Facing new obligations under the Proscribed Combination, the Hospitals sued to stop enforcement of the rule.[1] As the case boils down to pure questions of law, both Parties moved for summary judgment. Days before its brief was due, HHS issued a new guidance document (the "Revised Bulletin"). The Revised Bulletin softened language from the Original and noted that it "do[es] not have the force and effect of law" and isn't "meant to bind the public in any way." The Revised Bulletin further suggests the IIHI test is subjective. That is, the Revised Bulletin insinuates that information can *become* IIHI if the individual's *reason* for visiting a UPW relates to their personal healthcare (irrespective of the fact that such information is unknowable unless a UPW seeks it).

Changes **[*8]** aside, the Revised Bulletin did not change the salient legal questions. The Hospitals say summary judgment is warranted here because (1) HHS exceeded its authority in promulgating the Bulletins and (2) HHS violated the Administrative Procedure Act ("APA") in doing so. HHS sees things differently. As a preliminary matter, HHS says the Court lacks jurisdiction because the Bulletins are not a "final agency action" subject to judicial review. Even if the Court has jurisdiction, HHS says the Hospitals' claim fails on the merits because (1) the Revised Bulletin is consistent with HIPAA's definition of IIHI, (2) the Revised Bulletin is not "arbitrary and capricious" under the APA, and (3) HHS was authorized to issue the Revised Bulletin and did so with procedural propriety. Having reviewed the briefs and submissions from multiple amici, the Court agrees with the Hospitals that the Bulletins improperly create substantive legal obligations for covered entities.

## LEGAL STANDARD

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is "genuine" if, based on the evidence, "a reasonable jury could **[*9]** return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A fact is "material" if it would affect a case's outcome. *Id.* Generally, the "substantive law will identify which facts are material" and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* In assessing if summary judgment is warranted, the Court "view[s] all evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Cunningham v. Circle 8 Crane Servs., LLC*,

[1] The Complaint names three Defendants: the United States of America, Melanie Fontes Rainer (OCR Director), and Xavier Becerra (HHS Secretary). *See* ECF No. 1 at 1. The Court collectively calls them "HHS" or "the Department" because that's the most relevant executive entity.

64 F.4th 597, 600 (5th Cir. 2023).

While the Court may consider any evidence of record, it need only consider materials cited by the parties. FED. R. CIV. P. 56(c)(1)-(3); *see generally Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) (noting summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law"). But the Court need not mine the record for evidence supporting the nonmovant; the burden falls on the movant to simply show a lack of evidence supporting the nonmovant's case. *See Malacara v. Garber*, 353 F.3d 393, 404-05 (5th Cir. 2003). In this regard, "[s]ummary judgment is appropriate when 'the nonmoving party has failed to make a sufficient showing on an essential element of her **[*10]** case with respect to which she has the burden of proof.'" *Edwards v. Oliver*, 31 F.4th 925, 929 (5th Cir. 2022) (quoting *Celotex*, 477 U.S. at 323).

## ANALYSIS

As noted, the Parties contest HHS's authority to promulgate the Bulletins and the procedural propriety with which it did. *See* ECF Nos. 51, 60. But HHS also contests the Court's jurisdiction. *See* ECF No. 51 at 25. The Court addresses the jurisdictional challenge first, as "courts must assess their jurisdiction before turning to the merits." *United States v. Rodriguez*, 33 F.4th 807, 811 (5th Cir. 2022). As explained below, the Court has jurisdiction over the Hospitals' challenge.

### A. The Court has jurisdiction over the Hospitals' claim.

HHS says the Court lacks jurisdiction because the Bulletins were not a "final agency action."[2] *See* ECF No. 51 at 25. If true, the APA's judicial-review provisions don't apply. *See* 5 U.S.C. § 704. If Section 704 doesn't apply, the Court lacks jurisdiction over the Hospitals' APA claim. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990); *Apter v. HHS*, 80 F.4th 579, 593 (5th Cir. 2023). While the Court would still have jurisdiction over the Hospitals' non-APA claims, *see Apter*, 80 F.4th at 591, it would be unable to consider their APA arguments. This so-called "finality requirement" is the hallmark of federal-jurisdiction precedents under the APA. *See U.S. Army Corps of Eng'rs v. Hawkes Co. Inc.*, 578 U.S. 590, 591, 136 S. Ct. 1807, 195 L. Ed. 2d 77 (2016).

The APA has a "basic presumption of judicial review" for "one 'suffering legal wrong because of agency action.'" **[*11]** *Abbott Laby's v. Gardner*, 387 U.S. 136, 140, 87 S. Ct. 1507, 18 L. Ed. 2d 681 (1967) (quoting 5 U.S.C. § 702), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 97 S. Ct. 980, 51 L. Ed. 2d 192 (1977). The APA defines "agency" as "each authority of the Government of the United States," 5 U.S.C. § 551(1), and "agency action" as "the whole or a part of any agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(13). But what is a *final* agency action? Federal courts take a "pragmatic approach" to this question, viewing the finality requirement as inherently "flexible." *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019). At base, a final agency action must create "rights, obligations, or legal consequences," and those

[2] Notably, HHS's arguments solely concern the APA. The Hospitals counter by arguing "even if the APA were unavailable, this Court at least has the power to grant injunctive and declaratory relief against HHS for exceeding its authority under HIPAA." ECF No. 60 at 15. That opened a can of worms, with HHS submitting over a half-dozen briefing pages on the appropriate taxonomy for the Hospitals' non-APA claims. *See* ECF No. 51 at 31 ("Plaintiffs cannot avoid the finality requirement by recasting a garden-variety APA claim as a non-statutory equitable claim."); *id.* at 34 (contending Plaintiffs try to "cast a plain-vanilla APA claim in the guise of an implied equitable *ultra vires* claim"). These arguments ultimately lack bearing for the Court's analysis, as the Court has jurisdiction under both the APA and Art. III.

rights/obligations/consequences "must be new." *State v. Rettig*, 987 F.3d 518, 529 (5th Cir. 2021) (citations omitted). Courts use a two-part test to make this call, asking if the challenged action (1) represents "the consummation of the agency's decision-making process" and (2) determines "rights or obligations" for those subject to it. *See Bennett v. Spear*, 520 U.S. 154, 178, 117 S. Ct. 1154, 137 L. Ed. 2d 281 (1997) (cleaned up).

Here, HHS says the Revised Bulletin "satisfies neither requirement." ECF No. 51 at 25. For the first, HHS contends the Revised Bulletin "does not establish the agency's final position with respect to any concrete [HIPAA] requirement." *Id.* For the second, HHS argues the Revised Bulletin "lacks any independent force of law, as it explicitly states **[*12]** that it is non-binding and any legal consequences would only result after an administrative proceeding subject to judicial review." *Id.* The Hospitals disagree. On the first point, the Hospitals argue the Revised Bulletin articulates HHS's position on an ostensibly new class of IIHI. *See* ECF No. 60 at 18. On the second, the Hospitals argue the Revised Bulletin creates new substantive legal requirements on its face. *Id.* at 19-22. The Hospitals persuade.

1. <u>The Proscribed Combination is the consummation of HHS decision-making</u>.

