**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Jennifer L. Joost (Bar No. 296164)
jjoost@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

-and-

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Joseph H. Meltzer (appearance *pro hac vice*)
jmeltzer@ktmc.com
Melissa L. Yeates (appearance *pro hac vice*)
myeates@ktmc.com
Tyler S. Graden (appearance *pro hac vice*)
tgraden@ktmc.com
Jordan E. Jacobson (Bar No. 302543)
jjacobson@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**CARELLA BYRNE CECCHI**
**BRODY & AGNELLO, PC**
James E. Cecchi (appearance *pro hac vice*)
jcecchi@carellabyrne.com
Michael A. Innes (*pro hac vice* forthcoming)
minnes@carellabyrne.com
Kevin G. Cooper (appearance *pro hac vice*)
kcooper@carellabyrne.com
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744

*Counsel for Plaintiffs and the proposed Classes*
(*Additional Attorneys Listed on Signature Page*)

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

JOHN DOE, JOHN DOE II, JANE DOE, JANE DOE II, JANE DOE III, JANE DOE IV, and JANE DOE V, Individually and on behalf of all others similarly situated,

Plaintiffs,

v.

KAISER FOUNDATION HEALTH PLAN, INC., KAISER FOUNDATION HOSPITALS, and KAISER FOUNDATION HEALTH PLAN OF WASHINGTON,

Defendants.

Case No. 3:23-cv-02865-EMC

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

***REDACTED***

Judge: Hon. Edward M. Chen
Date: October 10, 2024
Time: 1:30 p.m.
Court: 5

SAC Filed: May 9, 2024
Trial Date: July 20, 2026

# TABLE OF CONTENTS


I. INTRODUCTION .................... 1

II. FACTUAL BACKGROUND .................... 4

A. Plaintiffs' Allegations in the Second Amended Complaint .................... 4

1. Twitter, Bing, and Google .................... 5

2. Adobe .................... 6

3. Quantum Metric and Dynatrace .................... 7

4. Additional Third Party Web Technologies .................... 8

B. Kaiser Removed the Offending Code After Plaintiffs Brought this Action .................... 9

C. Kaiser Issued a Privacy Breach Notification One Day After This Court Issued its Order Denying in Part Kaiser's Motion to Dismiss the FAC .................... 9

III. LEGAL STANDARD .................... 11

IV. PLAINTIFFS ADEQUATELY ALLEGE ALL DEFENDANTS' INVOLVEMENT .................... 11

V. PLAINTIFFS ARE ENTITLED TO PUNITIVE DAMAGES .................... 12

VI. KAISER IMPROPERLY SEEKS DISMISSAL OF CLAIMS INVOLVING DYNATRACE, QUANTUM METRIC, AND ADOBE .................... 16

VII. KAISER KNEW THAT TWITTER, BING, AND GOOGLE USED MEMBERS' PII AND PHI FOR THEIR OWN PURPOSES .................... 19

VIII. KAISER'S ADDITIONAL ARGUMENTS FOR DISMISSAL ALSO FAIL .................... 22

A. Claim 1: Plaintiffs Sufficiently Allege that the Crime Tort Exception Applies .................... 22

B. Claim 2: Plaintiffs Sufficiently Allege a Violation of CIPA .................... 23

C. Claim 3: Plaintiffs Sufficiently Allege Common Law Invasion of Privacy .................... 23

D. Claim 4: Plaintiffs Sufficiently Allege a Violation of the California Constitution .................... 26

E. Claim 8: Plaintiffs Sufficiently Allege a CMIA Violation .................... 27

F. Claim 9: Plaintiffs Sufficiently Allege Statutory Larceny .................... 28

G. Claim 10: Jane Doe II Adequately Alleges Kaiser Violated the DCCPPA .................... 29

H. Claim 11: John Doe II Adequately States a Claim for Violation of the GCSPA .................... 30

I. Claim 15: Jane Doe IV Adequately States a Claim for Violation of the VCCA .................... 31

J. Claim 18: Jane Doe Adequately Alleges a Claim for Violation of the WPA .................... 33

K. Claim 20: Plaintiffs Properly Plead Kaiser Violated the DC Breach Notification Statute and DCCPPA .................... 34

L. Claim 21: Jane Doe II Sufficiently Alleges Violation of MPIPA and MCPA .................... 37

M. Claim 23: Plaintiffs Adequately Allege a Washington Data Breach Act Violation .................... 38

IX. FURTHER LEAVE TO AMEND WOULD NOT BE FUTILE .................... 39

X. CONCLUSION .................... 40

## TABLE OF AUTHORITIES


Page(s)

**Federal Cases**

*Achal v. Gate Gourmet, Inc.*,
114 F. Supp. 3d 781 (N.D. Cal. 2015)....16

*Am. Hosp. Assoc'n v. Becerra*,
2024 WL 3075865 (N.D. Tex. June 20, 2024)....11

*In re Ambry Genetics Data Breach Litig.*,
567 F. Supp. 3d 1130 (C.D. Cal. 2021)....26, 28

*Attias v. CareFirst, Inc.*,
365 F. Supp. 3d 1 (D.D.C. 2019)....30

*Barrett v. Apple Inc.*,
523 F. Supp. 3d 1132 (N.D. Cal. 2021)....40

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....11

*Brown v. Stored Value Cards, Inc.*,
953 F.3d 567 (9th Cir. 2020)....40

*Calhoun v. Google LLC*,
526 F. Supp. 3d 605 (N.D. Cal. 2021)....28

*Caro v. Weintraub*,
618 F.3d 94 (2d Cir. 2010)....23

*Carrese v. Yes Online Inc.*,
2016 WL 6069198 (C.D. Cal. Oct. 13, 2016)....23

*Cousin v. Sharp Healthcare*,
702 F. Supp. 3d 967 (S.D. Cal. 2023)....26

*Curran v. Wells Fargo Bank, N. A.*,
2021 WL 6753480 (D.D.C. Mar. 11, 2021)....29

*Doe v. Beard*,
63 F. Supp. 3d 1159 (C.D. Cal. 2014)....25

*Doe v. Meta Platforms, Inc.*,
690 F. Supp. 3d 1064 (N.D. Cal. 2023)....29

*Doe v. N. Cal. Fertility Med. Ctr.*,
2024 WL 246178 (E.D. Cal. Jan. 23, 2024)....27

*Doe v. Regents of Univ. of Cal.*,
672 F. Supp. 3d 813 (N.D. Cal. 2023)....25

*Esparza v. Gen Digit. Inc.*,
2024 WL 655986 (C.D. Cal. Jan. 16, 2024)....25

*ExxonMobil Oil Corp. v. S. Cal. Edison Co.*,
2013 WL 12166214 (C.D. Cal. May 1, 2013)....15

*In re Facebook, Inc., Consumer Priv. User Profile Litig.*,
402 F. Supp. 3d 767 (N.D. Cal. 2019)....................26

*FERCO Enters., Inc. v. Taylor Recycling Facility LLC*,
2007 WL 9701361 (N.D. Ga. Oct. 16, 2007)....................31

*In re Google RTB Consumer Priv. Litig.*,
606 F. Supp. 3d 935 (N.D. Cal. 2022)....................24

*Grimberg v. United Airlines, Inc.*,
2023 WL 3431912 (C.D. Cal. Feb. 27, 2023)....................16

*Haw. Reg'l Council of Carpenters v. Yoshimura*,
2016 WL 4745169 (D. Haw. Sept. 12, 2016)....................23

*Huong Hoang v. Amazon.com, Inc.*,
2012 WL 1088165 (W.D. Wash. Mar. 30, 2012)....................34

*Jacobson v. Hofgard*,
168 F. Supp. 3d 187 (D.D.C. 2016)....................30

*James v. Walt Disney Co.*,
701 F. Supp. 3d 942 (N.D. Cal. 2023) (Chen, J.)....................11, 17

*Kuhl v. McDonough*,
2024 WL 3463350 (N.D. Cal. July 17, 2024)....................17

*Kurowski v. Rush Sys. for Health*,
2023 WL 8544084 (N.D. Ill. Dec. 11, 2023)....................23

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
519 F.3d 1025 (9th Cir. 2008)....................11

*In re Marriott Int'l, Inc., Consumer Data Sec. Breach Litig.*,
440 F. Supp. 3d 447 (D. Md. 2020)....................38

*McCluskey v. Hendricks*,
2021 WL 6773140 (C.D. Cal. Nov. 17, 2021)....................25

*McCulley v. Banner Health*,
2024 U.S. Dist. LEXIS 85232 (D. Ariz. May 10, 2024)....................25

*McFadden v. Nationstar Mortg. LLC*,
2022 WL 1001253 (D.D.C. Apr. 4, 2022)....................30

*In re Meta Healthcare Pixel Litig.*,
2024 WL 333883 (N.D. Cal. Jan. 29, 2024)....................26

*In re Meta Pixel Healthcare Litig.*,
647 F. Supp. 3d 778 (N.D. Cal. 2022)....................25, 34

*In re Meta Pixel Tax Filing Cases*,
2024 WL 1251350 (N.D. Cal. Mar. 25, 2024)....................29

*Mullinix v. US Fertility LLC*,
2021 WL 4935975 (C.D. Cal. Apr. 21, 2021)....................38

*Pereda v. Gen. Motors LLC*,
2022 WL 19975388 (N.D. Cal. Dec. 9, 2022)....................12

*Rivas Rosales v. Barr*,
2020 WL 1505682 (N.D. Cal. Mar. 30, 2020) (Chen, J.) ....................13, 27

*Ross v. AT&T Mobility, LLC*,
2020 WL 9848766 (N.D. Cal. May 14, 2020) ....................15

*Schmitt v. SN Servicing Corp.*,
2021 WL 3493754 (N.D. Cal. Aug. 9, 2021)....................27

*Stasi v. Inmediata Health Grp.*,
501 F. Supp. 3d 898 (S.D. Cal. 2020) ....................27, 28

*In re Target Corp. Customer Data Sec. Breach Litig.*,
309 F.R.D. 482 (D. Minn. 2015)....................27

*In re Target Corp. Data Sec. Breach Litig.*,
66 F. Supp. 3d 1154 (D. Minn. 2014) ....................4

*Thomas v. Papa Johns Int'l, Inc.*,
2024 WL 2060140 (S.D. Cal. May 8, 2024) ....................25

*In re Toy Asbestos*,
2021 WL 1884647 (N.D. Cal. May 10, 2021) ....................15

*In re Toys R Us, Inc., Priv. Litig.*,
2001 WL 34517252 (N.D. Cal. Oct. 9, 2001)....................22, 24

*Valentine v. NebuAd, Inc.*,
804 F. Supp. 2d 1022 (N.D. Cal. 2011)....................23

*In re Vizio, Inc., Consumer Priv. Litig.*,
238 F Supp. 3d 1204 (C.D. Cal. 2017)....................25

*Watson v. Carey*,
2007 WL 2670000 (N.D. Cal. Sept. 7, 2007), *aff'd*,
328 F. App'x 533 (9th Cir. 2009)....................29

*Wholesale Corp. v. Cox Commc'ns Hampton Roads, LLC*,
2013 WL 2147478 (E.D. Va. May 14, 2013)....................32

*Willis v. Buffalo Pumps Inc.*,
34 F. Supp. 3d 1117 (S.D. Cal. 2014) ....................15

*Xerox Corp. v. Far W. Graphics, Inc.*,
2004 WL 2271587 (N.D. Cal. Oct. 6, 2004)....................16

**State Cases**

*Brown v. Mortensen*,
253 P.3d 522 (Cal. 2011)....................28

*Colucci v. T-Mobile USA, Inc.*,
262 Cal. Rptr. 3d 50 (Cal. Ct. App. 2020) ....................16

*Scannell v. Cnty. of Riverside*,
152 Cal. App. 3d 596 (1984)....................16

*State v. Kipp*,
317 P.3d 1029 (Wash. 2014) (en banc)....................33, 34

*State v. Roden*,
321 P.3d 1183 (Wash. 2014) (en banc) .......... 34

*Velcoff v. MedStar Health, Inc.*,
186 A.3d 823 (D.C. 2018) .......... 30

*Wilson v. S. Cal. Edison Co.*,
234 Cal. App. 4th 123 (2015) .......... 16

**Federal Statutes**

18 U.S.C. §§ 2510, *et seq.* .......... 2

18 U.S.C. § 2511(2)(d) .......... 22

42 U.S.C. § 1320d-6 .......... 22, 25

**State Statutes**

Cal. Civ. Code §§ 56 *et seq.* .......... *passim*

Cal. Civ. Code § 1792 .......... 28

Cal. Civ. Code § 3294 .......... 13, 14

D.C. Code §§ 28-3851, *et seq.* .......... 12, 34, 35

D.C. Code § 28-3852(a) .......... 35

D.C. Code § 28-3853(1B) .......... 36

D.C. Code §§ 28-3901, *et seq.* .......... *passim*

D.C. Code § 28-3904 .......... 30, 35

Ga. Code Ann. § 16-9-92 .......... 31

Ga. Code Ann. § 16-9-93 .......... 3

Ga. Code Ann. §§ 33-39-1, *et seq.* .......... 2

Md. Code Ann., Cts. & Jud. Proc. §§ 10-401, *et seq.* .......... 2

Md. Code Ann., Com. Law §§ 13-101, *et seq.* .......... 37

Md. Code Ann., Com. Law §§ 14-3501, *et seq* .......... 37

Md. Code Ann., Com. Law § 14-3504 .......... 37, 38

Or. Rev. Stat. § 192.558 .......... 22

Or. Rev. Stat. §§ 646A.600, *et seq.* .......... 4

Or. Rev. Stat. §§ 646.605, *et seq.* .......... 2, 9, 12, 16

Va. Code Ann. §§ 18.2-152.1, *et seq.* .......... 3

Va. Code Ann. § 18.2-152.2 .......... 32

Va. Code Ann. § 18.2-152.4 .......... 32

Va. Code Ann. § 32.1-127.1:03 .......... 22

Va. Code Ann. §§ 38.2-600, *et seq.* .......... 2

Wash. Rev. Code § 9.73.030 .....33
Wash. Rev. Code § 19.255.005(2)(a)(i)(H).....39
Wash. Rev. Code §§ 19.86, *et seq.* .....2
Wash. Rev. Code §§ 70.02.005, *et seq.* .....2
Wash. Rev. Code § 70.02.020 .....22

