SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
WYNTER L. DEAGLE, Cal Bar No. 296501
wdeagle@sheppardmullin.com
KRISTIN P. HOUSH, Cal Bar No. 286651
khoush@sheppardmullin.com
ANNE-MARIE D. DAO, Cal Bar No. 282632
adao@sheppardmullin.com
DANE C. BRODY CHANOVE, Cal Bar No. 345843
dbrodychanove@sheppardmullin.com
12275 El Camino Real, Suite 100
San Diego, California 92130-4092
Telephone: 858.720.8900
Facsimile: 858.509.3691

Attorneys for Defendants
Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, and Kaiser Foundation Health Plan of Washington

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

JOHN DOE, JOHN DOE II, JOHN DOE III, JANE DOE, JANE DOE II, JANE DOE III, JANE DOE IV, JANE DOE V, and ALEXIS SUTTER, Individually and on behalf of all others similarly situated,

Plaintiffs,

v.

KAISER FOUNDATION HEALTH PLAN, INC., KAISER FOUNDATION HOSPITALS, and KAISER FOUNDATION HEALTH PLAN OF WASHINGTON,

Defendants.

Case No. 3:23-cv-02865-EMC

**DECLARATION OF WYNTER L. DEAGLE IN SUPPORT OF DEFENDANTS' REQUEST FOR JUDICIAL NOTICE AND MOTION TO DISMISS THE CONSOLIDATED COMPLAINT AND TO STRIKE PLAINTIFFS' TOLLING ALLEGATIONS AND REQUESTS FOR PUNITIVE DAMAGES**

*Filed concurrently with Notice of Motion and Motion, Request for Judicial Notice, and [Proposed] Orders*

Judge: Hon. Edward M. Chen
Date: May 29, 2025
Time: 1:30 p.m.
Crtrm.: 5

**[PUBLIC – REDACTED VERSION]**

Consolidated Complaint Filed: December 6, 2024
Trial Date: January 25, 2027

DECLARATION OF WYNTER L. DEAGLE

I, Wynter L Deagle, declare as follows:

1. I am an attorney duly admitted to practice before this Court. I am a partner with Sheppard, Mullin, Richter & Hampton LLP, attorneys of record for Defendants Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, and Kaiser Foundation Health Plan of Washington.

2. If called as a witness, I could and would competently testify to all facts within my personal knowledge except where stated upon information and belief.

3. This declaration is submitted in support of Defendants' Request for Judicial Notice Motion to Dismiss the Consolidated Complaint and to Strike plaintiffs' Tolling Allegations and Requests for Punitive Damages.

4. Attached hereto as **Exhibit A** is a true and correct copy of Quantum Metric's SaaS End-User License Agreement as cited in footnote 30 of Plaintiffs' Consolidated Master Class Action Complaint ("CMC").

5. Attached hereto as **Exhibit B** is a true and correct copy of the Google Cloud Master Agreement as referenced in paragraph 265 of the CMC.

6. Attached hereto as **Exhibit C** is a true and correct copy of a transcript from the June 26, 2024 hearing in the matter *John Doe II v. MedStar Health Inc.*, Case No. 24-C-20-000591 before the Circuit Court for Baltimore City, Maryland.

7. Attached hereto as **Exhibit D** is a true and correct copy of the Council of the District of Columbia, Committee of the Whole's Committee Report from January 21, 2020.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 28th day of January, 2025, at San Diego, California.

*/s/ Wynter L. Deagle*
Wynter L. Deagle

# EXHIBIT A

EXHIBIT A

PageVault

| | |
|---|---|
| Document title: | Terms and Conditions \| Quantum Metric IAM Platform |
| Capture URL: | https://iam.quantummetric.com/terms-and-conditions |
| Page loaded at (UTC): | Wed, 22 Jan 2025 21:33:33 GMT |
| Capture timestamp (UTC): | Wed, 22 Jan 2025 21:35:25 GMT |
| Capture tool: | 10.55.0 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (X11; Linux x86_64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/126.0.6478.234 Safari/537.36 |
| Operating system: | Linux (Node 20.17.0) |
| PDF length: | 17 |
| Capture ID: | e3VCuc5s1Qh5jve9uB5Ejt |
| Display Name: | rdarby |

PDF REFERENCE #: ahB5fCZEFjQH8E4qG7jhPF

Quantum Metric

## SaaS End-User License Agreement

Last Modified: November 13, 2024

THIS END USER LICENSE AGREEMENT, INCLUDING ANY APPLICABLE EXHIBITS ATTACHED HERETO (INCLUDING THE DATA PROCESSING ADDENDUM) OR ORDER FORM WHICH BY THIS REFERENCE IS INCORPORATED HEREIN (THIS ***"EULA"*** OR THIS ***"AGREEMENT"***), IS A BINDING AGREEMENT BETWEEN QUANTUM METRIC, INC. (***"QUANTUM"***) AND THE PARTY IDENTIFIED ON THE ORDER FORM AS THE BUYER OF THE SOFTWARE AND/OR THE PARTY MAKING USE OF THE QUANTUM SERVICE (AS DEFINED BELOW) (THE ***"CUSTOMER"***); PROVIDED, HOWEVER, THAT IF THE PARTIES HAVE ENTERED INTO A SEPARATE WRITTEN AGREEMENT TO GOVERN THE USE OF THE QUANTUM SERVICE, SUCH SEPARATE WRITTEN AGREEMENT SHALL CONTROL AND SHALL SUPERSEDE AND REPLACE THIS EULA IN ALL RESPECTS. SUBJECT TO THE FOREGOING, BY CLICKING THE "ACCEPT" BUTTON AND/OR CONTINUING TO USE THE QUANTUM SERVICE, CUSTOMER AGREES THAT THIS EULA AMENDS, RESTATES, SUPERSEDES, AND REPLACES IN ITS ENTIRETY ANY PREVIOUS END USER LICENSE AGREEMENT OR SIMILAR AGREEMENT BETWEEN CUSTOMER AND QUANTUM.

QUANTUM PROVIDES THE QUANTUM SERVICE SOLELY ON THE TERMS AND CONDITIONS SET FORTH IN THIS EULA AND ON THE CONDITION THAT CUSTOMER ACCEPTS AND COMPLIES WITH SUCH TERMS AND CONDITIONS. BY CLICKING THE "ACCEPT" BUTTON, CUSTOMER (A) ACCEPTS THIS EULA AND AGREES THAT CUSTOMER IS LEGALLY BOUND BY ITS TERMS; AND (B) REPRESENTS AND WARRANTS THAT: (I) IF CUSTOMER IS AN INDIVIDUAL, SUCH INDIVIDUAL IS 18 YEARS OF AGE OR OLDER; AND (II) IF AN INDIVIDUAL IS UTILIZING THE QUANTUM SERVICE ON BEHALF OF A CUSTOMER THAT IS A CORPORATION, GOVERNMENTAL ORGANIZATION, OR OTHER LEGAL ENTITY, THE INDIVIDUAL HAS THE RIGHT, POWER, AND AUTHORITY TO ENTER INTO THIS EULA ON BEHALF OF CUSTOMER AND BIND CUSTOMER TO ITS TERMS. IF CUSTOMER DOES NOT AGREE TO THE TERMS OF THIS EULA, QUANTUM WILL NOT AND DOES NOT GRANT AND/OR LICENSE THE RIGHT TO USE THE QUANTUM SERVICE TO CUSTOMER AND CUSTOMER AND/OR ANY INDIVIDUAL ACTING ON BEHALF OF CUSTOMER MUST NOT ACCESS OR INSTALL THE QUANTUM SERVICE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS EULA OR CUSTOMER'S ACCEPTANCE OF THE TERMS AND CONDITIONS OF THIS EULA, NO LICENSE IS GRANTED (WHETHER EXPRESSLY, BY IMPLICATION, OR OTHERWISE) UNDER THIS EULA, AND THIS EULA EXPRESSLY EXCLUDES ANY RIGHT, CONCERNING ANY SOFTWARE THAT CUSTOMER DID NOT ACQUIRE LAWFULLY OR THAT IS NOT A LEGITIMATE, AUTHORIZED USE OF THE QUANTUM SERVICE.

### 1 DEFINITIONS. As used in this EULA:

**1.1 "Affiliate"** means, with regard to either party hereto, an entity that owns or controls, is owned or controlled by or is or under common control or ownership with that party, where control is defined as the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity, whether through ownership of voting securities, by contract or otherwise.

**1.2 "Authorized User"** means an employee, contractor, partner, or service provider of Customer or its Affiliates who is authorized by Customer to access the Quantum Service.

**1.3 "Confidential Information"** means all information regarding a party's business, including, without limitation, technical, marketing, financial, employee, planning, and other confidential or proprietary information, disclosed under this Agreement, that is clearly identified as confidential or proprietary at the time of disclosure or that the receiving party knew or should have known, under the circumstances, was considered confidential or proprietary. Confidential Information of Customer includes Customer Data. Confidential Information of Quantum includes information derived from or concerning the Quantum Service, the Quantum Technology, the Documentation and the terms of this Agreement.

**1.4 "Customer Data"** means any data concerning the characteristics and activities of visitors/end users of the Digital Property that is collected through the use of the Quantum Service. For the avoidance of doubt, Customer Data may include PII (as defined below) subject to the limitations set forth in Section 3.3 herein.

**1.5 "Digital Property", "Digital Properties" or "Domain"** means any domain name, website, or native mobile application of Customer that may access the Quantum Service, as specified on the applicable Order Form(s).

**1.6 "Documentation"** means any user manuals, handbooks, and online materials provided by Quantum to Customer that describe the features, functionality or operation of the Quantum Technology.

**1.7 "Order Form"** means Quantum's standard form of ordering document, signed by both parties detailing the services to be made available by Quantum pursuant to this Agreement.

**1.8 "PII"** means any information or data that includes personally identifiable information.

**1.9 "Quantum Code"** means Quantum's proprietary software code to be installed, or actually installed, by Customer

Copyright © 2025 Quantum Metric, Inc. All rights reserved.

Quantum Metric

services to be made available by Quantum pursuant to this Agreement.

**1.8 "PII"** means any information or data that includes personally identifiable information.

**1.9 "Quantum Code"** means Quantum's proprietary software code to be installed, or actually installed, by Customer on a Digital Property, including any updates, modifications or improvements thereof provided by Quantum during the Term (as defined below) of this Agreement, which amongst other services, delivers cookies to visitors/end users of Digital Properties for the purpose of collecting Customer Data and interactions.

**1.10 "Quantum Service"** means the online service delivered by Quantum to Customer using the Quantum Technology as described in this Agreement (including all Order Forms).

**1.11 "Quantum Technology"** means the Quantum Code, Quantum Service and Documentation, including all intellectual property rights therein.

**1.12 "Sensitive Personal Information"** means any of the following: (a) a person's government-issued identification number (including but not limited to social security number, driver's license number, or state-issued identification number); (b) password data; (c) any data related to payment processing, including but not limited to any financial account number, credit card number, debit card number, CVV2, banking account or routing number, or credit report information, in each case with or without any required security code, access code, personal identification number, or password; and/or (d) biometric, health, medical or medical insurance data.

**1.13 "Services"** means professional services, including training, consulting and project management, provided by Quantum to Customer as set forth in the applicable Order Form.

**1.14 "Session"** means each instance in which a unique session identifier is sent by the Quantum Code to the browser of a visitor/end user of a Digital Property, which occurs when a Digital Property (a) contains an expired or invalid unique session identifier from the Quantum Code, or (b) contains no unique session identifier from the Quantum Code. The replacement of an expired or invalid unique session identifier from the Quantum Code or addition of a new unique session identifier by the Quantum Code constitutes a new session. Session volume consumed by the Quantum Service is tracked and available to view on the Quantum Service by viewing the session card for a specific period of time.

**1.15 "Term"** means collectively the initial term, which begins upon the acceptance of these terms and conditions, and each renewal term of this Agreement.

## 2 SUBSCRIPTION TO THE QUANTUM SERVICE.

2.1 Subject to the terms and conditions of this EULA, Quantum hereby grants to Customer a non-sublicensable, revocable, non-transferable, non-exclusive subscription during the Term to: (a) install, execute and use the Quantum Code on Customer's Digital Property; and (b) access and use the Quantum Service, up to the number of Sessions specified on the applicable Order Form(s). Quantum shall provide the Quantum Service or Trial Service (as the case may be) to Customer, and provide Customer with Services related thereto, on the terms and subject to the conditions set forth in this EULA (including all Order Forms).

**2.2 Trial Use.** Quantum may grant Customer such use rights in the Quantum Technology on a trial or evaluation basis as set out under Section 2.1 (that may be subject to no charge) ("***Trial Services***").

**2.2.1 Trial Services Conditions.** Customer may only use the Trial Services on a strictly temporary basis for the period set out under an applicable Order Form, or if no Order Form exists such use is limited to 30 days after the Trial Services are made available to Customer, unless it is otherwise mutually agreed by the parties ("***Trial Period***"). For clarity, the Quantum Service shall include support for one Digital Property during the Trial Period, data from such Digital Property may be deleted at the end of the Trial Period.

**2.2.2 Trial Fees.** Fees related to the Trial Services, if any, shall be set forth in the Order Form.

**2.2.3 Trial Suspension.** Customer acknowledges and agrees that Quantum, in its sole discretion, may stop providing the Trial Services at any time. Under such circumstances, Customer may no longer have access to any related data, information, and/or files and must immediately cease use of the Quantum Technology.

**2.2.4 Continuation.** If the parties wish to extend Customer's subscription to the Quantum Service beyond the Trial Period, the parties shall enter into a separate written agreement and/or Order Form with new business terms to govern such subscription.

## 3 CUSTOMER'S USE OF THE QUANTUM SERVICE.

**3.1 Access and Security Guidelines.** Each Authorized User will be assigned a unique user identification name and password ("UserID") for access to and use of the Quantum Service through integration with either parties' single sign-on provider. Customer is solely responsible for the security of its UserIDs, any access codes, and any passwords related thereto (including but not limited to administrative and user passwords) and is responsible for use of the Quantum Service by any Authorized Users. Customer shall immediately notify Quantum of any unauthorized access to or use of its UserIDs or access codes, or any other breach of security or misuse of the Quantum Service by its Authorized Users.

**3.2 General Restrictions.** Customer will not, and will not permit any of its employees, contractors, affiliates, agents

Copyright © 2025 Quantum Metric, Inc. All rights reserved.

Quantum Metric

or use of its UserIDs or access codes, or any other breach of security or misuse of the Quantum Service by its Authorized Users.

**3.2 General Restrictions.** Customer will not, and will not permit any of its employees, contractors, affiliates, agents, or personnel to: (a) use the Quantum Service in a manner that knowingly violates any applicable law or regulation; (b) harass or intentionally interfere with another Quantum customer's use and enjoyment of the Quantum Service; (c) reverse engineer, disassemble or decompile any component of the Quantum Technology; (d) intentionally interfere in any manner with the operation of the Quantum Technology or the hardware and network used to operate the Quantum Service; (e) except as expressly permitted herein, sublicense any of Customer's rights under this Agreement, or otherwise use the Quantum Technology for the benefit of a third party or to operate a service bureau; (f) modify, copy or make derivative works based on any part of the Quantum Technology; (g) access or use the Quantum Technology to build a similar or competitive product or service; (h) use any robot, spider, scraper, or other automated means to access the Quantum Service for any purpose; (i) intentionally take any action that imposes or may impose an unreasonable burden on the Quantum Service infrastructure; (j) interfere or attempt to interfere with the integrity or proper working of the Quantum Technology; (k) remove, deface, obscure, or alter Quantum's or any third party's copyright notices, trademarks, or other proprietary rights affixed to or provided as part of the Quantum Service; and/or (l) otherwise use the Quantum Service in any manner that exceeds the scope of use permitted under Section 2.

**3.3 Sensitive Data.** Notwithstanding anything in this Agreement to the contrary, Customer covenants and agrees that, with Quantum's reasonable assistance, Customer shall configure the Quantum Code and Quantum Service to refrain from collecting or transmitting: (a) any Sensitive Personal Information (whether or not encrypted); and/or (b) any other PII, except other PII that has been secured with Quantum's client-side public/private key encryption (such Sensitive Personal Information and unencrypted PII collectively, ***"Sensitive Data"***). In the event Customer becomes aware that any Sensitive Data has been collected or transmitted by the Quantum Service, Customer shall contact Quantum immediately, and reasonably cooperate with Quantum to delete all such Sensitive Data.

**3.4 Affiliates.** Customer may permit its Affiliates to exercise its rights or perform its obligations hereunder; provided that (i) such Affiliates agree to be bound by the terms and conditions of this Agreement as if they were "Customer" herein (and Customer's execution of the Order Form shall be deemed to be on behalf of itself and such Affiliates for this purpose); and (ii) all acts and omissions of such Affiliates (for clarity, including such Affiliates' personnel and Authorized Users) shall be deemed to be acts and omissions of Customer and Customer shall be responsible therefor.

**3.5 Compliance.** Customer shall do or cause to be done all things necessary to comply with all applicable federal and state laws, rules and regulations in connection with its use of the Quantum Service under this Agreement, including any applicable federal and state laws relating to the collection, use, storage, or disclosure of Customer Data. Although Quantum has no obligation to monitor Customer's use of the Quantum Service, Quantum may do so and may prohibit any use of the Quantum Service it believes in good faith may be in violation of the foregoing.

**3.6 Customer Requirements.** Customer shall be responsible for obtaining, maintaining, and managing any equipment and ancillary services needed to connect to, access or otherwise use the Quantum Service, including, without limitation, computer networks, modems, hardware, servers, software, operating systems, networking, web servers and the like, and shall be responsible for maintaining the security thereof. Customer is responsible for correctly configuring its systems in accordance with the Documentation and any instructions provided by Quantum as may be necessary to access to the features and functions of the Quantum Service.

**3.7 Implementation.** Except to the extent otherwise set forth in an Order Form, Customer will be solely responsible for the integration of the Quantum Code into the Digital Property and its configuration with the Quantum Service.

**3.8 Digital Properties.** As between Customer and Quantum, Customer is solely responsible and liable for the Digital Properties. In the event the Digital Property is not owned by Customer, Customer represents and warrants that it is authorized to act on behalf of the Digital Property's owner to configure the Quantum Code and Quantum Service on the applicable Digital Property, including but not limited to deploying the Quantum Code on such Digital Properties. On each Digital Property in which Customer uses the Quantum Code, Customer shall prominently display and comply with a customary privacy policy on such Digital Property, as well as with all applicable laws, policies, and regulations relating to the collection, use and transfer of information obtained from visitors of its webpages. Any such privacy policy must, among other customary provisions, provide visitors of its webpages with accurate disclosure of its privacy practices (including its use of cookies) with respect to its use of third-party analytics services such as the Quantum Service. Customer represents and covenants that the Digital Properties, including all content, products and services available therein, do not and will not: (a) violate any third-party right, including copyright, trademark, patent, trade secret, moral right, privacy right or right of publicity; (b) violate any laws or regulations (including with respect to privacy); (c) contain any harassing, abusive, tortious, defamatory, false, or intentionally misleading content; or (d) contain any computer viruses, worms or other software intended to damage or alter a computer system or data.

## 4 OWNERSHIP AND DATA.

**4.1 Quantum Technology.** Quantum shall own and retain all right, title and interest in and to: (a) the Quantum Technology (including the Quantum Service); (b) the source code and object code (including the Quantum Code) and the underlying structure, ideas, know-how or algorithms relevant to the Quantum Technology; (c) any software, documentation (including the Documentation), data (other than Customer Data), applications, inventions or other

Copyright © 2025 Quantum Metric, Inc. All rights reserved.

Technology (including the Quantum Service); (b) the source code and object code (including the Quantum Code) and the underlying structure, ideas, know-how or algorithms relevant to the Quantum Technology; (c) any software, documentation (including the Documentation), data (other than Customer Data), applications, inventions or other technology related to or developed in connection with the Quantum Technology; (d) all improvements, enhancements or modifications to any of the foregoing (whether or not based upon any suggestions, enhancement requests, recommendations or other feedback provided by Customer relating to the Quantum Service), and (e) all intellectual property rights related to any of the foregoing (collectively, "***Quantum IP***"), and such Quantum IP shall be Quantum's sole and exclusive property. Customer shall have no proprietary interest in the Quantum IP. Customer acknowledges that the Quantum IP is protected by intellectual property rights owned by or licensed to Quantum. Other than as expressly set forth in this Agreement, no license or other rights in any Quantum IP are granted to Customer.

**4.2 Quantum Use of Customer Data.** Customer shall own all right, title and interest in and to the Customer Data, as well as any data or reports (except the underlying technology, template forms and designs) that is created or derived from the Customer Data and provided to Customer as part of the Quantum Service. Subject to the terms of the Agreement, Quantum is provided a limited license to Customer Data for the purpose of providing the Quantum Service, including a license to collect, process, store, and display Customer Data to the extent appropriate in providing the Quantum Service to Customer. Customer represents and warrants to Quantum that it (a) has the right to provide access to the Customer Data to Quantum and that neither the provision of the Customer Data to Quantum nor Quantum's use of such Customer Data in accordance with this Agreement infringes or violates any intellectual property, publicity, privacy, confidentiality, contractual, or other rights; and (b) is authorized to, and has all necessary permissions to, provide the aforementioned license to Quantum. Quantum shall use and disclose Customer Data solely for the purpose of providing the Quantum Service to Customer, and shall not retain, use, sell, share, rent, transfer, distribute, or otherwise disclose or make available Customer Data for the benefit of anyone other than Customer without Customer's prior written consent, or as otherwise permitted under applicable privacy laws. Upon termination or expiration of this EULA for whatever reason, Customer shall have thirty (30) days to request a copy of its Customer Data from Quantum in an industry standard format. Following the thirty (30) days and/or upon request from Customer, Quantum shall immediately cease to process and otherwise handle Customer's information and may promptly destroy the Customer Data, in accordance with such instructions as may be given by Customer at that time.

**4.3 Aggregated Data.** Notwithstanding the foregoing, Quantum may use certain Aggregated Data in order to perform analysis and statistical reporting and for auditing, research and analysis to operate and improve Quantum technologies and services. ***"Aggregated Data"*** means aggregated statistical information and data that is not identifiable to any person or entity. Quantum shall not disclose to any third party any Aggregated Data that reveals or discloses Customer's Confidential Information or the identity of Customer. Without limiting the generality of the foregoing, Quantum shall have the right to collect and analyze data and other information relating to the provision, use and performance of various aspects of the Quantum Service and related systems and technologies (including, without limitation, information concerning Customer Data and data derived therefrom), and Quantum will be free (during and after the Term) to use such information and data to improve and enhance the Quantum Technology and for other development, diagnostic and corrective purposes in connection with the Quantum Service and other Quantum offerings, and to disclose such data solely in aggregate or other de-identified form in connection with its business.

**4.4 Integration with Third Party Services.** The Quantum Service is designed to work with certain third party services. Quantum does not control the operation of those third party services, and Customer acknowledges sole responsibility for and assumes all risk arising from Customer's use of such third party services. Accordingly, to the extent Customer elects to integrate a third party service with the Quantum Service, Customer acknowledges and agrees that Quantum shall not be responsible or liable, directly or indirectly, for: (i) the performance of such third party service, or other third party service Quantum may reference or provide links to, including, without limitation, its use or treatment of Customer Data therein; (ii) any content or other materials generated by such third party service; (iii) for any technical inability to access Customer Data in such third party service; and/or (iv) any damage or loss caused or alleged to be caused by or in connection with use of or reliance on any such third party services. For the avoidance of doubt, Quantum's third party enterprise cloud hosting provider is not considered a third party service under this Section 4.4.

**5 FEES, PAYMENT AND SUSPENSION OF SERVICES.** Customer will pay Quantum the fees for the Quantum Service and other related services (***"Fees"***) in accordance with the applicable Order Form. All Fees will be billed in advance on an annual basis and are due within 30 days of receipt of invoice, unless otherwise provided in the applicable Order Form. In the event that Customer wishes to increase the number of Digital Properties and/or Sessions beyond the maximum number of Digital Properties and/or Sessions specified in the applicable Order Form, Customer shall be required to pay additional fees associated with the increased number of Digital Properties and Sessions, prorated for the remainder of the then-current term. For avoidance of doubt, a Session is defined in Section 1.14 and Session volume is determined based on that definition. Such overages will be calculated as set forth on the applicable Order Form. All Fees owed by Customer in connection with this Agreement are exclusive of, and Customer shall pay, all sales, use, excise and other taxes and applicable export and import fees, customs duties and similar charges that may be levied upon Customer in connection with this Agreement, except for employment taxes and taxes based on Quantum's net income. If Quantum reasonably determines that it is required to collect tax from Customer in connection with this Agreement or an

Copyright © 2025 Quantum Metric, Inc. All rights reserved.

Quantum Metric

Customer in connection with this Agreement, except for employment taxes and taxes based on Quantum's net income. If Quantum reasonably determines that it is required to collect tax from Customer in connection with this Agreement or an Order Form issued hereunder, then Quantum may include the amount of such tax on the applicable invoice(s), and Customer shall pay such invoiced taxes in addition to the Fees. Customer shall pay to Quantum a late payment fee equal to 2% per month of any Fees or invoiced taxes not paid within 15 days of the payment due date until such amount is paid in full. Notwithstanding anything in this Agreement to the contrary, Quantum reserves the right (in addition to any other rights or remedies Quantum may have) to discontinue the Quantum Service and suspend the UserIDs and Customer's access to the Quantum Service if any Fees set forth in the Order Form or due in accordance with this Section 5 are more than 15 days overdue until such amounts are paid in full. Customer shall maintain complete, accurate and up-to-date billing and contact information.

**6 CONFIDENTIAL INFORMATION.** Each party (the ***"Receiving Party"***) understands that the other party (the ***"Disclosing Party"***) has disclosed or may disclose Confidential Information of the Disclosing Party. The Receiving Party agrees: (a) to take reasonable precautions to protect such Confidential Information, and (b) not to use (except in performance of its obligations hereunder or as otherwise permitted herein) or divulge the Disclosing Party's Confidential Information to any person or entity other than its or its Affiliates' employees, directors, partners, contractors, consultants, customers, counsel, service partners, or agents who have a reasonable need to know such information and who are bound by at least equivalent obligations of confidentiality and nondisclosure as those under this Agreement (collectively, "Authorized Recipients"). The Receiving Party shall be fully responsible for the breach of this Agreement by its Authorized Recipients. The Disclosing Party agrees that the foregoing shall not apply with respect to any information that the Receiving Party can document: (i) is or becomes generally available to the public; (ii) was in its possession or known by it prior to receipt from the Disclosing Party; (iii) was rightfully disclosed to it without restriction by a third party; (iv) was independently developed without use of any Confidential Information of the Disclosing Party; or (v) is required to be disclosed by law (but only to the extent such disclosure is required) after giving the Disclosing Party as much advance notice of the possibility of such disclosure as reasonably practicable so that the Disclosing Party may attempt to stop such disclosure or obtain a protective order concerning such disclosure (except that no notification is required if the Receiving Party is prohibited by law from notifying the Disclosing Party). Confidential Information disclosed to the Receiving Party remains the property of the Disclosing Party. All Confidential Information and any copies shall be promptly destroyed or returned to the Disclosing Party upon the termination of this Agreement or upon the Disclosing Party's earlier request, except to the extent the Receiving Party is obligated to retain by law, or that has been stored on routine back-up media solely for the purpose of disaster recovery will be subject to destruction in due course, provided that such Confidential Information cannot be accessed in the ordinary course of business prior to destruction. This Agreement states the entire, exclusive agreement between the parties concerning the disclosure of Confidential Information, including through use of the Quantum Service, and any confidentiality, non-disclosure, or similar agreement between the parties, shall be superseded, terminated, and of no further force and effect as of date Customer accepts these terms and/or uses the Quantum Service.

**7 WARRANTIES.** TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, QUANTUM, AND ITS AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, CONTRACTORS, AGENTS, PARTNERS, LICENSORS AND DISTRIBUTORS, DO NOT MAKE ANY REPRESENTATIONS, PROMISES, OR WARRANTIES, EXPRESS OR IMPLIED, ABOUT THE QUANTUM TECHNOLOGY OR SERVICES. QUANTUM PROVIDES THE QUANTUM TECHNOLOGY AND ALL SERVICES PROVIDED HEREUNDER "AS-IS," "WITH ALL FAULTS," AND "AS AVAILABLE." CUSTOMER'S USE OF THE QUANTUM TECHNOLOGY, INCLUDING CONTENT WITHIN THE QUANTUM TECHNOLOGY, IS AT CUSTOMER'S OWN RISK AND QUANTUM DOES NOT REPRESENT, PROMISE, OR WARRANT THAT THE QUANTUM TECHNOLOGY WILL BE UNINTERRUPTED, TIMELY, SECURE, OR ERROR-FREE. CUSTOMER UNDERSTANDS AND AGREES THAT NO DATA TRANSMISSION OVER THE INTERNET OR INFORMATION STORAGE TECHNOLOGY CAN BE GUARANTEED TO BE SECURE, AND QUANTUM EXPRESSLY DISCLAIMS ANY WARRANTIES, EXPRESS OR IMPLIED, TO THAT EFFECT. QUANTUM MAKES NO COMMITMENTS, PROMISES OR WARRANTIES ABOUT THE CONTENT WITHIN THE QUANTUM TECHNOLOGY OR CONTENT LINKED FROM THE QUANTUM TECHNOLOGY, THE SUPPORT QUANTUM PROVIDES FOR THE QUANTUM TECHNOLOGY, THE SPECIFIC FUNCTIONS OF THE QUANTUM TECHNOLOGY, THE SECURITY OF THE QUANTUM TECHNOLOGY, OR THE QUANTUM TECHNOLOGY'S RELIABILITY OR SERVICES, QUALITY, ACCURACY, AVAILABILITY, OR ABILITY TO MEET CUSTOMER'S NEEDS, PROVIDE CERTAIN OUTPUTS, OR ACHIEVE CERTAIN RESULTS. ALL IMPLIED WARRANTIES, SUCH AS THE IMPLIED WARRANTY OF MERCHANTABILITY, TITLE, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT ARE DISCLAIMED TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW.

**8 DATA PROCESSING ADDENDUM.** Quantum may process and use personal data in connection with Customer's use of the Quantum Technology in accordance with applicable privacy and data protection laws. Quantum's Data

Copyright © 2025 Quantum Metric, Inc. All rights reserved.

Quantum Metric

**8 DATA PROCESSING ADDENDUM.** Quantum may process and use personal data in connection with Customer's use of the Quantum Technology in accordance with applicable privacy and data protection laws. Quantum's Data Processing Addendum ("Quantum DPA") which is attached hereto as Exhibit A(and subject to update by Quantum from time to time) or such terms that may be executed between Customer and Quantum governing the same scope, is hereby incorporated by reference and solely applies to Customer's Personal Data (as defined in the Quantum DPA) in connection with use of the Quantum Technology.

**9 CERTAIN UNDERTAKINGS OF QUANTUM.**

**9.1 Recovery and Business Continuity.** Quantum shall maintain and implement disaster recovery and avoidance procedures and a business continuity plan reasonably designed to prevent the Quantum Service from being materially interrupted during any disaster.

**9.2 Data Security.** In addition to the obligations relating to Confidential Information stated above, Quantum shall protect and maintain the confidentiality, security and integrity of Customer Data in the manner provided for under, and otherwise comply with applicable domestic and foreign laws, regulations, rules and industry standards related to the collection, storage, handling, processing and transfer of such Customer Data. Without limiting the generality of the foregoing, Quantum shall implement and maintain reasonable administrative, technical and physical safeguards and other security measures necessary to maintain the confidentiality, security and integrity of Customer Data.

**9.3 SSAE 18 Audit.** Quantum anticipates that its third-party hosting provider shall conduct an annual examination of the controls placed in operation and a test of operating effectiveness, as defined by the American Institute of Certified Public Accountants' (AICPA) Statement on Standards for Attestation Engagements (SSAE) No. 18, Report on Controls at a Service Organization Relevant to Security, Availability, Process Integrity, Confidentiality and Privacy (SOC 2 Report), and issue a report thereon. As of the Effective Date, the results and reports from the latest such audit can be found at https://cloud.google.com/security/compliance/.

**9.4 GenAI.** Quantum disclaims all liability for any generated outputs from features or functionalities of the Quantum Service which rely on the use of generative artificial intelligence ("***GenAI***").

**10 INDEMNIFICATION.** Customer shall indemnify, defend, and hold harmless Quantum or its Affiliates, or each of its or their respective personnel, officers, employees, directors, agents, successors and assigns ("***Quantum Indemnitees***") from and against any and all Losses incurred by such Quantum Indemnitee resulting from an action by a third party (other than an Affiliate of Quantum) to the extent that such Losses arise out of or result from Customer's use of the Quantum Technology, Customer Data or violation of this EULA. The term "***Losses***" means any fines, penalties, charges, costs, expenses, compensation, damanages and fees (including reasonable attorney's fees).

**11 LIMITATION OF LIABILITY.** NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT SHALL QUANTUM OR ITS OFFICERS, DIRECTORS, STOCKHOLDERS, AFFILIATES, REPRESENTATIVES, CONTRACTORS, EMPLOYEES, OR AGENTS, BE RESPONSIBLE OR LIABLE WITH RESPECT TO ANY SUBJECT MATTER OF THIS EULA, UNDER ANY CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY OR OTHER THEORY: (A) FOR ERROR OR INTERRUPTION OF USE OR FOR LOSS OR INACCURACY OR CORRUPTION OF DATA OR COST OF PROCUREMENT OF SUBSTITUTE GOODS, SERVICES OR TECHNOLOGY OR LOSS OF BUSINESS; OR (B) FOR ANY INDIRECT, EXEMPLARY, INCIDENTAL, SPECIAL, PUNITIVE, OR CONSEQUENTIAL DAMAGES (INCLUDING, BUT NOT LIMITED TO, LOSS OF PROFITS, REVENUES, DATA AND/OR USE); IN EACH CASE, WHETHER OR NOT SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT SHALL QUANTUM'S AGGREGATE, CUMULATIVE LIABILITY IN ANY WAY RELATING TO THIS EULA (INCLUDING THE QUANTUM DPA) EXCEED THE AMOUNT OF FEES ACTUALLY RECEIVED BY QUANTUM FROM CUSTOMER DURING THE 12 MONTHS PRECEDING THE CLAIM. THE PARTIES WOULD NOT HAVE ENTERED INTO THIS EULA BUT FOR SUCH LIMITATIONS.

**12 MISCELLANEOUS.**

**12.1 Modification of the EULA.** Quantum reserves the right to change or modify any of the terms and conditions contained in this EULA at any time and in its sole discretion. If Quantum makes any changes to this EULA, Quantum will provide notice of such changes by revising the "Last Modified" date above and, in some cases, Quantum may provide additional notice (such as by sending an email or other notification or by posting a notice on the Quantum Service. Any changes or modifications will be effective the earlier of 7 days after Quantum provides notice that this EULA has been modified (the "Notice Period" ) or when you otherwise accept the changed or modified EULA. If not accepted by you earlier, your continued use of any of the Quantum Technology following the Notice Period will constitute your acceptance of such changes or modifications. You are advised to review this EULA whenever you access any of the Quantum Technology and at least every 30 days to make sure that you understand the terms and conditions that apply to your use of the Quantum Technology.

**12.2 Continued Use of the Services.** Customer may cease using the Quantum Technology at any time, at which time

Copyright © 2025 Quantum Metric, Inc. All rights reserved.

Quantum Technology and at least every 30 days to make sure that you understand the terms and conditions that apply to your use of the Quantum Technology.

**12.2 Continued Use of the Services.** Customer may cease using the Quantum Technology at any time, at which time any amount owed to Quantum under this Agreement will become immediately due and payable, but Customer's continued use of or subscription to any Quantum Technology after the effective date of any modifications to the EULA means that Customer agrees to the EULA as modified.

**12.3 Waiver and Severability of Terms.** The failure of Quantum to exercise or enforce any right or provision of this EULA will not constitute a waiver of such right or provision. If any provision (or part of a provision) of this EULA is found to be invalid, Quantum and Customer agree to give effect to the intentions as reflected in the provision, and the other provisions of this EULA remain in full force and effect.

**12.4 Assignment by Quantum.** Quantum may freely assign this EULA and all of the policies and other documents incorporated or referenced in it (including all rights, licenses, and obligations under it or them), in whole or in part and without notice, for any reason, including for the purpose of internal restructuring (for example, mergers or liquidations).

**12.5 Publicity.** Quantum may use Customer's name and logo on Quantum's websites and promotional materials (including for use at trade shows) to identify Customer as a user of the Quantum Service.

**12.6 Force Majeure.** Any delay in the performance of any duties or obligations of either party (except the payment of money owed) will not be considered a breach of this Agreement if such delay is caused by an act, event, or occurrence beyond such party's reasonable control, including, without limitation, acts of God, fires, floods, storms, landslides, epidemics, lightning, earthquakes, drought, blight, famine, quarantine, blockade, governmental acts or inaction, orders or injunctions, war, insurrection or civil strife, sabotage, explosions, labor strikes, work stoppages, acts of terror, acts or omissions of vandals or hackers, issues arising from bugs or other problems in the software, firmware or hardware of Quantum's suppliers, or outages or issues with upstream providers or network carriers, provided that such party uses reasonable efforts, under the circumstances, to notify the other party of the cause of such delay and to resume performance as soon as commercially feasible.

**12.7 Governing Law and Venue.** This EULA and any action related thereto will be governed and interpreted by and under the laws of the State of Delaware, without giving effect to any conflicts of laws principles that require the application of the law of a different jurisdiction. Customer hereby expressly consents to the exclusive personal jurisdiction and venue in the state and federal courts for the county in which Quantum's principal place of business is located for any action arising from or related to this EULA. The United Nations Convention on Contracts for the International Sale of Goods does not apply to this EULA.

**12.8 Export.** Customer agrees not to export, re-export, or transfer, directly or indirectly, any U.S. technical data acquired from Quantum, or any products utilizing such data, in violation of the United States export laws or regulations.

**12.9 Compliance with Laws.** Customer agrees to comply with all applicable federal, state, and local laws, executive orders and regulations issued, where applicable. Customer is solely responsible for determining whether a particular use of the Quantum Technology is compliant with any applicable laws.

**12.10 Federal Government End Use Provisions.** The Quantum Service is a "commercial item" as that term is defined at 48 C.F.R. § 2.101, consisting of "commercial computer software" and "commercial computer software documentation" as such terms are used in 48. C.F.R. § 12.212. Accordingly, if Customer is an agency of the US Government or any contractor therefor, Customer only receives those rights with respect to the Quantum Service as are granted to all other end users under this Agreement, in accordance with (a) 48 C.F.R. § 227.7201 through 48 C.F.R. § 227.7204, with respect to the Department of Defense and their contractors, or (b) 48 C.F.R. § 12.212, with respect to all other U.S. Government licensees and their contractors.

**12.11 Termination.** Quantum, it its sole discretion, may change, discontinue or terminate any or all aspects of a fee-based service provided to Customer without notice, including access to the Quantum Service and to support services, content and other products or services ancillary to the Quantum Service, and/or the Quantum Technology, subject to providing an appropriate refund for any prepaid and unearned fees. Notwithstanding the foregoing, Quantum may terminate this EULA, as well as access to the Quantum Service and to support services and other products or services ancillary to the Quantum Service, and/or the Quantum Technology, immediately upon written notice if Customer materially breaches the EULA and such termination will not entitle Customer to any refund.

**12.12 Independent Contractors.** The relationship of Quantum and Customer established by this Agreement is that of independent contractors. Nothing in this Agreement shall be construed to create any agency or employment relationship between Quantum or any of its employees and Customer or any of its employees. Neither Party shall have any right, power or authority to assume, create or incur any expense, liability or obligation, express or implied, on behalf of the other.

## 13 ACCESSING THE QUANTUM SERVICE THROUGH A RESELLER.

**13.1 Resellers.** Customer may purchase access to the Quantum Service from an authorized reseller of the Quantum Service (each, a ***"Reseller"***). Each Reseller offers access to the Quantum Service upon the terms and conditions agreed

Copyright © 2025 Quantum Metric, Inc. All rights reserved.

Quantum Metric

**13.1 Resellers.** Customer may purchase access to the Quantum Service from an authorized reseller of the Quantum Service (each, a ***"Reseller"***). Each Reseller offers access to the Quantum Service upon the terms and conditions agreed upon between Customer and Reseller. All access to, and use of, the Quantum Service is governed solely by this Agreement. For avoidance of doubt, despite purchasing access to the Quantum Service from a Reseller, Customer hereby understands and agrees to be bound by this Agreement.

**13.2 Reseller as Administrator.** If Customer orders the Quantum Service through a Reseller, then Customer is responsible for determining whether the Reseller has access to Customer's account, including access as an administrator and/or the ability to configure Customer's use of the Quantum Service and for any related rights or obligations. As between Customer and Quantum, Customer is solely responsible for any access by Reseller on behalf of Customer to the Quantum Service, including any configuration of the Customer Data to be collected through the Quantum Service.

**13.3 Purchase of Quantum Service through Reseller. If Customer purchased access to the Quantum Service through a Reseller:**

13.3.1 Instead of paying Quantum, Customer will pay the applicable amounts to the Reseller, as agreed between Customer and Reseller. Quantum may suspend or terminate Customer's right to use the Quantum Service if Quantum does not receive the corresponding payment from Reseller.

13.3.2 Customer's order details (e.g., the Quantum Service(s) to which Customer is subscribing, the number of Digital Properties, Session Count, user count, the subscription term, and the time period for Session Replay History and Analytics History) will be as stated in the order placed with Quantum by Reseller on Customer's behalf, and Reseller is responsible for the accuracy of any such order as communicated to Quantum.

13.3.3 If Customer is entitled to a refund under this Agreement, unless otherwise specified in writing by Quantum, Quantum will refund any applicable fees to Reseller and Reseller will be solely responsible for refunding the appropriate amounts to Customer.

13.3.4 Resellers are not authorized to modify this Agreement or make any promises or commitments on behalf of Quantum, and Quantum is not bound by any obligations to Customer other than as set forth in this Agreement.

## EXHIBIT A

## DATA PROCESSING ADDENDUM

This Data Processing Addendum ("Addendum"), is incorporated into and forms part of the End User License Agreement (and all exhibits and Order Forms issued thereunder) (collectively the "Principal Agreement"), and applies where, and to the extent that, Quantum processes Personal Data acting as a Processor for Customer in provision of the Quantum Service. For clarity, this is a binding agreement between Quantum Metric, Inc. and the party identified on the Order Form as the buyer of the Quantum Service and/or the party making use of the Quantum Service ("Customer"). The terms used in this Addendum shall have the meanings set forth in this Addendum. Capitalized terms not otherwise defined herein shall have the meaning given to them in the Principal Agreement. Except as modified below, the terms of the Principal Agreement shall remain in full force and effect.

In consideration of the mutual obligations set out herein, the parties hereby agree that the terms and conditions set out below shall be added as an Addendum to the Principal Agreement. Except where the context requires otherwise, references in this Addendum to the Principal Agreement are to the Principal Agreement as amended by, and including, this Addendum.

### 1 DEFINITIONS.

1.1 In this Addendum, the following terms shall have the meanings set out below and cognate terms shall be construed accordingly:

1.1.1 "2021 SCCs" means the 2021 EU Standard Contractual Clauses (Module 2 – Controller to Processor) ((EU) 2021/914), available at https://eur-lex.europa.eu/eli/dec_impl/2021/914/oj?uri=CELEX%3A32021D0914&locale=en, together with the attached Annexes 2 and 3.

1.1.2 "Adequacy Decision" means a decision adopted by a competent authority with jurisdiction over Customer Group Member declaring that a jurisdiction meets an adequate level of protection of Personal Data.

1.1.3 "Applicable Laws" means any applicable law with respect to any Customer Personal Data in respect of which any Customer Group Member is subject to any other Data Protection Laws.

1.1.4 "Customer Affiliate" means an entity that owns or controls, is owned or controlled by or is or under common control or ownership with Customer, where control is defined as the possession, directly or indirectly, of the power

Copyright © 2025 Quantum Metric, Inc. All rights reserved.

Quantum Metric

1.1.4 "Customer Affiliate" means an entity that owns or controls, is owned or controlled by or is or under common control or ownership with Customer, where control is defined as the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity, whether through ownership of voting securities, by contract or otherwise.

1.1.5 "Customer Group Member" means Customer or any Customer Affiliate.

1.1.6 "Customer Personal Data" means any Personal Data Processed by a Contracted Processor on behalf of a Customer Group Member in order to provide Services.

1.1.7 "Contracted Processor" means Quantum or a Subprocessor.

1.1.8 "Data Privacy Framework" means the EU-US Data Privacy Framework, the UK Extension to the EU-US Data Privacy Framework, and the Swiss-US Data Privacy Framework, as may be amended from time to time.

1.1.9 "Data Protection Laws" means EU and UK data protection laws, including the EU GDPR and laws implementing or supplementing the EU GDPR, and the UK GDPR and laws supplementing the UK GDPR, the California Consumer Privacy Act of 2018, as amended by the California Privacy Rights Act, and any regulations promulgated thereunder (collectively, the "CCPA"), the Colorado Privacy Act, the Utah Consumer Privacy Act, and the Virginia Consumer Data Protection Act, and, to the extent applicable, the data protection and privacy laws of any other jurisdiction, and in each case as amended, replaced or superseded from time to time.

1.1.10 "EEA" means the European Economic Area.

1.1.11 "EU GDPR" means EU General Data Protection Regulation 2016/679.

1.1.12 "Personal Data" means any information that identifies an individual or relates to an identifiable individual.

1.1.13 "Personal Data Breach" means a breach of security leading to the accidental or unlawful destruction, loss, alteration, unauthorized disclosure of, or access to, Personal Data transmitted, stored or otherwise Processed.

1.1.14 "Process" or "Processing" means the collection, recording, organization, structuring, alteration, use, access, disclosure, copying, transfer, storage, deletion, combination, restriction, adaptation, retrieval, consultation, destruction, disposal, or other use of data.

1.1.15 "Sale" or "Sell" means exchanging, disclosing, making available, transferring or otherwise providing or communicating Personal Data to a third party for monetary or other valuable consideration.

1.1.16 "Services" means the services and other activities to be supplied to or carried out by or on behalf of Quantum for Customer Group Members pursuant to the Principal Agreement.

1.1.17 "Share" or "Sharing" means sharing, releasing, disclosing, making available, transferring or otherwise providing or communicating Personal Data to a third party for c ross-context behavioral advertising, as defined in the CCPA, whether or not for monetary or other valuable consideration, including transactions between a business and a third party for cross-contextual behavioral advertising for the benefit of a business in which no money is exchanged.

1.1.18 "Standard Contractual Clauses" means the 2021 SCCs and the UK 2021 SCCs Addendum, as applicable.

1.1.19 "Subprocessor" means any person (including any third party, but excluding an employee, contractor or other personnel of Quantum) appointed by or on behalf of Quantum to Process Personal Data on behalf of any Customer Group Member in connection with the Principal Agreement.

1.1.20 "Transfer" means the access by, transfer or delivery to or disclosure of Personal Data to a person, entity or system located in a country or jurisdiction other than the country or jurisdiction from which the Personal Data originated.

1.1.21 "UK 2021 SCCs Addendum" means the International Data Transfer Addendum to the EU Commission Standard Contractual Clauses, Version B1.0, in force from March 21, 2022, available at https://ico.org.uk/media/for-organisations/documents/4019483/international-data-transfer-addendum.pdf, as amended or replaced from time to time.

1.1.22 "UK GDPR" means the EU GDPR as it forms part of the law of the United Kingdom by virtue of Section 3 of the European Union (Withdrawal) Act 2018, and as amended by the Data Protection, Privacy and Electronic Communications (Amendments etc.) (EU Exit) Regulations 2019

1.2 The terms, "Commission", "Controller", "Member State", "Processor" and "Supervisory Authority" shall have the same meaning as in the Data Protection Laws (as the context so requires), and their cognate terms shall be construed accordingly.

Copyright © 2025 Quantum Metric, Inc. All rights reserved.



EXHIBIT A-10

Quantum Metric

same meaning as in the Data Protection Laws (as the context so requires), and their cognate terms shall be construed accordingly.

1.3 The word "include" shall be construed to mean include without limitation, and cognate terms shall be construed accordingly.

## 2 PROCESSING OF CUSTOMER PERSONAL DATA.

2.1 **Role of the Parties.** The parties acknowledge and agree that with regard to the Processing of Customer Personal Data, Customer is the Controller, Quantum is the Processor (or "service provider," as defined under the CCPA), and that Quantum will engage Subprocessors pursuant to Section 5 hereof.

2.2 Quantum shall not Process Customer Personal Data other than on the relevant Customer Group Member's behalf and in accordance with the relevant Customer Group Member's documented instructions unless Processing is required by Applicable Laws to which the relevant Contracted Processor is subject, in which case shall to the extent permitted by Applicable Laws inform the relevant Customer Group Member of that legal requirement before the relevant Processing of that Personal Data.

2.3 Quantum shall not: (a) Sell or Share Customer Personal Data; (b) disclose Customer Personal Data to any third party for the commercial benefit of Quantum or any third party; (c) retain, use, disclose, or otherwise Process Customer Personal Data outside of its direct business relationship with Customer or for a commercial purpose other than the business purposes specified in the Agreement, or as otherwise permitted by Data Protection Laws; or (d) combine Customer Personal Data with Personal Data that Quantum receives from, or on behalf of, other persons, or collects from its own interaction with an individual covered under applicable Data Protection Laws, except as permitted under Data Protection Laws.

2.4 Each Customer Group Member:

2.4.1 instructs Quantum (and authorizes Quantum to instruct each Subprocessor) to:

2.4.1.1 Process Customer Personal Data; and

2.4.1.2 in particular, transfer Customer Personal Data to any country or territory,

as reasonably necessary for the provision of the Services and consistent with the Principal Agreement; and

2.4.2 warrants and represents that it is and will at all relevant times remain duly and effectively authorized to give the instruction set out in Section 2.4.1 on behalf of each relevant Customer Affiliate.

2.5 **Customer's Processing of Personal Data.** Customer shall, in its use of the Services, Process Personal Data in accordance with the requirements of applicable Data Protection Laws. For the avoidance of doubt, Customer's instructions for the Processing of Customer Personal Data shall comply with applicable Data Protection Laws. Customer shall have sole responsibility for the accuracy, quality, and legality of Customer Personal Data and the means by which Customer acquired Customer Personal Data.

2.6 **Details of Processing.** Annex 1 to this Addendum sets out certain information regarding the Contracted Processors' Processing of the Customer Personal Data, including the scope of the processing of Customer Personal Data. Customer may make reasonable amendments to Annex 1 by written notice to Quantum from time to time as Customer reasonably considers necessary to meet those requirements. Nothing in Annex 1 (including as amended pursuant to this Section 2.6) confers any right or imposes any obligation on any party to this Addendum.

## 3 QUANTUM PERSONNEL.

Quantum shall take reasonable steps to ensure the reliability of any employee, agent or contractor of any Contracted Processor who may have access to the Customer Personal Data, limiting access to those individuals who require access to Customer Personal Data for the purposes of the Principal Agreement, providing appropriate training related to data security to those individuals who have access to Customer Personal Data, and ensuring that all such individuals are subject to confidentiality undertakings or professional or statutory obligations of confidentiality.

## 4 SECURITY.

4.1 Taking into account the state of the art, the costs of implementation and the nature, scope, context and purposes of Processing as well as the risk of varying likelihood and severity for the rights and freedoms of natural persons, Quantum shall in relation to the Customer Personal Data implement appropriate technical and organizational measures to designed to provide a level of security appropriate to that risk, including, as appropriate, i) the pseudonymisation of Customer Personal Data; (ii) protecting the ongoing confidentiality, integrity, availability and resilience of Processing systems and services; (iii) restoring the availability and access to Customer Personal Data in a timely manner in the event of a physical or technical incident; and (iv) regularly testing, assessing, and evaluating the

Copyright © 2025 Quantum Metric, Inc. All rights reserved.



EXHIBIT A-11

Quantum Metric

pseudonymisation of Customer Personal Data; (ii) protecting the ongoing confidentiality, integrity, availability and resilience of Processing systems and services; (iii) restoring the availability and access to Customer Personal Data in a timely manner in the event of a physical or technical incident; and (iv) regularly testing, assessing, and evaluating the effectiveness of technical and organizational measures for ensuring the security of the Processing of Customer Personal Data – as set out in Quantum's then-current Enterprise Security Brief, the current version of which is available on the Quantum support site, as it may be updated from time to time. Quantum will not materially decrease the overall security of the Services during Customer's subscription term.

4.2 In assessing the appropriate level of security, Quantum shall take account in particular of the risks that are presented by Processing, in particular from a Personal Data Breach.

**5 SUBPROCESSORS.**

5.1 Each Customer Group Member authorizes Quantum to appoint (and permit each Subprocessor appointed in accordance with this Section 5 to appoint) Subprocessors in accordance with this Section 5 and any restrictions in the Principal Agreement.

5.2 Quantum may continue to use those Subprocessors already engaged by Quantum as at the date of this Addendum, subject to Quantum in each case as soon as practicable meeting the obligations set out in Section 5.3. As of the date of this Addendum, Quantum utilizes Google, LLC as a Subprocessor and Customer and all Customer Affiliates hereby agree to Quantum's use of Google as a Subprocessor.

Quantum shall give Customer prior written notice of the appointment of any new Subprocessor, including full details of the Processing to be undertaken by the Subprocessor. If, within ten (10) days of receipt of that notice, Customer notifies Quantum in writing of any objections (on reasonable grounds) to the proposed appointment, Quantum shall not appoint (or disclose any Customer Personal Data to) that proposed Subprocessor until reasonable steps have been taken to address the objections raised by any Customer Group Member and Customer has been provided with a reasonable written explanation of the steps taken. If Quantum is unable to make available such change within a reasonable period of time, which shall not exceed thirty (30) days, Customer may terminate the applicable Order Form(s) with respect only to those Services which cannot be provided by Quantum without the use of the objected-to new Subprocessor by providing written notice to Quantum. Quantum will refund Customer any prepaid fees covering the remainder of the term of such Order Form(s) following the effective date of termination with respect to such terminated Services, without imposing a penalty for such termination on Customer.

5.3 With respect to each Subprocessor, Quantum shall ensure that the arrangement between on the one hand (a) Quantum, or (b) the relevant intermediate Subprocessor; and on the other hand the Subprocessor, is governed by a written contract including terms which offer at least the same level of protection for Customer Personal Data as those set out in this Addendum.

**6 INDIVIDUAL RIGHTS.**

6.1 Taking into account the nature of the Processing, Quantum shall assist each Customer Group Member, at such Customer Group Member's request, by implementing appropriate technical and organizational measures, insofar as this is possible, for the fulfillment of the Customer Group Members' obligations, as reasonably understood by Customer, to respond to requests to exercise individual rights under applicable Data Protection Laws.

6.2 Quantum shall:

6.2.1 promptly notify Customer if Quantum receives a request from an individual under any applicable Data Protection Law in respect of Customer Personal Data; and

6.2.2 ensure that Quantum does not respond to that request except on the documented instructions of Customer or the relevant Customer Affiliate or as required by Applicable Laws to which Quantum is subject, in which case Quantum shall to the extent permitted by Applicable Laws inform Customer of that legal requirement before Quantum responds to the request.

**7 PERSONAL DATA BREACH.**

7.1 Quantum shall notify Customer without undue delay upon Quantum becoming aware of a Personal Data Breach affecting Customer Personal Data. Taking into account the nature of the Processing and the information available to Quantum, Quantum will, at Customer's request, assist Customer in complying with its notification obligations regarding Personal Data Breaches under applicable Data Protection Laws.

**8 COMPLIANCE WITH DATA PROTECTION LAWS.**

Quantum will comply with all obligations applicable to Quantum's Processing of Customer Personal Data under applicable Data Protection Laws. Upon the reasonable request of Customer, Quantum will make available to Customer all information in its possession necessary to demonstrate Quantum's compliance with its obligations under applicable

Copyright © 2025 Quantum Metric, Inc. All rights reserved.

Quantum Metric

Quantum will comply with all obligations applicable to Quantum's Processing of Customer Personal Data under applicable Data Protection Laws. Upon the reasonable request of Customer, Quantum will make available to Customer all information in its possession necessary to demonstrate Quantum's compliance with its obligations under applicable Data Protection Laws. Quantum will notify Customer if Quantum makes a determination that it can no longer meet its obligations under an applicable Data Protection Law. Customer has the right, upon providing notice to Quantum, to take reasonable and appropriate steps to stop and remediate unauthorized Processing of Customer Personal Data, including where Quantum has notified Customer that it can no longer meet its obligations under an applicable Data Protection Law.

**9 DATA PROTECTION IMPACT ASSESSMENT AND PRIOR CONSULTATION.**

Quantum shall provide reasonable assistance to each Customer Group Member, at such Customer Group Member's request, with any data protection impact assessments, and prior consultations with the Supervisory Authority or other competent data privacy authorities, which Customer reasonably considers to be required of any Customer Group Member by Article 35 or 36 of the EU GDPR or Article 35 or 36 of the UK GDPR (as applicable) or equivalent provisions of any other Data Protection Law, in each case solely in relation to Processing of Customer Personal Data by, and taking into account the nature of the Processing and information available to, Quantum.

**10 DELETION OR RETURN OF CUSTOMER PERSONAL DATA.**

10.1 Quantum shall handle the deletion of Customer Personal Data related to a termination of Services in accordance with Section 4.2 of the Principal Agreement.

10.2 Quantum may retain Customer Personal Data to the extent required by Applicable Laws and only to the extent and for such period as required by Applicable Laws.

10.3 Quantum shall, upon request from Customer, provide written certification to Customer that it has fully complied with this Section 10 within sixty (60) days from the date on which Services are terminated.

**11 AUDIT RIGHTS.**

11.1 Subject to Section 11.2, Quantum shall make available to each Customer Group Member on request all information reasonably necessary to demonstrate compliance with this Addendum, and shall allow for and contribute to audits, including inspections, by any Customer Group Member or an auditor mandated by any Customer Group Member in relation to the Processing of the Customer Personal Data by the Contracted Processors.

11.2 Customer or the relevant Customer Affiliate undertaking an audit shall give Quantum reasonable notice of any audit or inspection to be conducted under section 11.1 and shall make (and ensure that each of its mandated auditors makes) reasonable endeavors to avoid causing (or, if it cannot avoid, to minimize) any damage, injury or disruption to the Quantum's premises, equipment, personnel and business while its personnel are on those premises in the course of such an audit or inspection. Quantum need not give access to its premises for the purposes of such an audit or inspection: (a) to any individual unless he or she produces reasonable evidence of identity and authority; (b) outside normal business hours at those premises; or (c) for the purposes of more than one audit or inspection in any calendar year; except for any additional audits or inspections which Customer or the relevant Customer Affiliate undertaking an audit reasonably considers necessary because of genuine concerns as to Quantum's compliance with this Addendum; or a Customer Group Member is required or requested to carry out by Data Protection Law, a Supervisory Authority or any similar regulatory authority responsible for the enforcement of Data Protection Laws in any country or territory. Customer is responsible for all costs and fees related to such audit, and Customer should promptly notify Quantum of its findings discovered during the course of the audit.

**12 INTERNATIONAL TRANSFERS.**

12.1 Customer Personal Data may be Transferred to the United States, the United Kingdom, the EEA, Ukraine, any jurisdiction covered by an Adequacy Decision (including, but not limited to, Switzerland, Israel, and Canada), and any other jurisdiction specified in the Principal Agreement or otherwise in writing by Customer.

12.2 Where a Contracted Processor has a valid and current Data Privacy Framework certification, then any Transfer of Customer Personal Data from the EEA, UK, or Switzerland to the United States will be covered by the Data Privacy Framework. If a Contracted Processor is not Data Privacy Framework certified, or where Data Privacy Framework certification is not considered to provide adequate protection to enable the export of Personal Data in accordance with applicable Data Protection Laws, Sections 12.3 or 12.4, as applicable, shall govern.

12.3 Except as otherwise set forth in this paragraph, the 2021 SCCs, hereby incorporated by reference to this Addendum, will apply to any Transfer of Customer Personal Data that is subject to the EU GDPR or to the Swiss Federal Act on Data Protection ("FADP") from the EEA or Switzerland to a Contracted Processor located outside of the EEA or Switzerland. Notwithstanding the foregoing, the 2021 SCCs will not apply to the extent the Transfer is covered by an Adequacy Decision or a valid Data Privacy Framework certification. Where the Transfer relates to Customer Personal

Copyright © 2025 Quantum Metric, Inc. All rights reserved.

Quantum Metric

Act on Data Protection ("FADP") from the EEA or Switzerland to a Contracted Processor located outside of the EEA or Switzerland. Notwithstanding the foregoing, the 2021 SCCs will not apply to the extent the Transfer is covered by an Adequacy Decision or a valid Data Privacy Framework certification. Where the Transfer relates to Customer Personal Data subject to FADP, all references in the 2021 SCCs to "EU," "Union," or "Member State" will be interpreted as references to Switzerland, and references to EU law will be interpreted as relevant provisions of FADP.

12.3.1 For the purpose of Clause 9 of the 2021 SCCs, the parties agree that subcontracting will be in accordance with Option 2 as described in Section 5 of this Addendum.

12.3.2 For the purpose of Clause 17 of the 2021 SCCs, the parties agree that the 2021 SCCs will be governed by the law of Ireland for Transfers of Customer Personal Data subject to the EU GDPR and by the law of Switzerland for Transfers of Customer Personal Data subject to FADP.

12.3.3 For the purpose of Clause 18 of the 2021 SCCs, the parties agree that any dispute arising from the 2021 SCCs will be resolved by the courts of Ireland for Transfers of Customer Personal Data subject to the EU GDPR and by the courts of Switzerland for Transfers of Customer Personal Data subject to FADP.

12.3.4 For the Purpose of Annex I.C of the 2021 SCCs, the parties agree that [Customer to specify EU Member State] is the competent supervisory authority for Transfers of Customer Personal Data subject to the EU GDPR and that Switzerland is the competent supervisory authority for Transfers of Customer Personal Data subject to FADP.

12.4 This paragraph applies with respect to any Transfer of Customer Personal Data that is subject to the UK GDPR to a Contracted Processor located in a country outside the United Kingdom for which there is no Adequacy Decision or a valid Data Privacy Framework certification. In such cases, the parties agree that:

12.4.1 The applicable version of the 2021 SCCs shall apply for the purposes of Table 2 of the UK 2021 SCCs Addendum;

12.4.2 The provisions of the UK 2021 SCCs Addendum, including Part 2 'Mandatory Clauses', shall apply in full and are hereby incorporated by reference to this Addendum; Table 1 of the UK 2021 SCCs Addendum, the names of the parties, their roles and their details shall be considered populated by the information set out in Annex 2.A;

12.4.3 Tables 2 and 3 of the UK 2021 SCCs Addendum shall be considered populated by the applicable version of the 2021 SCCs, including the information set out in the Annexes of the 2021 SCCs; and

12.4.4 For the purposes of Table 4 of the UK 2021 SCCs Addendum, neither party may end the UK 2021 SCCs Addendum.

12.5 For Transfers of Customer Personal Data from jurisdictions outside the EEA, United Kingdom, Switzerland, Israel, Ukraine, and Similar Jurisdictions to jurisdictions not covered by an Adequacy Decision, a Contracted Processor will, if needed and at Customer's request, enter into an appropriate data transfer agreement in order to facilitate the transfer of Customer Personal Data.

### 13 LIMITATION OF LIABILITY.

13.1 Each party's and all of its Affiliates' liability, taken together in the aggregate, arising out of or related to this Addendum, whether in contract, tort or under any other theory of liability, is subject to the "Limitation of Liability" section of the Principal Agreement, and any reference in such section to the liability of a party means the aggregate liability of that party under the Principal Agreement and this Addendum together.

13.2 For the avoidance of doubt, Quantum's total liability for all claims from Customer and all Customer Affiliates arising out of or related to the Principal Agreement and this Addendum shall apply in the aggregate for all claims under both the Principal Agreement and this Addendum, including by Customer and all Customer Affiliates, and, in particular, shall not be understood to apply individually and severally to Customer and/or to any Customer Affiliate.

### 14 GENERAL TERMS.

14.1 Without prejudice to clauses 7 (Mediation and Jurisdiction) and 9 (Governing Law) of the Standard Contractual Clauses:

14.1.1 the parties to this Addendum hereby submit to the choice of jurisdiction stipulated in the Principal Agreement with respect to any disputes or claims howsoever arising under this Addendum, including disputes regarding its existence, validity or termination or the consequences of its nullity; and

14.1.2 this Addendum and any disputes or claims howsoever arising under this Addendum are governed by the laws of the country or territory stipulated in the Principal Agreement.

14.2 Nothing in this Addendum reduces Quantum's obligations under the Principal Agreement in relation to the

Copyright © 2025 Quantum Metric, Inc. All rights reserved.

Quantum Metric

of the country or territory stipulated in the Principal Agreement.

14.2 Nothing in this Addendum reduces Quantum's obligations under the Principal Agreement in relation to the protection of Customer Personal Data or permits Quantum to Process (or permit the Processing of) Customer Personal Data in a manner which is prohibited by the Principal Agreement. In the event of any conflict or inconsistency between this Addendum and the Standard Contractual Clauses, the Standard Contractual Clauses shall prevail.

14.3 Subject to Section 14.2, with regard to the subject matter of this Addendum, in the event of inconsistencies between the provisions of this Addendum and any other agreements between the parties, including the Principal Agreement and including (except where explicitly agreed otherwise in writing, signed on behalf of the parties) agreements entered into or purported to be entered into after the date of this Addendum, the provisions of this Addendum shall prevail.

14.4 Should any provision of this Addendum be invalid or unenforceable, then the remainder of this Addendum shall remain valid and in force. The invalid or unenforceable provision shall be either (i) amended as necessary to ensure its validity and enforceability, while preserving the parties' intentions as closely as possible or, if this is not possible, (ii) construed in a manner as if the invalid or unenforceable part had never been contained therein.

### List of Annexes

Annex 1 – Details of Processing of Customer Personal Data

Annex 2 – Standard Contractual Clauses

Annex 3 – Technical and Organizational Measures Including Technical and Organizational Measures to Ensure the Security of the Data

## ANNEX 1: DETAILS OF PROCESSING OF CUSTOMER PERSONAL DATA

This Annex 1 includes certain details of the Processing of Customer Personal Data as required by Article 28(3) EU GDPR and Article 28(3) UK GDPR.

Subject matter and duration of the Processing of Customer Personal Data

The subject matter and duration of the Processing of the Customer Personal Data are set out in the Principal Agreement and this Addendum.

The nature and purpose of the Processing of Customer Personal Data

Customer Personal Data will be processed to the extent necessary to perform the Services under the Principal Agreement and as instructed by Customer in its use of the Services.

The types of Customer Personal Data that may be Processed

- IP address
- Contact Information (email, phone, physical mailing address, billing address)
- As otherwise set forth on the applicable Order Form(s) or as instructed by Customer or Customer Affiliates in writing in accordance with the Principal Agreement

The categories of Data Subject to whom the Customer Personal Data relates

- Customer's end users who access Customer's websites or other applications where the Services are deployed
- As otherwise set forth on the applicable Order Form(s) or as instructed by Customer or Customer Affiliates in writing in accordance with the Principal Agreement

The obligations and rights of Customer and Customer Affiliates

- The obligations and rights of Customer and Customer Affiliates are set out in the Principal Agreement and this Addendum.

## ANNEX 2

### A. LIST OF PARTIES

Data exporter(s): [Identity and contact details of the data exporter(s) and, where applicable, of its/their data protection officer

Copyright © 2025 Quantum Metric, Inc. All rights reserved.

Quantum Metric

### A. LIST OF PARTIES

Data exporter(s): [Identity and contact details of the data exporter(s) and, where applicable, of its/their data protection officer and/or representative in the European Union]

**Name:** Customer as defined in the Principal Agreement

**Address:** Address as defined in the relevant Order Form, or if an Order Form does not exist, then the address of Customer as set forth in the Principal Agreement

**Contact person's name, position and contact details:** The Data Privacy Officer for the Customer, as defined in the Principal Agreement, or if there is none, then the name of the person executing the Principal Agreement

**Activities relevant to the data transferred under these Clauses:** The activities as authorized and described in the Principal Agreement between Quantum and Customer.

**Role (controller/processor):** Controller

Data importer(s):

**Name:** Quantum Metric, Inc.

**Address:** 10807 New Allegiance Drive, Ste. 155, Colorado Springs, Colorado 80921, USA

**Contact person's name, position and contact details:** The Data Privacy Officer for Customer, as defined in the Principal Agreement, or if there is none, then the name of the person executing the Principal Agreement

**Activities relevant to the data transferred under these Clauses:** The activities as authorized and described in the Principal Agreement between Quantum and Customer.

**Role (controller/processor):** Controller

### B. DESCRIPTION OF TRANSFER

Data subjects

The personal data transferred concern the following categories of data subjects (please specify): Those set forth in Annex 1 to the Addendum.

Categories of data

The personal data transferred concern the following categories of data (please specify): Those set forth in Annex 1 to the Addendum.

Special categories of data/sensitive data (if applicable)

The personal data transferred concern the following special categories of data or sensitive data (please specify): N/A

Applied restrictions or safeguards that fully take into consideration the nature of the data and the risks involved, such as for instance strict purpose limitation, access restrictions for sensitive data:

Access only for staff having followed specialized training.

The frequency of the transfer (e.g., whether the data is transferred on a one-off or continuous basis).

Continuous

Nature of the processing/Processing operations

The personal data transferred will be subject to the following basic processing activities (please specify): The activities set forth in Annex 1 to the Addendum.

Purpose(s) of the data transfer and further processing/p>

The purpose(s) of the transfer and further processing are Quantum's performance of the services as authorized and described in the Principal Agreement between Quantum and Customer.

The period for which the personal data will be retained, or, if that is not possible, the criteria used to determine that period

The criteria include: the duration of the services as agreed upon between the parties and set forth in the Principal Agreement between Quantum and Customer; whether there is a legal obligation to which Quantum is subject, for example,

Copyright © 2025 Quantum Metric, Inc. All rights reserved.

Quantum Metric

Data subjects

The personal data transferred concern the following categories of data subjects (please specify): Those set forth in Annex 1 to the Addendum.

Categories of data

The personal data transferred concern the following categories of data (please specify): Those set forth in Annex 1 to the Addendum.

Special categories of data/sensitive data (if applicable)

The personal data transferred concern the following special categories of data or sensitive data (please specify): N/A

Applied restrictions or safeguards that fully take into consideration the nature of the data and the risks involved, such as for instance strict purpose limitation, access restrictions for sensitive data:

Access only for staff having followed specialized training.

The frequency of the transfer (e.g., whether the data is transferred on a one-off or continuous basis).

Continuous

Nature of the processing/Processing operations

The personal data transferred will be subject to the following basic processing activities (please specify): The activities set forth in Annex 1 to the Addendum.

Purpose(s) of the data transfer and further processing/p>

The purpose(s) of the transfer and further processing are Quantum's performance of the services as authorized and described in the Principal Agreement between Quantum and Customer.

The period for which the personal data will be retained, or, if that is not possible, the criteria used to determine that period

The criteria include: the duration of the services as agreed upon between the parties and set forth in the Principal Agreement between Quantum and Customer; whether there is a legal obligation to which Quantum is subject, for example, certain laws requiring retention of the personal data; and whether retention is advisable in light of Quantum's legal position, such as in regard to applicable statutes of limitations, litigation, or regulatory investigations.

For transfers to processors, also specify subject matter, nature and duration of the processing

The performance of the services as set forth in the written services agreement with the (sub-) processor, with the duration of the performance of the services as set forth in the written services agreement with the (sub-) processor.

## ANNEX 3: TECHNICAL AND ORGANIZATIONAL MEASURES INCLUDING TECHNICAL AND ORGANIZATIONAL MEASURES TO ENSURE THE SECURITY OF THE DATA

Description of the technical and organizational measures implemented by the data importer(s) (including any relevant certifications) to ensure an appropriate level of security, taking into account the nature, scope, context and purpose of the processing, and the risks for the rights and freedoms of natural persons.

Data importer shall maintain administrative, physical, and technical safeguards for protection of the security, confidentiality and integrity of Customer Personal Data uploaded to the Services, as described in data importer's then-current Enterprise Security Brief, the current version of which is available on the data importer's support site at https://community.quantummetric.com/s/article/2021-Enterprise-Security-and-Privacy-Guide, as it may be updated from time to time. Data importer will not materially decrease the overall security of the Services during a subscription term.

For transfers to (sub-) processors, also describe the specific technical and organizational measures to be taken by the (sub-) processor to be able to provide assistance to the controller and, for transfers from a processor to a sub-processor, to the data exporter.

Where data importer transfers personal data to (sub-) processors, data importer implements and maintains measures for vetting and oversight of its (sub-) processors to protect personal data consistent with the 2021 SCCs, including with respect to security obligations and assistance to the controller and/or data exporter as applicable.

Copyright © 2025 Quantum Metric, Inc. All rights reserved.



EXHIBIT A-17

# EXHIBIT B
# Exhibit Filed Under Seal in its Entirety

EXHIBIT B
Exhibit Filed Under Seal in its Entirety

# EXHIBIT C

EXHIBIT C

IN THE CIRCUIT COURT FOR BALTIMORE CITY, MARYLAND

JOHN DOE II,

Plaintiff,

vs. Case Number: 24-C-20-000591

MEDSTAR HEALTH, INC., et al.,

Defendant.

______________________________________/

REPORTER'S OFFICIAL TRANSCRIPT OF PROCEEDINGS
(Motions Hearing)

Baltimore, Maryland
Wednesday, June 26, 2024

BEFORE:

THE HONORABLE ANTHONY F. VITTORIA, Associate Judge

APPEARANCES:

For the Plaintiffs:

JASON BARNES, ESQUIRE

JENNY PAULSON, ESQUIRE

WILLIAM SINCLAIR, ESQUIRE

For the Defendant:

ELIZABETH SCULLY, ESQUIRE

PAUL KARLSGODT, ESQUIRE

* Proceedings Digitally Recorded *

Transcribed by:
Patricia Trikeriotis
Chief Court Reporter
111 N. Calvert Street
Suite 515 Cummings Courthouse
Baltimore, Maryland 21202

# T A B L E O F C O N T E N T S

| | Page |
|---|---|
| Plaintiff's Motion for Summary Judgment | 5 |
| - The Court's Ruling (Denied) | 134 |
| Defendant's Motion for Summary Judgment | 5 |
| - The Court's Ruling (Granted) | 134 |
| Argument Re: Electronic Surveillance | |
| - Argument by Mr. Barnes | 5 |
| - Argument by Ms. Scully | 43 |
| - Rebuttal Argument by Mr. Barnes | 62 |
| - Surrebuttal Argument by Ms. Scully | 82 |
| - Continued Argument | 84 |
| Argument Re: Invasion of Privacy | |
| - Argument by Ms. Scully | 93 |
| - Argument by Mr. Barnes | 99 |
| - Rebuttal Argument by Ms. Scully | 106 |
| - Surrebuttal Argument by Mr. Barnes | 108 |
| Argument Re: Negligence Damage Claim | |
| - Argument by Mr. Barnes | 108 |
| - Argument by Ms. Scully | 115 |

P R O C E E D I N G S

(9:34 a.m.)

THE CLERK: The Circuit Court for Baltimore City, Part 16, is now in session. The Honorable Anthony F. Vitoria presiding.

THE COURT: Good morning, everyone.

COUNSEL: Good morning, Your Honor.

THE COURT: Please have a seat. All right. Calling the case of John Doe II versus MedStar Health, Inc., et al., Case number 24-C-20-000591.

Would counsel for the parties, please identify yourselves, starting with the Plaintiffs?

MR. BARNES: Thank you, Your Honor. Jay Barnes and Jenny Paulson from Simmons, Hanley, and Conroy on behalf of the Plaintiffs.

MR. SINCLAIR: Good morning, Your Honor. William Sinclair, Silverman, Thompson, Slutkin, and White, on behalf of the Plaintiffs. We have two of our law clerks here today to observe.

THE COURT: All right. Welcome.

MS. SCULLY: Welcome. Good morning, Your Honor. Elizabeth Scully, Baker Hostetler, on behalf of the Defendants.

MR. KARLSGODT: And Paul Karlsgodt from Baker and Hostetler, also on behalf of the Defendants.

THE COURT: All right. You folks know you're in the wrong seats?

MS. SCULLY: Yes.

MR. SINCLAIR: Yes,

THE COURT: That's what local counsel is for, isn't it?

MR. BARNES: That's right, Your Honor.

MR. SINCLAIR: We had this conversation. We decided we were more comfortable on this side.

THE COURT: Okay.

MR. SINCLAIR: Closer to the air conditioning.

THE COURT: All right.

MR. SINCLAIR: That's what local counsel is really for.

THE COURT: All right. We're going to deal with the motions for summary judgment first. There are cross-motions. I don't have any particular preference on how to handle these. If counsel don't have a suggestion or haven't worked it out, I can certainly go back and see if I can determine whose motion got filed first.

MR. BARNES: So, Your Honor, we did speak about this, and our thought was that we would go claim by claim --

THE COURT: Okay.

MR. BARNES: -- rather than Plaintiffs do their whole thing first, followed by Defendants.

THE COURT: Okay. All right. That works.

MR. BARNES: For what it's worth, we didn't speak about which claim to go first. For what it's worth, I think that the Electronic Surveillance Act claim is the -- has the most issues and is the best way to give Your Honor an overview of issues in general.

THE COURT: Okay. All right. So I suppose we'll go Plaintiff, Defendant, Plaintiff rebuttal, Defendant rebuttal, for lack of a better way. I need to have everybody have a fair shake. And we're not going to do surrebuttal or surreplies, but we'll do it that way.

So, Mr. Barnes, I take it you will be arguing?

MR. BARNES: Yes, Your Honor.

THE COURT: Okay. You can begin.

MR. BARNES: May I -- may I begin, Your Honor?

THE COURT: Yes.

MR. BARNES: May I approach as well? Because what I really think is important here is for -- the technology may seem complicated at first blush. But if you take it step by step, I think it will help the Court understand, as we say at the top of this slide, what's really going on here.

So there's no dispute in this case that MedStar

encouraged patients to use MedStarhealth.org to use the patient portal, and that Mr. Doe signed up for the patient portal; in fact, used the patient portal; clicked to log into the patient portal; went and exchanged communications inside the patient portal.

So the first slide in front of you is the broad overview that has not much white space, which is really bad way to make a PowerPoint. The second slide starts taking it step by step. And what the second slide shows, Your Honor, is it focuses on this first act, which is the content of the communication that a patient, in this case John Doe, sends to MedStar.

Log in to my MedStar is the content of the communication when somebody logs in. After they're logged in, the content of the communications at issue -- and this comes from MedStar MedStar's expert -- include my MedStar messaging, appointments, and medications.

Once this first transmission happens, a whole slew of things happen at the same time in the blink of an eye. It's the same way these transmissions work if you were to go to any website like the Baltimore Sun or the New York Times, okay? MedStar made the choice to uniformly place Facebook source code on the MedStarealth.org public page and the login page that sends patients to the patient portal that also has an

enroll button.

THE COURT: Okay. Let's let's make sure the distinction is clear. I certainly read something that indicated that while there is potentially a cookie on the page where you hit the button on the MedStar.com website, once you get to that other website where you put in your email address and your password, are you saying that that page has a bug?

MR. BARNES: Yes. It has source code from Google that makes the deposits cookies associated with Google cookies, and it makes disclosures to Google Analytics, Google Display Ads, which is DoubleClick.net, and Google Ads, which is Google.com. The Facebook source code is not on -- after you make that jump, the Facebook source code is no longer --

THE COURT: Once you put in your email and password, once you get inside the patient portal, you're saying the Facebook --

MR. BARNES: Is not there anymore.

THE COURT: -- is not there anymore. Okay,

MR. BARNES: And then it's only it's Google Analytics, Google Display Ads, and Google Ads.

THE COURT: Okay.

MR. BARNES: Inside the portal, okay?

Because MedStar has uniformly placed this

Facebook and Google source code on its properties where it's placed. So for Facebook, what that means is every single time, without exception, no matter what the browser privacy settings are, no matter what a patient has done, including John Doe, MedStar deposits Google and Facebook cookies on the patient's computer, their personal property, or their phone. They're called FBP cookie and the underscore _GA cookie.

After that happens at the same time -- so they send these cookies. And MedStar source code also commands the user's computer to redirect personally identifiable information and the file path here, which is the content to Facebook and Google. I'm speaking -- I hope Your Honor understands, I'm speaking -- I'm plumping and I'm bunching them together.

But Your Honor does understand the distinction between the main page with the log in and Google. And I don't want you to think I'm trying to mislead you to think Facebook is on both, but it's easier to talk about the process generally this way.

So MedStar commands every patient device to redirect the PII and the identifiers contents to Google and Facebook. So what happens next? The content is uniformly -- and personally identifiable information -- is uniformly redirected by MedStar to Google and

Facebook, where that source code appears.

At the bottom, you can see exactly what we mean by content. Content is the patient portal login communications and all file paths within the patient portal.

THE COURT: And what do you mean by login communications?

MR. BARNES: So literally when you click the button to log in, when you're at -- I'm going to take it in both steps okay. When you're at MedStar health.org, and you push the log in button or there's an enroll button, it reports to Facebook that that person has that patient has clicked to log in --

THE COURT: Okay.

MR. BARNES: -- or enroll.

THE COURT: Okay.

MR. BARNES: Then when you go to the main portal page --

THE COURT: Right.

MR. BARNES: -- when a button -- when a user clicks to log in.

THE COURT: Okay, wait a second. Let's let's make sure we're -- I'm fully understanding. He or she has typed in his email address and his password and then clicks to log in? Correct. Okay. What gets sent to

Google and Facebook?

MR. BARNES: A log in. The fact that they are logging in the literally the status of the log in. Okay. For Google at that point, it's an _GA cookie. It is passed in what's called a CID data parameter. This is where -- let me -- I'll get in the weeds. Okay.

THE COURT: But you're jumping ahead again because you said login information. I want to make clear that there is no allegation or proof that the email address or the password is being sent to Google or Facebook.

MR. BARNES: That's right, but it's not necessary.

THE COURT: I'm not asking that question. I'm sure you believe it's very necessary to your not very necessary to your claim. But I want to understand you're giving me this this tutorial. I want to exactly understand because you said login communications. I wanted to understand what you meant by that.

MR. BARNES: That is correct.

THE COURT: Okay.

MR. BARNES: Email address and password not sent to Google. Here is what is sent, the login, the fact of a login --

THE COURT: Okay.

MR. BARNES: Plus personally identifiable information. Google doesn't need your email address for it to be personally identifiable information. The information that is sent are Google cookies. This _GA cookie that is sent no matter what, no matter what your browser privacy settings are.

In addition to that, it gets -- so that gets sent, login, GA cookie, IP address gets sent, user agent gets sent, device properties get sent, information that is sufficient to identify the patient to Google when sent to Google.

We have an expert, Dr. Shafiq, who Defendant admits is a leading expert in the industry, who says it doesn't make a difference what the browser settings. It is always identifiable when it is sent to Facebook or Google. Facebook and Google do not need an email address to know who a person is. That's what our expert says. They have no expert to rebut that.

Okay. That is the overview of what's really going on here. I have a slide deck as well, Your Honor, on the issues in the wiretap or the Electronic Surveillance Act.

THE COURT: Okay. Thank you.

MR. BARNES: And I want to start with just a basic procedural thing that I think is actually

substantive, which is that we set forth a numbered -- I'm sorry.

THE COURT: Go ahead.

MR. BARNES: I'm papering you to death up there, Your Honor. We set forth a numbered statement of facts. My -- ordinarily, what happens when you set forth a numbered statement of facts is the Defendant admits or denies or provides some information for each individual fact. MedStar did not do that in this case. We think that means all of our statement of facts are deemed admitted as a procedural matter. But as a substantive matter, Your Honor, we think it doesn't really make a difference because they're not disputed facts.

If you go to Page 3, these are the high points, statement of facts two and three. John Doe was a MedStar patient. He used the patient portal to exchange communications. Paragraph seven and eight are what I just went over here with respect to MedStarHealth.Org. Paragraphs 12 and 28 discuss this step of what gets sent in every in every communication.

And with that, we go to the Electronic Surveillance Act itself. The first question on our motion, and they have their argument about it too, is whether there is an electronic communication at issue. I'm on Page 5 of my slideshow here. The act -- and we're

talking about statutory interpretation, so we start with the definition of the statute.

An electronic communication means any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by these systems that are electronic in nature. An electronic communication does not include any wire or oral communication.

MedStar has made what we think is a very ironic argument, that the Electronic Surveillance Act was not intended to cover electronic communications. This definition was added to the Maryland Statute in 1988. We have the part, a snippet, of the legislative history. We've attached more as an exhibit that says it was specifically updated to keep up to speed with the Federal Electronic Communications Privacy Act, including providing privacy for computer-to-computer communications.

There is no court anywhere that has ever held that the types of communications at issue in this case are not covered by either the Federal Electronic Communications Privacy Act or any state Electronic Communications Privacy Act that adopted it after 1986.

And the other thing regarding their position, Your Honor, is that they say, well, the Maryland Act is

only applies to oral communications. They have made that a hinting argument. Maybe they're backing away from it today. The statute itself specifically says an electronic communication does not include oral communication.

So these are electronic communications. They have no case. There is no fair reading of the statute to suggest it would not cover a patient's login to their healthcare providers web property.

The next issue, Your Honor, is content. And while the Maryland Act is modeled after the Federal Act, there are some key differences, and one of them is with respect to content. Under the Maryland Act, contents means any information concerning either the identity or the existence, substance, purport, or meaning of that communication.

On the motion for summary judgment, MedStar says we have no independent evidence of what the content of John Doe's communications are at issue in this case. That is not true. Exhibit 26 to our Motion for Class Certification and Exhibit B to our Motion for Summary Judgment are forensic records of his communications inside a patient portal.

The way the way that MedStar’s patient portal is set up -- and you can see this in their expert report

from Jim Vint (phonetic) -- is that if you look at slide six at the top, where it says “viewed lab results,” the content “lab results” would be disclosed to Google -- to Google -- because this is wholly inside the patient portal. And the same is true for everything on this page. The same is true for the logins.

Slide seven shows the Facebook communication, and this is what we spoke about earlier, Your Honor. This is the button that says enroll in my MedStar or log in to my MedStar.

THE COURT: What's the name of the company that that has the actual portal?

MR. BARNES: Well, Cerner is a vendor.

THE COURT: Cerner, the vendor. Is this page on a Cerner website?

MR. BARNES: No.

THE COURT: This is still a MedStar.com or whatever?

MR. BARNES: Correct. This is MedStarHealth.org.

THE COURT: Okay.

MR. BARNES: Wholly within the control of MedStar. And I would note that the patient portal, the aspects relating to MedStar, are wholly within the control of MedStar.

The next example, Your Honor, is on Page 8. What we've done here is I wanted to, because we cited in our opening brief this Meta Pixel Healthcare litigation case, and MedStar said, oh, well, you shouldn't pay any attention to that because that was an order on a motion for preliminary injunction. Everything was still up in the air.

So on the left side of this page is what gets sent to Facebook on the patient portal communication, where you can see the top highlighted line says CD button text. Log in to my MedStar. On the right side of the page is what we submitted as Exhibit Z on our reply. It is a report of the same expert in this case offered by the same attorneys in this case, in the Meta Healthcare Pixel litigation involving the exact same patient portal log in communication.

THE COURT: All right.

MR. BARNES: And it is that communication, that specific communication, that is identical in this case as it is in that case that Judge Orrick found this is --

THE COURT: Who is Judge Orrick?

MR. BARNES: Judge Orrick is the judge in the in re Meta Healthcare Pixel litigation case in the Northern District of California, where one of the hospitals interceptions at issue is MedStar.

THE COURT: All right, so let me -- you said something, and I'm looking at the words that are written on this page, and you said some words that don't appear on this page. So I'm just trying to understand.

MR. BARNES: Yes, sir.

THE COURT: It says class list, "class list": "button MedStar-button-primary button-round-medium" --

MR. BARNES: Are we on the same page, Your Honor? Are you on --

THE COURT: Eight.

MR. BARNES: -- slide eight?

THE COURT: Yeah.

MR. BARNES: Are you on the right side or the left side?

THE COURT: I'm on the left side.

MR. BARNES: Okay.

THE COURT: I thought this is what you were referring to because I can't read what's on the right side.

MR. BARNES: Okay.

THE COURT: And then it says "margin-ten," end quote.

MR. BARNES: Right. I'm reading the first highlighted line where it says "CD button text logged in to my MedStar."

THE COURT: “CD button text,” okay, “log in to my MedStar.” Okay.

MR. BARNES: Yes, that's the line I was reading. If you go down to, it says, “page feature patient portal home.”

THE COURT: Okay.

MR. BARNES: Now if you go over to the right side, and I realize, Your Honor, it is small. If you go down, there is a line that says “CD button text.”

THE COURT: Okay. I can't see that. So I guess my question to you though is, just so I understand -- it sends this information, log in -- “log in to my MedStar.” You're saying that this gets sent from the web star page -- from the login page to Google and/or Facebook.

MR. BARNES: Correct.

THE COURT: Okay. And --

MR. BARNES: It’s --

THE COURT: And then what did -- the CD page feature, you're saying that that also gets sent.

MR. BARNES: Yes, that also gets sent.

THE COURT: All right. Title: patient portal-home. And -- okay.

MR. BARNES: Everything -- everything on this page gets sent to Facebook.

THE COURT: Okay.

MR. BARNES: Slide nine is a -- highlights to Your Honor where content is in both our expert report from Mr. Smith and Virginia Mason's -- Virginia Mason, I'm sorry -- MedStar's expert report from Mr. Vint (phonetic). So that after the hearing, you can go back. These are the contents. My MedStar messaging page view, my MedStar appointments, appointments request, my MedStar health record, medications, and the login to my MedStar events.

If you go to slide ten. This is on Pages 87 and 88, I believe, of the Smith Report. And this case, again, it shows the same information being sent to Facebook, which is this log in. And that log in communication is content under the Federal Electronic Communications Privacy Act and under the Maryland Electronic Surveillance Act.

THE COURT: Okay. Let's, for the record, on the left-hand side of Page 10, you have highlighted “CD [meta] equals [“title”: “patient+portal+-+home”] end of bracket or end of parentheses there.

MR. BARNES: That's correct.

THE COURT: And then underneath it, “HTTP\1.1 200 okay.”

MR. BARNES: That's -- stop you there, Your

Honor.

THE COURT: Yeah.

MR. BARNES: What that means is the information was received and collected by Meta.

THE COURT: Okay.

MR. BARNES: That's computer code.

THE COURT: And then below that there is a string, and I'm not going to read it, but it is for "get," the "get" line, underneath the word "get."

MR. BARNES: Yes.

THE COURT: It is literally four -- excuse me -- six lines long, seven lines long. And I'll start reading it, but I won't continue. But it goes on, Https:\\www.facebook.com\2R\?ID=1321071481253782&EV= subscribedbuttonclick," no spaces, "&D" -- could be an L or an I -- "=https." And it goes on. And you have highlighted two particular things "EVequalssubscribe buttonclick." There's no spaces between any of that. And farther down in the string amongst a string of ampersands, percentage numbers, letters, "MyMedStar.iqhealth.com."

MR. BARNES: Correct.

THE COURT: Okay.

MR. BARNES: And then over on the right side -- and if Your Honor wants, I can explain what each of those

those data parameters are. But for the purposes of the content communication, the things that we've highlighted are the pertinent parts.

On the right side of the slide, it starts with log in, and then we have highlighted in our text "log in to my MedStar." I have omitted the ampersand 20s because all that is is computer code for space. And again, below, it says, "CDbuttontextlogin&22&20myMedStar."

THE COURT: What's the difference between -- it is a percentage, not ampersands. But percentage 20s and percentage 22s, what's the difference?

MR. BARNES: I do not know the 20 versus 22.

THE COURT: All right. What is the "BP=FB.1.1." and then it goes on to a longer string that I won't read.

MR. BARNES: That is the FBP cookie value that is transmitted, that is deposited on every patient device and that is sent to Facebook with every communication on MedStarHealth.org, including the patient portal log in page. It's the value of the cookie. It's like the credit card, the driver's license plate, the home address.

THE COURT: That's quite an analogy. I'm waiting to hear from Defense about that analogy, but I'll take -- I'll take your word. I'll take your word for it,

sir.

MR. BARNES: Your Honor, we have the only expert in the case who has opined on the abilities of Google and Facebook and this data. They have admitted that he is a leading expert. They have no rebuttal testimony against him.

So the next slide is about content. On the left side, I have highlighted language again from that Meta Health opinion that is directly on point to the exact content at issue in this case. The other thing I have done is there are two additional, I think, important cases that came out in the reply briefing from MedStar. One is called in re Google RTB. I happen to represent the Plaintiffs in that case. I'm sorry, it's not in Google RTB; it’s in re -- it's Brown versus Google. I do not represent the Plaintiffs in Brown versus Google.

That is the Washington Post URL at the top right of the page. MedStar argued in its briefs that the Brown versus Google case held that URLs, such as those at issue here, do not include content. That's directly incorrect. We highlighted in our reply brief, the Brown versus Google court held the exact opposite of what MedStar said in its brief.

THE COURT: And what was the procedural posture of that case?

MR. BARNES: It was a motion for summary judgment.

THE COURT: And you cited that?

MR. BARNES: What's that?

THE COURT: You cited that case?

MR. BARNES: In our in our reply, yes.

It was an MSJ, right?

It's either an MSJ or a class cert, I believe it was.

THE COURT: All right. Let's look that up. I'm curious. Because I went through every case that you cited, and I saw one that was on appeal, but every other case that I saw was in the motion to dismiss phase.

MR. BARNES: Yeah, it's in our reply, Your Honor, which we filed, I guess, Friday.

THE COURT: What’s the cite?

MR. BARNES: It’s -- it might have been the class cert --

THE COURT: Ah, okay.

MR. BARNES: Brown versus Google. It was also evidentiary, Your Honor.

THE COURT: There we go.

MR. BARNES: Let me --

THE COURT: Class certification is only quasi evidentiary, Counsel. We went through this. I’m not

supposed to be judging the merits of the case. What's the case cite?

Hey, let's focus on the judge for a second.

MR. BARNES: It's in our reply.

THE COURT: I want to know the cite to the case.

MR. BARNES: I am pulling it right now. It is 685. Well, here's the pincite. 685 F.Supp.3d 909. MedStar claimed that the court held that users IP addresses refers user agents, HTTP requests, and user’s actions on websites is the record, not substance of the communication. There was an ellipses in what it cited, Your Honor. We put the actual language from Brown, the court said, “Though much of this, such as user’s IP addresses and their user agent is the record not the substance of a communication. Google collects the type of search queries the Ninth Circuit thought could be content in Zynga. And then it has the URL that we highlight here.

THE COURT: All right. I’m going to look at the case.

MR. BARNES: Yeah. And we can -- is it an MSJ or is it class cert?

THE COURT: It's -- there's something about summary judgment in here.

MR. BARNES: There were cross motions, I believe. So Brown was related to a case I was involved in. I don't know the procedural posture as well. There was confusing because there was a motion for class cert and, like here, there were cross motions for summary judgment going on at the same time.

THE COURT: Okay. Well, I will certainly take a look at this case. This may be one that I didn't read because I looked at the cases that had been cited. And in many of the string cites, and every single one of them was in the context of a motion to dismiss. There was one that was an appeal following some kind of hearing. But I'll take a look at this case.

MR. BARNES: Well, two, the Meta Health Pixel -- Healthcare Pixel case was on a motion for preliminary injunction and evidentiary hearing.

THE COURT: Okay.

MR. BARNES: The other -- there is one other case that, because it was a criminal -- it was an application for a wiretap. It doesn't quite fit in that realm. And that's the in re Application of the United States case. It's from the District of Massachusetts in 2005. I know Your Honor doesn't like the fact that we're citing all non Maryland cases, but that's where all the action is and all these cases. And what that case

explained was that the file paths of URLs, amongst other things, are contents. MedStar argued that that case has no application here. That is wrong.

THE COURT: Well, it -- okay.

MR. BARNES: No. It's wrong as a matter of the technical detail, because this is a file path. This is why the Court needs to understand the the technology and the technological terms used. This is literally a file path. And if we highlighted on slide 11, paragraph 13 of Richard Smith's declaration in this case --

THE COURT: Mmm-hmm.

MR. BARNES: -- explains what a path is in a URL. It is everything after the .org.

THE COURT: Okay.

MR. BARNES: So MedStar says that case is not on point. That is wrong. It is directly on point. The reason it's directly on point, and to understand that, you have to understand the technology and the terms used for HTTPS communications.

THE COURT: Okay. Well, okay.

MR. BARNES: Okay. Slides 12. We'll do some quick hitters here, Your Honor.

Slide 12 is content of a communication sent to Google Analytics. You can see the highlighted parts, “patient portal home, click to my MedStar IQ Health.com,

log in to my MedStar."

Slide 13 is from MedStar's expert, Jim Vint. aip=1, which we'll talk about in a minute; page view; messaging; my MedStar messaging; and there's the CID cookie parameter.

Slide 14 is page view, appointment request, my MedStar appointments.

Slide 15 is page view, health record, medications.

Page 16 is page view, appointments.

Page 17 is page view, appointments.

The reason I highlight these things, Your Honor, is because this is uniform to all patients, including John Doe. MedStar -- one of MedStar's primary argument on the individual motion for summary judgment is that Doe did not capture in real time that which was being surreptitiously transmitted to Google and Facebook. There's one obvious problem with that, and that how could he have captured it in real time, right? If he didn't know what was going on in real time, how could he have captured it?

The second problem with it, though, is it doesn't matter if he captured it in real time because the experts agree this information is uniformly disclosed. If you are a patient using a browser or a phone that went

to MedStar's patient portal, your personally identifiable information and the contents that we've had here were sent to Facebook and Google. Full stop, no exceptions. We don't need recordings of what happened in real time with John Doe because there are no exceptions, which is also why the class should be certified, but that's -- we can talk about that later.

The next part that I want to talk about is unique to Maryland for the contents definition. On slide 18, we kept the contents definition at the top. And contents under Maryland law includes any information concerning the identities of the parties, the communication. That language is not in the Federal Act. So MedStar cited a bunch of cases under the Federal Electronic Communications Act about IP addresses not being covered content. None of those have any application here, because the identity of the parties to the communication is not part of the definition of contents under the ECPA. So Your Honor is left with a straight question of statutory interpretation.

So here's what we have. We have Professor Shafiq says that from the technical analysis that is adopted, there is no other -- in the sense that if there were a Daubert, there is no other technical analysis. This is it. This is the measure. He says it's

identifiable; it relates to identity.

He does so in two ways. The first way is identifying the entropy calculation. The second way is using his expertise of the industry itself and how the industry connects this information together. The third way we have it in this case for John Doe comes from MedStar's expert, Mr. Vint. Mr. Vint submitted information associated with his Facebook account. This is on slide 20. It is Exhibit 4 to Defense deposition.

Facebook keeps running track of all IP addresses and user agents associated with a person's account. It also keeps track of every data cookie associated with the user's account. What that means is these controls that they raise on class certification make no difference. What that means is their assertion that Doe has to come up with exactly what was surveilled in the moment it was being surveilled makes no difference because it works the same for everyone. Meta and Google cannot make money with a product that can be thwarted by somebody clicking a button. They have designed workarounds. The FBP cookie and the GA cookie to make sure it is always identifiable.

Slide 21. These slides go into -- these are all from MedStar’s expert. MedStar’s expert agrees that IP address and user agent are always in the header for

all transmissions. That's for Facebook and Google.

For 22, MedStar's expert agrees that anyone who -- for anyone who clicks the patient portal button, the pixel is the same. Our experts agree. There is no expert in the world who would disagree with this.

The next is slide 23. A user who clicks this button would have an indication that they clicked the button. Yes, that's what this does. And that is the patient portal login. Again, that is MedStar's expert. Richard Smith agrees. Zubair Shafiq agrees. There is no expert in the world who would disagree.

So the next issue is electronic devices. And for this one, Your Honor, the Maryland statute does not have a separate definition. For that matter, neither does the -- neither does the Federal Act. But there's a good amount of federal case law on it. We would point Your Honor to the cases we've cited.

I also want to point out, Your Honor, that MedStar cited cases that were flat wrong. Now, one of them, they submitted a correction. They said what we're talking about here aren't devices. They cited to a case that was about slot machines, and they submitted a correction on Monday. That was the primary case that they cited, and they withdrew it.

Another thing they did is they said that the in

re Carrier IQ case did not hold that software can be a device under the Electronic Communications Privacy Act. I want to read you a direct quote from in re Carrier IQ. Quote, "Plaintiffs have sufficiently alleged that the Carrier IQ software is a device for purposes of the Wiretap Act."

MedStar also cited a case called US versus Ackies, where in a footnote, there was a reference to a cell phone not being a device. That's right. Except that case was interpreting whether a cell phone was a tracking device under Section 3117(a), which refers to the installation of a mobile tracking device, not the type of wiretap device at issue in this case.

And I -- this is where the Wiretap Act can get confusing. There's an exception in the Wiretap Act for devices that are tracking devices. MedStar makes this backup argument that says, well, you know, Judge, these are tracking devices, these computers and the software, if anything, they're tracking devices, so they're not covered US versus Acies says the opposite. It says cell phones are not tracking devices, full stop. So the case they cite undermines and gets rid of their backup argument.

There's a case called Szymuszkiewicz (phonetic) from the Seventh Circuit, which I would recommend Your

Honor read closely just for its explanation of the technology at issue that says in an ordinary setup there are at least three devices: the victim's computer, the server, and the Defendant's own computer. We've alleged those things here.

The final thing I want to point out, Your Honor, and I will confess we should have caught this is there's another case that I think is is important. It's the doe Doe versus Meta case. It's the Meta Healthcare case. We did not cite it. It's 690 F.Supp.3d 1064 and at 1080.

We cited the Meta Healthcare preliminary injunction decision because Meta didn't even challenge whether it was a device. MedStar came back and said, oh, my gosh, Facebook's litigation strategy, how can that be held against us? Okay, fine. Meta subsequently filed a motion to dismiss, where they challenged whether the same things at issue here were a device. And the court held that, yes, it is a device.

Meta also made the same argument that, well, it would be a tracking device under California law because there's a similar provision of California law. And Judge Orrick looked at the tracking device cases and the tracking device statute and said, no, a tracking device is something that tracks someone's specific geographic

location across a broad swath of locations over a period of time. And the computer's source code server’s software at issue here are not tracking devices.

I skipped an issue that I want to address, Your Honor, and that is whether there is an -- whether there is an intercept. So the Maryland Act defines an intercept as the acquisition of the contents of an electronic communication. I’m trying to see if I have the exact quote in my notes. Acquisition of electronic -- of the contents of an electronic communication. That is from memory, not from written down.

THE COURT: Okay.

MR. BARNES: MedStar cites this case called Google Cookie to say there is no interception here because this information, right, this path goes directly from the patient's device to Google and Facebook.

I want to explain what was happening in Google Cookie, okay, and why it has no application here. The first thing is the issue in Google Cookie was whether Google was a party to the communication between this person -- and healthcare websites weren't at issue. It was websites that had advertisements on them; okay? What the Third Circuit found under the federal law -- because there is a party to the communication exception under federal law -- is that Google was a party to the

communication because Google would get the content for the advertisement shown on the page no matter what. The only thing different in its hacking scheme was it would also get PII.

So what the court said is there's no -- Google is a party to the communication with the content. The added PII is separate. And as a party to the communication under federal law, Google is immune from wiretap liability. The difference here -- there are several differences here.

The first is that there is no party to the communication exception under federal law.

The second is that, but for MedStar placing the Google source code and the Facebook source code on its property, Google and Facebook would not get any of this. They would get nothing. MedStar is the causal agent. It's causing both the content and the patient PII to be sent.

The third thing is Google Cookie is an outlier. Google Cookie is conflicts with the case. The first Circuit, called Fire Trak; a case in the Seventh Circuit, called Szymuszkiewicz; a case from the Third Circuit -- from the Ninth Circuit called Facebook Internet Tracking. They expressly rejected that rationale.

All of which you don't even need to get into

because there's no party to the communication exception under Maryland law. You have to get you have to get consent here from all parties to the communication. And one thing that I can't stress enough, how critical it is for Your Honor to understand that because MedStar has made an argument that the sky will fall if there is liability here, because these tools are so widespread, oh my gosh, the world's going to end. Everyone's going to be liable. There is no truth to that.

The reason for that is this is not per se illegal. It is not per se illegal. This is legal if MedStar gets consent from its patients, and they cannot argue that they got consent. And that's why we're here. So their sky is falling, world's going to end, internet commerce is going to end makes -- doesn't apply because these other websites that use these tools get consent, and they can get consent.

THE COURT: Now.

MR. BARNES: They did before, Your Honor.

THE COURT: Okay. If you say so, Counsel. I disagree with that statement, but you can you can tell me that. You're telling me that in 2019, every website that you went to asked you if they consent to having cookies?

MR. BARNES: No, I'm not saying that. I'm saying that the vast, vast majority of commercial

websites have privacy policies that disclose the information here in a way that would not lead those websites to any liability under MedStart -- under Maryland law. I can't vouch for every website in the world, Your Honor.

THE COURT: Well, so I think the point is, I mean, there are cases here in Maryland, in the District Court of Maryland, that had been filed. Well, let me first ask this foundational question, which is your claim, the Plaintiff, because it's a single person -- the Plaintiff's claim relating to the Wiretap Act makes no difference that MedStar is a healthcare provider; correct?

MR. BARNES: It does inform the privacy rights that they have --

THE COURT: Okay.

MR. BARNES: -- and the reasonable expectation of privacy that they have. Can I --

THE COURT: Let me -- let me -- let me finish. Are you familiar with the recent Maryland Federal District Court cases that said that the Maryland Wiretap Act is not a General Privacy Act statute?

MR. BARNES: I am aware that there have been Maryland court -- Maryland District Court cases. I am not aware of the specific cases to which you refer.

THE COURT: Okay. I can pull them for you. It is much like the case that you're citing here, this Brown versus Google. It was a -- there were motions for standing, for federal jurisdiction standing, Article III standing. And they were determining whether or not there was an injury, in fact, relating to certain devices, tracking devices if you want to call them that, bugs if you want to call them that, that were placed.

And three, of the District Courts here in Maryland all determined what the purpose of the Maryland wiretap statute was. They determined further that it wasn't a basically a codification of any of the common law torts, and that it is not a general privacy statute. Okay. All right. Maybe you don't care.

MR. BARNES: Understood.

THE COURT: And so -- so your argument that that, you know, on the context of it being a privacy issue, Maryland courts have already rejected -- Maryland courts, not a court in California. Maryland courts have already rejected that the Wiretap Act is not a privacy statute.

MR. BARNES: Your Honor, I argued that all they had to do was get consent.

THE COURT: Okay.

MR. BARNES: That’s a separate question

THE COURT: Okay. So how -- so tell me how it is that it is all legally relevant, that MedStar is a healthcare provider in regard to this aspect of your claim?

MR. BARNES: For the patient portal. MedStar has an obligation to protect the confidentiality of what's in the patient portal. How does that relate to this? It relates to the consent aspect and what is necessary to obtain actual consent to share information with Facebook and Google. But that, Your Honor, is a theoretical discussion. And why is it? Can I explain why it's theoretical?

THE COURT: No. Because I have to ask a question because you keep going on. I'm trying to focus on an issue. Your point here in defending against the motion for summary judgment is that these URLs are content.

MR. BARNES: Correct.

THE COURT: And it doesn't matter; it shouldn't matter; it can't matter that the content relates to a healthcare provider under the Maryland Wiretap Act. It shouldn't matter. It doesn't say, well, you can provide content if you go to Washingtonpost.com, but you can't provide content if you go to MedStar. We're talking simply about content. You're defending and you're saying

these you URLs are content.

MR. BARNES: Yes.

THE COURT: Okay. You're saying that they're content, and you're saying that they being they're being transferred to Google improperly under the Wiretap Act? Boom. We've stated a cause of action. We've got a material question of fact. And you're -- they're pointing out if that's all it takes is the exchange of content from one entity to another without permission, you've got a claim.

MR. BARNES: And that's where I'm telling you that content is not all it takes. It takes a lack of consent. And the standard for a lack of consent is twofold. Number one, MedStar hasn't met the standard of lack of consent under the rules for an ordinary website that sells shoes, okay. And they don't even argue that they've obtained consent. So if they had some argument that they had obtained consent from patients, maybe we should be having a discussion about whether they obtained consent. They don't even argue. They can't argue it.

THE COURT: No, they're not.

MR. BARNES: Right.

THE COURT: I don't think they're arguing consent.

MR. BARNES: So it's not alone that it's

content. It's that it was content that every -- all the elements fit, plus there was no consent. And here's the difference between -- I think I'm familiar with some of the cases, although I can't sign them off the top of my head. There are pizza delivery company cases. They are stupid --

THE COURT: Now it's Noom. You've heard of Noom?

MR. BARNES: Noom? I've heard of Noom.

THE COURT: Okay. And there are cases out there in Maryland decided in 2024 and 2023, in which the claim is not a healthcare entity, that you are sharing information, content information on a Noom website, and there's another one out there. So these cases do happen.

MR. BARNES: Some of those cases were -- yeah, cases do happen. Some of those cases were dismissed on the basis of personal jurisdiction; is that right?

THE COURT: Well, standing.

MR. BARNES: Okay.

THE COURT: A determination --

MR. BARNES: Not cited in MedStar's brief. I wasn't prepared to discuss them today if you'd like a specific response.

THE COURT: Well, you know, you're the

attorney. You're the counsel for your party. I just -- you'll cite me a hundred cases from California, but there's two cases in Maryland, and you're not familiar with them. I mean, I'll take that for what it's worth.

MR. BARNES: Your Honor, we're aware of the language of the statute itself and a straight statutory interpretation. And if they want to get consent, they could do all of this, but they didn't get consent.

THE COURT: Okay. But I take that as a concession that it doesn't matter that MedStar is a healthcare entity for purposes of the Maryland Wiretap Act.

MR. BARNES: No, Your Honor, that's not what I said. It doesn't matter for purposes of content. It doesn't matter for purposes of device. It doesn't matter for purposes of --

THE COURT: There's no dispute that they didn't get consent.

MR. BARNES: Right. Their status as a healthcare provider is relevant to the question of consent. It doesn't matter for all of the other things. And consent is an element. So the fact that they are a healthcare provider is relevant, does put them into a different category.

THE COURT: Okay.

MR. BARNES: So the next issue is procurement. We moved because MedStar placed the source code here. They say we haven't proved procurement. There's, again, there's no definition of procurement in the statute, so we go to the dictionary definition, which is to get or obtain, to cause. MedStar is the causal agent here of this happening. There's -- I don't know how there can be an actual dispute of fact about that.

And then the last thing I do -- I do -- the last thing I want to talk about was, was the relevance of the healthcare provider status. For an ordinary website that you go to, the expectation of privacy for that consumer is nowhere near what the expectation of privacy is for a patient of MedStar, using a web property and a patient portal that MedStar encouraged them to use to learn about their healthcare, and that they -- MedStar promised was secure.

MedStar promised it would not disclose this personally identifiable information. It had a HIPAA notice on the patient portal that said it wouldn't do this. That's what makes this different. The cases where -- the Domino's pizza cases, where you don't have a direct healthcare relationship, those are different. That's a different that's a different relationship. Even Noom is a different relationship than the relationship

between a patient and MedStar.

THE COURT: Okay. All right.

I'll hear from the Defendants on the Wiretap Act claim.

MS. SCULLY: Your Honor, can I hand up two documents to you?

THE COURT: Okay.

MS. SCULLY: And you received -- I gave this to you all. I gave them to Jenny. I have more if you need more. Do you need another one? Okay.

Your Honor, I want to start first with a few corrections with respect to the facts, because I think there are still some confusions when discussing what is happening on which sites.

And so the starting first with the point we -- there is no dispute John Doe was a patient of MedStar. It is undisputed that he used the patient portal and had a patient portal account. Exhibit B, which Mr. Barnes has referred to, which shows the patient portal activity, I thought I had it here. Well, there's they've referred to it in their exhibit, and it's included in the record. But exhibit B is something that was downloaded by Mister -- by John Doe that shows his account history for his activity on the patient portal.

That document does not show the nature of what

happened when John Doe was actually in the patient portal. That is just a record of, okay, when I'm in the portal, I can go in, and I can create a history report for myself. That isn't a document that shows what happens. It is undisputed that that shows the dates that he was on the patient portal, and it shows the activity that he engaged in on the portal, but it doesn't show the nature of the transmissions.

The other point that I think is important to understand is where you are and what happens. So we spent a lot of time -- and that's the first document I've given you, Your Honor.

So the first screen at the top of the document, this welcome to my MedStar with the login to my MedStar, that view that was shown to you and that Mr. Barnes refers to as the MedStar patient portal login page. And he says if a if someone comes to this page, and clicks on this button, a transmission occurs that they have logged into my MedStar. And when they click on that button, that information will be sent to Meta and to to Google. This page is not the patient portal. This is on MedStar's public website.

There is no evidence in the record that prior to Mister -- John Doe, sorry, John Doe becoming a patient, a Plaintiff in this case, that that's how he

accessed the patient portal. That is one mechanism for accessing the patient portal. It is not the only mechanism. So when you click on this log in to my MedStar button, you are then redirected to this website, which is the screenshot of the actual patient portal, the Cerner patient portal.

On that website, you could enter your username, your password information, and then you click to to log in this page here. The bottom one, the Cerner Patient portal, when you click to log in there, there is no meta. It is undisputed that on this website, the Cerner Patient Portal website, there is no Facebook cookie. There is --

THE COURT: On this front page?

MS. SCULLY: The first page.

THE COURT: The Cerner --

MS. SCULLY: The Cerner front page. And so I thought there was some confusion there in the way this was being described.

THE COURT: I was trying to clarify it as much, and I'll here --

MS. SCULLY: And I will let him respond, but I think that’s undisputed.

MR. BARNES: The first one with the --

THE COURT: This one, there's a cookie. This one there is not.

MS. SCULLY: Correct.

MR. BARNES: Well, the top one, there's Facebook and Google.

THE COURT: Right.

MR. BARNES: The bottom one, there's Google.

THE COURT: Okay.

MR. BARNES: Okay.

MS. SCULLY: And so why does that matter? What is the distinction there about whether it's just Facebook, or if it's just Google? Why that matters is because the only cookie that it's undisputed identifies a user account is the c_user cookie that is -- that's associated with the Facebook Pixel. I know that they have -- their experts have said you can try to -- you can determine other information through the GA cookies that are placed, but there is dispute about that.

The only cookie that is undisputed refers to a person's account is the c_user cookie. There is no evidence for any transmission of John Doe having a c_user cookie being transmitted to Facebook. Even when John Doe went to the public website to create the fiddler captures for the experts’ use and analysis in this case, he then went and he clicked to the log in to my MedStar button, which happens on this this first page, which he testifies that's not the way he previously would have accessed the

site, but he did do that.

THE COURT: He had it bookmarked.

MS. SCULLY: He had it bookmarked. But he did, for purposes of creating the fiddler captures, go and click log in. And when he clicked log in, there was no c_user cookie transmitted. And that means he wasn't logged into his Facebook account at the same time that he took that action. And, therefore, the c_user cookie doesn't get transmitted because it only is transmitted if someone's a Facebook account holder, they're logged in to their account during the same session on the same browser when they go to the MedStar public website and click. That did not happen here.

THE COURT: All right. What happens if he has Facebook on his computer in one of the tabs and then he X’s out of it? Is he still logged into Facebook such that the c_user cookie would be transferred?

MS. SCULLY: I don't believe that that would transfer the c_user cookie, but we have -- it has not been tested. No one -- there's no evidence in the record of that, and that is the Plaintiff's burden in this case to prove that a c_user cookie was transmitted, and they have not. They bear the burden.

Your Honor, I think you recognize that the testimony is that John Doe used a used a bookmark. So

then what happens when John Doe using his bookmark from his from his computer or his phone to access the patient portal? What is what is transmitted? What is the information that we're talking about? And that is the second document that I've shown you, and that shows the type of transmission that is at issue when John Doe is inside the patient portal.

This document doesn't demonstrate a substantive communication that shows an action, not a communication. It shows a viewing of a particular page on the website within the patient portal. It is undisputed in this case, there was no transmission of any of Mr. Doe’s -- John Doe's actual lab results, any of his communications with any of his physicians, no text messages were transmitted, none of his diagnosis was transmitted, none of -- no X-rays. None of that information is transmitted. All that is shown here is, okay, this is -- all you know is there is an IP address that is anonymized, by Google upon receipt, gets transmitted. Info --

THE COURT: Where is that in that string?

MS. SCULLY: Yeah. So in this string, you've got -- you show that it's GoogleAnalytics.com. The aip=1, that is the value that is undisputed, the experts agree, that that value reflects that the IP anonymization

was turned on. So what that means is the IP address, which has to be transmitted for the communication to occur, that IP address gets transmitted, but it is not stored by Google. It is anonymized before it is recorded by Google and saved by Google.

So you have an anonymized IP address being transmitted, and then you have certain cookies, Google cookies, the GA cookie that he was referring to, that would differentiate Plaintiff as a user from another user, but not identify the Plaintiff by name.

Why is is all of this important? It's important to understand the nature of the communications we're talking about because of the language of the Maryland Wiretap Statute and whether there is a covered claim here.

Everything that the Plaintiff's counsel has pointed out during his presentation are showing clicks through a website, not a substantive communication. And we refer Your Honor to the Cook v. GameStop and the Katz versus Lacabe Oracle [sic] decisions that they referred to that talk about the web page that is visited. Clicking on something is a -- it's not a communication. It's a navigational direction. It is not an intended communication.

Why is this important? Well, I think we need

to go back to what is the definition. We've got to look at the definitions within the Maryland Wiretap Statute.

MS. SCULLY: So you start first with why was the statute enacted? Why do you have it? And the Maryland Wiretap Act, you know, had a twofold purpose. It was a useful tool in crime detection, and to ensure that the interception of private communications is limited. And that's in the Agnew v. State decision from Maryland.

When they enacted the ECPA in 1988, they wanted to curtail the government's use of wiretaps to listen in on and monitor private conversations between two persons, recognizing that the nature and the mode by which persons could communicate had advanced. Technologies had advanced, and there were concerns about, okay, could there be other ways that the government could listen in on, unlawfully eavesdrop on, private conversations? And that was the -- that is the, you know, the framing in which you need to consider whether you actually have a wiretap claim here.

Plaintiff's focus only on the definition of, you know, electronic communications and say an electronic communication is broadly defined. But when you determine whether you actually have a cause of action, you need to look at whether there was a interception under the

definition of the Maryland Wiretap Act. An interception within the interception definition, it says the Wiretap Act defines interception as the oral or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device. Contents is also then a defined term. You do not have a viable cause of action without an interception, and you must have contents within that.

So within the contents definition, it says the wiretap defines contents as any information concerning the identity of the parties to the communication or the existence, substance, purport, or meaning of that communication. And when you're looking at this section of the statute, which is 10-401(4), that is referring to all three modes of communication. So within the wiretap, it's covering communications that are, that are oral, that are that are -- I'm sorry, four -- wire, electronic, oral communications.

So if you look at, okay, so you've got an electronic communication or an oral communication, or you have a wire communication, those communications, it is presumed from a plain language reading of the content's definition that those communications would have some sort of substantive content, purport, or meaning. You have to

look at the entirety of the definition.

It's not just, if you have the transmission of electronic data, computer-to-computer transmission of electronic data, with no intended substantive communication occurring, that is not an actionable wiretap claim. It might be an electronic communication, but it is not that you've acquired the contents of a communication as defined under the Maryland Wiretap Act.

When you focus on the piece of what is the identity of the parties to the communication, any information concerning the identity of the parties to the communication, that is not defined in the statute, Your Honor. And I don’t -- you don't have to get to this piece of our argument if you agree with us that the content of the communication has to have actual meaning, substance, purport, or meaning.

If you agree on that point, they have failed to satisfy that there has been a wiretap here, because there has been no substantive communication that was intended where John Doe was intending to communicate something to another person that's been intercepted. All -- the best case scenario you have here is that there was a transmission of a URL address with no content within it, just showing a page view, a view of a page where John Doe was on the patient portal, but not reflecting an intended

communication that he was making to to MedStar and looking for a response from MedStar.

Pardon? Yeah. Yes.

So another point on that that's important for the patient portal, Your Honor, is the way the patient portal is designed, there is no function for doing web search queries. So the cases that Plaintiff's counsel refers to in the federal cases where they say a detailed URL may -- someone could infer the content of a communication, the substantive purport or meaning of the communication, through detailed URLs. Those cases arise in the context of there being a search query that is run. And then within the URL, you can see the search query.

And that was what was at issue in the Brown v. Google decision, that Plaintiff's counsel referred to. The concern that the court had, if you look at the URL string there, was that it showed he did -- the party there had done a search for a particular article about the Ukraine and looking for information about updates on on Ukraine and the war in the Ukraine. The concern that they had there, and looking at what some of the other federal decisions have said as well, is putting in that detailed search is a substantive communication. I'm asking for you to -- I'm concerned about these various issues. You can read more into that URL. It's not just

-- and you could see what particular document someone was looking at and viewing.

Here, for the URL string that that I showed you that’s at issue for the lab results, you cannot determine any particular lab result that John Doe looked at. There is -- that's just a generic name of a tab. It does not reflect the particular document that was reviewed. It does not reflect any search that John Doe made. And so that's why those cases are distinguishable from the cases -- from the situation and the facts here, and why John Doe doesn't have a viable cause of action, wiretap cause of action, on the content piece of it.

He also, though, has not established that any of the information that is being transmitted is information concerning the identities of the parties. The info -- the information that Plaintiffs are addressing doesn't identify John Doe by name. That is undisputed.

Here, you have a IP address is one of the things that they say is transmitted, although it's an anonymized IP address. That's undisputed. An IP address, even if not anonymized, doesn't concern someone's identity. An IP address concerns the access point to the internet.

The cookies that they refer to also don't

identify a person. They identify a browser and a device. They don't identify a person. The actual GA cookie that they were referring to is a, you know, an anonymized string of numbers to distinguish one user from another. That is not sufficient to show that the data that was transmitted was information that relates to the identity of the person.

When Plaintiff’s counsel argued that this is the same as a driver's license, I would say this is far removed from that. That is not what we're referring to here. You know, they're -- a driver's license does relate to someone's identity. Here, their argument is more complex. They are arguing that someone that is sophisticated enough that they brought a Ph.D. expert who has come in and says when this information is transmitted, it has sufficient entropy that makes it unique. It distinguishes one user on the website from another user, and that's what Google Analytics is designed to do, to distinguish the uniqueness of a user. That does not equate to identifying the person.

Their expert then goes a step further and says, well, potentially, Google and Facebook could, using this, and then triangulating it with other data that they have, try to determine who the actual person is. There's not evidence that that has happened with respect to John Doe,

but that also doesn't get them there for the Maryland Wiretap Act. You have to have had a transmission that concerned the identity of the of the person, not, well, once you transmitted this, there's other information that Google or Facebook has that they could potentially use to then try to unmask or identify a person. That is -- that is not a wiretap claim, and that is not covered under the Maryland Wiretap Statute.

I would refer, Your Honor to the in re Nickelodeon Consumer Privacy litigation decision that Plaintiff's counsel relies upon in their briefing. That's from the Third Circuit. It was interpreting a different statute, I grant you that. It was under the VPPA statute.

There under the Video Privacy Protection Act, they were dealing with the fact that you are not -- a video service provider is not allowed to disclose the personally identifiable information concerning one of its customers. In that case, Plaintiff's counsel made a similar argument that Viacom disclosed to Google 11 pieces of information about children who were using the Nickelodeon website who browsed the website, including IP address, a user's browser operating system, and compromised browser fingerprints. They said that -- they made a similar argument like here, that the information

that was transmitted could match data, and then Google could determine the users of their websites.

In interpreting the VPPA statute, the court determined that on the spectrum of what may be considered personally identifying to trigger liability under the statute, the type of data that they were referring to was far too removed. The court stated that the allegation that Google will assemble otherwise anonymous pieces of data to unmask the identity of individual children is, at least with respect to the kind of identifiers at issue here, simply too hypothetical to support liability. The court noted that the Supreme Court has instructed that when a technological change has rendered a statute's initial term ambiguous, a law must be construed in favor of its basic purpose.

I would proffer, Your Honor that the same principles apply to this case, and interpretation of information concerning the identity of the parties to the communication has not been met here.

Focusing on the concern about our argument of absurd results. Carrying their interpretation of the statute to what does it mean. If the Court were to find that transmission on a website of a using Google Analytics and transmitting IP address and device browser pairing that that is sufficient to have a Maryland

wiretap claim, we would say that that is an unreasonable interpretation of the statute, and we do think that that would lead to absurd results, Your Honor.

Looking at the Maryland court's website today, the current website for this court, it's running Google Analytics. It says on its website we run Google Analytics, and it says the information that we obtain about you is not personally identifying information, which I find useful and interesting. I think they're correct, and it's why the information at issue here also is not information that is a wiretap, why it's susceptible to a Wiretap Act claim. Under Mr. Barnes theory, however, that website would be subject to liability under the Maryland wiretap.

THE COURT: What about consent?

MS. SCULLY: Pardon?

THE COURT: Why isn't there consent if there's a notice?

MS. SCULLY: Well, Your Honor, the issue that Mr. Barnes has raised about consent is that you would actually have to have consent from the people on your site, and just posting it would not be good enough for consent. There's also no cookie banner showing up.

Well, yes. Well, the other point, Your Honor, about with respect to the website is Mr. Barnes argues

that just the use of Google Analytics technology collects personally identifiable information. The Maryland website court says it does not collect personal identifiable information. So under Mr. Barnes argument, Maryland would have made a misrepresentation because that wouldn't have in fact informed someone that the information was being gathered was -- could be used by Google Analytics to ultimately try to determine who they were. We don't agree with his argument, but that that is the import of his argument, Your Honor.

THE COURT: I'm looking at the -- it's all irrelevant because we're looking at the website as it exists on June 26, 2024.

MS. SCULLY: Correct. And we’re in a totally different.

THE COURT: And it says, we're using cookies to give you the best experience on our website. You can find out more about which cookies we're using or switch them off in settings. I suppose that even by going to this page, I could be wrong, that some code is already being sent, some cookie is already being sent even before I get to choose whether or not I go on to other pages on this. But I can guarantee you that this banner at the bottom of this website didn't exist there in 2019.

MS. SCULLY: And I agree, Your Honor, we have

to look at the facts of this case in light of what was happening at the time. We are not -- the way internet is functioning now, and the way websites are currently being structured is far different than they were at the time of the facts of this case and the concepts of the cookie banners and cookie pop-ups were not as pervasive. The use of Google Analytics, however, has been pervasive during this time period, and that's why we believe that the interpretation that is being presented by Plaintiff's counsel is incorrect, and it's inconsistent with what the actual purpose and intent of the Maryland Wiretap Act was and is.

Your Honor, the in re Application of US decision that Plaintiff's counsel refers to, that decision when they are referring to and having a discussion about file names and subject lines in that decision that arose in the context of the court addressing emails, we believe that that is an important distinction. I recognize that Mr. Barnes is referring to these URLs as electronic transmission of file paths. But when you're talking about an email communication, that is a communication where one party is intending to communicate substantively with another party. That is where I do think you have contents at issue. That is far removed from the URLs that we are referring to and the

computer-to-computer transmissions that are reflected in the document that I showed you that just shows clicks on a website page, navigation on a website itself.

With respect to the argument about whether there has been an interception using a device, Your Honor, I would just refer the Court to within our papers 20 through 21, where we address other aspects of the Maryland Wiretap Act that compel the conclusion that the device was considered to be something that was a piece of equipment, something that was capable of actually being seized, Your Honor.

And then we also do cite some federal authorities. We have not been able to find any Maryland authorities that specifically address whether the software code at issue is a device. I don't dispute that there are federal decisions that have found that software code is a device. We believe, however, that the decisions that have found that this type of code is not a device are more, are the better reasons, decisions. In re Google Cookie Placement Consumer Privacy specifically addresses that the cookie doesn't capture anything. It is not a device.

With respect to the argument on interception, Your Honor, we also believe that that same decision that the in re Google Cookie Placement Consumer Privacy

decision was the better reasoned decision, especially when you consider the the rule of lenity when you are interpreting the application of a statute that is -- arises in the criminal context, even if you have a civil liability associated with it. The rule of lenity continues to apply.

Here, there has been no actual interception. It is undisputed that MedStar was -- when John Doe went on the website, he was intending to engage with MedStar to do things on the MedStar website. The transmission that are at issue with respect to, the cookie transmissions, those are transmissions that go directly from John Doe's browser directly to Google. There are no transmissions. There's no evidence in the record that there was any transmission of any communication from John Doe to to Meta, Your Honor. And under those facts, there has -- they have not proven that there has been a interception under the act. Thank you, Your Honor.

THE COURT: Okay. All right. Rebuttal?

MR. BARNES: Yes. Your Honor. Let me come up with some quick hitting points.

First of all, is our expert's testimony unrebutted that the c_user cookie does not matter. There is additional support for that from the Vint report that shows that the datr cookie is directly associated with

the Facebook account, as are IP addresses and user agents.

To your question about if someone went into Facebook and then just clicked the X, rather than logging out, would they remain signed in, MedStar is correct. I don't think there's anything in the papers, but --

THE COURT: There is. There was a statement in your papers that said that that didn't log you out. That's true. Okay. And there was no cite to it. It was an assertion.

MR. BARNES: Okay. It does not log you out. It would also be undisputed. It also doesn't matter. And that's why -- it still doesn't matter. That's the whole point of our expert declarations and explaining how these things tie together is the c_user cookie does not matter. It is not necessary for the information to be personal information.

And for that, Your Honor, if I could hand you what is Class Cert Exhibit 14? I'm going to hand a copy to counsel. It is not disputed that this information is health information that would identify an individual and provide a reasonable basis to believe the information could be used to do so, i.e. is identifiable. This is MedStar's internal privacy policy on the list on the right side. Device identifiers the FBP and GA cookie are

device identifiers. Next URLs, web addresses. Next internet protocol address numbers. Final on the list, any other unique identifying number, characteristic, or code.

Earlier, I made a reference explaining how our expert said that those things were like license plate numbers, and Your Honor expressed some skepticism about that. MedStar itself puts them in the same category as license plate numbers. If you look on the right-hand column of the page.

THE COURT: Am I sure I'm looking at the same thing?

MR. BARNES: Exhibit 14. Oh, did I hand you the correct? I don't know.

THE COURT: Can I? I'm looking at safe.secure.smart.

MR. BARNES: Correct.

THE COURT: Okay. I didn't see any columns.

MR. BARNES: The columns. The bullet points down at the bottom.

MS. SCULLY: There's no bullet points on there.

MR. BARNES: Well, okay. You're right, Your Honor.

THE COURT: Mr. Clerk, it's --

THE CLERK: Sorry, Your Honor.

THE COURT: That's okay.

MR. BARNES: Here's that.

THE COURT: All right. Thank you.

MR. BARNES: I apologize. Do you have the one with the columns?

MS. SCULLY: No. I just have one page.

MS. PAULSON: I just handed it to you.

MS. SCULLY: Oh, this?

MS. PAULSON: Yes.

MS. SCULLY: I'm sorry. Okay. Sorry.

MR. BARNES: Thank you, Your Honor. Now, I understand the very confused look as I got way ahead of myself. So this is an internal MedStar document.

Question is, what is protected health information? Protected health information is any health information that would identify an individual or provide a reasonable basis to believe the information can be used to do so. If you go down, it says question for discussion. How many PHI identifiers can you name in 30 seconds, and then there’s a list of PHI identifiers.

The right-hand column, the third bullet point, device identifiers. Fifth bullet -- fourth bullet point, URLs and web addresses. Fifth bullet point, IP addresses. Last bullet point, any other unique identifying number, characteristic, or code. And the

second bullet point is license plate readers. So when I say our expert likens the information disclosed here to license plate numbers, so does MedStar. It's not disputed.

THE COURT: Okay. I mean, you're going to say to me that names, the very first bullet point, is comparable to URLs and web addresses, just because they're listed in the same list?

MR. BARNES: They are admitted by MedStar's internal documents to be identifiers that either identify an individual or provide a reasonable basis to believe that they can be used to do so. And Your Honor may have that opinion, I understand. We have experts who disagree. They have no expert to rebut it. This is not the type of thing that is within the realm of common experience. This is the stuff that is subject of expert opinions, and we have internal documents from MedStar that agree with our experts.

THE COURT: Well, I mean, you keep mentioning that point, but I went back and looked at -- and I don't have his name here. My notes are back in my chambers. But I looked at his declaration that's attached to your -- at least to the opposition to the motion for summary judgment, and he indicates that he is -- his opinion is relying upon the opinion of the declaration of Mr. Smith.

MR. BARNES: He is relying -- he looked at Mr. Smith with respect to the types of information that were disclosed; correct.

THE COURT: Right. And then he lists a series of paragraphs from Mr. Smith's declaration that he looked at.

MR. BARNES: Correct.

THE COURT: And it's probably about 20 or 30.

MR. BARNES: Okay.

THE COURT: Okay. And only two of those paragraphs were John Doe II. Okay.

MR. BARNES: He doesn't need to. The reason he doesn't -- the reason he doesn't need to, Your Honor, is that it works the same for everyone. There are no exceptions. He knows what these cookies do.

THE COURT: Why didn't he say that?

MR. BARNES: He did throughout his.

THE COURT: He doesn't say. He doesn't make an opinion in regards to the use that that John Doe II said he did.

MR. BARNES: He says --

THE COURT: He's basing his opinion on all of this information, including Jane Doe I or II, including the examples that were set forth by Mr. Smith. He's taking all of that information. He's not taking the

information that John Doe II provided him, which is that he went to the website one time to look up one doctor's name, that he that he used a bookmark to go to the login page, and that he went into the login page apparently about 100 times during the relevant time period in this case to look up different test results and allergy results and things of that sort in the patient portal. He didn't do that analysis. His analysis is based on all of this information that John Smith, or whatever his name is, collected.

MR. BARNES: And, Your Honor, he did look at two of them. The reason it doesn't matter is because it is always the same. That is how the technology works, the expert says --

THE COURT: So why didn't he say that?

MR. BARNES: He did.

THE COURT: In specific -- sir, we are now dealing with one particular individual, and you've got an expert opinion that is expressly based on information regarding another Plaintiff, who doesn't exist anymore. He says it in his declaration. I am basing my opinion on the information that was provided to me by Mr. Smith. Then he lists the paragraphs. There's like 20 paragraphs. Only two -- and so he's basing it on all of those, not just on the two paragraphs of John Doe II.

He's basing it on all of those, and what we're reduced to from 20 paragraphs, 20 bits of information that he's relying upon in his report, we're down to two. And you're telling me as a court of law, I'm supposed to assume that although he's basing his opinion on this much information, we're now down to this much information. I have to accept that what he would say to this much information is exactly the same as what he would say to this much information, even though he never said it.

MR. BARNES: Your Honor, he did say it in the deposition. He says paragraphs 165.

THE COURT: Okay. Hold on, hold on.

MR. BARNES: This is what he relies upon.

THE COURT: Okay. Hold on.

MR. BARNES: We will provide you with the entire deposition. I don't -- what I think the problem is, Your Honor, is I understand Your Honor has certain feelings about the way the internet works. Dr. Shafiq has testified that this is not -- it is the same for everyone, including paragraphs 165 and 166. So it doesn't -- the specifics about John Doe don't matter because it's the same for every single patient.

THE COURT: I think a better way to phrase your statement is, maybe I have a different understanding of the way trials are supposed to work and cases are

supposed to work and the law. That might be a better way to explain it, but I personally don't have any opinion about how the internet works.

MR. BARNES: Dr. Shafiq was asked.

THE COURT: All right. What is the deposition testimony cite?

MR. BARNES: Can you pull the deposition testimony?

We will get you the deposition testimony cites. They --

THE COURT: Please don't say anything until we get that, because I'm focused on that right now.

MR. BARNES: May I explain while she --

THE COURT: No, wait. Let's wait until we get it.

MR. BARNES: May I cite his --

THE COURT: Yeah, sure.

MR. BARNES: -- his report.

THE COURT: Well, okay. Sure.

MR. BARNES: So paragraph six. Okay, says the information at issue far exceeds the critical amount of entropy. Okay. So what did he think was the information at issue?

THE COURT: Right.

MR. BARNES: If you go to paragraph 14 --

THE COURT: Been there.

MR. BARNES: A is IP address and user agent. That's in paragraphs 165 and 166, not disputed by the parties.

Paragraph B identifies specific cookies; okay? Cookie one is the IDE cookie. That would be in paragraph 165 to 166. Paragraph two is the NID cookie. That would be in paragraphs 165 or 166. Paragraph three is the datr cookie. That would be in paragraph 165 166. The c_user cookie would not be. That's in point four, paragraph 14. The fifth paragraph relates -- says the _GA cookie. That's in paragraphs 165 and 166, which is shared through a CID data parameter. The sixth one is the FBP cookie. That's in paragraphs 165 and 166. The third are the device attributes, which are -- I do not know if they were in 165 to 166, but they are elsewhere in the in the Smith Declaration. They there admitted by Mr. Vint that they are always sent.

So, yes, he relies upon the data sent relating to John Doe, and he doesn't have to look at John Doe's communications. Because he all he needs to know is that this was put on that website. That's all he needs to know.

You know what? They had an expert, the same expert. We took his deposition last week. The website

had removed the Facebook source code from the hospital's website. So you know what he did, he examined it from another website to see how it would work because it always works the same.

MR. BARNES: That's the whole point. Our expert says these distinctions are distinctions without a difference. There is no difference. It is always the same.

It is as if we had testimony that MedStar placed a recording device, a tape recorder, and hit the play button, and walked out of the room. We had testimony that the play button always recorded the conversation that was in the room, and we had an expert to testify as to how the machine worked, did it at all, that it always did that. And that when it did so, it always collected these things, and these things were always PII, no matter what the different settings of the person who walked into the room was.

It is a technological question of how that source code works. And his opinion unrebutted -- they can't find an expert anywhere in the world to rebut it -- is that it doesn't -- none of this stuff matters. He looked at 165 and 166 because that was specific to Doe. But his opinion is it doesn't matter because it's always identifiable. This is the way the internet works. This

is the way the internet works.

I know that -- look, he can rely on the fact that just this source code was on the website. That's enough for him to make this testimony, because that's how it works, without exception. And their guy agrees, Mr. Vint. So with respect to paragraph six or in six and seven, he says at issue data, paragraph 14 defines at issue data. Paragraphs 165 and 166 are specific to John Doe, and they include everything except the c_user cookie.

THE COURT: I read the declaration, Counsel.

MR. BARNES: Okay.

THE COURT: And I have a different interpretation of it than you do, so that's clear.

MR. BARNES: Understand, understand. And then for the second part of his declaration is how the companies in this industry work. Again, not rebutted and that it is identifiable to them.

I'd like to back up to Noom because I did read it. Distinction with Noom, the court found no standing, and I quote from the opinion. "Plaintiff does not allege that the session replay code actually captured her specific sensitive personal information. Absent allegations regarding the specific kinds of captured personal information implicating the substantive privacy

interest, plaintiff fails to allege that she suffered an intangible injury, i.e. invasion of privacy, specifically that her personal information was intercepted."

THE COURT: And so in that. But they talk about URLs. In that case, she does allege that they sent URLs.

MR. BARNES: She does. But she alleged -- she alleged that -- she does not allege that there was personal information about her sent about her. So it would be as if, yeah, this is all that is sent. Just -- I'm sorry.

THE COURT: That's okay.

MR. BARNES: I'm sorry. This is all this sent. It would be as if the content only is sent. And I think Noom stands for the proposition that content only, completely disconnected from the person, does not create Article III standing in federal court. That's my reading of that case. What it says, though, is she didn't do it because she didn't allege this PII part. She had content only.

THE COURT: Okay. Again, we have a different interpretation of the case. My interpretation of the case is that she talked about putting in her email address, her name, her other information, and there was

no allegation that that specific information was transferred.

In fact, more than that, because the federal court talks about the fact that even if she did put in her name and her email address, that wouldn't be the type of private information that would give the plaintiff Article III standing. They’re talking about even additional information, and she didn't allege that more private information was exchanged.

She didn't say that there was no ISP information or URL information that went along with their website, and the URL information that was exchanged. So their -- the court's use of private information in that case, that was specifically being alleged in that case, is private information that she input into the computer. It has nothing to do with the, for lack of a better term, the metadata that goes along with her punching into a website.

MR. BARNES: Your Honor, I would ask that you reread pages seven and eight of the opinion.

THE COURT: Okay. I’ve got it up right now.

MR. BARNES: I don't read it that way. It says absent allegations regarding the specific kinds of captured personal information, plaintiff fails to allege she suffered an intangible injury. We have specifics

here.

THE COURT: It says, “While plaintiff alleges that a variety of highly sensitive information can be captured in event responses from website visitors, including medical conditions, credit card details, and other personal information displayed or entered on web pages, she does not allege that the session replay code actually captured her specific sensitive personal information.”

MR. BARNES: Right, actually captured.

THE COURT: Rather, plaintiff alleges, when she typed a personal information into text fields, personal information and text fields, her website communications generally defined and complained in paragraph one, as mouse movements, clicks, keystrokes, URLs of pages visited and/or other electronic communications were captured by session replay, and then went to session replay providers.”

So she is alleging that URLs were sent and other electronic communications were sent. The court is making a distinction that that is not sufficient. What may have been sufficient is the information that she typed into the personal information in the text fields. They’re making a distinction between that personal information that could potentially be private and

important and render -- provide Article III standing and the information that she did allege, including URLs and other electronic communications.

MR. BARNES: Right. So the URLs alone are not enough.

THE COURT: And other and/or other electronic communications. That's the exact language that you're using, Counselor.

MR. BARNES: Right, right. Right. You have to have a PII attachment under that -- under that opinion.

THE COURT: Okay.

MR. BARNES: And if there's PII, that's what -- that's what triggers the Article III standing.

THE COURT: Okay. Again, we view the case differently.

MR. BARNES: Understand, Your Honor. I have anonymized IP address, Your Honor, just again, it doesn't matter because the _GA cookie, the anonymized IP address means nothing. There's still a device identifier sent, and it's acknowledged IP address is still sent. There's a promise by Google to remove the last octet. That's that's not an anonymous, a truly anonymized IP address.

The in re Nickelodeon case deals with the Video Privacy Protection Act. It has a definition of personal information that is unique in federal and state law. I

know, I litigated that case, and I do not like the opinion. The Third Circuit, though, did say that the plaintiffs in that case had a cause of action for intrusion upon seclusion and said that.

Regarding absurd results, MedStar keeps saying that Google Analytics alone gives you the liability. No, it doesn't. It's lack of consent. It can be how Google Analytics is configured.

And then the in re Application of the United States case again, Your Honor, that case deals specifically with not just emails. It does discuss emails. It discusses URLs and what are called post-cut-through dial digits.

So a post-cut-through dialed digits is, as the case law has developed, courts initially looking at this content issue made analogies back to telephone technology. So a post-cut-through dialed issue is if someone, a patient, called MedStar and received an automated service line, and the automated service line said press one to speak to Dr. Smith, and you press one, the one is what is called a post-cut-through dial digit. Post-cut-through dial digits are protected by the Electronic Communications Privacy Act. There is no case that holds otherwise.

The telephone company sued the federal

government when federal government tried to get post-cut-through dial digits for reason, and the and the D.C. Circuit Court said, yeah, that's that's content. You can't make telephone companies do that.

There's a case directly on point from the Fourth Circuit called Brown versus Waddell. It was a drug dealer pager case where they did a pager clone. So the pager clone gets the phone number, and the pager clone got the post-cut-through dial digits, which is like one, two, three, meet me at this corner; right? The Fourth Circuit said that the post-cut-through dialed digits were not a pen register, so they couldn't be the subject of a pen register decision. They had to get a wiretap application to get post-cut-through dialed digits.

And that's why -- that's where then, for the internet URLs, the case law jumps for log in to my MedStar to say hold on, if you have this communication here, the fact that you're at MedStarHealth.org alone is the equivalent of capturing the fact that you have called MedStar health, right? But when you click this button, and it has this, log in to my MedStar, that's the post-cut-through dialed digit that becomes the content that should not be intercepted under the substance, purport, or meaning analysis.

Since the first cases, like, went there, and Google cookie talks about post-cut-through dialed digits. The FISA court opinion that we submitted to you talks about post-cut-through dialed digits. Federal courts have kind of abandoned the underlying rationale. You know how cases build. You know, one case does the analogy, and the other cases rely on prior cases. But there is a Fourth Circuit case on these post-cut-through dialed digits, and this is the direct analogy to it.

Finally, with respect to search queries, and this distinction between a search query and something that someone types in versus a button they click, this is a distinction without a difference. I want to use this as an example as well.

There are three ways, theoretically, you can log in here, right? One is you can literally write down something like my MedStar.org/login. Second way is you could do -- you could type in a search on MedStar, say patient portal login enter. The third way is you can take a technological shortcut and click a button that says login.

There is no logical reason why this should not be protected. But if you take the long route, it's not protected because it's the same thing. It's a transfer of signs, signals, or information through electronic

means relating to the substance, purport, or meaning of an underlying communication. In this case, literally the communication is log in.

THE COURT: Where's the evidence that John Doe II clicked that button?

MR. BARNES: John Doe II said that hedid log in. He the evidence is that he enrolled. Okay. There is no direct evidence of the date and time that he clicked this button.

THE COURT: There is no evidence that he ever clicked it.

MR. BARNES: I don't -- I think that he would say he did not recall, so that's that's fair enough. There is evidence that he clicked the next page, right, with Google Analytics that it --

THE COURT: That has, right.

MR. BARNES: Right. You showed the page. There's a top, and then there's the bottom. There is certainly -- there's lots of evidence that he clicked the bottom -- the bottom button. I think you've got it up there.

THE COURT: Yeah. So he clicked this page, and it has Google Analytics but does not have Facebook.

MR. BARNES: It has Google Analytics. It has Google DoubleClick, which is Google Display Ads. And it

has Google ads, which is google.com. So it's not just Google Analytics.

THE COURT: All right. Anything else?

MR. BARNES: Not on the wiretap claim, Your Honor. I don't know if --

MS. SCULLY: I do, Your Honor.

THE COURT: Okay. Briefly, please.

MS. SCULLY: Yes. Very briefly, Your Honor.

First, Your Honor, the document that Mr. Barnes just showed you from MedStar with the identifiers, that is just a document that is quoting from the HIPAA privacy rules. That does not mean under the Maryland Wiretap Act that the transmissions at issue were information concerning the identity of the parties; that Mr. Barnes's attempt to bootstrap the HIPAA privacy rule into the statute is not a viable cause of action.

The cases that Mr. Barnes refers to regarding Coconspirators communicating with one another, those are at the heart of what the Wiretap Act is about. Those are the types of communications that the Wiretap Act was intended to address, not the non-contentless communications that we have at issue with respect to John Doe and the communications that have been -- that are in the record with respect to John Doe's clicking within the website of the patient portal on certain pages. Those

just are not content communications covered under the Maryland Wiretap Act.

It is the Plaintiff's burden to prove each element of the Maryland Wiretap Act claim. Based on the facts of John Doe, they have failed to establish that the communications at issue were of the nature and type that the Maryland Wiretap Act is designed to address. There was no interception because there were no contents of communications at issue being intercepted.

We request the Court enter summary judgment in favor of the Defendants on the Maryland Wiretap Act claim, Your Honor.

THE COURT: All right. So we've been going at it for about two hours. How much time do we think we need? An equal amount of time for the other three common law causes of action?

MR. BARNES: I don't think --

MS. SCULLY: Those should be shorter, Your Honor.

THE COURT: Okay. Well, let's take a let's take a ten minute break. I know I could use it.

THE CLERK: All rise. The court stands in recess for ten minutes.

(Whereupon, a recess was taken at 11:31, and the matter resumed at 11:53 a.m.)

THE CLERK: The Circuit Court for Baltimore City, Part 16, resumes its morning session. The Honorable Anthony F. Vittoria presiding.

THE COURT: Please have a seat.

MR. BARNES: Your Honor, I apologize. Ms. Paulson had to step out just a second. She'll be back. We can start. I just wanted to note.

THE COURT: Okay. I appreciate that. This is why I didn't want to move on. Mr. Barnes, do we have that deposition cite?

MR. BARNES: Yes. And if you look at our omnibus opposition to the to the motions to strike Dr. Shafiq -- on Page 29 -- all the citations, so in case you don't find them right now, are on page 29 of our omnibus opposition to the motion to strike. And what it identifies is how Dr. Shafiq explained what each identifier at issue is and how it works for Google and Meta respectively. There are seven footnotes here. I mean, I can read off the citations.

THE COURT: Can I see it?

MR. BARNES: Yeah. Let me make sure you get the whole section here. Much easier to just hand it to you.

(Brief pause.)

THE COURT: All right, Ms. Scully, this is from

page 30. MedStar asked Dr. Shafiq, point blank, quote, “Regardless of who was using the website and regardless of what they did on the website, is it your opinion that in every case, for every user, sufficient entropy was passed to Facebook and Google to exceed the identifiability threshold?” This is apparently from his transcript at 138, Lines 6 through 9.

Dr. Shafiq answered, “Yes...there is always enough information sent in -- that is commonly sent that exceeds the identifiability threshold. And actually far exceeds the identifiability threshold.” What's the Defendant's response to that?

MR. KARLSGODT: Your Honor, would it be okay if I respond to that since I'm the one that took the deposition?

THE COURT: Okay.

MR. KARLSGODT: The answer is Dr. Shafiq’s identifiability threshold analysis is really just a math calculation. And the math calculation is -- has a couple of components. One, he measures the number of bits of information. And his hypothesis is there are you need 33 bits of information to assign a unique identifier to every person in the world. So person one, person two, person three, go up to 8 trillion. Bits is in a different form, so there's more -- less bits than there

would be. But it's essentially 8 trillion combinations, right?

Is that right? How many people in the world, 8 trillion?

MS. SCULLY: Yeah.

MR. KARLSGODT: That's essentially his hypothesis. And so the reason that his answer to that question is, as he says it is, is because IP address alone, in his opinion, contains 32 bits of entropy, meaning you only need one other bit of information to exceed the what he calls the identifiability threshold. The problem, as he also admits many times in his deposition, is that what he means by identifiability is really uniqueness.

In other words, being able to distinguish one person from another, or not even a person, because he also admits that oftentimes it's an entity. And in a lot of the cookies that are at issue here, it's a it's a way of distinguishing one computer from another, not necessarily even one person from another.

And so the reason why the answer to that question is any of this information would be sufficient is because, in his opinion, IP address with one other thing, which he says user agent, which are two bits of -- or two pieces of information that are always sent in

every transmission on the internet, are sufficient by themselves to exceed what he calls the identifiability threshold. So that's the answer.

MR. BARNES: Your Honor, may I approach of the next two pages of the -- because the next two pages directly respond to -- or I can read from those two pages.

THE COURT: No, no. You can you can bring them, but I wish you had so that counsel could have addressed it at the time.

MR. BARNES: Well, I apologize, I was I was answering your question about whether they are always identifiable, and I just -- this is from our omnibus response on Page 31. We say that MedStar misrepresents Shafiq's testimony by testifying -- by saying that entropy does not answer whether a particular person could be identified or contacted. That takes his testimony out of context, because Shafiq testified that entropy is, quote, "used to establish whether the information makes someone unique and allows you to distinguish it."

After he answered that question, Mr. Karlsgodt asked, "And so to get to that point where we would be able to identify them for the purposes of communicating with them, we have to go to the second step of your analysis; is that right?"

Dr. Shafiq said, "Yes," and this goes to the second part of his report. And this is what he explained in the deposition. That's on Page 31. Dr. Shafiq says, "The easy way to think about this in two steps. First, you have some piece of information and you try to figure out whether that information is identifiable. That's the entropy calculation. Then there is this second step. Okay. You have this identifiable information. In some cases, that itself may be sufficient. So if I know your email addresses address or in some cases even if I know just your IP address, I have sufficient information I can use to contact you. In some cases, the identifiable information needs to be linked. So when you talk about contacting, one of the things you want to ask is is there a way of linking to be able to contact that person? So as I explained later in my report, all of this information that is at issue information is not only identifiable, but it is also linkable to a person. For example, name of a person such that a person may be contacted."

There is a two part analysis to Doctor -- Professor Shafiq. He says that the information is always meets --

THE COURT: Can I see that, please?

MR. BARNES: Yes.

THE COURT: Because I'm confused. I mean, he talks about email addresses, and then he says, well, not email addresses, something else. So --

(Brief pause.)

THE COURT: And I think part of my problem, Counsel, Counselor, Counsel, is -- and you may -- you may again attribute this to my inability to understand what's going on with the internet -- why didn't Mr. Shafiq pinpoint specifically the -- I forget what they're called, the -- oh, here they are -- the SAS files for Mr. Legos (phonetic) use of the MedStar health website?

MR. BARNES: The reason he did not, Your Honor -- well, he references 165 and 166, which refers to the SAS files. Let me put that. The other reason he did not go into that detail with respect to analyzing the SAS files is because these tools work the same everywhere they are employed.

THE COURT: Right. I understand the words that you're telling me. But he's saying, if you have this or if you have that, or if you have that, then you can do it. And I guess the evidentiary step that I'm missing is from Dr. Shafiq, not from Jay Barnes, where he says in this report, I have this information. It's right here. In this report, I have this information. It's right here. In this report, I have this information. It's

right here. Based on my understanding as an expert in the field of entropy -- in internet, I conclude that a reasonable degree of scientific certainty that I could have identified easily without much difficulty. However, I could have identified John Doe II.

And what I'm telling you is nowhere that I'm seeing does he make that opinion. You say that he makes an opinion that you could do it if you had this information. If my point is, I understand that, and they don't have an expert to rebut that, and I understand that's good. And I'm sure he's very good at what he did. But my point is here, in a court of law, he hasn't said with the information that we have about John Doe II, I could have done it.

MR. BARNES: Two things to that, Your Honor. And I recognize one of the responses -- I recognize what the response is going to be to the first one, and I'm going to say it anyway. But Dr. Shafiq's report was submitted in connection with class certification because it's the same for everyone, and he doesn't need the underlying data.

Now, the next step is if that's the flaw with respect to John Doe himself, Dr. Shafiq, if you read his entire deposition transcript, we think it makes the connection there that this is -- that this connection is

there based on what is in the Smith report and based on what Dr. Shafiq is testifying to. If you're not finding that connection, we can amend his report to fix it. It's not hard to fix. All he has to do is look at those specific fiddler files and say, this cookie, this cookie, this cookie, this cookie, this cookie, here are the connections. What he did is he said this cookie is identifiable this way. This one's identifiable this way. This is identifiable this way. With just bare reference to 165 166.

I understand you say that's not enough. He can make it even more robust and specific for John Doe. But our point -- and it goes back to class cert -- is it's not necessary because it's the same for everyone. That's still that there's -- that's why there's this merger here of class certification and the merits. Because we have an expert who says it's the same for everyone. They have no rebuttal to it.

And so yes, if we're going to move to individual trial, we think it's sufficient that he says, look, these identifiers which we have in this other declaration are identifiable. This is how you do it. If you think there has to be a direct 1 to 1 in a written expert report, we can do that. We think we've satisfied it anyway, but we can do that for the individual. Our point is it's not necessary because it's literally the

same for everyone. There are no exceptions.

THE COURT: All right. Could somebody hand this back to Counsel?

Counsel for MedStar, do you have any response?

MR. KARLSGODT: Yes, Your Honor, just very briefly, and I don't have the exact quote of what Mr. Barnes read, and I can I can try to find it, but. Oh, he's handing it to me.

What is important is when he's talking about the second part of this analysis that he's talking about, part one, again, is just this mathematical. Are there the right number of bits? Part two is where you get into how do you identify a person by name? How would you contact them? And if you listen to his language, it's qualified. If you have certain information, it could be linked. It may, you know, this person may be contacted. That's what's missing, not just for Mr. Smith, but for anyone in this potential class.

THE COURT: I don't care about anyone. That's my point. But I care about Mr. Smith now, because this is the one --

MR. KARLSGODT: I'm sorry. John Doe. I didn't -- I misspoke. Mr. Smith is the expert.

THE COURT: Oh, yeah, John Doe. I don't care about anybody but John Doe II because we have a one

person case now.

All right. Let's move on.

MR. BARNES: Okay. Your Honor, we talked. I think we'll do -- do you want to go first?

MS. SCULLY: Yeah.

MR. BARNES: Do you want me to go first?

MS. SCULLY: Your Honor, I think it would make sense that we go first, since you are only looking at certain elements, and we're asking for -- I mean, if you agree with us on our argument --

MR. BARNES: I'm fine with you going first. We're going to do -- hold on. We agreed privacy -- two privacy torts and then negligence.

MS. SCULLY: Yeah.

MR. BARNES: Okay.

MS. SCULLY: So we're going -- we're going to address the two invasion of privacy claims --

THE COURT: Okay.

MS. SCULLY: -- at the same time. I'll make those arguments, and then Mr. Barnes will make his arguments.

Once that is completed, we'll then address negligence, Your Honor, if that's acceptable.

THE COURT: That's fine.

MS. SCULLY: Plaintiffs have two theories of

invasion of privacy in this case, the intrusion upon seclusion and then the publication of private facts. Under both of the Plaintiff's theories, they bear the burden of demonstrating that the matter intruded upon was a private fact that was -- that the private fact that was made public or that was -- which was invaded upon, was something that would be highly offensive to a reasonable person of ordinary sensibilities.

As Your Honor has already recognized in ruling on the motion for class certification, under Maryland law, this is an undeniably high standard. For an actionable claim, the conduct must be the type that affects a person's reputation or would cause them mental harm, shame, humiliation.

The most favorable ruling of the facts that have been presented for John Doe is the fact that there was an IP anonymized address that was transmitted when he was on the MedStar patient portal that disclosed to Google Analytics the fact that he was on a page within the portal. From that, giving all the inferences to Plaintiff, at most, Google could infer, if they could determine who he was, that he was a user of a patient portal of a full service hospital with no transmission of any health conditions, no indication of who his treating physicians were, the nature of why he was a patient at

MedStar. Being a patient at a full service hospital that serves millions of people is not the type of information that a reasonable person would find would be highly offensive if that information was to be learned by someone in the public.

Given those facts, we proffer to Your Honor, that the Plaintiff's invasion of privacy claims fail entirely, and the motion for summary judgment should be entered in our favor.

We've presented in our briefs cases that address the disclosure of actual health conditions, the disclosure of an actual test result, a disclosure of that someone had a positive Covid 19 test result, even with information being transmitted about someone's -- or being disclosed about someone's actual physical condition or their actual medical records, that alone does not meet the highly offensive conduct element for an invasion of privacy claim. On the facts of John Doe, Plaintiffs cannot meet their burden for an invasion of privacy claim.

With respect to the publication of Private Fact Element, the failure to establish that there was highly offensive conduct alone is why summary judgment should be entered. We also, though, have argued in our briefing, Your Honor, that they have not met their burden to

establish that there has been any fact -- they have not been able to establish the publicity element of that aspect of their claim.

They do not dispute in their briefing, Your Honor, that to prove that MedStar communicated a private fact to the public at large, they must have communicated something that was certain to become one of public knowledge. The information that we are talking about here, where it is a computer-to-computer transmission of anonymized information; you've got an anonymized IP address; you have computer-to-computer transfer. There is no evidence in the record of any actual human being ever reading, comprehending, doing anything with this information. That makes this case very different from the cases where someone publishes someone's name in a paper.

And we would refer Your Honor to the point that was raised in the in re Facebook Consumer Privacy User Profile Litigation, and there the court recognized that there could be a distinction between publicizing sensitive information -- and here we would say there isn't sensitive information that's been -- that's at issue. But even publicizing sensitive information, there's a distinction between actual human being’s information being published where actual human beings

could see it, review it, consider it, that there's a distinction there from just adding anonymized information into big data computers that may be then used for other purposes, including sending targeted advertising on behalf of companies, with the former potentially being an area that meets the publicity element, but the latter not meeting the publicity element.

In that case, that, I will say, that was dicta. The court did not, in fact determine that issue, noting that neither party had in fact raised that issue. It was just an issue the court addressed in its in its ruling. But here, we have raised the issue. And on the facts in this record, we believe Your Honor can find that there has not been a publication of private fact under these facts.

Plaintiffs also have made an argument that MedStar has evaded a legally protected right to privacy. And in their argument, they refer to the Saint Luke's -- Saint Luke's institution versus Jones decision. Your Honor, we've taken the position, and I know Your Honor will review that decision, but that case involved actual medical records, and it addressed the Maryland Medical Records Act, which actually defines what is a medical record. And the medical record is defined to be information that actually is recorded in a person's

record. That is not what this case is about.

When this case was initially filed, there certainly were allegations, and the impression was given that this case was about the disclosures of medical records. And Your Honor will remember that at the class certification argument, we addressed arguments about the fact that some of the Plaintiffs who have now voluntarily dismissed their claims actually believe that that's what this case was about because of the ads that were run, that information, you know, the implication was that MedStar has leaked private medical information, and that's what they thought the case was about. But that's not what the facts have proven to be. That's not what the case has ever been about.

And here, on the facts of John Doe, there has been no release of any medical records. So for that additional reason, Your Honor, we believe that the plaintiffs have failed to meet the burden to show that there was a legally protected right to privacy that has been invaded here. Thank you.

THE COURT: All right, Counsel?

MR. BARNES: Yes, Your Honor. If I could come up and use the board here?

Ms. Paulson, can I have -- I have another handout for you, Your Honor.

THE COURT: Okay. Thank you.

MR. BARNES: So two claims, and I think it's important for Your Honor to distinguish between the two. The first one is intrusion upon seclusion, elements of which from the jury instructions are on Page 2. Intentional intrusion upon another’s solitude, seclusion, private affairs, or concerns in a manner that would be highly offensive to a reasonable person. So our intrusion claim has a -- these are set distinct claims. The publication of private facts is about the publication. The intrusion is about intrusion. To go back to this chart, okay, what we are alleging to the intrusion has three parts, four parts, but we don't need all four parts to make an intrusion claim. Okay.

The first part is that MedStar uniformly bugged its web properties where it sent patients to exchange communications about doctors, conditions, diseases, and the patient. The second part is the uniform placement of Google and Facebook cookies on patient communications devices, their phones or computers. Third part is the command, taking control of the computers. And the fourth part is the disclosure. We think the disclosure is obviously related to this intrusion, but this alone is an intrusion. And so it's a completed intrusion.

What are the two cases we have for that?

Pemberton versus Bethlehem Steel, where a placement of a listening device outside a motel room was said to be enough without any evidence of what it actually recorded. The placement of the device alone in that case was sufficient to state the intrusion claim.

The second case is New Summit versus Nistle. And in that case, the court held that the intentional act that exposes the private place, that's the direct quote. That’s what is the intrusion. That was the placement of a video camera in an apartment. Okay. It was the placement of the video camera itself, without regard to what happened next, that was the intrusion.

Our claim for the intrusion is that there is a relationship of trust between Mr. Doe and MedStar as a patient. MedStar admits to this. If you look at page six of the slide show, MedStar’s, I believe this was the 36th witness, says we do make some assumptions about how a patient would want to use the portal.

Question: “And what are those assumptions as it relates to privacy?”

Answer: “That when they log in, their navigation and the information they receive from the portal is confidential and private.”

Next question on the right side, “Do you agree just the fact that a person is a patient of MedStar is

confidential?”

Answer: “Yes.”

Middle, “Does MedStar agree that healthcare providers have a special relationship of trust and confidence with their patients?”

Answer: “Yes.”

“Does MedStar agree that healthcare providers have an obligation to keep communications with their patients confidential?”

Answer: “Yes.

A healthcare provider placing a surveillance tool on a patient's phone or computer is an invasion of their privacy in and of itself, and it is sufficient to get to a jury on whether it is highly offensive or not. For the highly offensive element, I don't think it's disputed. It's Black Letter Law that it's typically a jury question.

I think the best case for this, there are lots of Maryland cases that say it. The case that most closely resembles this one is the Google Cookie case in the Third Circuit, where the court pointed out that whether or not database targeting is the internet's Polestar, users are entitled to deny consent, and they are entitled to rely on the public promises of the companies they deal with.

In that case, Google had hacked its way around third-party cookie blockers on Safari, which is a similarity to this case because Google continues to hack its way around third-party cookie blockers. It makes no difference. And in response, certain attorneys general, the federal government, took interest. And the Third Circuit said with regard to the highly offensive element, that the fact that the elected branches, California and federal executive agencies, had sought to penalize Google, could indeed lead a reasonable factfinder to find that it would be highly offensive.

Here, what we have is you have the D.C. Attorney General taking interest. We also have the fact that inside the patient portal -- there might be a dispute with respect to outside the patient portal. But inside the patient portal, there's no longer any real dispute that it violates HIPAA. And the reason I say that, MedStar submitted notice of supplemental authority from Texas.

In that case, the American Hospital Association expressly said that it would not challenge the application of HIPAA to the use of Google Analytics or Facebook in connection with the patient portal. And the reason it won't is because it violates HIPAA. It is a very clear violation of it. That's in our class cert

slides, which I hope I get to at least show you, if even briefly. But that's why it can be a highly offensive.

The next --

THE COURT: What are the two cases that you cited?

MR. BARNES: So in re -- oh, for the Maryland cases --

THE COURT: Yes.

MR. BARNES: -- are Pemberton versus Bethlehem Steel.

THE COURT: And what's the cite?

MR. BARNES: 66 Md. App. 133, and it's a really long opinion. The pincite that I'm discussing is at 163.

THE COURT: Okay.

MR. BARNES: And then the other one. I have it listed here as New Summit versus Nistle because I wanted to save space. It's like New Summit Association, LLP, Inc., whatever. 73 Md. App. 351. And the pincite that I'm discussing is at page 360. Of course, the case discussed the tort in a broader context as well.

With respect to publication of private facts, that claim is limited to this; okay? MedStar makes the argument that publication to Facebook and Google is not publication to the public at large, like a newspaper, so

it doesn't count. To our knowledge, there are two cases on point. One of them -- we cite them both.

One is in re Google RTB. The other is the in re Facebook Consumer Privacy Profile Litigation. That's the list of cases. So it's not like there's this abundance of -- it's not like where earlier I was arguing about the Electronic Surveillance Act saying, Your Honor, there's all kinds of case law that says they're wrong. On this, there's only two cases.

So, look, I'll concede, if Your Honor says you don't agree with those two cases, then you don't agree with those two cases. But those are the two cases we're relying upon. To my knowledge, there's nothing in Maryland law. To my knowledge, there's nothing anywhere else, other than here, other than those two. So my response to that is, Your Honor, needs to read the cases and and make a decision whether they apply to these facts or not.

I would add that with respect to the highly offensive element here, what is the additional thing is the fact that it is the patient's healthcare provider that is doing this, that makes it highly offensive. It makes it a breach of --

THE COURT: I agree that it's particularly relevant for these claims. There's no doubt about that.

MR. BARNES: Okay. MedStar also raises the argument of damages for a for the intrusion and invasion of privacy claims, and they lump it together with the negligence claim. But the damages argument should not be lumped together with the negligence claim. Because there's a Maryland case, Johnson versus Value Food, Inc., 132 Md. App. 118 at 126, where it says there's a fundamental distinction between intentional and non intentional torts. While it is necessary to prove actual damages to obtain a recovery in negligence actions, the same rule does not apply to intentional torts. The plaintiff who proves a prima facie case of an intentional tort but fails to prove damages, will always be allowed to obtain at least a nominal recovery. A plaintiff need not prove damages in intentional torts.

We also cite a case called Neal versus United States that talks about that, but MedStar says we're wrong in that case because the federal court said, well, look, your expert didn't make the causation requirement to mental anguish. We're not making a mental anguish claim here. It's Black Letter Law that for intrusion claims, there's a general privacy interest that is separate and apart from the mental anguish, like going to a therapist, that is -- some courts call it general privacy damages. Some courts call it nominal damages.

Either way, it's available even without the proof of the mental anguish. Doe versus Chao is a Supreme Court case that points out that the common law makes these damages available for plaintiffs in privacy cases without respect to individual harm, and has done so for a long, long time.

Finally, I think this is -- there's a relationship here. I want to point Your Honor going back to your discussion of Noom and the privacy interest, the relation back to the Wiretap Act, and why there's standing. It's if you read Nickelodeon and you read Google Cookie -- I understand they're Third Circuit opinions, not Fourth Circuit, and certainly not Maryland opinions -- they address that Article III standing issue with respect to invasions of privacy head on and with respect to allegations of violation of wiretap. And they put it in the connection of where personally identifiable -- they talk about the interest in a broad way that I think is informative.

I'm trying to think. I think that's all for these two torts, and I don't know -- well, Ms. Scully can come back up.

THE COURT: Anything else, Ms. Scully?

MS. SCULLY: Yes, Your Honor. First, both the Pemberton decision and the New Summit decisions both

involved intentional surveillance. They are distinct from what was happening here, when you're talking about inside the portal using an analytics tool. Plaintiffs are characterizing that as surveillance, but the record does not reflect that. The use of the analytics within the patient portal was intended for surveillance. The New Summit case was a peephole case, I think very factually distinct from what we're discussing here and the data transmissions at issues here. And the Pemberton International involved surveillance by Bethlehem Steel on its employees.

We disagree that that it is undisputed whether the use of Google Analytics in the patient portal is, in fact, a HIPAA violation. The mere fact that that was not that that was not -- that aspect wasn't addressed by the AMA in its challenge in Northern District of Texas, does not mean that this, in fact, is a -- that there is a HIPAA violation here. We don't agree that there has been a HIPAA violation.

Regardless, even a technical HIPAA violation is not enough to find that there has been a highly offensive conduct. You need to focus and look at what, in fact, was the impact on this Plaintiff under the facts of this case. And with those facts, as we've already addressed, Plaintiff cannot meet their burden that there is

something that was highly offensive.

Thank you, Your Honor.

THE COURT: Anything else, Mr. Barnes?

MR. BARNES: Just that the argument that MedStar makes about highly offensive is a great argument to make to a jury.

THE COURT: All right. Negligence?

MS. SCULLY: One second, Your Honor.

MR. BARNES: I'll go. I'm going to be really brief on negligence.

THE COURT: Okay.

MR. BARNES: As we previewed -- I previewed with respect to the disclosure claim that full -- telling you that there's two cases, and that's what there is, and Your Honor just needs to decide if you agree with those two cases or not.

With respect to the damages for the negligence claims, there are two lines of cases. One line is well represented in the in re Marriott decision that we think is very well thought out. The other line is represented in the Kahn (phonetic) versus National Health System case. And we think the Marriott case is right. Maybe you agree with us, in which case you say this is enough. If you disagree with us, it's the converse's National Health System.

Let me make my brief pitch for why Marriott's right. And that is, there is no dispute that the type of data we're talking about has value. There is no dispute that it is bandied about and used by all kinds of companies. And when you have a case like this where the data is given away without permission and used without permission, that is a form of theft. Now, it's not obviously a strong-armed robbery, but it is a form of taking something and using it for a purpose for which the defendant did not have permission to do so. And I think the reason that courts are finding that the value of the data itself is viable as a damages model is precisely because it is monetizable. And where it's being taken away without permission, that fits under the category of a damage.

This case is slightly different than most cases that involve that line of thinking. Most of those cases are pure negligence cases, right? It's a hospital system that fails to adequately protect data. This is not an accident --

THE COURT: Data, not URLs, not IP addresses.

MR. BARNES: It depends on -- correct. Well, IP addresses, there have been HIPPA breach cases based on identifiers plus patient status and HIPAA breach notifications. They're not in the list of cases. But

you're right. You're right. That's another that's another distinction.

I'm not going to -- again, unlike the Electronic Surveillance Act where I told Your Honor MedStar's claims and arguments are outside the -- have no basis in law or fact. They've got an argument here. Okay. We think it's wrong. We hope that you agree with the Marriott decision, but it's within the realm of reasonableness for you to disagree with the Marriott decision.

We think also there is a recent decision in the Virginia Mason case, same counsel.

THE COURT: I've been tracking that case. I haven't seen anything in that case.

MR. BARNES: Okay. So there was a recent motion for summary judgment decision. We can provide it to Your Honor if you want. We want -- plaintiffs prevailed on some claims. Defendant prevailed on some claims. We can present it and brief it if you want.

For purposes of this claim, we have the same expert, Gary Olsen. Same basic challenge to his damages model. The court said no, Mr. Olson can testify. That's a valid damages model. I don't know if you want to hear more about the case right now, or you just want to --

THE COURT: Does somebody have an opinion -- the opinion? Was there an opinion?

MR. KARLSGODT: There is one. I don't -- it's not been submitted to the Court.

MR. BARNES: It's not been submitted.

THE COURT: When did it happen? When did it happen?

MR. KARLSGODT: A couple of weeks ago.

MR. BARNES: Yeah, two weeks ago.

MR. KARKSGODT: I only say this because I think we heard something last time that the Court wasn’t interested in hearing about that case, so I think that’s why both sides just --

MR. BARNES: Yes. That is correct, Your Honor.

THE COURT: Well, okay. I appreciate -- I may have said something along those lines, but I’ve certainly been interested in finding out what was going on with that case because, number one, the parties raised it for a potential need to to have a postponement of the trial date in this case, but also because I wanted to see what was going on.

MR. BARNES: So Defendant prevailed on the identity theft claim based on lack of identity -- lack of -- no -- lack of proof of intentionality and that the predicate crime, which was the Washington State Wiretap

Act, only applied to person-to-person communications. I will note the language of that act is different than the language of this act, and so we can we can have a discussion about that that might be necessary for further briefing. We haven't briefed it here today. If Your Honor wants to hear it, we can do it.

Plaintiffs prevailed -- what else did you prevail on, Mr. Karlsgodt?

MR. KARLSGODT: I don't remember. I'd have to pull --

MR. BARNES: The plaintiffs prevailed on their privacy claims, a negligence claim.

THE COURT: Okay. That's fine.

MR. BARNES: So we'll submit it. Rather than have us misstate it both different ways, both ways. How about, Your Honor, we submit it, and both sides submit brief, brief explanations?

THE COURT: Well, I don't need any more paper in this case.

MR. BARNES: Fair enough. What I would like, Your Honor, is to note the difference between the Washington Wiretap Act -- the statutory language difference between the Washington Wiretap Act and the Maryland Wiretap Act.

THE COURT: All right. So but my question

is -- and I'm having a little bit of trouble making the logical leap -- now the claim of damages in the negligence action is the fact that -- you tell me what is -- not the measure, not how you quantify the damages, but how is he damaged?

MR. BARNES: He is damaged because he has valuable information that could be sold in the marketplace that was sold without his permission, whether he -- so the big --

THE COURT: So this this, again, doesn't have anything to do with the fact that it's a medical provider. This is just purely his internet traffic.

MR. BARNES: Generally, correct. Yes. Yes. Generally -- I generally agree with that statement. The -- what you see in those lines of cases is there's often a dispute about, well, the plaintiff must show that they intended to actually sell it.

One sentence, the court says, well, yeah, that makes sense. How do you have a loss if you didn't intend to sell it? The other side is no, in order to be harmed by the unauthorized taking or use of something that has value or is property doesn't depend on whether you intended to sell it or not. And let me give you two examples.

First example is you have a family heirloom

that's in a bank vault. That gets stolen. You would have never, ever, ever sold that family heirloom. Have you been damaged? Of course you have, even though you never intended to sell it.

Second example. Let's say you buy land. You're big on conservation and hunting. You buy land because you want to reserve this land for hunting and hunting only. You don't want strip malls on it. You only want deer hunters on it. And someone comes in later, right? You sell it. And someone comes in later and puts a strip mall on it, or somehow intrudes upon what you deeded it for. Have you been harmed even though you never would have sold it? Yeah.

The other example I like to use is the environmentalist buys a piece of property that he never wants to use for logging, and a logging company comes in and takes a tree. He never would have sold the tree. But has he been damaged by the taking of his property, which is the tree? Yeah, that's actionable.

Now that's where courts analyzing that have made the leap to say, okay, we're not dealing with trees anymore. Obviously, the heirloom example that I used, we're not dealing with that, but we are dealing with something that has value that's taken without permission and used. So do you have to intend to sell it for there

to be harm or to be there to be damage? Our position is no.

THE COURT: Okay.

MS. SCULLY: Your Honor, starting with the last point that Mr. Barnes left off on. It is important here that we're not talking about something physical. We're not talking about property. And there is no argument that the browsing history is John Doe's exclusively to control when he is on the internet, nor has that browsing history, if it had a value, been diminished in any way.

Your Honor’s citation in the class certification decision to the in re Google Android Consumer privacy Litigation, we believe was correct, where the Court was addressing that this idea, this marketplace concept of if there has been -- if there -- if there is any market at all, and focusing on the points that Olson makes, of someone can go and have apps and put apps on their phone that collect a lot more information than we have at issue here and gain some certain rewards from using those apps.

This Plaintiff hasn't been prohibited from engaging in or using any of those apps. Nothing that we are talking about has he lost value of. It hasn't diminished. Nothing that has occurred has diminished the value in any of his personal information. And there is

no identified marketplace where John Doe could go out and sell to anyone. The fact that he went on to an individual site and did a search on a single site, whether it be a patient portal or not a patient portal, that that market just doesn't exist.

Plaintiffs have -- other than this theory, Plaintiffs have not established -- they don't have any evidence -- that John Doe has otherwise been harmed in any way. That is why we argue that the negligence claim -- summary judgment should be granted on the negligence claim, because it is their burden to prove that there has actually been an actual injury to John Doe, not just that there is a expert that can come in and calculate how damages could potentially be measured. They're missing the first foundational piece. Has he in fact suffered any injury? We say he has not.

The Kahn decision, we agree that is the correct analysis on this point. The argument that Plaintiff's counsel makes that there's a body of law, a growing body of law, contrary to Kahn. We would just point out that the growing body of law distinct -- description is inaccurate. You're talking about two decisions that were written by the same judge, Judge Koh, and then Judge Grimm in the Marriott case, then quotes to the two decisions written by one single judge.

The facts of the Marriott case also are different from the facts at issue here. Based on the arguments we have presented in our briefing, we believe the Plaintiffs fail to establish damages and negligence should be -- judgment should be entered in our favor on the negligence claim.

THE COURT: All right. We are going to break for lunch. Let's meet back here at 1:40.

MR. BARNES: Your Honor, is the courtroom locked during this time, or should we take our stuff?

THE COURT: Yeah. I don't think anybody will come in here. Everything's being recorded by cameras, but if you feel concerned about it --

MR. BARNES: Yeah.

THE COURT: -- you should take it.

MR. BARNES: Thank you. All right. Recess for lunch.

THE CLERK: All rise. The court’s in recess until 1:40.

(Whereupon, a luncheon recess was taken at 12:42 p.m.)

- oOo -

A F T E R N O O N S E S S I O N

(1:41 p.m.)

THE CLERK: The Circuit Court for Baltimore City, Part 16, is now in session. The Honorable Anthony F. Vittoria presiding.

THE COURT: Thank you. Please have a seat.

MR. SINCLAIR: Your Honor, real quick, I'm going to have to leave at 3:15. I apologize, but I've got an out-of-town colleague who's here for a meeting. And I thought with yesterday, we'd be able to get through today, so. But I think -- I'm not planning to argue any motions. And lead counsel is obviously handling everything. So with your permission, I'd like to be able to do that.

THE COURT: At 3:15?

MR. SINCLAIR: Yes, sir.

THE COURT: That’s fine.

MR. SINCLAIR: Thank you.

THE COURT: All right. This Court is prepared to rule on the motions for summary judgment. I think it's important that I do that now so that the parties can do whatever it is they believe they need to do following my motion -- following my rulings.

This case has -- well, I'll get to that in a minute. I may not understand the internet as well as

some other people in this room do, but I do like to think that I have an understanding of civil procedure, trial procedure, burdens that are necessary on motions for summary judgment. And those are the aspects that upon which I'm basing this ruling.

So first off, this case from my record -- I looked it up -- is 1608 days old. It was filed on January 31st of 2020. It's over four years ago, almost four and a half years ago. The time for supplementing documents, motions, briefs, that time is long past. The record is what the record is.

Second, this case is no longer a class case. This case involves a single individual, a single Plaintiff. And the facts relating to that Plaintiff are what we're looking at in this motion for summary judgment.

Now, we just had a trial where several experts testified. Again, I feel like I know what is required of experts. And the point was made here in this courtroom that there is no expert opinion directly relating to John Doe II. And we talked about it. I tried to make the point earlier, and it didn't seem to sink through, but then finally it did. Counsel produced additional deposition transcript or information from another brief from another deposition. I'm not sure exactly. The

Court -- I do know exactly. The Court isn't obligated to find information that supports the Plaintiff's case in pleadings and information that don't relate to the motion for summary judgment. But even those motions, even those that testimony, did not directly relate to John Doe, the Plaintiff that we're talking about in this case.

So let's talk about John Doe. John Doe has a Facebook account. John Doe uses a computer and his phone. John Doe has a Gmail account. He lives with his parents. His daughter uses his phone and his computer. He has been a patient of MedStar. He's scheduled appointments using MedStar's website.

He believes -- this is the first deposition, Page 48, Lines 5 to 6, and used the portal for a recent colonoscopy. At least to schedule a recent colonoscopy, Page 48, Lines 9 to 14. He's had a portal account. He set it up about three years ago. Page 48, Lines 20, basically 18 through 21. He's used the portal to check scheduling, results, and so forth. He recently checked for nerve tests on -- for nerve test results on the portal. He cannot ever remember sending a message on the portal.

As to the regular website, he testified that he remembers one time that he went to the regular website, and he looked at Doctor Levine's bio. He can't remember

when he did it. He knows what was on the MedStar website, but he doesn't know how he did there. And he admits it's possible that there was just a Google search, and that result took him directly to that web page.

Important to this Judge who's testifying -- who's thinking about a trial, who's thinking about this case, thinking about this Plaintiff, he testified that people knew he had surgeries. He testified that he told people he was a patient of MedStar. It's in his deposition. He testified that he put in Facebook in August 5th of 2020, that he had knee surgery, and he -- people commented on it, and he responded to those comments.

I went through his entire first deposition. If I was provided the second deposition, I was only provided excerpts of it. It might have been in something else, but thousands of pages that have been filed in this case, but it wasn't provided in response to either of the motions for summary judgment.

Then I went through -- oh, and by the way, he did provide the access log. This access log is 26 pages long. Interestingly, however, 13 of those pages all relate to the searches that he did in response to his counsel's requests on September 21st. He did approximately 106 searches or button clicks or something

else between the time of 12:12:50 on September 21st, 2021 and 12:24:13. So in less than 11 minutes, less than 12 minutes, 11 and a half minutes, he did as many clicks in the patient portal at the request of his counsel that he ever did in his whole life before that. So we're talking about a maximum of about 106 times, according to the Plaintiff’s evidence. That is in evidence. 106 times that he went to the patient portal prior to being requested to do so by his counsel.

So I went through both of the declarations that were attached to the motions for summary judgment, and I looked in particular at Mr. Shafiq's declaration. And I looked at the evidentiary import of that declaration. And I don't doubt that he's got qualifications, and I don't doubt that the Defendants haven't identified an expert that counters what he says in theory. My problem, as I pointed out in the hearing, is theory is different than an analysis of the facts and the plaintiff and the facts in this case, as they are now. And that doesn't exist.

So Page 2, as I explained below, the information at issue far exceeds a critical amount of entropy that allows third parties to uniquely identify the device used by a patient to access MedStar Health’s web properties. It's paragraph six. Paragraph seven

gets a little bit more specific. It's possible would be able to reasonably -- and there's a qualifier -- link the at issue information to a person or oh, yeah, a household.

And talks about later on paragraph ten the minimum amount of entropy is approximately 33 bits, and this is the paragraph I cited before: “I analyzed Richard Smith's analysis of network transmissions from patients’ web browsers when they are communicating with the MedStar health website, including transmissions to third parties such as Google and Meta.” All right. So this is what he relied upon.

And he drops a footnote. He has Smith declarations, paragraphs 15, 27, 66, 70, 74, 78, 79, 117, 118, 130, 132, 158, 159, 162, 163, 165, and 166. By my count, that's 17 different paragraphs that he relied upon in Mr. Smith's declaration. As I mentioned, only two of those paragraphs relate to the Plaintiff that is at issue now. Only four of them relate to any plaintiff that has ever been part of this case. One of those plaintiffs is gone, is not part of this case anymore. But all the other information that he relies upon are based solely on Mr. Smith's analysis and searches and things that he did.

It goes on to say in paragraph 17, “The user agent also contains a significant amount of entropy.

There are approximately ten bits of entropy in each end user agent."

It goes on to say in 18, "User agent when combined with other at issue information, such as IP address, typically exceeds the 32 bit identifiability threshold." Typically.

Then it goes on to say in 19, "Second, since arbitrary information can be stored in cookies, there is really no limit to how many bits of entropy, identifying information, can be stored in cookies." And this is the important part, "Tech companies typically store universally unique identifiers UUIDs in cookies. A UUID is 128 bits long and can guarantee uniqueness across space and time."

"Third," this is going on to paragraph 20, "the various device attributes shared with Google and Meta also contain sufficient entropy that can be combined," can be combined, "with other at issue information to exceed the 30 bit identifiability threshold. For example, IP address containing up to 32 bits for IPv4 and up to 128 bits for IPv6, and so forth." Again, it can be. Absolutely no analysis of the information relating to this Plaintiff whatsoever. He doesn't go on to provide any kind of analysis later in his declaration.

I also went and pooled analysis of Jonathan

Lego's use of MedStar website. This is from Smith's Declaration. This is paragraphs 165. Well, 164, which is just an introductory paragraph, 165, 166, and that's it. So according to this, the SAS files were created by John Doe in the Chrome browser on a windows PC as he accessed the my MedStar patient portal, which would reasonably be relevant here, and the MedStar websites, www.MedStarHealth.org and MedStar.org, which we have determined Mr. -- excuse me -- John Doe only went to one time.

So you have to go to paragraph 166 to find out what's really could be relevant in this case, and that's John Doe's traffic in the my MedStar patient portal. And that consists of five -- five captures, presumably from that April 21st time in 2021 when he went and spent 11 minutes and 30 seconds doing 90 different searches. There's no testimony about what any of these captures contain.

Mr. Barnes will tell you that it's there, Judge. It's always there. It's the same for everybody. But there's no testimony as to that.

We're at the motion for summary judgment stage. There's no testimony that that information could be used to identify John Doe. We're at the summary judgment stage after four and a half years of litigation. And

what I see is your URLs. It's undisputed that the information that's provided doesn't provide any information, other than it's indisputable, at least in the URLs, the pages that Mr. -- excuse me -- John Doe went to.

So that's the facts as exists at this point in time, when the case is closed, and discovery is closed, and the case has been submitted for summary judgment. So the question becomes, does that state a claim under the Maryland Wiretap Act? Well, apparently, according to Mr. Barnes, it would be reasonable for the Court to disagree with his position as it relates to the torts, but not according to the Wiretap Act claim. Well, we'll see.

I looked at the cases that are cited. I know that there has never been a case in Maryland under these types of facts that have upheld a claim under the Wiretap Act for this type of information exchange. It's not there. I also understand, from what has been submitted to me, that there is not a single case out there in the United States that has gone to trial on these kind of facts. A verdict was rendered on behalf of the plaintiff. It was appealed and upheld.

In fact, I was a little surprised when the Plaintiff cited to me a case that was on summary judgment. I'll get to that in a second. Every case that

I found related to preliminary motions, although there was one in re Farmer Track, 329 F.3d 9. That one was an appeal. I'll get to that in a second. Others -- some of them are -- other ones are an appeal of motions to dismiss cases. But they're all at the preliminary stage. And as we know, this case got past preliminary motions. I'm wondering -- because I have great respect for Judge Geller -- I'm wondering if the information had been pled differently, would it have gotten past a motion to dismiss stage? But it did. But we're not at the motion to dismiss stage anymore.

And in re Farmer Track, that related to a whole different amount of information. That related to names, addresses, telephone numbers, email addresses, dates of birth, genders, insurance statuses, education levels, occupations, medical conditions, medications, and reasons for visiting a particular website. The other cases cited by the Plaintiff talk about -- and I'm referring specifically to in re Google Cookies, 806 F.3d 125; in re Nickelodeon, which basically cites in re Google Cookie case. That one's 827 F.3d 262.

To this Court, to this Judge, the key phrase is some queried URLs qualify as content, and that it's a case-by-case situation. You can't, on motion to dismiss, say that there's no way that a query cannot be content.

But we're not at the motion to dismiss stage, again. We're at summary judgment.

We're at summary judgment where we know the only evidence about what John Doe did -- and I understand that he did his searches back in 2020. He did approximately 80 of them. That information is no longer available. I am not holding that against the Plaintiffs. I am crediting the Plaintiffs that if this individual went in and did these searches that are reflected in in 166, there's a reasonable inference that this would have been the information that had been provided back in 2020 when he actually did the search.

But that's not the point. If that is the reasonable inference, I am looking at the information that was provided. And again, I look at request 380. It says, “page view, my MedStar, IQ health, person, two person, health record, results, person, health record results, NS and D results.” It doesn't provide any information about any particular disorder that this individual had, any other healthcare information.

So from this Judge's understanding, there hasn't been a case where this has been upheld, much -- not only just in Maryland, but anywhere. Now it's working its way through the courts, and there could be a time where these cases are upheld. But it's not. This

is a completely novel -- especially in Maryland -- novel claim.

My view of the Wiretap Act and all the cases that have analyzed it, including the Noom case and the other cases that were referenced earlier this morning, the two cases in -- it's actually three. The other one is Straubmuller versus JetBlue Airways Corp. That's a Judge Chasanow case. The Noom case is a Julie Rubin case, one of my former colleagues here on this bench. They analyze the purpose of the Maryland Wiretap Act. And it is -- it's not a general privacy statute, and it's designed to protect communications.

So this Court holds, as a matter of law, that the type of information that is reflected in paragraphs -- in paragraph 166 of the Smith Declaration does not state a claim under the Maryland Wiretap Act. But I'm going to go a step farther and say, as a matter of law, that this Court finds that the information that's reflected in requests 380,382, 384, 379, in the Smith Declaration paragraph 166 is not content.

I will not make any findings as to device or interception.

Oh, that's right, I knew that there was one other finding that I was going to make. Because we have no opinion -- no information about the specific

information that John Doe did, the Court also finds, as a matter of law, there is no evidence that identity information was transferred.

So the Court finds that under this novel theory, the purpose of the Act, there is no cause of action for the information that is specific to this case, not another theoretical case, but this case. The Court also finds, as a matter of law, in this case, that content wasn't shared. And the Court finds, as a matter of law, that in this case, identity information was not shared. So the Court does grant the Defendant's Motion for Summary Judgment on the Wiretap Act.

Moving on to the torts. Intrusion upon seclusion. Intentional intrusion into a private place or affairs of another, such intrusion would be highly offensive to a reasonable person. The Court does not find Pemberton or the other case to be dispositive of this issue. What the Court does find to be dispositive of this issue is the information and the nature of obtaining that information. That's reflected in paragraphs 166, maybe even 165 of Mr. Smith's declaration, coupled with this particular Plaintiff's admittance that he told people he was a patient at MedStar, that he told people that he got his surgery and was getting medical care there, that he posted it on

Facebook, that as a matter of law this kind of information exchange could not be highly offensive to a reasonable person.

As far as intrusion is concerned, the Court will not enter a finding as and as to into a private place or affairs of another. The Court will not enter a finding. As to damages, it certainly in some regards the Court's understanding that in intentional torts you don't need to have an exact showing of damages. But there is case law in Maryland that for these two torts, you do need to show some kind of emotional harm.

Again, in this case, the Court finds, as a matter of law, that the plaintiff in this case cannot show any emotional harm, any kind of damage. Now, if it ends up, the Court of -- the Appellate Court of Maryland determines that you don't need to show any kind of damage for one of those claims, so be it. But in this case, because of his behavior outside of his searches on the internet, this particular Plaintiff cannot show any damage.

As far as the invasion of privacy, publication of private facts, the court finds, as a matter of law, there not has not been publication of these facts as contemplated under this tort. As stated before, that understanding under Maryland law is publication to the

public, and we don't have that here. What we have, at most, is publication for the pertinent context. And I'll accept counsel's representation as to Google, not even a particular person at Google, but the computer programs at Google. And then it spits it back, back to the Plaintiff in the way of advertisements.

So the Court finds by, as a matter of law, there's been no publicity. And again, in the light of the facts of this case, with this Defendant [sic] sharing publicly information about his status as a MedStar patient, his status as having undergone medical procedures, specific medical procedures at MedStar, the Court does not find -- does find -- does not find -- excuse me. The Court finds, as a matter of law, that this publication of the facts in this case could not be highly offensive to the reasonable person.

As to negligence, we're talking about -- at one point, the Plaintiffs are talking about, you know, the healthcare aspect. At another point, they're talking about just the pure value of any kind of internet searching. It's not clear to what -- where the Plaintiffs are exactly as to the claim of negligence.

But if we're talking about the divulgence of some kind of private information on the facts of this case, with the fact that this Plaintiff shared

information about being a MedStar patient, shared information about his specific healthcare receipt at MedStar, that he was not damaged by the sharing of information about his URLs, as reflected in paragraphs 165 and 166 of the Smith Report.

If we're talking purely about the value of the searches, the Court rejects the damages argument. We are talking about, at most, going back to the access logs, about 81 times, prior to when his counsel told him to do it, 81 times, where he went to a specific website, specific page on MedStar's website, or actually the patient portal.

And he was not aware that this information was being shared. It was -- it did not result -- those 81 times, to the extent that any information was shared with Google as to those 81 times, did not present, and the Court finds, as a matter of law, does not support a damages claim for the Plaintiff in this case. And without damages, under Maryland law, you don't have a claim for negligence.

So the Court grants a motion for summary judgment as to the intrusion upon seclusion to the Defendants. Grant summary judgment as to the invasion of privacy to the Defendants. And grants summary judgment as to the issue of negligence to the Plaintiffs. Denies

the -- excuse me -- Defendants. Let me say that again. The court granted summary judgment as to all claims to the Defendants. The Court denies the Plaintiff's Motion for Summary Judgment -- judgment. I don't know. I'll have to go back and look, but it moots all the other motions in this case. If I need to deny them as moot, I will do that. I will consider that. But at this point, I haven't done so.

I wish you all luck in your future in the Appellate Court of Maryland. But that's this Court's ruling. Thank you. Have a good day.

MR. BARNES: Thank you, Your Honor.

(Whereupon, the matter concluded at 2:10 p.m.)

REPORTER'S CERTIFICATE

I, Patricia A. Trikeriotis, Chief Court Reporter of the Circuit Court for Baltimore City, do hereby certify that the proceedings in the matter of John Doe II vs. MedStar Health, Inc., et al., Case Number 24-C-20-000591, on June 26, 2024, before the Honorable Anthony F. Vittoria, Associate Judge, were duly recorded by means of digital recording.

I further certify that the page numbers 1 through 134 constitute the official transcript of these proceedings as transcribed by me or under my direction from the digital recording to the within typewritten matter in a complete and accurate manner.

In Witness Whereof, I have affixed my signature this 26th day of July, 2024.

Patricia Trikeriotis

Patricia A. Trikeriotis
Chief Court Reporter

# EXHIBIT D

EXHIBIT D

# COUNCIL OF THE DISTRICT OF COLUMBIA
## COMMITTEE OF THE WHOLE
## COMMITTEE REPORT

1350 Pennsylvania Avenue, NW, Washington, DC 20004

**TO:** All Councilmembers

**FROM:** Chairman Phil Mendelson
Committee of the Whole

**DATE:** January 21, 2020

**SUBJECT:** Report on Bill 23-215, the "Security Breach Protection Amendment Act of 2020"

The Committee of the Whole, to which Bill 23-215, the "Security Breach Protection Amendment Act of 2020" was referred, reports favorably thereon, with amendments, and recommends approval by the Council.

CONTENTS


I. Background and Need ........ 1
II. Legislative Chronology ........ 7
III. Position of the Executive ........ 7
IV. Comments of Advisory Neighborhood Commissions ........ 7
V. Summary of Testimony ........ 7
VI. Impact on Existing Law ........ 10
VII. Fiscal Impact ........ 10
VIII. Section-by-Section Analysis ........ 11
IX. Committee Action ........ 13
X. Attachments ........ 13


OFFICE OF THE SECRETARY
2020 FEB -3 PM 4: 30

## I. BACKGROUND AND NEED

Bill 23-215, the "Security Breach Protection Amendment Act of 2020"[1] was introduced by Chairman Phil Mendelson at the request of the Attorney General on March 21, 2019. In the context of this bill, "security breach" means a data breach such as the well-publicized incidents where millions of computerized consumer records have been hacked. The bill expands the definition of personal information; adds requirements for the contents of a notification of a security breach to consumers; requires notification of a breach to the Office of Attorney General; requires persons and entities that possess personal information to implement and maintain reasonable security procedures and practices; and requires a company to provide 18 months of identity theft protections to an individual if his or her social security number or tax identification number is part of the security breach. Finally, the bill makes a violation of the data breach law a violation of the District's Consumer Protection Procedures Act which has the effect of strengthening enforcement

[1] The title of the bill has been updated to reflect that the bill was introduced in 2019 but is being considered by the Council in 2020.

provisions.

Bill 23-215, if approved, will be the first update to the District's data breach law since the Consumer Personal Information Security Breach Notification Act[2] was approved by the Council and became law in 2007. Since that time the District's law has not kept up with today's technology and is inadequate when compared to laws in other states. Ms. Wilkins from the Office of the Attorney General (OAG) testified at the hearing on Bill 23-215, that the District has fallen behind, and District consumers are not being sufficiently protected.[3] She added that in the new digital era there is more data collected on consumers, and the more data that is collected the more attractive it becomes to those who want to misuse that data.[4] In fact, the District had the highest number of cases per capita of identity theft and fraud when compared to others states.[5]

In recent years there have been numerous significant data breaches where the personal information of District residents was improperly acquired. In 2017, the breach of personal information maintained by Equifax comprised data belonging to 143 million Americans, which included more than 350,000 District residents.[6] It was reported in 2018 that Facebook believed that over 345,000 District residents' information may have been improperly shared in the Cambridge Analytica personal privacy breach.[7] Target had to pay $18.5 million to 47 states and the District of Columbia as part of a settlement agreement over a security breach in 2013 that compromised the data of millions of consumers nationwide.[8]

Justin Brookman from Consumer Reports testified at the hearing on Bill 23-215 that these data breaches are causing consumers to lack confidence in institutions to keep their data safe from misuse.[9] Bill 23-215 intends to protect District residents from bad actors, and thereby restoring consumer confidence, by incentivizing companies to take the necessary steps to safeguard personal information. Moreover, the new notification requirements in the bill provide more information and clarity to consumers so they can make informed decisions to best protect themselves.

***Personal Identifiable Information***

Bill 23-215 expands the definition of the term "personal information" to add sensitive

---

[2] Effective March 8, 2007 (D.C. Law 16-237; D.C. Official Code § 28-3851 *et seq.*).
[3] Elizabeth Wilkins, Senior Counsel, Office of the Attorney General, Testimony before the DC Council Committee of the Whole, 3, November 12, 2019.
[4] *Id.* at 2.
[5] *See* Brian Young, Public Policy Manager, National Consumers League, Testimony before the DC Council Committee of the Whole, 2, November 12, 2019, citing a 2019 survey by Wallet Hub.
[6] *See* Press Release, Karl Racine, Attorney General for the District of Columbia, Attorney General Racine Recommends District Residents Take Precautions in the Wake of Equifax Data Breach (Sept. 8, 2017), https://oag.dc.gov/release/attorney-general-racine-recommends-district.
[7] *See* Mike Valerio, Facebook: Half of DC potentially exposed to Cambridge Analytica Hack (May 3, 2018), *https://www.wusa9.com/article/news/local/dc/facebook-half-of-dc-potentially-exposed-to-cambridge-analytica-hack/65-548466144*.
[8] *See* Rachel Abrams, Target to Pay $18.5 Million to 47 States in Security Breach Settlement, The New York Times (March 23, 2017), *https://www.nytimes.com/2017/05/23/business/target-security-breach-settlement.html*.
[9] Justin Brookman, Director, Consumer Privacy and Technology Policy, Consumer Reports, Testimony before the DC Council Committee of the Whole, 4, November 12, 2019.

information that was not contemplated when the District's current law was adopted over ten years ago. The update ensures that the District's law aligns with the growing amount of personal data that could be improperly acquired.[10] The Committee believes expanding the definition is important. For instance, under the current law a resident would not have to be notified if: his or her email account was breached; information about his or her health insurance is improperly disclosed; or information about his or her medical history, biometric data, or DNA profile is acquired by a bad actor. As Mr. Brookman stated at the hearing, this is a common-sense updated that will better protect the privacy and financial security of District residents.[11]

Of note, the Committee, working with the OAG, updated the Committee Print for Bill 23-215 to address concerns that the new definition for the term "personal information" was too broad and vague and therefore difficult for businesses to follow. The Committee believes the definition in the Committee Print strikes the right balance between protecting consumers and providing clarity for businesses to be able to follow the requirements in the law.

***Risk of harm analysis***

During the hearing on Bill 23-215, Ms. Critides from the State Privacy & Security Coalition testified that the Council should consider adding a risk of harm analysis that triggers notification to consumers. She indicated that a majority of state data-breach notice laws only require notification if there is a risk of harm to a consumer.[12] This is an important criterion because it avoids "de-sensitizing" residents from constantly receiving notices about technical breaches that pose no risk to them.[13]

While companies should be as transparent as possible to the public when there is a data breach, the Committee agrees that unnecessary notifications of data breaches that cause no harm to a consumer might numb the consumer and may threaten the amount of attention the consumer will pay to another breach where there could be a significant risk of harm.[14] The Committee wants to ensure that when a consumer receives a notification of a breach that the consumers will take the notification seriously and take the necessary steps to protect him or herself from harmful consequences, such as identity theft or fraud.

Balancing the importance of transparency with ensuring that consumers are not inundated with unnecessary notifications, the Committee Print for Bill 23-215 provides that it is not considered a data breach for notification purposes, after consulting with law enforcement officials, reasonably determines that the breach will not harm the consumer.[15] Requiring coordination with

---

[10] *See Supra* note 3 at 4.
[11] *Supra* note 9 at 2.
[12] Elaine Critides, Counsel, State Privacy & Security Coalition, Testimony before the DC Council Committee of the Whole, 2, November 12, 2019.
[13] *See Id.*
[14] *See also Security Breach Notification Laws: Views from Chief Security Officers*, University of California-Berkeley School of Law 34 (December 2007), https://www.law.berkeley.edu/files/cso_study.pdf.
[15] The Committee modeled the language in the Committee Print on Connecticut's data breach law. Conn. Gen. Stat. § 36a-701b(b)(1), provides that "notification shall not be required if, after an appropriate investigation and consultation with relevant federal, state and local agencies responsible for law enforcement, the person reasonably

District and federal law enforcement agencies will assure a consumer that his or her data is sufficiently protected. Adding in this provision also builds on the safe harbor requirements that are already provided in the current law.[16]

***Notification Requirements***

Bill 23-215 inserts requirements for the type of information that must be provided by a company when a District resident is notified that his or her personal information has been improperly disclosed. Current law is silent as to the type of information that must be included in the breach notification.[17] The specificity required in the notification will ensure that consumers are armed with information that they need to protect themselves.[18]

The Committee has heard concerns that the notification requirements for email password breaches should be different. This is due to the fact that the only recourse in these cases is to have a consumer update his or her password for their email account and other online accounts. Ms. Critides (with the State Privacy and Security Coalition) testified at the hearing on Bill 23-215 that this separate notification requirement should be added in the bill to help avoid sending irrelevant breach notifications that could confuse District residents.[19] Hearing the concerns, the Committee Print for Bill 23-215 includes a separate notification requirement for email password breaches similar to the law in California.[20]

Further, Bill 23-215, as introduced, would have required prior notification of a security breach be made to the OAG before the public is notified. The notification to the OAG would bring the District's law in-line with other states and gives the Attorney General the tools to take swift action when a breach occurs.[21] It is important to note that even though notification to an Attorney General is common in other states, prior notice is only required in two other states: Maryland and New Jersey.[22]

During the hearing on Bill 23-215, Chairman Phil Mendelson raised the concern that prior notification to the OAG could delay notification to a resident whose personal information has been compromised. He also questioned the need to delay notification due to an ongoing law enforcement investigation as required under current law.[23] Chairman Mendelson stated that notice

determines that the breach will not likely result in harm to the individuals whose personal information has been acquired and accessed."

[16] *See* D.C. Official Code § 28-3851(1), which provides a good faith acquisition of data of protection information by employees or agents of the person or entity, and acquisition of data that has been rendered secured so as to be unusable by an unauthorized third party shall not be considered a breach of the security of the system.

[17] *See* D.C. Official Code § 28-3852(a).

[18] *See Supra* note 3 at 5.

[19] *Supra* note 12.

[20] *See* Cal. Civ. Code § 1798.82.

[21] *See Supra* note 3 at 5.

[22] *See* Kyle R. Innes, Assistant Vice President & Assistant General Counsel, Securities Industry and Financial Markets Association, Written Statement Submitted to the DC Council Committee of the Whole, 2, November 8, 2019.

[23] *See* D.C. Official Code 28-3852(e).

to a consumer must be immediate.

Accordingly, the Committee Print for Bill 23-215 provides that notification to a District resident and the OAG will be simultaneous. Moreover, the Committee Print includes a *de minimus* requirement for notification to the OAG in order to align the District's law with other states. What this means is that a company will be required to notify the OAG of a breach only if it affects 50 or more District residents. This will ensure that small businesses are not overly burdened by the notification requirements in the bill while still allowing the OAG to protect District residents when there has been a large-scale breach.

***Security Requirements***

Following cybersecurity best practices, Bill 23-215 requires companies to take reasonable and proactive steps to protect a District resident's personal information from unauthorized access, use, modification, or a reasonably anticipated hazard or threat. On many occasions a breach occurs because a company did not use best practices to secure data, and when this happens the consumer bears the burden or cost for this mistake.[24]

The Committee Print amends the bill to reflect that a company that is in compliance with Title V of the Gramm-Bleach-Bliley Act (GLBA),[25] the Health Insurance Portability Accountability Act of 1996[26] or the Health Information Technology for Economic and Clinical Health Act[27] will be in compliance with the security requirements in Bill 23-215. This change from the introduced version addresses concerns that were raised by Mr. Innes from the Securities Industry and Financial Markets Association. He wrote to the Committee that the bill's new security requirements are not more robust than what is required under other federal laws, but they are not similar either, so it is unnecessary and undesirable to require a company to follow both laws since the regulatory inconsistency could take away from a company's efforts to protect customers.[28]

***Credit Monitoring and Enforcement***

In order to provide more protections to District residents, Bill 23-215, as introduced, would require a company to provide two years of identity theft protection to each District resident whose social security number or tax identification number was released in a breach. California was the first state to require free credit monitoring services. Since California adopted its law, the states of Delaware, Connecticut, and Massachusetts have passed similar laws.

Unlike what was proposed in Bill 23-215, no other state requires 24 months of free credit

---

[24] *See Supra* note 5 at 3.
[25] 15 U.S.C. § 6801 *et seq.*
[26] Public Law 104-191.
[27] Public Law 111-5.
[28] *Supra* note 22.

monitoring services for all companies that are subject to the state's data breach law.[29] But the Committee believes that this is a necessary provision to incentivize companies to be good stewards of an individual's personal information. Still, the credit monitoring requirement should align with other states. California, Delaware, and Connecticut require 12 months of free credit monitoring services, and Massachusetts requires 18 months of free credit monitoring.[30]

The Committee has decided that requiring only 12 months of free credit monitoring services would be insufficient. This is due to the fact that sometimes bad actors hold on to data and use it a considerable time after the original breach occurred. The Committee recommends a timeline similar to what is provided under Massachusetts law. It provides enough time for consumers to get the protection they need, but also would not create a substantial burden for a small business (although the cost should be borne by insurance). The Committee Print of Bill 23-215 reflects this recommendation and would require all companies to provide 18 months of free credit monitoring services to a District resident.

Concerns were also raised regarding the enforcement provisions: that the enforcement provisions in Bill 23-215 would unfairly punish businesses. However, the Committee does not concur, and agrees with the OAG that the new enforcement provision (tieing data breaches to the Consumer Protection Procedures Act) gives real teeth in the law and creates an appropriate incentive for a company to safeguard consumers data.[31] These penalties should not be seen as a punishment since a company would not be subject to the penalties as long as the company is in compliance with the law. This is an incentive to be in compliance with the law.

Under current law, the penalties are some of the weakest in the country. For example, the Attorney General "may recover a civil penalty not to exceed $100 for each violation"[32] The penalties for a violation of this act hve not kept up, that is why the Committee agrees that the violation of the data breach law should be a violation of the District's Consumer Protection Procedures Act (CPPA). This will increase the civil penalty to an amount that is high enough to be considered a sufficient deterrent.[33] In addition, the bifurcated penalty system of the CPPA will allow the OAG to enact harsher penalties for recidivists.

Further, the Committee has received requests to remove the private right of action language from the law. Some believe that private right of action will lead to expensive litigation and foster frivolous claims. However, the current law already includes a private right of action provision and the Committee has seen no evidence of the claims that have been made.[34] Moreover, removing the private right of action provision would weaken protections for consumers.

---

[29] Of note, Massachusetts does require 42 months of free credit monitoring services be offered by a consumer reporting agency that experiences a breach.

[30] *See Massachusetts Data Breach Changes - Coming April 11!*, JDSUPRA, https://www.jdsupra.com/legalnews/massachusetts-data-breach-changes-41299/ (last visited Jan. 16, 2020).

[31] *See Supra* note 2 at 6.

[32] D.C. Official Code § 28-3853(b).

[33] The civil penalty that the OAG can recover for CPPA violation is $5,000 for an initial violation and $10,000 for each subsequent violation.

[34] D.C. Official Code § 28-3853(a).

The Committee recommends the approval of the Committee Print of Bill 23-215 because it will modernize the District's data breach law and better protect District residents. The Print also will update the District's law to be modeled after others states data breach laws that have been strengthened recently.

## II. LEGISLATIVE CHRONOLOGY

| | |
|---|---|
| March 21, 2019 | Bill 23-215, the "Security Breach Protection Amendment Act of 2020" is introduced by Chairman Mendelson at the request of the Attorney General. |
| March 29, 2019 | Notice of Intent to Act on Bill 23-215 is published in the *DC Register*. |
| April 2, 2019 | Bill 23-215 is "read" at a Legislative meeting and the referral to the Committee of the Whole with comments from the Committee on Judiciary and Public Safety is official. |
| October 25, 2019 | Notice of Public Hearing on Bill 23-215 is published in the *DC Register*. |
| November 1, 2019 | Revised and Abbreviated Notice of Public Hearing on Bill 23-215 is published in the *DC Register*. The notice was revised to reflect a change in the time of the hearing. |
| November 12, 2019 | The Committee of the Whole holds a public hearing on Bill 23-215. |
| January 21, 2020 | The Committee of the Whole marks up Bill 23-215. |

## III. POSITION OF THE EXECUTIVE

The Committee received no testimony or comments from the Executive on Bill 23-215.

## IV. COMMENTS OF ADVISORY NEIGHBORHOOD COMMISSIONS

The Committee received no testimony or comments from any Advisory Neighborhood Commissions on Bill 23-215.

## V. SUMMARY OF TESTIMONY

The Committee of the Whole held a public hearing on Bill 23-215 on Tuesday, November 12, 2019. The testimony summarized below is from that hearing. Copies of written testimony are attached to this report.

***Justin Brookman, Director, Consumer Privacy and Technology Policy, Consumer Reports,*** testified in support of Bill 23-215 because it will patch significant weaknesses in the District's existing data breach law. Mr. Brookman testified that this is common-sense legislation to protect consumers' privacy and financial security. He recommended the following changes: (1) expand the bill to provide protections for all online accounts not just email accounts; (2) expand the data security requirement to cover certain data that may not trigger consumer notification; and (3) expand the definition of medical information to include dental information so there is no loophole for oral care providers. The Committee Print addresses the definition of medical information that was raised by Mr. Brookman. Finally, Mr. Brookman testified that while expanding data security and breach notification requirements is real progress for consumers, this bill does not limit how companies obtain, share, and retain data in the first place, and he urged the Council to take up broader data privacy legislation.

***Brian Young, Public Policy Manager, National Consumers League,*** testified in support of Bill 23-215. Mr. Young testified that Bill 23-215 would help better safeguard the data security of District residents. He added that while this bill does not address issues like how businesses obtain and share data, Bill 23-215 will take meaningful steps to compel businesses to responsibly handle District residents' data. Further, he testified that the bill provides for meaningful disclosures and educational materials that consumers need to avoid being defrauded.

***Elaine Critides, Counsel, State Privacy & Security Coalition,*** testified in opposition to Bill 23-215 as introduced. She testified that the Coalition supports efforts by states to update their original breach notice laws, but the Council should clarify and scale back or eliminate anomalous requirements in the bill to better serve the goals of security and notice to District residents. She recommended the following changes: (1) provide more clarity with regard to what data triggers notification requirements; (2) remove several notice content elements in the bill that are needlessly confusing; (3) clarify when service providers must provide notice; (4) require notification only if there is some risk of harm to District residents; (5) remove the proposed rulemaking authority of the Office of Attorney General; (6) give sole enforcement authority to the Office of the Attorney General by removing the private right of action provision in the current law; and (7) require the District's data breach law to apply to District government agencies. As discussed above in the Report, the Committee Print addresses the issue as it relates to notification to consumers only if he or she is harmed, and it limits the Office of Attorney General's rulemaking authority.

***Elizabeth Wilkins, Senior Counsel for Policy, Office of the Attorney General,*** testified on behalf of the Attorney General in support of Bill 23-215 as it will improve the District's ability to protect residents in the new data economy. Ms. Wilkins testified that the District's current data breach law is not strong enough to sufficiently protect District consumers because it has not been updated since the law was adopted in 2007. She added that this bill will allow the Office of the Attorney General to be coequal partners with fellow state attorneys general in policing national cybersecurity issues. Ms. Wilkins testified that the advances in the digital economy and other states' policies around data breaches mean that the District is behind the times.

**Testimony Submitted for the Record**

***Brian Costello, Manager, State Government Relations, American Property Casualty Insurance Association (APCIA),*** wrote that APCIA recognizes the legislative objective of Bill 23-215, but the Association has significant concerns that the Bill will harm rather than benefit consumers. He raised the following concerns: (1) the expanded definition of personal information could raise overnotification consequences; (2) prioritizing notice to the Office of Attorney General misaligns the goal of the law which should be meaningful notification to consumers; (3) the rulemaking authority for the Office of the Attorney General should be removed as it could further complicate and differentiate an already inconsistent patchwork of breach notification laws; and (4) the private right of action provision will only create a frenzy of litigation activity. As discussed in the Report, the Committee Print addresses the concerns raised above as follows: (1) narrows the definition of personal information; (2) removes the prior notification to the Office of Attorney General requirement, and (3) limits the Office of Attorney General's rulemaking authority.

***Kyle R. Innes, Assistant Vice President & Assistant General Counsel, Securities Industry and Financial Markets Association,*** wrote in support of Bill 23-215 but provided some suggestions that would both strengthen consumer protections and increase the bill's efficiency. In addition, he wrote that the Gramm-Leach-Bliley Act compliance provision should be expanded to include the Office of the Attorney General notification provision and the new security requirement provision. As discussed in the Report, the Committee Print applies the Gramm-Leach-Bliley Act compliance provision to the new security requirement provision.

***CareFirst BlueCross BlueShield,*** wrote that the company supports efforts to protect consumer data in the District. It recommended that Bill 23-215 be amended to provided that if a company follows the security requirements outlined in the bill the company will not be in violation of the Consumer Procedures Protection Act. The Committee believes the proposed change is unnecessary, so the Committee Print does not reflect the language proposed by the company.

***Erika Wadlington, Director of Public Policy & Programs, DC Chamber of Commerce,*** wrote in opposition to Bill 23-215. She wrote that information that has been aggregated, de-identified, or is publicly available should not be covered by the law, and that District agencies should be covered by the law. She added that a risk of harm provision should be included, that prior notification to the Office of the Attorney General is unnecessary, and information collected in other contexts such as employment, hiring of vendors, contractors or seasonal workforce should be excluded. In addition, Ms. Wadlington wrote that language should be added that recognizes a businesses' compliance with industry guidelines and federal law. Finally, she wrote that violations of the law that are not willful or reckless should not be penalized and that the Council should remove the private right of action provision from the law. The Committee Print does not include many of these suggestions. However, the Committee worked with the Chamber to understand its concerns and the Committee Print reflects numerous adjustments in light of the Chamber's comments. Compare the Committee Print with the Chamber's letter (attached).

## VI. IMPACT ON EXISTING LAW

Bill 23-215 amends § 28-3801 to clarify that the provisions of Subchapter 1 of Chapter 38 only apply to that Subchapter and not to all of Chapter 38.

Bill 23-215 amends the table of contents of Subchapter 2 of Chapter 38 of Title 28 to add three new section designations.

Bill 23-215 amends § 28-3851 to update the definition of a "breach of the security system", and to include a new risk of harm trigger. In addition, the bill expands the definition of "personal information," and adds new definitions for the terms "genetic information", "medical information", and "person or entity."

Bill 23-215 amends § 28-3852 to specify the required contents of a notice when there is a security breach. Further, the bill requires notification to the Office of the Attorney General if the security breach affects 50 or more District residents, and it specifies the contents of the notification to the Office of the Attorney General.

Bill 23-215 adds a new § 28-3852a to specify the security requirements for protection of personal information.

Bill 23-215 adds a new § 28-3852b to require a person or entity to offer 18 months of identity theft protection to each District resident whose social security number or tax identification number was released as a result of the security breach.

Bill 23-215 adds a new § 28-3852c to allow the Attorney General to promulgate rules to implement the notification provisions pursuant to § 28-3852.

Bill 23-215 amends § 28-3853 to make a violation of the requirements for protection of personal information an unfair or deceptive trade practice.

Bill 23-215 amends § 28-3904 to provide that a violation of Subchapter 2 of Chapter 38 of Title 28 is an unfair or deceptive trade practice.

Bill 23-215 amends § 28-3909 to add to the enforcement actions that the Attorney General can bring against a person or entity, violations of sections § 28-3851, 28-3852, 28-3852a, and 28-3852b.

## VII. FISCAL IMPACT

The attached January 17, 2020 fiscal impact statement from the District's Chief Financial Officer states that funds are sufficient in the FY 2020 through FY 2023 budget and financial plan to implement Bill 23-215. The bill imposes requirements on the private sector and there is no exposure to the government.

## VIII. SECTION-BY-SECTION ANALYSIS

Section 1 States the short title of Bill 23-215.

Section 2 Amends Title 28 of the District of Columbia Code.

*subsection (a)* amends Chapter 38 of Title 28.

- *paragraph (1)* makes a technical and clarifying amendment to provide that the provisions of Subchapter 1 do not apply to all of Chapter 38.

- *paragraph (2)* updates the table of contents for Subchapter 2 of Chapter 38 of Title 28 by adding three new section designations: section 28-3852a. Security Requirements; section 28-3852b. Remedies; and section 28-3852c. Rulemaking.

- *paragraph (3)* amends section 28-3851 regarding several definitions.

    - *subparagraph (A)* clarifies that it is not a breach of the security of the system unless the information obtained has the potential to compromise the effectiveness of the security protection system. And that it is not a breach of the security of the system if the acquisition of personal information is determined by the person or entity, after consultation with District and federal law enforcement agencies, that the breach will likely not result in harm to the District resident.

    - *subparagraph (B)* adds new definitions for the term's: genetic information and medical information.

    - *subparagraph (C)* makes a conforming and technical amendment.

    - *subparagraph (D)* adds a new definition for the term person or entity. The term excludes District government.

    - *subparagraph (E)* expands and updates the definition of personal information to include a person's passport number, taxpayer identification number, military ID number, health information, biometric data, genetic information and DNA profiles, and health insurance information. As was discussed in the Report, the definition of personal information tries to be as inclusive as possible without being too broad.

- *paragraph (4)* amends section 28-3852 to update the notification requirements for a security breach.

- *subparagraph (A)* expands the notification requirements under current law by providing specific requirements for the content of that notification to consumers. Further, it allows for an alternative notification to a person if the security breach only involves an individual's email account.

- *subparagraph (B)* requires notification to the Office of the Attorney General if the security breach affects 50 or more District residents. The notice must be made in the most expedient manner possible. In addition, it provides the requirements that must be included in the notification provided to the Office of the Attorney General. Notification shall not be delayed because the total number of affected residents has not yet been ascertained.

- *subparagraph (C)* repeals the "own notification policy" exception to ensure a person or entity meets the notification requirements provided in the act. This change is closing a potential loophole in the law.

- *subparagraph (D)* provides that a person or entity that is in compliance with the notification requirements under Title V of the Gramm-Leach-Bliley Act, or under the Health Insurance Portability Accountability Act, or the Health Information Technology for Economic and Clinical Health Act shall be deemed in compliance with this section of District law. However, the person or entity must still provide written notification to the Official of Attorney General if a security breach affects 50 or more District residents.

- *paragraph (5)* adds new sections 28-3852a, 28-3852b, and 28-3852c.
  - Section 28-3852a is intended to protect District consumers (residents and entities) on a proactive basis. It requires a person or entity to implement and maintain reasonable safety security safeguards and practices (including access by third party providers, and the destruction of records) to protect the personal information of District residents. In addition, it provides that a person or entity who is in compliance with the security procedures and practices contained in Title V of the Gramm-Leach-Bliley Act shall be deemed in compliance with section 28-3852a.
  - Section 28-3852b requires a person or entity to provide 18 months of identity theft prevention services to an individual when the breach results in the release of the individual's social security or tax identification number.
  - Section 28-3852c provides that the Attorney General may promulgate rules to implement the notification provisions of this act.

- *pargraph (6)* makes a conforming amendment to the private right of action provision in the Act. In addition, it provides that a violation of this Act is a violation of the District's Consumer Protection Procedures Act.

*subsection (b)* amends Chapter 39 of Title 28.

- *paragraph (1)* makes a conforming amendment to the District's Consumer Protection Procedures Act to provide that the violation of the requirements for protection of personal information is an unfair or deceptive trade practice.

- *paragraph (2)* makes a confirming amendment to the District's Consumer Protection Procedures Act to provide the Attorney General with the authority to bring an enforcement action a person or entity for violations of sections § 28-3851, 28-3852, 28-3852a, and 28-3852b of this Act.

Section 3 Adopts the Fiscal Impact Statement.

Section 4 Establishes the effective date (standard 30-day congressional review language).

## IX. COMMITTEE ACTION

On January 21, 2020, the Committee met to consider Bill 23-215, the "Security Breach Protection Amendment Act of 2020." The meeting was called to order at 10:37 a.m., and Bill 23-215 was item V-C on the agenda. After ascertaining a quorum (Chairman Mendelson and Councilmembers Allen, Bonds, Cheh, Gray, Grosso, McDuffie, Silverman, Todd, R. White, and T. White present; Nadeau absent), Chairman Mendelson moved the Print with leave for staff to make technical and conforming changes. After an opportunity for discussion, the vote on the Print was unanimous (Chairman Mendelson and Councilmembers Allen, Bonds, Cheh, Gray, Grosso, McDuffie, Silverman, Todd, R. White, and T. White voting aye; Nadeau absent). The Chairman then moved the Report with leave for staff to make technical, conforming, and editorial changes. After an opportunity for discussion, the vote on the Report was unanimous (Chairman Mendelson and Councilmembers Allen, Bonds, Cheh, Gray, Grosso, McDuffie, Silverman, Todd, R. White, and T. White voting aye; Nadeau absent). The meeting adjourned at 12:44 p.m.

## X. ATTACHMENTS

1. Bill 23-215 as introduced.

2. Written Testimony.

3. Fiscal Impact Statement for Bill 23-215.

4. Legal Sufficiency Determination for Bill 23-215.

5. Comparative Print for Bill 23-215.

6. Committee Print for Bill 23-215.

# COUNCIL OF THE DISTRICT OF COLUMBIA
**1350 Pennsylvania Avenue, N.W.**
**Washington D.C. 20004**

Memorandum

---

To : Members of the Council

From : Nyasha Smith, Secretary to the Council

Date : March 25, 2019

Subject : Referral of Proposed Legislation

Notice is given that the attached proposed legislation was introduced in the Office of the Secretary on Thursday, March 21, 2019. Copies are available in Room 10, the Legislative Services Division.

TITLE: "Security Breach Protection Amendment Act of 2019", B23-0215

INTRODUCED BY: Chairman Mendelson at the request of the Attorney General

The Chairman is referring this legislation to the Committee of the Whole with comments from the Committee on Judiciary and Public Safety.

Attachment

cc: General Counsel
Budget Director
Legislative Services

**GOVERNMENT OF THE DISTRICT OF COLUMBIA**
**Office of the Attorney General**

2019 MAR 21 PM 3: 31
OFFICE OF THE SECRETARY

ATTORNEY GENERAL
KARL A. RACINE

March 21, 2019

The Honorable Phil Mendelson
Chairman, Council of the District of Columbia
John A. Wilson Building
1350 Pennsylvania Avenue, N.W.
Suite 504
Washington, DC 20004

Dear Chairman Mendelson:

I am writing to transmit the "Security Breach Protection Amendment Act of 2019". The bill amends Title 28, Chapter 38, Subchapter II of the D.C. Official Code to strengthen the protections for personal information released to unauthorized people because of the breach of the security of a computer system. The bill aims to specify the required contents of a notification of a security breach to a person whose personal information is included in a breach, to clarify timeframes for reporting breaches, to require that written notice of the breach, including specific information, be given to the Office of the Attorney General, to specify the security requirements for the protection of personal information, to make violation of the requirements for protection of personal information an unlawful trade practice, and to require the provision of 2 years of identity theft prevention services when the breach results in the release of social security or tax identification numbers. The bill makes violation of the subchapter a violation of the subchapter an unlawful trade practice subject to the remedies contained in D.C. Official Code § 28-3909.

Specifically, the bill:

(1) Updates the definition of personal information to include additional information, including passport number, taxpayer identification number, military ID number, health information, biometric data, genetic information and DNA profiles, and health insurance information;
(2) Inserts requirements for the content of the notification to consumers when there has been a breach, including a requirement that the notification include a statement informing residents of the right to obtain a security freeze at no cost (pursuant to federal law) and information how a resident may request a security freeze, and where appropriate the right to ID theft prevention services as described below;
(3) Requires notification to the Attorney General;

(4) Requires persons and entities that own, license, maintain, license, or otherwise possess personal information to implement and maintain reasonable security procedures and practices;
(5) Adds a requirement that in the case of a breach of SSN, the company must provide 2 years of identity theft prevention services, and
(6) Makes a violation of the data breach law a violation of the CPPA.

If you have any questions, your staff may contact my Legislative Director, James A. Pittman, on (202) 724-6517.

Sincerely,



Karl A. Racine
Attorney General for the District of Columbia

Chairman Phil Mendelson
at the request of the Mayor

A BILL

_______________

IN THE COUNCIL OF THE DISTRICT OF COLUMBIA

_______________

To amend Title 28 of the District of Columbia Official Code concerning businesses' data breaches to expand definitions, to specify the required contents of a notification of a security breach to a person whose personal information is included in a breach, to clarify timeframes for reporting breaches, to require that written notice of the breach, including specific information, be given to the Office of the Attorney General, to specify the security requirements for the protection of personal information, to make violation of the requirements for protection of personal information an unlawful trade practice, and to require the provision of 2 years of identity theft prevention services when the breach results in the release of social security or tax identification numbers.

BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this act may be cited as the "Security Breach Protection Amendment Act of 2019".

Sec. 2. Title 28, Chapter 38 of the District of Columbia Official Code is amended as follows:

(a) Section 28-3801 is amended by striking the "chapter" and inserting the word "subchapter" in its place.

(b) The table of contents for subchapter II is amended by adding three new section designations to read as follows:

"§ 28-3852a. Security Requirements.

"§ 28-3852b. Remedies.".

"§ 28-3852c. Rulemaking.".

(c) Section 28-3851 is amended as follows:

(1) Paragraph (1) is amended by striking the phrase "shall not be deemed to be a breach of the security of the system" and inserting the phrase "shall not be deemed to be a breach of the security of the system unless any information obtained has the potential to compromise the effectiveness of the security protection preventing unauthorized access" in its place.

(2) New paragraphs (1A) and (1B) are added to read as follows:

"(1A) Genetic information has the meaning ascribed to it under the federal Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), approved August 21, 1996 (Pub. Law 104-191; 110 Stat. 1936), as specified in 45 C.F.R. § 106.103.

"(1B) Medical Information means any information about a consumer's medical or mental health treatment or diagnosis by a health care professional.".

(3) Paragraph (3) is amended to read as follows:

"(3)(A) "Personal information" means:

"(i) An individual's first name, first initial and last name, or any other personal identifier, which, on its own or in combination with any of the following data elements, can be used to identify a person or the person's information:

"(I) Social security number, Individual Taxpayer Identification Number, passport number, driver's license number, military identification number, or other identifier issued by the District of Columbia or any local, state or federal government agency;

"(II) Account number, credit card number or debit card number, or any other number or code or combination of numbers or codes, such as an identification number, account number, security code, access code, or password, that allows access to or use of an individual's financial or credit account;

"(III) Medical information;

"(IV) Genetic information and deoxyribonucleic acid profile;

"(V) Health insurance information, including a policy number, subscriber information number, or any unique identifier used by a health insurer to identify the person that permits access to an individual's health and billing information;

"(VI) Biometric data of an individual generated by automatic measurements of an individual's biological characteristics such as a fingerprint, voice print, genetic print, retina or iris image, or other unique biological characteristic, that can be used to uniquely authenticate the individual's identity when the individual accesses a system or account; or

"(VII) Any combination of data elements included in sub-sub-sub paragraphs (I) through (VI) of this sub-subparagraph that would be sufficient to permit a person to commit or attempt to commit identity theft without reference to a person's first name or first initial and last name or other independent personal identifier.

"(ii) A user name or e-mail address in combination with a password, security question and answer or other means of authentication, or any combination of data elements included in sub-sub-sub paragraphs (I) through (VI) that permits access to an individual's e-mail account.".

(d) Section 28-3852 is amended as follows:

(1) A new subsection (a-1) is added to read as follows:

"(a-1) The notification required under subsection (a) of this section shall include:

"(1) To the extent possible, a description of the categories of information that were, or are reasonably believed to have been, acquired by an unauthorized person, including the elements of personal information that were, or are reasonably believed to have been, acquired;

"(2) Contact information for the person or entity making the notification, including the business address, telephone number, and toll-free telephone number if one is maintained;

"(3) The toll-free telephone numbers and addresses for the major consumer reporting agencies, including a statement notifying the resident of the right to obtain a security freeze free of charge pursuant to 15 U.S.C. § 1681c-1 and information how a resident may request a security freeze; and

"(4) The toll-free telephone numbers, addresses, and website addresses for the following entities, including a statement that an individual can obtain information from these sources about steps to take to avoid identity theft:

"(A) The Federal Trade Commission; and

"(B) The Office of the Attorney General for the District of Columbia.

"(5) Information regarding identity theft protection where when required under 28-3852b.".

(2) New subsections (b-1) and (b-2) are added to read as follows:

"(b-1) Prior to giving the notification required under subsection (a) of this section, and subject to subsection (d) of this section, the person or entity required to give notice shall provide

written notice of the breach of the security system to the Office of the Attorney General. This notice shall include:

"(1) The name and contact information of the person or entity reporting the breach;

"(2) The name and contact information of the person or entity that experienced the breach;

"(3) The nature of the breach of the security of the system, including the name of the person or entity that experienced the breach;

"(4) The types of personal information compromised by the breach;

"(5) The number of District residents affected by the breach;

"(6) The cause of the breach, including the person responsible for the breach, if known;

"(7) Any remedial action taken by the person or entity;

"(8) The date and time frame of the breach, if known; and

"(9) A sample of the notice to be provided to District residents.

"(b-2) The notice required under subsection (b-1) of this section shall not be delayed on the grounds that the total number of District residents affected by the breach has not yet been ascertained.".

(3) Subsection (e) is amended by inserting the following sentence at the end: "The person or entity shall, in all cases, provide written notice of the breach of the security of the system to the Office of the Attorney General as required under subsection (b-1) of this section." in its place.

(4) Subsection (g) is amended by striking the phrase "with this section" and inserting the phrase "with this section with respect to the notification of residents whose personal information is included in the breach. The person or entity shall, in all cases, provide written notice of the breach of the security of the system to the Office of the Attorney General as required under subsection (b-1) of this section" in its place.

(e) New sections 28-3852a, 28-3852b, and 28-3852c are added to read as follows:

"§ 28-3852a. Security requirements.

"(a) To protect personal information from unauthorized access, use, modification, disclosure or a reasonably anticipated hazard or threat, a person or entity that owns, licenses, maintains, handles or otherwise possesses personal information of an individual residing in the District shall implement and maintain reasonable security safeguards, including procedures and practices, that are appropriate to the nature of the personal information and the nature and size of the entity or operation.

"(b) A person or entity that uses a nonaffiliated third party as a service provider to perform services for a person or entity and discloses personal information about an individual residing in the District under a written agreement with the third party shall require by the agreement that the third party implement and maintain reasonable security procedures and practices that:

"(1) Are appropriate to the nature of the personal information disclosed to the nonaffiliated third party; and

"(2) Are reasonably designed to protect the personal information from unauthorized access, use, modification, disclosure.

"(c) When a person or entity is destroying records, including computerized or electronic records and devices containing computerized or electronic records, that contain personal information of a consumer, employee, or former employee of the person or entity, the person or entity shall take reasonable steps to protect against unauthorized access to or use of the personal information, taking into account:

"(1) The sensitivity of the records;

"(2) The nature and size of the business and its operations;

"(3) The costs and benefits of different destruction and sanitation methods; and

"(4) Available technology.".

"§ 28-3852b. Remedies

"When a person or entity experiences a breach of the security of the system that requires notification under subsection § 28-3852(a) or (b), and such breach includes or is reasonably believed to include a social security number or taxpayer identification number, the person or entity shall offer to each District resident whose social security number or tax identification number was released identity theft protection services at no cost to such District resident for a period of not less than 24 months. The person or entity that experienced the breach of the security of its system shall provide all information necessary for District residents to enroll in the services required under this subsection. This section shall not apply to an action of an agency of government.".

"§ 28-3852c. Rulemaking

The Attorney General for the District of Columbia, pursuant to § 2-501 et seq. may issue rules to implement the provisions of this subchapter.".

(f) Section 28-3853(b) is amended to read as follows:

"(b) A violation of this subchapter, or any rule issued pursuant to the authority of this subchapter, is an unlawful trade practice within the meaning of Chapter 39 of this Title and is subject to the remedies contained in § 28-3909.".

Sec. 3. Fiscal impact statement.

The Council adopts the fiscal impact statement of the Chief Financial Officer as the fiscal impact statement required by section 602(c)(3) of the District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 813; D.C. Official Code §1-206.02(c)(3)).

Sec. 4. Effective date.

This act shall take effect following approval by the Mayor (or in the event of veto by the Mayor, action by the Council to override the veto), a 30-day period of congressional review as provided in 602(c)(1) of the District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 813; D.C. Official Code §1-206.02(c)(1)), and publication in the District of Columbia Register.

GOVERNMENT OF THE DISTRICT OF COLUMBIA
OFFICE OF THE ATTORNEY GENERAL

ATTORNEY GENERAL
KARL A. RACINE

Legal Counsel Division

MEMORANDUM

TO: Alana Intrieri
Executive Director
Office of Policy and Legislative Affairs

FROM: Arthur J. Parker
Acting Deputy Attorney General
Legal Counsel Division

DATE: March 20, 2019

SUBJECT: Legal Sufficiency Certification of the "Security Breach Protection Amendment Act of 2019"
(AL-19-255)

---

**This is to Certify that** this Office has reviewed the above-referenced bill and has found it to be legally sufficient. If you have any questions regarding this certification, please do not hesitate to contact me at 724-5565.

Arthur J. Parker

Statement of

Justin Brookman
Director, Consumer Privacy and Technology Policy
Consumer Reports

Before the

Council of the District of Columbia
Committee of the Whole

on

Bill 23-215, Security Breach Protection Amendment Act of 2019

November 12, 2019

John A. Wilson Building
Room 412
1350 Pennsylvania Avenue, NW
Washington, DC 20004
11:00 am

Consumer Reports[1] appreciates the opportunity to provide testimony on the need for strong data security and data breach notification requirements. Residents of the District of Columbia deserve additional protections, because consumers remain more vulnerable to data breaches than ever. Companies have dramatically expanded their data collection practices as they have found new ways to monetize consumer data, but incentives to protect consumer data from unauthorized disclosure remain inadequate. For example, The Equifax data breach of 2017 led to the disclosure of the personal information, including Social Security numbers, of over 145 million Americans—about half of the United States population—leaving them susceptible to identity thieves seeking to open credit in their names for years to come.[2] The breadth and depth of personal information involved could all-too readily also be used to defraud and otherwise manipulate the individuals affected.[3]

To that end, Consumer Reports supports Bill 23-215, the Security Breach Protection Amendment of 2019, a bill that would patch significant weaknesses in the District of Columbia's existing data breach laws. The bill expands protections over personal data by requiring businesses to implement reasonable safeguards over personal information to help prevent data breaches. It also extends existing data breach notification requirements to cover additional categories of sensitive data, including information that can be used to access an email account,

---

[1] Founded in 1936, Consumer Reports has over 6 million members and publishes its magazine, website, and other publications. It employs its rigorous research and testing, consumer insights, journalism, and policy expertise to inform purchase decisions, improve the products and services that businesses deliver, and drive effective legislative and regulatory solutions and fair competitive practices. Consumer Reports works for pro-consumer policies in the areas of telecommunications and technology, financial services and marketplace practices, antitrust and competition policy, privacy and data security, food and product safety, travel, and other consumer issues, in Washington, DC, in the states, and in the marketplace.

[2] Jeremy C. Owens, *The Equifax Data Breach, In One Chart*, MARKETWATCH (Sept. 10, 2018), https://www.marketwatch.com/story/the-equifax-data-breach-in-one-chart-2018-09-07.

[3] Kelli B. Grant, *Your Next Worry After the Equifax Data Breach: Fake Tax Returns*, CNBC (Oct. 9, 2017), https://www.cnbc.com/2017/09/18/your-next-worry-after-the-equifax-breach-fake-tax-returns.html.

passport numbers, taxpayer identification information, biometric information, DNA profiles, and medical information, so that companies are required to notify consumers if the data is breached. We urge members of the DC City Council to support this common-sense legislation to better protect consumers' privacy and financial security.

While breaches can occur even when companies take reasonable precautions, many breaches have been caused by companies' carelessness and lack of accountability. It's time for the District of Columbia to make data security a priority, and to pass a law establishing these essential consumer protections. Without a clear regulatory framework for data security, companies have insufficient incentives to be better stewards of consumers' personal data. The market simply will not fix this problem—indeed, it was not until the states began enacting data breach laws in the early 2000s that companies even disclosed their breaches to the public. Although all of the states and the District of Columbia have now passed data breach notification laws,[4] only about half of the states have data security laws—nor is there an across-the-board federal requirement—which is needed to prevent breaches from happening in the first place.[5] This bill fills an important gap in protections, and by passing this bill, the District of Columbia will help encourage the remaining states to follow suit.

The damage caused by data breaches is wide-ranging. Security breaches of retailers, financial institutions, data brokers, businesses, government agencies, and universities are now

---

[4] *See 2019 Security Breach Legislation*, NAT'L COUNCIL OF STATE LEGISLATURES (July 26, 2019), http://www.ncsl.org/research/telecommunications-and-information-technology/2019-security-breach-legislation.aspx.

[5] *See Data Security Laws, Private Sector*, NAT'L COUNCIL OF STATE LEGISLATURES (May 29, 2019), http://www.ncsl.org/research/telecommunications-and-information-technology/data-security-laws.aspx.

commonplace. There were over 2,000 data breaches in the United States and abroad in 2018.[6] One survey revealed that nearly one-third of United States consumers were notified of an unauthorized disclosure of their information in 2017.[7] In what is widely considered the largest hack of personal information in history, web service provider Yahoo's 2013 data breach exposed the information of anywhere from one to three billion consumers.[8] A data breach in 2015 of the U.S. government's Office of Personnel Management's background investigation databases exposed the sensitive data of 21.5 million individuals.[9] And these breaches have a significant impact on consumers. Americans lost nearly $3.4 billion to new account fraud in 2018, up from about $3 billion the previous year.[10]

Data breaches are harmful for businesses—in 2018, the average cost of a breach to companies globally climbed to $3.9 million, a 12 percent increase over the past five years.[11] Summit Credit Union of Madison, Wisconsin testified that fraudulent charges related to data breaches cost them hundreds of thousands of dollars in 2017, not even counting the costs to replace credit and debit cards and for staff time to help resolve issues.[12] And as Pew Research

---

[6] *2019 Data Breach Investigations Report, Executive Summary*, VERIZON 2 (2019), https://enterprise.verizon.com/resources/executivebriefs/2019-dbir-executive-brief.pdf [hereinafter Verizon Data Breach Report].

[7] Press release, *One-Third of Consumers Notified Their Data Was Breached*, HSB (Mar. 22, 2018), https://www.businesswire.com/news/home/20180322005652/en/One-Third-Consumers-Notified-Data-Breached.

[8] Dell Cameron, *The Great Data Breach Disasters of 2017*, GIZMODO (Dec. 27, 2017), https://gizmodo.com/the-great-data-breach-disasters-of-2017-1821582178.

[9] *Cybersecurity Incidents*, OPM.GOV, https://www.opm.gov/cybersecurity/cybersecurity-incidents/.

[10] *2019 Identity Fraud Study: Fraudsters Seek New Targets and Victims Bear the Brunt*, JAVELIN (Mar. 6, 2019), https://www.javelinstrategy.com/coverage-area/2019-identity-fraud-report-fraudsters-seek-new-targets-and-victims-bear-brunt.

[11] *IBM Study Shows Data Breach Costs on the Rise; Financial Impact Felt for Years*, IBM NEWSROOM (July 23, 2019), https://newsroom.ibm.com/2019-07-23-IBM-Study-Shows-Data-Breach-Costs-on-the-Rise-Financial-Impact-Feltfor-Years.

[12] *Examining the Current Data Security and Data Breach Notification Regulatory Regime*, Hearing Before the House Fin. Svcs. Subcomm. on Fin. Institutions and Consumer Credit at 2 (Feb. 14, 2018) (Statement of Kim M. Sponem), *available at*

Center points out, these data breaches are causing consumers to lose their faith in institutions, as Americans "lack confidence in various institutions to keep their personal data safe from misuse."[13] Most of these breaches—43%—targeted small businesses.[14]

In addition to requiring security protections, this bill also takes the important step of expanding the definition of personal information. Biometric data, for example, clearly warrants additional protections. Biometric data is commonly used to confirm consumers' identity and can easily be exploited for identity theft and fraud purposes. Unlike a credit card number, the consumer's biometric information cannot be changed in the event of a breach, making its unauthorized disclosure all the more dangerous. But concerns about its disclosure go far beyond its potential misuse for the purposes of fraud. Aside from the inherent privacy interest in keeping this information secure, the disclosure of biometric data—for example, of voice recordings—could lead to reputational or emotional harm. In light of the plethora of data breaches in recent years, biometric data should have these additional protections.

The bill also extends protections to DNA data. There are few legal requirements on companies collecting DNA, and given the increased collection of this data through sites such as 23andMe, at the very least, companies should be required to keep it secure. Companies need these incentives to protect this data: the DNA testing service Vitagene recently revealed that it left information derived from DNA data, including gene-based health information, unsecured on

---

https://www.cuna.org/uploadedFiles/Advocacy/Actions/Comment_Calls,_Letters_and_Testimonies/2018/Testimonies/KimSponem_Testimony_February%2014%202018.pdf.

[13] Aaron Smith, *Americans and Cybersecurity*, PEW RESEARCH CTR. (Jan. 26, 2017), https://www.pewresearch.org/internet/2017/01/26/americans-and-cybersecurity/.

[14] Verizon Data Breach Report, *supra* note 5, at 2.

a server for years.[15] And in 2018, the ancestry site MyHeritage, which collects DNA data, disclosed that they left email addresses and hashed passwords unprotected on a server.[16] Breaches of this type of data can have devastating consequences: thieves could demand a ransom for the data, or it could be sold to insurance companies seeking to making important decisions about consumers.[17]

Covering taxpayer identification numbers, as well, will help prevent tax identity theft, which occurs when thieves use consumers' identifying information to obtain tax refunds. This is a serious problem: in 2017, Americans lost an estimated $1.6 billion to tax ID fraud.[18] This bill also bridges an important gap by protecting passport information. The 2018 Marriott data breach, in which the passport information of over 5 million people was disclosed, highlights the need for greater security of government-issued identification.[19] Passport information, combined with other data, can be used to impersonate consumers online, making them more vulnerable to fraud.[20]

This bill expands protections with respect to notification by requiring companies to provide consumers with meaningful information about the information that was breached and how to respond. For consumers, notice of a data breach is necessary so that they can protect

---

[15] Nico Grant, *DNA Test Service Exposed Thousands of Client Records Online*, BLOOMBERG (July 9, 2019), https://www.bloomberg.com/news/articles/2019-07-09/dna-testing-service-exposed-thousands-of-customer-records-online.

[16] Makena Kelly, *MyHeritage breach leaks millions of account details*, THE VERGE (June 5, 2018), https://www.theverge.com/2018/6/5/17430146/dna-myheritage-ancestry-accounts-compromised-hack-breach.

[17] Angela Chen, *Why a DNA data breach is much worse than a credit card leak,* THE VERGE (June 6, 2018), https://www.theverge.com/2018/6/6/17435166/myheritage-dna-breach-genetic-privacy-bioethics.

[18] Joe Davidson, *Thieves targeted $12 billion through IRS tax fraud,* WASH. POST (Oct. 19, 2018), https://www.washingtonpost.com/politics/2018/10/19/thieves-targeted-billion-through-irs-tax-fraud/.
https://www.irs.gov/newsroom/writtentestimony-of-john-a-koskinen-before-the-senate-finance-committee-on-the-2017-filing-season-and-irs-operationsapril-6-2017.

[19] Peter Holly, *Marriott: Hackers accessed more than 5 million passport numbers during November's massive data breach*, WASH. POST (Jan. 4, 2019), https://www.washingtonpost.com/technology/2019/01/04/marriott-hackers-accessed-more-than-million-passport-numbers-during-novembers-massive-data-breach.

[20] Laura Hautala, *Marriott breach: What to do when hackers steal your passport number*, CNET (Dec. 3, 2018), https://www.cnet.com/news/marriott-breach-what-to-do-when-hackers-steal-your-passport-number/.

themselves from identity theft or other harms. Knowing what data was exposed can guide consumers in choosing which steps, in addition to security freezes and credit monitoring, they must take to avert additional forms of identity theft, such as medical or tax fraud. Consumers consistently reported after the Equifax data breach that they were frustrated by the confusing and unhelpful information that Equifax provided to them following the incident. This bill will help ensure that consumers get the information they need to respond effectively.

The bill will also benefit consumers by requiring companies to provide free credit monitoring for two years following breaches of an SSN or taxpayer identification number. Many companies profit handsomely from using consumer data, but they offer consumers little or no recourse for data lapses. This remedy will help incentivize companies keep data secure and will offer to consumer some redress following a breach. While credit monitoring provides less protection than a credit freeze—which are now free under federal law[21]—it does provide useful and immediate information that could be used to limit the consequences of identity theft after the fact.

While this bill takes key steps to protect consumer data, it should be strengthened to help avoid any unintentional gaps in coverage. For example, while we appreciate that this bill expands protections to cover email accounts, covering all online accounts would better ensure that sensitive information that, once disclosed, could cause reputational or other harm, is covered. Further, the data security requirement should be expanded to cover certain data that may not necessarily trigger consumer notification. For example, companies should be required to keep behavioral data, search history, and shopping history secure, as it can reveal more about

[21] U.S. Code § 1681(i).

consumers than they might want to share with others: their sexual preferences, health issues, and political activities. In addition, the bill defines medical information to be about a consumer's medical or mental health treatment or diagnosis. This could inadvertently leave out dental information, or create a loophole for oral care providers, and should be modified to explicitly include oral health treatment. Finally, there may be overlap in subsection (IV) "biometric data of an individual generated by automatic measurements of an individual's biological characteristics such as … genetic print: and subsection (VI) "Genetic information and deoxyribonucleic acid profile," leaving the difference between the two subject to interpretation; we suggest further refinement to clearly distinguish the two in order to avoid any unintended future interpretation. We look forward to working with the author to perfect the bill as it moves through the legislative process.

Finally, while expanding data security and breach notification requirements is real progress for consumers, this bill does not limit how companies obtain, share, and retain data in the first place. Fundamentally consumers need legislation that limits commercial collection and retention to what is reasonably necessary to provide services to consumers. Several states are considering data privacy laws in the wake of California's first-in-the-nation privacy law—the California Consumer Privacy Act (or CCPA)[22]—that gives consumers the ability to delete extraneous data held by companies and opt out of the sale of their information. Previously, we supported legislation before the Council that limited internet service providers' ability to monitor and sell data about customers;[23] similar legislation was passed last year in Maine.[24] We strongly

[22] Cal. Civ. Code § 1798.100 et seq.
[23] B22-0403 (2017).
[24] Maine 2019 SB 275.

urge the Council to take up data privacy legislation, and Consumer Reports would be happy to assist the Council in any way possible toward extending DC residents these protections.

Councilmembers have a unique opportunity to guarantee basic security protections with respect to consumer data. For too long, inadequate laws have allowed companies to collect and profit from the use of consumers' personal information without consumers' knowledge or control, and without the incentives to properly steward that information and protect it from criminals. Given the unprecedented level of data collection in today's marketplace, and emergence of new privacy threats every day, now is the time to ensure that DC residents have the data protections they deserve. We thank you for your work to address these vital consumer protection issues.

**Testimony of**

**Brian Young**

**Public Policy Manager**

**of the National Consumers League**

**on**

**Bill 23-215, Security Breach Protection Amendment Act of 2019**

**Before the**

**Council of the District of Columbia**

**Committee of the Whole**

**November 12, 2019**

John A. Wilson Building

Room 412

1350 Pennsylvania Avenue, NW

Washington, DC 20004

11:00 am

Chairman Mendelson and distinguished Councilmembers of the District of Columbia, the National Consumers League appreciates the opportunity to present the following testimony to the Committee of the Whole in support of The Security Breach Protection Amendment Act of 2019 and the need for the Council of the District of Columbia to take action to protect District residents from the scourge of data breaches.

Founded in 1899, the National Consumers League (NCL) is the nation's pioneering consumer organization. Headquartered here in the District, our non-profit mission is to advocate on behalf of consumers and workers in the District, the United States and abroad.[1] Through NCL's Fraud.org campaign, NCL offers free fraud counseling, and educates consumers across the country on how to protect themselves in the aftermath of data breaches.[2]

Sadly, there has been no shortage of data breaches. Equifax, Capital One, Yahoo!, Marriott, Anthem, JP Morgan Chase, and thousands of others have all compromised consumers personal information, putting all of us at greater risk of identity fraud and other crimes. In fact according to the Identity Theft Resource Center (ITRC), there have been around 11,000 data breaches and over 1.6 billion compromised records since 2005.[3] That number appears to be growing. In the ITRC's latest report, they observed a year over year increase of 126 percent in

[1] For more information, visit www.nclnet.org.
[2] For more information, visit https://www.fraud.org/
[3] Identity Theft Resource Center. "Data Breaches." 2019. Online: https://www.idtheftcenter.org/data-breaches/

2018 of the number of compromised records which contained sensitive identifiable information.[4]

In the aftermath of a data breach, fraudsters, scammers, and identity thieves manipulate the breach data to further harm consumers. Leaked login credentials are often used to access other accounts that use the same username and password combination. Data obtained via a breach can be used to craft more convincing phishing emails, conduct social engineering attacks on call centers, open new lines of credit and steal consumers' tax refunds, to name just a few of the harms that can stem from breaches.

DC residents are not immune to this threat. A survey conducted by Wallet Hub, a personal finance website based in the District, found that when compared to the 50 other states, the District of Columbia had the highest cases per capita of identity theft and fraud in the nation.[5] It is for these reasons that we are strongly supportive of the Security Breach Protection Amendment Act of 2019, which would help better safeguard the data security of District residents.

First, this bill extends the definition of personal information to cover extremely sensitive data that if controlled by scammers, could wreak havoc on consumers. Without this bill, information including passport or military ID numbers; health information; biometric data

---

[4] Identity Theft Resource Center. "2018 End of Year Data breach Report." January 28, 2019. Online: ITRC_2018-End-of-Year-Aftermath_FINAL_V2_combinedWEB.pdf

[5] McCann, Adam. "2019's States Most Vulnerable to Identity Theft and Fraud." Wallet Hub. October 16, 2019. Online: https://wallethub.com/edu/states-where-identity-theft-and-fraud-are-worst/17549/#main-findings

such as an individual's voice or finger print or other unique biological characteristics; and DNA profile information would not receive the protection it deserves.

Second, this legislation will provide meaningful improvements to the District's breach notification standard. Under this section District residents will be notified what types of data were potentially compromised, and be given the information they need to contact the business directly as well as educational information on how they can receive a credit freeze free of charge and protect themselves from identity theft.

Third, this bill empowers the Attorney General's office to proactively help breach victims via a requirement to promptly notify the Attorney General's office of a breach.

Finally, this consumer protection bill will help stop breaches before they happen by requiring holders of personal data, to take reasonable steps to secure and safeguard the data they have been entrusted with. As technology changes, so do cybersecurity best practices. NCL appreciates the regulatory flexibility that this bill provides to ensure that businesses are encouraged to take proactive steps to secure user data. When breaches happen, it is often because the business did not utilize current best practices to secure data, and yet, it is the consumer that bears the price for the business' misstep. Consumers cannot and should not be expected to carry the load when it comes to protecting the data they share with businesses and other organizations.

As the problem of data breaches continues to grow, so does the risk to Washingtonians of falling victim to identify theft, and other types of fraud. While this bill does not address critical

issues like how businesses obtain and share data, and the control consumers need to have over this process, the Security Breach Protection Amendment Act off 2019 will take meaningful steps to compel businesses to responsibly handle District residents' data. Likewise, this bill provides meaningful disclosures and educational materials that consumers need to avoid fraud.

NCL believes that each councilmember has a unique opportunity to safeguard District residents' data, and thus urges the Council of the District of Columbia to quickly pass and implement this critical consumer protection bill.

Thank you for your time.

**STATEMENT OF ELAINE CRITIDES**

**COUNSEL, STATE PRIVACY & SECURITY COALITION**

**BEFORE THE DC CITY COUNCIL**

**COMMITTEE OF THE WHOLE**

**ON**

**BILL 23-215, SECURITY BREACH PROTECTION AMENDMENT ACT OF 2019**

**November 12, 2019**

**John A. Wilson Building, Room 412**
**1350 Pennsylvania Avenue, NW**
**Washington, DC 20004**
**11:00 am**

EAST\170252457.1

Chairman Mendelson and members of the Committee,

My name is Elaine Critides. I am testifying today on behalf of the State Privacy & Security Coalition, an organization of 27 companies and 6 trade associations that advocates for consistent, clear and workable requirements in state privacy, data security breach and cybersecurity laws.

All 50 states and the District of Columbia already have data breach notice laws. Our Coalition supports efforts by states to update their original breach notice laws to cover additional risky data elements, breach notice content, or adopting "reasonable security" requirements for data breach notice data elements. These existing laws provide good roadmaps about how to update data security laws.

However, it is extremely important that states and territories adopt state data breach and data security laws that are consistent with laws in other states. This is because data security and cybersecurity are complicated risk management activities that require businesses and organizations to keep up with rapidly escalating and changing attack methods. Similarly, responding to a significant data security breach involves often requires conducting or overseeing a complex forensic investigation and conducting crisis management. In these contexts, complying with outlier requirements in the District or any state hinders, instead of advancing, the interests of consumers.

For these reasons, we urge you to clarify and scale back or eliminate anomalous requirements in this bill. These changes would better serve the goals of security and notice to District residents, while updating and strengthening the District's laws in this area. Doing so is particularly important because of the dramatic expansion of enforcement authority in the bill.

1. **Clarity regarding what data triggers notification requirements**

For the reasons I just described, data breach and data security laws need to be very clear as to what information and situations trigger notice obligations and what information must be secured.

While some elements of the broader definition of "personal information" make sense and are consistent with other laws, other aspects are unnecessary and overbroad. In fact, the amendments to current law put forward in this bill appear to make unauthorized acquisition of a very broad range of data that are not even identifiable a data breach.

For example, the inclusion of an "other identifier" issued by a DC agency as part of the definition of personal information is counterproductive, both because it is unclear and because it undermines efforts to deidentify or pseudonymize information. These practices are privacy protective precisely because they make it harder for unauthorized actors to use the data in a way that could harm the consumer.

Furthermore, adding to the risk of harm standard "any combination of data elements included in sub-sub-sub paragraphs (I) through (VI) of this sub-sub paragraph that would be sufficient to permit a person to commit or attempt to commit identity theft" is a vague standard found in no state breach notice law. What is more, *any information* can be used to "attempt to commit identity theft", so this standard is potentially limitless.

EAST\170252457.1

### 2. Simplifying data breach ~~notice~~ content requirements

Many of the "second-generation" data breach notice laws contain notice content requirements. A handful of the states have outlier requirements, which create compliance traps for businesses and increase compliance costs by requiring hiring sophisticated law firms like the one at which I practice, but do *not* provide materially better information to residents receiving the notices.

While most of the notice content elements in the bill are consistent with other states and useful to residents, several are not or are needlessly confusing, and should be removed. These include: (1) "categories of personal information" reasonably believed to have been acquired, instead of the specific sensitive data elements that have been required, which is what residents really need to know about; (2) the street address of regulators, which is irrelevant; and (3) specific contact information for the State AG's Office (over and above the FTC, which has superb information applicable nationwide for what to do in response to a data breach).

What is more, the bill, contrary to almost every state breach notice law, would impose the same notice content requirements for email password breaches as for breaches of driver's license numbers. What is required in email password breaches is a different notice instructing users to change their password for their email account and other online accounts. This simple step, which is a best practice, prevents misuse of these accounts. This different notice requirement is the law in California and other states that both have prescriptive notice requirements and require notice of password breaches. It should be added to this bill to better protect residents and to avoid sending irrelevant breach notice information that would confuse state residents from taking the right steps to protect themselves.

With regard to notice to the State AG's Office, notice should not include the "remediation information" to the extent that this is intended to cover security measures taken in response to the breach, because hackers often use this information to launch secondary attacks. Furthermore, it should not include "the cause of the breach" or "the person responsible for the breach", as this information is often subjective and complicated and not able to be conveyed in a prompt notice.

### 3. Clarify when service providers must provide notice

Equally problematic is lack of clarity regarding when service providers must provide notice. Most state breach laws require notice to the owner of the data by service providers that store or maintain the "personal information" and suffer a breach. The language in DC's breach law goes further, also requiring notice by entities that "handle" the personal data. This term is confusing and suggests that *both the entity that maintains or stores the data and other "handlers"* should provide notice. Double notice serves no purpose. The obligation should only apply to entities that maintain or otherwise possess the personal data, consistent with other state laws.

### 4. Adding a Risk of Harm Trigger

The overwhelming majority of state breach notice laws require notice to state residents only if there is some risk of harm (almost always risk of identity theft or fraud) to state residents. This risk criterion for breach notice would avoid de-sensitizing DC residents to notices that actually pose risk to them because they receive notices about "technical" breaches.

A classic and very common example is accidental transmission of customer information to a service provider that is trusted and has signed a confidentiality agreement with the entity that sends the information, but that is not the right entity to receive the information. This would be a notifiable data breach under the bill as introduced for a very broad range of data, but would pose no risk to any DC resident.

Over the past few years, several states – most recently New York -- that had no risk of harm trigger have amended their laws to include one. DC should do so as well, particularly because it would be significantly expanding notice requirements under this bill.

The change would *benefit* DC residents by providing notice when there is some material risk and providing information and warnings that can help residents to act. However, where there is no risk, these warnings are confusing and not useful.

5. **AG Rulemaking should be removed from the law, as it introduces significant uncertainty**

Almost none of the state breach notice laws contain AG rulemaking authority, because this authority is wholly unnecessary.

First, there is no reason why requirements cannot be made clear in the statute (as they are clear in other breach notice laws). Without this clarity, covered entities will face needless difficulty tracking down requirements and the requirements will be less understood and *less effective*.

Second, to the extent the council retains the "reasonable security" requirements, giving the AG's Office unqualified rulemaking authority would introduce huge uncertainty. This authority could turn into new procurement mandates that interfere with the cybersecurity risk management for sophisticated businesses that are based upon clearly established national and international standards. Unique security requirements in the District would divert resources away from the complex task of managing these dynamic risks.

On the other hand, guidance documents for small businesses, such FTC guidance, can be helpful, but the Attorney General simply does not need any rulemaking authority, much less unqualified rulemaking authority, to produce guidance.

6. **There should not be private class action enforcement of the law**

It is important to understand that most businesses that suffer a data breach are themselves already a victim of crime. Making a violation of the data breach notification law an unfair trade practice — without removing the existing private right of action for consumers —unjustly punishes these companies.

It does not meaningfully protect consumers or encourage compliance because the complexity of data security means that even companies with strong practices and procedures can suffer a security incident and be forced to spend hundreds of thousands of dollars responding to lawsuits and attendant one-sided eDiscovery costs borne by defendants only.

Any amendment to the enforcement provisions of the law should give sole enforcement authority to the AG, rather than creating multiple avenues for class action lawyers to line their pockets.

In addition, the AG penalties are up to $10,000 per violation for any repeat violation. It is unclear whether a business' accidental failure to notify – for example, because a line employee did not report an incident contrary to a business' incident response plan – in a breach involving multiple residents would itself constitute repeat violations. For this reason, consistent with other state breach notice laws, there should be some cap on monetary penalties arising out of the same breach or series of breaches.

**7. There is no principled reason to exempt DC agencies from the security or notice requirements**

Government agencies typically hold far more "sensitive" information about consumers than do private sector entities in the District, and DC residents are affected equally or more when there is a breach of government "personal information." The interests in assuring notification of DC residents in the event of a data breach are as strong or stronger in the government agency context. For this reason, we believe that all requirements and all remedies under the law should apply to all DC government agencies.

Respectfully submitted,

Elaine Critides, Counsel
State Privacy & Security Coalition
(202) 799-4501

Statement of Elizabeth Wilkins
Senior Counsel for Policy
Office of the Attorney General

Before the

The Committee of the Whole
The Honorable Phil Mendelson, Chairperson

Public Hearing

"Bill 23-215, Security Breach Protection Amendment Act of 2019"

November 12, 2019
Time 11:00am
Room 412
John A. Wilson Building
1350 Pennsylvania Avenue, NW
Washington, District of Columbia 20004

Good afternoon Chairman Mendelson, Councilmembers, staff, and residents. I am Elizabeth Wilkins, and I serve as the Senior Counsel for Policy for the Office of the Attorney General ("OAG"). I am pleased to appear on behalf of Attorney General Karl A. Racine before the Committee of the Whole to testify on OAG's proposed bill, the Security Breach Protection Amendment Act of 2019. The bill before the Committee today makes significant advances in our ability to protect District consumers in the new data economy.

The security of consumers' data is becoming an increasing concern in our new digital era. By consumer data, we mean any personal information that may be collected on a consumer. We used to think primarily about, say, social security numbers collected by banks. But we have seen an explosion of the breadth of information collected on people, as well as significant changes in the ways that data is collected and stored. The more data that's out there, the more attractive it is to those who would misuse it, and the greater risk that consumers might suffer the consequences.

Our office has seen this dynamic in the frequency and increasing size of data breaches. A data breach occurs when sensitive or confidential information is intentionally or accidentally released by a company or an individual. These releases of information may happen because of insufficient security protections or as a result of hacking or cyber attacks. Recent years have seen some of the largest

and most serious data breaches in history, including the Equifax breach, which exposed the personal information of over 143 million people, including nearly 350,000 District residents.

Consumers caught in the crosshairs of these data breaches risk identity theft and other types of fraud. They may suffer financial harm, loss of significant time and resources, and even harassment.

Under our current laws, District consumers are not sufficiently protected. The District adopted our data breach laws in 2007—a lifetime ago in terms of the digital economy and cybersecurity. Many states have updated their laws to reflect these changes, and it is time the District did so as well.

After closely studying data breach laws in other jurisdictions and the latest innovations in this policy arena, our office proposed the bill at issue today, the Security Breach Protection Amendment Act of 2019. With this bill, we can protect our consumers here in the District and be coequal partners with our fellow state attorneys general in policing national cybersecurity issues.

If this bill becomes law, it would require companies that hold consumer data to do two things: maintain reasonable security procedures to safeguard consumer data, and notify consumers and the Attorney General of a breach. Certain key

reforms ensure that the law is crafted to keep up with current data practices, protect consumers, and create the right incentives:

(1) Current law protects a narrow swath of personal information that was at issue over ten years ago when our original bill was passed. This bill updates the definition of personal information to include additional sensitive information, some of which has been the subject of recent data breaches: passport number, taxpayer identification number, military ID number, health information, biometric data, genetic information and DNA profiles, and health insurance information. This update ensures the law better protects the growing breadth of sensitive information consumers may have at risk.

(2) Current law dictates that even where data is acquired without authorization, it does not constitute a breach if the data at issue has been rendered secure by appropriate cybersecurity techniques. The bill clarifies that a breach nevertheless *does* occur if the unauthorized access has undermined the efficacy of that security. This provision plugs a loophole to ensure that entities can be held accountable where their security measures are inadequate and consumers have been put at risk.

(3) Current law requires that companies notify consumers of a breach. This bill inserts requirements for the content of that notification to consumers, including a requirement that it include a statement informing residents of the right to obtain a security freeze at no cost (pursuant to federal law) and, where appropriate, the right to identity theft prevention services. This increased information ensures that consumers are armed with the information they need to protect themselves.

(4) The bill also requires notification of a breach to the Attorney General. This provision brings the District's law into line with that of most other states and ensures that OAG can take swift action in case of a breach affecting District residents.

(5) The bill requires persons and entities that own, license, maintain, license, or otherwise possess personal information to implement and maintain reasonable security procedures and practices. This is crucial: Given the amount of data we now entrust to third parties, we must ensure that those entities treat that data with the appropriate care.

(6) The bill adds a requirement that in the case of a breach of social security numbers, the company must provide 2 years of identity theft prevention services. Again, we want to ensure above all else that consumers are protected.

(7) The bill makes a violation of the data breach law a violation of the Consumer Protection Procedures Act (CPPA), the District's main consumer protection statute. This provision confirms that violations of the data breach law can be addressed through enforcement under the CPPA, ensures that there are real teeth to our law, and creates the appropriate incentives for companies to safeguard the data of their consumers.

Advances in the digital economy and in other states' policies around data breaches mean that the District is behind the times. We need this modernization of our data breach law in order to ensure that District residents are protected.

Thank you for the opportunity to testify, and I am happy to answer any questions that members may have.

American Property Casualty Insurance Association
INSURING AMERICA apci.org

November 20, 2019

Re: B23-0215 – Security Breach Protection Amendment Act of 2019.

Chairman Phil Mendelson
Committee of the Whole
1350 Pennsylvania Avenue NW, Suite 410
Washington, DC 20004

Dear Chairman Mendelson,

The American Property Casualty Insurance Association (APCIA) appreciates the opportunity to provide feedback on B23-215, "Security Breach Protection Amendment Act of 2019" (B23-215). APCIA represents nearly 60 percent of the U.S. property casualty insurance market and the broadest cross-section of home, auto, and business insurers of any national trade association. Of particular interest, APCIA members represent all sizes, structures, and regions, protecting families, communities, and businesses located in the District of Columbia.

Consumer privacy and data security are a priority issue for the insurance industry and as such, insurers devote considerable resources to protect data, information systems, and consumer trust. To that end, we support policy efforts that balance corporate responsibility with appropriate oversight that ultimately enhances consumer protections. We recognize the legislative objective of B23-215 is to strengthen consumer protections related to unauthorized access to personal information because of a breach of the security of a computer system; however, APCIA has significant concerns that the amendments proposed by B23-215 will harm rather than benefit consumers. These concerns are outlined below.

**Personal Information**

B23-215 proposes to amend the definition of personal information to make a "personal identifier" a data element and further allows the personal identifier and individual's first initial and last name to be considered a data element on their own. Such a broad definition would mean that an address, last name, or date of birth, for example, are independently considered personal information. These amendments raise consumer harm issues due to the overnotification consequences. APCIA respectfully urges the legislature to remove this proposed amendment. The definition of personal information in the current law appropriately strikes the right balance of notifying consumers when there is risk of a breach that presents a risk of substantial harm while avoiding the potential to desensitize consumers.

**Attorney General Notice**

The primary focus of a breach notification law should be meaningful notification to consumers of a material event without unreasonable delay. Prioritizing the attorney general notice misaligns these priorities. If notice to the Attorney General is necessary, the provision should be drafted to require notice

EXHIBIT D-54

only if notice must be sent to 500 or more D.C. residents and following delivery to the consumer. This will prioritize consumer notice and the 500 resident threshold avoids inundating the Attorney General with notifications.

The proposed language permitting the Attorney General to adopt regulations should be eliminated. Allowing regulations only adds uncertainty and has the potential to further complicate and differentiate and already inconsistent patchwork of breach notification laws.

**Private Right of Action**

Enforcement consistent with the Consumer Protection Procedures Act (CPPA) would introduce a private right of action for violations of the breach notification and new data security requirements. The legislature should specifically exclude a private right of action. Given the Attorney General's enforcement role, a private right of action will only create a frenzy of litigation activity in an already uncertain and litigious environment.

***

Thank you for the opportunity to comment and if we can answer any questions, please let us know. Please contact me directly at 847-553-3732 or via email at brian.costello@apci.org or APCIA's District of Columbia counsel, Brett Greene and Tiffini Greene at 202-280-6364 or via email at tgreene@amermgmt.com.

Respectfully submitted,

Brian Costello
Manager, State Government Relations
American Property Casualty Insurance Association

sifma
*Invested in America*

November 8, 2019

The Honorable Phil Mendelson
Chair, Council of the District of Columbia
Chair, Committee of the Whole
Wilson Building, Room 412
1350 Pennsylvania Avenue, N.W.
Washington, DC 20004

**RE: DC B23-215, A Bill Regarding Data Privacy Protection**

Dear Chair Mendelson:

The Securities Industry and Financial Markets Association[1] is a national trade association which brings together the shared interests of over 340 broker-dealers, banks and asset managers, many of whom have a strong presence in the District of Columbia. We thank you for the opportunity to provide feedback on B23-215, which would generally modernize the District's data breach law while keeping the law in line with similar requirements across the country.

SIFMA generally supports such efforts and commends Attorney General Racine and the Council on their efforts in this space. Below we have included several suggestions for your review that would both strengthen consumer protections and increase the proposed framework's efficiency:

- **<u>The Need to Expand the Gramm-Leach-Bliley Act Compliance Provision</u>**

  The current law states that entities subject to Title V of the GLBA, and who provide notice of a breach in accordance with that Act, are deemed to be compliant with the District's law. As currently drafted, B23-215 would add two new provisions to the existing law, both of which would be outside of the GLBA deemed-compliance provision: notification to the District Attorney General, and an additional security requirement. We urge you to consider expanding the GLBA deemed-compliance provision to include both provisions, or at least modifying the notification provision, for the reasons discussed below.

  **Public Records Requests**

  The proposed AG notification provision includes requirements that the cause or nature of the breach and the identity of the responsible individual be reported. Our membership has expressed significant concern that this information could be made public through a public records request, which could cause significant additional security issues. Generally, disclosing the nature or cause of a breach could reasonably lead to the inadvertent disclosure of critical system and/or security information – which

[1] SIFMA is the leading trade association for broker-dealers, investment banks and asset managers operating in the U.S. and global capital markets. On behalf of our industry's nearly 1 million employees, we advocate for legislation, regulation and business policy, affecting retail and institutional investors, equity and fixed income markets and related products and services. We serve as an industry coordinating body to promote fair and orderly markets, informed regulatory compliance, and efficient market operations and resiliency. We also provide a forum for industry policy and professional development. For more information, visit http://www.sifma.org.

would only be made worse if that information could also be made public. Such a disclosure could put the personal information of people in D.C. and across the country at greater risk. Similarly, reporting the name of the individual who is responsible for a breach, if known, is problematic because it could be difficult to identify a single responsible person. Additionally, the need to identify a person(s) responsible may impact an organization's decision as to how – or even if – to report, which would defeat the intent of the proposal. Should you choose not to expand the GLBA deemed-compliance provision to the AG notification, we urge you to either remove these requirements (in subsections 3 and 6), or at least ensure that such reports are exempt from public records requests.

**Timing of Notification**

B23-215 currently requires that the D.C. Attorney General be notified prior to notifying an impacted resident of the breached information.[2] Several of our members are concerned that this requirement could unnecessarily delay an organization's response time. Data breach laws are most often designed to notify impacted customers of the breach so that they can take steps to protect themselves. The requirement to notify the AG first could delay the impacted customer notification, leaving them unable to take those protective measures. We believe that this is currently happening in both New Jersey and Maryland – the only two states we're aware of with a prior notification requirement. Should you choose not to expand the GLBA deemed-compliance provision to the AG notification, we urge you to consider simultaneous reporting.

On a separate but similar issue, there is no timing guidance included for entities that are required to provide consumer notices. We believe a general timing requirement would be helpful (e.g., "within a reasonable time after discovery and confirmation of a breach") but believe that any set timeframe of at least 45 days after discovery and confirmation of a breach would be beneficial.

**De Minimis Requirement**

Currently, this bill would require notification to the AG if certain information of any single D.C. resident was breached. This would be a fairly unique requirement that could lead to unnecessary reporting and additional burdens on both reporting entities and the District AG's Office. In other states that have a single resident requirement, the state agency notification is usually included in the deemed-compliance provision. Should you choose not to expand the GLBA deemed-compliance provision to the AG notification, we urge you to consider the addition of a de minimis requirement.[3]

**Security Requirement**

New Section 28-3852a would not require a greater level of security than what is already required by GLBA, but neither does it include identical requirements. Such regulatory inconsistency can take away from firm efforts to protect their customers. In fact, Firm cybersecurity staff are currently spending 40% of their time, on average, on regulatory compliance efforts, taking their time away from other cyber defense activities.[4] As such, we strongly suggest that the GLBA deemed-compliance provision be extended to include new Section 28-3852a's security requirements.

---

[2] Please note that clarification on the numbering of the sections may prove helpful; the proposed number (b-1) and (b-2) makes them appear to be part of the requirement to notify the owner or licensee of a breach, rather than the requirement to notify consumers.

[3] 500 or 1,000 residents are the two most common requirements.

[4] Financial Services Sector Coordinating Council, "Financial Services Sector Cybersecurity Recommendations," available at: fsscc.org/files/galleries/FSSCC_Cybersecurity_Recommendations_for_Administration_and_Congress_2017.pdf.

- **The Definition of Personal Information Should Not Include "Attempt to Commit" Language**

  B23-215 currently includes any subset of information that would be sufficient for a person to "commit or attempt to commit identify theft [...]" in subsection VII of the definition of "Personal Information." In this case, the "attempt to commit" language is both unnecessary and problematic. The entire subsection is already conditional (i.e., the definition includes information that "would be sufficient to commit [...]") and would encompass the breach of any information which could cause harm to a consumer. On top of this, anyone could technically attempt to commit identity theft with any combination of information – regardless of whether such an attempt could ever be successful.

We appreciate your willingness to consider our suggestions. If there is any additional information we may be able to provide or any questions we can answer, please contact me at 212-313-1211 or kinnes@sifma.org with any questions.

Sincerely,

/s/
Kyle R. Innes
Assistant Vice President & Assistant General Counsel
SIFMA

CC: All Members, Committee of the Whole

**CareFirst BlueCross BlueShield**
840 First Street NE, Suite 1200
Washington, DC 20065-0001
Tel. 202-680-5224

**Testimony for the Record**
**Council of the District of Columbia**
**Committee of the Whole**
**Bill 23-0215, "Security Breach Protection Amendment Act of 2019"**

Chairman Mendelson and members of the Committee of the Whole, CareFirst BlueCross BlueShield (CareFirst) appreciates the opportunity to submit testimony for the record on Bill 23-0215, the "Security Breach Protection Amendment Act of 2019."

Bill 23-0215 seeks to provide protections to consumers if personal information is released to unauthorized individuals due to data security breach. Importantly, the bill creates security requirements for the protection of personal information and makes violations of the legislation a violation of the District's Consumer Protection Procedures Act (CPPA). However, the legislation makes any breach a violation of the CPPA, even if the business followed the security requirements outlined in 38-2852a.

CareFirst believes that the legislation should be amended such that if a company follows the security requirements outlined in 38-2852a they will not be in violation of the CPPA. The bill is intended to outline reasonable security procedures, and businesses should be able to rely on compliance with those procedures as sufficient to provide reasonable protections to consumers. CareFirst suggests the addition of the following at the end of line 167 of the legislation to achieve this:

> *"except if the company has complied with security requirements in 3852a, in which case the company will not be considered to be in violation of 28-3909."*

CareFirst supports efforts to protect consumer data in the District of Columbia.

CareFirst BlueCross BlueShield is the shared business name of CareFirst of Maryland, Inc. and Group Hospitalization and Medical Services, Inc. which are independent licensees of the Blue Cross and Blue Shield Association.
® Registered trademark of the Blue Cross and Blue Shield Association.®′ Registered trademark of CareFirst of Maryland, Inc.

DC Chamber of Commerce
DELIVERING THE CAPITAL

**DC Chamber of Commerce Testimony Submitted for the Public Record**
To
**The Committee of the Whole**
on
**Bill 23-215, the Security Breach Protection Amendment Act of 2019**
**Tuesday, November 12, 2019**

The D.C. Chamber of Commerce respectfully submits this statement for the record regarding ***Bill 23-215, The Security Breach Protection Amendment Act of 2019***. The DC Chamber does not support the bill as introduced and invites your attention to provisions that we have identified with concerns as well as ways in which the proposal currently before you can be improved.

The D.C. Chamber of Commerce represents businesses large and small throughout the District of Columbia and region. At the D.C. Chamber, we work hard to make living, working, playing, and doing business in D.C. a much better proposition for all. And we, at the Chamber, support ensuring that as technology and DC's place as a data-science and information hub evolves, effective practices are in place to protect consumers. Regrettably, however, as drafted Bill 23-215 is not the vehicle to ensure that important goal is met.

1. **Definitions & Scope Should Be Reconsidered**. We agree that the definitions should be comprehensive. However, information that has been aggregated, de-identified, or is publicly available should not be covered by the law. Any personal data altered from its original form or that is encrypted should be exempted from the notification requirements. This will incentivize entities to ensure data is protected via industry-standard methods while making it harder for hackers to decipher personal information.

   Should the Council consider acting on this legislation, District agencies should be covered by the act to the same extent as private companies. Those agencies likely hold as much, if not more, sensitive information than private companies operating in the District. The District's interest in keeping its residents' data secure and assuring notification of covered breaches to those residents is just as strong whether the breach affects a government agency or a private company.

As to the notification requirements, reporting and notice should not be triggered when events are merely theoretical, technical, or minimal. Additionally, the key terms should also detail a harm threshold. In approximately 40 jurisdictions throughout the United States and even some other countries, notification of a data breach is triggered only when there is a likelihood of significant harm to affected individuals or harm has occurred. Approximately half also specify a threshold number of affected residents. We ask that the Committee consider incorporating those thresholds to align with best practices and focus the notification on meaningful responses and solutions.

As to the proposed prior notice to the Attorney General, only three states currently require Attorney General notice prior to consumer notice. Whereas prompt notice to affected consumers allows them to take appropriate measures to protect themselves from identity theft, there is no purpose served by advance, potentially premature, notice to the Attorney General.

Finally, information collected in other contexts such as employment, hiring of vendors, contractors or seasonal workforce should be excluded.

Without such changes to the bill, we cannot be supportive.

2. **Changes to Enforcement Provisions & Applicability to other Laws**– As a result of enhanced industry standards and federal laws, businesses are already taking steps and implementing policies to ensure consumer data is properly secured and protected. With the passage of data protection, privacy, or consumer protection laws like HIPPA Privacy Security and Breach Law and Gramm-Leach-Bliley Act privacy laws already apply to large sectors of our economy. Should the committee move forward with the bill we ask that language is added that would recognize that compliance with industry guidelines and federal laws would constitute compliance with the act to avoid the need for inconsistent company policies and procedures in the District. Such language would align the bill to the Children's Online Privacy Protection Act (COPPA).

   After reviewing the legislation, the concern of our membership is that this bill would place a burden on small businesses including startups and CBE vendors. For most startups, capital is limited, Now, with this already, limited capital, they will not only have to implement specific systems, fulfill the administrative compliance with the act but also would be fiscally liable for breaches when they are the injured party of the attacks. We ask that violations of the act that is neither willful nor reckless should not be penalized. After all, in many cases, it is the business entity that is the victim of the attack.

> We strongly advise the Council to remove the private right of action from the law. Such provisions undermine existing enforcement capabilities, lead to expensive litigation, and foster frivolous claims.

At the DC Chamber, we are dedicated to ensuring that our city continues to grow and prosper together and that mission includes the promotion of responsible corporate practices. However, such a mission cannot be fulfilled without the partnership and inclusion of the public sector and policymakers. Thank you for the opportunity to comment on Bill 23-215. The DC Chamber looks forward to working with you to find optimal solutions to the challenges facing our city. Should you or your staff have questions or need additional information, please contact Ms. Erika Wadlington, Director of Public Policy & Programs at ewadlington@dcchamber.org or at (202) 347-7201.

Government of the District of Columbia
Office of the Chief Financial Officer

**Jeffrey S. DeWitt**
Chief Financial Officer

**MEMORANDUM**

| | |
|---|---|
| **TO:** | **The Honorable Phil Mendelson**<br>**Chairman, Council of the District of Columbia** |
| **FROM:** | **Jeffrey S. DeWitt**<br>**Chief Financial Officer** |
| **DATE:** | **January 17, 2020** |
| **SUBJECT:** | **Fiscal Impact Statement – Security Breach Protection Amendment Act of 2020** |
| **REFERENCE:** | **Bill 23-215, Committee print provided to the Office of Revenue Analysis on January 15, 2020** |

**Conclusion**

Funds are sufficient in the fiscal year 2020 through fiscal year 2023 budget and financial plan to implement the bill.

**Background**

The bill updates definitions and requirements associated with personal data security breaches at businesses and organizations and establishes notification requirements and remedies for failing to meet the requirements. It sets standards for entities to reasonably secure data and makes violation of requirements to protect personal information an unfair or deceptive trade practice, allowing for prosecution under those laws.

The bill requires that a person or entity[1] conducting business in the District notify the Office of the Attorney General (OAG) of an unauthorized acquisition of data or equipment that compromises personal information[2] if the breach affects 50 or more District residents. Notification cannot be

[1] A person or entity is defined in the bill as an individual, firm, corporation, partnership, company, cooperative, association, trust, or any other organization, legal entity, or group of individuals, but excludes the Government of the District of Columbia and its agencies.
[2] Personal information is defined in the bill to include names or other personal identifier including social security number, taxpayer identification number, account numbers, credit card numbers, medical information, genetic information, health insurance information, biometric data, email addresses, or any combination that allows for identification or access to an individual email account.

1350 Pennsylvania Avenue, NW, Suite 203, Washington, DC 20004 (202)727-2476
www.cfo.dc.gov

delayed on the grounds that the exact number of District residents is not yet determined. Entities must continue to provide notification to the affected parties as already established in current law. The bill requires that notification to affected parties include categories of information that were exposed, information about the right to obtain a security freeze, and contact information for the entity, consumer reporting agencies, the Federal Trade Commission and the OAG.

The bill requires entities to maintain reasonable security safeguards, including procedures and practices appropriate for the type of information and size of the entity. Entities must have a written agreement with any third-party service provider requiring that the third party also maintain reasonable security procedures. The reasonable safeguards must be also be maintained when destroying records.

When a breach occurs in which it is believed a social security number or tax identification number may have been released, entities must offer each affected District resident identity theft protection services for no fewer than 18 months at no cost.

**Financial Plan Impact**

Funds are sufficient in the fiscal year 2020 through fiscal year 2023 budget and financial plan to implement the bill. The bill imposes requirements on the private sector to report security breaches and provide remedies. The bill excludes the District government and its agencies from the security requirements of the bill, so there is no fiscal exposure to the specific remedies outlined in the bill. The Office of the Attorney General can absorb the cost of collecting notification of security breaches by entities, as well as all other provisions authorizing action by OAG, such as rulemaking.

OFFICE OF THE GENERAL COUNSEL
Council of the District of Columbia
1350 Pennsylvania Avenue NW, Suite 4
Washington, DC 20004
(202) 724-8026

**MEMORANDUM**

**TO:** **Chairman Phil Mendelson**

**FROM:** **Nicole L. Streeter, General Counsel**

**DATE:** **January 20, 2020**

**RE:** **Legal sufficiency determination for Bill 23-215, the Security Breach Protection Amendment Act of 2020**

The measure is legally and technically sufficient for Council consideration.

The proposed bill would amend Title 28 of the District of Columbia Official Code as follows:

- Amends section 3801 to clarify that the provisions of subchapter I do not apply to all of chapter 38.

- Amends section 3851 to clarify the definitions of "breach of the security of the system," "notify" or "notification," and "personal information," and adds definitions for the terms "genetic information," "medical information," and "person or entity."

- Amends section 3852 to specify: 1) the content of the notification to be provided to a District of Columbia resident whose personal information is included in a breach of the security of a system; and 2) that the person or entity required to give notice shall provide written notice to the Office of the Attorney General to the extent the breach affects 50 or more District residents. It also repeals subsection (e) and provides that a person or entity in compliance with the security breach notification requirements of certain federal laws shall be deemed to be in compliance with the requirements of the section.

- Adds a new section 3852a to require: 1) a person or entity that owns, licenses, maintains, handles, or otherwise possesses personal information of an individual residing in the District to implement and maintain reasonable security safeguards; 2) a person or entity that uses a nonaffiliated third party as a service provider and discloses to that service provider under a written agreement personal information about an individual residing in the District to implement and maintain certain reasonable security procedures and practices; and 3)

a person or entity that is destroying records, including computerized or electronic records and devices containing computerized or electronic records that contain personal information of a consumer, employee, or former employee, to take certain reasonable steps to protect against unauthorized access to or use of the personal information. It also provides that a person or entity in compliance with the security requirements of certain federal laws shall be deemed to be in compliance with the requirements of the section.

- Adds a new section 3852b to provide that a person or entity that experiences a breach of the security of the system that requires that the Attorney General be notified pursuant to section 3852 and that includes or is reasonably believed to include a social security number or taxpayer identification number shall offer each affected District resident identify theft protection services at no cost to the resident for not less than 18 months.

- Adds a new section 3852c to authorize the Attorney General for the District of Columbia to issue rules to implement the notification provisions set forth in section 3852 as amended.

- Amends section 3853 to repeal subsection (a), which provides for the filing of a civil action by any District of Columbia resident alleging a violation of subchapter II, and amends subsection (b) to no longer expressly provide for an action to be filed by the Attorney General alleging a violation of subchapter II and instead providing that a violation is an unfair or deceptive trade practice.

- Makes certain conforming amendments to sections 3904 and 3909 with respect to making a violation of subchapter II of chapter 38 an unfair or deceptive trade practice.

I am available if you have any questions.

**Bill 23-215, "Security Breach Protection Amendment Act of 2020"**
**Committee of the Whole**
**Comparative Print**

**An Act to amend certain provisions of subtitle II of title 28, District of Columbia Code, relating to interest and usury.**
**(D.C. OFFICIAL CODE § 28-3801)**

**§ 28–3801. Scope — Limitation on agreements and practices.**

This subchapter applies to actions to enforce rights arising from a consumer credit sale or a direct installment loan.

**Consumer Personal Information Security Breach Notification Act**
**(D.C. OFFICIAL CODE § 28-3851 *ET SEQ.*)**

**§ 28–3851. Definitions.**

For purposes of this subchapter, the term:

"(1)(A) "Breach of the security of the system" means unauthorized acquisition of computerized or other electronic data or any equipment or device storing such data that compromises the security, confidentiality, or integrity of personal information maintained by the person or entity who conducts business in the District of Columbia.

"(B) The term "breach of the security of the system" does not include:

"(i) A good faith acquisition of personal information by an employee or agency of the person or entity for the purposes of the person or entity if the personal information is not used improperly or subject to further unauthorized disclosure;

"(ii) Acquisition of data that has been rendered secure so as to be unusable by an unauthorized third party unless any information obtained has the potential to compromise the effectiveness of the security protection preventing unauthorized access; or

"(iii) Acquisition of personal information of an individual that the person or entity reasonably determines, after consultation with District and federal law enforcement agencies, will likely not result in harm to the individual.

~~(1) "Breach of the security of the system" means unauthorized acquisition of computerized or other electronic data, or any equipment or device storing such data, that compromises the security, confidentiality, or integrity of personal information maintained by the person or business. The term "breach of the security system" shall not include a good faith acquisition of personal information by an employee or agent of the person or business for the purposes of the person or business if the personal information is not used improperly or subject to further unauthorized disclosure. Acquisition of data that has been rendered secure, so as to be unusable by an unauthorized third party, shall not be deemed to be a breach of the security of the system.~~



EXHIBIT D-67

**Bill 23-215, "Security Breach Protection Amendment Act of 2020"**
**Committee of the Whole**
**Comparative Print**

(1A) Genetic information has the meaning ascribed to it under the federal Health Insurance Portability and Accountability Act of 1996 ("HIPPA"), approved August 21, 1996 (Pub. Law 104-191; 110 Stat. 1936), as specified in 45 C.F.R. § 106.103.

(1B) Medical information means any substantive information about a consumer's dental, medical or mental health treatment or diagnosis by a health care professional.

(2) "Notify" or "notification" means providing information through any of the following methods:

(A) Written notice;

(B) Electronic notice, if the customer has consented to receipt of electronic notice consistent with the provisions regarding electronic records and signatures set forth in the Electronic Signatures in Global and National Commerce Act, approved June 30, 2000 (114 Stat. 641; 15 U.S.C. § 7001); or

(C)(i) Substitute notice, if the person or entity ~~business~~ demonstrates that the cost of providing notice to persons subject to this subchapter would exceed $50,000, that the number of persons to receive notice under this subchapter exceeds 100,000, or that the person or entity ~~business~~ does not have sufficient contact information.

(ii) Substitute notice shall consist of all of the following:

(I) E-mail notice when the person or entity ~~business~~ has an e-mail address for the subject persons;

(II) Conspicuous posting of the notice on the website page of the person or ~~business~~ entity if the person or entity ~~business~~ maintains one; and

(III) Notice to major local and, if applicable, national media.

(2A) "Person or entity" means an individual, firm, corporation, partnership, company, cooperative, association, trust, or any other organization, legal entity, or group of individuals. The term "person or entity" shall not include the District of Columbia government or any of its agencies or instrumentalities.

(3)(A) "Personal information" means:

(i) An individual's first name, ~~or~~ first initial and last name, or any other personal identifier, which, in combination with any of the following data elements, can be used to identify a person or the person's information: ~~or phone number, or address, and any one or more of the following data elements:~~

______(I) Social security number, Individual Taxpayer Identification Number, passport number, driver's license number, District of Columbia identification card number, military identification number, or other unique identification number issued on a government document commonly used to verify the identity of a specific individual; ~~;~~

______(II) Account number, credit card number or debit card number, or any other number or code or combination of numbers or codes, such as account number, security code, access code, or password, that allows access to or use of an individual's financial or credit account;

~~Driver's license number or District of Columbia Identification Card number; or~~

______(III) Medical Information ~~Credit card number or debit card number~~;

______(IV) Genetic information and deoxyribonucleic acid profile;

______(V) Health insurance information, including a policy number, subscriber information number, or any unique identifier used by a health insurer to identify the person that permits access to an individual's health and billing information;

______(VI) Biometric data of an individual generated by automatic measurements of an individual's biological characteristics such as a fingerprint, voice print, genetic print, retina, or iris image, or other unique biological characteristic, that is used to uniquely authenticate the individual's identity when the individual accesses a system or account; or

______(VII) Any combination of data elements included in sub-sub-sub paragraph (I) through (VI) of this sub-paragraph that would enable a person to commit identity theft without reference to a person's first name or first initial or other independent personal identifier.

(ii) A username or e-mail address in combination with a password, security question and answer or other means of authentication, or any combination of data elements included in sub-sub-sub paragraphs (I) through (VI) that permits access to an individual's email account. ~~Any other number or code or combination of numbers or codes, such as account number, security code, access code, or password, that allows access to or use of an individual's financial or credit account.~~

(B) For purposes of this paragraph, the term "personal information" shall not include publicly available information that is lawfully made available to the general public from federal, state, or local government records.

---

**§ 28–3852. Notification of security breach.**

(a) Any person or entity who conducts business in the District of Columbia, and who, in the course of such business, owns or licenses computerized or other electronic data that includes

personal information, and who discovers a breach of the security of the system, shall promptly notify any District of Columbia resident whose personal information was included in the breach. The notification shall be made in the most expedient time possible and without unreasonable delay, consistent with the legitimate needs of law enforcement, as provided in subsection (d) of this section, and with any measures necessary to determine the scope of the breach and restore the reasonable integrity of the data system.

(a-1) The notification required under subsection (a) of this section shall include:

(1) To the extent possible, a description of the categories of information that were, or are reasonably believed to have been, acquired by an unauthorized person, including the elements of personal information that were, or are reasonably believed to have been, acquired;

(2) Contact information for the person or entity making the notification, including the business address, telephone number, and toll-free telephone number if one is maintained;

(3) The toll-free telephone numbers and addresses for the major consumer reporting agencies, including a statement notifying the resident of the right to obtain a security freeze free of charge pursuant to 15 U.S.C. § 1681c-1 and information how a resident may request a security freeze; and

(4) The toll-free telephone numbers, addresses, and website addresses for the following entities, including a statement that an individual can obtain information from these sources about steps to take to avoid identity theft:

(A) The Federal Trade Commission; and

(B) The Office of the Attorney General for the District of Columbia.

(5) Information regarding identity theft protection where when required under 28-3852b.

"(a-2) Notwithstanding subsection (a-1), in the case of a breach of the security of the system that only involves personal information defined in section 28-3851(3)(A)(ii), the person or entity may comply with this section by providing the notification in electronic format or other form that directs the person to change the person's password and security question or answer, as applicable, or to take other steps appropriate to protect the e-mail account with the person or entity and all other online accounts for which the person whose personal information has been breached uses the same username or email address and password or security question or answer.

(b) Any person or entity who maintains, handles, or otherwise possesses computerized or other electronic data that includes personal information that the person or entity does not own shall notify the owner or licensee of the information of any breach of the security of the system in the most expedient time possible following discovery.

**Bill 23-215, "Security Breach Protection Amendment Act of 2020"**
**Committee of the Whole**
**Comparative Print**

(b-1) In addition to giving notification required under subsection (a) of this section, the person or entity required to give notice shall promptly provide written notice of the breach of the security of the system to the Office of the Attorney General if the breach affects 50 or more District residents. This notice shall be made in the most expedient manner possible, without unreasonable delay, and no later than when notice is required by subsection (a) of this section. The written notice shall include:

(1) The name and contact information of the person or entity reporting the breach;

(2) The name and contact information of the person or entity that experienced the breach;

(3) The nature of the breach of the security system;

(4) The types of personal information compromised or potentially compromised by the breach;

(5) The number of District residents affected or estimated to be affected by the breach;

(6) The cause of the breach, including the relationship between the person or entity that experienced the breach and the person responsible for the breach, if known;

(7) Remedial action taken by the person or entity to include steps taken to assist District residents affected by the breach; and

(8) A generic copy of the notice to be provided to District residents.

(b-2) The notice required under subsection (b-1) of this section shall not be delayed on the grounds that the total number of District residents affected by the breach has not yet been ascertained.

(c) If any person or entity is required by subsection (a) or (b) of this section to notify more than 1,000 persons of a breach of security pursuant to this subsection, the person shall also notify, without unreasonable delay, all consumer reporting agencies that compile and maintain files on consumers on a nationwide basis, as defined by section 603(p) of the Fair Credit Reporting Act, approved October 26, 1970 (84 Stat. 1128; 15 U.S.C. § 1681a(p)), of the timing, distribution and content of the notices. Nothing in this subsection shall be construed to require the person to provide to the consumer reporting agency the names or other personal identifying information of breach notice recipients. This subsection shall not apply to a person or entity who is required to notify consumer reporting agencies of a breach pursuant to Title V of the Gramm-Leach-Bliley Act, approved November 12, 1999 (113 Stat. 1436; 15 U.S.C. § 6801 et seq[.]).

(d) The notification required by this section may be delayed if a law enforcement agency determines that the notification will impede a criminal investigation but shall be made as soon as possible after the law enforcement agency determines that the notification will not compromise the investigation.

**Bill 23-215, "Security Breach Protection Amendment Act of 2020"**
**Committee of the Whole**
**Comparative Print**

~~(e) Notwithstanding subsection (a) of this section, a person or business that maintains its own notification procedures as part of an information security policy for the treatment of personal information and is otherwise consistent with the timing requirements of this subchapter shall be deemed to be in compliance with the notification requirements of this section if the person or business provides notice, in accordance with its policies, reasonably calculated to give actual notice to persons to whom notice is otherwise required to be given under this subchapter. Notice under this section may be given by electronic mail if the person or entity's primary method of communication with the resident is by electronic means.~~

(f) A waiver of any provision of this subchapter shall be void and unenforceable.

"(g) A person or entity who maintains procedures for a breach notification system under Title V of the Gramm-Leach-Bliley Act, approved November 12, 1999 (113 Stat. 1436; 15 U.S.C. § 6801 *et seq.*), or the breach notification rules issued by the United States Department of Health and Human Services, Parts 160 and 164 of Title 45 of the Code of Federal Regulations, established pursuant to the Health Insurance Portability Accountability Act of 1996 (Public Law 104-191), or the Health Information Technology for Economic and Clinical Health Act (Public Law 111-5), and provides notice in accordance with such Acts, and any rules, regulations, guidance and guidelines thereto, to each affected resident in the event of a breach, shall be deemed to be in compliance with this section with respect to the notification of residents whose personal information is included in the breach. The person or entity shall, in all cases, provide written notice of the breach of the security of the system to the Office of the Attorney General as required under subsection (b-1) of this section. ~~(g) A person or entity who maintains procedures for a breach notification system under Title V of the Gramm-Leach-Bliley Act, approved November 12, 1999 (113 Stat. 1436; 15 U.S.C. § 6801 et seq.) ("Act"), and provides notice in accordance with the Act, and any rules, regulations, guidance and guidelines thereto, to each affected resident in the event of a breach, shall be deemed to be in compliance with this section.~~

Sec. 28-2852a. Security requirements.

(a) To protect personal information from unauthorized access, use, notification, disclosure or a reasonably anticipated hazard or threat, a person or entity that owns, licenses, maintains, handles, or otherwise possesses personal information of an individual residing in the District shall implement and maintain reasonable security safeguards, including procedures and practices, that are appropriate to the nature of the personal information and the nature and size of the entity or operation.

(b) A person or entity that uses a nonaffiliated third party as a service provider to perform services for a person or entity and discloses person information about an individual residing in the District under a written agreement with the third party shall require by the agreement that the third party implement and maintain reasonable security procedures and practices that:

(1) Are appropriate to the nature of the personal information disclosed to the nonaffiliated third party; and

(2) Are reasonably designed to protect the personal information from unauthorized access, use, modification, and disclosure.

(c) When a person or entity is destroying records, including computerized or electronic records and devices containing computerized or electronic records, that contain personal information of a consumer, employee, or former employee of the person or entity, the person or entity shall take reasonable steps to protect against unauthorized access to or use of the personal information, taking into account:

(1) The sensitivity of the records;

(2) The nature and size of the business and its operations;

(3) The costs and benefits of different destruction and sanitation methods; and

(4) Available technology.

(d) A person or entity who is subject to and in compliance with requirements for security procedures and practices contained in Title V of the Gramm-Leach-Bliley Act, approved November 12, 1999 (113 Stat. 1436; 15 U.S.C. § 6801 *et seq.*), or the Health Insurance Portability Accountability Act of 1996 (Public Law 104-191), or the Health Information Technology for Economic and Clinical Health Act (Public Law 111-5), and any rules, regulations, guidance and guidelines thereto, shall be deemed to be in compliance with this section.

Sec. 28-2852b. Remedies.

When a person or entity experiences a breach of the security of the system that requires notification under subsection § 28-3852(a) or (b), and such breach includes or is reasonably believed to include a social security number or taxpayer identification number, the person or entity shall offer identity theft protection services to each District resident whose social security number or tax identification number was released at no costs to such District resident for a period of not less than 18 months. The person or entity that experienced the breach of the security of its system shall provide all information necessary for District residents to enroll in the services required under this subsection.

Sec. 28-2852c. Rulemaking.

The Attorney General for the District of Columbia, pursuant to § 2-501 *et seq.* may issue rules to implement the notification provisions pursuant to section 28-3852.

---

**§ 28–3853. Enforcement.**

**Bill 23-215, "Security Breach Protection Amendment Act of 2020"**
**Committee of the Whole**
**Comparative Print**

~~(a) Any District of Columbia resident injured by a violation of this subchapter may institute a civil action to recover actual damages, the costs of the action, and reasonable attorney's fees. Actual damages shall not include dignitary damages, including pain and suffering.~~

(b) A violation of this subchapter, or any rule issued pursuant to the authority of this subchapter, is an unfair or deceptive trade practice pursuant to section 28-3904(kk).~~The Attorney General may petition the Superior Court of the District of Columbia for temporary or permanent injunctive relief and for an award of restitution for property lost or damages suffered by District of Columbia residents as a consequence of the violation of this subchapter. In an action under this subsection, the Attorney General may recover a civil penalty not to exceed $100 for each violation, the costs of the action, and reasonable attorney's fees. Each failure to provide a District of Columbia resident with notification in accordance with this section shall constitute a separate violation.~~

(c) The rights and remedies available under this section are cumulative to each other and to any other rights and remedies available under law.

**District of Columbia Consumer Protection Procedures Act**
**(D.C. OFFICIAL CODE § 28-3901 *ET SEQ.*)**

**§ 28–3904. Unfair or deceptive trade practices.**

It shall be a violation of this chapter for any person to engage in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived, or damaged thereby, including to:

(a) represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have;

(b) represent that the person has a sponsorship, approval, status, affiliation, certification, or connection that the person does not have;

(c) represent that goods are original or new if in fact they are deteriorated, altered, reconditioned, reclaimed, or second hand, or have been used;

(d) represent that goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another;

(e) misrepresent as to a material fact which has a tendency to mislead;

(e-1) [r]epresent that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law;

**Bill 23-215, "Security Breach Protection Amendment Act of 2020"**
**Committee of the Whole**
**Comparative Print**

(f) fail to state a material fact if such failure tends to mislead;

(f-1) [u]se innuendo or ambiguity as to a material fact, which has a tendency to mislead;

(g) disparage the goods, services, or business of another by false or misleading representations of material facts;

(h) advertise or offer goods or services without the intent to sell them or without the intent to sell them as advertised or offered;

(i) advertise or offer goods or services without supplying reasonably expected public demand, unless the advertisement or offer discloses a limitation of quantity or other qualifying condition which has no tendency to mislead;

(j) make false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions, or the price in comparison to price of competitors or one's own price at a past or future time;

(k) falsely state that services, replacements, or repairs are needed;

(l) falsely state the reasons for offering or supplying goods or services at sale or discount prices;

(m) harass or threaten a consumer with any act other than legal process, either by telephone, cards, letters, or any form of electronic or social media;

(n) cease work on, or return after ceasing work on, an electrical or mechanical apparatus, appliance, chattel or other goods, or merchandise, in other than the condition contracted for, or to impose a separate charge to reassemble or restore such an object to such a condition without notification of such charge prior to beginning work on or receiving such object;

(o) replace parts or components in an electrical or mechanical apparatus, appliance, chattel or other goods, or merchandise when such parts or components are not defective, unless requested by the consumer;

(p) falsely state or represent that repairs, alterations, modifications, or servicing have been made and receiving remuneration therefor when they have not been made;

(q) fail to supply to a consumer a copy of a sales or service contract, lease, promissory note, trust agreement, or other evidence of indebtedness which the consumer may execute;

(r) make or enforce unconscionable terms or provisions of sales or leases; in applying this subsection, consideration shall be given to the following, and other factors:

(1) knowledge by the person at the time credit sales are consummated that there was no reasonable probability of payment in full of the obligation by the consumer;

**Bill 23-215, "Security Breach Protection Amendment Act of 2020"**
**Committee of the Whole**
**Comparative Print**

(2) knowledge by the person at the time of the sale or lease of the inability of the consumer to receive substantial benefits from the property or services sold or leased;

(3) gross disparity between the price of the property or services sold or leased and the value of the property or services measured by the price at which similar property or services are readily obtainable in transactions by like buyers or lessees;

(4) that the person contracted for or received separate charges for insurance with respect to credit sales with the effect of making the sales, considered as a whole, unconscionable; and

(5) that the person has knowingly taken advantage of the inability of the consumer reasonably to protect his interests by reasons of age, physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of the agreement, or similar factors;

(s) pass off goods or services as those of another;

(t) use deceptive representations or designations of geographic origin in connection with goods or services;

(u) represent that the subject of a transaction has been supplied in accordance with a previous representation when it has not;

(v) misrepresent the authority of a salesman, representative or agent to negotiate the final terms of a transaction;

(w) offer for sale or distribute any consumer product which is not in conformity with an applicable consumer product safety standard or has been ruled a banned hazardous product under the federal Consumer Product Safety Act (15 U.S.C. § 2051-83), without holding a certificate issued in accordance with section 14(a) of that Act to the effect that such consumer product conforms to all applicable consumer product safety rules (unless the certificate holder knows that such consumer product does not conform), or without relying in good faith on the representation of the manufacturer or a distributor of such product that the product is not subject to a consumer product safety rule issued under that Act;

(x) sell consumer goods in a condition or manner not consistent with that warranted by operation of sections 28:2-312 through 318 of the District of Columbia Official Code, or by operation or requirement of federal law;

(y) violate any provision of the District of Columbia Consumer LayAway Plan Act (section 28-3818);

(z) violate any provision of the Rental Housing Locator Consumer Protection Act of 1979 (section 28-3819) or, if a rental housing locator, to refuse or fail to honor any obligation under a rental housing locator contract;

(z-1) violate any provision of Chapter 46 of this title;

(aa) violate any provision of sections 32-404, 32-405, 32-406, and 32-407;

(bb) refuse to provide the repairs, refunds, or replacement motor vehicles or fails to provide the disclosures of defects or damages required by the Automobile Consumer Protection Act of 1984;

(cc) violate any provision of the Real Property Credit Line Deed of Trust Act of 1987;

(dd) violate any provision of title 16 of the District of Columbia Municipal Regulations;

(ee) violate any provision of the Public Insurance Adjuster Act of 2002 [Chapter 16A of Title 31];

(ff) violate any provision of Chapter 33 of this title;

(gg) violate any provision of the Home Equity Protection Act of 2007 [Chapter 24A of Title 42];

(hh) fail to make a disclosure as required by § 26-1113(a-1);

(ii) violate any provision of Chapter 53 of this title; ~~or~~

(jj) violate any agreement entered into pursuant to section 28-3909(c)(6); or

(kk) violate any provision of subchapter 2 of Chapter 38 of this title. ~~.~~

**§ 28–3909. Restraining prohibited acts.**

(a) Notwithstanding any provision of law to the contrary, if the Attorney General for the District of Columbia has reason to believe that any person is using or intends to use any method, act, or practice in violation of section 28-3803, 28-3805, 28-3807, 28-3810, 28-3811, 28-3812, 28-3814, 28-3817, 28-3818, 28-3819, 28-3851, 28-3852, 28-3852a, 28-3852b or 28-3904, and if it is in the public interest, the Attorney General, in the name of the District of Columbia, may bring an action in the Superior Court of the District of Columbia to obtain a temporary or permanent injunction prohibiting the use of the method, act, or practice and requiring the violator to take affirmative action, including the restitution of money or property. In any action under this section, the Attorney General shall not be required to prove damages and the injunction shall be issued without bond.

(b) In addition, in an action under this section, the Attorney General for the District of Columbia may recover:

(1) From a merchant who engaged in a first violation of section 28-3803, 28-3805, 28-3807, 28-3810, 28-3811, 28-3812, 28-3814, 28-3817, 28-3818, 28-3819, 28-3851, 28-3852, 28-3852a, 28-3852b or 28-3904, a civil penalty of not more than $5,000 for each violation;

**Bill 23-215, "Security Breach Protection Amendment Act of 2020"**
**Committee of the Whole**
**Comparative Print**

(2) From a merchant who engaged in a first violation of section 28-3803, 28-3805, 28-3807, 28-3810, 28-3811, 28-3812, 28-3814, 28-3817, 28-3818, 28-3819, 28-3851, 28-3852, 28-3852a, 28-3852b or 28-3904 and who subsequently repeats the same violation, a civil penalty of not more than $10,000 for each subsequent violation;

(3) Economic damages; and

(4) The costs of the action and reasonable attorneys' fees.

(c) The Attorney General for the District of Columbia may also:

(1) represent the interests of consumers before administrative and regulatory agencies and legislative bodies;

(2) assist, advise, and cooperate with private, local, and federal agencies and officials to protect and promote the interests of consumers;

(3) assist, develop, and conduct programs of consumer education and information through public hearings, meetings, publications, or other materials prepared for distribution to consumers;

(4) undertake activities to encourage local business and industry to maintain high standards of honesty, fair business practices, and public responsibility in the production, promotion, and sale of consumer goods and services and in the extension of consumer credit;

(5) perform other functions and duties which are consistent with the purposes or provisions of this chapter, and with the Attorney General's role as *parens patriae*, which may be necessary or appropriate to protect and promote the welfare of consumers;

(6) negotiate and enter into agreements for compliance by merchants with the provisions of this chapter; or

(7) publicize its own actions taken in the interests of consumers.

(d) The Attorney General for the District of Columbia may apply the provisions and exercise the duties of this section to landlord-tenant relations.

**COMMITTEE PRINT**
Committee of the Whole
January 21, 2020

A BILL

23-215

---

IN THE COUNCIL OF THE DISTRICT OF COLUMBIA

---

To amend Title 28 of the District of Columbia Official Code concerning businesses' data breaches to expand definitions, to specify the required contents of a notification of a security breach to a person whose personal information is included in a breach, to clarify timeframes for reporting breaches, to require that written notice of the breach, including specific information, be given to the Office of the Attorney General, to specify the security requirements for the protection of personal information, to require the provision of 18 months of identity theft prevention services when the breach results in the release of social security or tax identification numbers, to make violation of the requirements for protection of personal information an unfair or deceptive trade practice, and to make a conforming amendment to the Consumer Protection Procedures Act.

BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this act may be cited as the "Security Breach Protection Amendment Act of 2020".

Sec. 2. Title 28 of the District of Columbia Official Code is amended as follows:

(a) Chapter 38 is amended as follows:

(1) Section 28-3801 is amended by striking the word "chapter" and inserting the word "subchapter" in its place.

(2) The table of contents for subchapter 2 is amended by adding three new section designations to read as follows:

"§ 28-3852a. Security Requirements.

"§ 28-3852b. Remedies.

"§ 28-3852c. Rulemaking.".

(3) Section 28-3851 is amended as follows:

(A) Paragraph (1) is amended to read as follows:

"(1)(A) "Breach of the security of the system" means unauthorized acquisition of computerized or other electronic data or any equipment or device storing such data that compromises the security, confidentiality, or integrity of personal information maintained by the person or entity who conducts business in the District of Columbia.

"(B) The term "breach of the security of the system" does not include:

"(i) A good faith acquisition of personal information by an employee or agency of the person or entity for the purposes of the person or entity if the personal information is not used improperly or subject to further unauthorized disclosure;

"(ii) Acquisition of data that has been rendered secure, including through encryption or redaction of such data, so as to be unusable by an unauthorized third party unless any information obtained has the potential to compromise the effectiveness of the security protection preventing unauthorized access; or

"(iii) Acquisition of personal information of an individual that the person or entity reasonably determines, after consultation with District and federal law enforcement agencies, will likely not result in harm to the individual.

(B) New paragraphs (1A) and (1B) are added to read as follows:

"(1A) "Genetic information" has the meaning ascribed to it under the federal Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), approved August 21, 1996 (Pub. Law 104-191; 110 Stat. 1936), as specified in 45 C.F.R. § 106.103.

"(1B) "Medical Information" means any information about a consumer's dental, medical or mental health treatment or diagnosis by a health care professional.".

(C) Paragraph (2) is amended by striking the word "business" wherever it appears and inserting the word "entity" in its place.

(D) A new paragraph (2A) is added to read as follows:

"(2A) "Person or entity" means an individual, firm, corporation, partnership, company, cooperative, association, trust, or any other organization, legal entity, or group of individuals. The term "person or entity" shall not include the District of Columbia government or any of its agencies or instrumentalities.".

(E) Paragraph (3) is amended to read as follows:

"(3)(A) "Personal information" means:

"(i) An individual's first name, first initial and last name, or any other personal identifier, which, in combination with any of the following data elements, can be used to identify a person or the person's information:

"(I) Social security number, Individual Taxpayer Identification Number, passport number, driver's license number, District of Columbia identification card number, military identification number, or other unique identification number issued on a government document commonly used to verify the identity of a specific individual;

"(II) Account number, credit card number or debit card number, or any other number or code or combination of numbers or codes, such as an identification number, account number, security code, access code, or password, that allows access to or use of an individual's financial or credit account;

"(III) Medical information;

"(IV) Genetic information and deoxyribonucleic acid profile;

"(V) Health insurance information, including a policy number, subscriber information number, or any unique identifier used by a health insurer to identify the person that permits access to an individual's health and billing information;

"(VI) Biometric data of an individual generated by automatic measurements of an individual's biological characteristics such as a fingerprint, voice print, genetic print, retina or iris image, or other unique biological characteristic, that is used to uniquely authenticate the individual's identity when the individual accesses a system or account; or

"(VII) Any combination of data elements included in sub-sub-sub paragraphs (I) through (VI) of this sub-subparagraph that would enable a person to commit identity theft without reference to a person's first name or first initial and last name or other independent personal identifier.

"(ii) A user name or e-mail address in combination with a password, security question and answer or other means of authentication, or any combination of data elements included in sub-sub-sub paragraphs (I) through (VI) that permits access to an individual's e-mail account.".

(4) Section 28-3852 is amended as follows:

(A) New subsections (a-1) and (a-2) are added to read as follows:

"(a-1) The notification required under subsection (a) of this section shall include:

"(1) To the extent possible, a description of the categories of information that were, or are reasonably believed to have been, acquired by an unauthorized person, including the elements of personal information that were, or are reasonably believed to have been, acquired;

"(2) Contact information for the person or entity making the notification, including the business address, telephone number, and toll-free telephone number if one is maintained;

"(3) The toll-free telephone numbers and addresses for the major consumer reporting agencies, including a statement notifying the resident of the right to obtain a security freeze free of charge pursuant to 15 U.S.C. § 1681c-1 and information how a resident may request a security freeze; and

"(4) The toll-free telephone numbers, addresses, and website addresses for the following entities, including a statement that an individual can obtain information from these sources about steps to take to avoid identity theft:

"(A) The Federal Trade Commission; and

"(B) The Office of the Attorney General for the District of Columbia.".

"(a-2) Notwithstanding subsection (a-1), in the case of a breach of the security of the system that only involves personal information defined in section 28-3851(3)(A)(ii),

the person or entity may comply with this section by providing the notification in electronic format or other form that directs the person to change the person's password and security question or answer, as applicable, or to take other steps appropriate to protect the e-mail account with the person or entity and all other online accounts for which the person whose personal information has been breached uses the same username or email address and password or security question or answer.

(B) New subsections (b-1) and (b-2) are added to read as follows:

"(b-1) In addition to giving the notification required under subsection (a) of this section, and subject to subsection (d) of this section, the person or entity required to give notice shall promptly provide written notice of the breach of the security of the system to the Office of the Attorney General if the breach affects 50 or more District residents. This notice shall be made in the most expedient manner possible, without unreasonable delay, and in no event later than when notice is provided under subsection (a) of this section. The written notice shall include:

"(1) The name and contact information of the person or entity reporting the breach;

"(2) The name and contact information of the person or entity that experienced the breach;

"(3) The nature of the breach of the security of the system, including the name of the person or entity that experienced the breach;

"(4) The types of personal information compromised by the breach;

"(5) The number of District residents affected by the breach;

"(6) The cause of the breach, including the relationship between the person or entity that experienced the breach and the person responsible for the breach, if known;

"(7) Remedial action taken by the person or entity to include steps taken to assist District residents affected by the breach;

"(8) The date and time frame of the breach, if known;

"(9) Address and location of corporate headquarters, if outside of the District;

"(10) Any knowledge of foreign country involvement; and

"(11) A sample of the notice to be provided to District residents.

"(b-2) The notice required under subsection (b-1) of this section shall not be delayed on the grounds that the total number of District residents affected by the breach has not yet been ascertained.".

(C) Subsection (e) is repealed.

(D) Subsection (g) is amended to read as follows:

"(g) A person or entity who maintains procedures for a breach notification system under Title V of the Gramm-Leach-Bliley Act, approved November 12, 1999 (113 Stat. 1436; 15 U.S.C. § 6801 *et seq.*), or the breach notification rules issued by the United States Department of Health and Human Services, Parts 160 and 164 of Title 45 of the Code of Federal Regulations, established pursuant to the Health Insurance Portability Accountability Act of 1996 (Public Law 104-191), or the Health Information Technology for Economic and Clinical Health Act (Public Law 111-5), and provides notice in accordance with such Acts, and any rules, regulations, guidance and guidelines thereto, to each affected resident in the event of a breach, shall be deemed to be in compliance with this section with respect to the notification of residents whose personal information is included in the breach. The person or entity shall, in all cases,

provide written notice of the breach of the security of the system to the Office of the Attorney General as required under subsection (b-1) of this section.".

(5) New sections 28-3852a and 28-3852b, and 28-3852c are added to read as follows:

"§ 28-3852a. Security requirements.

"(a) To protect personal information from unauthorized access, use, modification, disclosure or a reasonably anticipated hazard or threat, a person or entity that owns, licenses, maintains, handles or otherwise possesses personal information of an individual residing in the District shall implement and maintain reasonable security safeguards, including procedures and practices that are appropriate to the nature of the personal information and the nature an size of the entity or operation.

"(b) A person or entity that uses a nonaffiliated third party as a service provider to perform services for a person or entity and discloses personal information about an individual residing in the District under a written agreement with the third party shall require by the agreement that the third party implement and maintain reasonable security procedures and practices that:

"(1) Are appropriate to the nature of the personal information disclosed to the nonaffiliated third party; and

"(2) Are reasonably designed to protect the personal information from unauthorized access, use, modification, and disclosure.

"(c) When a person or entity is destroying records, including computerized or electronic records and devices containing computerized or electronic records, that contain personal information of a consumer, employee, or former employee of the person or entity, the person or

entity shall take reasonable steps to protect against unauthorized access to or use of the personal information, taking into account:

"(1) The sensitivity of the records;

"(2) The nature and size of the business and its operations;

"(3) The costs and benefits of different destruction and sanitation methods; and

"(4) Available technology.

"(d) A person or entity who is subject to and in compliance with requirements for security procedures and practices contained in Title V of the Gramm-Leach-Bliley Act, approved November 12, 1999 (113 Stat. 1436; 15 U.S.C. § 6801 *et seq.*), or the Health Insurance Portability Accountability Act of 1996 (Public Law 104-191), or the Health Information Technology for Economic and Clinical Health Act (Public Law 111-5), and any rules, regulations, guidance and guidelines thereto, shall be deemed to be in compliance with this section.".

"§ 28-3852b. Remedies.

"When a person or entity experiences a breach of the security of the system that requires notification under subsection 28-3852(a) or (b), and such breach includes or is reasonably believed to include a social security number or taxpayer identification number, the person or entity shall offer to each District resident whose social security number or tax identification number was released identity theft protection services at no cost to such District resident for a period of not less than 18 months. The person or entity that experienced the breach of the security of its system shall provide all information necessary for District residents to enroll in the services required under this subsection.

"§ 28-3852c. Rulemaking.

"The Attorney General for the District of Columbia, pursuant to section 2-501 *et seq*. may issue rules to implement the notification provisions pursuant to section 28-3852.".

(6) Section 28-3853 is amended as follows:

(A) Subsection (a) is repealed.

(B) Subsection (b) is amended to read as follows:

"(b) A violation of this subchapter, or any rule issued pursuant to the authority of this subchapter, is an unfair or deceptive trade practice pursuant to section 28-3904(kk).".

(b) Chapter 39 is amended as follows:

(1) Section 28-3904 is amended as follows:

(A) Subsection (ii) is amended by striking the word "or".

(B) Subsection (jj) is amended by striking the period and inserting the phrase "; or" in its place.

(C) A new subsection (kk) is added to read as follows:

"(kk) violate any provision of subchapter 2 of Chapter 38 of this title.".

(2) Section 28-3909 is amended by striking the phrase "28-3819 or 28-3904" wherever it appears and inserting the phrase "28-3819, 28-3851, 28-3852, 28-3852a, 28-3852b or 28-3904" in its place.

Sec. 3. Fiscal impact statement.

The Council adopts the fiscal impact statement of the Chief Financial Officer as the fiscal impact statement required by section 602(c)(3) of the District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 813; D.C. Official Code §1-206.02(c)(3)).

Sec. 4. Effective date.

This act shall take effect following approval by the Mayor (or in the event of veto by the Mayor, action by the Council to override the veto), a 30-day period of congressional review as provided in 602(c)(1) of the District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 813; D.C. Official Code §1-206.02(c)(1)), and publication in the District of Columbia Register.