**KESSLER TOPAZ MELTZER & CHECK, LLP**
Jennifer L. Joost (Bar No. 296164)
jjoost@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

-and-

**KESSLER TOPAZ MELTZER & CHECK, LLP**
Joseph H. Meltzer (appearance *pro hac vice*)
jmeltzer@ktmc.com
Melissa L. Yeates (appearance *pro hac vice*)
myeates@ktmc.com
Tyler S. Graden (appearance *pro hac vice*)
tgraden@ktmc.com
Jordan E. Jacobson (Bar No. 302543)
jjacobson@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**CARELLA BYRNE CECCHI BRODY & AGNELLO, PC**
James E. Cecchi (appearance *pro hac vice*)
jcecchi@carellabyrne.com
Michael A. Innes (*pro hac vice* forthcoming)
minnes@carellabyrne.com
Kevin G. Cooper (appearance *pro hac vice*)
kcooper@carellabyrne.com
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744

*Counsel for Plaintiffs and the proposed Classes*
(*Additional Attorneys Listed on Signature Page*)

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| JOHN DOE, JOHN DOE II, JOHN DOE III, JANE DOE, JANE DOE II, JANE DOE III, JANE DOE IV, JANE DOE V, and ALEXIS SUTTER, Individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>KAISER FOUNDATION HEALTH PLAN, INC., KAISER FOUNDATION HOSPITALS, and KAISER FOUNDATION HEALTH PLAN OF WASHINGTON,<br><br>Defendants. | Case No. 3:23-cv-02865-EMC<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED MASTER COMPLAINT**<br><br>Judge: Hon. Edward M. Chen<br>Date: May 29, 2025<br>Time: 1:30 p.m.<br>Court: 5<br><br>CMC Filed: December 6, 2024<br>Trial Date: January 25, 2027<br><br>**REDACTED** |

## TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. FACTUAL BACKGROUND .......... 5

A. Plaintiffs' Allegations in the Consolidated Master Class Action Complaint .......... 5

1. Twitter, Bing, and Google .......... 5
2. Adobe .......... 9
3. Quantum Metric and Dynatrace .......... 11
4. Additional Third Party Web Technologies .......... 12

B. Kaiser Removed the Offending Code After Plaintiffs Brought this Action .......... 13

C. Kaiser Issued a Privacy Breach Notification One Day After This Court Issued its Order Denying in Part Kaiser's Motion to Dismiss the FAC .......... 13

III. LEGAL STANDARD .......... 14

IV. ARGUMENT .......... 15

A. Kaiser's Argument that Plaintiffs Have Failed to Plausibly Allege Kaiser's Knowledge of Third Party Use Is a Red-Herring .......... 15

B. Claim 1: Plaintiffs Plausibly Allege the ECPA Crime Tort Exception Applies .......... 18

C. Claim 2: Plaintiffs Sufficiently Allege a Violation of CIPA .......... 19

D. Claim 8: Kaiser Must Comply with CMIA for All Enrollees .......... 19

E. Claims 3 and 4: Plaintiffs Plausibly Allege a Highly Offensive Intrusion in Support of Their Common Law Invasion of Privacy—Intrusion Upon Seclusion and Violation of the California Constitution's Right to Privacy claims .......... 21

F. Claim 19: Plaintiffs Plausibly Allege Theft by False Pretenses .......... 25

G. Claim 10: Jane Doe II Adequately Alleges Kaiser Violated the DCCPPA .......... 26

H. Claim 11: John Doe II Adequately States a Claim for Violation of the GCSPA .......... 28

I. Claim 13: As Before, Plaintiff Jane Doe III has Stated a MWESA Claim .......... 29

1. Jane Doe III has Standing to Pursue a MWESA Claim .......... 29
2. The Electronic Communications are Within the Scope of MWESA .......... 30
3. Plaintiff's Electronic Communications Were "Intercepted" .......... 31
4. Plaintiffs Allege that the Content Was Intercepted .......... 32
5. The Third Party Wiretappers' Code is a Device Under MWESA .......... 33
6. Plaintiffs are Not Pursuing Claims Under MWESA Section 10-402(d)(1). .......... 34

J. Claim 15: Jane Doe IV and Sutter State a Claim for Violation of the VCCA .......... 34

K. Claim 18: Jane Doe Sufficiently Alleges Violation of the Washington Privacy Act .......... 35

L. Claim 19: Jane Doe Sufficiently Alleges Violation of the Washington HCIA .......... 37

M. Plaintiffs Have Alleged Violations of the State Data Breach Notification Statutes .......... 38

1. Claim 20: Jane Doe II Properly Pleads Kaiser Violated the DC Breach Notification Statute and DCCPPA .......... 38

2. Claim 21: Jane Doe III Sufficiently Alleges MPIPA and MCPA Violations ........ 40

3. Claim 22: Jane Doe Adequately Alleges a Washington Data Breach Act Violation ........ 40

N. Plaintiffs Adequately Alleges All Defendants' Involvement ........ 41

O. There is no Basis to Strike Plaintiffs' Tolling Allegations ........ 42

P. There is no Basis to Strike Plaintiffs' Claim for Punitive Damages ........ 43

Q. Further Leave to Amend Would Not be Futile ........ 45

V. CONCLUSION ........ 45

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*A.B. by & Through Turner v. Google LLC*,
737 F. Supp. 3d 869 (N.D. Cal. 2024)....22

*Abels v. Bank of Am., N.A.*,
2012 WL 691790 (N.D. Cal. Mar. 2, 2012)....42

*Achal v. Gate Gourmet, Inc.*,
114 F. Supp. 3d 781 (N.D. Cal. 2015)....45

*Am. Career Coll., Inc. v. Medina*,
2021 WL 5263858 (C.D. Cal. Sept. 28, 2021)....26

*In re Ambry Genetics Data Breach Litig.*,
567 F. Supp. 3d 1130 (C.D. Cal. 2021)....21, 25

*B.K. v. Desert Care Network*,
2024 WL 1343305 (C.D. Cal. Feb. 1, 2024)....18

*Barrett v. Apple Inc.*,
523 F. Supp. 3d 1132 (N.D. Cal. 2021)....45

*Bautista v. Valero Mktg. & Supply Co.*,
2016 WL 3924117 (N.D. Cal. July 21, 2016)....23

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....14

*Benford v. Am. Broad. Cos.*,
554 F. Supp. 145 (D. Md. 1982)....30

*Bettles v. Toyota Motor Corp.*,
645 F. Supp. 3d 978 (C.D. Cal. 2022)....42

*Beyer v. Symantec Corp.*,
333 F. Supp. 3d 966 (N.D. Cal. 2018) (Chen, J.)....17

*Brewer v. Indymac Bank*,
609 F. Supp. 2d 1104 (E.D. Cal. 2009)....43

*Brown v. Google LLC*,
685 F. Supp. 3d 909 (N.D. Cal. 2023)....33

*Brown v. Stored Value Cards, Inc.*,
953 F.3d 567 (9th Cir. 2020)....45

*Bush v. Liberty Life Assurance Co. of Bos.*,
130 F. Supp. 3d 1320 (N.D. Cal. 2015)....................29, 37

*Calhoun v. Google LLC*,
526 F. Supp. 3d 605 (N.D. Cal. 2021)....................25

*Caro v. Weintraub*,
618 F.3d 94 (2d Cir. 2010)....................19

*Carrese v. Yes Online Inc.*,
2016 WL 6069198 (C.D. Cal. Oct. 13, 2016)....................19

*In re Carrier IQ, Inc.*,
78 F. Supp. 3d 1051 (N.D. Cal. 2015) (Chen, J.)....................34

*CineTel Films, Inc. v. Does 1-1, 052*,
853 F. Supp. 2d 545 (D. Md. 2012)....................33

*Cook v. GameStop, Inc.*,
689 F. Supp. 3d 58 (W.D. Pa. 2023)....................32

*Cousin v. Sharp Healthcare*,
702 F. Supp. 3d 967 (S.D. Cal. 2023)....................25

*Curran v. Wells Fargo Bank, N. A.*,
2021 WL 6753480 (D.D.C. Mar. 11, 2021)....................27

*Doe 1 v. Univ. of S.F.*,
685 F. Supp. 3d 882 (N.D. Cal. 2023)....................42

*Doe v. Beard*,
63 F. Supp. 3d 1159 (C.D. Cal. 2014)....................23

*Doe v. Meta Platforms, Inc.*,
690 F. Supp. 3d 1064 (N.D. Cal. 2023)....................26, 34

*Doe v. N. Cal. Fertility Med. Ctr.*,
2024 WL 246178 (E.D. Cal. Jan. 23, 2024)....................15

*Doe v. Regents of Univ. of Cal.*,
672 F. Supp. 3d 813 (N.D. Cal. 2023)....................23

*ExxonMobil Oil Corp. v. S. Cal. Edison Co.*,
2013 WL 12166214 (C.D. Cal. May 1, 2013)....................44

*In re Facebook, Inc., Consumer Priv. User Profile Litig.*,
402 F. Supp. 3d 767 (N.D. Cal. 2019)....................25

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020).................... *passim*

*FERCO Enters., Inc. v. Taylor Recycling Facility LLC*,
2007 WL 9701361 (N.D. Ga. Oct. 16, 2007) ... 28

*In re Fibrogen Sec. Litig.*,
2023 WL 5600077 (N.D. Cal. Aug. 29, 2023) (Chen, J.) ... 15

*Free Speech Sys., LLC v. Menzel*,
390 F. Supp. 3d 1162 (N.D. Cal. 2019) ... 42

*Gladstone v. Amazon Web Servs., Inc.*,
739 F. Supp. 3d 846 (W.D. Wash. 2024) ... 34

*In re Google Inc. Cookie Placement Consumer Privacy Litigation*,
806 F.3d 125 (3d Cir. 2015) ... 19, 32

*Grimberg v. United Airlines, Inc.*,
2023 WL 3431912 (C.D. Cal. Feb. 27, 2023) ... 45

*Haw. Reg'l Council of Carpenters v. Yoshimura*,
2016 WL 4745169 (D. Haw. Sept. 12, 2016) ... 18

*Hayter v. PHH Mortg. Corp.*,
2016 WL 3902483 (N.D. Cal. July 19, 2016) ... 22

*Henderson v. J.M. Smucker Co.*,
2011 WL 1050637 (C.D. Cal. Mar. 17, 2011) ... 43

*Hernandez v. Noom, Inc.*,
2023 WL 8934019 (D. Md. Dec. 27, 2023) ... 29

*Hoang v. Amazon.com, Inc.*,
2012 WL 1088165 (W.D. Wash. Mar. 30, 2012) ... 37

*Hubbard v. Google LLC*,
2024 WL 3302066 (N.D. Cal. July 1, 2024) ... 21

*In re § 2703(d),* 787 F. Supp. 2d 430, 436 (E.D. Va. 2011) ... 33

*India Price v. Carnival Corp.*,
712 F. Supp. 3d 1347 (S.D. Cal. 2024) ... 31, 33

*Jacobson v. Hofgard*,
168 F. Supp. 3d 187 (D.D.C. 2016) ... 27

*James v. Walt Disney Co.*,
701 F. Supp. 3d 942 (N.D. Cal. 2023) (Chen, J.) ... *passim*

*Joffe v. Google, Inc.*,
746 F.3d 920 (9th Cir. 2013) ... 30

*Katz-Lacabe v. Oracle Am., Inc.*,
2024 WL 1471299 (N.D. Cal. Apr. 3, 2024)....................19

*Katz-Lacabe v. Oracle Am., Inc.*,
668 F. Supp. 3d 928 (N.D. Cal. 2023)....................25

*Kay v. Wells Fargo & Co. N.A.*,
2007 WL 2141292 (N.D. Cal. July 24, 2007)....................42

*Krukas v. AARP, Inc.*,
376 F. Supp. 3d 1 (D.D.C. 2019)....................28

*Kuhl v. McDonough*,
2024 WL 3463350 (N.D. Cal. July 17, 2024)....................16

*Kurowski v. Rush Sys. for Health*,
2023 WL 8544084 (N.D. Ill. Dec. 11, 2023)....................18

*Manigault-Johnson v. Google, LLC*,
2019 WL 3006646 (D.S.C. Mar. 31, 2019)....................21, 22

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
519 F.3d 1025 (9th Cir. 2008)....................15

*May v. Google LLC*,
2024 WL 4681604 (N.D. Cal. Nov. 4, 2024)....................42

*McCluskey v. Hendricks*,
2021 WL 6773140 (C.D. Cal. Nov. 17, 2021)....................23

*McCulley v. Banner Health*,
2024 U.S. Dist. LEXIS 85232 (D. Ariz. May 10, 2024)....................23

*McDonald v. Kiloo ApS*,
385 F. Supp. 3d 1022 (N.D. Cal. 2019)....................24

*McFadden v. Nationstar Mortg. LLC*,
2022 WL 1001253 (D.D.C. Apr. 4, 2022)....................27

*McMurray v. Merck & Co.*,
2007 WL 1456042 (N.D. Cal. May 17, 2007)....................45

*In re Meta Healthcare Pixel Litig.*,
2024 WL 333883 (N.D. Cal. Jan. 29, 2024)....................25

*In re Meta Pixel Healthcare Litig.*,
647 F. Supp. 3d 778 (N.D. Cal. 2022)....................23, 26, 36

*In re Meta Pixel Tax Filing Cases*,
724 F. Supp. 3d 987 (N.D. Cal. 2024)....................26

*Nienaber v. Overlake Hosp. Med. Ctr.*,
733 F. Supp. 3d 1072 (W.D. Wash. 2024) ........................................................................19

*Okash v. Essentia Health*,
2024 WL 1285779 (D. Minn. Mar. 26, 2024) ...................................................................19

*Patrick Collins, Inc. v. Does 1-22*,
2011 WL 5439005 (D. Md. Nov. 8, 2011) .........................................................................33

*Pereda v. Gen. Motors LLC*,
2022 WL 19975388 (N.D. Cal. Dec. 9, 2022) ...................................................................41

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
402 F. Supp. 3d 615 (N.D. Cal. 2019) ................................................................................19

*Platte Anchor Bolt, Inc. v. IHI, Inc.*,
352 F. Supp. 2d 1048 (N.D. Cal. 2004) ..............................................................................15

*Plumlee v. Pfizer, Inc.*,
2014 WL 695024 (N.D. Cal. Feb. 21, 2014) ......................................................................42

*Popa v. Harriet Carter Gifts, Inc.*,
52 F.4th 121 (3d Cir. 2022) ................................................................................................31

*Potter v. Havlicek*,
2008 WL 2556723 (S.D. Ohio June 23, 2008) ...................................................................34

*Rhynes v. Stryker Corp.*,
2011 WL 2149095 (N.D. Cal. May 31, 2011) ....................................................................45

*Rivas Rosales v. Barr*,
2020 WL 1505682 (N.D. Cal. Mar. 30, 2020) (Chen, J.) ..................................................43

*Ross v. AT&T Mobility, LLC*,
2020 WL 9848766 (N.D. Cal. May 14, 2020) ...............................................................44, 45

*Rozier v. Dep't of Homeland Sec. Fed. Protective Serv.*,
2022 WL 2199938 (C.D. Cal. Mar. 7, 2022) .....................................................................45

*Saleh v. Nike, Inc.*,
562 F. Supp. 3d 503 (C.D. Cal. 2021) ................................................................................33

*Schmitt v. SN Servicing Corp.*,
2021 WL 3493754 (N.D. Cal. Aug. 9, 2021) ................................................................19, 20

*Se. Wholesale Corp. v. Cox Commc'ns Hampton Roads, LLC*,
2013 WL 2147478 (E.D. Va. May 14, 2013) .....................................................................35

*Shaterian v. Wells Fargo Bank, N.A.*,
829 F. Supp. 2d 873 (N.D. Cal. 2011) ................................................................................15

*Smith v. Facebook, Inc.*,
262 F. Supp. 3d 943 (N.D. Cal. 2017), *aff'd*, 745 F. App'x 8 (9th Cir. 2018)............................32

*Solomon v. Allstate Prop. & Cas. Ins.*,
2024 WL 4346264 (D.D.C. Sept. 29, 2024).........................................................................39

*Stasi v. Inmediata Health Grp.*,
501 F. Supp. 3d 898 (S.D. Cal. 2020) ...........................................................................19, 21

*Straubmuller v. Jetblue Airways Corp.*,
2023 WL 5671615 (D. Md. Sept. 1, 2023)...........................................................................30

