# EXHIBIT E

Jonathan Waisnor (CA Bar No. 345801)
jwaisnor@labaton.com
Morris Dweck (N.Y. Bar No. 5344627)
mdweck@labaton.com
Woodworth B. Winmill (N.Y. Bar No. 5917604)
wwinmill@labaton.com
**LABATON KELLER SUCHAROW LLP**
140 Broadway, 34th Floor
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

*Attorneys for Claimants*

**BEFORE THE OFFICE OF THE INDEPENDENT ADMINISTRATOR**

| | |
|---|---|
| **19,521 CLAIMANTS,**<br><br>        *Claimants,*<br><br>     v.<br><br>**KAISER FOUNDATION HEALTH PLAN, INC., KAISER FOUNDATION HOSPITALS, AND THE PERMANENTE MEDICAL GROUP, INC.**<br><br>        *Respondents.* | **CONSOLIDATED DEMAND FOR ARBITRATION** |

## I.     INTRODUCTION

1.      Claimants bring this arbitration to recover for Kaiser Foundation Health Plan, Inc.'s, Kaiser Foundation Hospitals, and The Permanente Medical Group, Inc.'s (collectively "Kaiser") unlawful disclosure, use, and sale of Claimants' personal health and medical information, in violation of the California Confidentiality of Medical Information Act ("CMIA"), the California Invasion of Privacy Act ("CIPA"), California Privacy Rights Act ("CPRA"), the California Consumer Legal Remedies Act ("CLRA"), the California Unfair Competition Law ("UCL"), the Electronic Communications Privacy Act ("ECPA"), breach of contract, breach of implied contract, negligence, and unjust enrichment.

2.      Kaiser is an integrated healthcare system that combines health insurance and medical care services.  The organization operates through a vertically integrated model that includes Kaiser Foundation Health Plans, which provide a range of insurance options, and Kaiser Foundation Hospitals and Medical Groups, which offer comprehensive medical care through their own facilities and employed physicians.

3.      This case is one of many against healthcare companies that have disclosed sensitive patient medical, health and other information to various third party technology companies, in violation of data and health privacy laws.

4.      Kaiser assured Claimants that "Kaiser Permanente is committed to protecting the[ir] privacy."[1]  When it came time to actually safeguard Claimants' personal sensitive information, Kaiser betrayed that trust.  Kaiser disclosed Claimants' sensitive medical information to third-party advertising and marketing technology companies, including Quantum Metric, Twitter, Adobe, Bing, Salesforce and Google ("Third Party Wiretappers"), so it could advertise more effectively.

5.      Without Claimants' knowledge or authorization, Kaiser embedded code from Third Party Wiretappers on its website and mobile applications which allowed the Third Party Wiretappers to intercept the content of Claimants' interactions with Kaiser's website, including patient status, identifying information, medical topics researched, and communications with healthcare providers, all of which is protected health information ("PHI").  Claimants PHI was then used by the Third Party Wiretappers to feed their expanding databases of personal information and for targeted marketing and advertising.

---

[1] *Website and mobile application Privacy Statement*, Kaiser, https://healthy.kaiserpermanente.org/southern-california/privacy (last visited September 24, 2024).

6.      Indeed, Kaiser has publicly admitted that the disclosure occurred and mailed notices to its members admitting that their data was disclosed to the Third Party Wiretappers. Exhibit 1.  According to Kaiser's notice, Third Party Wiretappers' cookies and/or pixels were configured to transmit Claimants' "IP address, name, information that could indicate a member was signed into a Kaiser Permanente account or service, information showing how the member interacted with and navigated through the website or mobile applications, and search terms used in the health encyclopedia."  Kaiser's disclosures were in violation of its own policies and applicable law, as set forth below.

## II.      PARTIES

7.      Claimants are 19,521 California members of Kaiser and are represented by undersigned counsel ("Claimants").  Exhibit 2 (Claimant List).

8.      Kaiser is an integrated healthcare provider and health plan.

9.      Kaiser is headquartered in Oakland, California, and regularly conducts business throughout the State of California.

10.      The conduct described herein emanated from Kaiser's California headquarters.

## III.      FACTUAL BACKGROUND

### A.      Tracking Technology: Software Development Kits, Cookies and Web Beacons

11.      Kaiser disclosed Claimants' PHI through embedded tracking technologies, including software development kits ("SDKs"), cookies, web beacons and other tracking scripts provided by the Third Party Wiretappers, that it incorporated into the Kaiser websites[2] ("Site") and applications ("App" collectively "Kaiser Platform" or "Platform").  SDKs, cookies and web beacons are tools and programs that allow developers, like Kaiser, to add features to their platforms

---

[2] https://healthy.kaiserpermanente.org/front-door.

that are developed by third parties, to track user interactions and collect data. For instance, Google's SDK can be incorporated into an app to share user data between the app and Google. By using the Google SDK, developers can gain access to Google's data analytics and use Google tools to assist with ads, among other things.

12.    While Third Party Wiretappers offer tracking technologies to mobile application and website operators, it is the operators themselves who embed the technologies into their platforms. When a user then accesses a platform with the embedded technology, the technology directs the platform to send a message to a third party's server during their interaction with the platform, without the user's awareness. After retrieving and collecting this information, the Third Party Wiretapper, e.g., Quantum Metric, Twitter, Adobe, Bing, Salesforce or Google, views it, processes it, analyzes it, and uses it to, amongst other things, target users with ads. Further, these operators associate information communicated across multiple visits to digital platforms by capturing persistent identifiers like IP addresses, browser fingerprints, and device and user IDs. These identifiers allow companies to link user activity over multiple visits, creating detailed profiles for advertising.

**B.    Kaiser's Site and App**

13.    Kaiser's Site and App are integral components of its digital ecosystem, designed to streamline access to health care services and information for members. The Site offers a member portal where users can manage their health records, schedule appointments, request prescription refills, and handle billing and payments through an internet browser.

14.    Claimants who have mobile devices, like smartphones or tablets, can download Kaiser's App from the Google or Apple Play Stores. The App allows members to access their personal health records, book or modify appointments, and communicate securely with health care

providers. Additionally, the App supports prescription management, virtual care through telemedicine, and health tracking features.

15.    The Kaiser Platform includes various features that collect user information, including PHI, which was shared with Third Party Wiretappers. The tracking technologies also collected detailed data about Claimants' interactions in real time, including actions like logging in, clicking on buttons, navigation paths, searching for medical information, scheduling appointments, or entering information into various forms, including private messages about treatments, prescriptions, and health conditions. Kaiser's disclosures included unique device identifiers.

16.    One of the Kaiser Platform features is the "Browse Health Encyclopedia," where Claimants searched for information on health conditions, symptoms, and medical procedures. Tracking code embedded on the Browse Health Encyclopedia page intercepted and disclosed Claimants' search terms to Third Party Wiretappers, revealing their medical conditions.

17.    Similarly, the "Find a doctor or location" tool allows Claimants to input personal health information to locate healthcare providers based on location, specialty, or specific medical conditions. This PHI was also intercepted by the Third Party Wiretappers.

18.    Kaiser's Platform also provides a secure patient portal ("Portal") where Claimants accessed their medical history, viewed test results, checked their symptoms, ordered prescriptions, scheduled appointments, and communicated directly with their healthcare providers. These interactions were also disclosed to third parties through tracking technologies.

19.    The Site's chat function, which is used to discuss issues with customer service representatives, also disclosed users' information to third parties, specifically to Salesforce. During these interactions, users' electronic communications, including messages related to

medical conditions and insurance details—comprising personally identifiable information ("PII") and PHI—were intercepted in real time and disclosed to Salesforce without user consent.

20.    Additionally, the login process captured Claimants' credentials and other related details, such as their names, medical record numbers, regions, and coverage status, which were also transmitted to the Third Party Wiretappers.  When Claimants utilized online medical evaluations or scheduled appointments, the information entered was also disclosed.

21.    For example, Kaiser's Platform transmits PHI to Adobe, Bing, Google, and Twitter like a recent medical procedure, e.g., a shoulder X-Ray, through their GET[3] and POST[4] requests back to their respective servers.  Adobe, Bing, Google, and Twitter also used GET and/or POST requests to transmit additional information from within the Kaiser Platform, including PHI like allergy information, and medical conditions.

22.    In essence, many of the Platform's features facilitated the gathering of Claimants' sensitive personal and health information, which was disclosed and used by the Third Party Wiretappers.

23.    Kaiser's disclosures were extensive, as Kaiser embedded a host of tracking technologies (as outlined below) into its Site and App, to gather data, including PHI, which were transmitted back to the Third Party Wiretappers.  Upon information and belief, the technologies enabled Third Party Wiretappers to collect, process, and analyze Claimants' information to enhance their advertising strategies.

---

[3] A "GET" request is an HTTP method used by a web browser or client to request data from a server. When a GET request is made, the client sends a request to a specified URL, asking the server to retrieve and return specific data, typically in the form of a webpage or other online resources. GET requests are generally used for reading or retrieving data and do not alter the data on the server. The requested information is often sent back as part of the URL, making GET requests visible in the browser's address bar.

[4] A "POST" call is an HTTP method used to send user data to a server, typically to create or update a resource. In this process, data is included in the body of the request rather than in the URL, allowing for larger amounts of data to be transmitted compared to other methods. Instead of simply relaying the user's initial request to the server, a POST command directs the user's browser to intercept and route subsequent communications from the user to the server, e.g., filling out a form.

| Vendor | Service/Product Name | Purpose | Location |
|---|---|---|---|
| Adobe | Adobe Target | Platform Support - Site Analytics | KP Site; KP App |
| Adobe | Adobe Analytics | Platform Support - Site Analytics | KP Site; KP App |
| Adobe | Adobe (Marketo) | Marketing | KP Site |
| Adobe | Adobe Audience Manager | Platform Support - Site Analytics | KP Site; KP App |
| Adobe | Adobe Advertising | Marketing | KP Site; KP App |
| Dynatrace | Infrastructure and Application Observability | Platform Support - Performance and Support | KP App |
| Google | DoubleClick | Marketing | KP Site; KP App |
| Google | Google Ads | Marketing | KP Site; KP App |
| Google | Google Analytics 360 | Platform Support - Site Analytics | KP Site; KP App |
| Google | Google Tag Manager 360 | Platform Support - Site Analytics | KP Site; KP App |
| Google | ReCaptcha | Verification Services | KP Site |
| Google | Google Maps (API) | Google Maps Integration | KP Site |
| Microsoft | Microsoft Conversion Tag (aka Bing Conversion Tag) | Marketing | KP Site; KP App |
| Quantum Metric | Quantum Metric Real User Monitor | Platform Support - Performance and Support - Session-Based Analytics | KP Site; KP App |
| Twitter | Twitter | Marketing | KP Site; KP App |
| Qualtircs | Experience Management Site Intercept | Marketing | KP Site |
| Salesforce | Chat | Customer Service | KP Site |

C.      **Specific Tracking Technologies Embedded by Kaiser**

1.      **Quantum Metric's Session Replay**

24.      Quantum Metric's Session Replay tool is a technology that records and replays individual user interactions on a website or app, capturing actions in real-time. By embedding code into the site, it intercepts and saves users' interactions—such as clicks, scrolls, and keystrokes—allowing companies to "replay" sessions to understand user behavior, similar to watching a video playback.

