**KESSLER TOPAZ MELTZER & CHECK, LLP**
Jennifer L. Joost (Bar No. 296164)
jjoost@ktmc.com
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone: (415) 400-3000
Facsimile: (415) 400-3001

-and-

**KESSLER TOPAZ MELTZER & CHECK, LLP**
Joseph H. Meltzer (appearance *pro hac vice*)
jmeltzer@ktmc.com
Melissa L. Yeates (appearance *pro hac vice*)
myeates@ktmc.com
Tyler S. Graden (appearance *pro hac vice*)
tgraden@ktmc.com
Jordan E. Jacobson (Bar No. 302543)
jjacobson@ktmc.com
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**CARELLA BYRNE CECCHI BRODY & AGNELLO, PC**
James E. Cecchi (appearance *pro hac vice*)
jcecchi@carellabyrne.com
Michael A. Innes (*pro hac vice* forthcoming)
minnes@carellabyrne.com
Kevin G. Cooper (appearance *pro hac vice*)
kcooper@carellabyrne.com
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744

*Interim Co-Lead Class Counsel for Plaintiffs and the proposed Classes*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

JOHN DOE, JOHN DOE II, JOHN DOE III, JANE DOE, JANE DOE II, JANE DOE III, JANE DOE IV, JANE DOE V, and ALEXIS SUTTER, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

KAISER FOUNDATION HEALTH PLAN, INC., KAISER FOUNDATION HOSPITALS, and KAISER FOUNDATION HEALTH PLAN OF WASHINGTON,

Defendants.

Case No. 3:23-cv-02865-EMC

**DECLARATION OF JOSEPH H. MELTZER IN SUPPORT OF PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT, CERTIFICATION OF SETTLEMENT CLASS, NOTICE TO SETTLEMENT CLASS, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

Judge: Hon. Edward M. Chen

I, Joseph H. Meltzer, hereby declare as follows:

1. I am a member of the Bar of the Commonwealth of Pennsylvania and a partner at the law firm of Kessler Topaz Meltzer & Check, LLP ("KTMC"). KTMC, together with Carella Byrne Cecchi Brody & Agnello, PC ("Carella Byrne"), serves as counsel for Plaintiffs John Doe, John Doe II, Jane Doe, Jane Doe II, Jane Doe III, Jane Doe IV, Jane Doe V, and Alexis Sutter ("Plaintiffs") and as Interim Co-Lead Class Counsel for the proposed Settlement Class in the above-captioned matter ("Action"). I make this Declaration based on my personal knowledge and would be competent to testify to the matters stated in this Declaration.

2. I submit this Declaration in support of Plaintiffs' Reply in Support of their Motion for Preliminary Approval of Proposed Class Action Settlement, Certification of Settlement Class, Notice to Settlement Class, and Memorandum of Points and Authorities in Support ("Reply").

3. A true and correct copy of a screenshot taken after running a search in the Meta Ads Library (available at https://www.facebook.com/ads/library/?active_status=active&ad_type=political_and_issue_ads&country=US&is_targeted_country=false&media_type=all), is attached hereto as Exhibit 1.

4. A true and correct copy of the complaint in *Guevara v. Kaiser Foundation Health Plan, Inc.*, No. 25CV121881 (Cal. Super. Ct) is attached hereto as Exhibit 2.

5. A true and correct copy of a chart comparing opt-out requirements for various cases is attached hereto as Exhibit 3.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: September 23, 2025

*/s/ Joseph H. Meltzer*
Joseph H. Meltzer

**KESSLER TOPAZ MELTZER & CHECK, LLP**

*Interim Co-Lead Class Counsel*

# EXHIBIT 1

# Labaton Keller Sucharow LLP

Ads About

**~5 results**

## Launched January 2024

Inactive

Library ID: 397298036115642

Jan 23, 2024 - Jan 28, 2025

Platforms

This ad has multiple versions

**4 ads** use this creative and text

See summary details

**Labaton Keller Sucharow LLP**
Sponsored

Up to $5,000 in compensation available for people who have used Kaiser Permanente's online portal. Apply today.




Apply Online For Free
Limited time to apply

Apply Now

Inactive

Library ID: 3705951239727102

Jan 23, 2024 - Jan 27, 2025

Platforms

This ad has multiple versions

EU transparency

See ad details

**Labaton Keller Sucharow LLP**
Sponsored

Have you used Kaiser Permanente's online portal? Your sensitive medical info may have been illegally shared. Apply for up to $5,000 in compensation.




Up to $5,000 Available
Limited time to apply

Apply Now

System status

# EXHIBIT 2

Jonathan Waisnor (SBN 345801)
jwaisnor@labaton.com
Morris Dweck (Pro Hac Vice Application Forthcoming)
mdweck@labaton.com
**LABATON KELLER SUCHAROW LLP**
140 Broadway, 34th Floor
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

John J. Nelson (SBN 317598)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
402 W Broadway, Suite 1760
San Diego, CA 92101
Tel.: (858) 209-6941
jnelson@milberg.com

James M. Wagstaffe (SBN 95535)
**ADAMSKI MOROSKI MADDEN CUMBERLAND & GREEN LLP**
6633 Bay Laurel Place
Avila Beach, CA 93424
wagstaffe@ammcglaw.com
Telephone: (805) 543-0990
Facsimile: (805) 543-0980

*Counsel for Plaintiffs*

**ELECTRONICALLY FILED**
Superior Court of California,
County of Alameda
**05/06/2025 at 02:24:34 PM**
By: Milagros Cortez,
Deputy Clerk

**SUPERIOR COURT FOR THE STATE OF CALIFORNIA**

**COUNTY OF ALAMEDA**

JESSICA GUEVARA, NICOLE REYNOLDS, LINDA RODRIGUEZ, OSCAR OCARANZA, YARA GARCIA AND CINDY BARKHO, individually and on behalf of all others similarly situated,

Plaintiffs,

vs.

KAISER FOUNDATION HEALTH PLAN, INC., KAISER FOUNDATION HOSPITALS, AND THE PERMANENTE MEDICAL GROUP, INC.,

Defendant.

**CASE NO.:** 25CV121881

**CLASS ACTION COMPLAINT FOR DAMAGES**

1. Violation of the California Confidentiality of Medical Information Act, Civ. Code § 56.10 et. seq.;
2. Violation of the California Privacy Rights Act, Cal. Civ. Code § 1798.100, et. seq.;
3. Violation of the California Invasion of Privacy Act, Cal. Civ. Code § 630, et seq.;

4. Violation of the California Consumer Legal Remedies Act, Cal. Civ Code § 1770, et seq.;
5. Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 1720, et seq.;
6. Breach of Contract
7. Breach of Implied Contract;
8. Negligence; and
9. Unjust Enrichment.

**DEMAND FOR JURY TRIAL**

Plaintiffs Jessica Guevara, Nicole Reynolds, Linda Rodriguez, Oscar Ocaranza, Yara García, and Cindy Barkho (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, through their undersigned counsel, bring this Class Action Complaint against Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, and The Permanente Medical Group, Inc.(collectively "Kaiser" or "Defendant(s)"), on behalf of themselves and all others similarly situated, and allege the following upon personal knowledge as to their own actions, and upon information and belief as to counsel's investigations and all other matters:

**INTRODUCTION**

1. Kaiser is an integrated healthcare system that combines health insurance and medical care services. The organization operates through a vertically integrated model that includes Kaiser Foundation Health Plans, which provide a range of insurance options, and Kaiser Foundation Hospitals and Medical Groups, which offer comprehensive medical care through their own facilities and employed physicians.

2. This case is one of many against healthcare companies that have disclosed sensitive patient medical, health and other information to third party marketing and technology companies, in violation of data and health privacy laws.

3. Kaiser assured users that "Kaiser Permanente is committed to protecting the[ir] privacy."[1] When it came time to actually safeguard users' personal sensitive information, Kaiser betrayed that trust. Unbeknownst to users, Kaiser engaged with third-party advertising and marketing technology companies, including Quantum Metric, Twitter, Adobe, Bing, Salesforce and Google ("Third Party Wiretappers") so Kaiser could advertise more effectively. By doing so, Kaiser permitted Third Party Wiretappers to intercept users personally identifiable health information without users knowledge or consent.

---

[1] *Website and mobile application Privacy Statement*, Kaiser, https://healthy.kaiserpermanente.org/southern-california/privacy (last visited September 24, 2024).

4. Without users' knowledge or authorization, Kaiser embedded code from Third Party Wiretappers on its websites[2] ("Site"), secure patient portal ("Portal") and applications[3] ("App" collectively "Kaiser Platform" or "Platform") which allowed the Third Party Wiretappers to intercept the content of users' interactions with Kaiser's Platform, including patient status, identifying information, medical topics researched, and communications with healthcare providers, all of which is protected health information ("PHI"). Users PHI was then used by the Third Party Wiretappers to feed their expanding databases of personal information and for targeted marketing and advertising.

5. On April 12, 2024, Kaiser disclosed to regulators that it had confirmed on October 25, 2023 that certain Third-Party Wiretappers were improperly receiving PHI, violating HIPAA and the CMIA. Despite the requirement under California Customer Records Act, Cal. Civ. Code § 1798.82 that "disclosure shall be made in the most expedient time possible and without unreasonable delay," Kaiser delayed nearly six months before informing regulators. Kaiser only began notifying Plaintiffs and other Class Members around May 8, 2024. This strategic delay was unfair, depriving members of crucial information and hindering their ability to take timely legal action.

6. According to Kaiser's notice, Third Party Wiretappers' cookies and/or pixels were configured to transmit users' "IP address, name, information that could indicate a member was signed into a Kaiser Permanente account or service, information showing how the member interacted with and navigated through the website or mobile applications, and search terms used in the health encyclopedia." Exhibit 1. Kaiser's disclosures were in violation of its own policies and applicable law, as set forth below.

## PARTIES

### A. Plaintiffs

7. Plaintiff Jessica Guevara is a citizen of California, who resides in Rowland Heights, California.

---

[2] *Kaiser Permanente*, https://healthy.kaiserpermanente.org/front-door (last visited Feb. 27, 2025).
[3] *Kaiser Permanente*, Apple, https://apps.apple.com/us/app/kaiser-permanente/id493390354 (last visited Feb. 27, 2025); *Kaiser Permanente*, Google, https://play.google.com/store/apps/details?id=org.kp.m (last visited Feb. 27, 2025).

8. Plaintiff Jessica Guevara is a Kaiser Foundation Health Plan member and has received medical treatment through Kaiser Foundation Hospitals and/or the Permanente Medical Group beginning in or around the year 2000.

9. Since approximately the year 2000 and through the present, Plaintiff Jessica Guevara has been insured by Kaiser, most recently through her employer, Whittier Hearing Center, Inc.

10. Plaintiff Jessica Guevara has consistently utilized Kaiser's Site, Patient Portal, and App to manage her healthcare needs. This includes scheduling appointments, accessing medical records, reviewing and requesting prescriptions, researching healthcare providers and medical conditions, checking test results, and reviewing her medical history. Her use of these services began around the year 2021 through the present.

11. Plaintiff Nicole Reynolds is a citizen of California, who resides in Los Angeles, California.

12. Plaintiff Nicole Reynolds is a Kaiser Foundation Health Plan member and has received medical treatment through Kaiser Foundation Hospitals and/or the Permanente Medical Group since approximately the year 2017. Additionally, Plaintiff Nicole Reynolds was a Kaiser Foundation Health Plan member and received medical treatment through Kaiser Foundation Hospitals and/or the Permanente Medical Group from approximately 2005 to 2010.

13. Since approximately 2017, Plaintiff Nicole Reynolds has been insured by Kaiser through her employer, the County of Los Angeles' mental health courts. From approximately 2005 to 2010, Nicole Reynolds was insured by Kaiser through her previous employer, the University of California, Los Angeles.

14. Plaintiff Nicole Reynolds has regularly used Kaiser's website, Patient Portal, and mobile app to handle various aspects of her healthcare. This includes tasks such as scheduling appointments, accessing medical records, managing prescriptions, researching healthcare providers and medical conditions, reviewing test results, and tracking her medical history. Her engagement with these services started around 2017.

15. Plaintiff Linda Rodriguez is a citizen of California, who resides in Westminster, California.

16. Plaintiff Linda Rodriguez is a Kaiser Foundation Health Plan member and has received medical treatment through Kaiser Foundation Hospitals and/or the Permanente Medical Group since approximately 2006.

17. Since approximately 2006, Plaintiff Linda Rodriguez has been insured by Kaiser through her employment at Disneyland in Anaheim, California.

18. Plaintiff Linda Rodriguez has consistently utilized Kaiser's Site and Patient Portal for her healthcare needs. These services have enabled her to schedule appointments, view medical records, request prescriptions, research providers and conditions, check test results, and review her medical history.

19. Plaintiff Oscar Ocaranza is a citizen of California, who resides in Montebello, California.

20. Plaintiff Oscar Ocaranza is a Kaiser Foundation Health Plan member and has received medical treatment through Kaiser Foundation Hospitals and/or the Permanente Medical Group since approximately 2005.

21. Since approximately 2005, Plaintiff Oscar Ocaranza has been insured by Kaiser through his spouse.

22. Plaintiff Oscar Ocaranza has consistently utilized Kaiser's Site and Patient Portal. His use encompasses scheduling appointments, accessing medical records, reviewing prescriptions, exploring healthcare providers and conditions, checking test results, and keeping track of his medical history.

23. Plaintiff Yara García is a citizen of California, who resides in Lockeford, California.

24. Plaintiff Yara García is a Kaiser Foundation Health Plan member and has received medical treatment through Kaiser Foundation Hospitals and/or the Permanente Medical Group beginning in or around the year 2006.

25. Since approximately the year 1995 and through the present, Plaintiff Yara García has been insured by Kaiser, most recently through her employer, Kaiser Foundation Health Plan, Inc.