Relying on its eve-of-brief Revised Bulletin, HHS doesn't brief finality for the Original Bulletin. *See* ECF No. 51 at 25. The Hospitals say that's because HHS "cannot meaningfully dispute that the Original Bulletin was final agency action when this suit was filed." ECF No. 60 at 16. They're probably right, but be that as it may, the Revised Bulletin is the legally operative document. In any event, both Bulletins consummated HHS decision-making with respect to the Proscribed Combination.[3] An action consummates agency decision-making where it is not "merely tentative or interlocutory." *Bennett*, 520 U.S. at 177-78. In such circumstances, the action determines the "rights and obligations" of covered **[*13]** entities and creates conditions from which "legal consequences could flow." *La. State v. U.S. Army Corps of Eng'rs*, 834 F.3d 574, 579 (5th Cir. 2016). That's because the agency has asserted its "final position on the factual circumstances underpinning the Agency's orders." *Ak. Dept. of Envt'l Conservation v. EPA*, 540 U.S. 461, 483, 124 S. Ct. 983, 157 L. Ed. 2d 967 (2004) (cleaned up).

Here, HHS says the Revised Bulletin does not articulate the Department's position "with respect to any concrete circumstances." ECF No. 51 at 25. The Court is unsure how HHS reached that conclusion. As the Hospitals rightly note, the Revised Bulletin clearly articulates the Department's position regarding PHI in certain contexts, including the Proscribed Combination:

> The Revised Bulletin's tweak to the Original Bulletin is still a definitive position and effectively the same one. As discussed, the Revised Bulletin retains its rule against the Proscribed Combination, adding only a subjective-intent gloss that is immaterial for purposes of APA finality. More specifically, the Revised Bulletin states that "the mere fact that an online tracking technology connects the IP address of a user's device (or other identifying information) with a visit to a webpage addressing specific health conditions or listing health care providers *is* . . . a sufficient combination of information **[*14]** to constitute IIHI *if* the visit to the webpage is . . . related to' the individual's own health. AR 4 (emphasis added; double negative omitted).

ECF No. 60 at 18 (quoting ECF No. 49, Administrative Record ("AR"), at 4). HHS attempts to characterize the document as a "policy statement" that simply informs covered entities how HHS will "exercise a discretionary power."

[3] At times the briefs conflate the Revised Bulletin as a whole with the Proscribed Combination as a subpart therein. This distinction is meaningful. The Revised Bulletin contains an array of guidance for covered entities, much of which is both legally and pragmatically sound. The Court's analysis concerns only the Proscribed Combination and the Revised Bulletin's attempt to apply HIPAA obligations to this ostensibly new IIHI context.

ECF No. 51 at 51. But whether the Department chooses to enforce its position, the wording of the Revised Bulletin "adopts a definitive interpretation of the IIHI definition that governs the scope of covered entities' duties." ECF No. 60 at 54; *see generally* AR at 4-6. And the words of the Revised Bulletin control, not the Department's *post hoc* rationalizations in its defense.

The Department further argues the Revised Bulletin does not consummate HHS decision-making because it is subject to judicial review. *See* ECF No. 51 at 25. True, the availability of judicial review suggests a challenged action was not truly "final" for APA purposes. *See Ak. Dep't of Envt'l Conservation*, 540 U.S. at 483. But HIPAA does not provide for judicial review of one-off guidance documents like the Revised Bulletin. Rather, what the Department actually notes is that "any *legal consequences*" from **[*15]** violations would "result after an administrative proceeding subject to judicial review." ECF No. 51 at 25.

Case law has long rejected the argument that an action is judicially reviewable merely because subsequent enforcement proceedings would be. *See, e.g., Sackett v. EPA*, 566 U.S. 120, 127, 132 S. Ct. 1367, 182 L. Ed. 2d 367 (2012) (rejecting identical argument where "future enforcement proceeding" was subject to judicial review but the contested provisions "were not subject to further Agency review" themselves). Most enforcement actions are judicially reviewable. *See id.* Thus, if accepted, the Department's argument would foreclose APA review for the most egregious executive oversteps until *after* penalties were imposed. The Supreme Court's APA precedents have rejected that argument time and time again. *See, e.g., Hawkes Co.*, 578 U.S. at 600 (internal quotation marks and citation omitted) ("As we have long held, parties need not await enforcement proceedings before challenging final agency action where such proceedings carry the risk of serious criminal and civil penalties.").

In a last-ditch effort to evade review, HHS argues the Revised Bulletin "is not sufficiently concrete to constitute the consummation of the agency's decisionmaking." ECF No. 51 at 27. The Court agrees the Revised **[*16]** Bulletin lacks critical detail for HIPAA-covered entities. But numerous cases have held that guidance documents can't escape review merely because they're poorly written. For all its shortcomings, the Revised Bulletin unambiguously states the Department's stance vis-à-vis the Proscribed Combination as IIHI. *See* AR at 4-6. And even if subsequent enforcement actions would be judicially reviewable, the Hospitals "need not assume such risks while waiting for [HHS] to 'drop the hammer' in order to have their day in court." *Hawkes Co.*, 578 U.S. at 600 (quoting *Sackett*, 566 U.S. at 127). Having found the Revised Bulletin consummates HHS decision-making vis-à-vis the Proscribed Combination, the Court must next ask whether it creates new legal rights, obligations, or consequences. *See Rettig*, 987 F.3d at 529.

2. <u>The Revised Bulletin imposes new obligations regarding the Proscribed Combination</u>.

Turning to the "new legal obligations" factor, the Court is unpersuaded by the Department's PR campaign for the Bulletins. HHS argues "[t]he Revised Bulletin is [] not final because it does not create any new legal rights or obligations." ECF No. 51 at 27. Rather, HHS contends the Revised Bulletin "merely reiterates the Privacy Rule's longstanding restrictions" and "highlights **[*17]** certain other preexisting obligations." *Id.* Big, if true.

As the Department notes, final agency actions "break[] new ground." ECF No. 51 at 27. Simply put, plaintiffs can't sue the Government merely because it reminds them of preexisting obligations or of laws already on the books. *Rettig*, 987 F.3d at 529; *see also Nat'l Pork Prods. Council v. EPA*, 635 F.3d 738, 756 (5th Cir. 2011). Here, the Revised Bulletin doesn't frame the Proscribed Combination as a new rule, but as a way to "ensure [covered entities] are not . . . violat[ing] the Privacy Rule." ECF No. 51 at 41. This is a subtle sleight of

hand, as it substitutes one question (*whether* PHI can be disclosed to tracking technology vendors) for another (*what counts* as PHI collected by online tools). *See* ECF No. 60 at 19.

To state the obvious, the Hospitals and countless amici are not in federal court to advocate for their right to disclose IIHI. Rather, they challenge whether the Proscribed Combination fits that taxonomy. *See* ECF No. 1. Much hinges on that distinction. If the Proscribed Combination isn't IIHI, the Privacy Rule doesn't apply. On the other hand, if the Proscribed Combination constitutes IIHI, covered entities have a host of legal obligations to ensure HIPAA compliance. And if the Proscribed Combination is **[*18]** novel, as the Hospitals contend, then these legal obligations are necessarily new. In this regard, HHS takes a well-trod path: it's hard to change the law itself, but with creative lawyering it's possible to argue the law always required certain conduct. *See, e.g., Bostock v. Clayton Cty.*, 590 U.S. 644, 649-50, 140 S. Ct. 1731, 207 L. Ed. 2d 218 (2020) (ignoring the meaning of Title VII when written to argue "sex" incorporates the conceptually distinct notion of "gender identity"). But the proof is in the pudding, and the Hospitals point to four compelling signs that the Revised Bulletin imposes new obligations. *See* ECF No. 60 at 20.

*First*, HHS has never issued a pronouncement "construing the IIHI definition in the [ ] context of information collected by online technologies—let alone adopting the agency's new rule on the Proscribed Combination." *Id.*; *see* AR at 4-7. *Second*, there's nothing close to unanimity between HIPAA-covered entities on this point. *Id.*; *see* AR at 347-49; ECF No. 26 at 26. *Third*, other courts have rejected HHS's interpretation. *Id.*; *see* ECF No. 51 at 44 (collecting cases). *Fourth*, like private-sector entities, "[i]t is undisputed that HIPAA-covered federal agencies are disclosing IIHI in violation of the Revised Bulletin's new rule." *Id.*; *see* ECF No. **[*19]** 51 at 44-45. So the Proscribed Combination hasn't been announced before, isn't standard practice for covered entities, has been rejected by federal courts, and isn't followed by the government.