**Rules**

Fed. R. Civ. P. 9(b).....19
Fed. R. Civ. P. 12(b)(6) .....11, 17

**Other Authorities**

*Use of Online Tracking Techs. by HIPAA Covered Entities & Business Assocs.*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Aug. 21, 2024) .....11

## I. INTRODUCTION[1]

One day after this Court's ruling on Kaiser's Motion to Dismiss the First Amended Complaint ("FAC"), Kaiser filed notices with state and federal agencies admitting to the conduct alleged in FAC and Second Amended Compliant ("SAC"). One day. Namely, Kaiser admitted that it shared members' personally identifiable information ("PII") with third parties through technology installed on its Site and Apps:

> As part of an in-depth and ongoing investigation, on October 25, 2023, Kaiser confirmed that certain third-party online technologies previously installed on some portions of its website and mobile application were configured to transmit limited information about Kaiser members and patients to the vendor-developer as part of the technology's standard functionality.

¶8. Kaiser further admitted that the information "collected by these technologies about Kaiser members may be considered Protected Health Information (PHI) under the Health Insurance Portability and Accountability Act (HIPAA)." ¶9.

Moreover, discovery produced **after Plaintiffs filed the SAC** reveals that on [redacted]. *See* Decl. of Melissa L. Yeates ("Yeates Decl."), Ex. A; Ex. B.[2]

These revelations do not exactly align with the positions Kaiser has taken in defending this case.

No longer able to conceal this information and lacking the keystone that supported its prior arguments for dismissal—namely, that neither PII nor PHI had been shared—Kaiser's Motion for partial dismissal[3] now resorts to a hodgepodge of arguments untethered to the facts (including the

[1] Unless otherwise noted, all emphases are added, all internal citations and quotations are omitted, all defined terms have the same meaning used in the Second Amended Class Action Complaint (ECF Nos. 130-4, 162) ("SAC"), and all references to ¶ herein refer to paragraphs in the SAC.

[2] Kaiser only produced these documents pursuant to a June 2024 Order entered by Judge Kang after Plaintiffs raised the issue with the Court and Judge Kang compelled their production.

[3] Kaiser has not moved to dismiss Plaintiffs' claims for breach of express contact, breach of implied

facts we now know to be true), legal precedent, and the law of the case (this Court's prior Order). For example, without any support or explanation, Kaiser asserts dismissal is required if third party use is not sufficiently pled. But, as Kaiser well knows, third party use is not required for the majority of Plaintiffs' claims, which this Court has already recognized in sustaining numerous claims in the FAC without third party use allegations. Regardless, the SAC includes plausible allegations that third parties were given access to Member PHI and PII in order to build user profiles and facilitate their own advertising networks in exchange for providing Kaiser their "free" products.

Next, while Kaiser contends that Kaiser Foundation Hospitals ("Hospitals") and Kaiser Foundation Health Plan of Washington ("KPWA") are improperly named in the SAC, these entities entered into contracts covering technology on the Site and Apps, are involved in their operation, and are proper Defendants. ¶¶52-55, 73, 352. Indeed, after Plaintiffs filed the SAC and raised Kaiser's discovery deficiencies with the Court, Kaiser belatedly identified a previously undisclosed document repository reflecting KPWA's actions on the Site and Apps. *See* ECF No. 211 at 6. So, there is a repository of documents showing actions taken by KPWA as to the Site and the Apps, and Hospitals and KPWA entered into relevant contracts with certain Third Party Wiretappers, thus confirming their involvement and showing that Kaiser's prior statement that "Plaintiffs have not (and cannot) allege" that any Kaiser entity other than KFHP had responsibility for the Site and Apps is false. *See* MTD FAC at 8. Kaiser's new argument for dismissal of Hospitals and KPWA is based on similarly misleading arguments and is easily rejected.

Kaiser's specific arguments with respect to Plaintiffs' claims also fail. *First*, Kaiser misconstrues Plaintiffs' Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq*. ("ECPA") allegations—Plaintiffs do not allege that the interception itself is the criminal or tortious act which satisfies the crime tort exception but rather that Kaiser's intention to use Members' PII and PHI as consideration for obtaining Twitter, Google, and Microsoft Bing's ("Bing") technology

contract, negligence, or violation of the Georgia Insurance and Information Privacy Act, Ga. Code Ann. §§ 33-39-1, *et seq*. ("GIIPPA"), Maryland Wiretapping and Electronic Surveillance Act, Md. Code Ann., Cts. & Jud. Proc. §§ 10-401, *et seq*. ("MWESA"), Oregon Unlawful Trade Practices Act, Or. Rev. Stat. §§ 646.605, *et seq*. ("OUTPA"), Virginia Insurance Information and Privacy Protection Act, Va. Code Ann. §§ 38.2-600, *et seq*. ("VIIPPA"), Washington Consumer Protection Act, Wash. Rev. Code §§ 19.86, *et seq*. ("WCPA"), or the Washington Health Care Information Act, Wash. Rev. Code §§ 70.02.005, *et seq*. ("WHCIA").

satisfies the crime tort exception. Next, Kaiser attempts to defeat invasion of privacy and intrusion upon seclusion claims by asserting its conduct was not "highly offensive," which is both puzzling and belied by the record. Kaiser has (i) [redacted] (¶¶148-52); (ii) [redacted] (¶105); and (iii) admitted to state and federal regulators that the Google, Twitter, and Bing technology resulted in a reportable privacy breach for which over 13 million notifications needed to be sent to Members. These facts certainly support Plaintiffs' allegation that a reasonable person could plausibly find that Kaiser's conduct was highly offensive.

Similarly, Kaiser's argument for dismissal of the Confidentiality of Medical Information Act, Cal. Civ. Code §§ 56.10, *et seq*. ("CMIA") claim is unfounded as the statute imposes strict requirements on California-regulated health care providers and service plans prohibiting them from disclosing patient or enrollee medical information without written authorization, ***regardless of where its patients or enrollees reside***.

Kaiser's arguments for dismissal of Plaintiffs' remaining state statutory claims fail as well. Regarding statutory larceny, the SAC plainly alleges that: (i) the Third Party Wiretappers used the personal information transmitted to them via the code on the Site and Apps (¶¶95-100, 134-47, 158, 163-68, 184-89, 192-95, 202-231, 235, 270-73, 314), (ii) Kaiser permitted these disclosures to obtain Twitter, Bing, and Google's services (¶¶185-86.); and (iii) this conduct was contrary to Members' reasonable expectation that Kaiser would not disclose their private personal information (¶¶84, 132, 297). Kaiser's argument that the District of Columbia Consumer Protection Procedures Act, D.C. Code §§ 28-3901, *et seq*. ("DCCPPA") claim fails because the SAC merely alleges breach of contract ignores the SAC's ***substantial allegations of Kaiser's deceptive conduct*** including, *inter alia*, concealing that it was disclosing Plaintiffs' PII and PHI to Third Party Wiretappers. ¶¶12, 105, 149-155, 383-85. Plaintiffs have also adequately alleged claims pursuant to the Georgia Computer Systems Protection Act, Ga. Code Ann. § 16-9-93 ("GCSPA") and the Virginia Computer Crimes Act , Va. Code Ann. §§ 18.2-152.1, *et seq.* ("VCCA") because Plaintiffs did not consent to the information being sent from their devices to the Third Party Wiretappers and therefore Kaiser used a computer or computer network "without authority" (i.e., exceeding rights or permissions granted).

Similarly, the SAC adequately alleges a Washington Privacy Act, Wash. Rev. Cod §§ 9.73, *et seq.* ("WPA") claim because Kaiser intercepted and/or recorded Plaintiffs' private communications without the consent of all parties. Finally, Kaiser's argument that Plaintiffs' D.C., Maryland, and Washington data breach notification statute claims should be dismissed is unwarranted; each of these statutes requires prompt notice when medical information is disclosed such as occurred here. Kaiser violated these statutes when it concealed its disclosures of Plaintiffs' PII and PHI rather than notifying Members promptly as required.

Accordingly, Plaintiffs respectfully request that the Court deny the Motion.[4]

## II. FACTUAL BACKGROUND

### A. Plaintiffs' Allegations in the Second Amended Complaint

The factual allegations in the SAC have been informed by what Plaintiffs have learned since the Court's ruling on Kaiser's previous motion to dismiss. This includes, of course, disclosures made by Kaiser (including those made ***one day*** following the Court's Order on the FAC) and also documents produced in discovery confirming, in essence, that Plaintiffs were right all along.[5]

Plaintiffs are Kaiser Members who receive their medical treatment through Hospitals and the Permanente Medical Group. *See* ¶¶21, 26, 30, 34, 38, 42, 46. As Members, Plaintiffs regularly use the Site and Apps to "access medical information and communicate with [their] health care providers, including making appointments, reviewing and ordering prescriptions, researching providers and medical conditions, communicating with providers, checking medical results, and reviewing [their] medical history," and pay medical bills. *See* ¶¶23, 27, 31, 35, 39, 43, 47. Contrary to its express and implied promises that it would protect Members' privacy on the Site and Apps, Kaiser installed code

[4] Based on this Court's prior ruling that the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.* ("CIPA") does not cover non-California residents, Plaintiffs do not oppose Kaiser's motion to dismiss this claim here but preserve their right to appeal. Plaintiffs also do not oppose Kaiser's argument for dismissal of Jane Doe V's claims for violation of the Oregon Consumer Information Protection Act, Oregon Consumer Information Protection Act, Or. Rev. Stat. §§ 646A.600, *et seq.* ("OCIPA") on the ground that OCIPA does not provide a private right of action. *But see In re Target Corp. Data Sec. Breach Litig.*, 66 F. Supp. 3d 1154, 1167 (D. Minn. 2014) (finding implied private right of action under the OCIPA). However, Plaintiffs are pursuing their separate claim under the OUTPA (Fourteenth Claim for Relief in the SAC), which Kaiser did not move to dismiss.

[5] Notably, Kaiser wrongly states the Court granted in part Defendants' Motion to Dismiss the FAC on April 4, 2024. Mot. at 2. Not so, the Docket unmistakably reflects that this Order was entered on April 11, 2024. *See* MTD FAC Order ("Order") ECF No. 124.

on the Site and Apps that intercepts and transmits Members' PII, PHI, and other sensitive and confidential information, to third party companies such as Adobe, Dynatrace, Google, Bing, Quantum Metric, Twitter, and other companies ("Third Party Wiretappers"). *See, e.g.*, *id.* at ¶¶4, 82.

**1. Twitter, Bing, and Google**

After this Court's Order on the FAC, Kaiser tacitly acknowledges, in both communications as well as privacy breach notifications sent to federal and state regulators, that it breached its obligations to Members and violated federal and state law by sending PII and PHI to Twitter, Bing, and Google. ¶¶8, 10, 12, 385. As Kaiser admitted in its recent disclosures—which stands in stark contrast to Kaiser's prior representations to this Court[6]—the information transmitted to Twitter, Bing, and Google included, IP addresses, names, information that could indicate a member was signed into a Kaiser account or service, information showing how the member interacted with and navigated through the website or mobile applications, and search terms used in the health encyclopedia. ¶9.

This information was extraordinarily valuable not just to Kaiser but also to Twitter, Bing, and Google. A main goal of Google, Bing, and Twitter is to develop user profiles to better target them with ads. ¶185. In order to collect the data needed to develop these profiles, Google, Bing, and Twitter offer "free" technology to companies like Kaiser. *Id*. This technology served a dual purpose, allowing Kaiser to get information about who visited its Site and Apps and also allowing Twitter, Bing, and Google to use that data to expand their advertising networks in terms of data tied to the unique profiles and also in terms of overall size. ¶186. Indeed, [redacted] ¶¶234-35. However, part of the implicit cost of this technology is providing Twitter, Bing, and Google with the ability use this information to supplement user profiles for better targeting and bolster their ad networks. ¶188. Kaiser thus understood that, in lieu

[6] *See, e.g.*, MTD Hr'g Tr at39:4-11, ECF No. 120 ("THE COURT: Are you suggesting, then, that Google, Bing, and Twitter have not been able to reach their goal? ***That they do not have the ability to ascertain the identity of*** -- once they've got this data that talks about, you know, some of the medical information that may have been received, ***they don't have the ability to tie that to any particular individuals***? ***MS. DEAGLE: Your Honor, I don't know if they do or they don't***.").

of monetary payments, Kaiser would be paying them in kind by providing Members' PII and PHI, which Twitter, Bing, and Google could then monetize. *Id.*

For example, when Members accessed the Portal, Twitter, Bing, and Google received data indicating that they successfully logged in and therefore were Kaiser Members and patients. ¶¶198-200, 231-33, 239-44, 275-80. Twitter, Bing, and Google also received additional information about Members' communications with their healthcare providers and activities on the Site and Apps, such as the fact that John Doe suffers from headaches and kidney stones, that he was prescribed Omeprazole, and that Jane Doe searched for "mental health" resources. ¶¶201-09, 239-61, 281-84, 287-88. Similar personal and medical information and communications were intercepted and transmitted to Twitter, Bing, and Google about all Members. ¶¶210-19, 262-69, 289-91.