*Sweat v. Houston Methodist Hosp.*,
2024 WL 3070184 (S.D. Tex. June 20, 2024) .....................................................................18

*In re Target Corp. Customer Data Sec. Breach Litig.*,
309 F.R.D. 482 (D. Minn. 2015) ..........................................................................................20

*Tate v. VITAS Healthcare Corp.*,
2025 WL 50447 (E.D. Cal. Jan. 8, 2025) ...............................................................................34

*Thomas v. Papa Johns Int'l, Inc.*,
2024 WL 2060140 (S.D. Cal. May 8, 2024) ..........................................................................23

*In re Toy Asbestos*,
2021 WL 1884647 (N.D. Cal. May 10, 2021) .......................................................................45

*In re Toys R Us, Inc., Priv. Litig.*,
2001 WL 34517252 (N.D. Cal. Oct. 9, 2001) ........................................................................18

*Ultimate Outdoor Movies, LLC v. FunFlicks, LLC*,
2019 WL 2233535 (D. Md. May 23, 2019) ..........................................................................34

*United States v. Ackies*,
918 F.3d 190 (1st Cir. 2019) ..................................................................................................34

*United States v. Henderson*,
906 F.3d 1109 (9th Cir. 2018).................................................................................................34

*United States v. Hutchins*,
361 F. Supp. 3d 779 (E.D. Wis. 2019) ...................................................................................34

*Valentine v. NebuAd, Inc.*,
804 F. Supp. 2d 1022 (N.D. Cal. 2011)...................................................................................19

*Vargas v. JP Morgan Chase Bank, N.A.*,
30 F. Supp. 3d 945 (C.D. Cal. 2014)......................................................................................42

*Watson v. Carey*,
2007 WL 2670000 (N.D. Cal. Sept. 7, 2007), *aff'd*, 328 F. App'x 533 (9th Cir. 2009)..............26

*Willis v. Buffalo Pumps Inc.*,
34 F. Supp. 3d 1117 (S.D. Cal. 2014) ....................44

*In re Zynga Priv. Litig.*,
750 F.3d 1098 (9th Cir. 2014) ....................33

**State Cases**

*Brown v. Mortensen*,
253 P.3d 522 (Cal. 2011) ....................20

*Colucci v. T-Mobile USA, Inc.*,
262 Cal. Rptr. 3d 50 (Cal. Ct. App. 2020) ....................45

*Doe v. Medstar Health, Inc*,
2020 Md. Cir. Ct. LEXIS 139 (Md. Cir. Ct. Aug. 5, 2022) ....................30, 32

*Hernandez v. Hillsides, Inc.*,
211 P.3d 1063 (Cal. 2009) ....................21, 24

*Holmes v. State*,
182 A.3d 341 (Md. Ct. Spec. App. 2018) ....................31

*Jacome v. Spirit Airlines Inc.*,
2021 WL 3087860 (Fla. Cir. Ct. June 17, 2021) ....................32

*People v. Miller*,
97 Cal. Rptr. 2d 684 (Cal. Ct. App. 2000) ....................26

*Schmerling v. Injured Workers' Ins. Fund*,
795 A.2d 715 (Md. 2002) ....................30, 34

*State v. Kipp*,
317 P.3d 1029 (Wash. 2014) (en banc) ....................36, 37

*State v. Maddox*,
69 Md. App. 296 (1986) ....................30

*State v. Roden*,
321 P.3d 1183 (Wash. 2014) (en banc) ....................37

*Velcoff v. MedStar Health, Inc.*,
186 A.3d 823 (D.C. 2018) ....................27

*Wilson v. S. Cal. Edison Co.*,
234 Cal. App. 4th 123 (2015) ....................45

**Federal Statutes**

18 U.S.C. § 2511(2)(d) ....................18

42 U.S.C. § 1320d-6 ........................................................................................................18, 22

**State Statutes**

Cal. Civ. Code § 1792 ...................................................................................................20

Cal. Civ. Code § 3294 ...................................................................................................43

Cal. Civ. Code § 56.05(l) ..............................................................................................20

Cal. Civ. Code § 56.10 ..................................................................................................20

Cal. Civ. Code § 56.10(a)...............................................................................................19

Cal. Civ. Code § 56.10(d)...............................................................................................18

Cal. Civ. Code § 56.36(a)...............................................................................................18

D.C. Code § 28-3851(1)(A) ..........................................................................................38

D.C. Code § 28-3851(1B) .............................................................................................39

D.C. Code § 28-3851(3)(A)(i)........................................................................................39

D.C. Code § 28-3904..............................................................................................27, 28

Ga. Code Ann. § 16-9-92 ...............................................................................................28

Md. Code Ann., Com. Law § 14-3501(e)(1)..................................................................40

Md. Code Ann., Com. Law § 14-3504(a)(1)..................................................................40

Md. Code Ann., Com. Law § 14-3504(c) ......................................................................40

Md. Code Ann., Crim. Proc. § 1-203.1 ..........................................................................34

Md. Code Ann., Cts. & Jud. Proc. § 10-401(4)..............................................................32

Md. Code Ann., Cts. & Jud. Proc. § 10-401(5)(i) ...........................................................30

Md. Code Ann., Cts. & Jud. Proc. § 10-401(8)..............................................................34

Md. Code Ann., Cts. & Jud. Proc. § 10-401(10)............................................................31

Or. Rev. Stat. § 192.558 .................................................................................................18

Va. Code Ann. § 18.2-152.2............................................................................................35

Va. Code Ann. § 18.2-152.4............................................................................................35

Va. Code Ann. § 32.1-127.1:03.......................................................................................18

Wash. Rev. Code § 9.73.030 ....................36

Wash. Rev. Code § 19.255.005(1) ....................40

Wash. Rev. Code § 19.255.005(2)(a)(i)(H) ....................41

Wash. Rev. Code § 70.02.010(17) ....................37

Wash. Rev. Code § 70.02.020 ....................18

**Rules**

Fed. R. Civ. P. 12(g)(2) ....................29, 37

# I. INTRODUCTION[1]

Despite essentially admitting the wrongdoing alleged in the initial Complaint, Kaiser moves to dismiss for a third time—by raising factual disputes not appropriate on a motion to dismiss, misstating the facts[2] and law, and inappropriately requesting inferences be drawn in its favor. Kaiser's scattershot and often contradictory arguments should be rejected.

On April 11, 2024,[3] this Court denied in part Kaiser's Motion to Dismiss Plaintiffs' First Amended Complaint ("MTD FAC") (ECF No. 88), in a decision largely premised on Kaiser's arguments that it had not shared personally identifiable information ("PII") or protected health information ("PHI") with third parties, finding that even without allegations of third-party use Plaintiffs had sufficiently stated claims for: (1) breach of implied contract; (2) negligence; and violation of the (3) Maryland Wiretapping and Electronic Surveillance Act ("MWESA"); (4) Oregon Unlawful Trade Practices Act, Or. Rev. Stat. §§ 646.605, *et seq.* ("OUTPA"); (5) Virginia Insurance Information and Privacy Protection Act, Va. Code Ann. §§ 38.2-600, *et seq.* ("VIIPPA") and (6) Washington Consumer Protection Act, Wash. Rev. Code §§ 19.86, et seq. ("WCPA").[4] *See* MTD FAC Order ("Order"), ECF No. 124. Then, ***just one day*** after this Court's Order, Kaiser filed notices with state and federal agencies ("April 12 Notifications") admitting that it shared members' PII with third parties through technology installed on its Site and Apps, stating:

[redacted].

¶8. Kaiser further admitted that the information "[redacted]

---

[1] Unless otherwise noted, all emphases are added, all internal citations and quotations are omitted, all defined terms have the meaning in the Master Consolidated Class Action Complaint ("CMC") (ECF No. 271), and all references to ¶ refer to CMC paragraphs.

[2] For example, Kaiser's assertion that Plaintiffs previously alleged in the FAC that Google, Bing, and Twitter "provided technologies for free to demonstrate the effectiveness of their targeted advertising services" invents allegations that are found nowhere in the FAC. Mot. at 1, 10 (citing FAC ¶135).

[3] As in its Motion to Dismiss the Second Amended Complaint ("Second MTD") (ECF No. 205), Kaiser again wrongly states the Court granted the MTD FAC in part on April 4, 2024. Mot. at 3.

[4] Kaiser's representations about the purported lack of PII being shared are detailed in Plaintiffs' Notice of Kaiser Disclosures. *See* ECF No. 127.

[redacted] ¶9. Subsequent discovery has further revealed that [redacted] ¶15. CMC, Exs. 2, 3.[5] Notably, [redacted]. CMC, Ex. 2 at KP_13_00180904-5.

Kaiser's April 12 Notifications are particularly troublesome given that Kaiser—through the same counsel in this action—admitted to regulators that it had confirmed the privacy breach by at least October 25, 2023, and discontinued using the technology since November 13, 2023, but nonetheless ***waited nearly six months*** (and one day after this Court's Order) to notify regulators despite statutes requiring prompt notification. ¶14. In fact, as Kaiser's counsel has acknowledged, Kaiser's investigation and ultimate decision to remove the offending code in November 2023 was in response to Plaintiffs' initiating this action and filing a Motion for a Preliminary Injunction requesting that this Court order the same. *See* Pls.' Notice of Withdrawal of Mot. for Prelim. Inj., ECF No. 101; *see also* Disc. Hr'g Tr. at 53:25-54:1, ECF No. 217 (Kaiser counsel admitting "[t]his litigation was part and parcel of what spurred the investigation into those technologies.").

No longer able to conceal this information and lacking the keystone that supported its prior arguments for dismissal—namely, that neither PII nor PHI had been shared—Kaiser's Motion for partial dismissal[6] resorts to a hodgepodge of arguments untethered to the facts, legal precedent, and this Court's prior Order, which is law of the case.

First, while Kaiser argues Plaintiffs have not sufficiently alleged Kaiser knew that the Third

[5] Kaiser only produced these documents pursuant to a June 2024 Order entered by Judge Kang after Plaintiffs raised the issue with the Court and Judge Kang compelled their production.

[6] Kaiser has not moved to dismiss Plaintiffs' claims for (1) breach of express contact, (2) breach of implied contract, (3) negligence, or violation of the (4) Georgia Insurance and Information Privacy Act, Ga. Code Ann. §§ 33-39-1, *et seq*. ("GIIPPA"), (5) OUTPA, (6) VIIPPA, or (7) WCPA.

Party Wiretappers used Plaintiffs' data for their own benefit, Kaiser fails to explain why such purported lack of knowledge warrants dismissal of any specific claim. Indeed, this Court already recognized third party use is not required for the majority of Plaintiffs' claims and sustained numerous claims without such allegations. Moreover, Kaiser ignores Plaintiffs' well-pled allegations of knowledge, that knowledge may be alleged generally, and that even if required all Plaintiffs need to show is that it is ***plausible*** that Kaiser knew that third parties were ***collecting or using*** the data for their own purposes. Regardless, Plaintiffs plausibly allege that Kaiser was aware that third parties collected and used Members' PHI and PII to build user profiles, facilitate their own advertising networks, and/or otherwise use that information to refine their own products. Next, Kaiser misconstrues Plaintiffs' Electronic Communications Privacy Act, 18 U.S.C. §§ 2510, *et seq*. ("ECPA") allegations. Plaintiffs do not allege that tortious or criminal interception alone is sufficient to satisfy the crime tort exception; they allege Kaiser's intention to use Members' PII and PHI as consideration for obtaining Twitter, Google, and Bing's technology is the separate crime/tort that satisfies the exception. Kaiser also wrongly argues that the Confidentiality of Medical Information Act, Cal. Civ. Code §§ 56.10, *et seq*. ("CMIA") does not apply outside of California. But, CMIA imposes strict requirements on California-regulated entities ***regardless of where patients or enrollees reside***. Moreover, Kaiser's attempt to defeat invasion of privacy and intrusion upon seclusion claims by asserting its conduct was not "highly offensive" is puzzling and belied by the record. The CMC plainly sets forth that Kaiser's conduct was highly offensive because: (1) Kaiser violated federal and state law, (2) the information disclosed by Kaiser and collected by Third Party Wiretappers was highly sensitive personal and medical/health information, (3) Kaiser intentionally disclosed Plaintiffs' private and highly sensitive information despite Members' reasonable expectation that such information would not be disclosed to third parties, (4) Kaiser recklessly disregarded Plaintiffs' privacy rights by disregarding the risks posed by the tracking technologies, and failing to accurately and completely disclose its tracking activities, so that Kaiser could improve its marketing, (5) privacy polls and studies show that informed, affirmative consent is needed to align with societal norms, (6) Kaiser did not have authorization or consent to disclose this information to any third party, including Third Party Wiretappers, and the Third Party Wiretappers did not have authorization to collect this

information, and (7) this invasion deprived Plaintiffs of the ability to control the circulation of their information. Nevertheless, determining whether conduct is "highly offensive" is not appropriate at this stage.

Regarding statutory larceny, the CMC plausibly alleges theft by false pretenses, as Kaiser knew or should have known the Third Party Wiretappers were collecting Members' PII and PHI for their own purposes, and that Kaiser provided this information in exchange for "free" use of Google's, Bing's, and Twitter's products, all contrary to its express and implicit representations. Kaiser's argument that the District of Columbia Consumer Protection Procedures Act, D.C. Code §§ 28-3901, *et seq*. ("DCCPPA") claim fails because the CMC merely alleges breach of contract ignores the ***substantial allegations of Kaiser's deceptive conduct*** including, *inter alia*, concealing that it was disclosing Plaintiffs' PII and PHI to Third Party Wiretappers for their own use and without sufficient protections. Plaintiffs have also adequately alleged claims pursuant to the Georgia Computer Systems Protection Act, Ga. Code Ann. § 16-9-93 ("GCSPA") and the Virginia Computer Crimes Act, Va. Code Ann. §§ 18.2-152.1, *et seq.* ("VCCA") because Plaintiffs did not consent to information being sent from their devices to the Third Party Wiretappers and therefore Kaiser used a computer or computer network "without authority." Similarly, the CMC adequately alleges a Washington Privacy Act, Wash. Rev. Cod §§ 9.73, *et seq.* ("WPA") claim, because Kaiser intercepted Plaintiffs' private communications without the consent of all parties.

Despite this Court previously upholding Jane Doe III's MWESA claim, and Kaiser not moving to dismiss in the Second MTD, Kaiser now throws an assortment of arguments for dismissal against the wall. Similarly, Kaiser moves to dismiss the Washington Health Care Information Act, Wash. Rev. Code §§ 70.02.005, *et seq.* ("WHCIA") claim (despite previously not moving to dismiss in the Second MTD). But, Kaiser waived its opportunity to dismiss the MWESA and WHCIA claims under Rule 12(b)(6) and, regardless, its arguments for dismissal fail.

Likewise, Kaiser's arguments that Plaintiffs have not sufficiently alleged relevant involvement by Kaiser Foundation Hospitals ("Hospitals") and Kaiser Foundation Health Plan of Washington ("KPWA"), and requests to strike Plaintiffs' tolling allegations and claim for punitive damages, wholly ignore Plaintiffs' well-pled allegations and should be rejected.

Finally, Kaiser's argument that Plaintiffs have not plausibly alleged violation of the D.C., Maryland, and Washington data breach notification statute claims is preposterous. Indeed, even Kaiser believed it violated these statutes, sending [redacted]. *See* Declaration of Tyler S. Graden ("Graden Decl."), Exs. A-C.

Accordingly, the Motion should be denied.

## II. FACTUAL BACKGROUND

### A. Plaintiffs' Allegations in the Consolidated Master Class Action Complaint

The factual allegations in the CMC have been informed by information produced since the Court's ruling on Kaiser's previous Motion to Dismiss, disclosures made by Kaiser (including those made ***one day*** following the Court's Order on the FAC) and documents produced in discovery confirming that Plaintiffs were right all along.

Plaintiffs are Kaiser Members who receive their medical treatment through Hospitals and the Permanente Medical Group. ¶¶25, 31, 36, 41, 46, 51, 56, 61, 66. As Members, Plaintiffs regularly use the Site and Apps to "access medical information and communicate with [their] health care providers, including making appointments, reviewing and ordering prescriptions, researching providers and medical conditions, communicating with providers, checking medical results, and reviewing [their] medical history," and paying medical bills. ¶¶27, 32, 37, 42, 47, 52, 57, 62, 67. Contrary to its express and implied promises that it would protect Members' privacy, Kaiser installed code on the Site and Apps that intercepts and transmits PII, PHI, and other sensitive and confidential information, to Adobe, Dynatrace, Google, Bing, QM, Twitter, and other third party companies ("Third Party Wiretappers"). ¶¶4, 103.