25.     Kaiser implemented Quantum Metric's code, including Session Replay functionality, on its homepage, patient portal login page, and various other pages across the Site, including within the Kaiser Portal itself.

26.     Session Replay enables real-time tracking and recording of interactions between Claimants and Kaiser's Site and Portal.  As Claimants navigate through the Portal, including performing functions such as scheduling appointments or viewing medical records, Session Replay captures extensive personal and sensitive data. This includes health information that is protected under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and other PII as Claimants use the Site and Portal for their healthcare needs.

27.     Quantum Metric's POST request also contained an Adobe Marketing ID, allowing a user to be tracked across multiple platforms:

28.     The tracking process uses POST calls to transmit data to Quantum Metric's servers. However, these communications include sensitive patient information that is intercepted by Quantum Metric before being analyzed and stored on its servers. This allows Quantum Metric to maintain a comprehensive record of each member's interactions. For instance, if a user seeks information on specialized treatments like addiction medicine or searches for particular types of health providers or specialists, Quantum Metric captures this sensitive search data and uses it to further analyze and enhance its products, generating economic benefits from these interactions without the awareness or consent of the users.

29.     Moreover, Kaiser's installation of Quantum Metric's technology led to extensive recording of PHI as Claimants engage with various features on the Portal. This data includes details such as Claimants' medical summaries, message center exchanges with healthcare providers, and private financial information within bill-pay sections.

30.     Testing revealed large amounts of data have been captured and redirected to Quantum Metric's servers during these interactions, further exposing sensitive and private information. For example, testing revealed Quantum Metric intercepted and received information that a user requires a vision prescription.

31.     The Session Replay tool tracks Claimants when they perform follow-up activities after logging out of the Portal, such as searching for healthcare providers, effectively documenting all interactions with the Site.

32.     Although Quantum Metric is also collecting general analytics, its main service for Kaiser goes beyond standard tracking cookies. It records individual sessions in detail and retains the information on its own systems, which is then accessible to other third parties through Quantum Metric's interface.

### 2.     Adobe Marketing Cloud Service

33.     Kaiser enabled Adobe access to Claimants' personal and sensitive information, including PHI and private communications—through code linked to the Adobe Experience Cloud, also known as Adobe Marketing Cloud, embedded on the Site, including within the Portal.

34.     Adobe Experience Cloud is a comprehensive suite of digital marketing tools designed to help businesses manage, personalize, and optimize customer experiences across channels.[5]

---

[5] The Adobe Experience Cloud offers a range of solutions, including analytics, advertising, content management, personalization, and e-commerce, enabling companies to gain insights into customer behavior, create targeted campaigns, and deliver consistent, personalized experiences to drive engagement and loyalty.  Included in Adobe Experience Cloud are tools for measurement, which allow companies to analyze visitor interactions across websites, apps, and social media, as well as tools for personalization that enable testing of new content and adjustments for relevance to specific visitors.  It also provides content management solutions for storing and delivering media across digital channels and advertising solutions to refine ad performance on platforms like search engines, apps, and social media.  These solutions facilitate a range of outreach efforts, such as email, text, and other online and offline marketing campaigns.

35.    To deliver these services, Adobe Experience Cloud collects a variety of personal and identifiable data from Claimants, including web browsing activity, such as page visits, URLs, search terms, and referral sources, along with device details like browser type, operating system, and IP address, which can approximate location.  The tools also gather data from social media profiles, user input on forms, ad campaign engagement metrics, and even transaction details, like items purchased or added to a shopping cart.

36.    Additionally, Kaiser used another technology, Adobe's Advertising Cloud,[6] which includes pre-defined health-related audience segments that are created using third-party data sources.  These segments enable companies to deliver targeted ads to users based on specific health-related interests and demographics. For example, companies can target individuals with ads based on their potential interest in topics such as health conditions, insurance options, fitness routines, and personal care products.  By leveraging these health-focused segments, Adobe's Advertising Cloud allows advertisers to reach audiences with content relevant to their health and wellness interests.

37.    When Claimants visit the Site and App, the Adobe tools gather their information through various tracking technologies, including cookies and web beacons, which power its cross-channel data and campaign management functions.  These include the "omtrdc.net" and "demdex.net" cookies, which capture and transmit data about user interactions across digital platforms.  Adobe's Experience Platform Launch (another tracking technology) further assists by managing a library of tags for other Adobe Experience Cloud tools, enabling deeper data tracking and analysis.

---

[6] Adobe Advertising Cloud is a comprehensive platform that enables businesses to plan, buy, and optimize digital advertising across channels, including search engines, social media, and display ads, while using data insights to create more targeted and effective ad campaigns.

38.     Other cookies, such as "everest_g_v2" and "demdex.net," play key roles in tracking user behavior.  For instance, the "everest_g_v2" cookie is created after a user clicks on one of Adobe's client's ads.  This cookie then tracks the user's ongoing activity on the client's website, linking the initial ad click with subsequent actions taken on the site.  This tracking helps Adobe's clients understand how ads drive engagement and allows them to analyze user journeys and optimize advertising and site experiences accordingly.

39.     These cookies are unique identifiers that Adobe uses for "cookie syncing" and "mapping."  Cookie syncing is a process that aligns user data across multiple platforms and websites, allowing Adobe to connect and identify the same user across different sessions and channels.  Through this technique, Adobe can match and merge data from various cookies, effectively mapping a user's activities and preferences across digital spaces.  This creates a more complete user profile, enabling more precise targeting and personalization across Adobe's advertising and marketing services.

40.     As Claimants navigate Kaiser's Site and App, code embedded within the Platform commands users' browsers to initiate multiple POST calls that transmit their' PII, PHI, and confidential communications to Adobe.  Adobe receives and stores this data on subdomains like "kaiser.tt.omtrdc.net," specifically set up on its servers to collect communications and interactions from Kaiser.

41.     POST calls to kaiser.tt.omtrdc.net were made from various Kaiser Sites, including the Kaiser home page, doctor search sites, sites where users retrieve test results, medical history pages within the Portal and the bill pay page.  These POST calls transmitted PHI, including users' medical conditions, and medications used.

42.     Even after logging out, Adobe intercepted users' search terms like "mental health" and "neurologist," along with identifying details like zip codes.

43.    Further, Adobe uses "fingerprinting" techniques as part of the data-gathering process.  Adobe collects information on users' browsers, devices, operating systems, and other specific hardware characteristics, creating a unique digital fingerprint for each device.  This process, known as web or device fingerprinting, enables Adobe to identify and track users over time, even when they take steps to avoid tracking.  With this fingerprint, Adobe can monitor users' browsing behavior and deliver targeted ads or other personalized content. In cases of cross-device tracking, Adobe can also link users' activity across multiple devices by combining unique device fingerprints when a user logs in from both a computer and a mobile phone.

44.    Additional data within the HTTP requests disclosed to Adobe include sensitive details about users' web activity and identifiers set by Adobe.  For example, the HTTP request contains URLs that reveal when users access Kaiser's Portal, thereby identifying them as Kaiser members and patients.  Adobe's "marketingCloudVisitorID" and "tntID" identifiers, were also transmitted, which work with tracking cookies to identify specific users across Adobe's services. This combination of information includes confidential and HIPAA-protected data, which is transmitted each time users interact with Kaiser's Site and App.

45.    Along with the URL headers, each time Adobe's code intercepted and redirected Claimants' communications on the Site and App, Adobe also collected Claimants' IP addresses.

46.    When Claimants first visit Kaiser's Site or Portal with the embedded Adobe Experience Cloud installed, Adobe checks for the presence of the AMCV cookie, which stores a unique marketingCloudVisitorID (or Experience Cloud ID).  This ID is persistent and universally tracks visitors across all Adobe Experience Cloud solutions.  If the cookie is not set, Adobe creates one by calling the "demdex.net" server, which generates the marketingCloudVisitorID and stores it in the AMCV cookie, allowing consistent tracking across the Kaiser Site. Additionally, a

"demdex ID" cookie, which remains persistent across domains, enables Adobe to track specific devices across various websites.

47.    Adobe also uses other tracking identifiers, such as the tntID (stored in a persistent "mbox" cookie), which functions as a device ID.  The tntID aids Adobe Target in personalizing user experiences on sites like Kaiser's, using data such as environment parameters, geographical location, mobile device details, and session behavior.  Another ID, the thirdPartyID, is a cross-channel identifier that can link user interactions across web, mobile, and IoT channels.[7]  When Claimants log into the Portal, this ID helps Adobe associate the user with a specific profile, enabling targeted and personalized content delivery based on their history and behaviors.

48.    These unique identifiers, combined with data like IP addresses, device fingerprints, and third-party information, allow Adobe to identify Claimants' identities, locations, devices, and online activities, enabling Kaiser and others to use Adobe's advertising technology for precise ad targeting.

### D.    Twitter, Bing, and Google Intercepted Claimants' Communications from the Site and App

49.    Kaiser's use of online tracking technologies also sent PHI to Twitter, Bing, and Google through HTTP GET and POST requests. Kaiser's transmissions included sensitive details such as IP addresses, user interactions, and identifiable information of Kaiser members.

50.    Google, Bing, and Twitter use the information disclosed by Kaiser to create detailed user profiles for targeted advertising, generating substantial revenue.  For example, Alphabet (Google's parent company) reported over $31 billion in revenue in 2023, largely stemming from

---

[7] An IoT (Internet of Things) channel is a communication pathway or medium used for sending data between IoT devices, applications, and systems.  This channel enables IoT devices to share data with other devices, cloud platforms, or applications, facilitating real-time monitoring, control, and data analysis.

its advertising networks, which rely on extensive data collection to enhance ad targeting.[8]  In exchange for the "free" analytics services provided by these tech giants, Kaiser effectively contributed Claimants' sensitive information, enabling these companies to expand their advertising networks and improve their service offerings.  By leveraging these analytics tools, Kaiser not only compromised the confidentiality of Claimants' health data but also facilitated the monetization of that information by large advertising networks.

### E.    Kaiser Embedded Tracking Technologies Which Disclosed PHI to Twitter

51.    Twitter (now known as "X") gathers extensive information about users, both those with Twitter accounts and those without, to create detailed profiles for targeted advertising.  This includes data on users' tweets, browsing activity, device details, IP addresses, and even websites visited before and after engaging with Twitter. Such insights help advertisers understand user demographics and interests, allowing for more effective ad placements on users' timelines.

52.    In relation to Kaiser, Twitter tracks information shared by ad partners, including data embedded within Kaiser's Site and App.  According to Twitter's Privacy Policy, the personally identifiable information from partners like Kaiser is merged with Twitter's own data to refine user profiles further.  This combination of data enables Twitter to facilitate targeted advertising by leveraging analytics technologies, which Kaiser utilized by embedding Twitter's tracking code on its Platform.  This integration allowed Kaiser to enhance its marketing capabilities based on user behavior, including the sensitive health information of Claimants.