26. Plaintiff Yara García has consistently utilized Kaiser's Site, Patient Portal, and App to manage her healthcare needs. This includes scheduling appointments, accessing medical records,

reviewing and requesting prescriptions, researching healthcare providers and medical conditions, checking test results, and reviewing her medical history. Her use of these services began around the year 2006 through the present.

27. Plaintiff Cindy Barkho is a citizen of California, who resides in Anaheim, California.

28. Plaintiff Cindy Barkho is a Kaiser Foundation Health Plan member and has received medical treatment through Kaiser Foundation Hospitals and/or the Permanente Medical Group beginning in or around the year 2017.

29. Since approximately the year 2017 and through the present, Plaintiff Cindy Barkho has been insured by Kaiser, most recently through her employer, United Domestic Care Workers of America - OC.

30. Plaintiff Cindy Barkho has consistently utilized Kaiser's Site, Patient Portal, and App to manage her healthcare needs. This includes scheduling appointments, accessing medical records, reviewing and requesting prescriptions, researching healthcare providers and medical conditions, checking test results, and reviewing her medical history. Her use of these services began around the year 2017 through the present.

31. Unbeknownst to Plaintiffs Jessica Guevara, Nicole Reynolds, Linda Rodriguez, Oscar Ocaranza, Yara García, and Cindy Barkho and without their consent, Kaiser permitted Third Party Wiretappers to intercept, collect, and analyze their personal and sensitive health information. Third Party Wiretappers accessed details about their patient status, identifying information, and confidential communications with healthcare providers through Kaiser's Platform. This data interception occurred while the information was in transit, since Plaintiffs began using Kaiser's services until around November 2023, when Kaiser reportedly removed, altered, or disabled the tracking technologies from its website and mobile applications.

32. On or around May 11, 2024, Plaintiffs Yara Garcia and Cindy Barkho received emails from Kaiser Permanente with the subject line "Notice of Data Breach." In this correspondence, Kaiser acknowledged a violation of their privacy, admitting that, on October 25, 2023, it had discovered that certain online tracking technologies (such as cookies and pixels) embedded in Platform had transmitted personal data to third-party companies, including Google, Microsoft Bing, and X

(formerly Twitter). The letter specified that the exposed information included IP addresses, names, indications of user account activity, browsing behavior on Kaiser's digital platforms, and search terms used in the health encyclopedia. Additionally, Kaiser stated that following an internal investigation, it had removed these tracking technologies and implemented further security measures, under expert guidance, to prevent similar incidents in the future.

33. On or around May 12, 2024, Plaintiffs Nicole Reynolds and Oscar Ocaranza received emails from Kaiser Permanente with the subject line "Notice of Data Breach." These emails contained substantially the same statements as the email that Plaintiffs Yara Garcia and Cindy Barkho received.

34. Plaintiffs Jessica Guevara and Linda Rodriguez received letters on or around May 31, 2024, from Kaiser Permanente titled "Notice of Data Breach." These letters contained substantially the same statements as the emails that Plaintiffs Yara Garcia and Cindy Barkho received.

**B. Defendants**

35. Defendant Kaiser Foundation Health Plan, Inc. is a healthcare provider with its headquarters in Oakland, California.

36. Kaiser Foundation Health Plan, Inc. operates under an integrated care model, delivering both hospital and physician services through a network of medical facilities and healthcare professionals under the Kaiser Permanente brand. Individuals enrolled in Kaiser health plans have access to hospitals and numerous healthcare centers managed by Kaiser Foundation Hospitals and Permanente Medical Groups across the United States.

37. Kaiser Foundation Health Plan, Inc. assumes financial responsibility for covering the cost of medical services for its enrolled members or has contractually agreed to such responsibility with other Kaiser entities. As the largest healthcare service plan in the country, Kaiser Foundation Health Plan, Inc. serves over 12.7 million members. The organization owns and manages a website and mobile applications, which allow Kaiser members to access and exchange information related to their insurance and healthcare.

38. Kaiser Foundation Hospitals is a nonprofit, public-benefit corporation headquartered in Oakland, California. It oversees nearly 40 acute care hospitals and approximately 680 medical offices, with its largest presence in California, where the majority of its hospitals are based.

39. Although the Terms and Conditions of Kaiser's Site and App state that these platforms are owned and operated by Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals also played a role in their development and maintenance. For example, it was involved in negotiating and managing agreements with third-party service providers, including Quantum Metric, Adobe, and Dynatrace, which supplied technologies used on the digital platforms.

40. The Permanente Medical Group, Inc. is a physician-owned, for-profit entity headquartered in Oakland, California, consisting of professional corporations and partnerships

41. Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, and The Permanente Medical Group, Inc. operate collectively under the Kaiser Permanente name. While Kaiser Permanente is not a distinct legal entity, it is a registered trademark or trade name owned by Kaiser Foundation Health Plan, Inc. and used by Kaiser Foundation Health Plan, Inc., Kaiser Foundation Hospitals, The Permanente Medical Group, Inc., and their affiliates in joint operations.

## JURISDICTION AND VENUE

42. This class action is brought pursuant to the California Code of Civil Procedure section 382. The monetary damages and restitution sought by Plaintiffs exceed the minimal jurisdiction limits of the Superior Court and will be established according to proof at trial. The "amount in controversy" for the named Plaintiffs, including but not limited to claims for compensatory damages, restitution, penalties, wages, premium pay, and pro rata share of attorneys' fees, is less than seventy-five thousand dollars ($75,000).

43. This Court has jurisdiction over this action pursuant to the California Constitution, Article VI, Section 10, which grants the superior court "original jurisdiction in all other causes" except those given by statute to other courts. The statutes under which this action is brought do not specify any other basis for jurisdiction.

44. This Court has personal jurisdiction over Defendant because it is headquartered in and has its principal place of business in California.

45. Venue is proper in this Court under Code of Civil Procedure sections 395 and 395.5 because Defendant is headquartered in this county and a substantial part of the acts or omissions giving rise to this action occurred in this county.

## COMMON FACTUAL ALLEGATIONS

### C. Tracking Technology: Software Development Kits, Cookies and Web Beacons

46. Kaiser disclosed users' PHI through embedded tracking technologies, including software development kits ("SDKs"), cookies, web beacons and other tracking scripts provided by the Third Party Wiretappers, that it incorporated into the Kaiser Platform. SDKs, cookies and web beacons are tools and programs that allow developers, like Kaiser, to add features to their platforms that are developed by third parties, to track user interactions and collect data. For instance, Google's SDK can be incorporated into an app to share user data between the app and Google. By using the Google SDK, developers can gain access to Google's data analytics and use Google tools to assist with ads, among other things.

47. While Third Party Wiretappers offer tracking technologies to mobile application and website operators, it is the operators themselves who embed the technologies into their platforms. When a user then accesses a platform with the embedded technology, the technology directs the platform to send a message to a third party's server during their interaction with the platform, without the user's awareness. After retrieving and collecting this information, the Third Party Wiretapper, e.g., Quantum Metric, Twitter, Adobe, Bing, Salesforce or Google, views it, processes it, analyzes it, and uses it to, amongst other things, target users with ads. Further, these operators associate information communicated across multiple visits to digital platforms by capturing persistent identifiers like IP addresses, browser fingerprints, and device and user IDs. These identifiers allow companies to link user activity over multiple visits, creating detailed profiles for advertising.

### D. Kaiser's Site and App

48. Kaiser's Site and App are integral components of its digital ecosystem, designed to streamline access to health care services and information for members. The Site offers a member

portal where users can manage their health records, schedule appointments, request prescription refills, and handle billing and payments through an internet browser.

49. Users who have mobile devices, like smartphones or tablets, can download Kaiser's App from the Google or Apple Play Stores. The App allows members to access their personal health records, book or modify appointments, and communicate securely with health care providers. Additionally, the App supports prescription management, virtual care through telemedicine, and health tracking features.

50. The Kaiser Platform includes various features that collect user information, including PHI, which was shared with Third Party Wiretappers. The tracking technologies also collected detailed data about users' interactions in real time, including actions like logging in, clicking on buttons, navigation paths, searching for medical information, scheduling appointments, or entering information into various forms, including private messages about treatments, prescriptions, and health conditions. Kaiser's disclosures included unique device identifiers.

51. One of the Kaiser Platform features is the "Browse Health Encyclopedia," where users searched for information on health conditions, symptoms, and medical procedures. Tracking code embedded on the Browse Health Encyclopedia page intercepted and disclosed users' search terms to Third Party Wiretappers, revealing their medical conditions.

52. Similarly, the "Find a doctor or location" tool allows users to input personal health information to locate healthcare providers based on location, specialty, or specific medical conditions. This PHI was also intercepted by the Third Party Wiretappers.

53. Kaiser's Platform also provides a secure patient portal ("Portal") where users accessed their medical history, viewed test results, checked their symptoms, ordered prescriptions, scheduled appointments, and communicated directly with their healthcare providers. These interactions were also disclosed to third parties through tracking technologies.

54. The Site's chat function, which is used to discuss issues with customer service representatives, also disclosed users' information to third parties, specifically to Salesforce. During these interactions, users' electronic communications, including messages related to medical

conditions and insurance details—comprising personally identifiable information ("PII") and PHI—were intercepted in real time and disclosed to Salesforce without user consent.

55. Additionally, the login process captured users' credentials and other related details, such as their names, medical record numbers, regions, and coverage status, which were also transmitted to the Third Party Wiretappers. When users utilized online medical evaluations or scheduled appointments, the information entered was also disclosed.

56. For example, Kaiser's Platform transmits PHI to Adobe, Bing, Google, and Twitter like a recent medical procedure, e.g., a shoulder X-Ray, through their GET[4] and POST[5] requests back to their respective servers. Adobe, Bing, Google, and Twitter also used GET and/or POST requests to transmit additional information from within the Kaiser Platform, including PHI like allergy information, and medical conditions.

57. In essence, many of the Platform's features facilitated the gathering of users' sensitive personal and health information, which was disclosed and used by the Third Party Wiretappers.

58. Kaiser's disclosures were extensive, as Kaiser embedded a host of tracking technologies (as outlined below) into its Site and App, to gather data, including PHI, which were transmitted back to the Third Party Wiretappers. Upon information and belief, the technologies enabled Third Party Wiretappers to collect, process, and analyze users' information to enhance their advertising strategies.

| **Vendor** | **Service/Product Name** | **Purpose** | **Location** |
|---|---|---|---|
| Adobe | Adobe Target | Platform Support - Site Analytics | KP Site; KP App |
| Adobe | Adobe Analytics | Platform Support - Site Analytics | KP Site; KP App |

[4] A "GET" request is an HTTP method used by a web browser or client to request data from a server. When a GET request is made, the client sends a request to a specified URL, asking the server to retrieve and return specific data, typically in the form of a webpage or other online resources. GET requests are generally used for reading or retrieving data and do not alter the data on the server. The requested information is often sent back as part of the URL, making GET requests visible in the browser's address bar.

[5] A "POST" call is an HTTP method used to send user data to a server, typically to create or update a resource. In this process, data is included in the body of the request rather than in the URL, allowing for larger amounts of data to be transmitted compared to other methods. Instead of simply relaying the user's initial request to the server, a POST command directs the user's browser to intercept and route subsequent communications from the user to the server, e.g., filling out a form.

| Vendor | Service/Product Name | Purpose | Location |
|---|---|---|---|
| Adobe | Adobe (Marketo) | Marketing | KP Site |
| Adobe | Adobe Audience Manager | Platform Support - Site Analytics | KP Site; KP App |
| Adobe | Adobe Advertising | Marketing | KP Site; KP App |
| Dynatrace | Infrastructure and Application Observability | Platform Support - Performance and Support | KP App |
| Google | DoubleClick | Marketing | KP Site; KP App |
| Google | Google Ads | Marketing | KP Site; KP App |
| Google | Google Analytics 360 | Platform Support - Site Analytics | KP Site; KP App |
| Google | Google Tag Manager 360 | Platform Support - Site Analytics | KP Site; KP App |
| Google | ReCaptcha | Verification Services | KP Site |
| Google | Google Maps (API) | Google Maps Integration | KP Site |
| Microsoft | Microsoft Conversion Tag (aka Bing Conversion Tag) | Marketing | KP Site; KP App |
| Quantum Metric | Quantum Metric Real user Monitor | Platform Support - Performance and Support - Session-Based Analytics | KP Site; KP App |
| Twitter | Twitter | Marketing | KP Site; KP App |
| Qualtircs | Experience Management Site Intercept | Marketing | KP Site |
| Salesforce | Chat | Customer Service | KP Site |

### E. Specific Tracking Technologies Embedded by Kaiser

#### 1. Quantum Metric's Session Replay

59. Quantum Metric's Session Replay tool is a technology that records and replays individual user interactions on a website or app, capturing actions in real-time. By embedding code into the site, it intercepts and saves users' interactions—such as clicks, scrolls, and keystrokes—allowing companies to "replay" sessions to understand user behavior, similar to watching a video playback.

60. More specifically, as described by Quantum Metric, "Session replay is the reproduction of a user's interactions on web or native mobile applications. Session replay captures things like mouse movements, clicks, typing, scrolling, swiping, tapping, etc. Session replay isn't a

recording of a user's session. It's a reproduction of the individual experience based on the changing state of their browser or application, with all of the underlying contextual user data."[6]

61. Kaiser implemented Quantum Metric's code, including Session Replay functionality, on its homepage, patient portal login page, and various other pages across the Site, including within the Kaiser Portal itself.

62. Session Replay enables real-time tracking and recording of interactions between users and Kaiser's Site and Portal. As users navigate through the Portal, including performing functions such as scheduling appointments or viewing medical records, Session Replay captures extensive personal and sensitive data. This includes health information that is protected under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and other PII as users use the Site and Portal for their healthcare needs.