To be fair, noncompliance doesn't prove a law doesn't exist. *See* ECF No. 51 at 44-45 ("To the extent any federal agencies are [violating the Proscribed Combination] . . . the Revised Bulletin reminds them to protect that information . . . just as it does for regulated entities outside of the federal government."). But at some point, one would expect a degree of compliance if the Proscribed Combination was already law—as is seen for HIPAA's numerous other requirements. *See* ECF No. 37 at 10-11. Indeed, the record reflects ubiquitous *non-compliance* with the Proscribed Combination among private and public entities who operate UPWs. *See, e.g.*, AR at 347-49; ECF No. 26 at 26. Such widespread noncompliance is persuasive in the absence of any HHS pronouncement previously articulating the Proscribed Combination. *See* ECF No. 60 at 20. As a whole, these signs point to one conclusion: HHS tried to tweak the IIHI definition and got caught. With its hand in the cookie jar, the Department now backtracks. In **[*20]** doing so, it gaslights covered entities by arguing the Bulletins restate what the rule has been all along.

Review of the Revised Bulletin confirms the Hospitals' suspicions. True, HHS seemed to acknowledge the Original Bulletin went too far, as the Revised Bulletin confirms that the Proscribed Combination, by itself, does not constitute IIHI. *See* AR at 4 ("The mere fact that an online tracking technology connects the IP address of a user's device (or other identifying information) with a visit to a webpage addressing specific health conditions or listing health care providers is not sufficient . . . to constitute IIHI."). And it added an additional example to illustrate as much. *See id.* at 6 (discussing a hypothetical student interacting with a UPW for research purposes).

All else equal, the Revised Bulletin would fix the problem. But as the Hospitals note, all else isn't equal:

> The agency's retreat does not go far enough, however, to fix the rule's fatal flaws. The Revised Bulletin's modified rule for what constitutes IIHI remains essentially the same. HHS only tweaked the Proscribed Combination to require that the identifiable individual's subjective reason for visiting the health-related **[*21]** public page must be related to his own health. Specifically, the Revised Bulletin states (with a double negative removed) that the Proscribed Combination "is not a sufficient combination of information to constitute IIHI if the visit to the webpage is not related to [the] individual's past, present, or future health, healthcare, or payment for healthcare." . . . But this subjective-motive gloss on the Proscribed Combination is a distinction without a difference.

ECF No. 60 at 11-12; *see also* ECF No. 26 at 3-11. For a jargon-heavy topic like HIPAA, nomenclature matters. Taking a step back, one can see the Revised Bulletin *appears* to soften the Department's stance, *see* AR at 4-6, but effectively changes nothing regarding the operative nomenclature. The Original Bulletin said its IIHI when an online technology connects (1) an individual's IP address with (2) a visit to a UPW addressing specific health conditions or healthcare providers. *See* AR at 20-22. The Revised Bulletin says its IIHI when an online technology connects (1) an individual's IP address with (2) a visit to a UPW with *the intent* to address *the visitor's* specific health conditions or healthcare providers. *See* ECF No. 51 at **[*22]** 41.

Subjective intent aside, the Revised Bulletin only compounds the conundrum for covered entities. Indeed, covered entities must modify their behavior the same way under both Bulletins. A user's intent in visiting a UPW is unknowable. Thus, because HIPAA doesn't mandate clairvoyance, covered entities must act as if the Original Bulletin controls, i.e., as if the Proscribed Combination is *per se* IIHI. And the record is clear that covered entities have not been doing that. *See* AR at 347-49; ECF No. 26 at 26. Accordingly, the Proscribed Combination calls for a change to the status quo, a change only effectuated by new conduct from covered entities. If the Privacy Rule always applied in this context, that's news to countless covered entities in both the private sector and the federal government. *See id.*; *see also* ECF No. 60 at 20.

Recognizing the Proscribed Combination has not been followed, the Department says "it may be prudent" for covered entities to take measures that "prevent disclosures of non-IIHI." *Id.* at 41. Why? Because that's the only way to stop "violation[s] of the Privacy Rule." ECF No. 51 at 41. Break that down to see through the euphemism. The Department says certain actions **[*23]** "may be *prudent*" . . . "to *ensure*" . . . compliance with "the Privacy Rule." But the Privacy Rule is a mandatory legal obligation. *See* 45 C.F.R. § 164.102. Thus, it's not just "prudent" to take actions to comply with it; its legally required. While it may be prudent, it's prudent the same way it's "prudent" to drive the speed limit. No reasonable juror could read the Revised Bulletin otherwise. *See Liberty Lobby*, 477 U.S. at 248. That leads to the second *Bennett* factor.

3. <u>The Revised Bulletin imposes legal obligations regarding the Proscribed Combination</u>.

Having found the Proscribed Combination imposes new obligations, the Court must next ask if those obligations are *legal*. *See Bennett*, 520 U.S. at 178. HHS says they aren't, for three reasons. *First*, the Revised Bulletin says they aren't. *See* ECF No. 51 at 28; *see also* AR at 11 (stating the document "do[es] not have the force and effect of law"). *Second*, the Revised Bulletin "merely expresses its view of what the law requires," rather than articulating legal obligations *per se*. *Id. Third*, to the extent the Revised Bulletin creates legal consequences, they only come "after an investigation by OCR and a separate administrative enforcement proceeding." *See* ECF No. 51 at 26. These arguments don't persuade.

The first **[*24]** argument fails because substance trumps titles. True, the Revised Bulletin ostensibly

waives any "force and effect of law." *See* AR at 11. But courts have long rejected a "magic words" approach that ignores the content of a law because it contains such a caveat. *See, e.g., Azar v. Allina Health Servs.*, 587 U.S. 566, 575, 139 S. Ct. 1804, 204 L. Ed. 2d 139 (2019) (collecting cases) ("[C]ourts have long looked to the *contents* of the agency's action, not the agency's self-serving *label*."). Indeed, this is the Department's argument against the Hospitals' non-APA claims. *See* ECF No. 51 at 33. The Department says the Hospitals "recast[] a garden-variety APA claim as a non-statutory equitable claim." *Id.* at 31 (cleaned up). HHS thus asks the Court to look beyond titles to substance there while endorsing the opposite approach here. The Court is disinclined to do so.

The Department's first argument also renders the Revised Bulletin internally conflicted. On one hand, the document tells covered entities how to act vis-à-vis PHI in a new online context. *See* AR at 4. On the other, HHS bookends this guidance with the caveat that the Revised Bulletin should not "bind the public in any way." AR at 11. So the Revised Bulletin tells covered entities how to act and then tells them not to base **[*25]** how they act on what it says. This tension is the natural byproduct of such "force-of-law waivers" on documents which, by their very nature, are designed to inform conduct. Substance trumps titles. *See Texas v. Becerra*, 89 F.4th 529, 535, 541 (5th Cir. 2024) (rejecting the title "reminder" when an HHS document "set out HHS's legal position—for the first time—regarding how [the law] operates"). And the substance of the Revised Bulletin dictates how covered entities must conduct their affairs regarding the Proscribed Combination.