Despite the obvious sensitivity of this information, Kaiser knowingly sent it to Twitter, Bing, and Google without any contracts to safeguard this data—which at a minimum created a materially enhanced risk to Members' privacy. In fact, ***Kaiser had no contracts at all*** with Twitter to protect this data. ¶196. The same is true with respect to the Bing and Google technology at issue here. While Kaiser was aware that Bing used PII and PHI collected from Members for targeted advertising, and had contracts with Microsoft governing other technology, Kaiser did not enter into any contracts covering the Bing Conversion Tag (a/k/a Microsoft Conversion Tag) code installed on the Site and Apps, and thus did not ensure that Bing would not use the information collected for advertising purposes. ¶¶274, 292-96.[7] Kaiser's Google Cloud Master Agreement—which covers the Google Maps technology provided by Google—***explicitly allowed*** Google to use and retain Members' PII, despite the fact that Kaiser never entered into a Business Associate Agreement ("BAA") with Google. ¶233. And, Kaiser had no contracts restricting Google's ability to use information gathered by the DoubleClick, Google Ads, and Analytics code that Kaiser used on the Site and Apps. ¶¶231-33.

### 2. Adobe

Adobe has long offered various marketing and analytics services, such as the Adobe Experience Cloud, Adobe Marketing Cloud, LifeCycle, and Marketo, which similarly collect a wide variety of PII, and in this case PHI, including: IP addresses; URLs; web searches; browser and device

[7] Kaiser entered into BAAs with Microsoft that only covered other products and services. ¶274.

information; location information; social media profile information; information provided on the website or mobile application; advertising success rates; and items purchased. ¶¶133-35. [redacted] ¶¶134-47, 155-58, 163-66, 168. Kaiser installed this Adobe code on its Site and Apps and, as a result, Adobe received Plaintiffs' and other Members' PII and PHI. ¶¶132-33, 155-77.

Discovery confirms that Kaiser has long-known that the Adobe code compromised its Members' privacy and that Kaiser failed to take appropriate action to prevent this. Notably, [redacted] ¶149. And, [redacted] ¶¶150-53. Instead, [redacted]. ¶154. Moreover, [redacted] ¶152. Indeed, as discovery has recently revealed, [redacted]. Yeates Decl. Ex. D.

### 3. Quantum Metric and Dynatrace

Kaiser also placed Quantum Metric and Dynatrace's "Platform Support" technologies on the Site and Apps. ¶¶82, 84, 87-88, 311-13. Quantum Metric's "Session Replay" code captured Members' communications on the Site in real-time while those communications were in transit, and continued to do so as Users moved throughout the Site. ¶87. As Quantum Metric explains: "At its core, **session replay** is technology that allows you to watch an end user's session as they experienced it, similar to how you watch a video. You can pause, rewind, and fast-forward the session (just like a YouTube video) to watch how a user interacts with a website or mobile app." ¶88. Quantum Metric also sends data through POST transmissions that contain Adobe Marketing ID, which are used to

track individuals across multiple platforms. ¶305. The Dynatrace APM platform, which was used on the Washington Site and App, can also "track user experience across platforms," and, like Quantum Metric, captures Plaintiffs' and Members' interactions with the Site and Apps. ¶312.

Quantum Metric and Dynatrace also use this data for their own purposes. For example, [redacted] ¶95-100. Dynatrace's publicly available subscription agreement similarly states, Dynatrace may "monitor and collect Usage Data to improve Dynatrace's current and future offerings." ¶314. Kaiser installed this Quantum Metric and Dynatrace code on its Site and Apps and, as a result, Quantum Metric and Dynatrace received Plaintiffs' and other Members' PII and PHI. ¶¶84-85, 111-24.

Moreover, the Quantum Metric and Dynatrace code created a materially enhanced risk to Member's privacy. For example, [redacted]. ¶96. Quantum Metric also [redacted] ¶¶97-99. Moreover, [redacted] ¶105. [redacted] ¶¶106-07. And, despite Dynatrace receiving Members' PHI, Kaiser did not even have a BAA with Dynatrace. ¶315.

#### 4. Additional Third Party Web Technologies

[redacted]. ¶355. [redacted]. *Id.*

Additionally, [redacted] ¶¶355-77. [redacted]. ¶¶361, 355-77.

**B. Kaiser Removed the Offending Code After Plaintiffs Brought this Action**

After Plaintiffs filed their initial Complaint on June 9, 2023, and moved for a preliminary injunction asking this Court to order that Kaiser remove the Third Party Wiretappers' code, Kaiser represented in November 2023 that it had disabled, deleted, or modified the offending code. ¶¶86, 108, 110, 154, 162, 182-83, 197, 236, 306; *see also* ECF No. 96 at 1-2 ("To the extent they were installed, KFHP removed certain internet technologies provided by Adobe, Bing, Google, Twitter, and Quantum Metric from the Website by: (1) disabling the technologies through a tag manager tool; (2) deleting the source code installed on the Website relating to these technologies; or (3) modifying the coding or Website to prevent the tool from being launched or invoked. KFHP completed removal of these technologies from the Website on or about November 7, 2023."), at 2-3 ("On or about September 14, 2023, KFHP completed its migration of the Dynatrace technology to the on-premise deployment model offered by Dynatrace. As such, all Website and App visitor data is collected and stored solely in KFHP's on-premises server. No Website or App visitor data is disclosed to Dynatrace."); Disc. Hr'g Tr. at 53:25-54:1, ECF No. 217 (Kaiser counsel admitting "[t]his litigation was part and parcel of what spurred the investigation into those technologies.").

**C. Kaiser Issued a Privacy Breach Notification One Day After This Court Issued its Order Denying in Part Kaiser's Motion to Dismiss the FAC**

On April 11, 2024, this Court denied Kaiser's Motion to Dismiss the FAC in part, upholding Plaintiffs' claims for breach of implied contract, negligence, and violation of MWESA, OUTPA, VIIPPA, and WCPA. Order at 56-57. In granting the Motion with leave to amend the remaining claims, the Court found that Plaintiffs failed to allege that the information the Third Party Wiretappers received was individually identifiable,[8] as Kaiser had argued throughout its Motion and oral

[8] *See, e.g.*, Order at 32 ("As the FAC is pled, there are no clear allegations as to how individually identifiable health information was disclosed."), 38 (noting that CMIA claim "involved the same basic issue regarding individually identifiable information"), 46 (dismissing GIIPPA claim because "[a]s the FAC is pled, there is no clear allegation as to how individually identifiable personal

argument.[9]

Incredibly, the very ***next day***, Kaiser filed notices with federal and state regulators admitting that it shared Members' PII and PHI to third parties and had known for months, stating:

> [O]n October 25, 2023, Kaiser confirmed that certain third party online technologies previously installed on some portions of its website and mobile application were configured to transmit limited information about Kaiser members and patients to the vendor-developer as part of the technology's standard functionality. These online technologies (sometimes called "cookies" or "pixels") were provided by Google, Microsoft Bing, and Twitter, third party vendors engaged by Kaiser to support the performance and use of the Kaiser website and mobile application.

¶8. Kaiser further admitted that the information "collected by these technologies about Kaiser members ***may be considered Protected Health Information (PHI) under the Health Insurance Portability and Accountability Act (HIPAA)***." ¶9.

The information Kaiser now admits it was transmitting to the Third Party Wiretappers includes: "IP address, name, information that could indicate a member was signed into a Kaiser Permanente account or service, information showing how the member interacted with and navigated through the website or mobile applications, and search terms used in the health encyclopedia." *Id.* [redacted]. *See* Yeates Decl., Ex. D. [10]

---

information was disclosed"), 55 (dismissing WHCIA claim because "it is not clearly alleged that such information identified her or could be readily associated with her personal identity").

[9] *See, e.g.*, ECF No. 88 at 2 ("Plaintiffs do not plead that the information purportedly disclosed is individually identifiable."), 28 ("Plaintiffs rely only on conclusory allegations that any 'individually identifiable information' was exposed."), 33-34 ("[B]ecause … the FAC does not allege that John Doe II's individually identifiable information was disclosed, he has failed to plead disclosure of privileged or personal information."), 55 ("Jane Doe does not explain how any of this information 'identifies or can readily be associated with' her. None of the information listed would allow third-parties to identify Jane Doe.").

[10] Kaiser also devotes an entire section in the Factual Background portion of its brief to addressing a June 20, 2024 decision from the Northern District of Texas regarding unauthenticated public webpages on hospital websites, falsely arguing, "[t]he HHS Guidance Relied on by Plaintiffs Was Deemed Unlawful." Mot. at 4-5 (discussing *Am. Hosp. Assoc'n v. Becerra*, 2024 WL 3075865 (N.D. Tex. June 20, 2024). Significantly, the court there held that HHS lacked the authority to impose the requirements of the HIPAA Privacy Rule merely because the online technology connects a user's IP address ***with a visit to an unauthenticated public webpage***—not the ***authenticated webpages*** at issue

## III. LEGAL STANDARD

Rule 12(b)(6) requires only that a plaintiff allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Such factual allegations are sufficient where they "suggest that the claim has at least a plausible chance of success." *James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 946 (N.D. Cal. 2023) (Chen, J.). When ruling on a motion to dismiss under Rule 12(b)(6), courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

## IV. PLAINTIFFS ADEQUATELY ALLEGE ALL DEFENDANTS' INVOLVEMENT

The SAC alleges that Hospitals and KPWA were involved in the development and/or operations of the Site and Apps. ¶¶52-55. [redacted]. *Id.* [redacted]. ¶352 ([redacted]). Indeed, KPWA operates its own mobile applications which are distinct from those offered in other Kaiser regions. ¶73. In fact, after Plaintiffs raised multiple discovery deficiencies before Judge Kang, it has recently come to light that there exists a previously undisclosed, and unsearched, document repository of documents reflecting KPWA

---

here. *Id.* at *17. The Court specifically noted that its vacatur "is not intended to, and should not be construed as, limiting the legal operability of other guidance in the germane HHS document." *Id.* at *17 n.8. Accordingly, on June 26, 2024, HHS issued updated guidance in light of the court's order. *See Use of Online Tracking Techs. by HIPAA Covered Entities & Business Assocs.*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Aug. 21, 2024). This guidance continues to maintain that "[t]racking technologies on a regulated entity's user-authenticated webpages," such as Kaiser's Site and Apps, "generally have access to PHI." *Id.* Thus, "a regulated entity must configure any user-authenticated webpages that include tracking technologies to allow such technologies to only use and disclose PHI in compliance with the HIPAA Privacy Rule." *Id.* Further, the updated guidance noted that while unauthenticated webpages typically "do not have access to individuals' PHI," and thus are "not regulated by the HIPAA Rules," ***there are circumstances*** in which "tracking technologies on unauthenticated webpages may have access to PHI, in which case the HIPAA Rules apply to the regulated entities' use of tracking technologies and disclosures to the tracking technology vendors." *Id.*

actions on the Site and Apps. *See* ECF No. 211 ("Defendants also informed Plaintiffs on July 9, 2024 that they have recently identified an additional repository of potentially relevant Jira tickets for the Kaiser Foundation Health Plan of Washington."). While only further discovery will provide details regarding the role of each entity, Plaintiffs' allegations are sufficient at this stage to show Hospitals' and KPWA's involvement in the privacy violations alleged.[11]

Kaiser's reliance on inapposite cases regarding breach of contract do not compel a different result. Plaintiffs' claims—even those that sound in contract—do not arise from the performance of the contracts between Hospitals, KPWA, and the Third Party Wiretappers. Instead, the existence of such contracts provides a reasonable inference that Hospitals and KPWA ***played a role in how the Site and Apps are run*** by entering into contracts and making decisions about the Third Party Wiretappers' technology on the Site and Apps. These allegations are sufficient to plead that Hospitals and KPWA were involved in the wrongdoing vis-à-vis the operation of the Site and Apps.