#### 1. Twitter, Bing, and Google

After this Court's Order on the FAC, Kaiser tacitly acknowledged, in both communications as well as privacy breach notifications sent to federal and state regulators, that it breached its obligations to Members and violated federal and state law by [redacted] ¶¶8-12, 14, 426. As Kaiser admitted in its belated disclosures—which stands in stark

contrast to Kaiser's prior representations to this Court[7]—[redacted]. ¶9.

This information was valuable not just to Kaiser but also to Twitter, Bing, and Google. A main goal of Google, Bing, and Twitter is to develop user profiles to better target them with ads. ¶214. In order to collect the data for these profiles, Google, Bing, and Twitter offer "free" technology to companies like Kaiser. *Id.* This technology served a dual purpose, allowing Kaiser to get information about who visited its Site and Apps and also allowing Twitter, Bing, and Google to use that data to expand their advertising networks and better target ads. ¶215.

For example, when Members accessed the Portal, Twitter, Bing, and Google received data indicating they logged in and therefore were Kaiser Members and patients. ¶¶228-30, 263-65, 271-76, 309-14. Twitter, Bing, and Google also received additional information about Members' communications with their healthcare providers and activities on the Site and Apps, such as the fact that John Doe suffers from headaches and kidney stones, that he was prescribed Omeprazole, and that Jane Doe searched for "mental health" resources. ¶¶231-39, 271-93, 315-18, 321-22. Similar personal and medical information and communications were intercepted and transmitted to Twitter, Bing, and Google about all Members. ¶¶240, 243-45, 294-96, 323-25.

Despite the obvious sensitivity of this information, Kaiser knowingly sent it to Twitter, Bing, and Google without any contracts to safeguard this data—which at a minimum created a materially enhanced risk to Members' privacy. In fact, ***Kaiser had no contracts at all*** with Twitter to protect this data. ¶226. The same is true with respect to Bing and certain Google technology at issue. While Kaiser was aware that Google and Bing used PII and PHI collected from Members for targeted advertising, and had contracts with Google or Microsoft governing other relevant technology, it had no contracts with either limiting their use of the analytics and marketing technology at issue here. For

[7] *See, e.g.*, MTD Hr'g Tr at 39:4-11, ECF No. 120 ("THE COURT: Are you suggesting, then, that Google, Bing, and Twitter have not been able to reach their goal? ***That they do not have the ability to ascertain the identity of*** -- once they've got this data that talks about, you know, some of the medical information that may have been received, ***they don't have the ability to tie that to any particular individuals***? ***MS. DEAGLE: Your Honor, I don't know if they do or they don't***.").

example, Kaiser did not enter into any contracts covering the Bing Conversion Tag (a/k/a Microsoft Conversion Tag) code installed on the Site and Apps, and thus did not ensure that Bing would not use the information collected for advertising purposes. ¶308.[8] Similarly, Kaiser's Google Cloud Master Agreement—which covers the Google Maps technology provided by Google—***explicitly allowed*** Google to use and retain Members' PII, despite the fact that Kaiser never entered into a BAA with Google, and Kaiser had ***no contracts*** restricting Google's ability to use information gathered by the DoubleClick, Google Ads, and Analytics code on the Site and Apps. ¶¶262-65.

Plaintiffs also plausibly allege that Kaiser knew that Twitter, Bing, and Google collected and used data from the Site and Apps for their own purposes. By implementing this code on the Site and Apps, Kaiser gained access to their analytics platforms and advertising capabilities and, in exchange, these Third Party Wiretappers gained access to valuable Member data. ¶¶214-15. In fact, the reason that these companies' technologies and advertising capabilities are so valuable and sought after is because they are able to "supplement user profiles for better targeting" and to "bolster their ad networks" with data collected from the very technology deployed on the Kaiser Site and Apps. *Id*.[9] Kaiser thus understood that, in lieu of monetary payments, Kaiser would be paying them in kind by providing Members' PII and PHI, which Twitter, Bing, and Google could then monetize. *Id.* Remarkably, Kaiser disclaims knowledge of these technologies despite previously characterizing their function as "widely understood." ECF No. 88 at 16.

In fact, [redacted] ¶216. Kaiser now seeks to distance itself from that decision, arguing that even though these global advertising companies' business models are based on using data generated from technology embedded in millions of websites, and these companies' public

[8] Kaiser's Business Associate Agreements ("BAAs") with Microsoft covered other products. *Id.*

[9] Kaiser argues that the CMC's allegation that Kaiser's use of Google's, Bing's, and Twitter's technologies came with the "implicit cost" of permitting Kaiser Member data to be used to "supplement user profiles for better targeting" and to "bolster their ad networks," ¶217, is inconsistent with the allegations in the FAC. Mot. at 10-11. Such allegations are entirely consistent with the FAC's assertion that "Google, Bing, and Twitter do not charge to use their services because they are able to generate billions of dollars in revenue each year by selling targeted advertising." ECF No. 44 at ¶135. Both the CMC and the FAC make clear that these services are not "free," but instead come with an "implicit cost." ¶217; ECF No. 44 at ¶141.

disclosures admitting to such use, Kaiser was somehow ignorant of this fact. In fact, Google discloses in its policies for partner sites, like Kaiser, that it "uses the information shared by sites and apps to deliver our services," including "the URL of the page you're visiting and your IP address." ¶257. HHS's Office for Civil Rights further warned covered entities, like Kaiser, that use of "technologies, such as ... Google Analytics, that can track a user's online activities" can "gather identifiable information about users as they interact with a website or mobile app, often in ways which are not avoidable by and largely unknown to users." ¶261. [redacted]. Graden Decl., Ex. D at KP_12_00060180 [redacted] In fact, Kaiser further understood that, [redacted].[10] *Id.* Kaiser also intentionally misconstrues Google's representations during discovery, taking Plaintiffs' allegations out of context and falsely suggesting that Google told Plaintiffs that information from the Site was not used to personalize ads. To the contrary, Google confirmed [redacted]. ¶¶266-67. Further, Google did not confirm ***when*** such classifications went into effect, only that they were in effect as of February 2024—three months ***after*** Kaiser represented to this Court that it had disabled, deleted, or modified the Google code on the Site and Apps. *Id.*

Twitter's and Bing's disclosures also put Kaiser on notice that they also collected Member data for their purposes. For example, Twitter's Privacy Policy also makes clear that information shared by partners like Kaiser "may be combined with the other information [Twitter users] share with X and that X receives, generates, or infers." ¶223. Twitter even explains to partners that its

[10] Kaiser's argument that the Google Cloud Master Agreement undermines Plaintiffs' theory that Kaiser impermissibly exchanged Members' data for access to the Third Party Wiretapper's analytics and advertising capabilities also fails. As the CMC clearly states, this agreement covers only "Google Maps Core Services," and thus does not address other marketing and analytics services Google provided to Kaiser, such as through DoubleClick or Google Analytics. ¶¶264-65. That this agreement explicitly permitted Google to use and retain Members' PII, and Kaiser had no other agreements prohibiting such use with respect to other technology, at a minimum give rise to a plausible inference that Kaiser knew that Google would similarly use the data collected through other technologies where there was no contract for its own purposes as well. ¶265. At a minimum, Kaiser should have entered into a BAA with Google, [redacted].

analytics and marketing tools "collect the cookie IDs of visitors and matches them to X users."[11] ¶224. Bing also uses a Machine Unique Identifier ("MUID") and Universal Event Tagging to identify and track individual internet users, used "to report advertiser activity on a Website" and was "installed on all pages viewed on the Kaiser Website, including within the Portal." ¶¶309-14. The MUID is not only used by Kaiser, but allows Bing to "sync across domains and allows tracking of users by Microsoft Bing from website to website"—a capability that Kaiser could not have done itself. ¶311. Using the MUID, along with the other information collected, such as IP addresses, Bing is able to match the information received to specific advertising profiles which it maintains. ¶¶310, 314. While Kaiser now tries to spin its transmission of Kaiser Member data to Bing without a BAA in place as a positive, the CMC makes clear that Kaiser should have known about Bing's use of Kaiser Member data for advertising purposes. ¶¶314, 332.

**2. Adobe**

Adobe also offers various marketing and analytics services, such as the Adobe Experience Cloud, Adobe Marketing Cloud, LifeCycle, and Marketo, which similarly collect a wide variety of PII, and in this case PHI, including: IP addresses; URLs; web searches; browser and device information; location information; social media profile information; information provided on the website or mobile application; advertising success rates; and items purchased. ¶¶160-62. Adobe uses this information to build user profiles and further its advertising business, including by marketing health-related segments used to target advertisements and creating unified profiles to connect Members' PHI and PII with their interactions across platforms. ¶¶161-74, 182-85, 190-193, 195. Kaiser installed this Adobe code on its Site and Apps and, as a result, Adobe received Plaintiffs' and other Members' PII and PHI. ¶¶159-60, 182-206.

Indeed, Adobe's documentation about their tools is very clear about their purpose, disclosing to clients like Kaiser that Adobe's technology "[c]reates a common key or ID which can be used to

---

[11] Indeed, Twitter made clear that they valued the Kaiser Member data transmitted by the Twitter pixel by [redacted]. ¶462. Thus, Kaiser was aware that the access it gained to Twitter's marketing and analytics tools by embedding Twitter code on the Site and Apps would result in Member PII and PHI being transmitted to Twitter. ¶225. While Kaiser [redacted]." CMC Ex. 8.

link profiles and identities," "[u]niquely identifies a device across multiple solutions," "[r]eceives aliases and ID mappings from Experience Cloud customers and partners," "[m]anages ID synchronization within the Experience Cloud," and "[s]upports ID synchronization with different third-parties across the ad tech ecosystem."[12] Adobe's documentation also clearly describes how they link or "match" the unique identifiers they assign to people to the unique identifiers assigned by other third-parties, including how accurate their matching methods are, so as to facilitate the construction of unified advertising profiles.[13]

As alleged, Kaiser has long-known that the Adobe code exposed Members' PHI to unauthorized use and that Adobe used this information to identify, profile and track users across sites and devices. *See*, *e.g.*, ¶¶160, 165-68, 172, 182-95. Indeed, as set forth in the CMC, [redacted][14] ¶176. Unfortunately, even [redacted], Kaiser continued to send and allow third parties like Adobe to intercept Plaintiffs' and other Members' PHI until approximately November 2023 when Kaiser represented to this Court that it had disabled, deleted, or modified the Adobe code on the Site and Apps. ¶181. Without proper

[12] *See About the ID* Service, Adobe (Sept. 15, 2021), https://experienceleague.adobe.com/en/docs/id-service/using/intro/about-id-service.

[13] *See Understanding ID synchronization and match rates*, Abode (Dec. 13, 2021), https://experienceleague.adobe.com/en/docs/id-service/using/intro/match-rates.

[14] Significantly, as has recently come to light in connection with Plaintiffs' challenge to Kaiser's privilege log, this [redacted] coincided with a lawsuit against Sutter Health regarding similar tracking technology, which also caused Kaiser to investigate its tracking technology more generally. *See* Joint Letter Brief (Jan. 17, 2025), ECF No. 291 (recognizing that the withheld presentation "was created in the wake of the 2019 class action lawsuit filed against Sutter Health relating to the alleged use of 'cookie synching.'"). In fact, after Plaintiffs' challenge, Kaiser produced this document on February 14, 2025 after conceding that it was not privileged. Graden Decl., Ex. E. The document is further proof that Plaintiffs' have plausibly alleged that Kaiser was aware that the third parties were using this information for their own purposes, recognizing [redacted]

safeguards in place, there was at a minimum a materially enhanced risk that the visitor profiles built through Adobe Target and stored in the Adobe Audience Library would be used by Adobe or Adobe's other customers to serve personalized ads, or that the data collected through Adobe Analytics and used by Adobe Campaign could be similarly used by others. *Id.*

Despite [redacted], Kaiser did not ensure that PHI was not being sent to Adobe, nor did Kaiser notify Members that their PII and PHI had been exposed as required by federal and state law. ¶¶177-80. Instead, Kaiser concealed the breaches and did not remove this code until after Plaintiffs filed suit and moved for a preliminary injunction. ¶181. Moreover, [redacted]. ¶179. Indeed, as discovery has recently revealed, [redacted]. CMC, Ex. 1.

### 3. Quantum Metric and Dynatrace

Kaiser also placed QM and Dynatrace's "Platform Support" technologies on the Site and Apps. ¶¶103, 109, 112-13, 349-51. QM's "Session Replay" code captured Members' communications on the Site in real-time while those communications were in transit, and continued to do so as Users moved throughout the Site. ¶112. As QM explains: "At its core, **session replay** is technology that allows you to watch a user's session as they experienced it, similar to how you watch a video. You can pause, rewind, and fast-forward the session (just like a YouTube video) to watch how a user interacts with a website or mobile app." ¶113. The Dynatrace APM platform, which was used on the Washington Site and App, can also "track user experience across platforms," and, like QM, captures Plaintiffs' and Members' interactions with the Site and Apps. ¶350.

QM and Dynatrace also use this data for their own purposes. For example, [redacted].[15] ¶¶120-125. Kaiser's use of QM also exposed Members' data to use through QM's Partner Program, which "enables partners to

[15] While Kaiser claims that it only knew that QM could use "aggregated data," Kaiser inappropriately asks the Court to draw an inference in its favor that it was not QM that was aggregating—and thus in possession and using—that individually identifiable data. Mot. at 7.

develop and deliver specialized solutions and services with [QM] and provides co-sell incentives to accelerate partner business growth." ¶124. Despite these risks, Kaiser lacked contractual controls to safeguard Member data.[16] Significantly, QM also sends data through POST transmissions that contain Adobe Marketing ID, a feature Kaiser enabled which allowed Adobe to link the individual-level data collected on their service. ¶341. Dynatrace's publicly available subscription agreement similarly states, Dynatrace may "monitor and collect Usage Data to improve Dynatrace's current and future offerings."[17] ¶352. Kaiser installed this QM and Dynatrace code on its Site and Apps and, as a result, QM and Dynatrace received Plaintiffs' and other Members' PII and PHI. ¶¶109-10, 136-49.

At a minimum, the QM and Dynatrace code created a materially enhanced risk to Member's privacy. For example, the QM data was not just transmitted to a recording device to which only Kaiser had access; rather, [redacted]. ¶121. QM also [redacted]. ¶¶122-24. Moreover, as discovery has revealed, [redacted] ¶130. [redacted]. ¶¶131-32. And, despite Dynatrace receiving Members' PHI, Kaiser did not even have a BAA with Dynatrace. ¶353.

### 4. Additional Third Party Web Technologies

In addition to the Third Party Wiretappers, Kaiser deployed third party marketing tags and other technologies, [redacted]. ¶396. [redacted]

---

[16] While Kaiser falsely claims that [redacted]. ¶¶125-34. [redacted]. *Id.*

[17] While Kaiser contends that "Usage Data" is defined to exclude personal data collected from this site, Kaiser ***cites no language*** showing this to be true and Kaiser's factual arguments cannot be taken as fact. Indeed, Dynatrace even distinguishes from general "Usage Data," and a subset of that data that is "aggregated and not identifying Customer or any individual." ¶352.

[redacted]. *Id.* [redacted]. ¶¶396-418. Plaintiffs and any member who accessed the Site when this technology was present would similarly have had their privacy compromised. *Id.*

**B. Kaiser Removed the Offending Code After Plaintiffs Brought this Action**

After Plaintiffs filed their initial Complaint on June 9, 2023, and moved for a preliminary injunction asking this Court to order that Kaiser remove the Third Party Wiretappers' code, Kaiser represented in November 2023 that it had disabled, deleted, or modified the offending code. ¶¶111, 133, 135, 181, 189, 211-212, 227, 268, 342; *see also* ECF No. 96 at 1-2 ("To the extent they were installed, KFHP removed certain internet technologies provided by Adobe, Bing, Google, Twitter, and [QM] from the Website by: (1) disabling the technologies through a tag manager tool; (2) deleting the source code installed on the Website relating to these technologies; or (3) modifying the coding or Website to prevent the tool from being launched or invoked. KFHP completed removal of these technologies from the Website on or about November 7, 2023."), at 2-3 ("On or about September 14, 2023, KFHP completed its migration of the Dynatrace technology to the on-premise deployment model offered by Dynatrace. As such, all Website and App visitor data is collected and stored solely in KFHP's on-premises server. No Website or App visitor data is disclosed to Dynatrace."); Disc. Hr'g Tr. at 53:25-54:1, ECF No. 217 (Kaiser counsel admitting "[t]his litigation was part and parcel of what spurred the investigation into those technologies.").