53.    Despite Twitter receiving PHI from Kaiser's site, Kaiser did not establish contracts or agreements that would limit Twitter's use of this data for advertising purposes.  In fact, Twitter's

---

[8] Alphabet Inc., Annual Report (Form 10-K) (Jan. 31, 2024),
https://abc.xyz/assets/4b/01/aae7bef55a59851b0a2d983ef18f/596de1b094c32cf0592a08edfe84ae74.pdf.

privacy policy explicitly permits the use of such information for its own marketing objectives, highlighting a lack of safeguards on Kaiser's part.

54.    When Claimants accessed Kaiser's Portal, Twitter received two GET requests indicating their successful login.  When requesting electronic copies of their medical records, Twitter captured information revealing health conditions through these GET requests.  This data enables Twitter to tailor ads targeting these conditions, promoting specific products like pain medications.  The requests included cookie identifiers specific to Claimants, allowing Twitter to match the data to their advertising profiles.

55.    Additionally, when Claimants accessed medication pages hosted on the Kaiser website, Twitter received relevant information, including specific drugs they were inquiring about. The same cookie identifiers were transmitted, linking this information to their advertising profiles. Similarly, when Claimants searched for terms like "mental health" on the Site, Twitter captured these search terms via GET requests, further allowing for targeted advertising based on their health-related inquiries.

56.    Despite legal obligations to maintain patient confidentiality, Kaiser's implementation of Twitter's tracking code, including the Twitter Analytics SDK and other related SDKs, facilitated the unauthorized transmission of sensitive health information to Twitter.  This included not only identifiable patient information but also the contents of communications between Claimants and Kaiser, covering details regarding medical conditions and health services.  By intentionally embedding this code across various pages of the Kaiser Site and App, Kaiser compromised the privacy of the Claimants' communications, allowing Twitter to intercept and record confidential patient information without appropriate consent or contractual protections.

**F.     Kaiser enabled Google's Interception of PHI for Its Own Purposes**

57.     Google collects extensive information about users of the Kaiser Site and App to develop detailed profiles that enhance ad targeting.  For instance, when a Claimant searches for a medical condition like cancer, Google can subsequently direct ads for cancer treatment centers to that Claimant.  This capability is bolstered by Google's ad remarketing, which displays ads based on a user's previous interactions with websites that utilize Google's advertising services.

58.     Historically, Google tracked user behavior primarily through third-party cookies, allowing it to monitor users across multiple websites.  These cookies are widespread across the internet, enabling Google to compile a comprehensive view of individual interests and habits.  However, since cookies are not universally set on all devices and can be blocked or cleared, Google introduced an "advertising ID" to enhance user tracking across devices and locations.  Additionally, Google gathers information via IP addresses, which it collects when users visit sites with Google's advertising services or analytics tools.  This data allows Google to improve its services, personalize user experiences, and measure ad effectiveness.

59.     Furthermore, Google enables advertisers to target users based on particular health conditions, indicating that detailed health-related profiles can be created for precise ad targeting.

60.     The Kaiser Site and Apps, including the Portal, employ Google code, such as Google Analytics and DoubleClick, to track user interactions and facilitate targeted advertising.  This integration allowed Google to access Claimants' PII and PHI for marketing purposes.  Kaiser was aware of these capabilities when it installed the Google code, intending to utilize Google's marketing tools to target individuals based on their online behavior.  However, Kaiser did not establish contracts with Google to restrict its use of Claimants' confidential information for its own or third-party advertising.

61.     In a 2019 Google Cloud Master Agreement, Kaiser acknowledged that Google could collect and retain data, including search terms and IP addresses, to enhance its products and services. Despite admitting that it provided Google with HIPAA-protected PHI, Kaiser failed to secure Business Associate Agreements or any contracts that would limit Google's use of this data. Google has stated that while data from healthcare provider websites is typically classified as sensitive, data from insurance company websites, like Kaiser's, may be used for personalized advertising.

62.     Kaiser integrated Google's code, allowing the system to intercept and redirect data to Google, enabling the assignment of topics for targeted advertising. For instance, Google could categorize Claimants under "Health Insurance" based on their site interactions, leading to targeted advertisements from third-party advertisers using Google's platform.

63.     When Claimants logged into the Portal, Google sent GET requests to both googleads.g.doubleclick.net and google.com, transmitting data such as the URL of the accessed page, event types (like conversions), and device information, which enables Google to create device fingerprints.  For instance, when Claimants accessed the Portal, multiple GET requests disclosed sensitive health information, including medical conditions. Similarly, POST requests to Google Analytics included temporary session IDs and browser data, confirming successful logins and allowing Google to track user activities across different sites.

64.     Kaiser's implementation of Google's code allowed for the redirection and disclosure of Claimants' communications, including medical record information and search queries. For example, when a user accessed their medical records, Google received GET requests that included information about prescribed medications, which could be used to target relevant ads. Searches conducted within the Portal, such as for mental health or specific medical professionals, resulted in POST and GET requests that revealed the user's health conditions and

treatment. Kaiser's intentional deployment of Google's tracking code facilitated the unauthorized interception of personal communications, exposing the private health information of Claimants and breaching their confidentiality rights.

### G.    Kaiser Facilitated Bing's Use of Claimants' PII and PHI for Marketing

65.    Bing collects extensive information from users of the Kaiser Site and App to enhance targeted advertising. For instance, when a Claimant searches for a medical condition like cancer, Bing can subsequently display ads for related services, thereby utilizing search behavior for remarketing.  Kaiser installed Bing code on its Site and App to leverage this functionality but failed to establish contracts that would prevent Microsoft from using the collected data for its own or third-party advertising purposes.  On information and belief, although Kaiser has Business Associate Agreements with Microsoft for other services, these agreements do not cover the Bing code.

66.    The Bing code embedded on Kaiser's Site includes Universal Event Tagging ("UET"), which tracks user interactions.  For example, when a Claimant logs into the Portal, Bing receives information through GET requests that disclose identifiers from cookies, allowing the creation of advertising profiles.

67.    The GET requests to Bing also incorporated a number of cookies including the Machine Unique Identifier ("MUID"), the Windows Live ID ("WLID"); and the user's WLS identifier ("WLS").

68.    The MUID functions as a unique identifier that tracks users across websites, linking their interactions and search behaviors to advertising profiles.  This identifier allows Bing to maintain persistent tracking of specific individuals, even as they navigate different pages or log in and out of the Kaiser Site and Portal, enabling targeted advertising based on health-related searches and interactions.

69.    The WLID is a unique user identifier assigned to a specific user, consisting of an alphanumeric string and the user's name.

70.    The WLS is also a unique user identifier assigned to a specific user, consisting of an alphanumeric string along with the user's real name.

71.    The Bing SDK integrated into the Kaiser Platform collects a wide range of user data, including PII and PHI.  This data is sent to various Bing-controlled domains, such as bat.bing.com, where it can be linked to specific users and their medical information.  The SDK intercepts data through user interactions on the Kaiser Platform, such as search queries, visited pages, videos, prescriptions, and medical records, capturing not just the content of these interactions but also unique identifiers like MUID, WLID, and WLS, which allow Bing to correlate this information to individual Kaiser members.  Each time a user navigates through the Kaiser Platform, the SDK records URLs, page titles, and other identifiers, thereby creating a comprehensive profile of the user's health-related activities and history.

72.    This data can be used to better target ads based on individual health conditions, as seen in instances where Claimants' medical issues or search terms related to health conditions or physician specialties are sent to Bing's servers.  On information and belief, the Bing SDK was installed on all pages on the Kaiser Platform, including within the Portal.

73.    Kaiser knowingly allowed Bing to intercept Claimants' PII and PHI without their consent.

**H.    Kaiser Embedded the Salesforce Chat Feature Disclosing Users' Private Communications**

74.    Salesforce provides a software service called "Chat" that combines a basic customer service chat function with backend analytics tools, which are marketed to improve customer support experiences.  As an Application Programming Interface ("API"), this Chat

function can be easily integrated into various company websites, including Kaiser's, through a Salesforce server.

75.    Kaiser purchased a Salesforce license to use the Chat feature, which allowed Kaiser users to interact with customer service agents directly on its Site while Salesforce managed the back-end infrastructure.

76.    When Kaiser members use the chat feature, any messages exchanged between the user and the customer service agent are routed through Salesforce servers.  This setup allows Salesforce to record interactions in real-time, creating a "paper trail" that provides an official record of the chat.

77.    Additionally, the chat function includes a "Sneak Peek" feature, enabling Salesforce to monitor what a user is typing in real-time before they even send the message, effectively giving Salesforce insight into unsent communications.  Alongside message content, Salesforce can track a user's geographic location, time spent on the site, and other data points, reinforcing its role in monitoring user interactions on the Kaiser Site.

78.    Salesforce's Chat function constitutes more than a simple record-keeping tool; it operates as an independent third party, intercepting and analyzing these interactions to a degree beyond standard data capture.  Salesforce uses the collected chat data in its Einstein artificial intelligence (AI) platform to provide various customer service analytics tools.[9]  For instance, Einstein's AI can suggest responses based on language patterns, identify frequent customer inquiries, and generate message recommendations, which customer service agents can use to improve responses.  This platform also uses the intercepted data to refine Salesforce's AI models, develop new products, and enhance existing services, making Salesforce's Chat function a powerful tool for real-time data extraction, analysis, and customer service optimization.  This setup

---

[9] https://help.salesforce.com/s/articleView?id=sf.admin_einstein_features_data_usage.htm&type=5.

also allows Salesforce to leverage data from Kaiser's user interactions for Salesforce's product and service enhancement, even though users were unaware of this disclosure and did not consent to it.

### I.     Kaiser Embedded Additional Third Party Pixels

79.     Kaiser further enabled the sharing of user identities and activities with third-party advertisers by embedding Trade Desk Pixel technology into its Site.  Trade Desk is a technology company that provides a digital advertising platform, specializing in programmatic advertising. Programmatic advertising is an automated process of buying and selling digital ads using data and algorithms, which helps brands target specific audiences more effectively.

80.     The integration of the Trade Desk Pixel allowed Trade Desk to generate a unique advertising identifier, or TDID, for each Kaiser user, based on pseudonymous data stored in browser cookies.  When users accessed the Kaiser Site, the Trade Desk Pixel triggered requests to Trade Desk's servers, initiating a process called "cookie syncing."  Through this process, advertisers could link users' activities across platforms, ultimately connecting a Kaiser user's web browsing with targeted ad content.

81.     The cookie syncing was directed by certain parameters in the code—specifically, the "fmt" parameter set to enable syncing.  Upon executing these requests, the Trade Desk would assign the TDID to the user, marking their browsing device with this identifier, which then allowed other advertisers to identify and track Kaiser users.  Trade Desk shared these identifiers with advertisers like Yahoo, Google, and AppNexus, who could leverage the TDID to target the individual Kaiser member with tailored ads based on previous interactions.