63. Quantum Metric's POST request also contained an Adobe Marketing ID, allowing a user to be tracked across multiple platforms:

64. The tracking process uses POST calls to transmit data to Quantum Metric's servers. However, these communications include sensitive patient information that is intercepted by Quantum Metric before being analyzed and stored on its servers. This allows Quantum Metric to maintain a comprehensive record of each member's interactions. For instance, if a user seeks information on specialized treatments like addiction medicine or searches for particular types of health providers or specialists, Quantum Metric captures this sensitive search data and uses it to further analyze and enhance its products, generating economic benefits from these interactions without the awareness or consent of the users.

65. Moreover, Kaiser's installation of Quantum Metric's technology led to extensive recording of PHI as users engage with various features on the Portal. This data includes details such as users' medical summaries, message center exchanges with healthcare providers, and private financial information within bill-pay sections.

[6] Session Reply, Quantum Metric, https://www.quantummetric.com/platform/session-replay (last accessed February 27, 2025).

66. According to the Quantum Metric End-User License Agreement, Kaiser permits Quantum Metric to collect, process, store, and display customer interactions with its website. The agreement states: "Subject to the terms of the Agreement, Quantum is provided a limited license to Customer Data for the purpose of providing the Quantum Service, including a license to collect, process, store, and display Customer Data to the extent appropriate in providing the Quantum Service to Customer."[7]

67. Testing revealed large amounts of data have been captured and redirected to Quantum Metric's servers during these interactions, further exposing sensitive and private information. For example, testing revealed Quantum Metric intercepted and received information that a user requires a vision prescription.

68. The Session Replay tool tracks users when they perform follow-up activities after logging out of the Portal, such as searching for healthcare providers, effectively documenting all interactions with the Site.

69. Although Quantum Metric is also collecting general analytics, its main service for Kaiser goes beyond standard tracking cookies. It records individual sessions in detail and retains the information on its own systems, which is then accessible to other third parties through Quantum Metric's interface.

70. A 2017 study by Princeton University's Center for Information Technology Policy warned that session recording technologies could expose users to identity theft, online scams, and other risks by collecting and transmitting sensitive information, such as medical conditions and credit card details, to third parties. The study also found that data collection from such technologies exceeds user expectations, capturing text typed into forms before submission and tracking precise mouse movements without any user notification, and that such data cannot reasonably be expected to remain anonymous.[8]

---

[7] SaaS End-User License Agreement, Quantum Metric, last modified Nov. 13, 2024, https://iam.quantummetric.com/terms-and-conditions.

[8] Steven Englehardt, *No Boundaries: Exfiltration of Personal Data by Session-Replay Scripts*, Freedom to Tinker, Nov. 15, 2017, https://freedom-to-tinker.com/2017/11/15/no-boundaries-exfiltration-of-personal-data-by-session-replay-scripts/.

71. From at least January 2022 to November 2023, Kaiser knowingly allowed Third-Party Wiretappers to intercept Plaintiffs' and Kaiser Plan Members' personal information. On information and belief, the same type of data tracked, disclosed, and transmitted to Quantum Metric, described in paragraphs 59-70 above, was collected and shared for all Plaintiffs and other Class Members each time they accessed the Site, Portal, or App.

72. Kaiser voluntarily embedded Quantum Metric's software on its Site, fully aware that the software would intercept, record, and redirect users' Site and Portal activity, including PHI and HIPAA-protected data, as well as communications with Kaiser and its providers. When installed on Kaiser's Site and Apps, Quantum Metric's Session Replay and related code functioned as a wiretap, with Quantum Metric acting as a third-party wiretapper.

**2. Adobe Marketing Cloud Service**

73. Kaiser knowingly and purposefully enabled Adobe access to users' personal and sensitive information, including PHI and private communications—through code linked to the Adobe Experience Cloud, also known as Adobe Marketing Cloud, embedded on the Site, including within the Portal since at least 2015.

74. Adobe Experience Cloud is a comprehensive suite of digital marketing tools designed to help businesses manage, personalize, and optimize customer experiences across channels.[9]

75. To deliver these services, Adobe Experience Cloud collects a variety of personal and identifiable data from users, including web browsing activity, such as page visits, URLs, search terms, and referral sources, along with device details like browser type, operating system, and IP address, which can approximate location. The tools also gather data from social media profiles, user input on

[9] The Adobe Experience Cloud offers a range of solutions, including analytics, advertising, content management, personalization, and e-commerce, enabling companies to gain insights into customer behavior, create targeted campaigns, and deliver consistent, personalized experiences to drive engagement and loyalty. Included in Adobe Experience Cloud are tools for measurement, which allow companies to analyze visitor interactions across websites, apps, and social media, as well as tools for personalization that enable testing of new content and adjustments for relevance to specific visitors. It also provides content management solutions for storing and delivering media across digital channels and advertising solutions to refine ad performance on platforms like search engines, apps, and social media. These solutions facilitate a range of outreach efforts, such as email, text, and other online and offline marketing campaigns.

forms, ad campaign engagement metrics, and even transaction details, like items purchased or added to a shopping cart.

76. Additionally, Kaiser used another technology, Adobe's Advertising Cloud,[10] which includes pre-defined health-related audience segments that are created using third-party data sources. These segments enable companies to deliver targeted ads to users based on specific health-related interests and demographics. For example, companies can target individuals with ads based on their potential interest in topics such as health conditions, insurance options, fitness routines, and personal care products. By leveraging these health-focused segments, Adobe's Advertising Cloud allows advertisers to reach audiences with content relevant to their health and wellness interests.

77. When users visit the Site and App, the Adobe tools gather their information through various tracking technologies, including cookies and web beacons, which power its cross-channel data and campaign management functions. These include the "omtrdc.net" and "demdex.net" cookies, which capture and transmit data about user interactions across digital platforms. Adobe's Experience Platform Launch (another tracking technology) further assists by managing a library of tags for other Adobe Experience Cloud tools, enabling deeper data tracking and analysis.

78. Other cookies, such as "everest_g_v2" and "demdex.net," play key roles in tracking user behavior. For instance, the "everest_g_v2" cookie is created after a user clicks on one of Adobe's client's ads. This cookie then tracks the user's ongoing activity on the client's website, linking the initial ad click with subsequent actions taken on the site. This tracking helps Adobe's clients understand how ads drive engagement and allows them to analyze user journeys and optimize advertising and site experiences accordingly.

79. These cookies are unique identifiers that Adobe uses for "cookie syncing" and "mapping." Cookie syncing is a process that aligns user data across multiple platforms and websites, allowing Adobe to connect and identify the same user across different sessions and channels.

[10] Adobe Advertising Cloud is a comprehensive platform that enables businesses to plan, buy, and optimize digital advertising across channels, including search engines, social media, and display ads, while using data insights to create more targeted and effective ad campaigns.

Through this technique, Adobe can match and merge data from various cookies, effectively mapping a user's activities and preferences across digital spaces. This creates a more complete user profile, enabling more precise targeting and personalization across Adobe's advertising and marketing services.

80. As users navigate Kaiser's Site and App, code embedded within the Platform commands users' browsers to initiate multiple POST calls that transmit their' PII, PHI, and confidential communications to Adobe. Adobe receives and stores this data on subdomains like "kaiser.tt.omtrdc.net," specifically set up on its servers to collect communications and interactions from Kaiser.

81. POST calls to kaiser.tt.omtrdc.net were made from various Kaiser Sites, including the Kaiser home page, doctor search sites, sites where users retrieve test results, medical history pages within the Portal and the bill pay page. These POST calls transmitted PHI, including users' medical conditions, and medications used.

82. Even after logging out, Adobe intercepted users' search terms like "mental health" and "neurologist," along with identifying details like zip codes.

83. Further, Adobe uses "fingerprinting" techniques as part of the data-gathering process. Adobe collects information on users' browsers, devices, operating systems, and other specific hardware characteristics, creating a unique digital fingerprint for each device. This process, known as web or device fingerprinting, enables Adobe to identify and track users over time, even when they take steps to avoid tracking. With this fingerprint, Adobe can monitor users' browsing behavior and deliver targeted ads or other personalized content. In cases of cross-device tracking, Adobe can also link users' activity across multiple devices by combining unique device fingerprints when a user logs in from both a computer and a mobile phone.

84. Additional data within the HTTP requests disclosed to Adobe include sensitive details about users' web activity and identifiers set by Adobe. For example, the HTTP request contains URLs that reveal when users access Kaiser's Portal, thereby identifying them as Kaiser members and patients. Adobe's "marketingCloudVisitorID" and "tntID" identifiers, were also transmitted, which work with tracking cookies to identify specific users across Adobe's services. This combination of

information includes confidential and HIPAA-protected data, which is transmitted each time users interact with Kaiser's Site and App.

85. Along with the URL headers, each time Adobe's code intercepted and redirected users' communications on the Site and App, Adobe also collected users' IP addresses.

86. When users first visit Kaiser's Site or Portal with the embedded Adobe Experience Cloud installed, Adobe checks for the presence of the AMCV cookie, which stores a unique marketingCloudVisitorID (or Experience Cloud ID). This ID is persistent and universally tracks visitors across all Adobe Experience Cloud solutions. If the cookie is not set, Adobe creates one by calling the "demdex.net" server, which generates the marketingCloudVisitorID and stores it in the AMCV cookie, allowing consistent tracking across the Kaiser Site. Additionally, a "demdex ID" cookie, which remains persistent across domains, enables Adobe to track specific devices across various websites.

87. Adobe also uses other tracking identifiers, such as the tntID (stored in a persistent "mbox" cookie), which functions as a device ID. The tntID aids Adobe Target in personalizing user experiences on sites like Kaiser's, using data such as environment parameters, geographical location, mobile device details, and session behavior. Another ID, the thirdPartyID, is a cross-channel identifier that can link user interactions across web, mobile, and IoT channels.[11] When users log into the Portal, this ID helps Adobe associate the user with a specific profile, enabling targeted and personalized content delivery based on their history and behaviors.

88. These unique identifiers, combined with data like IP addresses, device fingerprints, and third-party information, allow Adobe to identify users' identities, locations, devices, and online activities, enabling Kaiser and others to use Adobe's advertising technology for precise ad targeting.

[11] An IoT (Internet of Things) channel is a communication pathway or medium used for sending data between IoT devices, applications, and systems. This channel enables IoT devices to share data with other devices, cloud platforms, or applications, facilitating real-time monitoring, control, and data analysis.

89. On information and belief, the same type of data tracked, disclosed and transmitted to Adobe, described in paragraphs 73-88 above, was collected and shared with Adobe for all Plaintiffs and other Class Members each time they accessed the Site, Portal, or App.

**F. Twitter, Bing, and Google Intercepted Users' Communications from the Site and App**

90. Kaiser's use of online tracking technologies also sent PHI to Twitter, Bing, and Google through HTTP GET and POST requests. Kaiser's transmissions included sensitive details such as IP addresses, user interactions, and identifiable information of Kaiser members.

91. Google, Bing, and Twitter use the information disclosed by Kaiser to create detailed user profiles for targeted advertising, generating substantial revenue. For example, Alphabet (Google's parent company) reported over $31 billion in revenue in 2023, largely stemming from its advertising networks, which rely on extensive data collection to enhance ad targeting.[12] In exchange for the "free" analytics services provided by these tech giants, Kaiser effectively contributed users' sensitive information, enabling these companies to expand their advertising networks and improve their service offerings. By leveraging these analytics tools, Kaiser not only compromised the confidentiality of users' health data but also facilitated the monetization of that information by large advertising networks.

**G. Kaiser Embedded Tracking Technologies Which Disclosed PHI to Twitter**

92. Twitter (now known as "X") gathers extensive information about users, both those with Twitter accounts and those without, to create detailed profiles for targeted advertising. This includes data on users' tweets, browsing activity, device details, IP addresses, and even websites visited before and after engaging with Twitter. Such insights help advertisers understand user demographics and interests, allowing for more effective ad placements on users' timelines.

93. In relation to Kaiser, Twitter tracks information shared by ad partners, including data embedded within Kaiser's Site and App. According to Twitter's Privacy Policy, the personally

[12] Alphabet Inc., Annual Report (Form 10-K) (Jan. 31, 2024), https://abc.xyz/assets/4b/01/aae7bef55a59851b0a2d983ef18f/596de1b094c32cf0592a08edfe84ae74.pdf.

identifiable information from partners like Kaiser is merged with Twitter's own data to refine user profiles further. This combination of data enables Twitter to facilitate targeted advertising by leveraging analytics technologies, which Kaiser utilized by embedding Twitter's tracking code on its Platform. This integration allowed Kaiser to enhance its marketing capabilities based on user behavior, including the sensitive health information of users.

94. Despite Twitter receiving PHI from Kaiser's site, Kaiser did not establish contracts or agreements that would limit Twitter's use of this data for advertising purposes. In fact, Twitter's privacy policy explicitly permits the use of such information for its own marketing objectives, highlighting a lack of safeguards on Kaiser's part.

95. When users accessed Kaiser's Portal, Twitter received two GET requests indicating their successful login. When requesting electronic copies of their medical records, Twitter captured information revealing health conditions through these GET requests. This data enables Twitter to tailor ads targeting these conditions, promoting specific products like pain medications. The requests included cookie identifiers specific to users, allowing Twitter to match the data to their advertising profiles.

96. Additionally, when users accessed medication pages hosted on the Kaiser website, Twitter received relevant information, including specific drugs they were inquiring about. The same cookie identifiers were transmitted, linking this information to their advertising profiles. Similarly, when users searched for terms like "mental health" on the Site, Twitter captured these search terms via GET requests, further allowing for targeted advertising based on their health-related inquiries.

97. On information and belief, the same type of data tracked, disclosed, and transmitted to Twitter, as described in paragraphs 92-96 above, was collected and shared for all Plaintiffs and other Class Members each time they accessed the Site, Portal, or Kaiser App.