The Department's second argument fails because HHS (through OCR) enforces HIPAA. *See* 42 U.S.C. § 1320d-5; 45 C.F.R. §§ 160.306, 160.308, 160.312, 160.314, 160.402. When an authority "expresses its view of what the law requires," *see* ECF No. 51 at 28, the governed must behave accordingly. That's why the Department's reliance on *Luminant Generation Co. v. EPA*, 757 F.3d 439 (5th Cir. 2014) is misguided. The Fifth Circuit has stressed *Luminant*'s applicability to non-compliance notices issued to a single company. *See Becerra*, 89 F.4th at 539. If an enforcement body "expresses its view" to Company A, Company B should probably pay attention. But the notice to Company A isn't legally operative as to Company B. *See id.*

Here, unlike *Luminant*, HHS has informed "[its] staff and all [covered entities] what sort of policy is unlawful." *Id.* at 539 (citation omitted). The Revised Bulletin says UPW visits **[*26]** "do not result in a disclosure of PHI to tracking technology vendor[s] if the visit is not related to an individual's past, present, or future health, health care, or payment for healthcare." AR at 6. Put differently, such visits *do* "result in a disclosure of PHI" if the visit *is* "related to an individual's past, present, or future health, health care, or payment for healthcare." *See id.* This categorical applicability undermines the Department's argument. Indeed, in the very act of "expressing its view," HHS articulated its stance on this new category of IIHI to *all* covered entities. And nothing in the Revised Bulletin could be read to suggest otherwise.

The Department's third argument fails because it's wrong. Even if an OCR investigation and enforcement action would be required for legal consequences, that fact does not rob the Revised Bulletin of legal effect. Rather, the Department's position reeks of Benthamite legal positivism, essentially equating the substance of a "legal obligation" with the State coercion needed to enforce it.[4] An ordinance banning skateboards in the park doesn't become law only when a joyriding perp is apprehended. Much to Texans' chagrin, speed limits are **[*27]** still speed limits long before blue lights flash. And the Proscribed Combination is still a legal obligation even if "any legal consequences require an administrative

[4] *See generally* David B. Lyons, *Logic & Coercion in Bentham's Theory of Law*, 57 CORNELL L. REV. 335, 338 (1971) (describing the logical predicate to Bentham's juridical theory: that "a legal system is *equivalent* to a set of commands which are essentially coercive").

enforcement proceeding . . . subject to judicial review." ECF No. 51 at 28.

The Fifth Circuit's analysis in *EEOC* makes this clear. Here, HHS issued a guidance document stating the Proscribed Combination violates the Privacy Rule. *See* ECF No. 60 at 37. There, the EEOC issued a guidance document stating blanket bans on hiring individuals with criminal records violate Title VII. *See EEOC*, 933 F.3d at 437-38. The Privacy Rule doesn't change here; Title VII didn't change there. *See id.* The change in both is what *constitutes* a violation. *EEOC* pointed to three considerations to determine if a "guidance document" constitutes legal action: (1) mandatory language, (2) restrictions on the agency's discretion to adopt a different view, and (3) the creation of safe harbors from legal consequences. *See* 933 F.3d at 441-43. Applied here, each indicates the Revised Bulletin creates legal obligations.

To start, the Proscribed Combination is worded in mandatory language. A document can be "mandatory" if "it either appears **[*28]** on its face to be binding[] or is applied by the agency in a way that indicates it is binding." *Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015). Before discussing PHI in the UPW context, the Bulletins remind covered entities they must "comply with the HIPAA Rules." AR at 8. Fair enough. But HHS then tells covered entities they "must meet" certain conditions to comply with HIPAA in the previously unaddressed context of the Proscribed Combination. *See id.* The problem isn't the mandatory language itself, but its use in a new context.

The Revised Bulletin also limits HHS to a particular position regarding the Proscribed Combination, thus restricting its discretion to adopt a different view. *See EEOC*, 933 F.3d at 441-43. Sure, the Revised Bulletin says it isn't "meant to bind the public in any way." *See* AR at 11; ECF No. 51 at 28. But "whether the agency action binds the *agency* indicates whether legal consequences flow from the action." *EEOC*, 933 F.3d at 445. And the Revised Bulletin clearly binds HHS. *See* AR at 5. There is no "may" or "might" to it; the Revised Bulletin expressly states that the Privacy Rule applies to the Proscribed Combination. *See id.*

Given the Revised Bulletin's clarity, HHS can say the document isn't "meant to bind the public" all it wants. *See* ECF No. 51 **[*29]** at 13, 24, 28; AR at 11. By prescribing certain conduct to ensure covered entities are not violating the Privacy Rule, *see* ECF No. 51 at 41, the Revised Bulletin shows its cards. HHS will consider the Proscribed Combination (with the subjective-intent caveat) a violation. *See id.* And the second *Bennett* factor is met where, as here, the agency action "alter[s] the legal regime to which the action agency is subject." *Bennett*, 520 U.S. at 178; *see also Hawkes Co.*, 578 U.S. at 598 (quoting *Bennett*, 520 U.S. at 178) (finding finality where "[t]he definitive nature of [the agency action] gives rise to 'direct and appreciable legal consequences'").

The Court in *Bennett* addressed cases which reached the opposite conclusion. *See id.* (discussing *Franklin v. Massachusetts*, 505 U.S. 788, 112 S. Ct. 2767, 120 L. Ed. 2d 636 (1992) and *Dalton v. Specter*, 511 U.S. 462, 114 S. Ct. 1719, 128 L. Ed. 2d 497 (1994)). The Court's non-finality finding in *Franklin* "was premised on the observation that the [action] carried 'no direct consequences' and served 'more like a tentative recommendation.'" *Id.* (quoting *Franklin*, 505 U.S. at 798). Here, the Revised Bulletin applies the Privacy Rule to the Proscribed Combination, a change with "direct consequences." And applying the Privacy Rule to the Proscribed Combination isn't "a tentative recommendation" because the Privacy Rule isn't optional. *See* 45 C.F.R. § 164.102.

Similarly, the Court found the actions in *Dalton* were not final because they were "in no way **[*30]** binding" and the president "had absolute discretion to accept or reject them." *Bennett*, 520 U.S. at 178 (quoting *Dalton*, 511 U.S. at 469-71). Here, notwithstanding the Revised Bulletin's "force-of-law" waiver, the document applies the Privacy Rule

(which is binding) to the Proscribed Combination. AR at 11. And because the Privacy Rule is mandatory, any "discretion" afforded to covered entities amounts to a Hobson's choice. Thus, "affected private parties are reasonably led to believe that failure to conform will bring adverse consequences." *EEOC*, 933 F.3d at 442. And the Revised Bulletin gives HHS no discretion to adopt a different view.

Finally, the Revised Bulletin enumerates legal safe harbors for covered entities. "Another indication that an agency's action binds it and thus has legal consequences or determines rights and obligations is whether the document creates safe harbors protecting private parties from adverse action." *Id.* at 442. The Revised Bulletin explains precisely how covered entities must treat the Proscribed Combination—namely, as if it's IIHI—to ensure they aren't violating HIPAA. *See* AR at 1-17; *see also* ECF No. 51 at 13 (noting the Revised Bulletin "provide[s] additional clarity to regulated entities . . . about what types of disclosures to **[*31]** tracking technologies might reveal IIHI, [and] offer[s] advice about ways regulated entities can use tracking technologies and also comply with the Privacy Rule"). If covered entities fail to comply, HHS is bound by its position. Because the Department's hands are tied, the Revised Bulletin is as discretionary as compliance with the Privacy Rule itself. In other words, it's mandatory. *Cf. Franklin*, 505 U.S. at 798; *Dalton*, 511 U.S. at 469-71.