## V. PLAINTIFFS ARE ENTITLED TO PUNITIVE DAMAGES

The SAC is replete with allegations regarding Kaiser's knowing and willful disclosure of Plaintiffs' PII and PHI, in direct contradiction of its express and implied promises to keep such information private, and its deliberate choice to conceal these disclosures. ¶¶12, 82-83, 109-10, 126, 132, 149-53, 182, 186, 196-97, 265-68, 274, 295, 307, 321-28, 349-77, 385, 553, 559, 569, 586, 632-34, 641-43. These allegations demonstrate fraud and/or malice.[12]

*First*, Plaintiffs have adequately alleged entitlement to punitive damages pursuant to

---

[11] *See Pereda v. Gen. Motors LLC*, 2022 WL 19975388, at *10 (N.D. Cal. Dec. 9, 2022) ("[W]here the defendants are entities that 'largely hold the same role,' courts have declined to dismiss for inappropriate grouping."). Indeed, Plaintiffs "cannot be expected to know the exact corporate structure and degree of each Defendant's involvement, at this stage in the litigation and prior to discovery." *Id.* (quoting *In re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160, at *9 (D.N.J. May 8, 2017)). The SAC alleges a contractual relationship and duties, not mere communications with these other entities through the Site and Apps, which this Court previously found insufficient. Order at 9 (dismissing claims against Hospitals and The Permanente Medical Group where there was "no indication that the health care providers[] ... had anything to do with how the website and mobile applications are run").

[12] As noted above Plaintiffs are not pursuing their Twenty-First Claim for Relief pursuant to OCIPA. Plaintiffs are seeking punitive damages for these claims: negligence (Claim 7), CMIA (Claim 8), DCCPPA (Claim 10), MWESA (Claim 13), OUTPA (Claim 14), and District of Columbia Consumer Breach Notification Act, D.C. Code §§ 28-3851, *et seq.* ("DC Breach Notification Statute") (Claim 20).

California law,[13] which permits punitive damages when a defendant is “guilty of oppression, fraud, or malice.” Cal. Civ. Code § 3294. “Malice” means “conduct which is carried on by the defendant with a willful and conscious disregard of the rights ... of others” and “fraud” “means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of ... legal rights or otherwise causing injury.” *Id*. Numerous allegations reveal that Kaiser engaged in malice and/or fraud as statutorily defined. For example, Kaiser “allowed the tracking and disclosure of Kaiser Plan Members’ individually identifying personal information, PHI, other personal and sensitive health information, and private, sensitive and confidential communications with Kaiser and its providers to Third Party Wiretappers” (¶¶82-83) in willful and blatant disregard for its legal obligations not to disclose such information. ¶¶4, 7, 14-17, 216, 266, 293, 385 *see also* 109-10, 126, 132, 136-37, 182, 186, 196-97, 265-68, 274, 295, 307, 321-28, 349-77, 553, 559, 569, 586, 632-34, 641-43.

Indeed, Kaiser permitted the Third Party Wiretappers to access Plaintiffs’ PHI even though “Kaiser was required to protect [such information] under HIPAA, its Privacy Statement and the Terms and Conditions of the Site and Apps” as well as its patients’ reasonable expectations regarding their private, personal, and medical data. ¶7. Despite these obligations, Kaiser knowingly provided the Third Party Wiretappers access to this highly sensitive information.

Similarly, Kaiser repeatedly concealed and chose not to notify regulators and Members when it knew that PII and PHI was wrongfully disclosed. ¶12 (Kaiser confirmed Plaintiffs’ allegations as to Third Party Wiretappers on October, 25, 2023, but waited six months to report to regulators); ¶105 ([redacted]”); ¶¶149-53 ([redacted]

[13] Kaiser asserts that because “courts apply the punitive damages law of the forum state” California law applies to all of Plaintiffs’ punitive damages requests (Mot. at 8) and has waived any argument that the punitive damages laws of any other state should apply. *See Rivas Rosales v. Barr*, 2020 WL 1505682, at *9 (N.D. Cal. Mar. 30, 2020) (Chen, J.).

[redacted]).

Further, [redacted] ¶¶106, 152, 383-85.

As such, Kaiser clearly acted with "willful and conscious disregard of the rights" of Plaintiffs and its Members to maintain the privacy of their PII and PHI pursuant to state and federal privacy laws, Kaisers' express and implied promises, and Members' reasonable expectations. Cal. Civ. Code § 3294. Additionally, these allegations raise a plausible inference that Kaiser committed fraud by concealing the "material fact known to" Kaiser that Members' PII and PHI was disclosed "with the intention ... of … depriving" Members "of ... legal rights or otherwise causing injury" by, *inter alia*, failing to provide Members with the timely notice they were entitled to and preventing Members from seeking redress for the disclosure of their private information. *Id*.

Moreover, Kaiser's malicious and/or intentionally deceptive conduct has continued throughout this litigation. Unapologetically, Kaiser admits to investigating the claims soon after this lawsuit was filed, and asserts in public documents that by October 2023 it had confirmation of Plaintiffs' allegations that the code installed on the Site and Apps transmitted PII and PHI to third parties, yet "***Kaiser waited nearly six months*** to notify the regulators of its finding." ¶12. In a clear effort to deprive the Court from considering this information while Kaiser's Motion was pending, this disclosure was made on April 12, one day after the Court issued its Order. Thus, internally Kaiser had conducted an investigation and concealed its confirmatory findings; externally, Kaiser resisted discovery and denied that any PII or PHI was disclosed. Kaiser's conduct and continued concealment during this litigation is stunning and further confirms its malicious and/or intentionally deceptive behavior and supports Plaintiffs' claims for punitive damages at this stage. *See Ross v. AT&T*

*Mobility, LLC*, 2020 WL 9848766, at *18 (N.D. Cal. May 14, 2020) (finding request for punitive damages adequately supported by allegations that defendant failed to abide by "rules and regulations [that required defendant] to protect customers'... sensitive information," and "promises, including in its privacy policy, that it would protect its customers' information."); *ExxonMobil Oil Corp. v. S. Cal. Edison Co.*, 2013 WL 12166214, at *3 (C.D. Cal. May 1, 2013) (denying motion to dismiss request for punitive damages where plaintiff alleged that defendant acted in "conscious disregard of its obligations and promises").

*Second*, Kaiser's assertion that an officer, director, or managing agent must ratify the conduct to support punitive damages is unfounded. Courts have rejected similar arguments, finding "allegations [which] are sufficient to raise the inference" that the malice and/or fraud alleged in the complaint "occurred as a result of" acts "at the level of officer, director, or managing agent" are sufficient to support punitive damages allegations.[14] Importantly, "[a] plaintiff need not produce a smoking memorandum signed by the CEO and Board of Directors to satisfy [the] 'managing agent' requirement." *In re Toy Asbestos*, 2021 WL 1884647, at *2 (N.D. Cal. May 10, 2021). Regardless, Plaintiffs have asserted allegations which sufficiently "raise the inference" that Kaiser's wrongful conduct occurred "at the level of officer, director, or managing agent." *Ross*, 2020 WL 9848766, at *18. Indeed, the harms Plaintiffs allege are a result of Kaiser's corporate conduct, which center on its decision to install third party code on the Site and Apps that discloses Members' PII and PHI. ¶5. [redacted], and there are no allegations or assertions that a rogue employee was responsible. *See* ¶¶53, 101-02, 101, 148, 233. Kaiser cannot plausibly argue that someone other than an individual with "discretionary authority over significant aspects of a corporation's business" was

---

[14] *See, e.g.*, *Ross*, 2020 WL 9848766, at *18 (denying motion to dismiss punitive damages and rejecting defendant's argument that plaintiff "fail[ed] to allege that any officer, director, or managing agent of [defendant] knew about, committed, ratified, or authorized any of the actions about which [plaintiff] complains"); *Willis v. Buffalo Pumps Inc.*, 34 F. Supp. 3d 1117, 1133 (S.D. Cal. 2014) (plaintiff can meet the managing agent requirement "through evidence showing the information in the possession of the corporation and the structure of management decisionmaking [sic] that permits an inference that the information in fact moved upward to a point where corporate policy was formulated"); *ExxonMobil Oil Corp.*, 2013 WL 12166214, at *3 (denying motion to dismiss punitive damages allegations and rejecting argument that "request for punitive damages should be dismissed because [the complaint] does not allege that [defendant] committed [wrongful acts] through its officer, director, or managing agent").

able to approve the negotiation and execution of contracts with Third Party Wiretappers and the installation of code on the Site and Apps. *Colucci v. T-Mobile USA, Inc.*, 262 Cal. Rptr. 3d 50, 58 (Cal. Ct. App. 2020) (finding a managing agent is anyone with "substantial discretionary authority over significant aspects of a corporation's business"). These allegations support an inference that high-level officials within Kaiser were involved in the malicious and/or fraudulent conduct alleged.[15]

## VI. KAISER IMPROPERLY SEEKS DISMISSAL OF CLAIMS INVOLVING DYNATRACE, QUANTUM METRIC, AND ADOBE

Kaiser's strawman argument for dismissal of claims involving Dynatrace, Quantum Metric, and Adobe misconstrues both this Court's prior Order and Plaintiffs' allegations. *First*, Kaiser misleadingly contends that this Court previously dismissed all claims that were based on Third Party Wiretapper use of Plaintiffs' PII and PHI. Mot. at 9-12. However, as this Court is well aware, it sustained Plaintiffs' claims for breach of implied contract, negligence, and violation of the MWESA, OUTPA, VIIPPA, and WCPA statutes, even though it found that the FAC only pled that "Kaiser simply hired the third parties to do work for Kaiser, which exposed the third parties to personal information about members." Order at 11-12. Moreover, even after finding that the FAC only pled "that Kaiser hired third parties to collect and/or use information for the benefit of Kaiser," this Court did not issue a blanket dismissal of all of Plaintiffs' remaining claims; rather, the Court examined each of the remaining claims, dismissing them without prejudice largely because it determined that Plaintiffs had not plausibly alleged that ***PII*** was being transmitted—an argument Kaiser has since abandoned after its public admission.[16] Indeed, this Court has recognized that statutory claims for privacy violations survive even if plaintiffs do not plead defendant knew the intercepted information was used for another's benefit. *See, e.g.*, *James*, 701 F. Supp. 3d at 965, *motion to certify appeal*

---

[15] Kaiser relies on inapposite cases. *Wilson v. S. Cal. Edison Co.*, a post-trial appeal where the *only* evidence of managing agents involvement in the allegedly wrongful conduct was "in the context of [defendant] trying to mitigate it." 234 Cal. App. 4th 123, 165 (2015). *Grimberg v. United Airlines, Inc.*, 2023 WL 3431912, at *4 (C.D. Cal. Feb. 27, 2023) (seeking punitive damages for claim based on the wrongful conduct of a Flight Manager that plaintiff alleged was "inconsistent[] with corporate policy"); *Achal v. Gate Gourmet, Inc.*, 114 F. Supp. 3d 781, 816 (N.D. Cal. 2015) (seeking punitive damages for retaliatory termination approved by defendant's employees); *Scannell v. Cnty. of Riverside*, 152 Cal. App. 3d 596, 614 (1984) (claims arising from defendant employees' arrest and imprisonment of plaintiff). *Xerox Corp. v. Far W. Graphics, Inc.*, 2004 WL 2271587, at *2 (N.D. Cal. Oct. 6, 2004) (finding plaintiff failed to allege "conduct by an offer, director, or managing agent" and striking request for punitive damages "with leave to amend").

[16] *See, e.g.*, *supra* note 8.

*denied*, 2024 WL 664811 (N.D. Cal. Feb. 16, 2024).

Accordingly, to carry its burden for dismissal Kaiser must show ***why*** Plaintiffs' claims should be dismissed with respect to Dynatrace, Quantum Metric, and Adobe, even if the SAC did not sufficiently plead that these third parties independently used Members' PII and PHI. *Kuhl v. McDonough*, 2024 WL 3463350, at *10 (N.D. Cal. July 17, 2024) ("Rule 12(b)(6) places the burden of persuasion on the moving party, meaning that the party who files a motion to dismiss must explain why dismissal is warranted.").[17] However, Kaiser makes no attempt to do so, instead generically arguing that Plaintiffs' factual allegations about these third parties' independent use of intercepted information are insufficient and then broadly concluding that "all claims" based on independent use allegations should be dismissed. Kaiser provides no explanation as to why independent use is an essential element for the survival of any of Plaintiffs' claims. At most, as pled, third party use is only required for Plaintiffs' ECPA and larceny claims. *See infra* note 18. Thus, even if this Court finds that the SAC only pleads that Dynatrace, Quantum Metric, and Adobe collected and/or used information for the benefit of Kaiser (which it does not), Kaiser has failed to carry its burden for dismissal of all of Plaintiffs' claims regarding Dynatrace, Quantum Metric, or Adobe.

*Second*, Kaiser's argument that Claims 5, 10, 15, and 18 should be dismissed "[e]ven if Plaintiffs had alleged Kaiser knew and/or approved of Dynatrace, Quantum Metric, and Adobe collecting and/or using information for their own purposes" makes no sense.[18] Mot. at 12. Notably, in its prior Order, this Court sustained both the MWESA (Claim 15) and VIIPPA (Claim 18) claims ***even after*** finding that the FAC had only pled "that Kaiser hired third parties to collect and/or use information for the benefit of Kaiser." Order at 12. As such, additional allegations regarding third party use of this information are wholly unnecessary for these claims to survive. Moreover, Kaiser

---

[17] Moreover, it is unclear what actual relief Kaiser is seeking as none of Plaintiffs' claims are restricted to Dynatrace, Quantum Metric, and Adobe, and all claims include the conduct of other Third Party Wiretappers. *See* Fed. R. Civ. P. 12(b)(6) ("[F]ailure to state a ***claim*** upon which relief can be granted.").