**C. Kaiser Issued a Privacy Breach Notification One Day After This Court Issued its Order Denying in Part Kaiser's Motion to Dismiss the FAC**

On April 11, 2024, this Court denied Kaiser's Motion to Dismiss the FAC in part, upholding Plaintiffs' claims for breach of implied contract, negligence, and violation of MWESA, OUTPA, VIIPPA, and WCPA. Order at 56-57. In granting the Motion with leave to amend, the Court found that Plaintiffs failed to allege that the information the Third Party Wiretappers received was

individually identifiable,[18] as Kaiser had argued throughout its Motion and oral argument.[19]

Incredibly, the very ***next day***, Kaiser filed notices with federal and state regulators admitting that it shared Members' PII and PHI to third parties and had known for months, stating:

[redacted]

¶8. Kaiser further admitted that the information [redacted] ¶9.

The information Kaiser now admits it was transmitting to the Third Party Wiretappers includes: [redacted] *Id.* According to Kaiser's filings—which were only produced after Plaintiffs filed the SAC and moved to compel—[redacted]. CMC, Ex. 1.

## III. LEGAL STANDARD

Rule 12(b)(6) requires only that a plaintiff allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Such factual

[18] *See, e.g.*, Order at 32 ("As the FAC is pled, there are no clear allegations as to how individually identifiable health information was disclosed."), 38 (noting that CMIA claim "involved the same basic issue regarding individually identifiable information"), 46 (dismissing GIIPPA claim because "[a]s the FAC is pled, there is no clear allegation as to how individually identifiable personal information was disclosed"), 55 (dismissing WHCIA claim because "it is not clearly alleged that such information identified her or could be readily associated with her personal identity").

[19] *See, e.g.*, ECF No. 88 at 2 ("Plaintiffs do not plead that the information purportedly disclosed is individually identifiable."), 28 ("Plaintiffs rely only on conclusory allegations that any 'individually identifiable information' was exposed."), 33-34 ("[B]ecause … the FAC does not allege that John Doe II's individually identifiable information was disclosed, he has failed to plead disclosure of privileged or personal information."), 55 ("Jane Doe does not explain how any of this information 'identifies or can readily be associated with' her. None of the information listed would allow third-parties to identify Jane Doe.").

allegations are sufficient where they "suggest that the claim has ***at least a plausible*** chance of success." *James v. Walt Disney Co.*, 701 F. Supp. 3d 942, 946 (N.D. Cal. 2023) (Chen, J.). When ruling on a motion to dismiss under Rule 12(b)(6), courts "accept factual allegations in the complaint as true and ***construe the pleadings in the light most favorable to the nonmoving*** party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

When reviewing a motion to strike under Rule 12(f), a court must also view the pleading in the light most favorable to the non-moving party. *Platte Anchor Bolt, Inc. v. IHI, Inc.*, 352 F. Supp. 2d 1048, 1057 (N.D. Cal. 2004). Motions to strike are "generally disfavored," and should only be granted where "the matter to be stricken clearly could have no possible bearing on the subject of the litigation." *Shaterian v. Wells Fargo Bank, N.A.*, 829 F. Supp. 2d 873, 879 (N.D. Cal. 2011). According, if there is "any doubt whether the portion to be stricken might bear on an issue in the litigation, the court should deny the motion to strike." *In re Fibrogen Sec. Litig.*, 2023 WL 5600077, at *1 (N.D. Cal. Aug. 29, 2023) (Chen, J.).

Similarly, in resolving a facial attack to a plaintiffs' standing under Rule 12(b)(1), a court must also accept the plaintiff's allegations as true and draw all reasonable inferences in the plaintiff's favor. *Doe v. N. Cal. Fertility Med. Ctr.*, 2024 WL 246178, at *2 (E.D. Cal. Jan. 23, 2024). A plaintiff has standing where they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 597 (9th Cir. 2020).

## IV. ARGUMENT

### A. Kaiser's Argument that Plaintiffs Have Failed to Plausibly Allege Kaiser's Knowledge of Third Party Use Is a Red-Herring

Without connecting its argument to any specific claims, or recognizing applicable pleading standards, Kaiser asks this Court to draw factual inferences in Kaiser's favor and find that Kaiser could not have plausibly known that the third parties were using Members' data for their own purposes. Mot. at 6-13. Not only does this turn the applicable pleading standard on its head, misconstrue this Court's prior Order, and rewrite Plaintiffs' allegations, but it presupposes third party use is required—which it is not for the majority of Plaintiffs' claims.[20]

[20] Indeed, at most, third party use is only required here for Plaintiffs' ECPA and larceny claims.

First, Kaiser misleadingly contends that this Court previously dismissed ***all claims*** that were based on Third Party Wiretapper use of Plaintiffs' PII and PHI. Mot. at 6. Significantly, Kaiser fails to explain ***which claims*** it believes require knowledge of third party use and ***why***—instead generically arguing that Plaintiffs' allegations about these third parties' independent use are insufficient and then broadly concluding that "all Claims" based on independent use against Google, Bing, and Twitter should be dismissed.[21] Mot at 13. But to carry its burden, Kaiser must show ***why*** Plaintiffs' claims should be dismissed, even if as Kaiser contends the CMC did not sufficiently plead knowledge of these third parties' independent use of Members data. *Kuhl v. McDonough*, 2024 WL 3463350, at *10 (N.D. Cal. July 17, 2024) ("Rule 12(b)(6) places the burden of persuasion on the moving party, meaning that the party who files a motion to dismiss must explain why dismissal is warranted."). Kaiser provides no explanation as to why such knowledge is an essential element for any of Plaintiffs' claims.

Notably, this Court previously sustained Plaintiffs' claims for breach of implied contract, negligence, and violation of MWESA, OUTPA, VIIPPA, and WCPA even though it found that the FAC only pled that "Kaiser simply hired the third parties to do work for Kaiser, which exposed the third parties to personal information about members." Order at 11-12. Moreover, this Court did not issue a blanket dismissal of all of Plaintiffs' remaining claims; rather, the Court examined each of the remaining claims, dismissing them without prejudice largely because it determined that Plaintiffs had not plausibly alleged that ***PII*** was being transmitted—an argument Kaiser has abandoned after its public admission that it disclosed PII and PHI. Indeed, this Court has recognized that statutory claims for privacy violations survive even if plaintiffs do not plead defendant knew the information was used for another's benefit. *See, e.g.*, *James*, 701 F. Supp. 3d at 965, *motion to certify appeal denied*, 2024 WL 664811 (N.D. Cal. Feb. 16, 2024). Thus, even if this Court were to find that the CMC only pleads that the Third Party Wiretappers used information for Kaiser's benefit for things Kaiser could have done itself, Kaiser has failed to carry its burden showing why dismissal is warranted.

Second, this Court did not previously hold that Kaiser is only liable if Plaintiffs show that the

[21] While Kaiser raises factual arguments regarding Dynatrace, QM, and Adobe (Mot. at 6-9), Kaiser does not conclude in these sections ***that any*** claims against these third-parties should be dismissed.

Third Party Wiretappers actually used Members' information for their own purposes; rather, this Court found partial dismissal warranted because there were no allegations "that Kaiser knew and/or approved of third parties ***collecting and/or using*** information for their own purposes." Order at 12. The Court further observed that, in the FAC, there was "not even an allegation that Kaiser negligently ***failed to take steps to ensure that third parties could not collect and/or use*** information for their own benefit." *Id.* As the Court explained in the context of Plaintiffs' California Invasion of Privacy Act ("CIPA") claim: "The key is whether the hiring of a third party to collect information – even if for the benefit of the contracting party – ***poses a materially enhanced risk*** to the individual's privacy." *Id.* at 26. Thus, Plaintiffs need not plead facts showing that the Third Party Wiretappers ***actually used*** Members' data for their own purposes; rather, showing that Kaiser failed to take adequate steps to prevent third parties from collecting that information for their own use is sufficient—a standard which Plaintiffs readily meet in the CMC.

Third, because allegations regarding a party's knowledge involve facts often in the exclusive possession of the defendant, allegations regarding knowledge—even under a heightened Rule 9(b) pleading standard—need only be pled generally. Fed. R. Civ. P. 9(b). ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). As this Court has recognized, it can plausibly be inferred that a company that designs and produces software knows how that software functions. *See Beyer v. Symantec Corp.*, 333 F. Supp. 3d 966, 981 (N.D. Cal. 2018) (Chen, J.) ("Despite this, the complaint sufficiently alleges knowledge, because it alleges that Symantec designed and produced the software in question. It plausibly follows from this fact that Symantec knew how the Second Software functioned, including that the software unpacked potentially malicious files in a high-privilege environment."). Here, it can also be plausibly inferred that Kaiser—one of the largest health insurance companies in the country, with a massive digital marketing department—knows how the software it installed on its Site and Apps operated. Indeed, Kaiser has withheld thousands of documents in this litigation, only making them available for in-person inspection in New York, on grounds that they reveal Kaiser's "Highly Confidential Source Code." *See* ECF No. 292 at 5. As set forth above, the CMC pleads multiple facts giving rise to a plausible inference that Kaiser was aware that third parties were collecting and/or using Member data for their

own purposes. *See* supra Section II.A.

**B. Claim 1: Plaintiffs Plausibly Allege the ECPA Crime Tort Exception Applies**

The CMC cures the pleading deficiency previously identified with the ECPA claim, as Plaintiffs now properly allege application of the crime tort exception. *See* 18 U.S.C. § 2511(2)(d) (single-party consent does not apply where the "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State"). Specifically, Plaintiffs allege that Members' communications were intercepted for the purpose of criminally and tortiously using their PII and PHI "as consideration for Kaiser obtaining Twitter, Google, and Microsoft Bing's technology." ¶460. These third parties do not require monetary payment to use their marketing and analytics code; rather, "the implicit cost of this technology is that Kaiser provide Google, Microsoft Bing, and Twitter the ability" to use Members' PII and PHI for better ad targeting—which Kaiser understood when it installed the code. ¶¶215, 461. As a result, Kaiser "essentially sold its patient lists, and other PHI, to Twitter, Google, and Microsoft Bing" in violation of the HIPAA Privacy Rule, which carries criminal penalties,[22] and otherwise acted tortiously[23] by using this information without consent or compensation. ¶¶464-66. *See Kurowski v. Rush Sys. for Health*, 2023 WL 8544084, at *3 (N.D. Ill. Dec. 11, 2023) (applying crime-tort exception where hospital violated HIPAA by knowingly transmitting individually identifiable health information for financial gain); *Sweat v. Houston Methodist Hosp.*, 2024 WL 3070184, at *4 (S.D. Tex. June 20, 2024) (crime-tort exception applied where defendant provided medical information to a third party in violation of HIPAA); *B.K. v. Desert Care Network*, 2024 WL 1343305, at *6 (C.D. Cal. Feb. 1, 2024) (disclosure of prescription refill requests and appointment scheduling in violation of federal and state law triggers crime tort exception); *Haw. Reg'l Council of Carpenters v. Yoshimura*, 2016 WL 4745169 (D. Haw. Sept. 12, 2016) (applying crime-tort exception to party to communication). Indeed, [redacted]

[22] *See* 42 U.S.C. § 1320d-6; Cal. Civ. Code § 56.10(d); Cal. Civ. Code § 56.36(a); Md. Code Ann., Health-Gen. § 4-303; Md. Code Ann., Health-Gen. §§ 4-309(d)-(e); Or. Rev. Stat. § 192.558; Va. Code Ann. § 32.1-127.1:03; Wash. Rev. Code § 70.02.020.

[23] *See In re Toys R Us, Inc., Priv. Litig.*, 2001 WL 34517252, at *8 (N.D. Cal. Oct. 9, 2001) (spying on website users to "obtain[] detailed, free market research and consumer analysis rather than paying for it" are tortious purposes that fall within the ECPA's crime-tort exception).

[redacted] ¶462. This use of Members' PII and PHI for Kaiser's gain, which discovery will show goes beyond just Twitter, exposes Kaiser to criminal and civil liability and the crime tort exception applies.

Moreover, "the existence of a lawful purpose does not mean that the interception is not also for a tortious or unlawful purpose." Order at 13 (quoting *Sussman v. Am. Broad. Cos*., 186 F.3d 1200, 1202 (9th Cir. 1999)).[24] Indeed, "[w]here the taping is legal, but is done for the purpose of facilitating *some further impropriety*, such as blackmail," the ECPA applies. *Id.* at 14 (quoting *Sussman*, 186 F.3d at 1202-03) (emphasis in original). While Kaiser may have had the right to record this information for its own purposes, Kaiser also did this to facilitate a further impropriety—accessing Twitter, Bing, and Google technology without paying money, which is separate and independent of the interception itself.[25] *See Caro v. Weintraub*, 618 F.3d 94, 99 (2d Cir. 2010).

### C. Claim 2: Plaintiffs Sufficiently Allege a Violation of CIPA

Recognizing the Court's previous Order, Plaintiffs continue to maintain that CIPA protects both California residents and residents of other states and preserve this issue for appeal. *See Valentine v. NebuAd, Inc.*, 804 F. Supp. 2d 1022, 1028 (N.D. Cal. 2011); *Carrese v. Yes Online Inc.*, 2016 WL 6069198, at *4 (C.D. Cal. Oct. 13, 2016).

### D. Claim 8: Kaiser Must Comply with CMIA for All Enrollees

As a California-regulated health care provider and/or health care service plan, Kaiser cannot disclose patient or enrollee medical information without written authorization, ***regardless of where its patients or enrollees reside***. Cal. Civ. Code § 56.10(a); ¶¶607-17. *See Stasi v. Inmediata Health Grp.*, 501 F. Supp. 3d 898, 924 (S.D. Cal. 2020) (upholding nationwide CMIA claim); *Schmitt v. SN*

---

[24] As Kaiser's authority makes clear, "whether defendants had an illegal purpose in mind when making the recordings – as their sole purpose or as a purpose in addition to a legitimate purpose – will be determined by the jury." *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 402 F. Supp. 3d 615, 688 (N.D. Cal. 2019), *aff'd sub nom. Planned Parenthood Fed'n of Am., Inc. v. Newman*, 2022 WL 13613963 (9th Cir. Oct. 21, 2022).

[25] Kaiser's authority, where the plaintiffs did not allege information collected inside secure patient portals, do not compel a different result. *See Nienaber v. Overlake Hosp. Med. Ctr.*, 733 F. Supp. 3d 1072, 1095 (W.D. Wash. 2024) (no allegation that patient portal communications intercepted); *Okash v. Essentia Health*, 2024 WL 1285779, at *2 (D. Minn. Mar. 26, 2024) (plaintiff dropped allegations related to patient portal). And unlike *Katz-Lacabe v. Oracle Am., Inc.*, 2024 WL 1471299, at *3 (N.D. Cal. Apr. 3, 2024), and *In re Google Inc. Cookie Placement Consumer Privacy Litigation*, 806 F.3d 125, 145 (3d Cir. 2015), here Plaintiffs allege that their healthcare provider disclosed their private medical information in violation of statutory and common law duties.

*Servicing Corp.*, 2021 WL 3493754, at *3 (N.D. Cal. Aug. 9, 2021) (quoting *In re iPhone 4S Consumer Litig.*, 2013 WL 3829653, at *7 (N.D. Cal. Jul. 23, 2013)) ("[S]tate statutory remedies may be invoked by out-of-state parties when they are harmed by wrongful conduct occurring in California."). CMIA contains no statutory language limiting its application to California residents (*see* Cal. Civ. Code §§ 56 *et seq.*), instead defining "patient" as "a natural person, whether or not still living, who received health care services from a provider of health care and to whom medical information pertains."[26] Cal. Civ. Code § 56.05(l). Notwithstanding Kaiser's unexplained assertion to the contrary, all Plaintiffs readily meet this definition. Moreover, CMIA plainly covers the conduct of a health service plan, like Kaiser, and broadly provides for recovery for violations by California companies.[27] Cal. Civ. Code § 56.10 (stating "health care service plan … ***shall not*** disclose medical information regarding a patient of the provider of health care or an enrollee or subscriber of a health care service plan without first obtaining an authorization").