82.     Through the TDID, the Trade Desk could not only track but also aggregate behavioral data associated with each user to create profiles.  Their privacy policy confirms their use of such data for profiling based on attributes like interests, demographic categories, and past

ad responses. Furthermore, advertisers could use this system to improve campaign accuracy based on a user's health-related browsing, revealing sensitive associations such as patient status. This interconnected tracking effectively allowed external parties to use this data for their benefit, creating extensive, individualized advertising profiles without patient consent.

83.    Kaiser also utilizes Qualtrics' Experience Management Site Intercept software ("Site Intercept") on its Site to track user data through various unique user identifiers and cookies. Key identifiers include the Anonymous Survey ID ("ASID"), which is a numeric string assigned to each user, and the Contact ID ("CID"), an alphanumeric string stored in a first-party cookie on the user's computer. The CID enables Qualtrics to track users across different web pages and is linked to the user's account, allowing for the storage of their data. Another identifier, the Survey Instance ID ("SIID"), also an alphanumeric string, is similarly stored in a first-party cookie, which helps associate user responses with their respective CID.

84.    In addition to these primary identifiers, Site Intercept employs several additional Qualtrics identifiers. The ZoneID ("ZID") is an alphanumeric string, while the InterceptID shares the same value as the SIID, allowing for consistent tracking. The ActionSetID corresponds to the ASID, and the CreativeID matches the CID, facilitating a comprehensive view of user interactions. Furthermore, Site Intercept collects "User-Agent" data, which includes identifying information about the user's web browser, further enhancing its tracking capabilities.

85.    Site Intercept, collects user PII and PHI through a three-step process. First, it sends user identifiers to Qualtrics' servers. Next, it combines this data with additional user information, including medical details such as conditions and prescriptions, allowing Qualtrics to link users to their medical histories. Finally, the system sends this aggregated data back to the user's browser, enabling Qualtrics to match specific users with their medical information. This data collection extends to various user interactions on the Site, including when users search for medical conditions

or prescriptions, the URLs of visited webpages, and pages related to allergies and immunizations are monitored in a similar fashion, allowing Qualtrics to compile extensive medical data linked to specific users.

86.    Similarly, Kaiser used Adform technology on its Site, which enabled detailed tracking and data collection on users, linking their identities across multiple devices and online interactions through cookie syncing.  According to Adform's Privacy Policy, it collects data like cookie IDs, geolocation, device information, IP addresses, and timestamped engagement metrics to support digital advertising activities such as tracking audience trends, forecasting, and attribution.

87.    Adform leverages this data for product improvement, synchronization with other advertising services, and device linking, allowing it and other advertisers to create unified user profiles across devices.  Adform processes this information by default on the basis of legitimate interest, though it specifies that it may obtain user consent depending on the site owner's policies.

**J.    Kaiser's Disclosures Of Claimants PHI Caused Them Harm**

88.    By disregarding Claimants' right to privacy, Kaiser has subjected them to various harms.  Kaiser's disclosure of Claimants' data to Third Party Wiretappers increases the risk of further exposure and data breaches, leading to financial and legal repercussions.

89.    Consumers become targets for invasive marketing practices, with companies exploiting their personal data to bombard them with unsolicited ads and manipulate their choices based on behavioral targeting.  Moreover, consumers lose control over their personal data when it is shared or sold without their consent, leading to potential misuse in situations like credit evaluations, political campaigns, or insurance assessments.  The negative effects of privacy violations also extend to societal impacts.  For instance, companies' disregard for privacy can

increase the potential for manipulation, exploitation, and price discrimination for entire groups of people.

90.     These are not minor or inconsequential violations.  The Federal Trade Commission ("FTC") took action against three healthcare companies for practices similar to those of Kaiser: Flo Health, GoodRx, and BetterHelp, for misleading consumers about their data privacy practices. Flo Health was accused of sharing sensitive health information without proper consent through Google Analytics and the Facebook SDK;[10] GoodRx was cited for sharing prescription data with advertisers via pixels and cookies;[11] and BetterHelp faced scrutiny for failing to protect user data and misrepresenting its privacy practices, also due to pixels and cookies.[12]  In response to these concerns, the FTC reached settlements with these companies, requiring them to implement stricter data privacy measures and improve transparency regarding their data handling practices.

91.     Additionally, Claimants' PHI, which Kaiser permits Third Party Wiretappers to intercept, holds monetary value.  For instance, a recent study surveyed over a thousand consumers globally, asking what price they would expect third parties to pay for access to their data.[13]  Results showed health information and medical records were valued at an average of $59.80.  Similarly, companies like Prognos Health profit from selling what they claim to be de-identified health information from millions of patients.[14]

---

[10] Complaint, *Flo Health, Inc.* (Docket No. C-4747, F.T.C. (2020), https://www.ftc.gov/system/files/documents/cases/192_3133_flo_health_complaint.pdf.
[11] Complaint for Permanent Injunction, Civil Penalties, and Other Relief, *USA v. GoodRx Holdings Inc*., No. 23-cv-460 (N.D. Cal. Feb. 1, 2023), ECF No. 1., https://www.ftc.gov/system/files/ftc_gov/pdf/goodrx_complaint_for_permanent_injunction_civil_penalties_and_other_relief.pdf.
[12] Complaint, *BetterHelp. Inc.* Docket No. C-4796, F.T.C. July 7, 2023, https://www.ftc.gov/system/files/ftc_gov/pdf/2023169betterhelpcomplaintfinal.pdf.
[13] Jonathan Weicher, *Healthcare hacks—how much is your personal information worth?*, Netlib Security, https://netlibsecurity.com/articles/healthcare-hacks-how-much-is-your-personal-information-on-worth/ (last visited Sept. 15, 2023).
[14] Press Release, *Prognos Health Announces Patent-Pending Technology* (Apr. 6, 2021), https://prognoshealth.com/about-us/news/press-release/prognos-health-announces-patent-pending-technology.

### K.      Kaiser Admitted to Disclosing Claimants' PHI

92.      On April 12, 2024, Kaiser admitted that by October 2023, an internal investigation revealed "that certain third party online technologies previously installed on some portions of its website and mobile application were configured to transmit limited information about Kaiser members and patients to the vendor-developer as part of the technology's standard functionality. These online technologies (sometimes called "cookies" or "pixels") were provided by Google, Microsoft Bing, and Twitter, third party vendors engaged by Kaiser to support the performance and use of the Kaiser website and mobile application."[15]

93.      Furthermore, Kaiser acknowledged that the "information collected by these technologies about Kaiser members may be considered PHI under HIPAA."[16]

94.      The information disclosed included "IP address, name, information that could indicate a member was signed into a Kaiser Permanente account or service, information showing how the member interacted with and navigated through the website or mobile applications, and search terms used in the health encyclopedia."

95.      Kaiser reiterated the same when it sent individual breach notification letters to its members in 2024.  Exhibit 3.

### L.      Kaiser's Disclosures Violated HIPAA

96.      Kaiser was required to implement administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and availability of Claimants' PHI.  42 U.S.C. § 1320d-6; 45 C.F.R. §§ 160, 164.  HIPAA also requires medical providers to train their workforce on privacy policies and procedures to comply with HIPAA regulations and protect patient privacy. *Id*.

---

[15] Exhibit 1.

[16] *Id.*

97.     HIPAA's Privacy Rule broadly defines PHI as "individually identifiable health information" ("IIHI") that is "(i) [t]ransmitted by electronic media; (ii) [m]aintained in electronic media; or (iii) [t]ransmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

98.     IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

99.     A corporation violates the HIPAA Privacy Rule if it knowingly: "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." 42 U.S.C. § 1320d-6.

100.    A "person . . . shall be considered to have obtained or disclosed individually identifiable health information . . . if the information is maintained by a covered entity . . . and the individual obtained or disclosed such information without authorization." *Id*.

101.    The Department of Health and Human Services (HHS) has clarified that patient status is protected under the HIPAA Privacy Rule, prohibiting unauthorized disclosures:

        (a)     HIPAA does not allow "the sale of a patient list to a marketing firm" (Standards for Privacy of Individually Identifiable Health Information, 65 Fed. Reg. 82717, Dec. 28, 2000);

        (b)     HIPAA requires a covered entity to obtain prior written authorization from individuals to disclose protected health information for marketing, including disclosures revealing

26

patient status through a patient list (Standards for Privacy of Individually Identifiable Health Information, 67 Fed. Reg. 53186, Aug. 14, 2002);

(c)    Unauthorized disclosure of a patient list containing names, addresses, and hospital IDs would violate HIPAA (Modifications to the HIPAA Privacy, Security, Enforcement, and Breach Notification Rules Under the Health Information Technology for Economic and Clinical Health Act and the Genetic Information Nondiscrimination Act; Other Modifications to the HIPAA Rules, 78 Fed. Reg. 5642, Jan. 25, 2013); and

(d)    Hospitals may identify a patient's status only in a facility directory (name, location, general condition, and religious affiliation) accessible to clergy or persons who ask by name, with patients retaining the right to object (45 C.F.R. § 164.510).

102.    On March 18, 2024, the Department of Health and Human Services (HHS) confirmed in a bulletin that HIPAA governs healthcare providers' use of tracking technologies, such as those created by Third Party Wiretappers and employed by Kaiser.[17]  HHS clarified that healthcare providers violate HIPAA when utilizing tracking technologies that reveal an individual's identifying information, regardless of whether treatment information is included.[18]

103.    Additionally, HIPAA's Breach Notification Rule requires covered entities to notify affected individuals, the Secretary of Health and Human Services, and, in certain cases, the media, following a breach of unsecured protected health information.  45 C.F.R. §§ 164.400-414. Notifications must be made without unreasonable delay and no later than 60 days after the breach is discovered.  *Id.*

---

[17] *HHS OCR Updates Guidance on Third-Party Web Trackers*, ABA, https://www.americanbar.org/groups/health_law/section-news/2024/march/hhs-ocr-updates-guidance-on-third-party-web-trackers/; *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, US Dept. of Health and Human Services, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.
[18] *Id.*

104.    Kaiser knowingly withheld this information and failed to disclose it as mandated by the HIPAA Breach Notification Rule and applicable state laws, despite publicly acknowledging awareness of these violations.  *Id*.  Kaiser's delayed response violated its obligation to notify affected individuals within 60 days of discovering the breach.

**M.    Kaiser's Privacy Statement**

105.    For years, Kaiser affirmatively misrepresented its data collection and sharing practices to users in its Privacy Statement.[19]   In its Privacy Statement, Kaiser claims it "is committed to protecting the privacy of the users of the Site,"[20] and that its "use and disclosure of an individual's personal information (including health information) is limited as required by state and federal law."[21]

106.    Kaiser never told Claimants that their electronic communications were being wiretapped by the Third Party Wiretappers.  Kaiser does not ask Claimants whether they consent to having the contents of their information and communications with Kaiser disclosed to the Third Party Wiretappers.