98. Despite legal obligations to maintain patient confidentiality, Kaiser's implementation of Twitter's tracking code, including the Twitter Analytics SDK and other related SDKs, facilitated the unauthorized transmission of sensitive health information to Twitter. This included not only identifiable patient information but also the contents of communications between users and Kaiser, covering details regarding medical conditions and health services. By intentionally embedding this

code across various pages of the Kaiser Site and App, Kaiser compromised the privacy of the users' communications, allowing Twitter to intercept and record confidential patient information without appropriate consent or contractual protections.

99. Further, according to Twitter's Privacy Policy, PII received from partners like Kaiser is combined with other data collected by Twitter to create user profiles for more targeted advertising.[13]

100. Twitter further explains that its analytic technology allows partners to track website visitors for targeted marketing using the X website tag, a small code snippet embedded on web pages. Once installed, this tag collects visitor cookie IDs and matches them to X users. This data enables businesses, like Kaiser, to create audience segments and target X Ads campaigns specifically to those who have recently visited their website.[14]

101. By embedding Twitter's tracking code on its Site and App, Kaiser knowingly allowed Twitter to collect and merge data on Kaiser Plan Members, including their PHI, with other data sources. This enabled Kaiser, Twitter, and third parties to leverage Twitter's marketing tools to target individuals—including Plaintiffs and Kaiser Plan Members—based on their online activity.

**H. Kaiser enabled Google's Interception of PHI for Its Own Purposes**

102. Google collects extensive information about users of the Kaiser Site and App to develop detailed profiles that enhance ad targeting. For instance, when a user searches for a medical condition like cancer, Google can subsequently direct ads for cancer treatment centers to that user. This capability is bolstered by Google's ad remarketing, which displays ads based on a user's previous interactions with websites that utilize Google's advertising services.

103. Historically, Google tracked user behavior primarily through third-party cookies, allowing it to monitor users across multiple websites. These cookies are widespread across the internet, enabling Google to compile a comprehensive view of individual interests and habits. However, since cookies are not universally set on all devices and can be blocked or cleared, Google

[13] X Privacy Policy, effective Nov. 15, 2024, https://x.com/en/privacy.

[14] X Business, *Website Activity Custom Audiences*, https://business.x.com/en/help/campaign-setup/campaign-targeting/custom-audiences/website-activity (last visited February 27, 2025).

introduced an "advertising ID" to enhance user tracking across devices and locations. Additionally, Google gathers information via IP addresses, which it collects when users visit sites with Google's advertising services or analytics tools. This data allows Google to improve its services, personalize user experiences, and measure ad effectiveness.

104. Furthermore, Google enables advertisers to target users based on particular health conditions, indicating that detailed health-related profiles can be created for precise ad targeting.

105. The Kaiser Site and Apps, including the Portal, employ Google code, such as Google Analytics and DoubleClick, to track user interactions and facilitate targeted advertising. This integration allowed Google to access users' PII and PHI for marketing purposes. Kaiser was aware of these capabilities when it installed the Google code, intending to utilize Google's marketing tools to target individuals based on their online behavior. However, Kaiser did not establish contracts with Google to restrict its use of users' confidential information for its own or third-party advertising.

106. In a 2019 Google Cloud Master Agreement, Kaiser acknowledged that Google could collect and retain data, including search terms and IP addresses, to enhance its products and services. Despite admitting that it provided Google with HIPAA-protected PHI, Kaiser failed to secure Business Associate Agreements or any contracts that would limit Google's use of this data. Google has stated that while data from healthcare provider websites is typically classified as sensitive, data from insurance company websites, like Kaiser's, may be used for personalized advertising.

107. Kaiser integrated Google's code, allowing the system to intercept and redirect data to Google, enabling the assignment of topics for targeted advertising. For instance, Google could categorize users under "Health Insurance" based on their site interactions, leading to targeted advertisements from third-party advertisers using Google's platform.

108. When users logged into the Portal, Google sent GET requests to both googleads.g.doubleclick.net and google.com, transmitting data such as the URL of the accessed page, event types (like conversions), and device information, which enables Google to create device fingerprints. For instance, when users accessed the Portal, multiple GET requests disclosed sensitive health information, including medical conditions. Similarly, POST requests to Google Analytics

included temporary session IDs and browser data, confirming successful logins and allowing Google to track user activities across different sites.

109. Kaiser's implementation of Google's code allowed for the redirection and disclosure of users' communications, including medical record information and search queries. For example, when a user accessed their medical records, Google received GET requests that included information about prescribed medications, which could be used to target relevant ads. Searches conducted within the Portal, such as for mental health or specific medical professionals, resulted in POST and GET requests that revealed the user's health conditions and treatment.

110. Kaiser's intentional deployment of Google's tracking code facilitated the unauthorized interception of personal communications, exposing the private health information of users and breaching their confidentiality rights.

111. On information and belief, the same type of data tracked, disclosed, and transmitted to Google described in paragraphs 102-110 above, was collected and shared for Plaintiffs and Class Members.

**I. Kaiser Facilitated Bing's Use of Users' PII and PHI for Marketing**

112. Bing collects extensive information from users of the Kaiser Site and App to enhance targeted advertising. For instance, when a user searches for a medical condition like cancer, Bing can subsequently display ads for related services, thereby utilizing search behavior for remarketing. Kaiser installed Bing code on its Site and App to leverage this functionality but failed to establish contracts that would prevent Microsoft from using the collected data for its own or third-party advertising purposes. On information and belief, although Kaiser has Business Associate Agreements with Microsoft for other services, these agreements do not cover the Bing code.

113. The Bing code embedded on Kaiser's Site includes Universal Event Tagging ("UET"), which tracks user interactions. For example, when a user logs into the Portal, Bing receives information through GET requests that disclose identifiers from cookies, allowing the creation of advertising profiles.

114. The GET requests to Bing also incorporated a number of cookies including the Machine Unique Identifier ("MUID"), the Windows Live ID ("WLID"); and the user's WLS identifier ("WLS").

115. The MUID functions as a unique identifier that tracks users across websites, linking their interactions and search behaviors to advertising profiles. This identifier allows Bing to maintain persistent tracking of specific individuals, even as they navigate different pages or log in and out of the Kaiser Site and Portal, enabling targeted advertising based on health-related searches and interactions.

116. The WLID is a unique user identifier assigned to a specific user, consisting of an alphanumeric string and the user's name.

117. The WLS is also a unique user identifier assigned to a specific user, consisting of an alphanumeric string along with the user's real name.

118. The Bing SDK integrated into the Kaiser Platform collects a wide range of user data, including PII and PHI. This data is sent to various Bing-controlled domains, such as bat.bing.com, where it can be linked to specific users and their medical information. The SDK intercepts data through user interactions on the Kaiser Platform, such as search queries, visited pages, videos, prescriptions, and medical records, capturing not just the content of these interactions but also unique identifiers like MUID, WLID, and WLS, which allow Bing to correlate this information to individual Kaiser members. Each time a user navigates through the Kaiser Platform, the SDK records URLs, page titles, and other identifiers, thereby creating a comprehensive profile of the user's health-related activities and history.

119. This data can be used to better target ads based on individual health conditions, as seen in instances where users' medical issues or search terms related to health conditions or physician specialties are sent to Bing's servers. On information and belief, the Bing SDK was installed on all pages on the Kaiser Platform, including within the Portal.

120. On information and belief, the same type of data tracked, disclosed, and transmitted to Bing described in paragraphs 112-119 above, was collected and shared for Plaintiffs and Class Members.

121. Kaiser knowingly allowed Bing to intercept users' PII and PHI without their consent.

**J. Kaiser Embedded the Salesforce Chat Feature Disclosing Users' Private Communications**

122. Salesforce provides a software service called "Chat" that combines a basic customer service chat function with backend analytics tools, which are marketed to improve customer support experiences. As an Application Programming Interface ("API"), this Chat function can be easily integrated into various company websites, including Kaiser's, through a Salesforce server.

123. Kaiser purchased a Salesforce license to use the Chat feature, which allowed Kaiser users to interact with customer service agents directly on its Site while Salesforce managed the back-end infrastructure.

124. When Kaiser members use the chat feature, any messages exchanged between the user and the customer service agent are routed through Salesforce servers. This setup allows Salesforce to record interactions in real-time, creating a "paper trail" that provides an official record of the chat.

125. Additionally, the chat function includes a "Sneak Peek" feature, enabling Salesforce to monitor what a user is typing in real-time before they even send the message, effectively giving Salesforce insight into unsent communications. Alongside message content, Salesforce can track a user's geographic location, time spent on the site, and other data points, reinforcing its role in monitoring user interactions on the Kaiser Site.

126. Salesforce's Chat function constitutes more than a simple record-keeping tool; it operates as an independent third party, intercepting and analyzing these interactions to a degree beyond standard data capture. Salesforce uses the collected chat data in its Einstein artificial intelligence (AI) platform to provide various customer service analytics tools.[15] For instance, Einstein's AI can suggest responses based on language patterns, identify frequent customer inquiries, and generate message recommendations, which customer service agents can use to improve responses. This platform also uses the intercepted data to refine Salesforce's AI models, develop new products, and enhance existing services, making Salesforce's Chat function a powerful tool for real-

---

15 https://help.salesforce.com/s/articleView?id=sf.admin_einstein_features_data_usage.htm&type=5.

time data extraction, analysis, and customer service optimization. This setup also allows Salesforce to leverage data from Kaiser's user interactions for Salesforce's product and service enhancement, even though users were unaware of this disclosure and did not consent to it.

### K. Kaiser Embedded Additional Third Party Pixels

127. Kaiser further enabled the sharing of user identities and activities with third-party advertisers by embedding Trade Desk Pixel technology into its Site. Trade Desk is a technology company that provides a digital advertising platform, specializing in programmatic advertising. Programmatic advertising is an automated process of buying and selling digital ads using data and algorithms, which helps brands target specific audiences more effectively.

128. The integration of the Trade Desk Pixel allowed Trade Desk to generate a unique advertising identifier, or TDID, for each Kaiser user, based on pseudonymous data stored in browser cookies. When users accessed the Kaiser Site, the Trade Desk Pixel triggered requests to Trade Desk's servers, initiating a process called "cookie syncing." Through this process, advertisers could link users' activities across platforms, ultimately connecting a Kaiser user's web browsing with targeted ad content.

129. The cookie syncing was directed by certain parameters in the code—specifically, the "fmt" parameter set to enable syncing. Upon executing these requests, the Trade Desk would assign the TDID to the user, marking their browsing device with this identifier, which then allowed other advertisers to identify and track Kaiser users. Trade Desk shared these identifiers with advertisers like Yahoo, Google, and AppNexus, who could leverage the TDID to target the individual Kaiser member with tailored ads based on previous interactions.

130. Through the TDID, the Trade Desk could not only track but also aggregate behavioral data associated with each user to create profiles. Their privacy policy confirms their use of such data for profiling based on attributes like interests, demographic categories, and past ad responses. Furthermore, advertisers could use this system to improve campaign accuracy based on a user's health-related browsing, revealing sensitive associations such as patient status. This interconnected tracking effectively allowed external parties to use this data for their benefit, creating extensive, individualized advertising profiles without patient consent.

131. Kaiser also utilizes Qualtrics' Experience Management Site Intercept software ("Site Intercept") on its Site to track user data through various unique user identifiers and cookies. Key identifiers include the Anonymous Survey ID ("ASID"), which is a numeric string assigned to each user, and the Contact ID ("CID"), an alphanumeric string stored in a first-party cookie on the user's computer. The CID enables Qualtrics to track users across different web pages and is linked to the user's account, allowing for the storage of their data. Another identifier, the Survey Instance ID ("SIID"), also an alphanumeric string, is similarly stored in a first-party cookie, which helps associate user responses with their respective CID.

132. In addition to these primary identifiers, Site Intercept employs several additional Qualtrics identifiers. The ZoneID ("ZID") is an alphanumeric string, while the InterceptID shares the same value as the SIID, allowing for consistent tracking. The ActionSetID corresponds to the ASID, and the CreativeID matches the CID, facilitating a comprehensive view of user interactions. Furthermore, Site Intercept collects "user-Agent" data, which includes identifying information about the user's web browser, further enhancing its tracking capabilities.

133. Site Intercept, collects user PII and PHI through a three-step process. First, it sends user identifiers to Qualtrics' servers. Next, it combines this data with additional user information, including medical details such as conditions and prescriptions, allowing Qualtrics to link users to their medical histories. Finally, the system sends this aggregated data back to the user's browser, enabling Qualtrics to match specific users with their medical information. This data collection extends to various user interactions on the Site, including when users search for medical conditions or prescriptions, the URLs of visited webpages, and pages related to allergies and immunizations are monitored in a similar fashion, allowing Qualtrics to compile extensive medical data linked to specific users.

134. Similarly, Kaiser used Adform technology on its Site, which enabled detailed tracking and data collection on users, linking their identities across multiple devices and online interactions through cookie syncing. According to Adform's Privacy Policy, it collects data like cookie IDs, geolocation, device information, IP addresses, and timestamped engagement metrics to support digital advertising activities such as tracking audience trends, forecasting, and attribution.

135. Adform leverages this data for product improvement, synchronization with other advertising services, and device linking, allowing it and other advertisers to create unified user profiles across devices. Adform processes this information by default on the basis of legitimate interest, though it specifies that it may obtain user consent depending on the site owner's policies.

**L. Kaiser's Disclosures Of Users PHI Caused Them Harm**

136. By disregarding users' right to privacy, Kaiser has subjected them to various harms. Kaiser's disclosure of users' data to Third Party Wiretappers increases the risk of further exposure and data breaches, leading to financial and legal repercussions.