It's also worth noting that the moniker "guidance document" changes nothing. *See EEOC*, 933 F.3d at 446 (finding a guidance document created legal obligations where it "commit[ed] the agency itself to a view of the law that, in turn, force[d] the plaintiff either to alter its consequences, or expose itself to potential liability"); *Becerra*, 89 F.4th at 535 (same, for a rule mischaracterized as a "reminder").[5] One could query why executive rules and regulations are so abstruse they require numerous "guidance documents" to ensure compliance. Nevertheless, guidance documents play an important role for entities subject to a regulatory regime. *See EEOC*, 933 F.3d at 446. But they can also serve as a Trojan horse for bureaucrats changing the rules of the game. Here, to the extent the Revised Bulletin provides "guidance" on the Proscribed Combination, it provides guidance **[*32]** regarding mandatory legal obligations. *See id.* To hold otherwise, as the Hospitals note, would allow HHS to brandish a "sword of Damocles" above their heads. *See* ECF No. 60 at 21-22; *see also Sackett v. EPA*, 566 U.S. 120, 127, 132 S. Ct. 1367, 182 L. Ed. 2d 367 (2012) (noting such situations force regulated parties to alter their conduct or "wait for the Agency to drop the hammer"). A rose by any other name is still a rose, and a law by any other title is still a law.

* * *

Try as it might, HHS cannot plausibly argue the Revised Bulletin "expresses a reasonable—and, indeed, correct—explanation" of conduct "HIPAA Rules have long required." ECF No. 51 at 48. While it does "reiterate[] the Privacy Rule's longstanding restriction on the use and disclosure of PHI," *see id.* at 27, it does more than that, too. In particular, it shoehorns a novel category of information into the inelastic definitional contours of "IIHI." And because "[l]egal consequences [] flow from the Guidance, [] it determines rights and obligations." *EEOC*, 933 F.3d at 446. In doing so, the Revised Bulletin is redolent of other "guidance

[5] HHS pushes back on the Hospitals' appeals to *Becerra*, a case which found a different HHS guidance document was a reviewable final action. *See* ECF No. 51 at 29-30 (discussing *Becerra*, 89 F.4th at 541). As HHS notes, "central to the court's analysis" was a "sea-change" in the law brought about by the Supreme Court's ruling in *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 142 S. Ct. 2228, 213 L. Ed. 2d 545 (2022). *See id.* Given that change to the legal landscape, the document did more than restate the Department's position, it articulated a stance "regarding how EMTALA operates post-*Dobbs*." *Becerra*, 89 F.4th at 541. While this case is different, the Hospitals' appeals to *Becerra* are still well received because what catalyzed the new position is irrelevant. What matters in each case is whether the challenged document "sets out HHS's legal position—for the first time—regarding how [the relevant statute] operates." *Id.*

documents" that imposed substantive legal obligations. *Becerra*, 89 F.4th at 541. This Court knows a law when it sees one, and the Proscribed Combination is a law. Thus, the Revised Bulletin is **[*33]** a "final agency action" subject to judicial review. *See* 5 U.S.C. § 704; *Bennett*, 520 U.S. at 178. The Court now turns to the merits of the Hospitals' challenge.

**B. The HHS lacked authority to promulgate the Proscribed Combination**.

The Court's finding that the Revised Bulletin imposes new legal obligations establishes jurisdiction under the APA but changes nothing. There's nothing wrong with imposing new legal obligations—executive agencies do that all the time. And the Court is not a tribunal to discuss the soundness of a given policy. *See Nuziard v. Minority Bus. Dev. Agency*, __ F. Supp. 3d __, 2024 U.S. Dist. LEXIS 38050, 2024 WL 965299, at *5-6 (N.D. Tex. Mar. 5, 2024) (Pittman, J.). Rather, judicial review exists to ensure executive agencies promulgate new policies within the boundaries set by the Constitution and their enabling statute. *See generally Ak. Dep't of Envt'l Conservation*, 540 U.S. at 496-97. The APA provides an analytical framework to make this determination. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 316, 99 S. Ct. 1705, 60 L. Ed. 2d 208 (1979).

The Hospitals argue the Proscribed Combination is both substantively and procedurally improper. *See* ECF No. 25. The briefs devolve into wide-ranging multiple-theatre combat on this point, but the Court's analysis need not. At base, the Hospitals argue the rule is improper because (1) HHS allegedly exceeded its authority in promulgating the Bulletins and (2) HHS allegedly violated the APA when doing so. *See* ECF No. 25 at 24-42. **[*34]** Their arguments under the APA are twofold, as the Hospitals contend (1) the Proscribed Combination is arbitrary and capricious and (2) the Proscribed Combination was promulgated without notice and comment. *See id.* at 35-42. As explained below, the Court need not address the Parties' contentions regarding HHS's "arbitrary and capricious" rationale or its failure to conduct notice and comment because the Proscribed Combination facially violates HIPAA's unambiguous definition of IIHI.

1. <u>The Proscribed Combination falls outside the statutory definition of IIHI</u>.

[A]n agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374, 106 S. Ct. 1890, 90 L. Ed. 2d 369 (1986). HIPAA is extraordinarily expansive, so Congress gave HHS broad authority to promulgate rules and regulations to effectuate its mandates. *See* CHRIS D. LINEBAUGH & EDWARD C. LIU, CONG. RSCH. SERV., LSB10797, PROTECTION OF HEALTH INFORMATION UNDER HIPAA AND THE FTC ACT: A COMPARISON 1-5 (2022); *see generally Mourning v. Fam. Pubs. Serv., Inc.*, 411 U.S. 356, 376, 93 S. Ct. 1652, 36 L. Ed. 2d 318 (1973) (noting the objective in delegating such broad authority "is to relieve Congress of the impossible burden of drafting a code explicitly covering every conceivable future problem"). But the Department's authority isn't absolute, and **[*35]** the Proscribed Combination goes too far.

That HHS lacked authority to promulgate the Proscribed Combination is unsurprising, as our nation's bureaucratic apparatus would give Hobbes' *Leviathan* a run for its money. Indeed, few are the facets of modern life untouched by the federal government's administrative machinery, which is as sophisticated as it is complex. We've drifted from the founders' intent,[6] but that's not the only

---

[6] *See, e.g.*, THE FEDERALIST NO. 45 (James Madison) (Clinton Rossiter ed., 1961) ("The powers delegated by the Constitution to the Federal Government are *few* and *defined* [and should be] . . . exercised principally on external objects such as war, peace, negotiation, and foreign commerce.") (emphasis added); Letter from Thomas Jefferson to Thomas Cooper (Nov. 29, 1802), *available at* NATIONAL ARCHIVES, https://founders.archives.gov/documents/Jefferson/01-39-02-0070 ("The path we have to pursue is so quiet that we have nothing

problem. Another, as Hobbes and the founders foresaw, is the tendency of large bureaucracies to self-perpetuate, emboldened by each successive *ultra vires* action. As the old saying goes, "give an inch, they'll take a mile." And HHS has taken a mile. *See* ECF No. 25 at 24 ("[T]he threshold problem with the Bulletin is also the most fundamental: The Bulletin's new rule exceeds HHS's authority under HIPAA.").

HHS may enforce the Privacy Rule as it pertains to IIHI. *See* 45 C.F.R. § 160.103; 42 U.S.C. § 1320d(6). As noted, IIHI is unambiguously defined as PHI that (1) "relates to" an individual's "past, present, or future physical or mental health or condition," the individual's receipt of "health care," or the individual's "payment for" healthcare; *and* (2) "identifies **[*36]** the individual" or provides "a reasonable basis to believe that the information can be used to identify the individual." 42 U.S.C. § 1320d(6). Put another way, PHI becomes IIHI if two conditions are met:

> (1) the PHI relates to the individual's "past, present, or future physical or mental health or condition," their receipt of healthcare, and/or their payment for healthcare; *and*
> (2) the PHI "identifies" the individual or could reasonably "be used to identify" them.