[18] The ECPA claim is only brought with regard to Kaiser's use of Google, Bing, and Twitter's technology because Kaiser did pay for the use of Dynatrace, Quantum Metric, and Adobe's technology. Claim nine for larceny is also similarly brought only with respect to Google, Bing, and Twitter because, with respect to this claim, Plaintiffs allege that Kaiser's actions amounted to theft because it did not inform Members that it would be providing their information to Google, Bing, and Twitter in exchange for "free" use of Google, Bing, and Twitter products. ¶576.

misleadingly claims that because Plaintiffs included additional allegations in Claims 5, 10, 15, and 18 regarding Google, Bing, and Twitter, suddenly those Claims only assert claims related to data shared with those third parties. This is belied by the remainder of the allegations in the SAC, including with those Claims. With regard to breach of contract, while Plaintiffs allege that Kaiser breached its promise that it would not "sell or rent personal information about visitors to the Site" by disclosing Members' PII and PHI to Google, Bing, and Twitter in exchange for "free" use of these third parties' software (¶¶185-86), the SAC also alleges that Kaiser breached its express contract with respect to ***all Third Party Wiretappers***, including specific allegations regarding Quantum Metric and Dynatrace (¶¶487-88). Plaintiffs similarly plead breach of contract allegations as to information shared with ***all Third Party Wiretappers***:

- Paragraphs 491-492 regarding Kaiser's breach of its agreement that User data would only be collected on an aggregate basis, and only used to improve Kaiser's content and overall usage;
- Paragraphs 493-495 regarding Kaiser's breach of its agreement regarding the use of cookies, web beacons, GET requests, and POSTs which transmitted PII and PHI to the Third Party Wiretappers;
- Paragraphs 496-497 regarding Kaiser's representations that any disclosures of personal information would be in compliance with applicable law and use of that data would be pursuant to Kaiser's written instructions.

Significantly, Kaiser does not challenge that it breached these representations. Kaiser's arguments with respect to Paragraph 653 pled in connection with the VCCA, Paragraph 690 pled in connection with the WPA, and Claim Ten for violation of the DCCPPA similarly fail, as the surrounding paragraphs and language in each of those Claims undeniably includes allegations regarding all Third Party Wiretappers. ¶¶585 (Claim 10); 654-54 (Claim 15); 699 (Claim 19).

*Third*, Plaintiffs allege that Dynatrace, Quantum Metric, and Adobe used the information Kaiser provided. For example, Dynatrace's publicly available subscription agreement provides that "Dynatrace may monitor and collect Usage Data to improve Dynatrace's current and future offerings, and if aggregated and not identifying Customer or any individual, for industry analysis, benchmarking, and analytics." ¶314. While Kaiser contends that "Usage Data" is defined to exclude personal data collected from this site, this is not what the definition states and should not be taken as fact, particularly in light of the additional language Dynatrace included regarding other uses of this data "if aggregated and not identifying Customer or any individual." *Id.* Plaintiffs have met their

pleading burden and the extent and nature of Dynatrace's use of this Usage Data is the proper subject of discovery.

With respect to Quantum Metric and Adobe, Kaiser also falsely claims that [redacted] To the contrary, [redacted] (¶¶101-09, 137, 148-54) and [redacted]. *Id.* [redacted]. ¶100.

## VII. KAISER KNEW THAT TWITTER, BING, AND GOOGLE USED MEMBERS' PII AND PHI FOR THEIR OWN PURPOSES

Even though third party use is not required for the majority of Plaintiffs' claims, the SAC also sufficiently alleges such use by Twitter, Bing, and Google.[19] [redacted] ¶187. Kaiser now seeks to distance itself from that decision, arguing that these global advertising companies did not use the data generated from the Site and Apps for their own benefit—and even if they did, that Kaiser was somehow unaware of this fact. However, as detailed in the SAC, [redacted]

[19] Even under the heightened Rule 9(b) pleading standard, which Kaiser no longer argues is applicable here, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

[redacted] ¶187. By implementing Twitter, Bing, and Google's code on the Site and Apps, Kaiser gained access to their analytics platforms and advertising capabilities and, in exchange, these Third Party Wiretappers gained access to valuable Member data. ¶186.

Twitter, in addition to collecting user activity from its platform, also tracks browsing activity across the internet. ¶¶189-91. Twitter collects a variety of information, including: browser type; device and operating system; mobile carrier; IP address; and browsing activity. ¶191. Partner websites, including Kaiser, provide this information to Twitter through the code they embed in their websites and mobile applications. ¶192. As Twitter's Privacy Policy makes clear—which Kaiser knew or should have known—information shared by partners like Kaiser "may be combined with the other information [Twitter users] share with X and that X receives, generates, or infers." ¶193. Twitter even explains to partners that its analytics and marketing tools "collect the cookie IDs of visitors and matches them to X users." ¶194. Thus, Kaiser was aware that the access it gained to Twitter's marketing and analytics tools by embedding Twitter code on the Site and Apps would result in Member PII and PHI being transmitted to Twitter. ¶195. Yet, Kaiser had no BAA with Twitter, or any contractual controls that would allow it to restrain Twitter's use of Member data. ¶196.

Bing, one of the largest search engines and a widely used advertising platform, collects a vast amount of data in order to sell targeted advertising based on a user's browsing history. ¶¶184, 270-72. Bing uses a Machine Unique Identifier ("MUID") and Universal Event Tagging ("UET") to identify and track individual internet users. ¶¶275-80. The MUID "can sync across domains and allows tracking of users by Bing from website to website." ¶277. Using the MUID, along with the other information collected, such as IP addresses, Bing is able to match the information received to specific advertising profiles which it maintains. ¶¶276, 280. UET is a technology used by Bing "to report advertiser activity on a Website," and was "installed on all pages viewed on the Kaiser Website, including within the Portal." ¶280. [redacted] ¶274.

Google, not only the largest search engine in the world but also a widely used advertising

platform, collects a vast amount of data in order to develop profiles and sell targeted advertising based on a user's browsing history. ¶¶184, 220-22. Over time, Google has relied on a variety of technologies and data points in order to track user behavior, including cookies, advertising IDs, IP addresses, and its recently launched Topics API. ¶¶223-25. In fact, Google discloses in its policies for partner sites, like Kaiser, that it "uses the information shared by sites and apps to deliver our services," including "the URL of the page you're visiting and your IP address." ¶225. HHS's Office for Civil Rights further warned covered entities, like Kaiser, that use of "technologies, such as ... Google Analytics, that can track a user's online activities" can "gather identifiable information about users as they interact with a website or mobile app, often in ways which are not avoidable by and largely unknown to users." ¶229. [redacted] ¶¶231-33.

Kaiser argues that the Google Cloud Master Agreement undermines Plaintiffs' theory that Kaiser impermissibly exchanged Members' PII and PHI for access to the Third Party Wiretapper's analytics and advertising capabilities. However, [redacted]" *Id.*

[redacted]

[redacted] *Id.*

## VIII. KAISER'S ADDITIONAL ARGUMENTS FOR DISMISSAL ALSO FAIL

### A. Claim 1: Plaintiffs Sufficiently Allege that the Crime Tort Exception Applies

While the ECPA provides that it shall not be unlawful for someone to intercept communications where one party consents, it explicitly provides that this exception ***does not apply*** where, as here, the "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d). Here, Plaintiffs allege that Members' communications were intercepted for the purpose of criminally and tortiously using their PII and PHI "as consideration for Kaiser obtaining Twitter, Google, and Microsoft Bing's technology." ¶419. These third parties do not require monetary payment to use the code; rather, "the implicit cost of this technology is that Kaiser provide Google, Microsoft Bing, and Twitter the ability" to use Members' PII and PHI for better ad targeting—which Kaiser understood when it installed the code. ¶¶186, 420. As a result, Kaiser "essentially sold its patient lists, and other PHI, to Twitter, Google, and Microsoft Bing" in violation of the HIPAA Privacy Rule, which carries criminal penalties,[20] and otherwise acted tortiously[21] by using this

---

[20] *See* 42 U.S.C. § 1320d-6 (criminal penalties where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm"). State laws similarly prohibit disclosure of individually identifiable health information without authorization or consent. Cal. Civ. Code § 56.10(d) ("Except to the extent expressly authorized by a patient, … a provider of health care, health care service plan … shall not intentionally share, sell, use for marketing, or otherwise use medical information"); Cal. Civ. Code § 56.36(a) (violations punishable as a misdemeanor); Md. Code Ann., Health-Gen. § 4-303 ("A health care provider shall disclose a medical record on the authorization of a person … [A]n authorization shall: (1) Be in writing, dated, and signed"); Md. Code Ann., Health-Gen. §§ 4-309(d)-(e) (violations punishable as a misdemeanor); Or. Rev. Stat. § 192.558 ("A health care provider or state health plan: (1) May use or disclose protected health information of an individual in a manner that is consistent with an authorization provided by the individual or a personal representative of the individual."); Va. Code Ann. § 32.1-127.1:03 ("No person to whom health records are disclosed shall redisclose or otherwise reveal the health records of an individual, beyond the purpose for which such disclosure was made, without first obtaining the individual's specific authorization to such redisclosure"); Wash. Rev. Code § 70.02.020 ("Except as authorized elsewhere in this chapter, a health care provider, an individual who assists a health care provider in the delivery of health care, or an agent and employee of a health care provider may not disclose health care information about a patient to any other person without the patient's written authorization.").

[21] *See In re Toys R Us, Inc., Priv. Litig.*, 2001 WL 34517252, at *8 (N.D. Cal. Oct. 9, 2001) (spying on website users to "collect their personal information without consent or compensation," and "obtain[] detailed, free market research and consumer analysis rather than paying for it" are tortious purposes that fall within the ECPA's crime-tort exception).

information without consent or compensation. ¶¶422-24. *See Kurowski v. Rush Sys. for Health*, 2023 WL 8544084, at *3 (N.D. Ill. Dec. 11, 2023) (applying crime-tort exception where hospital violated HIPAA by knowingly transmitting individually identifiable health information for financial gain); *Haw. Reg'l Council of Carpenters v. Yoshimura*, 2016 WL 4745169 (D. Haw. Sept. 12, 2016) (applying crime-tort exception to party to communication). Indeed, as discovery has now revealed, [redacted] Yeates Decl., Ex. C. This unacceptable use of Members' PII and PHI for Kaiser's gain, as alleged in the SAC and which discovery will further show, goes beyond just Twitter and exposes Kaiser to criminal and civil liability.

Moreover, "the existence of a lawful purpose does not mean that the interception is not also for a tortious or unlawful purpose." Order at 13 (quoting *Sussman v. Am. Broad. Cos*., 186 F.3d 1200, 1202 (9th Cir. 1999). Indeed, "[w]here the taping is legal, but is done for the purpose of facilitating *some further impropriety*, such as blackmail," the ECPA applies. *Id.* at 14 (quoting *Sussman*, 186 F.3d at 1202-03) (emphasis in original). While Kaiser may have had the right to record this information for its own purposes, Kaiser also did this to facilitate a further impropriety—accessing the Twitter, Bing and Google technology without paying money, which is separate and independent of the interception itself. *See Caro v. Weintraub*, 618 F.3d 94, 99 (2d Cir. 2010).

**B. Claim 2: Plaintiffs Sufficiently Allege a Violation of CIPA**

Plaintiffs continue to maintain that CIPA protects both California residents and residents of other states. *See Valentine v. NebuAd, Inc.*, 804 F. Supp. 2d 1022, 1028 (N.D. Cal. 2011); *Carrese v. Yes Online Inc.*, 2016 WL 6069198, at *4 (C.D. Cal. Oct. 13, 2016). However, Plaintiffs also recognize that the Court's previous ruling on this issue, if applied here, would bar non-California Plaintiffs' CIPA claims, a finding which Plaintiffs seek to preserve for appeal. Additionally, Plaintiff John Doe has agreed to stay his claims in light of this Court's prior ruling regarding arbitration, also preserving that finding for appeal.

**C. Claim 3: Plaintiffs Sufficiently Allege Common Law Invasion of Privacy**

The SAC pleads highly offensive conduct because (i) Kaiser's conduct "materially increase[d]

the risk of dissemination of the collected information"; and/or (ii) Kaiser knew and/or approved of third parties collecting and/or using information for their own purposes.[22] Order at 28.

*First*, Kaiser's conduct is highly offensive because it materially increased the risk of dissemination of Plaintiffs' PII and PHI. Indeed, by Kaiser's own omission, the installation of this technology amounted to a privacy breach that it was required to disclose to state and federal regulators. ¶¶8-12, 384-5. The SAC alleges Kaiser failed to include sufficient safeguards, [redacted] (¶¶18, 106, 152, 196, 232-33, 274), [redacted] ¶¶105, 149-53. Kaiser also deceived Plaintiffs regarding the security of their PII and PHI, including whether that information would be disclosed to third parties, and concealed breaches. *See In re Google RTB Consumer Priv. Litig.*, 606 F. Supp. 3d 935, 946 (N.D. Cal. 2022) (denying motion to dismiss intrusion of seclusion claim where plaintiffs alleged "Google sold and shared information relating to plaintiffs' web browsing histories, device information, and consumer interest data"). While Kaiser does not challenge that Plaintiffs had a reasonable expectation of privacy over the information shared on the Site and Apps, it thwarted these expectations by misrepresenting its use of Plaintiffs' confidential medical information in its Privacy Statement (¶¶321-28); [redacted] (¶¶101-02, 105-07, 111-24, 132-33, 137, 148-153, 155-77, 178, 183, 196-213, 220, 232-33, 239-63, 270, 274-90, 297, 299-309, 314-20, 451-57), failing to obtain consent for such disclosures (¶¶24, 28, 32, 36, 40, 44, 48, 321-28, 336, 345-46, 450), and concealing the disclosures. *See In re Google RTB Consumer Priv. Litig.*, 606 F. Supp. 3d at 947 (finding "plaintiffs' allegations that Google shared and sold plaintiffs' personal and sensitive information without disclosing that it would precludes the Court from finding that plaintiffs have no reasonable expectation of privacy in this information"). A jury could find this conduct highly offensive.