Moreover, when the California legislature intends to limit the protection of its laws to California residents, it does so explicitly. *See, e.g.*, Genetic Information Privacy Act, Cal. Civ. Code § 56.18(b)(3) ("'Consumer' means a natural person who is a California resident."); Song-Beverly Act, Cal. Civ. Code § 1792 (implied warranty of merchantability applies to "every sale of consumer goods that are sold at retail ***in this state***"). The legislature's choice not to do so in CMIA indicates its intent to permit a right of action for non-residents harmed by California health care providers, like Kaiser. The goal of CMIA is "to protect the confidentiality of individually identifiable medical information obtained from a patient by a health care provider, while at the same time setting forth limited circumstances in which the release of such information to specified entities or individuals is permissible." *Brown v. Mortensen*, 253 P.3d 522, 533 (Cal. 2011). Thus, the Act applies uniform confidentiality standards to California healthcare providers, regardless of where their patients reside,

[26] In "other data breach cases" courts "have similarly applied the law of the state where the company had its headquarters." *Schmitt*, 2021 WL 3493754, at *4; *see also In re Target Corp. Customer Data Sec. Breach Litig.*, 309 F.R.D. 482, 486 (D. Minn. 2015) (applying Minnesota law where "Target is headquartered in Minnesota; its computer servers are located in Minnesota; the decisions regarding what steps to take or not take to thwart malware were made in large part in Minnesota").

[27] Kaiser similarly fails to explain why [redacted] ¶¶8-9, 615-16.

rather than set forth different standards for residents versus non-residents and permit California companies to disclose non-residents' medical data with impunity. *See In re Ambry Genetics Data Breach Litig.*, 567 F. Supp. 3d 1130, 1152 (C.D. Cal. 2021) (applying CMIA to patients nationwide); *Stasi*, 501 F. Supp. 3d at 905 (same). As such, Plaintiffs have standing.[28]

### E. Claims 3 and 4: Plaintiffs Plausibly Allege a Highly Offensive Intrusion in Support of Their Common Law Invasion of Privacy—Intrusion Upon Seclusion and Violation of the California Constitution's Right to Privacy claims

As an initial matter, the CMC plainly sets forth that Kaiser's conduct was highly offensive because Kaiser (1) violated federal and state law, (2) disclosed and Third Party Wiretappers collected highly sensitive and personal and medical/health information, (3) intentionally disclosed Plaintiffs' private and highly sensitive information despite Members' reasonable expectation that such information would not be disclosed to third parties, (4) recklessly disregarded Plaintiffs' privacy rights by disregarding the risks posed by the tracking technologies, and failing to accurately and completely disclose its tracking activities, so that it could improve its marketing, (5) privacy polls and studies show that informed, affirmative consent is needed to align with societal norms, and (6) did not have authorization or consent to disclose this information to any third party, including Third Party Wiretappers, and the Third Party Wiretappers did not have authorization to collect this information.[29] ¶¶361-369, 374-389, 496-499, 512. Moreover, this invasion deprived Plaintiffs of the ability to control the circulation of their information and privacy polls and studies show that informed, affirmative consent is needed to align with societal norms. ¶¶374-81; *Hernandez v. Hillsides, Inc.*, 211 P.3d 1063, 1079 (Cal. 2009) (an intrusion upon privacy is highly offensive where the defendant's conduct is not "accidental, misguided, or excusable acts of overstepping upon legitimate privacy rights"). Here, Kaiser's acts were intentional and it had knowledge of and/or approved the Third Party Wiretappers' collection and/or use of Plaintiffs' information.

While Kaiser argues that "violations of law do not necessarily represent highly offensive behavior" based on *Hubbard v. Google LLC*, 2024 WL 3302066, at *8 (N.D. Cal. July 1, 2024) and *Manigault-Johnson v. Google, LLC*, 2019 WL 3006646, at *6 (D.S.C. Mar. 31, 2019), those are

[28] Kaiser does not challenge this claim on any basis other than standing. *See* Mot. at 17.

[29] Plaintiffs do not bring invasion of privacy claims under article 1 section 1 of the California Constitution on behalf of non-California residents.

Children's Online Privacy Protection Act cases against Google/YouTube—not against a healthcare provider like Kaiser that is obligated by explicit and implicit promises, as well as state and federal regulations to keep member and patient information confidential. [30] Indeed, as the Court in *Manigault-Johnson* recognized, a defendant's "duplicitous tactic" of collecting information contrary to their privacy assurances has been found to be highly offensive. 2019 WL 3006646, at *5. Here, Kaiser and the Third Party Wiretappers collected PII and PHI and Kaiser disclosed PHI without written consent, in violation of HIPAA (42 U.S.C. § 1320d-6), failed to timely notify regulators in violation of HIPAA's Breach Notification Rule (45 C.F.R. §§ 164.400-414) and state statutes, and failed to timely notify its patients of the disclosures in violation of state data breach laws. ¶¶8-15.[31] This type of conduct, including Kaiser's failure to protect confidential Member data it was required to keep private by implicit and explicit promises, as well under state and federal law like HIPAA, certainly could be found to be highly offensive. As discussed below, when medical/health information is at stake, claims for intrusion upon seclusion are sustained.

Further, Kaiser sets up a strawman argument falsely claiming that Plaintiffs contend all state and federal privacy laws require consent and citing the California Consumer Privacy Act, Cal. Civ. Code § 1798.100, a statute not at issue in this case. Kaiser fails to provide any analysis of the consent requirements of the *actual* federal and state regulations under which Plaintiffs bring claims (*see*, *e.g.*, ¶23). And its failure to obtain consent under the applicable statues is simply another factor to be considered in determining that Kaiser's conduct was highly offensive.

Kaiser next latches on to a single allegation that "Plaintiffs and Class Members' use of Kaiser's Site and/or Apps ***through deceit*** is highly offensive to a reasonable person[]" and attempts to bootstrap this allegation into a requirement that Plaintiffs must now satisfy the requirements of

[30] Also, other courts have disagreed with this analysis. *See A.B. by & Through Turner v. Google LLC*, 737 F. Supp. 3d 869, 884 (N.D. Cal. 2024), motion to certify appeal denied, 2024 WL 4933345 (N.D. Cal. Dec. 2, 2024) ("A violation of federal law is generally considered egregious, and because COPPA prohibits such data collection from minors to protect their privacy, plaintiffs have adequately pleaded an egregious intrusion into the minors' expectation of privacy.").

[31] Kaiser's selective quotation of *Hayter v. PHH Mortg. Corp.*, 2016 WL 3902483, at *4 (N.D. Cal. July 19, 2016) is misleading as it omits the key point that "when the challenged communications were initiated by the plaintiffs and were in no other way offensive … the plaintiffs cannot jury-rig an intrusion claim by tacking on other alleged statutory failures." *Hayter* involved a claim where plaintiffs applied to defendant for a loan modification and defendant sent letters stating foreclosure was possible if a modification was not completed. This is a far cry from Kaiser's conduct here.

Rule 9(b). ¶497. This is wrong.[32] *See Bautista v. Valero Mktg. & Supply Co.*, 2016 WL 3924117, at *3 (N.D. Cal. July 21, 2016) (rejecting defendant's argument that plaintiff's omission claims "sound in fraud" and therefore he "must include 'the who, what, when, where, and how that would suggest fraud' to satisfy Rule 9(b)" because plaintiff "does not claim [defendant] intended to make false misrepresentations."). And regardless, Plaintiffs include multiple factual allegations that do not require deceit, such as sharing of highly sensitive personal and health/medical information about Plaintiffs without their consent.

Kaiser's citations to cases that do not involve medical or health data are inapposite[33] and its position that sharing PHI and PII is not highly offensive is untenable. As a healthcare provider, Kaiser is held to a higher standard than the defendants in the cases it relies upon. In fact, lawmakers' enactment of "criminal and civil statutes forbidding the disclosure of protected health information without proper authorization" reflects "policy decisions regarding the importance of safekeeping this information" and support a finding that Kaiser's conduct is highly offensive. *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 800 (N.D. Cal. 2022); *see also McCulley v. Banner Health*, 2024 U.S. Dist. LEXIS 85232, at *31 (D. Ariz. May 10, 2024) (same); *Doe v. Regents of Univ. of Cal.*, 672 F. Supp. 3d 813, 820 (N.D. Cal. 2023) ("Personal medical information is understood to be among the most sensitive information that could be collected about a person."); *Doe v. Beard*, 63 F. Supp. 3d 1159, 1170 (C.D. Cal. 2014) (disclosure of medical information subverts a public interest favoring confidentiality and thus meets the egregious violation of social norms standard); ¶¶8-15 ([redacted]). Kaiser's intrusion on Plaintiffs' privacy, including medical/health information "is unacceptable as a matter of public policy" (Mot. at 18 (citing *Hernandez*, 47 Cal. 4th at 287)) and thus highly offensive.

[32] Even if Rule 9(b) applied, Plaintiffs have easily met the heightened standards by setting forth the who (Kaiser and Third Party Wiretappers); what (use of Third Party Wiretappers code to collect, transmit, use and/or disseminate Plaintiffs' highly sensitive personal and health/medical information without appropriate disclosures or safeguards); when (during the Class Period); where (on Kaiser's Site, Patient Portal, and App); and how (through the undisclosed use of that code).

[33] *Thomas v. Papa Johns Int'l, Inc.*, 2024 WL 2060140, at *4 (S.D. Cal. May 8, 2024) (disclosure of data from interactions with a ***pizza restaurant's website***); *McCluskey v. Hendricks*, 2021 WL 6773140, at *6 (C.D. Cal. Nov. 17, 2021) (screenshots of ***Instagram account***).

In addition, Plaintiffs do not merely allege that Kaiser acted with "reckless disregard;" but that Kaiser's conduct is highly offensive because it knew and/or approved of third parties' collecting and/or using PII and PHI for their own purposes. With respect to Google, Twitter, Bing, and Adobe, that included using Members' personal information for advertising and marketing. *See, e.g.,* ¶¶160, 162-64, 167, 170, 176, 208, 210, 212, 215, 217, 219, 252, 304. With respect to QM and Dynatrace, this independent use included [redacted]. *See, e.g.,* ¶¶119-22, 126-30, 349, 352.

In *Hernandez*, the California Supreme Court also considered whether "defendant could have minimized the privacy intrusion through other reasonably available, less intrusive means." 211 P.3d at 1079. Here, Kaiser could have easily minimized the privacy intrusion as evidenced by the fact that it "discontinued" use of certain "online technologies" "since November 13, 2023." ¶8.

Moreover, the polls, studies, and other information Plaintiffs cite are relevant because they help to set forth the "social norms" and provide context for the analysis of whether a "reasonable person" would find Kaiser's conduct to be highly offensive. *Hernandez*, 47 Cal. 4th at 295. Plaintiffs do not "argue that it is highly offensive to collect any personal information when a person visits a website unless they provide express consent" (Mot. at 21); rather, the CMC details how the allegations in this case demonstrate Kaiser's conduct is highly offensive. Specifically, Plaintiffs point to (1) the data involved, which is private, highly sensitive and includes medical/health information, (2) Kaiser's failure to fully and completely disclose the tracking activity and obtain affirmative consent, (3) the nature of the technology involved (*i.e.*, hidden code), (4) the number of third parties involved and the access they were given to Plaintiffs' data, and (5) Kaiser failure and delay in disclosing and reporting data breaches. ¶¶107, 130, 109-360, 361-69, 374-88; *McDonald v. Kiloo ApS*, 385 F. Supp. 3d 1022, 1035 (N.D. Cal. 2019) (plaintiffs "present detailed and specific allegations about why these intrusions would have been highly offensive to the reasonable person on the basis of multiple sources, including reports, studies, surveys, case law and secondary legal materials").

Finally, courts are reluctant to determine whether conduct is highly offensive at this stage and routinely deny motions to dismiss claims for intrusion upon seclusion, particularly in cases involving

plaintiffs' medical information. *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 606 ("The ultimate question of whether Facebook's tracking and collection practices could highly offend a reasonable individual is an issue that cannot be resolved at the pleading stage."); *In re Meta Healthcare Pixel Litig.*, 2024 WL 333883, at *3 (N.D. Cal. Jan. 29, 2024) ("[A]t this juncture and given that plaintiffs were communicating with their healthcare providers about their healthcare needs, plaintiffs have alleged enough for this claim to proceed to discovery."); *Cousin v. Sharp Healthcare*, 702 F. Supp. 3d 967, 974 (S.D. Cal. 2023) (where plaintiffs alleged their "medical conditions and statuses as patients" were transmitted to Meta, linked to them using their IP addresses, and used for targeted advertising, "[t]he ultimate question of whether [Defendant's disclosure of their information] … could highly offend a reasonable individual is an issue that cannot be resolved at the pleading stage"); *In re Ambry Genetics Data Breach Litig.*, 567 F. Supp. 3d at 1143 (court "refused to dismiss invasion of privacy claims at the motion to dismiss stage [because] a data breach involved medical information, because *the disclosure of such information is more likely to constitute an 'egregious breach of the social norms'* that is 'highly offensive'"); *Katz-Lacabe v. Oracle Am., Inc.*, 668 F. Supp. 3d 928, 942 (N.D. Cal. 2023) (allegation that defendant collected "sensitive health and personal safety information" was sufficient to withstand motion to dismiss claim for intrusion upon seclusion); *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 797 (N.D. Cal. 2019).

Given the allegations in the CMC, a jury could find Kaiser's conduct highly offensive and its Motion to Dismiss Claims 3 and 4 should be denied.

**F. Claim 19: Plaintiffs Plausibly Allege Theft by False Pretenses**

Plaintiffs plausibly allege statutory larceny because Kaiser: (1) knew or should have known the Third Party Wiretappers were using PII and PHI from the Site and Apps; and (2) provided Members' private information to third parties for the use of Google, Bing, and Twitter products. *See supra* Section II.A. *See also Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 635 (N.D. Cal. 2021) (plaintiffs stated a claim where they alleged defendant stole "Plaintiffs' personal information without Plaintiffs' consent"). Plaintiffs have also adequately alleged that they transferred their PHI and PII to Kaiser "in reliance" on its false representations that it would keep the information shared on the Site and Apps private and confidential. Order at 39 ("Theft by false pretenses simply requires ... [that] the

[property] owner transferred the property to the defendant in reliance on the [false] representation."). For example, Plaintiffs allege Kaiser made false assurances in its Privacy Statement (which governs the use of the Site and Apps[34]), that it was "committed to protecting the privacy of the users of the Site" and "will [only] use and disclose your personal information as stated in this Privacy Statement," and that will "abide by ... promises regarding the confidentiality and protections of Kaiser Plan Members' communications and data on the Site and Apps." ¶101. Additionally, Plaintiffs aver that "Plaintiffs and Class Members reasonably believed their interactions with Kaiser on the Site, and [Apps] were private and would not be transmitted to third parties" because they had a "reasonable expectation of privacy" based, in part, on Kaiser's "express promises of privacy and confidentiality." ¶¶375, 381, 390; ¶1 ("Plaintiffs trusted that their healthcare providers would treat the information that they shared with them as private and confidential."). These allegations give rise to an inference that Plaintiffs relied on Kaiser's express and implied representations that it would keep PII and PHI confidential. *Watson v. Carey*, 2007 WL 2670000, at *2 (N.D. Cal. Sept. 7, 2007), *aff'd*, 328 F. App'x 533 (9th Cir. 2009) (for theft by false pretenses claim "[r]eliance may be inferred from all the circumstances").[35]

**G. Claim 10: Jane Doe II Adequately Alleges Kaiser Violated the DCCPPA**

Previously, this Court dismissed the DCCPPA claim without prejudice because there was "no allegation that Kaiser allowed the third parties to intercept information for anyone's benefit other than Kaiser." Order. at 42. As set forth above, the CMC includes such allegations.

Indeed, Kaiser's April 12 Disclosures regarding the privacy breach further confirm that this is no run-of-the-mill breach of contract action; rather, Kaiser's conduct violated a host of federal and

---

[34] ¶¶95-96, 98.