107.    Kaiser inaccurately asserts that no health history information about Kaiser plan members is being transmitted; representing to Claimants that its "cookie consists of a unique identifier that does not contain information about your health history."[22]

108.    Kaiser's Privacy Statement references "third parties" does not define these them and stating that others might monitor certain information does not equate to disclosing that third parties actively collect user data in real time.

---

[19] *Website and mobile application Privacy Statement*, Kaiser, https://healthy.kaiserpermanente.org/ privacy (last visited September 24, 2024).
[20] *Id*.
[21] *Id*.
[22] *Id.*  ¶ 3.

109.    Kaiser further represented that it only collected aggregate data regarding the Sites members visited or their click paths.[23]  This does not disclose that Kaiser sends Claimants' medical information and communications to the Third Party Wiretappers, as Kaiser effectively admitted by sending breach notices to Claimants beginning in April 2024.

110.    Mentioning the potential use of "cookies . . . and other tracking technologies" does not adequately inform Kaiser members about the use of technology such as Session Replay and other tracking tools employed by Third Party Wiretappers, which differ from first-party cookies in that they (1) transmit data to an external server as the user navigates the website; (2) track users across devices; (3) are not easily disabled by users; and (4) effectively create a record of all interactions and information exchanges on the Site.

111.    Finally, information disclosures to the Third Party Wiretappers are not solely for optimizing the Kaiser Platform for user convenience, but are also used for marketing purposes, including generating targeted ads for third parties.

**N.      OIA Jurisdiction**

112.    All California Kaiser members agree to arbitration as a condition of enrollment. Kaiser's arbitration clause is included in every member's Evidence of Coverage document. Exhibit 4 (Evidence of Coverage).  The clause provides that "[a]ny dispute shall be submitted to binding arbitration if . . . the claim arises from or is related to an alleged violation of any duty incident to or arising out of or relating to this *EOC* or a Member Party's relationship to Kaiser Foundation Health Plan Inc. . . .  irrespective of the legal theories upon which the claim is asserted."

113.    On June 6, 2023, seven anonymous plaintiffs filed a class action complaint against Kaiser in the federal court in the Northern District of California for its disclosures of their PHI to the Third Party Wiretappers.  *Doe v. Kaiser Found. Health Plan, Inc.*, 725 F. Supp. 3d 1033 (N.D.

---

[23] *See Id.*

Cal. 2024). Notably, plaintiff John Doe was the only resident of California. *Id*. Kaiser filed a motion to compel John Doe's claims to arbitration on November 14, 2023. Judge Edward Chen granted the motion to compel arbitration on March 26, 2024, affirming that the arbitration clause in the Evidence of Coverage document encompasses all legal claims, including privacy violations. *Id*.

114.    In prevailing on this motion, Kaiser is now estopped from challenging that its members agreed to arbitrate all claims against it, "irrespective of the legal theories upon which the claim is asserted," including statutory privacy claims. *Doe v. Kaiser Found. Health Plan, Inc.*, 3:23-cv-02865 (N.D. Cal. Nov. 14, 2023), ECF No. 81 at 1.

115.    Furthermore, Kaiser argued that the arbitration agreement broadly encompasses all Kaiser entities because, "the arbitration agreement is expressly made for the benefit of KFHP, TPMG, and Hospitals." *Id*. As a result, the OIA has jurisdiction over Claimants claims.

116.    Claimants are not seeking "class arbitration" because each Claimant is represented by counsel. The OIA rules and Kaiser's arbitration clause specifically permit consolidation or joinder of claims by multiple Claimants within the same arbitration. OIA, RULES FOR KAISER PERMANENTE MEMBER ARBITRATIONS, Rule 12(a) ("regardless of the number or claims asserted in the Demand for Arbitration or the number or Claimants or Respondents named in the Demand for Arbitration."); *see also* Exhibit 4, EOC (same).

### O.    Claimants' Notice to Kaiser

117.    On February 9, 2024, Labaton Keller Sucharow LLP ("LKS") mailed a notice of dispute on behalf of 6,847 individuals to Kaiser.[24] The letter stated the nature and basis of Claimants' claims and their willingness to resolve their claims amicably prior to initiating

---

[24] Exhibit 5. Since then, LKS has noticed an additional 13,024 Claimants.

arbitrations.  Claimants also informed Kaiser that if they could not resolve their dispute, they would commence arbitration with the Office of the Independent Administrator.

118.    LKS noticed an additional 8,767 Claimants on March 19, 2024 and an additional 5,500 Claimants on April 26, 2024.

119.    Claimants entered into a tolling agreement and agreement to mediate with Kaiser on March 27, 2024.

120.    The parties mediated this dispute with Judge Wayne Anderson (Ret.) on October 1, 2024.

121.    The tolling agreement expired by its terms on October 17, 2024.

122.    The list of 19,521 Claimants attached as Exhibit 2 is the current list of Claimants in this proceeding.  However, Claimants reserve the right to supplement this list with additional Claimants.

## CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT CIVIL CODE SECTION 56.10.

123.    Claimants re-allege and incorporate the preceding allegations of this Demand with the same force and effect as if fully restated herein.

124.    According to section 56.10 of the California Civil Code a "provider of health care . . . shall not disclose medical information regarding a patient . . . without first obtaining an authorization."  This requires Claimants to show that Kaiser is (a) a provider of health care, (b) that it disclosed "medical information" regarding a patient, and (c) that it did not have authorization to do so.

125.    *Provider of health care*: Kaiser is a provider of health care for two reasons.  First, as an integrated managed care consortium, Kaiser runs hospitals and medical centers and is a

licensed clinic, health dispensary, or health facility.  Cal. Civ. Code § 56.05(p).  Second, Kaiser is a provider of health care as it maintains medical information and offers software to consumers that is designed to maintain medical information for the purposes of allowing its users to manage their information and for the diagnosis, treatment, and management of medical conditions, specifically, the Site, App and Portal.  Cal. Civ. Code § 56.06(a) and (b); *In re BlackBaud, Inc., Customer Data Breach Litig.*, No. 3:20-mn-02972, 2021 WL 3568394, at *8 (D.S.C. Aug. 2021) (company providing software for collecting medical information considered a provider of healthcare); *Frasco v. Flo Health, Inc.*, No. 3:21-CV-00757-JD, 2022 WL 21794391, at *1 (N.D. Cal. June 6, 2022) (same).  Kaiser is therefore subject to the requirements of the CMIA and obligated to maintain the same standards of confidentiality required of a provider of health care with respect to medical information that it maintains on behalf of users.

126.    *Disclosure of medical information*: Kaiser disclosed "medical information" about its patients.  "Medical information" is defined as "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care…regarding a patient's medical history…mental or physical condition, or treatment."  Cal. Civ. Code § 56.05(i).  By disclosing Claimants' appointment information, medical form data and private messages about treatments, prescriptions, and health conditions, Kaiser disclosed Claimants' medical information.  *See*, *e.g.*, *Harkey-Kirk v. Cal. Dep't of Pub. Health*, 34-2019-00260616-CU-NP-GDS, 2020 Cal. Super. LEXIS 33010, at *6 (Cal. Super. Ct. Sacramento Cnty. Aug 27, 2020), (finding plaintiff's pregnancy alone was considered medical information under the CMIA.); *see also Glenon v. Abbott Lab'ys*, No. 22-cv-2061-AGS-DEB, 2023 WL 6120612, at *1–3 (S.D. Cal. Sept. 18, 2023); *M.G. v. Therapymatch, Inc.* No. 23-cv-04422-AMO, 2024 WL 4219992, at *2 (N.D. Cal. Sept. 16, 2024).

127.    The statute broadly defines "Individually identifiable" as containing "any element of personal identifying information sufficient to allow identification of the individual, such as the patient's name, address, electronic mail address, telephone number, or social security number, or other information that, alone or in combination with other publicly available information, reveals the identity of the individual."  Cal. Civ. Code § 56.05(i).  Kaiser's disclosure of Claimants' medical information in conjunction with Claimants' IP address, name, login and medical form information and unique identifiers allows Claimants' to be identified individually.  *See* Order re Motions to Dismiss, *Frasco v. Flo Health, Inc.*, No. 3:21-cv-00757, (N.D. Cal. June, 6, 2022), ECF No. 158 (denying motion to dismiss where defendant shared persistent identifiers); *Glenon*, 2023 WL 6120612, at *1-3.

128.    *Without authorization*: Kaiser's Privacy Statement represented that its cookies did not include details about Claimants' health history.  Additionally, Kaiser stated that it only gathered aggregate data related to the Sites users visited or their browsing paths.  As Kaiser failed to reveal it was transmitting Claimants' medical information and communications to Third Party Wiretappers, Kaiser did not have Claimants' authorization, in violation of the CMIA.  Cal. Civ. Code §§ 56.05, 56.10.

129.    This release of Claimant's PHI to third parties was an affirmative act in violation of Cal. Civ. Code § 56.10(a).

130.    Cal. Civ. Code § 56.10(d) reinforces these restrictions by stating that unless "expressly authorized by a patient, enrollee, or subscriber, or as provided by subdivisions (b) or (c), a provider of health care . . . shall not intentionally share, sell, use for marketing, or otherwise use medical information for a purpose not necessary to provide health care services to the patient."

131.    As a direct and proximate result of Kaiser's violation of Cal. Civ. Code §56.10(a), Claimants' Medical Information was shared, viewed, and used for marketing.

132.    Kaiser's unauthorized disclosures of Claimants' PHI has caused injury to Claimants.

133.    Accordingly, Claimants are entitled to: (1) statutory damages pursuant to Cal. Civ. Code § 56.36(b); (2) punitive damages pursuant to Cal. Civ. Code § 56.35; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

**COUNT II**
**VIOLATIONS OF CALIFORNIA CONFIDENTIALITY OF**
**MEDICAL INFORMATION ACT**
**CIVIL CODE SECTION 56.101.**

134.    Claimants re-allege and incorporate the preceding allegations of this Demand with the same force and effect as if fully restated herein.

135.    The CMIA requires that every provider of health care "who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein."  Cal. Civ. Code § 56.101(a).

136.    Kaiser creates, maintains, preserves and stores Claimants' medical records, health histories and medical conversations on its servers.  Yet, by disclosing Claimants' medical form information, diagnoses and private messages with providers to the Third Party Wiretappers, Kaiser failed to comply with the requirement to properly store and preserve PHI.  *Doe v. Regents of Univ. of California*, 672 F. Supp. 3d 813, 819 (N.D. Cal. 2023) (denying motion to dismiss § 56.101 claims where provider's website used the Meta Pixel).[25]

137.    Thus, Kaiser shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of Cal. Civ. Code § 56.36.

---

[25] Additionally, as described above, Quantum Metric stores Claimant data and shares it with partners through its "Solution Partner Program," while Adobe's ECID enables persistent identification of consumers across platforms for marketing purposes.