137. Consumers become targets for invasive marketing practices, with companies exploiting their personal data to bombard them with unsolicited ads and manipulate their choices based on behavioral targeting. Moreover, consumers lose control over their personal data when it is shared or sold without their consent, leading to potential misuse in situations like credit evaluations, political campaigns, or insurance assessments. The negative effects of privacy violations also extend to societal impacts. For instance, companies' disregard for privacy can increase the potential for manipulation, exploitation, and price discrimination for entire groups of people.

138. These are not minor or inconsequential violations. The Federal Trade Commission ("FTC") took action against three healthcare companies for practices similar to those of Kaiser: Flo Health, GoodRx, and BetterHelp, for misleading consumers about their data privacy practices. Flo Health was accused of sharing sensitive health information without proper consent through Google Analytics and the Facebook SDK;[16] GoodRx was cited for sharing prescription data with advertisers via pixels and cookies;[17] and BetterHelp faced scrutiny for failing to protect user data and misrepresenting its privacy practices, also due to pixels and cookies.[18] In response to these concerns,

---

[16] Complaint, *Flo Health, Inc.* (Docket No. C-4747, F.T.C. (2020), https://www.ftc.gov/system/files/documents/cases/192_3133_flo_health_complaint.pdf.

[17] Complaint for Permanent Injunction, Civil Penalties, and Other Relief, *USA v. GoodRx Holdings Inc.*, No. 23-cv-460 (N.D. Cal. Feb. 1, 2023), ECF No. 1., https://www.ftc.gov/system/files/ftc_gov/pdf/goodrx_complaint_for_permanent_injunction_civil_penalties_and_other_relief.pdf.

[18] Complaint, *BetterHelp. Inc.* Docket No. C-4796, F.T.C. July 7, 2023, https://www.ftc.gov/system/files/ftc_gov/pdf/2023169betterhelpcomplaintfinal.pdf.

the FTC reached settlements with these companies, requiring them to implement stricter data privacy measures and improve transparency regarding their data handling practices.

139. Additionally, users' PHI, which Kaiser permits Third Party Wiretappers to intercept, holds monetary value. For instance, a recent study surveyed over a thousand consumers globally, asking what price they would expect third parties to pay for access to their data.[19] Results showed health information and medical records were valued at an average of $59.80. Similarly, companies like Prognos Health profit from selling what they claim to be de-identified health information from millions of patients.[20]

**M. Kaiser Admitted to Disclosing Users' PHI**

140. On April 12, 2024, Kaiser admitted that by October 2023, an internal investigation revealed "that certain third party online technologies previously installed on some portions of its website and mobile application were configured to transmit limited information about Kaiser members and patients to the vendor-developer as part of the technology's standard functionality. These online technologies (sometimes called "cookies" or "pixels") were provided by Google, Microsoft Bing, and Twitter, third party vendors engaged by Kaiser to support the performance and use of the Kaiser website and mobile application."[21]

141. Furthermore, Kaiser acknowledged that the "information collected by these technologies about Kaiser members may be considered PHI under HIPAA."[22]

142. The information disclosed included "IP address, name, information that could indicate a member was signed into a Kaiser Permanente account or service, information showing how the member interacted with and navigated through the website or mobile applications, and search terms used in the health encyclopedia."

---

[19] Jonathan Weicher, *Healthcare hacks—how much is your personal information worth?*, Netlib Security, https://netlibsecurity.com/articles/healthcare-hacks-how-much-is-your-personal-information-worth/ (last visited Sept. 15, 2023).

[20] Press Release, *Prognos Health Announces Patent-Pending Technology* (Apr. 6, 2021), https://prognoshealth.com/about-us/news/press-release/prognos-health-announces-patent-pending-technology.

[21] Exhibit 1.

[22] *Id.*

143. Kaiser reiterated the same when it sent individual breach notification letters to its members in 2024. Exhibit 3.

**N. Kaiser's Disclosures Violated HIPAA**

144. Kaiser was required to implement administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and availability of users' PHI. 42 U.S.C. § 1320d-6; 45 C.F.R. §§ 160, 164. HIPAA also requires medical providers to train their workforce on privacy policies and procedures to comply with HIPAA regulations and protect patient privacy. *Id*.

145. HIPAA's Privacy Rule broadly defines PHI as "individually identifiable health information" ("IIHI") that is "(i) [t]ransmitted by electronic media; (ii) [m]aintained in electronic media; or (iii) [t]ransmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

146. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

147. A corporation violates the HIPAA Privacy Rule if it knowingly: "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." 42 U.S.C. § 1320d-6.

148. A "person . . . shall be considered to have obtained or disclosed individually identifiable health information . . . if the information is maintained by a covered entity . . . and the individual obtained or disclosed such information without authorization." *Id*.

149. The Department of Health and Human Services (HHS) has clarified that patient status is protected under the HIPAA Privacy Rule, prohibiting unauthorized disclosures:

(a) HIPAA does not allow "the sale of a patient list to a marketing firm" (Standards for Privacy of Individually Identifiable Health Information, 65 Fed. Reg. 82717, Dec. 28, 2000);

(b) HIPAA requires a covered entity to obtain prior written authorization from individuals to disclose protected health information for marketing, including disclosures revealing patient status through a patient list (Standards for Privacy of Individually Identifiable Health Information, 67 Fed. Reg. 53186, Aug. 14, 2002);

(c) Unauthorized disclosure of a patient list containing names, addresses, and hospital IDs would violate HIPAA (Modifications to the HIPAA Privacy, Security, Enforcement, and Breach Notification Rules Under the Health Information Technology for Economic and Clinical Health Act and the Genetic Information Nondiscrimination Act; Other Modifications to the HIPAA Rules, 78 Fed. Reg. 5642, Jan. 25, 2013); and

(d) Hospitals may identify a patient's status only in a facility directory (name, location, general condition, and religious affiliation) accessible to clergy or persons who ask by name, with patients retaining the right to object (45 C.F.R. § 164.510).

150. On March 18, 2024, the Department of Health and Human Services (HHS) confirmed in a bulletin that HIPAA governs healthcare providers' use of tracking technologies, such as those created by Third Party Wiretappers and employed by Kaiser.[23] HHS clarified that healthcare providers violate HIPAA when utilizing tracking technologies that reveal an individual's identifying information, regardless of whether treatment information is included.[24]

151. Additionally, HIPAA's Breach Notification Rule requires covered entities to notify affected individuals, the Secretary of Health and Human Services, and, in certain cases, the media, following a breach of unsecured protected health information. 45 C.F.R. §§ 164.400-414.

---

[23] *HHS OCR Updates Guidance on Third-Party Web Trackers*, ABA, https://www.americanbar.org/groups/health_law/section-news/2024/march/hhs-ocr-updates-guidance-on-third-party-web-trackers/; *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, US Dept. of Health and Human Services, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

[24] *Id*.

Notifications must be made without unreasonable delay and no later than 60 days after the breach is discovered. *Id*.

152. Kaiser knowingly withheld this information and failed to disclose it as mandated by the HIPAA Breach Notification Rule and applicable state laws, despite publicly acknowledging awareness of these violations. *Id*. Kaiser's delayed response violated its obligation to notify affected individuals within 60 days of discovering the breach.

**O. Kaiser's Terms and Conditions and Privacy Statement**

153. The Kaiser's Terms and Conditions and Privacy Statement form a distinct and independent agreement between users of the Site and Apps and Kaiser. The Privacy Statement explicitly acknowledges that the Site allows members and other users to access health-related information, communicate with practitioners and staff, arrange healthcare services, and utilize additional features.

154. By clicking "Sign In" before accessing their healthcare information, users, including Plaintiffs and Class Members, enter into an express and/or implied contract with Kaiser. This contract governs user rights, responsibilities, and obligations regarding the Site, Apps, and the information provided within them. The Terms and Conditions and Privacy Statement outline these contractual terms. The Terms and Conditions explicitly incorporate the Privacy Statement, stating: "Any personal information you submit to the Site (for yourself or someone else) is governed by our Website and KP Mobile Application Privacy Statement."

155. In agreeing to these terms, Kaiser members provide valuable benefits to Kaiser, including: sharing PII and accessing PHI under the agreed terms, enhancing operational efficiency in delivering healthcare services, and reducing costs associated with managing members' medical conditions.

156. As an integrated managed care consortium, Kaiser benefits directly from cost savings achieved through these efficiencies, given its dual role as both healthcare provider and insurer.

157. Additionally, Kaiser's website provides a link to the HIPAA Notice of Privacy Practices, which outlines its legal obligations regarding PHI. However, Kaiser breached these commitments, failing to uphold the promises made regarding PHI protection.

158. For years, Kaiser affirmatively misrepresented its data collection and sharing practices to users in its Privacy Statement.[25] In its Privacy Statement, Kaiser claims it "is committed to protecting the privacy of the users of the Site,"[26] and that its "use and disclosure of an individual's personal information (including health information) is limited as required by state and federal law."[27]

159. Kaiser never told users that their electronic communications were being wiretapped by the Third Party Wiretappers. Kaiser does not ask users whether they consent to having the contents of their information and communications with Kaiser disclosed to the Third Party Wiretappers.

160. Kaiser inaccurately asserts that no health history information about Kaiser plan members is being transmitted; representing to users that its "cookie consists of a unique identifier that does not contain information about your health history."[28]

161. Kaiser's Privacy Statement references "third parties" does not define these them and stating that others might monitor certain information does not equate to disclosing that third parties actively collect user data in real time.

162. Kaiser further represented that it only collected aggregate data regarding the Sites members visited or their click paths.[29] This does not disclose that Kaiser sends users' medical information and communications to the Third Party Wiretappers, as Kaiser effectively admitted by sending breach notices to users beginning in April 2024.

163. Mentioning the potential use of "cookies . . . and other tracking technologies" does not adequately inform Kaiser members about the use of technology such as Session Replay and other tracking tools employed by Third Party Wiretappers, which differ from first-party cookies in that they (1) transmit data to an external server as the user navigates the website; (2) track users across devices; (3) are not easily disabled by users; and (4) effectively create a record of all interactions and information exchanges on the Site.

---

[25] *Website and mobile application Privacy Statement*, Kaiser, https://healthy.kaiserpermanente.org/privacy (last visited September 24, 2024).
[26] *Id.*
[27] *Id.*
[28] *Id.* ¶ 3.
[29] *See Id.*

164. Finally, information disclosures to the Third Party Wiretappers are not solely for optimizing the Kaiser Platform for user convenience, but are also used for marketing purposes, including generating targeted ads for third parties.

165. Kaiser willfully and deceptively allowed the unauthorized interception, disclosure, and transfer of PII and PHI, violating its own Terms and Conditions and Privacy Statement.

**P. Kaiser's Conduct Violates California Privacy Laws**

166. Kaiser Plan Members have a reasonable expectation of privacy regarding their personal identifying information, sensitive medical data, and communications with Kaiser and its providers. This expectation is supported by state and federal privacy laws, as well as Kaiser's express and implied contracts and disclosures. Specifically, members reasonably expect that their information will not be disclosed to or tracked by Third Party Wiretappers or used for marketing purposes.

167. Plaintiffs and Class Members believed their interactions with Kaiser on the Site, Portal, and App were private and would not be shared with third parties, recorded, or monitored for later playback. The data collected by Kaiser—such as web pages visited and content viewed—revealed personalized and sensitive information about Plaintiffs and Class Members, including medical details.

168. Plaintiffs and Class Members were not reasonably able to discover Defendants' unauthorized conduct, as Kaiser failed to disclose its actions or seek consent before transmitting information to Third Party Wiretappers. Privacy polls consistently show that most Americans consider affirmative consent crucial before a company collects or shares personal data.[30]

169. As Kaiser Plan Members, Plaintiffs and Class Members have a reasonable expectation that their personal and medical information, as well as confidential communications with Kaiser and its providers, will not be shared with third parties without their express consent. This expectation of privacy stems from several factors, including:

[30] *E.g.,* Brooke Auxier et al., *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, Pew Research Center (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

(a) Kaiser's role as the healthcare provider for its members;

(b) Kaiser's common law obligation to maintain confidentiality of patient data;

(c) California and federal laws protecting the confidentiality of medical information, i.e., the CMIA and HIPAA;

(d) California laws safeguarding communication and computer data, i.e., California Privacy Rights Act, California Electronic Communications Privacy Act, California Information Privacy Act, California Invasion of Privacy Act, and California's Digital Privacy Laws; and

(e) Kaiser's express and implied promises of privacy and confidentiality.

## CLASS ALLEGATIONS

170. Plaintiffs bring this action under Cal. Civ. Proc. Code section 382 on behalf of a Class of California Citizens who are Kaiser Plan Members and beneficiaries. Excluded from this Class are Defendant and its officers, directors, and managerial employees. Also excluded is anyone employed by counsel for the parties in this action and any Judge to whom this case is assigned, his or her staff and immediate family, anyone who is a named plaintiff in any previously-filed suit against Kaiser and anyone who has previously given notice of an intention to arbitrate and is represented by counsel other than undersigned counsel.

171. Plaintiffs reserve the right to modify, change, or expand the Class definition, including by proposing subclasses, based on discovery and further investigation.

172. <u>The Class Is Sufficiently Numerous.</u> While the exact number of Class Members is not known at this time, the estimated number of California Kaiser Plan Members and beneficiaries impacted by Kaiser's disclosure is over 9.4 million, making joinder of all members impractical. The identities of Class Members are readily ascertainable from information and records in Defendant's possession, custody, or control, and notice of this action can be readily provided to the Class.

173. <u>Typicality.</u> Plaintiffs' claims are typical of the claims of the Class. Plaintiffs, like all Class Members, had their PII and PHI disclosed to Third Party Wiretappers by Kaiser. Plaintiffs and Class Members were injured by the same wrongful acts, practices, and omissions of Kaiser as described herein. Accordingly, Plaintiffs' claims arise from the same course of conduct that gives rise

to the claims of all Class Members, and their interests are significantly similar to those of other Class Members.