*See id.* The definition is inclusive, meaning information must satisfy *both* the "relates to" clause *and* the "identifies" clause to be classified as IIHI. *Id.*; *see also* ECF No. 25 at 25 ("Accordingly, even where information relates to some individual's health, healthcare, or payment for healthcare, a covered entity may disclose the information so long as it cannot reasonably be used to identify that particular individual.") (collecting examples). The Proscribed Combination fails both on its face.

*i. The Proscribed Combination fails the "relates to" prong.*

As noted, the Revised Bulletin repackages the Original with a subjective-intent gloss. *See* AR at 6. But HHS cannot require covered entities to perform the impossible. Thus, even if a UPW's metadata **[*37]** could identify a particular individual, "[t]hat information cannot become IIHI based solely on the visitors' subjective motive for visiting the page." ECF No. 60 at 38. The Hospitals' brief discusses two hypotheticals to illustrate this point:

> Even assuming (without conceding) that such information may provide a reasonable basis for identifying the persons who visited the webpage—say, that John Smith visited a page for booking dialysis appointments, or Mary Jones visited a page about the onset of Alzheimer's disease—that establishes nothing. There are many *generic reasons* why they may have visited such pages, entirely unrelated to the health, healthcare, or payment for healthcare of *any* particular individual (*e.g.*, they could be public-health researchers or hospital employees). In addition, even if their visits were related to some individual's healthcare needs, they could have been acting for family members, friends, or countless other third parties. And their IP addresses provide no reasonable basis to determine otherwise. Without contesting any of this, HHS baldly asserted that the Proscribed Combination is "indicative" of the visitor's own health status or treatment, [] but any **[*38]** such inference drawn from internet metadata falls far short of what the IIHI definition requires, as courts have recognized.

ECF No. 25 at 11-12. HHS refutes this argument by noting such information could be "indicative" of Mr. Smith's and Ms. Jones's PHI. *See* ECF No. 51 at 41-42. But that's not enough. Indeed, as the Hospitals contend, "[t]his conclusory rationale would eviscerate the express limits on the IIHI definition." ECF No. 25 at 26.

---

scarcely to propose [to Congress]. A noiseless course, not meddling with the affairs of others, unattractive of notice, is a mark that society is going on in happiness.").

HHS says it's "common sense" that "some users who visits these webpages . . . are doing so to learn information about their own medical conditions, to inquire about specific medical practices or providers for the purpose of obtaining healthcare, to actually obtain an appointment with a particular provider, or for other reasons related to their own healthcare." ECF No. 41 at 40. The Court does not disagree. Indeed, the Court wouldn't disagree if HHS argued *most* people visit for those reasons. But that's not what HIPAA requires. In any event, Congress only included the "reasonable basis" qualifier for the identification prong. *See* 45 C.F.R. § 160.103; *accord* 42 U.S.C. § 1320d(6). The Bulletins took that qualifier and ran with it, inserting it into the first prong and adding an atextual **[*39]** "indicative" gloss to boot.

The "indicative" gloss aside, unambiguous legislative text must control. As it pertains to IIHI, the text says what it says and doesn't say what it doesn't say. The IIHI definition explicitly states the PHI in question must "relate[] to" a listed category of information. *See* 42 U.S.C. § 1320d(6). You don't have to read tea leaves to divine what that means. Congress could have said "*may* relate to." It could have said "*might* relate to." It could have said "relates to *or is indicative of*." It didn't. Thus, without *knowing* a particular query relates to a category of information in Section 1320d(6), metadata from a UPW search cannot constitute IIHI. *See* 45 C.F.R. § 160.103; 42 U.S.C. § 1320d(6). To hold otherwise would empower HHS and other executive entities to take increasingly expansive liberties with the finite authority granted to them. The Court is disinclined to set that precedent here.

*ii. The Proscribed Combination fails the "identifies" prong.*

The Proscribed Combination fares no better on the "identifies" clause. The Department acknowledges that "tracking technologies on [UPWs] may collect identifying information from users who are not visiting the webpage for their health care needs." ECF No. 51 at 41. Nevertheless, it notes **[*40]** "identifying information about users who *are* visiting the webpage for their healthcare needs constitutes IIHI." *Id.* The Hospitals don't disagree with the foundational premise. *See* ECF No. 60 at 49-50 ("Under the Revised Bulletin, the information that is actually collected and transmitted in not itself [PHI] (the metadata showing the mere fact that an identifiable individual visited a health-related page, but not the reason for the visit), and the information that might actually be [PHI] is not collected and transmitted at all (whether the individual's reason for visiting the page was related to his own health)."). The issue is that the Proscribed Combination does not and cannot identify an individual or the individual's PHI without an unknowable subjective-intent element—an element not countenanced by the controlling statutory text.

As the Hospitals rightly note, "IIHI is limited to information that is related to a specific person's health and [is] reasonably capable of being used to identify *that person*—such as, for example, unredacted patient records or billing statements." ECF No. 25 at 13-14. The Department acknowledges that the Proscribed Combination does not, in itself, "identify" **[*41]** the individual searcher and their condition. *See* ECF No. 51 at 41. But the Department nevertheless insists the Proscribed Combination is proper, emphasizing the "reasonably" caveat appended to this prong. *See id.*; *see also* 42 U.S.C. § 1320d(6)(B) (noting PHI can become IIHI if it provides "a reasonable basis" to believe the information "can be used to identify the individual").

Appeals to this "reasonable basis" language cannot save the Proscribed Combination. To be fair, reasonableness is in the eye of the beholder. It's a lax standard, and HHS should be afforded deference in determining what's "reasonable" in most circumstances. *See, e.g., United States v. Mead Corp.*, 533 U.S. 218, 227, 121 S. Ct. 2164, 150 L. Ed. 2d 292 (2001); *United States v. Morton*,

467 U.S. 822, 834, 104 S. Ct. 2769, 81 L. Ed. 2d 680 (1984); *Chevron, USA, Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843-44, 104 S. Ct. 2778, 81 L. Ed. 2d 694 (1984). But such deference does not give HHS interpretive carte blanche to justify whatever it wants irrespective of violence to HIPAA's text. And "reasonable basis" must mean *something*. And whatever it means, it assuredly does not include information that, at most, supports an "inference" of identification. The Court agrees with its numerous sister courts who have reached that conclusion.[7]

The Department's problems run even deeper on this point. The IIHI definition applies to information that "is created or received by a health care provider, health plan, employer, **[*42]** or health care clearinghouse." 42 U.S.C. § 1320d(6). It's uncontested that information in the Proscribed Combination is user-generated, though it is "received" by one or more of the above entities. However, upon receiving the relevant metadata, the recipient could not "reasonably use" the data to identify an individual or their health condition. That's because, as the Department concedes, there's a missing ingredient of subjective intent. *See* AR at 4. And *that* information is not received. Put simply, "[t]hat information cannot become IIHI based solely on the visitors' subjective motive for visiting the page, which is not *information* that the Revised Bulletin requires the healthcare provider or third-party vendor to *receive* at all." ECF No. 60 at 38. Thus, even after multiple speculations, the Proscribed Combination could never fit HIPAA's definition of IIHI.

Giving HHS the benefit of the doubt, suppose a UPW visitor's query related to someone's healthcare. Suppose further that their query related to *their* healthcare. Without knowing information that's never received—i.e., the visitor's subjective motive—the resulting metadata could never identify that individual's PHI. Simply put, **Identity** (Person A) **[*43]** + **Query** (Condition B) ≠ **IIHI** (Person A has Condition B). If a covered entity's UPW greets visitors with a dropdown box requesting their subjective motive for visiting the page, that would be one thing. The Department can and should remind covered entities that the Privacy Rule would apply in those circumstances. But absent such an admittedly bizarre scenario, the Proscribed Combination cannot become IIHI as unambiguously defined.