[22] The Court previously found that Plaintiffs properly pled an intrusion and Kaiser no longer challenges that element. *See id.* The only challenge to the intrusion upon seclusion claim is whether Plaintiffs have properly pled whether the intrusion was highly offensive, which they have. ¶¶452-56.

Kaiser's citations to cases that do not involve medical data are inapposite[23] and its assertion that sharing its patients' personal and medical data with third parties is not highly offensive, is concerning. As a healthcare provider subject to federal privacy regulations, Kaiser should hold itself to a higher standard than it has. Lawmakers' enactment of "criminal and civil statutes forbidding the disclosure of protected health information without proper authorization[]" reflects "policy decisions regarding the importance of safekeeping this information" and support a finding that Kaiser's conduct is highly offensive. *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 800 (N.D. Cal. 2022); *see also McCulley v. Banner Health*, 2024 U.S. Dist. LEXIS 85232, at *31 (D. Ariz. May 10, 2024) (same). In addition, federal and state laws protect PII and PHI and outline a specific process to be followed if such information is disclosed to third parties. ¶¶341-48, 561-70, 693-706; *see also supra* note 20. Among other federal and state law violations, Kaiser disclosed Plaintiffs' PHI without written consent, in violation of HIPAA (42 U.S.C. § 1320d-6), failed to timely notify regulators in violation of HIPAA's Breach Notification Rule (45 C.F.R. §§ 164.400-414), and failed to timely notify its patients of the disclosures in violation of state data breach laws. ¶¶8-14, 346-49; *see also* ¶19 (alleging violations of eighteen federal and state laws), 453 (asserting Kaiser admitted the data disclosed may be considered PHI under HIPAA); *Doe v. Regents of Univ. of Cal.*, 672 F. Supp. 3d 813, 820 (N.D. Cal. 2023); *In re Vizio, Inc., Consumer Priv. Litig.*, 238 F Supp. 3d 1204, 1233 (C.D. Cal. 2017); *Doe v. Beard*, 63 F. Supp. 3d 1159, 1170 (C.D. Cal. 2014) (disclosure of medical information subverts a public interest favoring confidentiality and thus meets the egregious violation of social norms standard). At a minimum, Kaiser's conduct in failing to promptly notify its Members of the privacy breach as required by law and, instead, concealing and denying the disclosures occurred for nearly six months while its Motion to Dismiss the FAC was pending was highly offensive. *See supra* Section V.

*Second*, Plaintiffs have sufficiently alleged that Kaiser's conduct is highly offensive because it knew and/or approved of third parties' collecting and/or using Plaintiffs' PII and PHI for their own

---

[23] *See, e.g.*, *Thomas v. Papa Johns Int'l, Inc.*, 2024 WL 2060140, at *4 (S.D. Cal. May 8, 2024) (disclosure of data from interactions with a ***pizza restaurant's website***); *McCluskey v. Hendricks*, 2021 WL 6773140, at *6 (C.D. Cal. Nov. 17, 2021) (screenshots of ***Instagram account***); *Esparza v. Gen Digit. Inc.*, 2024 WL 655986, at *1-2 (C.D. Cal. Jan. 16, 2024) (interactions with the website's ***tech support chat feature***).

purposes. *See supra* Sections VI-VII. With respect to Google, Twitter, Bing, and Adobe, [redacted] ¶¶144-47, 155-58 184-86, 188-96, 204, 220-33, 247, 249, 253, 257, 261, 270-74, 276-77, 280, 282, 284, 286. With respect to Quantum Metric and Dynatrace, [redacted] ¶¶95, 100, 314-15.

Finally, courts deny motions to dismiss claims for intrusion upon seclusion involving plaintiffs' medical information as premature. *See In re Meta Healthcare Pixel Litig.*, 2024 WL 333883, at *3 (N.D. Cal. Jan. 29, 2024) ("[A]t this juncture and given that plaintiffs were communicating with their healthcare providers about their healthcare needs, plaintiffs have alleged enough for this claim to proceed to discovery."); *Cousin v. Sharp Healthcare*, 702 F. Supp. 3d 967, 974 (S.D. Cal. 2023) (where plaintiffs alleged their "medical conditions and statuses as patients" were transmitted to Meta, linked to them using their IP addresses, and used for targeted advertising, "[t]he ultimate question of whether [Defendant's disclosure of their information] … could highly offend a reasonable individual is an issue that cannot be resolved at the pleading stage").[24]

**D. Claim 4: Plaintiffs Sufficiently Allege a Violation of the California Constitution**

Because Plaintiffs have sufficiently pled an intrusion upon seclusion claim, Plaintiffs have also adequately pled an invasion of privacy claim pursuant to Article I, Section 1 of the California Constitution. *See* Order at 28 (citing *In re Facebook, Inc.*, 402 F. Supp. 3d at 797). This Court has already recognized that the claims are functionally identical as are Kaiser's challenges. (*see id.*) and Kaiser's disclosure of Plaintiffs' medical information plainly supports this claim. *In re Ambry Genetics Data Breach Litig.*, 567 F. Supp. 3d 1130, 1143 (C.D. Cal. 2021) (court "refuse[d] to dismiss invasion of privacy claims at the motion to dismiss stage [because] a data breach involved medical information, because *the disclosure of such information is more likely to constitute an 'egregious breach of the social norms'* that is 'highly offensive'"); *Doe v. N. Cal. Fertility Med. Ctr.*, 2024 WL 246178, at *6 (E.D. Cal. Jan. 23, 2024).

[24] *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 797 (N.D. Cal. 2019) ("Under California law, courts must be reluctant to reach a conclusion at the pleading stage about how offensive or serious the privacy intrusion is.").

**E. Claim 8: Plaintiffs Sufficiently Allege a CMIA Violation**

As a California-regulated health care provider and/or health care service plan, Kaiser cannot disclose patient or enrollee medical information without written authorization, ***regardless of where its patients or enrollees reside***. Cal. Civ. Code § 56.10(a); ¶¶562-570.[25] *See Stasi v. Inmediata Health Grp.*, 501 F. Supp. 3d 898, 924 (S.D. Cal. 2020) (upholding nationwide CMIA claim); *Schmitt v. SN Servicing Corp.*, 2021 WL 3493754, at *3 (N.D. Cal. Aug. 9, 2021) (quoting *In re iPhone 4S Consumer Litig.*, 2013 WL 3829653, at *7 (N.D. Cal. Jul. 23, 2013)) ("[S]tate statutory remedies may be invoked by out-of-state parties when they are harmed by wrongful conduct occurring in California."). CMIA contains no statutory language limiting its application to California residents (*see* Cal. Civ. Code §§ 56 *et seq.*), instead defining "patient" as "a natural person, whether or not still living, who received health care services from a provider of health care and to whom medical information pertains." *Id.* § 56.05(m). All Plaintiffs meet this definition. Moreover, CMIA focuses on the conduct of the health service plan, and broadly provides for recovery for violations by California companies. Cal. Civ. Code § 56.10 (stating "health care service plan … ***shall not*** disclose medical information regarding a patient of the provider of health care or an enrollee or subscriber of a health care service plan without first obtaining an authorization."). In "other data breach cases" courts "have similarly applied the law of the state where the company had its headquarters." *Schmitt*, 2021 WL 3493754, at *4; *see also In re Target Corp. Customer Data Sec. Breach Litig.*, 309 F.R.D. 482, 486 (D. Minn. 2015) (applying Minnesota law in data breach action where "Target is headquartered in Minnesota; its computer servers are located in Minnesota; the decisions regarding what steps to take or not take to thwart malware were made in large part in Minnesota").

Moreover, when the California legislature intends to limit the protection of its laws to California residents, it does so explicitly. *See, e.g.*, Genetic Information Privacy Act, Cal. Civ. Code § 56.18(b)(3) ("'Consumer' means a natural person who is a California resident."); Song-Beverly Act, Cal. Civ. Code § 1792 (implied warranty of merchantability applies to "every sale of consumer

[25] While the Court noted in its previous Order that Kaiser argued that Plaintiffs failed to allege in the FAC that "individually identifiable medical information" was disclosed to third parties (Order at 38), the Notice confirms such information was shared and the SAC properly pleads disclosure to third parties. ¶¶8-9, 568-69. Kaiser does not now challenge this claim on this basis (*see* MTD at 19-20) and thus, this cannot be a basis for dismissal. *See Rivas Rosales*, 2020 WL 1505682, at *9.

goods that are sold at retail ***in this state***"). The legislature's choice not to do so in CMIA indicates its intent to permit a right of action for non-residents harmed by California health care providers, like Kaiser. The goal of CMIA is "to protect the confidentiality of individually identifiable medical information obtained from a patient by a health care provider, while at the same time setting forth limited circumstances in which the release of such information to specified entities or individuals is permissible." *Brown v. Mortensen*, 253 P.3d 522, 533 (Cal. 2011). It makes sense that the Act applies uniform confidentiality standards to California healthcare providers, regardless of where their patients reside, rather than set forth different standards for residents versus non-residents and permit California companies to disclose non-residents' medical data with impunity. *See In re Ambry Genetics Data Breach Litig*., 567 F. Supp. 3d at 1152 (applying CMIA to patients nationwide); *Stasi*, 501 F. Supp. 3d at 905 (same). As such, Plaintiffs have standing.[26]

**F. Claim 9: Plaintiffs Sufficiently Allege Statutory Larceny**

The SAC adequately alleges that: (1) Kaiser knew or should have known the Third Party Wiretappers were using Members' PII and PHI gathered from the Site and Apps; and (2) Kaiser provided Members' private information to third parties for the use of Google, Bing, and Twitters' products. *See supra* Section VII. See also *Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 635 (N.D. Cal. 2021) (plaintiffs stated a claim where they alleged defendant stole "Plaintiffs' personal information without Plaintiffs' consent"). Plaintiffs have also adequately alleged that they transferred their PHI and PII to Kaiser "in reliance" on Kaiser's false representations that it would keep the information Plaintiffs shared on the Site and Apps private and confidential. Order at 37 ("Theft by false pretenses simply requires ... [that] the [property] owner transferred the property to the defendant in reliance on the [false] representation."). Specifically, Plaintiffs allege that Kaiser made false assurances in its Privacy Statement (which governs the use of the Site and Apps[27]), that Kaiser was "committed to protecting the privacy of the users of the Site" and that "[Kaiser] will [only] use and disclose your personal information as stated in this Privacy Statement," and that Kaiser would "abide by ... promises regarding the confidentiality and protections of Kaiser Plan Members' communications and data on the Site and Apps." ¶80. Additionally, Plaintiffs aver that "Plaintiffs and

[26] Kaiser does not challenge this claim on any basis other than standing. *See* Mot. at 19-20.
[27] ¶¶74-75, 77.

Class Members reasonably believed their interactions with Kaiser on the Site, and [Apps] were private and would not be transmitted to third parties" because they had a "reasonable expectation of privacy" based, in part, on Kaiser's "express promises of privacy and confidentiality." ¶¶334, 340; ¶1 ("Plaintiffs trusted that their healthcare providers would treat the information that they shared with them as private and confidential."). These allegations give rise to an inference that Plaintiffs relied on Kaiser's express and implied representations that it would keep Plaintiffs' PII and PHI confidential. *See Watson v. Carey*, 2007 WL 2670000, at *2 (N.D. Cal. Sept. 7, 2007), *aff'd*, 328 F. App'x 533 (9th Cir. 2009) (for theft by false pretenses claim "[r]eliance may be inferred from all the circumstances").[28]

**G. Claim 10: Jane Doe II Adequately Alleges Kaiser Violated the DCCPPA**

Contrary to Kaiser's suggestion, this is no run-of-the-mill breach of contract action; rather, Kaiser's conduct violated a host of federal and state laws, including the DCCPPA, D.C. Code §§ 28-3901, *et seq*. ¶¶579-87. The DCCPPA "is a comprehensive statute designed to provide procedures and remedies for a broad range of practices which injure consumers[,]" and is not limited to circumstances where there is no contractual relationship between the parties. Regardless of whether a contract exists, courts have refused to dismiss DCCPPA claims where, as here, a defendant has "misrepresent[ed] ... a material fact which has a tendency to mislead[.]" *Curran v. Wells Fargo Bank, N. A.*, 2021 WL 6753480, at *8 (D.D.C. Mar. 11, 2021) (denying motion to dismiss DCCPPA claim where loan servicer misrepresented material facts to borrower). Moreover, a DCCPPA claim arises where Kaiser "fail[ed] to state a material fact if such failure tends to mislead" or used "innuendo or ambiguity as to a material fact, which has a tendency to mislead," as engaging is such practices violates the DCCPPA "whether or not any consumer is in fact misled, deceived, or damaged thereby." D.C. Code § 28-3904.