[35] Kaiser relies on inapposite authority. *See Am. Career Coll., Inc. v. Medina*, 2021 WL 5263858, at *5 (C.D. Cal. Sept. 28, 2021) (sustaining RICO claim based on predicate acts of mail and wire fraud). Both *In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d 987, 999-01 (N.D. Cal. 2024) and *Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1074 (N.D. Cal. 2023) involved plaintiffs suing defendants based on collection of plaintiffs' information from websites defendants did not operate. Accordingly, the privacy policies of defendants there did not govern. *In re Meta* Pixel, 724 F. Supp. 3d at 1012, 1022; *see also Doe*, 690 F. Supp. 3d at 1088. Kaiser operates the Site and Apps and its Privacy Policy governs. ¶¶95-104, 361-68, 374-77. *People v. Miller*, involving a romance scam, recognizes that reliance can be inferred from the circumstances. 97 Cal. Rptr. 2d 684, 695 (Cal. Ct. App. 2000).

state laws—including the DCCPPA which "is a comprehensive statute designed to provide procedures and remedies for a broad range of practices which injure consumers[,]" and is not limited to circumstances where there is no contractual relationship between the parties. *Curran v. Wells Fargo Bank, N. A.*, 2021 WL 6753480, at *8 (D.D.C. Mar. 11, 2021). Regardless of whether a contract exists, courts have refused to dismiss DCCPPA claims where, as here, a defendant has "misrepresent[ed] ... a material fact which has a tendency to mislead[.]" *Id.* (denying motion to dismiss DCCPPA claim where loan servicer misrepresented material facts to borrower).

Here, the CMC alleges that Kaiser not only made material misrepresentations and omissions regarding its safeguarding of Plaintiffs' PII and PHI, but further alleges that Kaiser traded this information for "free" access to Google, Bing, and Twitter's advertising and analytics services (¶¶213-15, 632-33) and further concealed instances where it knew PII and PHI breaches occurred, hiding such breaches from its Members in violation of state and federal laws, and misrepresenting that no PII or PHI was leaked. ¶¶7, 12, 130, 176-80, 424-26. These go well beyond a mere contractual dispute. *Velcoff v. MedStar Health, Inc.*, 186 A.3d 823, 825-26 (D.C. 2018) (finding plaintiff adequately alleged DCCPPA claims based on wrongful disclosure of "sensitive" health information). Where, as here, Plaintiffs have pled additional allegations regarding Kaiser's deceit, concealment, and material misrepresentations and omissions, a DCCPPA claim is properly pled. *Jacobson v. Hofgard*, 168 F. Supp. 3d 187, 193, 199-200 (D.D.C. 2016) (denying in part motion to dismiss DCCPPA claim, which was pled along with breach of contract claim, where defendant engaged in additional conduct, including failing to make truthful representations); *McFadden v. Nationstar Mortg. LLC*, 2022 WL 1001253, at *17 (D.D.C. Apr. 4, 2022) (denying motion to dismiss DCCPPA claim where breach of contract also pled). Indeed, Plaintiffs have been "victimized by [Kaiser's] unlawful trade practices" (Order at 41), and their injury is much more than "contractual disappointment." *Jacobson*, 168 F. Supp. 3d at 199. *See also Velcoff*, 186 A.3d at 825-26.

Kaiser's causation argument is also contrary to the law. It is a violation of the Act to engage in an unfair or deceptive trade practice "whether or not any consumer is in fact misled, deceived, or damaged thereby." D.C. Code § 28-3904. Courts "consider an alleged unfair trade practice in terms of how the practice would be viewed and understood by a reasonable consumer," and how a

reasonable consumer would view such practices "is generally a question for the jury." *Krukas v. AARP, Inc.*, 376 F. Supp. 3d 1, 39 (D.D.C. 2019). A DCCPPA claim arises here, where Kaiser "fail[ed] to state a material fact if such failure tends to mislead" or used "innuendo or ambiguity as to a material fact, which has a tendency to mislead," as engaging in such practices violates the DCCPPA "whether or not any consumer is in fact misled, deceived, or damaged thereby." D.C. Code § 28-3904. Regardless, Plaintiff has adequately alleged a causal connection between Kaiser's conduct and her harm. ¶¶101, 381, 390.

### H. Claim 11: John Doe II Adequately States a Claim for Violation of the GCSPA

Kaiser violated the GCSPA when it acted without authority by installing code on the Site and Apps that permitted Third Party Wiretappers to collect Plaintiffs' private information. ¶¶636-46. Critically, as Kaiser acknowledges, the GCSPA defines "without authority" as including "the use of a computer or computer network ***in a manner that exceeds any right or permission granted by the owner of the computer or computer network***." Ga. Code Ann. § 16-9-92. The CMC plainly alleges that Kaiser exceeded the permissions Plaintiffs granted to Kaiser about how private information on the Site and Apps could be used pursuant to the Terms and Conditions and Privacy Statement, and thus acted "without authority." ¶¶95-104 (Kaiser's Terms and Conditions and Privacy Statement did not disclose Kaiser's placement of third party code), ¶¶361-68, 375-77.[36]

In addition, Plaintiffs have adequately alleged "use" of a computer or computer network to carry out the wrongdoing. While Kaiser placed code on the Site and Apps, and not directly on John Doe II's computer, Kaiser ignores that the CMC alleges this code ***commandeered his computer*** and, without his knowledge, ***directed his computer to send*** his PII and PHI to Third Party Wiretappers. ¶5 ("The third party code that Kaiser has installed on the Site and Apps transmits and redirects the content of Plaintiffs and other Class Members' communications, along with their IP addresses and other unique identifiers, to these Third Party Wiretappers from the very moment that a user first loads Kaiser's Site or opens its Apps, and continues as the user navigates through the website, researching

[36] *FERCO Enters., Inc. v. Taylor Recycling Facility LLC*, 2007 WL 9701361 (N.D. Ga. Oct. 16, 2007) is not to the contrary. In *Ferco*, at summary judgment, the court considered whether an employee using "an employer's computer to send emails to outside parties" was an "unauthorized" use of the employer's computer and found that an "employee is considered to have authorization to access computer files and the computer provided to him by his employer so long as he has an agency relationship with the employer." *Id.* at *30-31.

and sharing sensitive information."); *see also* ¶¶118, 182-88, 197-204, 208-09, 271-95, 315-24, 335-45, 354-60 (data transmitted to Third Party Wiretappers contains PII and PHI).

**I. Claim 13: As Before, Plaintiff Jane Doe III has Stated a MWESA Claim**

In its prior Order, this Court sustained Plaintiff's MWESA claim. Order at 31. Kaiser, in its Second MTD, tellingly did not seek dismissal of this claim and therefore has waived this defense. *See* ECF No. 205; Fed. R. Civ. P. 12(g)(2) ("[A] party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion."); *Bush v. Liberty Life Assurance Co. of Bos.*, 130 F. Supp. 3d 1320, 1326 (N.D. Cal. 2015) (finding arguments waived). Regardless, Kaiser's belated arguments fail.

**1. Jane Doe III has Standing to Pursue a MWESA Claim**

Kaiser wholly ignores Plaintiffs' extensive allegations regarding the type of data being intercepted and transmitted to third parties, misleadingly portraying the data as merely "mouse movements, keystrokes, and URLs of pages visited." Mot. at 25. But, as the CMC makes clear, the interception included Members' names (¶¶136, 282-83), Kaiser ID (¶136), medical test results (¶139), medical conditions (¶¶198-99, 231-33, 277-81, 315-16), prescribed medications (¶¶200, 235-37, 284-87, 317-18), searches for specialists (¶¶201-02, 238-39), 288-93, 319-22), and appointment scheduling (¶¶241-42). Indeed, Kaiser admitted in the April 12 Disclosures, the Third Party Wiretappers received "[redacted] ¶9. Kaiser further admitted this information [redacted]. *Id.* This sensitive medical information plainly implicates the privacy interest which the Ninth Circuit has held is sufficient to confer Article III standing. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 599.

Kaiser's reliance on inapposite cases involving less sensitive websites or where the plaintiffs failed to plead the specific information intercepted do not support dismissal here. *See Hernandez v. Noom, Inc.*, 2023 WL 8934019, at *8 (D. Md. Dec. 27, 2023) (no allegations regarding specific information captured); *Straubmuller v. Jetblue Airways Corp.*, 2023 WL 5671615, at *4 (D. Md.

Sept. 1, 2023) (merely alleging airline website "*could* capture personal information, not that it actually" did). And, to the extent that Kaiser argues that the CMC lacks allegations specific to Jane Doe III, the CMC makes clear that all Kaiser members were exposed to the same interceptions when interacting with the Site and Apps (¶¶138, 140, 157, 203-04, 240, 243-44, 294-95, 323-24) and this Court already rejected this same argument. Order at *4 (N.D. Cal. Apr. 11, 2024) ("It is plausibly alleged that, so long as the other Plaintiffs used the website and mobile applications, their information was treated similarly as John Doe's and Jane Doe's … it may reasonably be inferred that the same policies or practices applied to all Kaiser plan members."). Jane Doe III plainly has standing to allege a claim under MWESA.

**2. The Electronic Communications are Within the Scope of MWESA**

MWESA defines "Electronic communication" broadly to encompass "***any*** transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system." Md. Code Ann., Cts. & Jud. Proc. § 10-401(5)(i). The Ninth Circuit has explained in the context of the ECPA that "[t]he paramount objective of the Wiretap Act is to protect effectively the privacy of communications." *Joffe v. Google, Inc.*, 746 F.3d 920, 931 (9th Cir. 2013). And not only is MWESA modeled after the ECPA, but the "State Legislature unequivocally has demonstrated its intent to create an Act ***more*** protective of privacy interests than that which is promoted" by the ECPA. *Schmerling v. Injured Workers' Ins. Fund*, 795 A.2d 715, 722 (Md. 2002). Accordingly, Maryland courts have held that "the plain language of the statute itself is straightforward and provides a legal foundation" for claims alleging disclosure of "personally identifiable, private data related to patients' medical care." *Doe v. Medstar Health, Inc*, 2020 Md. Cir. Ct. LEXIS 139, at *5 (Md. Cir. Ct. Aug. 5, 2022). Similarly, the Ninth Circuit has upheld ECPA claims alleging similar interceptions. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 607 (considering GET requests to be communications under ECPA). Kaiser relies on inapposite cases which predate the amendment of the MWESA to include "Electronic communications," and are irrelevant regarding the scope of the Act's current protections. *See State v. Maddox*, 69 Md. App. 296, 301 (1986); *Benford v. Am. Broad. Cos.*, 554 F. Supp. 145, 151 (D. Md. 1982). Similarly, *Holmes v. State* specifically deals with interception of *oral communications*

under the Act, not the electronic communications at issue here. 182 A.3d 341, 348 (Md. Ct. Spec. App. 2018). Kaiser's claimed limitation plainly conflicts with the statute's text and purpose, and should be rejected.

**3. Plaintiff's Electronic Communications Were "Intercepted"**

As alleged in the CMC, when Members interacted with the Site and Apps, "[t]he Third Party Wiretappers intentionally intercepted and used the contents of Plaintiff's and Maryland Sub-Class Members' electronic communications." ¶675. Kaiser's attempt to constrain the expansive definition of "Intercept" under MWESA, which broadly covers the "acquisition of the contents of any [electronic communication] through the use of ***any*** electronic, mechanical, or other device," fails. Md. Code Ann., Cts. & Jud. Proc. § 10-401(10). Courts in this Circuit—including this Court—have held that technologies like those at issue here "intercept" electronic communications under wiretap statutes. *James*, 701 F. Supp. 3d at 962 (explaining that once the technology is on a user's device "it *then* begins to intercept communications *when the user makes communications to the website*"); *India Price v. Carnival Corp.*, 712 F. Supp. 3d 1347, 1360 (S.D. Cal. 2024) ("Drawing all reasonable inferences in favor of Plaintiffs, the Court finds that Plaintiffs have plausibly alleged that interception occurs contemporaneously with transmission."); *see also Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121, 125-26 (3d Cir. 2022) (noting that in the wiretap context interception has a "broader connotation than the ordinary meaning"). As the Ninth Circuit explained:

> When an individual internet user visits a web page, his or her browser sends a message called a "GET request" to the web page's server. The GET request serves two purposes: it first tells the website what information is being requested and then instructs the website to send the information back to the user. The GET request also transmits a referer header containing the personally-identifiable URL information. Typically, this communication occurs only between the user's web browser and the third-party website. On websites with Facebook plug-ins, however, Facebook's code directs the user's browser to copy the referer header from the GET request and then send a separate but identical GET request and its associated referer header to Facebook's server. It is through this duplication and collection of GET requests that Facebook compiles users' browsing histories.

*In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 607.

Here, Plaintiffs allege "the collection without consent of Plaintiffs' information ... contemporaneously with its ordinary transmission." *India Price*, 712 F. Supp. 3d at 1359; *see also* ¶670 ("Third Party Wiretappers, through the source code Kaiser Permanente embedded and ran on

its website, contemporaneously and intentionally intercepted, and endeavored to intercept Plaintiff's and Maryland Sub-Class Members' electronic communications without authorization or consent."). Kaiser's inapposite cases are unrelated to the definition of "interception," and do not compel a different result. *See Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 955 (N.D. Cal. 2017), *aff'd*, 745 F. App'x 8 (9th Cir. 2018) (holding that court lacked personal jurisdiction over certain defendants and that plaintiffs had consented to interception); *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d at 142 (applying ECPA party exception).

### 4. Plaintiffs Allege that the Content Was Intercepted

MWESA defines "Contents" to include "any information concerning ***the identity of the parties*** to the communication or the ***existence***, substance, purport, or meaning of that communication." Md. Code Ann., Cts. & Jud. Proc. § 10-401(4). The CMC clearly alleges the disclosure of Members' identifiable information to Third Party Wiretappers—a fact conceded in the April 12 Disclosures. ¶136 (disclosing name and Kaiser ID); ¶¶184-88 (describing Adobe identifiers which "specifically identify users"), ¶¶231-37 (describing Twitter identifiers which "pertain[]specifically" to Plaintiffs to "match[]" to "advertising profile[s]"), ¶257 (describing Google's collection of IP addresses and use of "a unique identifier for advertising"), ¶¶271-76 (describing Plaintiffs' identifying information collected by Google), ¶¶309-14 (describing Bing's collection of MUID individual identifier from Kaiser Members). Moreover, while Kaiser seeks to trivialize the information intercepted, claiming it is mere record information, the CMC specifically alleges interception of sensitive PHI—far different from generic "record information."

Such allegations are more than sufficient at the pleading stage. *See Medstar Health*, 2020 Md. Cir. Ct. LEXIS 139, at *3-4. And while Kaiser relies on a transcript of a subsequent decision in *Medstar Health*, that decision was issued at ***summary judgment*** where the court specifically noted that the plaintiff had failed to show "any information about any particular disorder that this individual had, any other healthcare information."[37] Deagle Decl. Ex. C, at 128:18-20. By contrast, here the

[37] Kaiser's other inapposite authority, interpreting different statutes, fares no better. In *Cook v. GameStop, Inc.*, the plaintiff entirely failed to allege "the type of information allegedly captured." 689 F. Supp. 3d 58, 69 (W.D. Pa. 2023); *see also Jacome v. Spirit Airlines Inc.*, 2021 WL 3087860, at *4 (Fla. Cir. Ct. June 17, 2021) (failing to allege specific content intercepted). Even further afield are Kaiser's cited cases involving motions to quash subpoenas to internet service providers by

CMC details specific information regarding Plaintiffs' healthcare intercepted by Third Party Wiretappers. *See, e.g.,* ¶¶199, 232, 277, 315 (kidney stones diagnosis); ¶¶236, 284, 317-18 (prescription for Omeprazole 20mg); ¶355 (mammogram).