138.     Accordingly, Claimants are entitled to: (1) statutory damages pursuant to Cal. Civ. Code § 56.36(b); (2) punitive damages pursuant to Cal. Civ. Code § 56.35; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

## COUNT III
## VIOLATIONS OF CALIFORNIA PRIVACY RIGHTS ACT
## CAL. CIV. CODE §1798.100 ET SEQ.
## (IN THE ALTERNATIVE TO COUNTS I AND II)

139.     Claimants re-allege and incorporate the preceding allegations of this Demand with the same force and effect as if fully restated herein.

140.     The California Privacy Rights Act ("CPRA") amended the California Consumer Privacy Act, which was enacted in 2018 and became effective in 2020, and added additional privacy protections that began on January 1, 2023.

141.     The CPRA includes a private right of action for:

> any consumer whose nonencrypted and non-redacted personal information, as defined in subparagraph (A) of paragraph (1) of subdivision (d) of Section 1798.81.5, . . . is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information . . .

Cal. Civ. Code §1798.150(a).

142.     The definition of "personal information" includes "[m]edical information" under Cal. Civ. Code § 1798.81.5(d)(1)(A)(iv).

143.     Claimants are consumers as they are residents of California and pay to use Kaiser's services.  Cal. Civ. Code §1798.150(a).

144.     Claimants' personal information was subject to an authorized access and disclosure by Kaiser as it failed to implement proper procedures to ensure it only disclosed Claimants' medical information in accordance with California law and with its own Privacy Statement. *Therapymatch, Inc.*, 2024 WL 4219992, at *7 (CCPA claims survive a motion to dismiss where

plaintiff alleged that defendants disclosed plaintiff's personal information without his consent); *Stasi v. Inmediata Health Grp. Corp,* 501 F. Supp. 3d 898, 924 (S.D. Cal. 2020) (plaintiffs alleged a plausible CCPA claim where their personal and medical information was accessible over the internet but there was no theft). Rather, Kaiser disclosed Claimants' medical information to Third Party Wiretappers using tracking technology without Claimants' authorization.

145.    Indeed, Kaiser has effectively admitted to a breach of this statute when it sent Claimants notices informing them that their PHI was unlawfully disclosed to the Third Party Wiretappers. Exhibits 1, 3.

146.    Under the CPRA, Claimants are entitled to recover the statutory damages of $750, as well as injunctive and declaratory relief. Cal. Civ. Code §1798.150(a)(1).

**COUNT IV**
**AIDING AND ABETTING VIOLATIONS OF THE CALIFORNIA**
**INVASION OF PRIVACY ACT**
**CAL. PENAL CODE §630 – 638.55.**

147.    Claimants re-allege and incorporate the preceding allegations of this Demand with the same force and effect as if fully restated herein.

148.    The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630 - 638.55. ("CIPA") finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.* § 630.

149.    CIPA aims to "prevent[s] the acquisition of the contents of a message by an unauthorized third-party." *In re Facebook, Inc. Internet Tracking Litig.,* 956 F.3d 589, 608 (9th Cir. 2020).

150.    Courts are "required to liberally construe" CIPA to effectuate the "important public policy" surrounding privacy.  *Kight v. CashCall, Inc.,* 231 Cal. App. 4th 112, 131 (Cal. Ct. App. 2014).

151.    CIPA provides that:

> [a]ny person who, by means of any machine . . . or in any other manner, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or who willfully and without the consent of all parties to the communication . . . reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state . . . or **who aids, agrees with, employs, or conspires** with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section is liable to the harmed party.

Cal. Pen. Code § 631(a) (emphasis added).  This requires Claimants to show that Kaiser (a) aided the Third Party Wiretappers to (b) read the contents of a message, (c) willfully, and (d) without consent, (e) while in transit.

152.    *Kaiser Aided*: The definition of aiding and abetting includes "giving substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately considered, constitutes a breach of duty to the third person."  *Fiol v. Doellstedt*, 50 Cal. App. 4th 1318, 1325-26 (Cal. Ct. App. 1996) (citation omitted).  Kaiser knowingly aided Third Party Wiretappers in intercepting Claimants' communications by embedding SDKs, cookies, web beacons, and other tracking technologies into its Platform, profiting from the advertising and information services it received in return.  *See In re Hulu Privacy Litig.*, 86 F. Supp. 3d 1090, 1095 (N.D. Cal. 2015); *Czarnionka v. Epoch Times Ass'n, Inc.*, No. 22 CIV. 6348 (AKH), 2022 WL 17069810, at *4 (S.D.N.Y. Nov. 17, 2022); *Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1145 (Cal. Ct. App. 2005) (ordinary business transactions may "satisfy the substantial

assistance element of an aiding and abetting claim"). Kaiser intentionally programmed its Platform to transmit Claimants' PHI by embedding these tracking technologies and configuring them to send PHI. *See Cousin v. Sharp Healthcare*, 681 F. Supp. 3d 1117, 1130 (S.D. Cal. 2023) (finding plaintiff adequately pled defendant aided and abetted under section 631(a) of the California Penal Code for embedding the Meta Pixel into a health care website); *Gershzon v. Meta Platforms, Inc.*, No. 23-CV-00083-SI, 2023 WL 5420234, at *13 (N.D. Cal. Aug. 22, 2023) (denying defendant's motion to dismiss CIPA claim for use of the Meta Pixel).

153. *Intentionally taps*: By embedding tracking technologies into its Platform, Kaiser aided Third Party Wiretappers to tap and/or make unauthorized connections with, the lines of internet communication between users and Kaiser's Site.

154. *Instrument*: CIPA extends beyond phone lines and also applies to "new technologies," including computers, the internet, and email. S*ee Matera v. Google Inc.*, 15-CV-04062-LHK, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy).

155. The tracking technologies Kaiser embedded into its Platform, including Salesforce's Chat API, is a "machine, instrument, contrivance, or . . . other manner" used to wiretap users' PHI.

156. *Willfully reads*: The Third Party Wiretappers did not merely receive information inadvertently, their technologies are specifically designed to maximize the private information gathered from Claimants using the Kaiser Platform, and they are fully aware that this data is being transmitted and read. *Gershzon*, 2023 WL 5420234, at *11. In fact, the Third Party Wiretappers used Claimants' data to create user profiles for targeted advertising, increasing their advertising effectiveness and revenue. These companies willfully gained access to valuable user information

in exchange for providing analytics tools to Kaiser.  *See Frasco*, ECF No. 485 at 6-7 (N.D. Cal. Sept. 23, 2024) (denying summary judgement on CIPA claim to Google where communications were transmitted via Google's SDK).

157.    Importantly, the Third Party Wiretappers do not simply facilitate Kaiser's own business functions.  Third Party Wiretappers use Claimants' information for their own benefit as well as for that of other third-party customers of theirs by uniquely identifying Claimants so they can target them with advertisements.  Quantum Metric, for example, stores Claimant data on its systems and makes it accessible to various partners, including system integrators, digital agencies, and resellers.  The company's "Solution Partner Program" incentivizes these partners to develop specialized solutions using Quantum Metric's data, creating a hub-and-spoke network that facilitates the sharing of user information.

158.    Kaiser's transmissions also contained Adobe's proprietary persistent identifier for identifying consumers, known as the "Experience Cloud Visitor ID" (ECID).[26]  Adobe's documentation explains that the Adobe ID is used to "uniquely identify visitors and resolves identity information."[27]  Adobe's documentation further explains that the Adobe ID "provides a universal and persistent ID that identifies your visitors across all applications" and that it allows businesses to "market to real people as opposed to devices."[28]

159.    Google, Bing, and Twitter utilize user data to build detailed profiles for targeted advertising, which is a major revenue source for these companies.  In exchange for providing free analytics tools to companies like Kaiser, they gain access to valuable user information, thereby expanding their advertising networks and refining their ad targeting strategies.  This data not only

---

[26] The ECID is often referred interchangeably as the Adobe ID, Marketing Cloud Visitor ID (MCID), and Marketing ID (MID). See, e.g., https://adobeexchangeec.zendesk.com/hc/en-us/articles/360024277392-Adobe-Experience-Cloud-Using-the-ECID-for-integration.

[27] Adobe Experience Cloud Identity Service, https://experienceleague.adobe.com/docs/id-service/using/home.html?lang=en.

[28] ECID overview, https://experienceleague.adobe.com/docs/experience-platform/identity/ecid.html?lang=en.

supports their advertising networks but also enhances the effectiveness of ads, as it allows advertisers to connect with users at the most relevant moments.

160.    *Contents of a message*: Courts have determined that information gathered by Third Party Wiretappers from medical platforms and websites can qualify as the "contents" of a message if it is sufficiently identifiable.  For example, "search terms" are considered content because they can reveal "a user's personal interests, queries, and habits."  *In re Facebook*, 956 F.3d at 605. Similarly, URLs that disclose "search terms or similar communications" can be classified as content under the law.  *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 795 (N.D. Cal. 2022); *see also*, *Therapymatch, Inc.*, 2024 WL 4219992, at *4; *M.R. v. Salem Health Hosps. & Clinics*, No. 6:23-CV-01691-AA, 2024 WL 3970796, at *4 (D. Or. Aug. 28, 2024).  Kaiser's disclosures included the content of Claimants' messages, extending far beyond search terms and URLs.  *Id.*  The disclosures encompassed Claimants' information entered into various forms, as well as private messages regarding treatments, prescriptions, and health conditions.

161.    *Without consent*: CIPA requires the consent of all parties to the communication, notably, the Claimant.  *D'Angelo v. FCA US, LLC, No.* 3:23-cv-00982-WQH-MMP, 2024 WL 1625771, at *10 (S.D. Cal. Mar. 28, 2024).  However, Kaiser did not obtain appropriate consent from Claimants to permit the Third Party Wiretappers to intercept their PHI.  Kaiser did not disclose in its Privacy Statement that it was sharing Claimants' health information or private communications with third parties.  *Supra*, III.B.2.M.  Indeed, Kaiser's Privacy Statement actually undermined any informed consent by representing that its cookies did not include details about Claimants' health history and that it only gathered aggregate data related to the Sites users visited or their browsing paths.  Privacy Statement at ¶ 3, *Gershzon*, 2023 WL 5420234, at *9; *D'Angelo*, 2024 WL 1625771, at *7.

162.    *While in transit*: Tracking technologies installed by Kaiser automatically and simultaneously intercept Claimants' communications with Kaiser's Platform while in transit. *Licea v. Old Navy, LLC*, 669 F. Supp. 3d 941, 946 (C.D. Cal. 2023) (plaintiff sufficiently pled communications were intercepted in transit by alleging that defendant embedded code).

163.    Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy).

164.    As Kaiser aided and abetted Third Party Wiretappers to read Claimants' communications in real time without their consent, Claimants are entitled to recover statutory damages of $5,000, per violation, as well as injunctive or other equitable relief. Cal. Civ. Code § 637.2(a).

## COUNT V
## VIOLATIONS OF CALIFORNIA INVASION OF PRIVACY ACT
## CAL. PENAL CODE §638 ET SEQ.

165.    Claimants re-allege and incorporate the preceding allegations of this Demand with the same force and effect as if fully restated herein.