174. Adequacy of Representation. Plaintiffs are members of the proposed Class and will fairly and adequately represent and protect the other members' interests. Plaintiffs' counsel are experienced in class actions, complex and privacy litigation and will pursue this action vigorously. For example, Labaton Keller Sucharow LLP, formerly Labaton Sucharow LLP, has represented or is representing the plaintiffs in *Patel, et al. v. Facebook, Inc.*, No. 3:15-cv-03747-JD (N.D. Cal), *Garner, et al. v. Amazon.com, Inc. et al.*, No. 2:21-cv-00750-RSL (W.D. Wash.), *Frasco, et al. v. Flo Health Inc.,* No. 3:21-cv-00757-JD (N.D. Cal.), and *Afriye. et al. v. NBCUniversal Media, LLC*, No. 1:23-cv-09433-VSB (SDNY). Plaintiffs have no interests adverse to the interests of other Class Members.

175. Predominant Common Issues of Law and Fact. There is a well-defined community of interest in the common questions of law and fact that underlie Class Members' claims for relief. The questions of law and fact in this case that are common to Class Members predominate over questions affecting only individual Class Members. Among the questions of law and fact common to the Class are:

a. Whether Defendants' actions and practices violated the California Confidentiality of Medical Information Act, Cal. Civ. Code § 56.10;
b. Whether Defendants' actions and practices violated the California Confidentiality of Medical Information Act, Cal. Civ. Code § 56.101;
c. Whether Defendants' actions and practices violated the California Privacy Rights Act, Cal. Civ. Code § 1798.100, et. seq.;
d. Whether Defendants aided and abetted violations of the California Invasion of Privacy Act, Cal. Civ. Code § 630, et seq.;
e. Whether Defendants' actions and practices violated the California Invasion of Privacy Act, Cal. Penal Code § 638, et seq.
f. Whether Defendants' actions and practices breached the California Consumer Legal Remedies Act, Cal. Civ Code §§ 1770(A)(5), (7);
g. Whether Defendants' actions and practices breached the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 1720-17210;
h. Whether Defendants' actions and practices invaded Plaintiffs and Class Members right to privacy;
i. Whether Defendants violated an express contract;
j. Whether Defendants violated an implied contract;
k. Whether Defendants' actions and practices constituted negligence;
l. Whether Defendants' were unjustly enriched by their acts and practices..
m. Whether Plaintiffs and Class Members are entitled to damages, equitable relief, injunctive relief, or other appropriate remedies.

176. Superiority. A class action is superior to other alternatives for the fair and efficient adjudication of this controversy. Absent a class action, most members of the Class would find the cost of litigating their claims individually to be prohibitively high and would have no effective remedy. Class treatment will conserve judicial resources, avoid waste and the risk of inconsistent rulings, and promote efficient adjudication before a single Judge.

177. Injunctive and Declaratory Relief. Kaiser has acted or refused to act on grounds generally applicable to the Class, thereby making it appropriate for this Court to grant injunctive and corresponding declaratory relief with respect to the Class as a whole.

## CAUSES OF ACTION

## COUNT I

## VIOLATIONS OF CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT CIVIL CODE § 56.10.

178. Plaintiffs and Class Members re-allege and incorporate the preceding allegations of this Demand with the same force and effect as if fully restated herein.

179. According to section 56.10 of the California Civil Code a "provider of health care . . . shall not disclose medical information regarding a patient . . . without first obtaining an authorization." This requires Plaintiffs to show that Kaiser is (a) a provider of health care, (b) that it disclosed "medical information" regarding a patient, and (c) that it did not have authorization to do so.

180. *Provider of health care*: Kaiser is a provider of health care for two reasons. First, as an integrated managed care consortium, Kaiser runs hospitals and medical centers and is a licensed clinic, health dispensary, or health facility. Cal. Civ. Code § 56.05(p). Second, Kaiser is a provider of health care as it maintains medical information and offers software to consumers that is designed to maintain medical information for the purposes of allowing its users to manage their information and for the diagnosis, treatment, and management of medical conditions, specifically, the Site, App and Portal. Cal. Civ. Code § 56.06(a), (b). Kaiser is therefore subject to the requirements of the CMIA and obligated to maintain the same standards of confidentiality required of a provider of health care with respect to medical information that it maintains on behalf of Plaintiffs and Class Members.

181. *Disclosure of medical information*: Kaiser disclosed "medical information" about its patients. "Medical information" is defined as "any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care…regarding a patient's medical history…mental or physical condition, or treatment." Cal. Civ. Code § 56.05(i). By disclosing users' appointment information, medical form data and private messages about treatments, prescriptions, and health conditions, Kaiser disclosed users' medical information.

182. The statute broadly defines "Individually identifiable" as containing "any element of personal identifying information sufficient to allow identification of the individual, such as the patient's name, address, electronic mail address, telephone number, or social security number, or other information that, alone or in combination with other publicly available information, reveals the identity of the individual." Cal. Civ. Code § 56.05(i). Kaiser's disclosure of users' medical information in conjunction with users' IP address, name, login and medical form information and unique identifiers allows users' to be identified individually.

183. *Without authorization*: Kaiser's Privacy Statement represented that its cookies did not include details about Plaintiffs and Class Members' health history. Additionally, Kaiser stated that it only gathered aggregate data related to the Sites users visited or their browsing paths. As Kaiser failed to reveal it was transmitting Plaintiffs and Class Members' medical information and communications to Third Party Wiretappers, Kaiser did not have their authorization, in violation of the CMIA. Cal. Civ. Code §§ 56.05, 56.10.

184. This release of Plaintiffs and Class Members' PHI to third parties was an affirmative act in violation of Cal. Civ. Code § 56.10(a).

185. Cal. Civ. Code § 56.10(d) reinforces these restrictions by stating that unless "expressly authorized by a patient, enrollee, or subscriber, or as provided by subdivisions (b) or (c), a provider of health care . . . shall not intentionally share, sell, use for marketing, or otherwise use medical information for a purpose not necessary to provide health care services to the patient."

186. As a direct and proximate result of Kaiser's violation of Cal. Civ. Code §56.10(a), Plaintiffs and Class Members' Medical Information was shared, viewed, and used for marketing.

187. Kaiser's unauthorized disclosures of Plaintiffs and Class Members' PHI has caused them injury.

188. Accordingly, Plaintiffs and Class Members are entitled to: (1) statutory damages pursuant to Cal. Civ. Code § 56.36(b); (2) punitive damages pursuant to Cal. Civ. Code § 56.35; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

**COUNT II**
**VIOLATIONS OF CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT**
**CIVIL CODE § 56.101.**

189. Plaintiffs and Class Members re-allege and incorporate the preceding allegations of this Demand with the same force and effect as if fully restated herein.

190. The CMIA requires that every provider of health care "who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein." Cal. Civ. Code § 56.101(a).

191. Kaiser creates, maintains, preserves and stores Plaintiffs and Class Members' medical records, health histories and medical conversations on its servers. Yet, by disclosing Plaintiffs and Class Members' medical form information, diagnoses and private messages with providers to the Third Party Wiretappers, Kaiser failed to comply with the requirement to properly store and preserve PHI.[31]

192. Thus, Kaiser shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of Cal. Civ. Code § 56.36.

193. Accordingly, Plaintiffs and Class Members are entitled to: (1) statutory damages pursuant to Cal. Civ. Code § 56.36(b); (2) punitive damages pursuant to Cal. Civ. Code § 56.35; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

**COUNT III**
**VIOLATIONS OF CALIFORNIA PRIVACY RIGHTS ACT**
**CAL. CIV. CODE § 1798.100 ET SEQ.**
**(IN THE ALTERNATIVE TO COUNTS I AND II)**

[31] Additionally, as described above, Quantum Metric stores user data and shares it with partners through its "Solution Partner Program," while Adobe's ECID enables persistent identification of consumers across platforms for marketing purposes.

194. Plaintiffs re-allege and incorporate the preceding allegations of this Demand with the same force and effect as if fully restated herein.

195. The California Privacy Rights Act ("CPRA") amended the California Consumer Privacy Act, which was enacted in 2018 and became effective in 2020, and added additional privacy protections that began on January 1, 2023.

196. The CPRA includes a private right of action for:

> any consumer whose nonencrypted and non-redacted personal information, as defined in subparagraph (A) of paragraph (1) of subdivision (d) of Section 1798.81.5, . . . is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information . . .

Cal. Civ. Code §1798.150(a).

197. The definition of "personal information" includes "[m]edical information" under Cal. Civ. Code § 1798.81.5(d)(1)(A)(iv).

198. Plaintiffs and Class Members are consumers as they are residents of California and pay to use Kaiser's services. Cal. Civ. Code §1798.150(a).

199. Plaintiffs' personal information was subject to an authorized access and disclosure by Kaiser as it failed to implement proper procedures to ensure it only disclosed Plaintiffs and Class Members' medical information in accordance with California law and with its own Privacy Statement. Rather, Kaiser disclosed Plaintiffs and Class Members' medical information to Third Party Wiretappers using tracking technology without their authorization.

200. Indeed, Kaiser has effectively admitted to a breach of this statute when it sent Plaintiffs and Class Members notices informing them that their PHI was unlawfully disclosed to the Third Party Wiretappers. Exhibits 1, 3.

201. Under the CPRA, Plaintiffs and Class Members are entitled to recover the statutory damages of $750, as well as injunctive and declaratory relief. Cal. Civ. Code §1798.150(a)(1).

## <u>COUNT IV</u>
## VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT CAL. PENAL CODE §§ 630 et. seq.

202. Plaintiffs and Class Members re-allege and incorporate the preceding allegations of this Demand with the same force and effect as if fully restated herein.

203. The California Legislature enacted the California Invasion of Privacy Act, Cal. Penal Code §§ 630 - 638.55 ("CIPA") finding that "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.* § 630.

204. CIPA aims to "prevent[s] the acquisition of the contents of a message by an unauthorized third-party." *In re Facebook, Inc. Internet Tracking Litig.,* 956 F.3d 589, 608 (9th Cir. 2020).

205. Courts are "required to liberally construe" CIPA to effectuate the "important public policy" surrounding privacy. *Kight v. CashCall, Inc.,* 231 Cal. App. 4th 112, 131 (Cal. Ct. App. 2014).

206. CIPA provides that:

> [a]ny person who, by means of any machine . . . or in any other manner, intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or who willfully and without the consent of all parties to the communication . . . reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state . . . or **who aids, agrees with, employs, or conspires** with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section is liable to the harmed party.

Cal. Pen. Code § 631(a) (emphasis added). This requires Plaintiffs and Class Members to show that Kaiser (a) aided the Third Party Wiretappers to (b) read the contents of a message, (c) willfully, and (d) without consent, (e) while in transit.

207. *Kaiser Aided*: The definition of aiding and abetting includes "giving substantial assistance to the other in accomplishing a tortious result and the person's own conduct, separately

considered, constitutes a breach of duty to the third person." *Fiol v. Doellstedt*, 50 Cal. App. 4th 1318, 1325-26 (Cal. Ct. App. 1996) (citation omitted). Kaiser knowingly aided Third Party Wiretappers in intercepting Plaintiffs and Class Members' communications by embedding SDKs, cookies, web beacons, and other tracking technologies into its Platform, profiting from the advertising and information services it received in return. Kaiser intentionally programmed its Platform to transmit Plaintiffs and Class Members' PHI by embedding these tracking technologies and configuring them to send PHI.

208. *Intentionally taps*: By embedding tracking technologies into its Platform, Kaiser aided Third Party Wiretappers to tap and/or make unauthorized connections with, the lines of internet communication between Plaintiffs and Class Members and Kaiser's Site.

209. *Instrument*: CIPA extends beyond phone lines and also applies to "new technologies," including computers, the internet, and email. S*ee Matera v. Google Inc.*, 15-CV-04062-LHK, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016).

210. The tracking technologies Kaiser embedded into its Platform, including Salesforce's Chat API, is a "machine, instrument, contrivance, or . . . other manner" used to wiretap Plaintiffs and Class Members' PHI.

211. *Willfully reads*: The Third Party Wiretappers did not merely receive information inadvertently, their technologies are specifically designed to maximize the private information gathered from Plaintiffs and Class Members using the Kaiser Platform, and they are fully aware that this data is being transmitted and read. In fact, the Third Party Wiretappers used Plaintiffs and Class Members' data to create user profiles for targeted advertising, increasing their advertising effectiveness and revenue. These companies willfully gained access to valuable user information in exchange for providing analytics tools to Kaiser.

212. Importantly, the Third Party Wiretappers do not simply facilitate Kaiser's own business functions. Third Party Wiretappers use Plaintiffs and Class Member information for their own benefit as well as for that of other third-party customers of theirs by uniquely identifying users so they can target them with advertisements. Quantum Metric, for example, stores user data on its systems and makes it accessible to various partners, including system integrators, digital agencies,

and resellers. The company's "Solution Partner Program" incentivizes these partners to develop specialized solutions using Quantum Metric's data, creating a hub-and-spoke network that facilitates the sharing of user information.

213. Kaiser's transmissions also contained Adobe's proprietary persistent identifier for identifying consumers, known as the "Experience Cloud Visitor ID" (ECID).[32] Adobe's documentation explains that the Adobe ID is used to "uniquely identify visitors and resolves identity information."[33] Adobe's documentation further explains that the Adobe ID "provides a universal and persistent ID that identifies your visitors across all applications" and that it allows businesses to "market to real people as opposed to devices."[34]

214. Google, Bing, and Twitter utilize user data to build detailed profiles for targeted advertising, which is a major revenue source for these companies. In exchange for providing free analytics tools to companies like Kaiser, they gain access to valuable user information, thereby expanding their advertising networks and refining their ad targeting strategies. This data not only supports their advertising networks but also enhances the effectiveness of ads, as it allows advertisers to connect with users at the most relevant moments.