The above conclusion is far from novel. Indeed, covered entities have long been allowed to disclose PHI that does not identify the *particular* individual. *See* 45 C.F.R. § 164.514(a) (noting that, after "de-identification," PHI "is not [IIHI]"). The Department now seeks to reverse that, ignoring the inherently de-identified nature of relevant metadata and insisting such information should be treated as IIHI. *See* ECF No. 51 at 41. Thus, if enforced, the Proscribed Combination would turn provisions like 45 C.F.R. § 164.514(a) on their head. Federal courts have already recognized as much. *See supra* n.7.

To conclude, the law is clear that "[h]ealth information that does not identify an individual and with respect to which there is no reasonable basis to believe that the information can be used to identify the **[*44]** individual is not [IIHI]." *See* 45 C.F.R. § 164.514(a). At summary judgment, the Court must give HHS every reasonable benefit of the doubt. *Cunningham*, 64 F.4th at 600. Having done so, the closest the Proscribed Combination gets to IIHI is a speculative inference extrapolated from (but

[7] *See, e.g., Smith v. Facebook, Inc.*, 745 F. App'x 8, 9 (9th Cir. 2018) ("Put simply, the connection between a person's browsing history and his or her own state of health is too tenuous to support Plaintiffs' contention that the disclosure requirements of HIPAA . . . apply."); *Kurowski v. Rush Sys. for Health*, 683 F. Supp. 3d 836, 843 (N.D. Ill. 2023) ("By contrast, [Plaintiff's] allegations are far too vague to allow an inference to be drawn that [Defendant] was actually disclosing IIHI as it is unambiguously defined by HIPAA, rather than just metadata."); *Hartley v. Univ. of Chi. Med. Ctr.*, No. 22-c-5891, 2023 U.S. Dist. LEXIS 200619, 2023 WL 7386060, at *2 (N.D. Ill. Nov. 8, 2023) (citing *Smith*, 745 F. App'x at 9) (rejecting argument that metadata as discussed in the Revised Bulletin could be IIHI because plaintiff couldn't show "any particular health or treatment information disclosure specific as to them that [Defendant] allegedly made to any third-party whether within the portal or not").

unsubstantiated by) collected metadata. Because the Proscribed Combination facially exceeds HIPAA's unambiguous text, the Court need not consider the Parties' other APA arguments.

* * *

No matter how sound the Proscribed Combination may be as a matter of policy, it is improper as a matter of law. Thus, for the above reasons, the Court must **GRANT** the Hospitals' request for declaratory relief. ECF No. 1 at 22. The Court now turns to their additional requests for vacatur and a permanent injunction.

**C. Vacatur is the more appropriate equitable remedy under the circumstances of this case**.

The Hospitals ask the Court to declare the Proscribed Combination unlawful, vacate it, and permanently enjoin its enforcement. *See id.* Having granted declaratory judgment, the Court now takes up their requests for equitable relief. In doing so, "[t]he Court notes that Plaintiffs don't get [injunctive relief] just because they got a declaratory judgment." *Nuziard*, 2024 U.S. Dist. LEXIS 38050, 2024 WL 965299, at *44 (collecting cases). **[*45]** As explained below, vacatur is the more appropriate remedy here.

1. <u>The Department should not be enjoined from enforcing the Proscribed Combination</u>.

The Hospitals seek an injunction to mitigate the risk that they are penalized for noncompliance with an unlawful law. *See* ECF No. 1 at 22. But an injunction "is not a remedy which issues as of course." *Harrisonville v. W.S. Dickey Clay Mfg. Co.*, 289 U.S. 334, 337-38, 53 S. Ct. 602, 77 L. Ed. 1208 (1933). Indeed, injunctions have long been considered a "drastic and extraordinary remedy." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165, 130 S. Ct. 2743, 177 L. Ed. 2d 461 (2010). To warrant injunctive relief, the Hospitals must show:

> (1) that [they have] suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006). And they must "clearly carry[] the burden of persuasion on all [four] elements." *Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.*, 577 F.3d 250, 253 (5th Cir. 2009). They fail to do so. Specifically, they win on factors two through four, but lose on factor one.

To start with the wins, the Hospitals show inadequacy of legal remedies. *See eBay*, 547 U.S. at 391. Because they sue the government, money damages are off the table. *See Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021). That's a win for factor **[*46]** two. *eBay*, 547 U.S. at 391. And factors three and four "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435, 129 S. Ct. 1749, 173 L. Ed. 2d 550 (2009). As applied to the Parties themselves, the Court "looks to the relative harm to both parties if the injunction is granted or denied." *Def. Distrib. v. U.S. Dept' of State*, 838 F.3d 451, 460 (5th Cir. 2016). A denied injunction leaves the Hospitals in limbo to face potential enforcement of an invalid law. A granted injunction merely stops HHS from enforcing one improper subset of a guidance document issued three months ago.

On balance, private hardships favor the Hospitals—public interests even more so. The importance of digital healthcare information has grown by orders of magnitude since the COVID-19 pandemic. *See* ECF No. 35 at 31-32. As thoroughly detailed in amicus briefs, the Proscribed Combination would "undermine[] the joint efforts of Hospitals and the Government to modernize healthcare." *Id.* at 31 (cleaned up). If enforced, the Proscribed Combination would have a profound chilling effect

on providers' use of technology vendors to facilitate critical UPWs. *See id.* While healthcare providers can "host websites and patient portals without using any third-party analytics . . . it serves nobody to have websites that patients do not know and cannot navigate effectively." **[*47]** *Id.* at 33.

To be fair, the OCR has seen a surge of complaints from citizens concerned about IIHI in this context. *See* AR at 1-17. But as noted above, metadata shared with third-party vendors can only reveal sensitive PHI if an unknown subjective intent is communicated. In the pre-Revised Bulletin status quo, healthcare providers have been "constantly vigilant to protect the confidentiality of their patients' [IIHI]." ECF No. 37 at 10. Indeed, "HIPAA compliance is woven deep into hospital operations, with implications for every way in which hospitals interact with patients or patients' medical information." *Id.* at 10-11. The Proscribed Combination fails to improve upon these current privacy protections while jeopardizing the dissemination of important healthcare information to the masses. *See id.* at 14-20.

In most cases, the avoidance of improper laws is "the highest public interest at issue." *Def. Distrib.*, 838 F.3d at 460. That interest is implicated here. *See supra* pp. 25-26. But it's the penultimate interest for this case given the significant public-health considerations discussed above. *See Roman Catholic Diocese v. Cuomo*, 592 U.S. 14, 19-20, 141 S. Ct. 63, 208 L. Ed. 2d 20 (2020) (noting public health is paramount in injunctive-relief analyses). Yet despite these decisive victories, the Hospitals **[*48]** must "clearly carry[] the burden of persuasion on all elements" to obtain a permanent injunction. *Bluefield Water Ass'n*, 577 F.3d at 253. And they fail to do so for factor one.