Here, the SAC alleges that Kaiser made material misrepresentations and omissions regarding

[28] The authorities Kaiser relies on are inapposite. Both *In re Meta Pixel Tax Filing Cases*, 2024 WL 1251350, at *1-2 (N.D. Cal. Mar. 25, 2024) and *Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1074 (N.D. Cal. 2023) involved plaintiffs suing a defendant based on collection of plaintiffs' information from websites that the defendant did not operate. Accordingly, the privacy policies of the defendant in *In re Meta Pixel Tax Filing Cases* and *Doe v. Meta Platforms* did not govern. 2024 WL 1251350, at *13, *23; *see also Doe*, 690 F. Supp. 3d at 1088. Here Kaiser operates the Site and Apps and its Privacy Policy governs. ¶¶74-83, 321-28, 333-36.

its safeguarding of Plaintiffs' PII and PHI and concealed that it was sharing Plaintiffs' PII and PHI with third parties. ¶¶80-82. The SAC further alleges PII and PHI was collected and disclosed for Kaiser's own use and third party use without authorization, in exchange for free access to Google, Bing, and Twitter's advertising and analytics services. ¶¶184-86, 585-86. Moreover, [redacted] ¶¶7, 12, 105, 149-53, 383-85; MTD FAC at 8. These allegations align with pleading an intentional tort, not a mere contractual dispute. *See, e.g.*, *Velcoff v. MedStar Health, Inc.*, 186 A.3d 823, 825-26 (D.C. 2018) (finding plaintiff adequately alleged DCCPPA claims based on wrongful disclosure of "sensitive" health information).

Thus, Kaiser's assertion that there is no DCCPPA violation where there are no separate allegations of unfair and deceptive conduct is irrelevant. *See, e.g.*, *Attias v. CareFirst, Inc.*, 365 F. Supp. 3d 1, 26 (D.D.C. 2019) (finding DCCPPA claim entirely duplicative of breach of contract claim because ***no additional conduct*** other than failing to comply with the privacy policy was alleged). This is not a case where Plaintiffs solely plead injury based on Kaiser's failure to perform under a contract. Where, as here, Plaintiffs have pled additional allegations regarding Kaiser's deceit, concealment, and material misrepresentations and omissions, a DCCPPA claim is properly pled. *See Jacobson v. Hofgard*, 168 F. Supp. 3d 187, 193, 199-200 (D.D.C. 2016) (denying in part motion to dismiss DCCPPA claim, which was pled along with breach of contract claim, where defendant engaged in additional conduct, including failing to make truthful representations); *McFadden v. Nationstar Mortg. LLC*, 2022 WL 1001253, at *17 (D.D.C. Apr. 4, 2022) (denying motion to dismiss DCCPPA claim where breach of contract also pled). Indeed, Plaintiffs have been "victimized by [Kaiser's] unlawful trade practices" (Order at 41), and their injury is much more than "contractual disappointment." *Jacobson*, 168 F. Supp. 3d at 199. *See also Velcoff*, 186 A.3d at 825-26 (DCCPPA claim sustained based on sharing of treatment file without consent).

### H. Claim 11: John Doe II Adequately States a Claim for Violation of the GCSPA

Kaiser violated the GCSPA when it acted without authority by installing code on the Site and Apps that permitted Third Party Wiretappers to collect Plaintiffs' private information. ¶¶589-99.

Critically, as Kaiser acknowledges, the GCSPA defines "without authority" as including "the use of a computer or computer network ***in a manner that exceeds any right or permission granted by the owner of the computer or computer network***." Ga. Code Ann. § 16-9-92. The SAC plainly alleges that Kaiser exceeded the permissions Plaintiffs granted to Kaiser about how private information on the Site and Apps could be used pursuant to the Terms and Conditions and Privacy Statement, and thus acted "without authority." ¶¶74-83 (Kaiser's Terms and Conditions and Privacy Statement did not disclose Kaiser's placement of third party code), 321-28, 334-36. And, aside from wrongly claiming Plaintiffs' breach of contract claim was not pled regarding data shared with certain Third Party Wiretappers, Kaiser does not even challenge the breach of contract claim.[29]

In addition, Plaintiffs have adequately alleged "use" of a computer or computer network to carry out the wrongdoing alleged in the SAC. While Kaiser placed code on the Site and Apps, and not directly on John Doe II's computer, Kaiser ignores that the SAC alleges this code commandeered his computer and, without his knowledge, directed his computer to send his PII and PHI to Third Party Wiretappers. ¶5 ("The third party code that Kaiser has installed on the Site and Apps transmits and redirects the content of Plaintiffs and other Class Members' communications, along with their IP addresses and other unique identifiers, to these Third Party Wiretappers from the very moment that a user first loads Kaiser's Site or opens its Apps, and continues as the user navigates through the website, researching and sharing sensitive information."); *see also* ¶¶93, 155-61, 170-77, 179-80, 239-63, 281-90, 299-309, 316-20 (data transmitted to Third Party Wiretappers containing Plaintiffs' PII and PHI).

### I. Claim 15: Jane Doe IV Adequately States a Claim for Violation of the VCCA

The SAC contains numerous factual allegations supporting a reasonable inference that Kaiser acted "with malicious intent, or through intentionally deceptive means and without authority" and therefore violated the VCCA. Va. Code Ann. § 18.2-152.4. *First*, the VCCA defines "without authority" as acting in a manner in which the individual "know[s] that he has no right, agreement, or

[29] *FERCO Enters., Inc. v. Taylor Recycling Facility LLC*, 2007 WL 9701361 (N.D. Ga. Oct. 16, 2007) is not to the contrary. In *Ferco*, at summary judgment, the court considered whether an employee using "an employer's computer to send emails to outside parties" was an "unauthorized" use of the employer's computer and found that an "employee is considered to have authorization to access computer files and the computer provided to him by his employer so long as he has an agency relationship with the employer." *Id.* at *30-31.

permission" to act or acting "in a manner knowingly exceeding such right, agreement, or permission." Va. Code Ann. § 18.2-152.2. The SAC contains numerous factual allegations demonstrating that, by knowingly permitting the Third Party Wiretappers to obtain Members' PII and PHI, Kaiser acted in a manner "exceeding" the rights, agreements, and/or permissions Members gave Kaiser when they agreed to the Terms and Conditions and Privacy Statement. ¶¶74-83, 321-28.[30] Indeed, had those disclosures been sufficient, Kaiser never would have had to notify regulators of a privacy breach. ¶8.

*Second*, the SAC plainly alleges Kaiser's malicious intent and/or intentional deception. ¶¶105, 149-53, 383-85; *see also supra* Section V. Kaiser's conduct and continued concealment during this litigation further confirms its malicious and/or intentionally deceptive behavior. *See id.*; ¶12.

*Third*, the SAC alleges Kaiser knowingly permitted the Third Party Wiretappers to use the private information collected via the code on the Site and Apps. ¶654. Moreover, [redacted] ¶196; *see also* ¶¶232-33, 274, 653. Similarly, [redacted]. ¶¶106, 152. The Complaint also explains why this was problematic because, contrary to Kaiser's unsupported assertion that Plaintiffs allege it was required to "*assume* ... third-party companies like Adobe and Google were going ... rogue" when they "misuse[d] information collected" from the Site and Apps (Mot. at 23), the SAC details how the use of data collected by these entities' code is part of their well-known and publicly disclosed business models. ¶¶184-85 ("Google and Microsoft Bing are the most widely used search engines, and Twitter is one of the largest social media sites in the world. Generally, Google, Microsoft Bing, and Twitter do not charge to use their services because they are able to generate billions of dollars in revenue each year by selling targeted advertising. A main goal for Google, Microsoft Bing,

[30] Kaiser's citation to *Wholesale Corp. v. Cox Commc'ns Hampton Roads, LLC*, 2013 WL 2147478, at *5 (E.D. Va. May 14, 2013) in misplaced. In *Wholesale*, plaintiffs sued defendant for prematurely porting a toll-free number used by plaintiff in violation of the terms of a contract. *Id.* at *1. The court concluded that plaintiff could not assert a VCCA claim by simply alleging that "[d]efendant used a computer to 'wrongfully' port the toll-free number" and there were no allegations, like there are here, that defendant placed code on its website which surreptitiously collected information about the plaintiffs on their computers. *See id.* at *6-7. *Wholesale* in irrelevant here.

and Twitter is to develop a profile of users to better target them with ads. These advertising networks are significant to each of these entities."); *see also* ¶188 ("[P]art of the implicit cost of this Google, Microsoft Bing, and Twitter technology is the ability to allow Google, Microsoft Bing, and Twitter to use the information received to supplement user profiles for better targeting and bolster their ad networks."); *see also* ¶¶94-96 ([redacted]"); *see also* ¶¶134-36, 155-68 (explaining Adobe's use of unique identifiers to track users across websites to serve targeted advertisements).

*Fourth*, Kaiser's argument that it cannot use its own computer or computer networks without authority is misguided. The focus of this litigation is not on how Kaiser used its own computer and/or computer networks, but rather, on the fact that Kaiser installed the code to wrongfully record and transmit information from Members' computers to the Third Party Wiretappers.

**J. Claim 18: Jane Doe Adequately Alleges a Claim for Violation of the WPA**

Jane Doe has adequately alleged that Kaiser intercepted and/or recorded her communications on the Site and Apps without consent. *See* Wash. Rev. Code § 9.73.030. Kaiser ignores that the WPA plainly prohibits the interception or recording of a communication "***without first obtaining the consent of all the participants in the communication.***" *Id*. Whether or not Kaiser was a party to the communications is irrelevant because Kaiser placed code on the Site and Apps which created a copy of Members' communications with Kaiser which were shared with the Third Party Wiretappers without Members' consent. ¶¶155-61, 170-77, 239-63, 281-90, 299-309, 316-20.

In *State v. Kipp*, 317 P.3d 1029, 1036 (Wash. 2014) (en banc), the Supreme Court of Washington held that the WPA is implicated where, as here, one party to a communication recorded the communication without the consent of the other party. The *Kipp* court noted that "[g]enerally, the [WPA] is implicated when one party records a conversation without the other party's consent" and held that because one party had a "subjective and reasonable expectation of privacy as he was speaking ... the recording violated the [WPA]." *Id*. at 1031-36. As in *Kipp*, here, the non-consenting parties to the communication (Members) reasonably believed that the information they shared with

their healthcare provider, including PII and PHI, in password protected Site and Apps was private and that unauthorized third parties would not be listening into these conversations. *See, e.g.*, *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d at 800 (finding plaintiffs "had an objectively reasonable expectation that their communications with their medical providers were confidential based on the laws and regulations protecting the confidentiality of medical information"). Thus, Kaiser's placement of the code, which surreptitiously intercepted and/or recorded these private communications, violates the WPA. *Kipp*, 317 P.3d at 1036

Further, this case is distinguishable from Kaiser's only cited authority *Huong Hoang v. Amazon.com, Inc*., 2012 WL 1088165, at *1 (W.D. Wash. Mar. 30, 2012), which predates *Kipp*. In *Huong Hoang*, plaintiff alleged that defendant misused information she voluntarily provided it—the WPA was not implicated because there was no interception or recording at issue.[31] *See* 2012 WL 1088165, at *1. Additionally, contrary to Kaiser's contention otherwise, here unlike in *Huong Hoang*, there are well-pled allegations of the Third Party Wiretappers' use of the information that was impermissibly intercepted and/or recorded. ¶¶8, 94-96, 134-36, 155-56, 184-85, 188, 314-15; *see also supra* Section VI. Here, Plaintiffs have sufficiently alleged that Kaiser's placement of code on the Site and Apps which intercepted and/or recorded their private communications falls within the broad ambit of the WPA and the Court should not dismiss this claim. *See State v. Roden*, 321 P.3d 1183, 1185 (Wash. 2014) (en banc) (noting the WPA "broadly protects individuals' privacy rights" and is "one of the most restrictive electronic surveillance laws ever promulgated").

### K. Claim 20: Plaintiffs Properly Plead Kaiser Violated the DC Breach Notification Statute and DCCPPA

After repeatedly failing to timely notify Members that their PII and PHI was disclosed to third parties, despite internally acknowledging this fact, Kaiser cannot seriously contend that it promptly notified Jane Doe II of its disclosure as required by the DC Breach Notification Statute. Its failure to do so violates both that statute and the DCCPPA.[32] ¶¶709-19; D.C. Code § 28-3904(kk); D.C. Code § 28-3852(a). Instead, Kaiser incorrectly asserts that the PII and PHI disclosed somehow does not

[31] Kaiser, the party that permitted the unlawful recording and/or interception of Plaintiffs' private communications on the Site and Apps, violated the WPA and is unquestionably a proper defendant.