Indeed, the Ninth Circuit has contrasted cases where "users had communicated with the website by entering their personal medical information" with those involving mere record information. *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1107 (9th Cir. 2014). Courts in this Circuit have held that such substantive information is sufficient to invoke the protections of wiretapping statutes. *India Price*, 712 F. Supp. 3d at 1361 ("The Court finds that Plaintiffs have alleged the capture of personally identifiable information that is the subject of the communication, and thus Plaintiffs have sufficiently alleged the interception of 'contents.'"); *James*, 701 F. Supp. 3d at 956 (holding that interception of "information about the webpages they viewed and searches they conducted" sufficiently alleged interception of contents); *Brown v. Google LLC*, 685 F. Supp. 3d 909, 935 (N.D. Cal. 2023) (holding that "users' IP addresses, referers, user-agents, HTTP requests, users' actions on a website, and their search queries" are contents); *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 518 (C.D. Cal. 2021) (plaintiff alleged interception of contents where they alleged interception of *inter alia* "keystrokes and a video of Plaintiff's interactions"); *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 605 ("The URLs, by virtue of including 'the particular document within a website that a person views' reveal 'much more information' ... Plaintiffs allege that the URLs in the instant case could emanate from search terms inputted into a third-party search engine. These terms and the resulting URLs could divulge a user's personal interests, queries, and habits[.]").[38]

### 5. The Third Party Wiretappers' Code is a Device Under MWESA

Under MWESA, an "Electronic, mechanical, or other device" includes "***any*** device ***or***

---

defendants accused of copyright infringement. In these cases, the subpoenas sought information contained in the ISP's customer records—not the contents of an intercepted communication. *See CineTel Films, Inc. v. Does 1-1, 052*, 853 F. Supp. 2d 545, 556 n.6 (D. Md. 2012); *Patrick Collins, Inc. v. Does 1-22*, 2011 WL 5439005, at *5 (D. Md. Nov. 8, 2011). *In re § 2703(d)*, involving the government's request for Twitter account information under the Stored Communications Act, is similarly inapplicable. 787 F. Supp. 2d 430, 436 (E.D. Va. 2011).

[38] Kaiser's argument that the rule of lenity should be employed to undermine the objectives of and narrow the protections afforded by MWESA should also be rejected. *See James*, 701 F. Supp. 3d at 960 (finding "this argument is not particularly compelling" where the statute "uses broad language and engaging in a 'hyper-technical reading of the statute' is inconsistent with what is presumably the purpose of the statute, *i.e.*, to 'prohibit unauthorized artificial interception of communication in an era of changing technologies.'").

***electronic communication***." Md. Code Ann., Cts. & Jud. Proc. § 10-401(8). As the Maryland Court of Appeals has explained, by defining this term so broadly "the ***default rule*** is that the device is an intercepting device forbidden by the Maryland Wiretap Act." *Schmerling*, 795 A.2d at 722. This Court, applying a similarly broad definition under Pennsylvania's Wiretapping and Electronic Surveillance Control Act, rejected the identical argument that software cannot constitute a device under such statutes. *James*, 701 F. Supp. 3d. at 957-58 (explaining that this argument "ignores the fundamental fact that, in order for software to work, it must be run on some kind of computing device"); *see also In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1087 (N.D. Cal. 2015) (Chen, J.) ("Software is an '[e]lectronic, mechanical, or other device' which 'can be used to intercept a wire, oral, or electronic communication.'"). Indeed, contrary to Kaiser's claim, "[t]he majority of courts to consider this issue have entertained the notion that ***software may be considered a device*** for purposes of the Wiretap Act."[39] *Gladstone v. Amazon Web Servs., Inc.*, 739 F. Supp. 3d 846, 856 (W.D. Wash. 2024) (quoting *Hutchins*, 361 F. Supp. 3d at 795); *see also Tate v. VITAS Healthcare Corp.*, 2025 WL 50447, at *6 (E.D. Cal. Jan. 8, 2025) (holding that software is a device under CIPA); *Doe*, 690 F. Supp. 3d at 1080 (following *In re Carrier IQ*).[40]

**6. Plaintiffs are Not Pursuing Claims Under MWESA Section 10-402(d)(1)**

Plaintiffs are not separately pursuing liability under MWESA Section 10-402(d)(1).

**J. Claim 15: Jane Doe IV and Sutter State a Claim for Violation of the VCCA**

The CMC contains numerous factual allegations supporting a reasonable inference that Kaiser acted "with malicious intent, or through intentionally deceptive means and without authority" and

[39] The cases on which Kaiser relies are either outliers or inapposite. The holding in *Potter v. Havlicek* is contrary to the weight of the authority. 2008 WL 2556723, at *8 (S.D. Ohio June 23, 2008); *see also United States v. Hutchins*, 361 F. Supp. 3d 779, 794 (E.D. Wis. 2019) ("The *Havlicek* court did not cite any cases directly in support of its conclusion, and this Court finds its definitional logic faulty: computers, alone, also cannot be used to intercept communications. They require some software or program installed in order to have this capability."). *Ultimate Outdoor Movies, LLC v. FunFlicks, LLC*, involving a business licensing dispute, simply held that the intended destination of a properly addressed email is not a "device" under ECPA—particularly where, pursuant to the parties' prior settlement, the defendant had the right to control the email address in question. 2019 WL 2233535, at *21 (D. Md. May 23, 2019). Finally, *United States v. Ackies*, considered the definition of *tracking device* under the ECPA. 918 F.3d 190, 199 (1st Cir. 2019); *see also infra* note 40.

[40] Kaiser's specious argument that the software at issue here is excluded as a "tracking device" should be rejected. Such devices are used to track the "physical location of any person or property." *United States v. Henderson*, 906 F.3d 1109, 1114 (9th Cir. 2018). Kaiser's ***own authority*** recognizes as much. *See Ackies*, 918 F.3d at 199. Indeed, Maryland law has a separate provision governing location information obtained from electronic devices. *See* Md. Code Ann., Crim. Proc. § 1-203.1.

therefore violated the VCCA. Va. Code Ann. § 18.2-152.4. First, the VCCA defines "without authority" as acting in a manner in which the individual "know[s] that he has no right, agreement, or permission" to act or acting "in a manner knowingly exceeding such right, agreement, or permission." Va. Code Ann. § 18.2-152.2. As with the GCSPA, the CMC contains numerous factual allegations demonstrating that, by knowingly installing the Third Party Wiretappers' code, Kaiser acted in a manner "exceeding" the rights, agreements, and/or permissions Members gave Kaiser when they agreed to the Terms and Conditions and Privacy Statement. ¶¶95-104, 361-68.[41] Indeed, had those disclosures been sufficient, [redacted]. ¶8.

Second, the CMC plainly alleges Kaiser's malicious intent and/or intentional deception. ¶¶130, 176-80, 424-26; *see also infra* Section IV.P. Kaiser's conduct and continued concealment during this litigation further confirms its malicious and intentionally deceptive behavior. *See id.*; ¶14.

Third, as set forth above, the CMC alleges Kaiser knowingly permitted the Third Party Wiretappers to use the private information collected via the code on the Site and Apps. *See supra* Section II.A.

Fourth, Kaiser's argument that it cannot use its own computer or computer networks without authority is misguided. The focus of this litigation is not on how Kaiser used its own computer and/or computer networks, but rather, on the fact that Kaiser installed the code—as described above with respect to the GCSPA—to wrongfully record and transmit information from Members' computers to the Third Party Wiretappers. *See supra* Section IV.H.

**K. Claim 18: Jane Doe Sufficiently Alleges Violation of the Washington Privacy Act**

Jane Doe has sufficiently alleged that her communications with her healthcare providers, including messages sent via the Message Center, are among the communications intercepted. ¶¶42-43, 91-92, 129, 144. This Court previously held that Jane Doe ***had in fact*** sufficiently alleged communications between two or more individuals based on the interception of her messages with

[41] Kaiser's citation to *Se. Wholesale Corp. v. Cox Commc'ns Hampton Roads, LLC*, 2013 WL 2147478, at *5 (E.D. Va. May 14, 2013) in misplaced. In *Wholesale*, plaintiffs sued defendant for prematurely porting a toll-free number used by plaintiff in violation of the terms of a contract. *Id*. at *1. The court concluded that plaintiff could not assert a VCCA claim by simply alleging that "[d]efendants used a computer to 'wrongfully' port the toll-free number" and there were no allegations, like there are here, that defendant placed code on its website which surreptitiously collected information about the plaintiffs on their computers. *See id*. at *6-7. *Wholesale* is irrelevant here.

healthcare providers. Order at 35. Kaiser's reliance on a Washington trial court's grant of ***summary judgment*** on an ***identity theft statute*** claim—which contains no details as to the plaintiffs' factual allegations—cannot be more "directly on point" than this Court's own decision, nor does it apply the proper standard. Mot. at 34 (citing *Doe v. Virginia Mason Med. Ctr.*, 2024 WL 3517759, at *5 (Wash. Super. June 06, 2024)). This court did not previously hold that, as a party to the communication, Kaiser cannot be held liable under the WPA. Rather, the Court merely held that Plaintiff at the time had not sufficiently pled that the third parties collected and/or used their information for their own purposes. Order at 54 ("But even if the third parties are Kaiser's agents, that does not detract from Kaiser's status as a party to the communication if what was done was pursuant to Kaiser's directive. If anything, this simply takes the Court back to the question of whether Kaiser can be held liable for hiring a third party to do work that Kaiser could have legally done itself."). Indeed, the WPA plainly prohibits the interception or recording of a communication "***without first obtaining the consent of all the participants in the communication.***" Wash. Rev. Code § 9.73.030. Whether Kaiser was a party to the communications is irrelevant because it placed code on the Site and Apps that created a copy of Members' communications with Kaiser, which were shared with the Third Party Wiretappers without Members' consent. ¶¶155-61, 170-77, 239-63, 281-90, 299-309, 316-20.

Notably, in *State v. Kipp*, 317 P.3d 1029, 1036 (Wash. 2014) (en banc), the Supreme Court of Washington held that the WPA is implicated where, as here, one party to a communication recorded the communication without the consent of the other party. The *Kipp* court noted that "[g]enerally, the [WPA] is implicated when one party records a conversation without the other party's consent" and held that because one party had a "subjective and reasonable expectation of privacy as he was speaking ... the recording violated the [WPA]." *Id.* at 1031-36. As in *Kipp*, here, the non-consenting parties to the communication (Members) reasonably believed that the information they shared with their healthcare provider, including PII and PHI, in password protected Site and Apps, was private. *See, e.g.*, *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d at 800 (finding plaintiffs "had an objectively reasonable expectation that their communications with their medical providers were confidential based on the laws and regulations protecting the confidentiality of medical information"). Thus, Kaiser's placement of the code, which surreptitiously intercepted and/or

recorded these private communications, violates the WPA. *Kipp*, 317 P.3d at 1036

Further, this case is distinguishable from Kaiser's only cited authority, *Hoang v. Amazon.com, Inc*., 2012 WL 1088165, at *1 (W.D. Wash. Mar. 30, 2012), which predates *Kipp*. In *Hoang*, plaintiff alleged that defendant misused information she voluntarily provided it—the WPA was not implicated because there was no interception or recording at issue.[42] *See* 2012 WL 1088165, at *1. Additionally, contrary to Kaiser's contention otherwise, here unlike in *Hoang*, there are well-pled allegations of the Third Party Wiretappers' use of the information that was impermissibly intercepted and/or recorded. ¶¶8, 94-96, 134-36, 155-56, 184-85, 188, 314-15; *see also supra* Section II.A. Here, Plaintiffs have sufficiently alleged that Kaiser's placement of code on the Site and Apps, which intercepted and/or recorded their private communications, falls within the broad ambit of the WPA, and the Court should not dismiss this claim. *State v. Roden*, 321 P.3d 1183, 1185 (Wash. 2014) (en banc) (noting the WPA "broadly protects individuals' privacy rights" and is "one of the most restrictive electronic surveillance laws ever promulgated").

### L. Claim 19: Jane Doe Sufficiently Alleges Violation of the Washington HCIA

Having omitted this defense from its prior 12(b)(6) motion, Kaiser's renewed challenge to Jane Doe's Washington Health Care Information Act ("HCIA") claim has been waived. *See* Fed. R. Civ. P. 12(g)(2); *Bush*, 130 F. Supp. 3d at 1326. Regardless, Jane Doe's HCIA claim is sufficient.

The HCIA defines "Health care information" as "any information ... that identifies or can readily be associated with the identity of a patient and directly relates to the patient's health care." Wash. Rev. Code § 70.02.010(17). Jane Doe alleges specific information regarding the disclosure of information which directly relates to the care, service, and procedures she has received from Kaiser, including her restless leg syndrome diagnosis (¶356), as well as information disclosing a shoulder X-Ray and a mammogram (¶¶354-55); *see also* ¶¶139, 198-99, 200, 201-02, 231-33, 235-37, 241-42, 277-81, 284-87. Indeed, [redacted]. ¶¶8-9, 44. Because Jane Doe has pled disclosure of information that can readily be associated with her identity and relates to her health care, she has stated a claim under the HCIA.

[42] Kaiser, the party that permitted the unlawful recording and/or interception of Plaintiffs' private communications on the Site and Apps, violated the WPA and is unquestionably a proper defendant.

### M. Plaintiffs Have Alleged Violations of the State Data Breach Notification Statutes

On April 12, 2024—one day after this Court ruled on Kaiser's first Motion to Dismiss—Kaiser [redacted] ¶¶8-12. [redacted]. Graden Decl., Ex. A [redacted]

Amazingly, Kaiser now represents that, [redacted], no such breach occurred. Mot. at 37-40. This argument strains credulity.

#### 1. Claim 20: Jane Doe II Properly Pleads Kaiser Violated the DC Breach Notification Statute and DCCPPA

Kaiser's assertion that there was no plausible "data breach that would require it to comply with the notification requirements of the statute" is belied by Kaiser's own actions and admissions. Mot. at 37. First, while Kaiser now argues that no "unauthorized" access occurred, [redacted] Graden Decl., Ex. A. Kaiser cites certain legislative history and claims that the DCCPPA only applies to undefined "hacking," but the DCCPPA does not confine its coverage to hacking, however that term is defined. Rather, the plain text of the statute defines "Breach of the security of the system" to mean the "unauthorized acquisition of computerized or other electronic data ... or integrity of personal information." D.C. Code § 28-3851(1)(A). Indeed, the same legislative history cited by Kaiser recognizes that the DCCPPA was intended to protect not only against "hacking" by malicious actors, but also protect against broader privacy breaches such as the

"Cambridge Analytica personal privacy breach" where Facebook leaked DC residents' personal information.[43] Deagle Decl. Ex. D-3. Here, the CMC plainly alleges the unauthorized acquisition of Members' data of the sort covered by the DCCPPA. ¶¶95-104, 361-68, 375-77. And, [redacted]. Graden Decl., Ex. A. Moreover, while now casting its notice as voluntary, Kaiser previously admitted that it was required to notify D.C. residents "in the most expedient time possible and without unreasonable delay" and that failing to do so violates the District of Columbia Consumer Breach Notification Act, D.C. Code §§ 28-3851, *et seq.* ("DC Breach Notification Statute") and the DCCPPA. ECF No. 205 at 25.[44]

Kaiser's argument that the PHI disclosed is not "personal information" also has no merit and not surprisingly, Kaiser cites no supportive caselaw for its flawed argument. Under the DCCPPA, "personal information" includes, *inter alia*, an individual's first name, first initial, and last name, ***or*** any other personal identifier, which, when combined with any of the seven data elements listed in the statute, can be used to identify a person or their information. D.C. Code § 28-3851(3)(A)(i). One of the enumerated data elements is "medical information" which is broadly defined as "***any*** information about a consumer's dental, medical, or mental health treatment or diagnosis by a health-care professional." D.C. Code § 28-3851(1B). *See also* ¶758. As the CMC alleges, Kaiser disclosed Jane Doe II's and D.C. Class Members' "[redacted]. ¶¶8-9, 758-61. And, [redacted]. ¶¶29, 34, 39, 44, 49, 54, 59, 64, 69. Indeed, [redacted]

---

[43] As the article cited in the legislative history explains, nearly half of D.C.'s population was exposed to the Cambridge Analytica "***personal privacy breach***" in which "345,652 people may have had their information ***improperly shared*** with Cambridge Analytica." Mike Valerio, *Facebook: Half of DC potentially exposed to Cambridge Analytica hack*, WUSA9 (May 3, 2018), https://www.wusa9.com/article/news/local/dc/facebook-half-of-dc-potentially-exposed-to-cambridge-analytica-hack/65-548466144; *see also* Deagle Decl. Ex. D-3 at n.7.

[44] *Solomon v. Allstate Prop. & Cas. Ins.*, in which pro se litigants alleging improper distribution of information they produced in discovery raised the D.C. statute for the first time in their opposition brief, does not compel a different result. 2024 WL 4346264, at *3 (D.D.C. Sept. 29, 2024).

[redacted] ¶9. Accordingly, it is disingenuous for Kaiser to assert that no "personal information" was shared.