166.    California law prohibits installing a pen register without first securing a court order. California Penal Code § 638.51.

167.    A "pen register" is defined as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is sent, but not the content of the communication." *Id*. at § 638.50(b).

168.    (c) "Trap and trace device" means a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing,

addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication. *Id*. at § 638.50(c).

169.    Kaiser uses a pen register device and/or process on its Site and App by deploying tracking code from Third Party Wiretappers, because the software is designed to record and decode the dialing, routing, addressing, and signaling information from which the communication is sent.

170.    Kaiser also uses a trap and trace device and/or process on its Site and App by deploying tracking code from Third Party Wiretappers, because the software is designed to capture the phone number, email, routing, addressing and other signaling information of the Platforms visitors.  As such, the tracking code is designed precisely to identify the source of the incoming electronic and wire communications to the Platform.

171.    Kaiser did not obtain consent from Claimants before using pen register or trap and trace technology in violation Section 638.51.

172.    CIPA imposes civil liability and statutory penalties for violations of §638.51. California Penal Code § 637.2; *see also*, *Greenley v. Kochava, Inc.*, 2023 WL 4833466, at *15-*16 (S.D. Cal. July 27, 2023).

173.    Claimants are entitled to recover statutory damages of $5,000, per violation, as well as injunctive or other equitable relief.  Cal. Civ. Code § 637.2(a).

<u>COUNT VI</u>
**VIOLATIONS OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT
CAL. CIV. CODE §1770(A)(5); CAL. CIV. CODE § 1770(A)(7)**

174.    Claimants re-allege and incorporate the preceding allegations of this Demand with the same force and effect as if fully restated herein.

175.    Kaiser's conduct violated California's Consumer Legal Remedies Act ("CLRA"). The CLRA is one of the strongest and broadest consumer protection statutes in the nation, and

broadly prohibits companies from engaging in unfair, unlawful, and deceptive business practices. Cal. Civ. Code §1770(a)(5); Cal. Civ. Code § 1770(a)(7).

176.    Specifically, the CLRA provides that "[t]he unfair methods of competition and unfair or deceptive acts or practices listed in this subdivision undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer are unlawful," and prohibits: (1) "[r]epresenting that goods or services have . . . characteristics . . . that they do not have;" or (2) "[r]epresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not." Cal. Civ. Code § 1770(a)(5), (16).

177.    Claimants are "consumers" within the meaning of Cal. Civ. Code § 1761(d), and Kaiser is a "person" within the meaning of Cal. Civ. Code § 1761(c).

178.    Kaiser, through its Privacy Statement, represented to Claimants that their confidential information and communications regarding their health history would not be shared with third parties. *Supra*, III.B.2.M.

179.    While Kaiser represented to Claimants that their PHI would be kept confidential, Kaiser consistently disclosed Claimants' information without their consent and sent the information to Third Party Wiretappers for its own commercial gain in violation of the CLRA.

180.    Pursuant to the CLRA, Claimants notified Kaiser of its misrepresentations and unauthorized disclosures over 30 days prior to filing this demand; however, no remedy has been provided. Cal. Civ. Code § 1782.

181.    Under the CLRA, Claimants may recover injunctive relief, attorneys' fees, and costs for Kaiser's unfair and deceptive practices, as well as restitution, which would include monies Kaiser received through the sale of Claimants' medical information, and the amounts Claimants paid for Kaiser's services or its affiliates. *See generally*, *Krueger v. Wyeth, Inc*., 396 F. Supp. 3d 931, 949 (S.D. Cal. 2019).

<u>COUNT VII</u>
**VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW
CAL. BUS. & PROF. CODE §§ 17200-17210.**

182.    Claimants re-allege and incorporate the preceding allegations of this Demand with the same force and effect as if fully restated herein.

*183.*    Kaiser's conduct also violated California's Unfair Competition Law ("UCL"), which similarly prohibits companies from engaging in unfair, unlawful, and deceptive business practices.  Cal. Bus. & Prof. Code §§ 17200-17210.

184.    Under the UCL, Cal. Bus. Prof. Code § 17200, unfair competition includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1."

185.    Chapter 1, § 17500 contains an expansive definition of false or misleading statements prohibited by the UCL, including any corporation performing services, to make or disseminate in any manner or means any statement which is untrue or misleading.

186.    Kaiser violated the UCL by misrepresenting that it would maintain and protect the privacy of Claimants' PHI and that their PHI would not be shared with third parties.  *Supra*, III.B.2.M.

187.    Kaiser consistently disclosed Claimants' information without their consent, contrary to its stated representations, and shared this information with Third Party Wiretappers for its own commercial benefit.

188.    Claimants may recover restitution under the UCL, which would include monies Kaiser received through the sale of Claimants' medical information, as well as injunctive relief. *See generally*, *Krueger*, 396 F.Supp.3d at 949.

## COUNT VIII
## VIOLATION OF THE ELECTRONIC
## COMMUNICATIONS PRIVACY ACT, 18 U.S.C. §§ 2510, *ET SEQ.*

189.    Claimants re-allege and incorporate the preceding allegations of this Demand with the same force and effect as if fully restated herein.

190.    The ECPA provides a civil cause of action for "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter." 18 U.S.C. § 2520(a).

191.    The ECPA is violated where any person intentionally intercepts or attempts to intercept any electronic communication; discloses or attempts to disclose its contents knowing it was unlawfully obtained; or uses or attempts to use the contents knowing it was obtained through unlawful interception.  18 U.S.C. §§ 2511(1)(a), (c)-(d).

192.    ECPA defines "electronic communications service" as "any service which provides to users thereof the ability to send or receive wire or electronic communications."  18 U.S.C. § 2510(15).  Kaiser's communications with Claimants through its Platform fall under the protections of the ECPA, because they allow Claimants to communicate with their providers through the Platform to coordinate medical services and treatment.

193.    Kaiser intentionally embedded source code from Third Party Wiretappers allowing these entities to intercept Claimants' communications without their consent, in violation of the ECPA.

194.    Under the ECPA, "interception" includes any unauthorized acquisition of electronic communications during transmission.  Kaiser allowed Third Party Wiretappers to collect Claimants' PHI, as Claimants used the secure patient Portal to communicate with their healthcare providers.  This was done without Claimants' knowledge or authorization.

195.    Kaiser not only intercepted Claimants' communications but also disclosed and redirected these communications to unauthorized Third Party Wiretappers.  This disclosure was made intentionally while Claimants were engaged in confidential exchanges, which Kaiser was duty-bound to protect.

196.    The ECPA prohibits the interception of communications for criminal or tortious purposes, such as using Claimants' data for financial or marketing gain without consideration. Kaiser, however, shared this information with Third Party Wiretappers as a form of payment for their technology, thereby obtaining valuable ad-targeting tools at no monetary cost, while compromising Claimants' privacy.

197.    The use of Claimants' personal information in exchange for Third Party Wiretappers' services violated both HIPAA and ECPA.  Kaiser failed to obtain Claimants' written consent before sharing their PHI with marketing platforms, which directly contravenes federal regulations that protect patient privacy in healthcare communications.

198.    Kaiser acted knowingly and willfully, embedding the wiretappers' code across its Platform to gain access to marketing technologies.  These actions were not the result of oversight but were a deliberate violation of the privacy rights conferred to Claimants under the ECPA and related privacy laws.

199.    As a result of these unlawful interceptions and disclosures, Claimants suffered harm, including the loss of control over their personal information.  Under ECPA, Claimants are entitled to: (1) appropriate equitable or declaratory relief; (2) statutory damages of the greater of $100 per day per violation or $10,000; and (3) reasonable attorneys' fees and costs.  18 U.S.C. § 2520.

## COUNT IX
## VIOLATION OF THE ELECTRONIC
## COMMUNICATIONS PRIVACY ACT, 18 U.S.C. §§ 2510, *ET SEQ.*

200.     Claimants re-allege and incorporate the preceding allegations of this Demand with the same force and effect as if fully restated herein.

201.     The ECPA provides that "a person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication (other than one to such person or entity, or an agent thereof) while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient."  18 U.S.C. § 2511(3)(a).

202.     ECPA defines "electronic communications service" as "any service which provides to users thereof the ability to send or receive wire or electronic communications."  18 U.S.C. § 2510(15).  Kaiser's communications with Claimants through its Platform fall under the protections of the ECPA, because they allow Claimants to communicate with their providers through the platforms to coordinate medical services and treatment.

203.     Kaiser intentionally embedded source code from Third Party Wiretappers divulging Claimants' communications without their consent, in violation of the ECPA.  This disclosure was made intentionally while Claimants were engaged in confidential exchanges, which Kaiser was duty-bound to protect.

204.     Tracking technologies installed by Kaiser automatically and simultaneously intercept Claimants' communications with Kaiser's Platform while in transit.  *Licea v. Old Navy, LLC*, 669 F. Supp. 3d 941, 946 (C.D. Cal. 2023) (plaintiff sufficiently pled communications were intercepted in transit by alleging that defendant embedded code).

205.     Kaiser's disclosure of the contents of Claimants' communications to third-party wiretappers does not fall within any of the exceptions outlined in 18 U.S.C. § 2511(3)(b), nor was

it authorized by 18 U.S.C. § 2511(2)(a)(i). Specifically, the disclosure was not a necessary part of providing Kaiser's services, nor required to protect Kaiser's rights or property.

206.    Kaiser's sharing of user communication data through the pixel code on Kaiser's browser was not done "with the lawful consent of the originator or any addressee or intended recipient of such communication[s]." 18 U.S.C. § 2511(3)(b)(ii). As outlined above: (a) Claimants did not give Kaiser permission to disclose the contents of their communications, and (b) Kaiser did not obtain "lawful consent" from the websites or apps involved in the exchange of information.

207.    Furthermore, Kaiser shared the contents of Claimants' communications through pixels with individuals who are not employees or agents whose facilities are used to forward such communication to its destination." *Id*.

208.    There is no indication that the contents of Claimants' communications were related to criminal activity, and Kaiser did not disclose them to any law enforcement agency.

209.    As a result of these unlawful interceptions and disclosures, Claimants suffered harm, including the loss of control over their personal information. Under ECPA, Claimants are entitled to: (1) appropriate equitable or declaratory relief; (2) statutory damages of the greater of $100 per day per violation or $10,000; and (3) reasonable attorneys' fees and costs. 18 U.S.C. § 2520.

## COUNT X
## VIOLATION OF COMMON LAW INVASION OF PRIVACY
## INTRUSION UPON SECLUSION

210.    Claimants re-allege and incorporate the preceding allegations of this Demand with the same force and effect as if fully restated herein.

211.    A Claimant asserting a claim for intrusion upon seclusion must plead (1) that the defendant intentionally intruded or and/or aided, agreed with, employed, and/or conspired with a

third-party to intrude into a place, conversation, or matter as to which Claimant had a reasonable expectation of privacy; and (2) that the intrusion was highly offensive to a reasonable person.