215. *Contents of a message*: Information gathered by Third Party Wiretappers from medical platforms and websites can qualify as the "contents" of a message if it is sufficiently identifiable. For example, "search terms" are considered content because they can reveal a user's personal interests, queries, and habits. Similarly, URLs that disclose "search terms or similar communications" can be classified as content under the law. *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 795 (N.D. Cal. 2022). Kaiser's disclosures included the content of Plaintiffs and Class Members' messages, extending far beyond search terms and URLs. *Id*. The disclosures encompassed Plaintiffs

[32] The ECID is often referred interchangeably as the Adobe ID, Marketing Cloud Visitor ID (MCID), and Marketing ID (MID). See, e.g., https://adobeexchangeec.zendesk.com/hc/en-us/articles/360024277392-Adobe-Experience-Cloud-Using-the-ECID-for-integration.

[33] Adobe Experience Cloud Identity Service, https://experienceleague.adobe.com/docs/id-service/using/home.html?lang=en.

[34] ECID overview, https://experienceleague.adobe.com/docs/experience-platform/identity/ecid.html?lang=en.

and Class Members' information entered into various forms, as well as private messages regarding treatments, prescriptions, and health conditions.

216. *Without consent*: CIPA requires the consent of all parties to the communication, notably, Plaintiffs and Class Members. However, Kaiser did not obtain appropriate consent from Plaintiffs and Class Members to permit the Third Party Wiretappers to intercept their PHI. Kaiser did not disclose in its Privacy Statement that it was sharing users' health information or private communications with third parties. *Supra*, ¶¶ 153-165. Indeed, Kaiser's Privacy Statement actually undermined any informed consent by representing that its cookies did not include details about users' health history and that it only gathered aggregate data related to the Sites users visited or their browsing paths. Privacy Statement at ¶ 3.

217. *While in transit*: Tracking technologies installed by Kaiser automatically and simultaneously intercept Plaintiffs and Class Members' communications with Kaiser's Platform while in transit.

218. Section 631(a) is not limited to phone lines, but also applies to new technologies such as computers, the Internet, and email.

219. As Kaiser aided and abetted Third Party Wiretappers to read Plaintiffs and Class Members' communications in real time without their consent, Plaintiffs and Class Members are entitled to recover statutory damages of $5,000, per violation, as well as injunctive or other equitable relief. Cal. Civ. Code § 637.2(a).

## COUNT V
## VIOLATIONS OF CALIFORNIA INVASION OF PRIVACY ACT
## CAL. PENAL CODE § 638.

220. Plaintiffs and Class Members re-allege and incorporate the preceding allegations of this Demand with the same force and effect as if fully restated herein.

221. California law prohibits installing a pen register without first securing a court order. California Penal Code § 638.51.

222. A "pen register" is defined as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a

wire or electronic communication is sent, but not the content of the communication." *Id*. at § 638.50(b).

223. A "Trap and trace device" is a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication. *Id*. at § 638.50(c).

224. Kaiser uses a pen register device and/or process on its Site and App by deploying tracking code from Third Party Wiretappers, because the software is designed to record and decode the dialing, routing, addressing, and signaling information from which the communication is sent.

225. Kaiser also uses a trap and trace device and/or process on its Site and App by deploying tracking code from Third Party Wiretappers, because the software is designed to capture the phone number, email, routing, addressing and other signaling information of the Platforms' visitors. As such, the tracking code is designed precisely to identify the source of the incoming electronic and wire communications to the Platform.

226. Kaiser did not obtain consent from Plaintiffs and Class Members before using pen register or trap and trace technology in violation Section 638.51.

227. CIPA imposes civil liability and statutory penalties for violations of §638.51. California Penal Code § 637.2.

228. Plaintiffs and Class Members are entitled to recover statutory damages of $5,000, per violation, as well as injunctive or other equitable relief. Cal. Civ. Code § 637.2(a).

## COUNT VI
## VIOLATIONS OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT
## CAL. CIV. CODE § 1770(A)(5); CAL. CIV. CODE § 1770(A)(7)

229. Plaintiffs and Class Members re-allege and incorporate the preceding allegations of this Demand with the same force and effect as if fully restated herein.

230. Kaiser's conduct violated California's Consumer Legal Remedies Act ("CLRA"). The CLRA is one of the strongest and broadest consumer protection statutes in the nation, and broadly prohibits companies from engaging in unfair, unlawful, and deceptive business practices. Cal. Civ. Code §1770(a)(5); Cal. Civ. Code § 1770(a)(7).

231. Specifically, the CLRA provides that "[t]he unfair methods of competition and unfair or deceptive acts or practices listed in this subdivision undertaken by any person in a transaction intended to result or that results in the sale or lease of goods or services to any consumer are unlawful," and prohibits: (1) "[r]epresenting that goods or services have . . . characteristics . . . that they do not have;" or (2) "[r]epresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not." Cal. Civ. Code § 1770(a)(5), (16).

232. Plaintiffs and Class Members are "consumers" within the meaning of Cal. Civ. Code § 1761(d), and Kaiser is a "person" within the meaning of Cal. Civ. Code § 1761(c).

233. Kaiser, through its Privacy Statement, represented to Plaintiffs and Class Members that their confidential information and communications regarding their health history would not be shared with third parties. *Supra*, ¶¶ 153-165.

234. While Kaiser represented to Plaintiffs and Class Members that their PHI would be kept confidential, Kaiser consistently disclosed Plaintiffs and Class Members' information without their consent and sent the information to Third Party Wiretappers for its own commercial gain in violation of the CLRA.

235. Pursuant to the CLRA, Plaintiffs and Class Members notified Kaiser of its misrepresentations and unauthorized disclosures over 30 days prior to filing this demand; however, no remedy has been provided. Cal. Civ. Code § 1782.

236. Under the CLRA, Plaintiffs and Class Members may recover injunctive relief, attorneys' fees, and costs for Kaiser's unfair and deceptive practices, as well as restitution, which would include monies Kaiser received through the sale of Plaintiffs and Class Members' medical information, and the amounts they paid for Kaiser's services or its affiliates.

## COUNT VII
## VIOLATIONS OF CALIFORNIA'S UNFAIR COMPETITION LAW CAL. BUS. & PROF. CODE §§ 17200-17210.

237. Plaintiffs and Class Members re-allege and incorporate the preceding allegations of this Demand with the same force and effect as if fully restated herein.

*238.* Kaiser's conduct also violated California's Unfair Competition Law ("UCL"), which similarly prohibits companies from engaging in unfair, unlawful, and deceptive business practices. Cal. Bus. & Prof. Code §§ 17200-17210.

239. Under the UCL, Cal. Bus. Prof. Code § 17200, unfair competition includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1."

240. Chapter 1, § 17500 contains an expansive definition of false or misleading statements prohibited by the UCL, including any corporation performing services, to make or disseminate in any manner or means any statement which is untrue or misleading.

241. Kaiser violated the UCL by misrepresenting that it would maintain and protect the privacy of Plaintiffs and Class Members' PHI and that their PHI would not be shared with third parties. *Supra*, ¶¶ 153-165.

242. Kaiser consistently disclosed Plaintiffs and Class Members' information without their consent, contrary to its stated representations, and shared this information with Third Party Wiretappers for its own commercial benefit.

243. Plaintiffs and Class Members may recover restitution under the UCL, which would include monies Kaiser received through the sale of Plaintiffs and Class Members' medical information, as well as injunctive relief.

## COUNT VIII
## VIOLATION OF COMMON LAW INVASION OF PRIVACY
## INTRUSION UPON SECLUSION

244. Plaintiffs and Class Members re-allege and incorporate the preceding allegations of this Demand with the same force and effect as if fully restated herein.

245. A plaintiff asserting a claim for intrusion upon seclusion must plead (1) that the defendant intentionally intruded or and/or aided, agreed with, employed, and/or conspired with a third-party to intrude into a place, conversation, or matter as to which plaintiff had a reasonable expectation of privacy; and (2) that the intrusion was highly offensive to a reasonable person.

246. Kaiser's disclosure of Plaintiffs and Class Members' PHI, including medical searches and conversations with health care providers constitutes an intentional intrusion upon their solitude

or seclusion in that Kaiser deliberately embedded tracking technology into its Platform and shared information that was intended to stay private with Third Party Wiretappers without Plaintiffs and Class Members' consent, and despite Kaiser's express agreement that it would not do so. *Supra*, ¶¶ 153-165.

247. Plaintiffs and Class Members had a reasonable expectation of privacy of their PHI. Plaintiffs and Class Members did not consent to, authorize, or know about Kaiser's intrusion at the time it occurred. Plaintiffs and Class Members never agreed that Kaiser could disclose their PHI.

248. Indeed, California recognizes that a patient's right to privacy in the healthcare context "is all the more pronounced precisely because the disclosed information is true and may accurately reveal intimate details the [user] had a right to expect were to be maintained in confidence. A person's medical profile is an area of privacy infinitely more intimate, more personal in quality and nature than many" other protected areas. *Brown v. Mortensen*, 51 Cal. 4th 1052, 1071 (2011) (internal citations and quotations omitted).

249. Kaiser's intentional intrusion on Plaintiffs and Class Members' solitude or seclusion without consent would be highly offensive to a reasonable person. Plaintiff and Class Members reasonably expected, based on Kaiser's Privacy Statement, that their PHI would not be disclosed. *Supra*, ¶¶ 153-165. Kaiser's conduct is especially egregious as it failed to restrict what Third Party Wiretappers do with Plaintiffs and Class Members' PHI once it was disclosed. Additionally, privacy polls and studies show that the overwhelming majority of Americans believe one of the most important privacy rights is the need for an individual's affirmative consent before personal data is shared.[35] Moreover, the disclosure and collection of PHI by Kaiser violated its own privacy disclosures and representations.

[35] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, Consumer Reports (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety/; *Americans and Privacy: Concerned, Confused, and Feeling Lack of Control Over Their Personal Information*, Pew Research Center, (Nov. 15, 2019), https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

250. Given the extremely personal nature of the data Kaiser collected and disclosed, this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

251. As a result of Kaiser's actions, Plaintiffs and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights and are entitled to just compensation, including monetary damages.

252. Plaintiffs and Class Members seek appropriate relief for their injuries, including but not limited to injunctive relief, damages that will reasonably compensate them for the harm to their privacy interests as well as a disgorgement of profits made by Kaiser as a result of its intrusions upon their privacy.

253. Plaintiffs and Class Members are entitled to punitive damages due to the malicious, deliberate, and intentional actions taken by Kaiser, which were aimed at harming Plaintiffs and Class Members with a reckless disregard for their rights. These damages are necessary to prevent Kaiser from engaging in similar behavior in the future. Plaintiffs and Class Members also request any additional relief the Arbitrator finds appropriate and just.

**COUNT IX**
**BREACH OF CONTRACT**

254. Plaintiffs and Class Members re-allege and incorporate the preceding allegations of this Demand with the same force and effect as if fully restated herein.

255. All Plaintiffs and Class Members agreed to Kaiser's Terms & Conditions ("T&C") upon using Kaiser's Site, creating an express contract. The T&C state: BY USING THE SITE OR BY CLICKING "I ACCEPT" BELOW, YOU SIGNIFY YOUR AGREEMENT TO THESE TERMS AND CONDITIONS."[36]

256. Plaintiffs and Class Members have fully complied with their obligations under the T&C with regard to their use of Kaiser's Platform.

257. Kaiser's Privacy Statement is a contract, which Plaintiffs and Class Members and Kaiser agreed to through its incorporation into the T&C.[37]

---

[36] *Terms and Conditions for our Website and Mobile Application*, Kaiser Permanente, https://healthy.kaiserpermanente.org/termsconditions.
[37] *Id.*

258. Kaiser's Privacy Statement states that its cookies do "not contain information about your health history."[38] Kaiser further represented that it only collected aggregate data regarding the Sites Plaintiffs and Class Members visited or their click paths, rather than data collected on an individual basis.[39]

259. Kaiser's Privacy Statement also states Kaiser would use and disclose its users PHI in accordance with applicable law.

260. As set forth above, Kaiser violated several laws by disclosing Plaintiffs and Class Members' PHI to Third Party Wiretappers, without their consent. Kaiser also violated the key terms of the contract.

261. Kaiser's actions diminished the value of Plaintiffs and Class Members' personal information and violated their property rights over private communications and personally identifiable medical data.

262. As a result of Kaiser's breach of contract, Plaintiffs and Class Members are entitled to compensatory, consequential and/or nominal damages. Plaintiffs and Class Members also seek attorneys' fees and costs.

**COUNT X**
**BREACH OF IMPLIED CONTRACT (IN THE ALTERNATIVE TO COUNT IX)**

263. Plaintiffs and Class Members re-allege and incorporate the preceding allegations of this Demand with the same force and effect as if fully restated herein.

264. An implied contract existed between Kaiser and Plaintiffs and Class Members, wherein Kaiser promised to provide a secure portal and mobile applications for Plaintiffs and Class Members to confidentially make appointments, access medical records, view test results, communicate with providers, and find doctors. Plaintiffs and Class Members agreed to use these secure digital services instead of other methods like phone or in-person interactions.

265. The implied contract between Kaiser and Plaintiffs and Class Members was based on: (a) the confidential nature of the medical-provider/patient relationship; (b) Kaiser's promises to

[38] *Id.*
[39] *Id.*

protect patients' PHI and communications through its Platform; (c) the creation of a secure Portal requiring login credentials, leading Plaintiffs and Class Members to believe their information would remain private; and (d) Plaintiffs and Class Members' reliance on the secure Portal for appointments, test results, and doctor searches instead of using phone or in-person methods.

266. Kaiser knew or should have known that Plaintiffs and Class Members would interpret their relationship as an agreement to keep their PHI confidential when using Kaiser's Platform.