An irreparable injury is a *sine qua non* for injunctive relief. *See id.* As noted, the Hospitals can't get damages here. *See Wages & White Lion Invs.*, 16 F.4th at 1142. That ordinarily indicates a harm is irreparable. *See Sampson v. Murray*, 415 U.S. 61, 90, 94 S. Ct. 937, 39 L. Ed. 2d 166 (1974) ("The key word in in this consideration is *irreparable*. Mere injuries, however substantial, . . . are not enough. The possibility that adequate compensatory or other relief will be available at a later date . . . weighs heavily against a claim of irreparable harm."). But hiding in plain sight is the "or other relief" language in *Murray*. *See id.* As explained below, other relief can remedy the Hospitals' injury—namely, a declaratory judgment coupled with vacatur. Thus, the Hospitals do not show a permanent injunction is the only remedy that could address their injury. Because they fail to make that showing, they do not carry their burden in seeking such an "extraordinary and drastic" remedy. *Monsanto*, 561 U.S. at 165. The Court must **DENY** their request accordingly. *See* ECF No. 1 at 22.

2. <u>The Proscribed Combination should be vacated</u>.

As discussed, the Hospitals seek both a permanent injunction and vacatur. **[*49]** *See id.* While it's not impossible to get both, the Court must always consider the "least severe" equitable remedy to resolve a plaintiff's harm. *See Nuziard*, 2024 U.S. Dist. LEXIS 38050, 2024 WL 965299, at *44-49 (collecting cases); *see generally O'Donnell v. Harris Cnty.*, 892 F.3d 147, 155 (5th Cir. 2018) (noting an equitable remedy must be "narrowly tailored to the injury it is remedying"). And while this Court doubts the APA intended to authorize vacatur, *see Nuziard*, 2024 U.S. Dist. LEXIS 38050, 2024 WL 965299, at *41-44, the Fifth Circuit's "ordinary practice is to vacate unlawful agency action." *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022).

The Proscribed Combination is unlawful. *See supra* pp. 25-26; *see also* 5 U.S.C. § 706 (empowering courts to "set aside" unlawful agency actions). Between alternatives, vacatur is less severe on HHS but still remedies the Hospitals' harm. *See Texas v. United States*, 40 F.4th 205, 219 (5th Cir. 2022) (citing *Monsanto*, 561 U.S. at 165) ("There are meaningful differences between an injunction, which is a 'drastic and extraordinary remedy,' and vacatur, which is 'a less drastic remedy.'"). While

plaintiffs need more than a perfunctory analysis to justify vacatur, the controlling doctrinal framework is more forgiving than it is for an injunction. *See id.* Vacatur is also less severe as applied to the relevant agency. *See id.* Thus, the Court endorses the Fifth Circuit's standard practice here. *See Data Mktg. P'ship*, 45 F.4th at 859. The Hospitals say vacatur is warranted because the continued presence **[*50]** of an unlawful rule on the books will undermine any effectual relief the Court could render. *See* ECF No. 59 at 58. The Court agrees, especially considering "vacatur does nothing but re-establish the status quo absent unlawful agency action." *Texas*, 40 F.4th at 220. As such, "[a]part from the constitutional or statutory basis on which the court invalidated an agency action, vacatur neither compels nor restrains further agency decision-making." *Id.*

The Hospitals point to a recent case where this Court exercised its equitable discretion to deny vacatur in favor of an injunction. *See* ECF No. 59 at 57-58 (discussing *Nuziard*, 2024 U.S. Dist. LEXIS 38050, 2024 WL 965299, at *43-44). In *Nuziard*, the Court denied vacatur under Section 706 "[b]ecause a declaratory judgment an injunction [were] more clearly authorized . . . and [would] remedy Plaintiff's injuries." 2024 U.S. Dist. LEXIS 38050, 2024 WL 965299, at *43. Central to that determination was a desire to issue the least restrictive equitable remedy. *See id.* That consideration supports the opposite conclusion here. *Nuziard* involved the implementing legislation of a nationwide executive agency. *See id.* The plaintiffs challenged a race-based benefits presumption that was baked into the very fabric of the agency. *See id.* Thus, vacatur doubts aside, an injunction was *less* severe in that **[*51]** case and would result in less flux for interested parties. An injunction stopped the agency from implementing the unconstitutional racial presumption. Because the presumption was built into the agency's structure, vacating every provision containing the presumption would be an administrative fiasco and would effectively implode the agency. *See id.*

The inverse is true here. Without minimizing the Proscribed Combination's consequences, this case involves a straightforward challenge to a single rule issued in a single guidance document. *See* ECF No. 1. Because the Proscribed Combination is not central to HHS and its implementing legislation, vacatur will have less drastic consequences here that it did in *Nuziard*. Indeed, the Court can envision numerous solutions that would reduce regulatory flux while ensuring IIHI is protected moving forward. Thus, because the Fifth Circuit prefers vacatur for unlawful agency actions, *see See Data Mktg. P'ship*, 45 F.4th at 859, and because no case-specific considerations indicate the Court should deviate from that practice, the Court must **GRANT** the Hospitals' request for vacatur under 5 U.S.C. § 706. ECF No. 1 at 22.

## CONCLUSION

It's easy for eyes to glaze over at a thirty-page opinion discussing the administrative **[*52]** esoterica accordant with HIPAA compliance. But this case isn't really about HIPAA, the Proscribed Combination, or the proper nomenclature for PHI in the Digital Age. Rather, this is a case about power. More precisely, it's a case about our nation's limits on executive power. In the grand scheme, the Revised Bulletin is one small guidance document among countless others issued by HHS and other executive entities. But a wise Man once said that "one who is faithful in a very little is also faithful in much, and one who is dishonest in a very little is also dishonest in much." Luke 16:10 (ESV). While the Proscribed Combination may be trivial to HHS, it isn't for covered entities diligently attempting to comply with HIPAA's requirements. And even small executive oversteps can compound over time, resulting in larger transgressions down the road. Accordingly, for the reasons above, the Court **GRANTS in part** and **DENIES in part** the Hospitals' Motion for Summary Judgment. ECF No. 24.

The Court **GRANTS** the Hospitals' request for

declaratory judgment and **DECLARES** that the Proscribed Combination, as set forth in the HHS Bulletin of March 18, 2024, is **UNLAWFUL**, as it was promulgated in clear excess **[*53]** of HHS's authority under HIPAA. *See La. Pub. Serv. Comm'n*, 476 U.S. at 374. While the Court **DENIES** the Hospitals' request for a permanent injunction, it **GRANTS** their request for vacatur and **ORDERS** that the Proscribed Combination be **VACATED**.[8]

**SO ORDERED** on this **20th day** of **June 2024**.

/s/ Mark T. Pittman

**MARK T. PITTMAN**

UNITED STATES DISTRICT JUDGE

**FINAL JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 58 and the Court's Opinion & Order entered this same date (ECF No. 67), the Court hereby **ORDERS, ADJUDGES**, and **DECREES** as follows:

- The Proscribed Combination as described in the Court's Opinion & Order (ECF No. 67) and set forth in the March 18, 2024 Revised Bulletin issued by the Department of Health and Human Services (HHS) is **DECLARED** unlawful, as it was promulgated in excess of HHS's authority under the Health Insurance Portability and Accountability Act ("HIPAA").

- Pursuant to that declaration of legal invalidity, the Proscribed Combination as described in the Court's Opinion & Order (ECF No. 67) and set forth in the March 18, 2024 Revised Bulletin issued by the Department of Health and Human Services (HHS) is hereby **VACATED** under 5 U.S.C. § 706.

Nothing in the Court's Opinion & Order (ECF No. 67) or this Final Judgment is intended to, or shall be construed as, limiting **[*54]** the legal operability of anything else in the March 18, 2024 Revised Bulletin.

**SO ORDERED** on this **20th day** of **June 2024**.

/s/ Mark T. Pittman

**MARK T. PITTMAN**

UNITED STATES DISTRICT JUDGE

---

**End of Document**

[8] Such vacatur is not intended to, and should not be construed as, limiting the legal operability of other guidance in the germane HHS document.