[32] Kaiser admits that it was required to notify D.C. residents "in the most expedient time possible and without unreasonable delay" and that failing to do so violates the DC Breach Notification Statute and the DCCPPA (Mot. at 25).

meet the broad definition of "personal information" under the statute. This argument has no merit and Kaiser cites no supportive caselaw. Under the DC Breach Notification Statute, "personal information" includes, *inter alia*, an individual's first name, first initial, and last name, ***or*** any other personal identifier, which, when combined with any of the seven data elements listed in the statute, can be used to identify a person or their information. D.C. Code § 28-3851(3)(A)(i). One of the enumerated data elements is "medical information" which is broadly defined as "***any*** information about a consumer's dental, medical, or mental health treatment or diagnosis by a health-care professional." D.C. Code § 28-3851(1B). *See also* ¶711. As the SAC alleges, Kaiser disclosed Jane Doe II's and D.C. Class Members' "personal information," as defined by the statute, including name and/or IP address (which is a personal identifier), along with medical information. ¶¶8-9, 711-14.

Kaiser cannot rely on the wording it unilaterally chose to include in its Notice to preclude Plaintiff's claim because the allegations in the SAC are broader than the Notice (¶¶114-24, 162, 170-77, 198-213, 239-62, 275-90, 299-306, 316-20) and because during this litigation Kaiser concealed and repeatedly denied that the disclosures occurred before finally issuing the Notice admitting the opposite. *See* MTD FAC at 5 (asserting certain Plaintiffs had not asserted an injury in fact because they lacked allegations that "personal information" was "disclosed to or intercepted" by the Third Party Wiretappers); ECF No. 110 at 11 n.9 (informing the Court that "[D]efendants did not provide any PHI or IIHI to the Vendors."); *see also* MTD Hr'g Tr. at 43:22-25-44:3 (Kaiser's counsel arguing that plaintiffs did not "allege facts that are sufficient to show that [Kaiser] disclosed information" to the Third Party Wiretappers and that there were "no allegation[s] that [the Third Party Wiretappers] received any information that directly identified any of the plaintiffs or that the information actually received by defendants was used or could be used to identify the plaintiffs"). This Motion is to be decided on Plaintiffs' pleading, not on what Kaiser is now willing to admit before Plaintiffs have full access to discovery.[33]

---

[33] Notably, Kaiser has consistently attempted to stymie discovery in this litigation. After the Court denied Kaiser's attempts to bifurcate discovery, Kaiser attempted to unilaterally limit discovery to discrete subjects and then slow-played productions. And despite that the Court sustained several of Plaintiffs' claims in its Order, in violation of the stipulated Case Management Schedule (ECF No. 107) which ordered Phase II discovery to begin over fourth months ago on April 1, 2024, Kaiser has refused to produce any discovery it deems related to Phase II.

Regardless, as pled in the SAC, and as the Notice confirms, IP addresses, names, and "information showing how … member[s] interacted with and navigated through the website or mobile applications" were disclosed as well as information showing how patients interacted with the Site and Apps. ¶¶8-11. These disclosures undoubtedly contain medical information. *See also* ¶9 (quoting Notices' assertion that "information collected by these technologies about Kaiser members may be considered [PHI]"). The SAC also pleads that Jane Doe II used the Site and Apps to make appointments with health care providers, research providers and medical conditions, check her medical results, and review her medical history. ¶35. This is exactly what triggers the notification requirement. D.C. Code §§ 28-3851(3), 28-3852(a). Medical appointments, medical test results, searches for medical professionals, and prescriptions are undoubtedly considered *any* information about a consumer's medical treatment or diagnosis in satisfaction of the statutory definition of "medical information." D.C. Code § 28-3853(1B). *See also* ¶¶5, 9, 111, 135, 158, 162, 168, 183, 191, 225, 233, 280, 307, 319 (alleging code disclosed Kaiser Member's IP addresses and names to the Third Party Wiretappers); ¶¶114-24 (alleging substantial data was transferred to Quantum Metric when Users navigate the Site including when they participate in a Social Health Review, access the Site's message center where Members communicate with health care providers, access their Medical Summary page, and search for a specialist); ¶¶170-77 (alleging that code transferred information to Adobe about Kaiser Member's lab test results, specific medical condition, information about medications taken, the fact that a Kaiser Member searched for a doctor and mental health); ¶¶198-213 (alleging that the code transferred information Twitter including the fact that medical records were requested, that a Member suffers from specific medical conditions, that a Member takes specific medications, that a Member searched for mental health, and that a Member tried to schedule medical appointments); ¶¶239-62 (alleging that Google created a "device fingerprint" for Members that used the Site and received information showing Member's name, that a Member accessed his medical records, that a Member suffers from specific medical conditions, that a Member takes specific medications, and searched for mental health); ¶¶275-90 (alleging that the code created a unique identifier for Bing and transferred information to Bing about a Kaiser Member accessing medical records, suffering from specific medical conditions, accessing a prescriptions page, and disclosed to

Bing that a Member takes specific medications, that a Member searched for mental health, and searched for a physician); ¶¶299, 304-05, 308-09, 316-20 (alleging the code sent similar medical information to the Third Party Wiretappers through the App). Accordingly, it strains credulity for Kaiser to assert that no "personal information" was shared.

### L. Claim 21: Jane Doe II Sufficiently Alleges Violation of MPIPA and MCPA

Plaintiff Jane Doe III adequately alleges that Kaiser failed to timely notify her and other Maryland Class Members of the third party disclosures in violation of the Maryland Personal Information Protection Act, Md. Code Ann., Com. Law §§ 14-3501, *et seq.* ("MPIPA"), which is a violation of the Maryland Consumer Protection Act, Md. Code Ann., Com. Law §§ 13-101, *et seq.* ("MCPA"). ¶¶721-32; Md. Code Ann., Com. Law § 14-3504(c). *First*, the information disclosed clearly falls within MPIPA's statutory definition of personal information, which is defined broadly to include a person's first name or first initial and last name in combination with any one or more of the listed data elements, among which are "[h]ealth information, including information about an individual's mental health." Md. Code Ann., Com. Law § 14-3501(e)(1). As discussed *supra* in Section VIII K, the SAC alleges that names and health information were disclosed by Kaiser. *See, e.g.*, ¶¶114-24, 162, 170-77, 198-213, 239-62, 275-90, 299-306, 316-20. The SAC also alleges that mental health information was disclosed. ¶¶208-09; 258-61, 286. Kaiser's argument that its Notice did not specifically list "health insurance information" or a "health insurance policy number" is beside the point because the statute requires notification if *any* "health information" is disclosed. Tellingly, Kaiser ignores that the Notice itself states that "information collected by these technologies about Kaiser Members may be considered Protected Health Information (PHI)." ¶9. Regardless, to hold that a company is only liable under the statute based on statements made in its own notice would leave enforcement of MPIPA dependent on whether companies make honest admissions, which Kaiser has failed to do throughout this litigation. *See supra* Section VIII (K) (Kaiser's positions in briefing and at oral argument were contradicted by admissions in the Notice).

*Second*, Kaiser selectively quotes MPIPA to incorrectly assert that notice is required only when personal information "has or will be misused." Mot. at 28. In truth, under MPIPA: "[U]nless the business ***reasonably determines*** that the breach of the security of the system ***does not create a***

***likelihood*** that personal information has been or will be misused, the owner or licensee of the computerized data shall notify the individual of the breach." Md. Code Ann., Com. Law § 14-3504(b)(2). Kaiser cannot rely on its self-serving statements that it is "not aware of any misuse" and that purportedly "[t]here is no evidence that your information has been misused" to escape liability. Mot. at 28. These statements do not speak to the relevant issue of whether the disclosure of PII and PHI created a ***likelihood*** that personal information has been **"*or will be*"** misused and thus do not support dismissal. Md. Code Ann., Com. Law § 14-3504(b)(2); *Mullinix v. US Fertility LLC*, 2021 WL 4935975, at *1, *5 (C.D. Cal. Apr. 21, 2021) (denying motion to dismiss MPIPA claim where plaintiffs alleged disclosure of personal information and ***risk*** of misuse of their sensitive health information). Once PII and PHI is disclosed, there is a risk of misuse. Additionally, the SAC alleges that the data was used by the third parties for their own purposes including to, *inter alia*, track Members and create user profiles for targeted advertising, which goes against federal and state statutes and reasonable expectations of privacy. ¶¶100, 138-44; 184-88, 189-96, 220-28, 230-33, 270-72, 275-80; *see also supra* Sections VI and VII. Regardless, MPIPA requires a breach notice to be given "as soon as reasonably practicable, but not later than 45 days after the business discovers or is notified of the breach of the security of a system." Md. Code Ann., Com. Law § 14-3504(b)(3). Despite this, Kaiser waited nearly six months to issue its belated Notice (¶12) and Plaintiffs have properly pled Kaiser violated MPIPA and MCPA. *See In re Marriott Int'l, Inc., Consumer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 488 (D. Md. 2020) (failure to disclose data breach for more than two months was a MPIPA violation).

### M. Claim 23: Plaintiffs Adequately Allege a Washington Data Breach Act Violation

The information Kaiser admittedly disclosed to third parties—which includes Jane Doe's name, information about how she navigated through the Site and Apps, search terms used in Kaiser's health encyclopedia, and information that Kaiser asserts "may be considered" PHI under HIPAA—plainly falls within the Washington Data Breach Act's ("WDBA") broad definition of "Personal Information." ¶¶8-9; Wash. Rev. Code § 19.255.005(2)(a)(i)(H) (defining "Personal Information" as an individual's first name or first initial and last name combined with "***[a]ny*** information about a consumer's medical history or mental or physical condition or about a health care professional's

medical diagnosis or treatment of the consumer”). Kaiser’s contention that “Personal Information” was not disclosed is belied by its own Notice, which plainly admits that Member names and medical information were disclosed. ¶¶8-11; *supra* Section VIII (K). The SAC alleges that the Site and Apps are used to obtain, view, and monitor medical information and that Kaiser wrongfully permitted the disclosure of this information. *Supra* Section VIII (K). The SAC also alleges that Jane Doe “has regularly used Kaiser’s Site [and Apps] to access medical information and communicate with her health care providers, including making appointments, researching providers and medical conditions, checking medical results, and reviewing her medical history.” ¶31.

As discussed above, the SAC is broader than the Notice and is replete with allegations about how Kaiser disclosed Jane Doe’s Personal Information. ¶¶114-124, 162, 170-77, 198-213, 239-62, 275-90, 299-306, 316-20; *see also supra* Section VIII (K). Tellingly, Kaiser ignores Jane Doe’s allegations that when she used one of the Apps, Dynatrace intercepted information showing that she had a shoulder X-Ray, had a mammogram, and suffered from restless leg syndrome. ¶¶316-18. The SAC also alleges that data was transferred to Quantum Metric when Jane Doe (1) viewed her “Name, Medical Record Number (Kaiser ID#), Region, and Coverage Status” (2) “entered personal medical search information” in the Portal’s Doctor Search and (3) “logged into the Portal and accessed recent medical test results.” ¶¶111-14. The SAC also alleges that “Adobe ... received information about the fact Plaintiff Jane Doe had lab test results available.” ¶170. The SAC further alleges that Jane Doe conducted a search for “mental health” on the Site, which was transmitted to Twitter, Google, and Bing. ¶¶208-09, 258-61, 285-86. These allegations further support Plaintiffs’ allegation that Kaiser transmitted Personal Information as defined by the WDBA and the claim should be sustained.

## IX. FURTHER LEAVE TO AMEND WOULD NOT BE FUTILE

Throughout this litigation, Kaiser has delayed discovery to conceal relevant facts. Kaiser engaged in anemic productions prior to this Court’s ruling on their FAC, with over eighty-five percent of the documents produced after that ruling, and only with intervention from Judge Kang. [redacted]

[redacted] ¶¶105, 149-53, 184-86, 188, 196, 231-33, 274, 292-96, 355. Additional discovery produced after the SAC further confirms third party use. *See supra* Section I. As such, further amendment would not be futile as even limited discovery supports Plaintiffs' claims. *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 574 (9th Cir. 2020); *Barrett v. Apple Inc.*, 523 F. Supp. 3d 1132, 1149 (N.D. Cal. 2021).

**X. CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request the Court deny Defendants' Motion.

DATED: August 22, 2024

Respectfully submitted,

**KESSLER TOPAZ
MELTZER & CHECK, LLP**

/s/ *Melissa L. Yeates*
Joseph H. Meltzer (appearance *pro hac vice*)
jmeltzer@ktmc.com
Melissa L. Yeates (appearance *pro hac vice*)
myeates@ktmc.com
Tyler S. Graden (appearance *pro hac vice*)
tgraden@ktmc.com
Jordan E. Jacobson (Bar No. 302543)
jjacobson@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056

-and-

**KESSLER TOPAZ
MELTZER & CHECK, LLP**
Jennifer L. Joost (Bar No. 296164)
jjoost@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel: (415) 400-3000
Fax: (415) 400-3001

**CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.**
James E. Cecchi (appearance *pro hac vice*)
jcecchi@carellabyrne.com
Michael A. Innes (*pro hac vice* forthcoming)
minnes@carellabyrne.com
Kevin G. Cooper (appearance *pro hac vice*)
kcooper@carellabyrne.com
5 Becker Farm Road
Roseland, New Jersey 07068

Telephone: (973)-994-1700
Facsimile: (973)-994-1744

-and-

**CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.**
Zachary Jacobs (appearance *pro hac vice*)
zjacobs@carellabyrne.com
222 S Riverside Plaza
Chicago, Illinois 06606

*Counsel for Plaintiffs and the proposed Classes*