**2. Claim 21: Jane Doe III Sufficiently Alleges MPIPA and MCPA Violations**

Plaintiff Jane Doe III similarly plausibly alleges that Kaiser failed to timely notify her and other Maryland Class Members of the third party disclosures in violation of the Maryland Personal Information Protection Act, Md. Code Ann., Com. Law §§ 14-3501, *et seq.* ("MPIPA"), which is a violation of the Maryland Consumer Protection Act, Md. Code Ann., Com. Law §§ 13-101, *et seq.* ("MCPA"). ¶¶768-79; Md. Code Ann., Com. Law § 14-3504(c).

As with the other breach statutes, Plaintiff adequately alleges the "unauthorized acquisition of computerized data that compromises the ... integrity of the personal information maintained." Md. Code Ann., Com. Law § 14-3504(a)(1); *see also* ¶¶95-104, 361-68, 375-77. Indeed, [redacted] Graden Decl., Ex. B. The information disclosed clearly falls within MPIPA's statutory definition of personal information, which is defined broadly to include a person's first name or first initial and last name in combination with any one or more of the listed data elements, among which are "[h]ealth information, including information about an individual's mental health." Md. Code Ann., Com. Law § 14-3501(e)(1). As discussed *supra* in Section II.A, the CMC alleges that names and health information were disclosed by Kaiser. *See, e.g.*, ¶¶139-49, 189, 197-204, 228-43, 271-94, 209-24, 290-93, 335-42, 354-58. Indeed, [redacted] ¶9.

**3. Claim 22: Jane Doe Adequately Alleges a Washington Data Breach Act Violation**

Kaiser's identical challenges to Jane Doe's Washington Data Breach Act claim should also be rejected. As with the other statutes, Plaintiff adequately alleges the "unauthorized acquisition of data that compromises the … integrity of personal information." Wash. Rev. Code § 19.255.005(1). The information Kaiser disclosed to third parties—[redacted]—plainly fall within the

Washington Data Breach Act's broad definition of "Personal Information." ¶¶8-9; Wash. Rev. Code § 19.255.005(2)(a)(i)(H) (defining "Personal Information" as an individual's first name or first initial and last name combined with "***[a]ny*** information about a consumer's medical history or mental or physical condition or about a health care professional's medical diagnosis or treatment of the consumer"). And, [redacted] Graden Decl., Ex. C.

**N. Plaintiffs Adequately Alleges All Defendants' Involvement**

The CMC alleges that Hospitals and KPWA were involved in the development and/or operations of the Site and Apps. ¶¶73-76. With the benefit of limited discovery, [redacted].[45] *Id.* Discovery has also revealed that [redacted] ¶393 ([redacted]. ¶¶76, 94. Indeed, Kaiser belatedly revealed an undisclosed, and unsearched repository of documents reflecting KPWA actions on the Site and Apps. *See* ECF No. 211. While further discovery will provide details regarding the role of each entity, Plaintiffs' allegations are sufficient to show Hospitals' and KPWA's involvement in these privacy violations.[46]

[45] Kaiser's reliance on inapposite cases regarding breach of contract is unavailing. Plaintiffs' claims—even those that sound in contrast—do not arise from the performance of the contracts between Hospitals, KPWA, and the Third Party Wiretappers. Instead, [redacted]

[46] *See Pereda v. Gen. Motors LLC*, 2022 WL 19975388, at *10 (N.D. Cal. Dec. 9, 2022) ("[W]here the defendants are entities that 'largely hold the same role,' courts have declined to dismiss for inappropriate grouping."). Indeed, Plaintiffs "cannot be expected to know the exact corporate structure and degree of each Defendant's involvement, at this stage in the litigation and prior to discovery." *Id.* (quoting *In re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160, at *9 (D.N.J. May 8, 2017)). [redacted], not mere communications with these other entities through the Site and Apps, which this Court previously found insufficient. Order at 9 (dismissing claims against Hospitals and The Permanente Medical Group where there was "no indication that the health care providers[] ... had anything to do with how the website and mobile applications are run").

**O. There is no Basis to Strike Plaintiffs' Tolling Allegations**

Kaiser cannot satisfy the high burden to strike Plaintiffs' tolling allegations. Motions to strike "are generally disfavored because they are often used as delaying tactics and because of the limited importance of pleadings in federal practice," and should only be granted where "the matter to be stricken clearly could have no possible bearing on the subject of the litigation." *Free Speech Sys., LLC v. Menzel*, 390 F. Supp. 3d 1162, 1169 (N.D. Cal. 2019). Here, Plaintiffs have properly alleged tolling under the discovery rule.

As alleged in the CMC, Plaintiffs had a reasonable expectation of privacy in their communications and activities on the Site and Apps. ¶¶378-81. This expectation was, in part, based on Kaiser's representations in the Privacy Statement and other assurances made to Members. ¶¶100-02. Plaintiffs accordingly lacked a reasonable opportunity to discover Defendants' conduct. ¶377. Kaiser, by contrast, possessed superior and exclusive knowledge of the conduct at issue. ¶423. [redacted]. ¶¶424-25; *see also* ¶¶107, 130, 176-81. Indeed, despite declaring in this litigation that it had confirmed that Third Party Wiretappers were receiving PHI in October 2023, Kaiser waited to disclose this breach, as required by law, for six months. ¶¶14-15. Even with the exercise of due diligence, Plaintiffs could not have "discovered the full scope of Kaiser's [mis]conduct because the incorporation of the Third Party Wiretappers' code is highly technical and there were no disclosures." ¶427. *See Doe 1 v. Univ. of S.F.*, 685 F. Supp. 3d 882, 900-01 (N.D. Cal. 2023) ("Courts apply the discovery rule in situations where the injury is difficult to detect, and the defendant has superior knowledge of the injury and reason to think that the plaintiff is unaware of it.").[47]

While Plaintiffs were able to uncover Kaiser's conduct, as alleged in the prior complaints, Kaiser vociferously denied the allegations and hid this conduct from its patients until after the initial

[47] Kaiser's inapposite cases where the plaintiffs' claims were ***already*** barred by the statute of limitations do not compel a different result. *See Bettles v. Toyota Motor Corp.*, 645 F. Supp. 3d 978 (C.D. Cal. 2022); *Vargas v. JP Morgan Chase Bank, N.A.*, 30 F. Supp. 3d 945 (C.D. Cal. 2014); *Plumlee v. Pfizer, Inc.*, 2014 WL 695024 (N.D. Cal. Feb. 21, 2014); *Abels v. Bank of Am., N.A.*, 2012 WL 691790 (N.D. Cal. Mar. 2, 2012). Nor do Kaiser's cases where the plaintiff failed to allege the defendant concealed the conduct. *May v. Google LLC*, 2024 WL 4681604, at *10 (N.D. Cal. Nov. 4, 2024); *Kay v. Wells Fargo & Co. N.A.*, 2007 WL 2141292, at *6 (N.D. Cal. July 24, 2007).

decision on the motion to dismiss. ¶¶8-15. This deception belies Kaiser's arguments that tolling is inappropriate. *See, e.g.*, *Brewer v. Indymac Bank*, 609 F. Supp. 2d 1104, 1118 (E.D. Cal. 2009); *Henderson v. J.M. Smucker Co.*, 2011 WL 1050637, at *2 (C.D. Cal. Mar. 17, 2011). The Court should not strike Plaintiffs' tolling allegations.

**P. There is no Basis to Strike Plaintiffs' Claim for Punitive Damages**

The CMC is replete with allegations regarding Kaiser's knowing and willful disclosure of Plaintiffs' PII and PHI, in direct contradiction of its express and implied promises to keep such information private, and its deliberate choice to conceal these disclosures. These allegations demonstrate fraud and/or malice, which support Plaintiffs' claim for punitive damages.[48]

First, Plaintiffs have adequately alleged entitlement to punitive damages pursuant to California law,[49] which permits punitive damages when a defendant is "guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294. Kaiser "allowed the tracking and disclosure of [] Members' individually identifying personal information, PHI, other personal and sensitive health information, and private, sensitive and confidential communications with Kaiser and its providers to Third Party Wiretappers" (¶¶103-05) in willful and blatant disregard for its legal obligations not to disclose such information. ¶¶4, 7, 17-21, 246, 298, 327, 426; *see also* ¶¶134-35, 151, 159, 163-64, 211, 215, 218, 226-27, 297-300, 308, 329, 343, 361-69, 390-418, 598, 604, 616, 633, 679-81, 688-90.

Indeed, Kaiser permitted the Third Party Wiretappers to access Plaintiffs' PHI even though they knew, or should have known, that they were failing to comply with applicable statutes and common law duties. ¶¶7, 106, 206, 251, 303, 332, 347, 360. Despite these obligations, Kaiser knowingly provided the Third Party Wiretappers access to this highly sensitive information.

Similarly, Kaiser repeatedly concealed and chose not to notify regulators and Members when it knew that PII and PHI was wrongfully disclosed. ¶¶14, 130, 176-80. Further, [redacted] ¶424, [redacted]

[48] Plaintiffs are seeking punitive damages for: negligence, CMIA, DCCPPA, MWESA, OUTPA, and DC Breach Notification Statute.

[49] Kaiser asserts that because "courts apply the punitive damages law of the forum state" California law applies to all of Plaintiffs' punitive damages requests (Mot. at 43 n.13) and has waived any argument that the punitive damages laws of any other state should apply. *See Rivas Rosales v. Barr*, 2020 WL 1505682, at *9 (N.D. Cal. Mar. 30, 2020) (Chen, J.).

[redacted] ¶426; *see also* ¶¶13, 107, 130-31, 179-80, 424-26.

Moreover, Kaiser's malicious and/or intentionally deceptive conduct has continued throughout this litigation. Unapologetically, Kaiser admits to investigating the claims soon after this lawsuit was filed, and asserts in public documents that by October 2023 it had confirmed Plaintiffs' allegations that the code installed on the Site and Apps transmitted PII and PHI to third parties, yet "***Kaiser waited nearly six months*** to notify the regulators of its finding." ¶14. In a clear effort to deprive the Court from considering this information while Kaiser's Motion was pending, this disclosure was made on April 12, one day after the Court issued its Order. ¶¶8, 14-15, 107. *See Ross v. AT&T Mobility, LLC*, 2020 WL 9848766, at *18 (N.D. Cal. May 14, 2020) (finding request for punitive damages adequately supported by allegations that defendant failed to abide by "rules and regulations [that required defendant] to protect customers'... sensitive information," and "promises, including in its privacy policy, that it would protect its customers' information."); *ExxonMobil Oil Corp. v. S. Cal. Edison Co.*, 2013 WL 12166214, at *3 (C.D. Cal. May 1, 2013) (denying motion to dismiss request for punitive damages where plaintiff alleged that defendant acted in "conscious disregard of its obligations and promises").

Second, Kaiser's assertion that an officer, director, or managing agent must ratify the conduct to support punitive damages is unfounded. Courts have rejected similar arguments, finding "allegations [which] are sufficient to raise the inference" that the malice and/or fraud alleged in the complaint "occurred as a result of" acts "at the level of officer, director, or managing agent" are sufficient to support punitive damages allegations.[50] Importantly, "[a] plaintiff need not produce a smoking memorandum signed by the CEO and Board of Directors to satisfy [the] 'managing agent' requirement." *In re Toy Asbestos*, 2021 WL 1884647, at *2 (N.D. Cal. May 10, 2021). Regardless, Plaintiffs have asserted allegations which sufficiently "raise the inference" that Kaiser's wrongful

[50] *See, e.g.*, *Ross*, 2020 WL 9848766, at *18; *Willis v. Buffalo Pumps Inc.*, 34 F. Supp. 3d 1117, 1133 (S.D. Cal. 2014); *ExxonMobil Oil Corp.*, 2013 WL 12166214, at *3.

conduct occurred "at the level of officer, director, or managing agent." *Ross*, 2020 WL 9848766, at *18. Indeed, the harms Plaintiffs allege are a result of Kaiser's corporate conduct, which center on its decision to install third party code on the Site and Apps that discloses Members' PII and PHI. ¶5, 391. Some of the pertinent code was installed pursuant to contracts entered into between Kaiser and the Third Party Wiretappers, and there are no allegations or assertions that a rogue employee was responsible. *See* ¶¶74, 126-27, 175, 265. Kaiser cannot plausibly argue that someone other than an individual with "discretionary authority over significant aspects of a corporation's business" was able to approve the negotiation and execution of contracts with Third Party Wiretappers and the installation of code on the Site and Apps. *Colucci v. T-Mobile USA, Inc.*, 262 Cal. Rptr. 3d 50, 58 (Cal. Ct. App. 2020). These allegations support an inference that high-level officials within Kaiser were involved in the malicious and/or fraudulent conduct alleged.[51]

### Q. Further Leave to Amend Would Not be Futile

Discovery is still at an early stage and, because Kaiser has not challenged several of Plaintiffs' claims, this case will go forward regardless of how the Court rules on Kaiser's Motion. Accordingly, to the extent the Court believes that Plaintiffs have not plausibly alleged a violation of a particular claim or party's involvement, further discovery may reveal additional evidence supporting such claims. As such, further amendment would not be futile. *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 574 (9th Cir. 2020); *Barrett v. Apple Inc.*, 523 F. Supp. 3d 1132, 1149 (N.D. Cal. 2021).

## V. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court deny Defendants' Motion.

---

[51] Kaiser relies on inapposite cases. *Wilson v. S. Cal. Edison Co.*, 234 Cal. App. 4th 123, 165 (2015) (a post-trial appeal where the *only* evidence of managing agents' involvement in the allegedly wrongful conduct was "in the context of [defendant] attempting to mitigate it"); *Grimberg v. United Airlines, Inc.*, 2023 WL 3431912, at *4 (C.D. Cal. Feb. 27, 2023) (seeking punitive damages for claim based on the wrongful conduct that plaintiff alleged was "inconsistent[] with corporate policy"); *Achal v. Gate Gourmet, Inc.*, 114 F. Supp. 3d 781, 816 (N.D. Cal. 2015) (seeking punitive damages for retaliatory termination approved by defendant's employees); *Rhynes v. Stryker Corp.*, 2011 WL 2149095, at *6 (N.D. Cal. May 31, 2011) (plaintiff relied on single paragraph with "threadbare recital[]" of statutory element); *Rozier v. Dep't of Homeland Sec. Fed. Protective Serv.*, 2022 WL 2199938, at *3 (C.D. Cal. Mar. 7, 2022) (plaintiff failed to allege employer's knowledge of employees' intentional torts). *McMurray v. Merck & Co.* contains no details about the plaintiff's allegations. 2007 WL 1456042, at *2 (N.D. Cal. May 17, 2007).

DATED: March 4, 2025

Respectfully submitted,

**KESSLER TOPAZ MELTZER & CHECK, LLP**

/s/ *Melissa L. Yeates*
Joseph H. Meltzer (appearance *pro hac vice*)
jmeltzer@ktmc.com
Melissa L. Yeates (appearance *pro hac vice*)
myeates@ktmc.com
Tyler S. Graden (appearance *pro hac vice*)
tgraden@ktmc.com
Jordan E. Jacobson (Bar No. 302543)
jjacobson@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056

-and-

**KESSLER TOPAZ MELTZER & CHECK, LLP**
Jennifer L. Joost (Bar No. 296164)
jjoost@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Tel: (415) 400-3000
Fax: (415) 400-3001

**CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.**
James E. Cecchi (appearance *pro hac vice*)
jcecchi@carellabyrne.com
Michael A. Innes (*pro hac vice* forthcoming)
minnes@carellabyrne.com
Kevin G. Cooper (appearance *pro hac vice*)
kcooper@carellabyrne.com
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973)-994-1700
Facsimile: (973)-994-1744

-and-

**CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & AGNELLO, P.C.**
Zachary Jacobs (appearance *pro hac vice*)
zjacobs@carellabyrne.com
222 S Riverside Plaza
Chicago, Illinois 06606

*Interim Class Counsel*

**LAW OFFICES OF ROBERT MACKEY**
Robert Mackey, Cal Bar No. 125961
bobmackeyesq@aol.com
16320 Murphy Road
Sonora, CA 95370
Telephone: (412) 370-9110

-and-

**MIGLIACCIO & RATHOD LLP**
Jason S. Rathod
jrathod@classlawdc.com
412 H Street NE, no. 302
Washington, DC, 20002
Telephone: (202) 470-3520

*Additional Counsel for Plaintiff Alexis Sutter*