212.    Kaiser's disclosure of Claimants' PHI, including medical searches and conversations with health care providers constitutes an intentional intrusion upon Claimants' solitude or seclusion in that Kaiser deliberately embedded tracking technology into its Platform and shared information that was intended to stay private with Third Party Wiretappers without Claimants' consent, and despite Kaiser's express agreement that it would not do so. *Supra*, III.B.2.M.

213.    Claimants had a reasonable expectation of privacy of their PHI. Claimants did not consent to, authorize, or know about Kaiser's intrusion at the time it occurred. Claimants never agreed that Kaiser could disclose their PHI.

214.    Indeed, California recognizes that a patient's right to privacy in the healthcare context "is all the more pronounced precisely because the disclosed information is true and may accurately reveal intimate details the [user] had a right to expect were to be maintained in confidence.  A person's medical profile is an area of privacy infinitely more intimate, more personal in quality and nature than many" other protected areas. *Brown v. Mortensen*, 51 Cal. 4th 1052, 1071 (2011) (internal citations and quotations omitted).

215.    Kaiser's intentional intrusion on Claimants' solitude or seclusion without consent would be highly offensive to a reasonable person.  Claimant reasonably expected, based on Kaiser's Privacy Statement, that their PHI would not be disclosed. *Supra*, III.B.2.M.  Kaiser's conduct is especially egregious as it failed to restrict what Third Party Wiretappers do with Claimants' PHI once it was disclosed.  Additionally, privacy polls and studies show that the overwhelming majority of Americans believe one of the most important privacy rights is the need

for an individual's affirmative consent before personal data is shared.[29]  Moreover, the disclosure and collection of PHI by Kaiser violated its own privacy disclosures and representations.

216.    Given the extremely personal nature of the data Kaiser collected and disclosed, this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

217.    As a result of Kaiser's actions, Claimants have suffered harm and injury, including but not limited to an invasion of their privacy rights and are entitled to just compensation, including monetary damages.

218.    Claimants seek appropriate relief for their injuries, including but not limited to injunctive relief, damages that will reasonably compensate Claimants for the harm to their privacy interests as well as a disgorgement of profits made by Kaiser as a result of its intrusions upon Claimants' privacy.

219.    Claimants are entitled to punitive damages due to the malicious, deliberate, and intentional actions taken by Kaiser, which were aimed at harming Claimants with a reckless disregard for their rights.  These damages are necessary to prevent Kaiser from engaging in similar behavior in the future.  Claimants also request any additional relief the Arbitrator finds appropriate and just.

## COUNT XI
## BREACH OF CONTRACT

220.    Claimants re-allege and incorporate the preceding allegations of this Demand with the same force and effect as if fully restated herein.

---

[29] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, Consumer Reports (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety/; *Americans and Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information*, Pew Research Center, (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

221.    All Claimants agreed to Kaiser's Terms & Conditions ("T&C") upon using Kaiser's Site, creating an express contract.  The T&C state: BY USING THE SITE OR BY CLICKING "I ACCEPT" BELOW, YOU SIGNIFY YOUR AGREEMENT TO THESE TERMS AND CONDITIONS."[30]

222.    Claimants have fully complied with their obligations under the T&C with regard to their use of Kaiser's Platform.

223.    Kaiser's Privacy Statement is a contract, which Claimants and Kaiser agreed to through its incorporation into the T&C.[31]

224.    Kaiser's Privacy Statement states that its cookies do "not contain information about your health history."[32]  Kaiser further represented that it only collected aggregate data regarding the Sites users visited or their click paths, rather than data collected on an individual basis.[33]

225.    Kaiser's Privacy Statement also states Kaiser would use and disclose its users PHI in accordance with applicable law.

226.    As set forth above, Kaiser violated several laws by disclosing Claimants' PHI to Third Party Wiretappers, without Claimants' consent.  Kaiser also violated the key terms of the contract.

227.    Kaiser's actions diminished the value of Claimants' personal information and violated their property rights over private communications and personally identifiable medical data.

228.    As a result of Kaiser's breach of contract, Claimants are entitled to compensatory, consequential and/or nominal damages.  Claimants also seek attorneys' fees and costs.

---

[30] *Terms and Conditions for our Website and Mobile Application*,
Kaiser Permanente, https://healthy.kaiserpermanente.org/termsconditions.
[31] *Id.*
[32] *Id.*
[33] *Id.*

<u>COUNT XII</u>
**BREACH OF IMPLIED CONTRACT (IN THE ALTERNATIVE TO COUNT XI)**

229.    Claimants re-allege and incorporate the preceding allegations of this Demand with the same force and effect as if fully restated herein.

230.    An implied contract existed between Kaiser and Claimants, wherein Kaiser promised to provide a secure portal and mobile applications for Claimants to confidentially make appointments, access medical records, view test results, communicate with providers, and find doctors. Claimants agreed to use these secure digital services instead of other methods like phone or in-person interactions.

231.    The implied contract between Kaiser and Claimants was based on: (a) the confidential nature of the medical-provider/patient relationship; (b) Kaiser's promises to protect patients' PHI and communications through its Platform; (c) the creation of a secure Portal requiring login credentials, leading Claimants to believe their information would remain private; and (d) Claimants' reliance on the secure Portal for appointments, test results, and doctor searches instead of using phone or in-person methods.

232.    Kaiser knew or should have known that Claimants would interpret their relationship as an agreement to keep their PHI confidential when using Kaiser's Platform.

233.    Claimants' use of Kaiser's patient Portal and App provides significant benefits to Kaiser, including increased efficiency, optimized workflows, cost reduction, and incentive payments from the federal government via the Meaningful Use Program.

234.    Claimants performed under the parties' implied contract.

235.    Kaiser violated its implied contract with Claimants by disclosing their patient status, personally identifiable data, and confidential communications made within the Portal and App to Third Party Wiretappers. This disclosure violated Kaiser's promise to provide a secure Platform. The patient data shared, which Claimants reasonably believed was being transmitted

52

securely, was not aggregated as described in Kaiser's Privacy Statement and was instead shared with unauthorized Third Party Wiretappers.

236.    As a result of Kaiser's breach, Claimants have suffered damages including damages for the invasion of their privacy rights.  Claimants' PHI, which they intended to keep private, is no longer secure, eroding the essential confidentiality of the provider-patient relationship.  Kaiser gained an unjust benefit from Claimants' PHI without their knowledge or consent, while Claimants did not receive the full value of the medical services they paid for, which included a duty of confidentiality.  Additionally, Kaiser's actions diminished the value of Claimants' personal information and violated their property rights over private communications and personally identifiable medical data.

237.    As a result of Kaiser's breach of implied contract, Claimants are entitled to compensatory, consequential and/or nominal damages.  Claimants also seek attorneys' fees and costs.

## COUNT XIII
### NEGLIGENCE (Including Negligence Per se)

238.    Claimants re-allege and incorporate the preceding allegations of this Demand with the same force and effect as if fully restated herein.

239.    Kaiser had an obligation to comply with all applicable statutes, including ECPA and HIPAA, and California laws governing wiretapping, computer crimes, insurance information, medical information, and larceny.

240.    Specifically, Kaiser was prohibited from unlawfully intercepting, disclosing, or using Claimants' electronic communications under CIPA.  Kaiser was also barred from unauthorized use of computer networks for fraudulent purposes and from disclosing personal or privileged information without authorization under state insurance information statutes.

Under the CMIA, Kaiser was prohibited from disclosing Claimants' medical information without authorization.

241.    Pursuant to the California Customer Records Act, Cal. Civ. Code §§ 1798.80, et seq., Kaiser was required to safeguard Claimants' medical information and provide timely notifications of any data breaches.

242.    Pursuant to California's Larceny statute, Cal. Penal Code §§ 484, 496, Kaiser was prohibited from obtaining and/or using Claimants' PHI in a manner constituting theft.

243.    Claimants are within the class of persons these statutes are aimed to protect, and their injuries fall within the harms these laws are designed to prevent.  Kaiser's failure to comply with these statutes constitutes negligence per se.

244.    By intercepting and aiding Third Party Wiretappers in accessing Claimants' private information through its Platform, Kaiser acted unreasonably, compromising the privacy of Claimants' PHI.  Kaiser knowingly collected this information and had a duty to exercise reasonable care in protecting it from unauthorized disclosures.  However, Kaiser failed to provide adequate safeguards and instead allowed Third Party Wiretappers to access this sensitive information, breaching its responsibilities to Claimants.

245.    The harm caused by Kaiser's actions was foreseeable, as it collected personally identifiable information while facilitating its interception by Third Party Wiretappers.  Public policy strongly favors preventing such harm, and as a direct result of Kaiser's negligence, Claimants' information was wrongfully disclosed.

246.    But for Kaiser's breaches of duty, Claimants would not have suffered injury, which was the foreseeable consequence of these failures.

247.    Therefore, Claimants are entitled to and seek punitive damages, equitable relief, and any other relief the Arbitrator deems just and proper.

## COUNT XIV
## UNJUST ENRICHMENT

248.     Claimants re-allege and incorporate the preceding allegations of this Demand with the same force and effect as if fully restated herein.

249.     Kaiser received benefits from Claimants and unjustly retained those benefits at Claimants' expense.

250.     Claimants conferred a benefit upon Kaiser in the form of monthly payments and valuable sensitive personal data that Kaiser disclosed to Third Party Wiretappers without authorization and proper compensation.  Kaiser has collected, disclosed, and otherwise misused this information for its own gain, providing Kaiser with economic, intangible, and other benefits, including substantial monetary compensation from Third Party Wiretappers who received Claimants' PHI.

251.     Kaiser unjustly retained those benefits at the expense of Claimants, as its conduct caused harm without providing any commensurate compensation.

252.     The benefits that Kaiser derived from Claimants rightly belong to Claimants.  It would be inequitable under unjust enrichment principles for Kaiser to retain any profit or other benefits it derived from the unfair and unconscionable methods, acts, and practices alleged in this Demand.

253.     Kaiser should be compelled to disgorge for the benefit of Claimants all unlawful or inequitable proceeds that Kaiser received, and such other relief as the arbitrator may deem just and proper.

## RELIEF REQUESTED

A.     Claimants seek an award of at least $639,312,750, representing:

(i)      Statutory damages;

(ii)     Punitive damages; and

        (iii)    Restitution.

B.     Enjoining Respondents' unlawful conduct.

C.     Pre- and post-judgment interest, to the extent allowable.

D.     Declaring that Respondents violated the laws cited herein.

E.     Costs and attorneys' fees for bringing this action, as well as such other and additional relief as the arbitrator may determine to be just and proper.

Dated: December 16, 2024

                                                 _____

Jonathan Waisnor (CA Bar No. 345801)
Morris Dweck (N.Y. Bar No. 5344627)
Woodworth B. Winmill (N.Y. Bar No. 5917604)
jwaisnor@labaton.com
mdweck@labaton.com
wwinmill@labaton.com
**LABATON KELLER SUCHAROW LLP**
140 Broadway, 34th Floor
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477