267. Plaintiffs and Class Members' use of Kaiser's patient Portal and App provides significant benefits to Kaiser, including increased efficiency, optimized workflows, cost reduction, and incentive payments from the federal government via the Meaningful Use Program.

268. Plaintiffs and Class Members performed under the parties' implied contract.

269. Kaiser violated its implied contract with Plaintiffs and Class Members by disclosing their patient status, personally identifiable data, and confidential communications made within the Portal and App to Third Party Wiretappers. This disclosure violated Kaiser's promise to provide a secure Platform. The patient data shared, which Plaintiffs and Class Members reasonably believed was being transmitted securely, was not aggregated as described in Kaiser's Privacy Statement and was instead shared with unauthorized Third Party Wiretappers.

270. As a result of Kaiser's breach, Plaintiffs and Class Members have suffered damages including damages for the invasion of their privacy rights. Plaintiffs and Class Members' PHI, which they intended to keep private, is no longer secure, eroding the essential confidentiality of the provider-patient relationship. Kaiser gained an unjust benefit from Plaintiffs and Class Members' PHI without their knowledge or consent, while Plaintiffs and Class Members did not receive the full value of the medical services they paid for, which included a duty of confidentiality. Additionally, Kaiser's actions diminished the value of Plaintiffs and Class Members' personal information and violated their property rights over private communications and personally identifiable medical data.

271. As a result of Kaiser's breach of implied contract, Plaintiffs and Class Members are entitled to compensatory, consequential and/or nominal damages. Plaintiffs and Class Members also seek attorneys' fees and costs.

## COUNT XI

**NEGLIGENCE (Including Negligence Per se)**

272. Plaintiffs and Class Members re-allege and incorporate the preceding allegations of this Demand with the same force and effect as if fully restated herein.

273. Kaiser had an obligation to comply with all applicable statutes, including ECPA and HIPAA, and California laws governing wiretapping, computer crimes, insurance information, medical information, and larceny.

274. Specifically, Kaiser was prohibited from unlawfully intercepting, disclosing, or using Plaintiffs and Class Members' electronic communications under CIPA. Kaiser was also barred from unauthorized use of computer networks for fraudulent purposes and from disclosing personal or privileged information without authorization under state insurance information statutes.

275. Under the CMIA, Kaiser was prohibited from disclosing Plaintiffs and Class Members' medical information without authorization.

276. Pursuant to the California Customer Records Act, Cal. Civ. Code §§ 1798.80, et seq., Kaiser was required to safeguard Plaintiffs and Class Members' medical information and provide timely notifications of any data breaches.

277. Pursuant to California's Larceny statute, Cal. Penal Code §§ 484, 496, Kaiser was prohibited from obtaining and/or using Plaintiffs and Class Members' PHI in a manner constituting theft.

278. Plaintiffs and Class Members are within the class of persons these statutes are aimed to protect, and their injuries fall within the harms these laws are designed to prevent. Kaiser's failure to comply with these statutes constitutes negligence per se.

279. By intercepting and aiding Third Party Wiretappers in accessing Plaintiffs and Class Members' private information through its Platform, Kaiser acted unreasonably, compromising the privacy of Plaintiffs and Class Members' PHI. Kaiser knowingly collected this information and had a duty to exercise reasonable care in protecting it from unauthorized disclosures. However, Kaiser failed to provide adequate safeguards and instead allowed Third Party Wiretappers to access this sensitive information, breaching its responsibilities to Plaintiffs and Class Members.

280. The harm caused by Kaiser's actions was foreseeable, as it collected personally identifiable information while facilitating its interception by Third Party Wiretappers. Public policy strongly favors preventing such harm, and as a direct result of Kaiser's negligence, Plaintiffs and Class Members' information was wrongfully disclosed.

281. But for Kaiser's breaches of duty, Plaintiffs and Class Members would not have suffered injury, which was the foreseeable consequence of these failures.

282. Therefore, Plaintiffs and Class Members are entitled to and seek punitive damages, equitable relief, and any other relief the Arbitrator deems just and proper.

**COUNT XII**
**UNJUST ENRICHMENT**

283. Plaintiffs and Class Members re-allege and incorporate the preceding allegations of this Demand with the same force and effect as if fully restated herein.

284. Kaiser received benefits from Plaintiffs and Class Members and unjustly retained those benefits at their expense.

285. Plaintiffs and Class Members conferred a benefit upon Kaiser in the form of monthly payments and valuable sensitive personal data that Kaiser disclosed to Third Party Wiretappers without authorization and proper compensation. Kaiser has collected, disclosed, and otherwise misused this information for its own gain, providing Kaiser with economic, intangible, and other benefits, including substantial monetary compensation from Third Party Wiretappers who received Plaintiffs and Class Members' PHI.

286. Kaiser unjustly retained those benefits at the expense of Plaintiffs and Class Members, as its conduct caused harm without providing any commensurate compensation.

287. The benefits that Kaiser derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members. It would be inequitable under unjust enrichment principles for Kaiser to retain any profit or other benefits it derived from the unfair and unconscionable methods, acts, and practices alleged in this Demand.

288. Kaiser should be compelled to disgorge for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Kaiser received, and such other relief as the arbitrator may deem just and proper.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs pray for an order:

(a) Certifying this action as a class action, appointing Plaintiffs as Class representatives, and appointing Plaintiffs' counsel to represent the Class;

(b) Entering judgment for Plaintiffs and the Class;

(c) Awarding Plaintiffs and Class Members monetary relief, including nominal, punitive and statutory damages;

(d) Ordering appropriate injunctive or other equitable relief;

(e) Awarding pre-and post-judgment interest as prescribed by law;

(f) Awarding reasonable attorneys' fees and costs as permitted by law; and

(g) Granting such further and other relief as may be just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED: May 6, 2025

**LABATON KELLER SUCHAROW LLP**

Jonathan Waisnor (SBN 345801)
140 Broadway, 34th Floor
New York, NY 10005
jwaisnor@labaton.com
Telephone: (212) 907-0700
Facsimile: (212) 818-0477

**LABATON KELLER SUCHAROW LLP**
Morris Dweck (Pro Hac Vice Forthcoming)
140 Broadway, 34th Floor
New York, New York 10005
Tel.: (212) 907-0700
Fax: (212) 907-7039
mdweck@labaton.com

John J. Nelson (SBN 317598)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
402 W Broadway, Suite 1760
San Diego, CA 92101
Tel.: (858) 209-6941
jnelson@milberg.com

**ADAMSKI MOROSKI MADDEN CUMBERLAND & GREEN LLP**
James M. Wagstaffe (SBN 95535)
6633 Bay Laurel Place
Avila Beach, CA 93424
Telephone: (805) 543-0990
Facsimile: (805) 543-0980
wagstaffe@ammcglaw.com

*Counsel for Plaintiffs*

# EXHIBIT 3

| Case | Opt-Out Requirements |
| --- | --- |
| *Frasco v. Flo Health*, No. 3:21-cv-00757, ECF No. 589-4 at 11 (N.D. Cal. Mar. 21, 2025) (Labaton) | "The written Request for Exclusion must (i) identify the case name of the Action (*Erica Frasco, et al. v. Flo Health, Inc., et al.*, Case No. 3:21-cv-00757-JD (N.D. Cal.)); (ii) identify your full name, current address, telephone number, and email address; (iii) proof or an attestation that you are a Settlement Class Member, which may include the claimant ID code and other information included on the email Notice provided by the Settlement Administrator that identifies you as a Settlement Class Member; (iv) include your original signature, ***and***, if represented by counsel, be signed by your counsel; and (v) include a statement clearly indicating your intent to be excluded from the Settlement, such as 'Request for Exclusion.'" |
| *In re AME Church Employee Retirement Fund Litig.*,No. 22-md-03035, ECF No. 676-2 at 20 (W.D. Tenn. Jan. 15, 2025) (Milberg) | "In the written request for exclusion, the Class Member must state: (1) their full name, last four digits of their social security number, address, and telephone number where they may be contacted; and (2) a statement that they wish to be excluded from the Class. The request for exclusion must be personally signed by the Class Member submitting the request. A request to be excluded that does not include the foregoing information, that is not sent to the Administrator, that is not postmarked by the Opt-Out Deadline, or that is not personally signed by the Class Member shall be invalid." |
| *Yearby v. Am. Nat'l Ins. Co.*, No. 3:20-cv-09222-EMC, ECF No. 82-4 at 19 (N.D. Cal. Aug. 11, 2023) | "To exclude yourself (or "opt-out") of the Settlement, you must complete and mail the Settlement Administrator a written request for exclusion. The exclusion request must include the following: •Your full name, address, telephone number, and email address (if any); •A statement says that you want to be excluded from the Settlement Class; •The case name (*Yearby v. American National Insurance Company*) •The policy number(s) to be excluded; and •Your signature." |
| *Remoundos et al. v. LendUS, LLC*, No. 3:22-cv-00749-EMC, ECF Nos. 40-7 at 8, 44 at 5 (N.D. Cal. Dec. 20, 2022) | "Any member of the Settlement Class who or that wishes to be excluded ("opt out") from the Settlement Class must send a written request to the designated Post Office box established by the Claims Administrator postmarked on or before the Opt-Out Date. Members of the Settlement Class may not opt-out of the Settlement by submitting requests to opt-out as a group or class, but must in each instance individually and personally submit an opt-out request."<br><br>"To exclude yourself, send a letter that says you want to be excluded from the settlement in, *Remoundos, et al. v. LendUS. LLC*, Case No. 4:22-cv-00749-EMC (N.D. Cal.) ("Exclusion Request"). Include your name, address, and signature." |

| Case | Opt-Out Requirements |
| --- | --- |
| *Martinez v. Costco Wholesale Corp.*, No. 3:19-cv-05624-EMC, ECF No. 37-2 at 29 (N.D. Cal. July 25, 2022) | "Class Members may opt out of this Agreement by mailing, emailing, or faxing the Settlement Administrator a Request for Exclusion. A Request for Exclusion must be signed and dated by the Class Member, must provide the Class Member's full name, current address, current telephone number, and the last four digits of the Class Member's Social Security number, and must expressly state an intention to be excluded from the terms of the Agreement. Any purported Request for Exclusion will be deemed ineffective if it is untimely or if it omits required information." |
| *Julian et al. v. TTE Tech., Inc.*, No. 3:20-cv-02857-EMC, ECF No. 140 at 5-6 (N.D. Cal. July 8, 2022) (Milberg) | "Exclusion requests must: (a) state the Settlement Class Member's name, address, and phone number; (b) be personally signed by the Settlement Class Member and not the Case Settlement Class Member's attorney or anyone acting on the Settlement Class Member's behalf; and (c) include the statement 'I/we request to be excluded from the class settlement in *Christopher Julian et al.v. TTE Technology, Inc.*, Case No. 3:20-CV-02857-EMC (N.D. Cal.).' Requests to opt-out that do not include all required information and/or that are not submitted on a timely basis, will be null, void, and ineffective. No Settlement Class Member, or any person acting on behalf of or in concert or participation with that Settlement Class Member, may exclude any other Settlement Class Member from the Settlement Class." |
| *Watson v. Checkr, Inc.*, No. 3:19-cv-03396-EMC, ECF No. 66-1 at 17 (N.D. Cal. June 16, 2021) | "A Settlement Class Member may request to be excluded from the Settlement Class by sending a written request for exclusion to the Settlement Administrator at the addresses provided in the Notice ('Opt- Out'). The Settlement Class Member's Opt-Out must contain the Settlement Class Member's original handwritten signature, current postal address, and a specific statement that the Settlement Class Member wants to be excluded from the Settlement Class. Opt-Outs must be postmarked no later than the deadline set by the Court in the Preliminary Approval Order. In no event shall Persons who purport to Opt-Out of the Settlement Class as a group, on an aggregate basis or as a class involving more than one Class Member be considered valid Opt-Outs. Requests for exclusion that do not comply with any of the foregoing requirement are invalid." |
| *In re Facebook Biometric Info. Privacy Litig.*, No. 3:15-cv-03747, ECF No. 468 at 17 (N.D. Cal. July 22, 2020) (Labaton) | "To exercise the right to be excluded, a Class Member must timely send a written request for exclusion to the Settlement Administrator providing his/her name, address and email; a signature, the name and number of the Action, and a statement that he or she wishes to be excluded from the Class for purposes of this Settlement. In light of the COVID-19 pandemic, the Settlement Administrator shall create a dedicated e-mail address to receive |

| Case | Opt-Out Requirements |
| --- | --- |
| | exclusion requests electronically. A request to be excluded that does not include all of this information, or that is sent to an address other than that designated in the Notice, or that is not postmarked within the time specified, shall be invalid, and the person(s) serving such a request remain a member(s) of the Class and shall be bound as a Class Member by this Agreement, if approved. . . . The request for exclusion must be personally signed by the person requesting exclusion. So-called "mass" or "class" opt-outs shall not be allowed. To be valid, a request for exclusion must be postmarked or received by the date specified in the Notice." |
| *In re Yahoo! Inc. Customer Data Security Breach Litig.*, No. 5:16-md-02752, ECF No. 369-7 at 19 (N.D. Cal. Apr. 9, 2019) (Milberg) | "To exclude yourself from the Settlement, you must send a letter by mail saying that you wish to do so. Your exclusion letter must include: a. The name and case number of this lawsuit (*In re: Yahoo! Inc. Customer Data Security Breach Litigation*, Case Number 16-md-02752-LHK); b. Your full name and mailing address, and email address or telephone number; c. An explanation of why you believe you are a Settlement Class Member; d. The words "Notification of Exclusion" or a statement that you want to be excluded from the Settlement; and e. Your handwritten or electronically imaged written (e.g. "DocuSign") signature. An attorney's signature, or a typed signature, is not sufficient." |