UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN DOES 1-5, *et al.*,

   Plaintiffs,

  v.

KAISER FOUNDATION HEALTH PLAN, INC., *et al.*,

   Defendants.

Case No.  23-cv-02865-EMC

**ORDER GRANTING PLAINTIFFS' MOTION FOR FINAL APPROVAL; GRANTING IN PART PLAINTIFFS' MOTION FOR ATTORNEYS' FEES, ETC.; AND DENYING OBJECTORS' FEE APPLICATION**

Docket Nos. 401-02, 411

Plaintiffs are individuals who have filed a class action against three Kaiser entities (collectively, "Kaiser").[1]  Plaintiffs allege that Kaiser violated their privacy rights, and those of others similarly situated, in violation of various federal and state laws.  According to Plaintiffs,

> unbeknownst to Plaintiffs and other Kaiser Plan Members, Kaiser has installed code from multiple third parties throughout the Kaiser website and mobile applications that allows third party companies, including but not limited to Quantum Metric, Twitter, Adobe, Microsoft Bing, . . . Google[,] [and Dynatrace] (collectively, "Third Party Wiretappers") to intercept the content of Plaintiffs and Class Members' patient status, identifying information, medical topics researched, choices made, information shared and communications with their medical providers, including personally identifiable medical information, Protected Health Information ("PHI") that Kaiser was required to protect under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. § 1320d-6, and other confidential information and communications, when that information is in transit.

CAC ¶ 4.

/ / /

_____

[1] The entities are: Kaiser Foundation Health Plan, Inc. ("KFHP"); Kaiser Foundation Hospitals; and Kaiser Foundation Health Plan of Washington.

Previously, the Court granted approval to Plaintiffs' motion for preliminary approval of a class action settlement. Now pending before the Court are the following: (1) Plaintiffs' motion for final approval; (2) Plaintiffs' motion for attorneys' fees, litigation expenses, and service awards; and (3) Objectors' fee application in which objectors' counsel seeks a portion of the fee award. Having considered the papers filed, the oral argument of counsel, and all other evidence of record, the Court hereby **GRANTS** the motion for final approval, **GRANTS** in part the motion for attorneys' fees, litigation expenses, and service awards, and **DENIES** Objectors' fee application.

## I.      DISCUSSION

A.      <u>Plaintiffs' Motion for Final Approval</u>

The Court previously granted preliminary approval to the parties' class action settlement. The settlement covers approximately 13.1 million people. Under the settlement, Kaiser will pay out a gross settlement amount of $46 million, which could increase to $47.5 million depending on the number of opt-outs. *See* Docket No. 384 (Order at 2). As discussed below, now that the number of opt-outs has been finalized, the gross settlement amount will be $47.5 million.

The amount available for distribution to the class will be smaller because attorneys' fees, litigation expenses, settlement administration expenses, and incentive awards will need to be deducted from the gross settlement fund. In addition, how much monetary relief each class member will get depends on how many members submitted claims. At preliminary approval, the parties anticipated a claims rate of 5-10%, which would mean each claiming class member would receive about $20-40 in terms of monetary relief. Each class member has already benefited from Plaintiffs' litigation of the case because, after Plaintiffs moved for a preliminary injunction, Kaiser disabled, deleted, or modified the third-party tracking technologies. In addition, Kaiser implemented consent banners on its website and mobile apps. *See* Docket No. 384 (Order at 2-3).

The Court granted preliminary approval to the settlement, taking into account, *inter alia*, that there was significant litigation risk should Plaintiffs continue to litigate the case. Litigation risk included the following:

- Plaintiffs were pursuing a factual theory that Kaiser allowed the code on its website and apps for the benefit of third parties (and not for its own benefit).

<div style="writing-mode: vertical-lr">United States District Court<br>Northern District of California</div>

- Individuals could be subject to arbitration (such as the named California plaintiff whom the Court did compel to arbitration).
- Choice of law might require application of the laws of multiple state laws which could then make it difficult for Plaintiffs to satisfy Rule 23(b)(3)'s requirements of predominance and superiority (*i.e.*, for class certification).
- Privacy breach case law is still developing (*e.g.*, damages methodologies).
- Not all claims would necessarily survive – *e.g.*, in its order granting in part the motion to dismiss the first amended complaint, the Court dismissed Plaintiffs' claims for violations of the Electronic Communications Privacy Act, the California Invasion of Privacy Act, and the California Confidentiality of Medical Information Act.
- If claims with statutory damages were dismissed, then there might be nominal damages only or damages could be too individualized.
- Courts have recognized that data breach cases face difficulties in obtaining class certification.

Because the Court granted preliminary approval, the main issues for final approval are: (1) whether there was sufficient notice to the class members; and (2) how the class has responded to notice of the settlement.

1.    Notice to the Class

The Court has reviewed the information provided by the settlement administrator concerning notice to the class.  Per the Court's preliminary approval order, notice was given to those persons who received from Kaiser the May 2024 notice of privacy breach.[2]  Notice was given by (1) email or (2) mail (a postcard) if no email address was known.  Notice by email or mail was given via a short-form notice.  *See* Sett. Agmt. ¶ 1.22 & Ex. E.  A long-form notice was

---

[2] "May 2024 Notice List" is defined in the settlement agreement as follows: "the confidential list of current and former Kaiser Permanente members who were notified in May 2024 pursuant to 45 CFR §§ 164.400-414, including their names and contact information used to provide individualized notice (email address and mailing address where email address is not known)." Sett. Agmt. ¶ 1.9.

posted on the settlement website, which the settlement administrator maintained. The settlement administrator also maintained a toll-free number.

Kaiser provided the settlement administrator with records for 13,134,307 settlement class members. *See* Docket No. 424 (Mulholland Reply Decl. ¶ 5). Notice was successfully provided to the vast majority of the class. Based on the settlement administrator's calculations, the number of members who did not get notice was approximately 139,534. This translates to about 1% of the 13.1 million-member class.

At the hearing, the Court discussed whether additional notice through, *e.g.*, a social media campaign might be of benefit. Plaintiffs did not believe additional notice was needed, particularly because there was the equivalent of publication notice since the settlement was covered through local as well as nationwide press (USA Today). The cost of additional notice was another consideration. The Court agreed that additional notice was not necessary.

2.  Response of the Class

The settlement administrator has provided an update regarding the responses of class members. As of the March 12, 2026, claims filing deadline, the number of individuals who have submitted claims is 755,551, *see* Docket No. 436 (Mulholland Decl. ¶ 13) (adding that, after the claims filing deadline, an additional 17,932 claim forms were received) – representing a claims rate of approximately 5.7% (*i.e.*, 755,551/13,134,307). Though the claims rate is not large, it is consistent with the rate expected by the settlement administrator (as stated at preliminary approval) and with the rates obtained by plaintiffs in similar cases. *See* Docket No. 345-5 (Mulholland Decl. ¶ 23) (settlement administrator noting that it considered "five comparative data breach settlements and the related claims rate for each"; the claims rates range "from 1.95% to 9.17% (mid-point 5.56%) with an average claims rate of 4.63%"). The claims rate therefore does not indicate a lack of support by the class.

The number of individuals who have opted out of the class is relatively small, particularly given the total size of the class: 22,599 individuals. *See* Docket No. 449 (Mulholland Decl. ¶ 3 & Ex. A). This data point suggests that the settlement is, as an overall matter, supported by the class.

/ / /

Finally, the number of objections to the settlement is very small – only 19.  Again, this indicates overall support for the settlement.

The Court has also considered the content of the objections to determine whether final approval is appropriate.  Though some of the objections raise fair points, the issues raised do not warrant denial of final approval.  For example, some objectors have argued that more compensation is warranted given the serious privacy violation alleged.  The Court acknowledges that a serious privacy violation has been alleged because personal health information is at issue.  However, if a member did suffer a severe privacy violation for which they suffered concrete damages, they have the option of opting out.  Also, this objection assumes that Plaintiffs were likely to succeed on the merits but, as noted above, there were significant litigation risks.  The objection also gives short shrift to the non-monetary relief that was obtained through the settlement – *e.g.*, the third-party code was removed from the website and apps.  In addition, Kaiser implemented consent banners on its website and apps, informing users of Kaiser's use of web-tracking technology and sharing of data with third parties to be used for the benefit of Kaiser and its enrollees.  *See* Docket No. 374 (Supp. Br. at 7-8).

Another objection is that the settlement provides no real benefit to the class because Kaiser will simply pass off the cost of the settlement to its enrollees – *i.e.*, Kaiser will increase its premiums or reduce its services.  While a valid concern, it is a criticism that can be made in almost any class action where the plaintiffs are customers of the defendant.  Furthermore, the settlement has value because the size of the payout will likely have a deterrent effect for future conduct.  In addition, as noted above, the class still obtains the benefit of the non-monetary relief obtained through the settlement.

In addition to the above, there is an objection that there should not be a claims process at all; in other words, Kaiser should make a payout to every member of the settlement class instead of requiring claims to be made in order for members to be compensated.  The problem with this objection is that the administrative cost of sending checks out to 13.1 million class members would be significant – thus lessening the amount available for distribution to the class.  (And of course, if each of the 13.1 million members would be getting checks, each check would be very

small in value.)  While theoretically, administrative costs could be reduced through using other kinds of payment systems (*e.g.*, direct deposit), that would require class members to provide information to get payment, which would be tantamount to class members submitting claims.

To the extent objections have been made to the amount of attorneys' fees, the Court addresses that objection below in conjunction with Plaintiffs' motion for attorneys' fees, litigation expenses, and service awards.  Because the gross settlement fund is fair, the objection to attorneys' fees should not preclude final approval.  The amount of fees will simply affect the amount of the fund available for distribution to the class.

Finally, the Court addresses the objection to the cy pres beneficiaries designated by the parties.  The Court agrees that the Institute for Public Health Innovation ("IPHI") is not an appropriate beneficiary.  Even if Kaiser has no relationship with IPHI, the organization may have a regional focus whereas the settlement class is essentially nationwide in reach.  Furthermore, although the organization engages in health-care related work, the instant case is ultimately about privacy rights.  *See Nachshin v. AOL, LLC*, 663 F.3d 1034, 1039-41 (9th Cir. 2011) (stating that a "*cy pres* distribution must be guided by (1) the objectives of the underlying statute(s) and (2) the interests of the silent class members"; adding that the geographic distribution of the class is also a consideration).  The Court finds, however, that Privacy Rights Clearinghouse is an appropriate beneficiary.

Accordingly, for the reasons stated above, the Court grants Plaintiffs' motion for final approval.

B.     Plaintiffs' Motion for Attorneys' Fees, Litigation Expenses, and Service Awards

In their second motion, Plaintiffs ask for 33% of the gross settlement fund in attorneys' fees, plus $598,431 in litigation expenses[3] and $5,000 for each named plaintiff (totaling $40,000) as a service award.

/ / /

---

[3] In their original papers, Plaintiffs asked for $605,103.06 in litigation expenses but they subsequently reduced their request because travel expenses were not incurred for a hearing.  *See* Docket No. 477 (Status Rpt. at 4 n.4).

United States District Court
Northern District of California

The Court begins with the service awards. In this District, "[s]ervice awards of $5,000 are considered 'presumptively reasonable.'" *Maciel v. M.A.C. Cosms., Inc.*, No. 23-cv-03718-AMO, 2026 U.S. Dist. LEXIS 9487, at *5 (N.D. Cal. Jan. 16, 2026). In addition, the declarations from the named plaintiffs sufficiently establish that a service award of $5,000 for each individual is reasonable given their involvement and participation in the proceedings. *See* Docket No. 403 (Graden Decl., Exs. 1A-1H) (declarations from named plaintiffs).

As for litigation expenses, some expenses do cause concern, in particular, the costs related to (1) experts/consultants ($234,129.17) and (2) travel (transportation, lodging, and meals) ($119,427.28). In their motion, Plaintiffs explain that their experts included "Dr. Ross Malaga who worked with Plaintiffs to identify the Third-Party Wiretapper's code transmitted from their devices during the investigation stage of the litigation and who also prepared an expert report submitted in support of Plaintiffs' Motion for a Preliminary Injunction." Fee Mot. at 17. As for travel expenses, Plaintiffs maintain that the amount is reasonable because there were, *e.g.*, Court hearings, six in-person discovery conferences with Judge Kang, and two different mediations (covering three days total). *See* Fee Mot. at 13, 17 (adding that Class Counsel are located in Pennsylvania and New Jersey). The Court gives Plaintiffs the benefit of the doubt on the expenses related to experts, especially as Dr. Malaga appears to have done fairly extensive work. As for travel expenses, the Court shall also give Plaintiffs the benefit of the doubt, particularly because it will be strictly scrutinizing the request for fees. Counsel for Plaintiffs, however, are advised that, for future applications, they should ensure that travel costs are reasonable (*e.g.*, in terms of the number of attorneys who attend hearings, use of economy flights, modest lodging, and per diems for meals).

The biggest issue is whether the attorneys' fees requested are appropriate. Plaintiffs seek in fees **33%** of the gross settlement fund (which has now been determined to be $47.5 million because the number of opt-outs has been finalized). This translates to a fee award of about **$15.68 million**. As a point of comparison, if Class Counsel were awarded the typical benchmark of 25%, that would be about $11.88 million. According to Plaintiffs, as of September 2025 (when preliminary approval briefing was completed), their lodestar was about **$12 million**, reflecting

7

**19,000 hours** of attorney time. *See* Docket No. 403 (Graden Decl. ¶¶ 14, 87). Thus, if the Court were to award $15.68 million, the multiplier would be about 1.32.[4] *See also* Docket No. 403 (Graden Decl. ¶¶ 72, 87).

Plaintiffs add that, because counsel *continued* to spend time on the case between October 2025 and May 2026 (*i.e.*, the period covering the motion for final approval and fees), their attorneys spent another 1,416 hours on the case – amounting to an *additional* $1,036,927 million in fees.[5] *See* Docket No. 448 (Graden Decl. ¶ 11). Much of the additional time involved addressing the objectors' request for a portion of the fee award, a circumstance not typically encountered, as well as dealing with the number of opt-outs (most of whom were represented by objectors' counsel). Thus, according to Plaintiffs, if the Court looks at the entirety of the litigation, as of May 2026, their attorneys spent more than **20,000 hours** on the case with a total lodestar of roughly **$13 million**. *See* Docket No. 448 (Graden Decl. ¶ 12). Based on the most recent numbers, Plaintiffs maintain that an award of $15.68 million would reflect a multiplier of only 1.2 (*i.e.*, $13 million x 1.2 = $15.6 million).

The Court finds that an award of $15.68 million in attorneys' fees – at 33%, a departure from the 25% benchmark used in the Ninth Circuit – is not warranted. Factors a court may

> consider in assessing a request for attorneys' fees that was calculated using the percentage-of-recovery method . . . include the extent to which class counsel achieved exceptional results for the class, whether the case was risky for class counsel, whether counsel's performance generated benefits beyond the cash settlement fund, the market rate for the particular field of law (in some circumstances), the burdens class counsel experienced while litigating the case (e.g., cost, duration, foregoing other work), and

---

[4] *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2022) (noting that "[t]he bar against risk multipliers in statutory fee cases does not apply to common fund cases[;] [i]ndeed, 'courts have routinely enhanced the lodestar to reflect the risk of non-payment in common fund cases'").

[5] The Court granted preliminary approval in December 2025. Plaintiffs also moved for final approval in December 2025. At the time of the final approval hearing in May 2026, Plaintiffs calculated how much additional time counsel had spent on the case between October 2025 and February 2026. According to Plaintiffs, in that timeframe, their attorneys spent another 547.40 hours on the case – amounting to an additional $518,189.50. *See* Graden Reply Decl. ¶ 6.

This suggests that, between March 2026 and May 2026, counsel spent about 900 more hours on the case, incurring another $500,000 in fees.

whether the case was handled on a contingency basis.

*In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 954-55 (9th Cir. 2015). These factors do not support an award of one-third of the gross settlement fund. For example, the results obtained – while reasonable – were not exceptional, particularly given the highly private information at issue. Consistent with the notice to the class, each claiming class member will get about $40. Even if the Court takes into account that nonmonetary relief was also obtained (*i.e.*, the removal of the third-party code from the website and apps and the inclusion of consent banners on the website and apps), there is still a disconnect between the fee award sought ($15.6 million) and the net distribution to the class (approximately $30 million). The Court also notes that, although the settlement here is not necessarily a megafund case, it is close to being one. *See Amador v. Sheriff*, No. 2:10-cv-01649-SVW-JEM, 2020 U.S. Dist. LEXIS 173822, at *49 (C.D. Cal. Aug. 11, 2020) (noting that the Ninth Circuit has not clearly defined what a megafund is; adding that, while most courts suggest a megafund is in excess of $50 million, some courts have viewed settlements of $50 million as a megafund). For a megafund, a percentage *less* than 25% is typically appropriate. That suggests a court should be wary of a multiplier in a case that is close to a megafund (even if it is on the lower end).

To be sure, Plaintiffs have cited to cases where courts have awarded 33% in cases where a similar size settlement fund was obtained. But notably, the cases they cite are not analogous to the instant case – a data breach/privacy case involving millions of class members and their personal health information. Indeed, the cases cited by Plaintiffs are materially distinguishable. They include, for instance, a complicated antitrust case where the end-payor class appeared to achieve very significant results. *See In re Lidoderm Antitrust Litig.*, No. 14-md-02521-WHO, 2018 U.S. Dist. LEXIS 162425 (N.D. Cal. Sept. 20, 2018) (one-third of settlement awarded as attorneys' fees (which represented 1.37 multiplier on multiplier), but significant results were obtained – end-payor class recovered 46% of the highest single damages estimate it was prepared to seek at trial; case also involved complex issues – an antitrust case that was the first post-*Actavis* pay-for-delay case).

///

9

The lodestar cross-check also suggests that an award of $15.68 million is not appropriate. Class Counsel's claimed lodestar as of September 2025 – when the bulk of the work in this litigation was completed – was only about $12 million.  Even if the Court were to use the claimed lodestar as of May 2026 (which covers the period related to final approval), that lodestar was $13 million.  Plaintiffs acknowledge that they are asking for more than their claimed lodestar but maintain that the multiplier they are seeking is modest in nature (either 1.32 or 1.2).  But the difference in absolute dollars (which would otherwise go to class members) is significant: millions (which reflects the fact that this case is close to a megafund case).

Moreover, awarding the full lodestar(s) claimed by Plaintiffs would already be generous. As noted above, according to Plaintiffs, as of May 2026, their counsel spent 20,000 hours on their case over the course of about three years, the equivalent of approximately three attorneys working full time over three years.

To be clear, the Court recognizes that this case was vigorously litigated such that Class Counsel naturally incurred a significant number of hours.  During the lawsuit, Class Counsel worked on a variety of matters, including the following:

- **Motion for preliminary injunction.**  *See* Docket No. 58 (motion filed on 10/4/2023).  Kaiser responded to the motion by stating that it had removed or modified the code on its site and apps at issue in the case.  Plaintiffs thus withdrew their motion.  *See* Docket No. 101 (notice).

- **Response to motions to dismiss.**  Kaiser filed three motions to dismiss.  Kaiser filed its motion to dismiss the FAC in November 2023.  *See* Docket No. 88 (motion).  The Court granted in part and denied in part the motion.  *See* Docket No. 124 (order filed on 4/11/2024).  Kaiser filed its motion to dismiss the SAC in July 2024.  *See* Docket No. 205 (motion).  Plaintiffs responded to the motion, *see* Docket No. 223 (opposition), but the motion ended up being tabled because of new cases that were filed against Kaiser as well as others (Google and Meta).  *See* Graden Decl. ¶ 33.  The Court ended up severing those parts of the new cases that involved Google and Meta, thus leaving before the Court only the claims against

10

Kaiser. *See* Docket No. 254 (minutes). Plaintiffs then filed a consolidated complaint for all of the Kaiser cases. *See* Docket No. 271 (consolidated complaint). Kaiser filed its motion to dismiss the consolidated complaint in January 2025. *See* Docket No. 303 (motion). Briefing on that motion to dismiss was completed in April 2025. *See* Docket No. 334 (reply). A hearing, however, never took place before, in May 2025, the parties informed the Court of a preliminary settlement. *See* Docket No. 342 (notice).

- **Response to motions to compel arbitration.** In conjunction with its three motions to dismiss, Kaiser filed three motions to compel arbitration. The first motion to compel arbitration – for John Doe, the only California named plaintiff – was filed in November 2023. *See* Docket No. 82 (motion). The Court granted the motion but gave John Doe leave to amend. *See* Docket No. 119 (order). Kaiser filed its second motion to compel for John Doe in July 2024, *see* Docket No. 195 (motion), which Plaintiff opposed. *See* Docket No. 226 (opposition). As above, that motion was tabled because of the new cases that had been filed against Kaiser. After Plaintiffs filed their consolidated complaint, Kaiser filed its third motion to compel as to John Doe. *See* Docket No. 300 (motion). The Court granted the motion to compel because Plaintiffs did not dispute that, under the Court's prior analysis, he would be compelled to arbitration. *See* Docket No. 335 (Order at 2) ("In essence, JD is simply repeating a rejected argument to preserve the issue for appeal.").

- **Discovery.** Judge Kang resolved a number of discovery disputes. *See* Docket No. 100 (order re contents of protective order); Docket No. 102 (order re subpoenas on third parties); Docket No. 188 (order re document requests); Docket No. 216 (order re document requests); Docket No. 250 (order re interrogatory and document requests, part of Discovery Management Order No. 1); Docket No. 267 (order re interrogatory, confidentiality designations, and ESI, part of Discovery Management Order No. 2); Docket No. 293 (order re relevancy and document requests, part of Discovery Management Order No. 3); Docket No. 325 (order re privilege logs).

United States District Court
Northern District of California

Additional discovery efforts are discussed at page 15 of the motion for final approval. *See* Final App. Mot. at 15 ("Before reaching the Settlement, the Parties participated in six discovery management conferences, served written discovery requests followed by numerous meet-and-confers, engaged in multi-day expert-led review of highly confidential source code, presented several oral arguments on discovery disputes before Magistrate Judge Kang, undertook third-party discovery, exchanged expert reports in connection with Plaintiffs' Motion for Preliminary Injunction, and extensively negotiated ESI keywords and custodians over two discovery phases which allowed Class Counsel to review and analyze tens of thousands of documents.").

- **Mediations.** Mediations were held before two different JAMS mediators. *See* Final App. Mot. at 2. The first mediation was with Judge Andersen (retired district judge for the Northern District of Illinois) and was held in October 2024 over two days. *See* Final App. Mot. at 8; Graden Decl. ¶ 43. Judge Gandhi (retired magistrate judge for the Central District of California) conducted the second mediation (held on May 13, 2025) which culminated in the settlement. *See* Final App. Mot. at 3, 8; Graden Decl. ¶ 44.

- **Preliminary and final approval.** As part of both preliminary and final approval, Plaintiffs had to address the arguments made by objectors who were represented by several firms, including but not limited to the Labaton firm.

But even this amount of work does not mean that some 20,000 hours of litigation in a roughly three-year period was clearly warranted. There was no trial or trial preparation. There were no motions for summary judgment or *Daubert* motions as typically encountered in complex cases. And, in fact, there are indicators that the case was not always efficiently litigated. For example, based on Plaintiffs' submissions, counsel spent 10,768.1 hours on discovery and document review. This appears to be *independent* of expert work and fact investigation. Even taking into account that Kaiser produced "nearly 40,000 documents," Graden Decl. ¶ 9, that is a significant number of hours. In addition, two firms devoted about 3,100 hours to

United States District Court
Northern District of California

12

pleadings/motions/briefs alone. The Court further takes notes that the bulk of the litigation was completed by September 2025 (*i.e.*, after preliminary approval briefing was completed), but Class Counsel still spent more than 1,400 hours thereafter, incurring another $1 million in fees. Finally, there is an insufficient showing that Class Counsel made efforts to ensure that the hours supporting the lodestar were not excessive (especially given that two firms were representing Plaintiffs). For instance, counsel has not represented that they took a discount or haircut off their claimed fees to address duplication and inefficiencies. *See, e.g.*, Docket No. 403 (Graden Decl. ¶ 79) ("Exhibit 2 was prepared from contemporaneous daily time records regularly prepared and maintained by KTMC . . . ."); Docket No. 403 (Graden Decl. ¶ 88) ("Class Counsel's time and lodestar calculations are reasonable and were necessary for the effective and efficient prosecution and resolution of the Action."); Docket No. 403-11 (Cecchi Decl. ¶ 3) ("Carella Byrne has reviewed its time and expense records. The purpose of this review was to confirm both the accuracy of the time entries and expenses and the necessity for, and reasonableness of, the time and expenses committed to the Action. I believe that the time reflected in my firm's lodestar calculation and the expenses for which payment is sought as stated in this Declaration are reasonable in amount and were necessary for the effective and efficient prosecution and resolution of the Action.").

Taking into account the above, the Court concludes that a fee award of $13 million is appropriate. This amount is consistent with the $13 million lodestar claimed by Class Counsel (for the period through May 2026). Though the Court considers an award of the lodestar generous for the reasons stated above, it will give Class Counsel the benefit of the doubt, especially given the percentage method cross-check discussed below.

An award of $13 million represents 27-28% of the gross settlement fund (of $47.5 million). This percentage exceeds the 25% benchmark used in the Ninth Circuit (which, as noted above, is at least somewhat weighted in favor of counsel given that this case is almost a megafund). An award above the benchmark, even for a near-megafund case, is fair here given the substantial non-monetary relief obtained, as well as the risk of nonpayment taken on by counsel in a case which required substantial investment of time and expense. On the other hand, any award

13

above 27-28% would not be warranted here given the already generous lodestar award and the relatively modest monetary award obtained.

Any fees not awarded shall be distributed to the class, consistent with the terms of the parties' settlement agreement.

C.       Objectors' Fee Application

The last motion for the Court's consideration is one filed by certain objectors in which they ask for a share of the attorneys' fee award given to class counsel. The only objectors who seek a share of the fees are those represented by the Labaton firm.[6]

Labaton asks to be awarded a specific percentage from the fee award given to the settlement class: 6.8%. Labaton proceeds with the assumption that the gross settlement fund will be $46 million (not $47.5 million) and that fees will be awarded constituting 33% of that fund (*i.e.*, $15.18 million). Thus, Labaton asks to be awarded 6.8% of $15.18 million, or about $1.03 million. According to Labaton, this would amount to a small multiplier of 1.18 on its lodestar for the work it has done that has contributed to this case – and would reduce class counsel's multiplier to 1.18 as well. Labaton claims that its lodestar is $878,332 which represents 1,474.7 hours of work. *See* Obj. Mot. at 17, 19; Dweck Decl., Ex. F (summary of lodestar per attorney or staff member); Dweck Decl., Ex. H (hours categorized by litigation task). Labaton states that its contributions can generally be broken down into three phases:

- Mediation/settlement negotiations. 134.5 hours, for a total of $115,599.50.
- Settlement-improvement/preliminary-approval objections. 532.4 hours, for a total of $345,738.50.
- Mass-arbitration/OIA track work. 737.4 hours, for a total of $366,853.50.

*See* Obj. Mot. at 19-20.

As explained by the Ninth Circuit,

> [u]nder certain circumstances, attorneys for objectors may be entitled to attorneys' fees from the fund created by class action litigation. . . .

---

[6] Neither the Milberg firm nor the Potter firm has asked for an award of fees (even though the former worked hand-in-hand with Labaton).

14

> If [the] objections **result in an increase** to the common fund, the objectors may claim entitlement to fees on the same equitable principles as class counsel. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051-52 (9th Cir. 2002). Conversely, objectors who do "not increase the fund or **otherwise substantially benefit** the class members" are not entitled to fees, even if they bring "about minor procedural changes in the settlement agreement." *Id.* at 1051; *see also Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 288 (7th Cir. 2002) (explaining that "[t]he principles of restitution that authorize" the award of fees to objectors "also require, however, that the objectors produce an improvement in the settlement worth more than the fee they are seeking; otherwise they have rendered no benefit to the class"). Nor is it error to deny fees to objectors whose work is duplicative, or who merely echo each others' arguments and confer no unique benefit to the class. *See Reynolds*, 288 F.3d at 288-89; *see also WPPSS*, 19 F.3d at 1298.

*Rodriguez v. Disner*, 688 F.3d 645, 658-59 (9th Cir. 2012) (emphasis added). The burden is on the objectors to show that they provided a substantial benefit to the class. *See Faught v. Am. Home Shield Corp.*, 444 F. App'x 445, 446 (11th Cir. 2011); *cf.* Fed. R. Civ. P. 23(e)(5)(B), 2018 advisory committee notes ("If the consideration involves a payment to counsel for an objector, the proper procedure is by motion under Rule 23(h) for an award of fees."). "This is 'a mark [that] few objectors hit.'" *In re Zoom Video Commc'ns, Inc. Priv. Litig.*, No. 20-cv-02155-LB, 2023 U.S. Dist. LEXIS 30678, at*14 (N.D. Cal. Feb. 23, 2023).

In the case at bar, Labaton does not claim to have taken action directly resulting in an increase to the common fund. Rather, its position is that it has conferred a substantial benefit to the settlement class in two ways:

(1) Kaiser was effectively induced to enter into the settlement in the class action because Labaton was putting pressure on Kaiser through its mass arbitration and then its state court action (which it launched after Kaiser allegedly changed the arbitral rules).

(2) Labaton improved the class action settlement through, *e.g.*, its input on the settlement class definition and mass opt-outs.[7]

The Court rejects both "substantial benefit" theories.

---

[7] For category (2) above, Labaton claims that its lodestar is $345,738.50 (representing 532.4 hours of work).

15

For its first theory, Labaton notes that approximately 70% of the settlement class members are California residents. Labaton contends that Kaiser initially wanted to "channel [this] largest segment of the class into individualized arbitration proceedings, a shift that threatened to erode class leverage by removing the dominant California cohort from the Action." Labaton Mot. at 6 (emphasis added). According to Labaton, when it started to do mass arbitrations, the "arbitration channel [was changed] from a point of strategic weakness to an acute, high-stakes pressure point, multiplying Kaiser's case-management burden and amplifying the downside risk that comes from coordinated, high-volume, statutory-damages claims." Labaton Mot. at 1; *see also* Labaton Mot. at 1-2 (arguing that the mass arbitrations "materially strengthened the negotiating position of the Settlement Class" as they made "an immediate class resolution more enticing for Kaiser"; "the Settlement would not exist without the negotiation leverage that LKS created"); Labaton Mot. at 13 (arguing that "[t]his multi-pronged approach was a significant pressure point, driving Kaiser's decision to settle this Action"); Labaton Reply at 1 (emphasizing that class counsel's own brief says what drove the settlement was the risk of litigation, "including the potential appeal of this Court's order compelling arbitration [for the one named California plaintiff]"); Labaton Reply at 9 (asserting that the economic logic is that "[a] single class settlement resolving all claims in one proceeding was far more attractive to Kaiser than the alternative: defending thousands of individual arbitrations before the OIA, a parallel state-court class action in *Guevara*, and this Action simultaneously – each with its own discovery obligations, procedural timelines, and damages exposure under California's per-violation statutory framework"); *see also* Docket No. 451 (Status Rpt. at 3-4) (arguing that "Labaton's work changed the settlement landscape from a single federal class action into a multi-forum dispute involving coordinated California statutory claims, arbitration demands, and state-court action").

But even if Labaton is right that its tactics of pursuing a mass arbitration and then state court litigation gave an incentive to Kaiser to settle, the mere fact of a settlement was not in and of itself a substantial benefit to the class created by Labaton. Labaton has not demonstrated that its tactics informed the specific terms of the settlement to the benefit of the settlement class. To be sure, the settling parties accounted for the fact that there would be people who would not

participate in the settlement (*i.e.*, those who were deemed to be outside of the class definition or those who opted out). And the settling parties agreed that Kaiser could unilaterally terminate the settlement agreement if, in essence, it made a serious miscalculation about how many people would be covered by the settlement. *See* Sett. Agmt. ¶ 2.8 (giving Kaiser the right to terminate the settlement "in the event that the number of current or former members of Kaiser Permanente meet the conditions set forth in the Parties' confidential supplemental agreement . . . and are excluded from the Settlement Class, in accordance with that agreement"). But these facts in and of themselves do not establish that Labaton's tactics affected the specific terms of the settlement, particularly for the benefit of the settlement class. Indeed, the fact that Labaton had the mass arbitrations and state court lawsuit going on at the same time made Kaiser less likely to give the settlement class a "good deal" because it still had to worry about the mass arbitrations and state court lawsuit, and it had to contend with mass opt-outs and exclusions from the class. In short, the threat posed by Labaton's clients likely served to diminish, not enhance the size of the settlement award.

Even if Labaton's threat of mass arbitration provided some incentive for Kaiser to be amenable to settle the class action, there is no showing of the degree to which that alleged incentive drove the settlement. Nor is there any way to quantify such effect given the tenuous nature of the chain of causation asserted by Labaton. Indeed, Labaton gives little credit to the economic threat posed by the class action itself. After all, Kaiser faced a huge financial risk; had Plaintiffs prevailed in obtaining class certification of millions of patients and prevailed on the merits at trial, the verdict value could have reached many multiples of the settlement amount. Nothing suggests the conventional threat of class action liability is not what drove the class action settlement. In fact, the assertion that the settlement was due to the threat of Labaton's clients' pursuit of arbitration and then a state court action is particularly speculative where, as here, the settlement effectively excluded these clients who are free to pursue their claims against Kaiser outside the class settlement. It is hardly surprising that Labaton failed to cite and case law

precedence for its theory.[8]

As for Labaton's second theory, its contention that it improved the settlement in a substantial way is not persuasive at all. The settling parties had already agreed that arbitrating individuals should be excluded (as was the case in *23andMe* case, another case over which the undersigned presided), and the Court rejected Labaton's suggestion that a person who made something less than an arbitration demand should be enough to take someone out of the settlement class definition. To the extent the Court agreed with Labaton that a person did not actually have to pay the arbitration filing fee to be outside of the settlement class definition, that was, again, entirely consistent with the Court's ruling in *23andMe* where the only requirement was that a person have made an arbitration demand. As for the procedures for opting out, the Court rejected Labaton's contention that mass opt-outs should be allowed. To the extent the Court gave more time for individuals to opt out or allowed Labaton to collect individual signatures, those were ideas that came from the Court, not Labaton. *See also* Opp'n at 10 (noting that Labaton was trying to take credit for the Court's own work). In short, it is hard to identify anything in the ultimate terms of the settlement approved by this Court to which Labaton contributed. Even if Labaton gave some benefit to the class,[9] it was not substantial, and even if it were, it hardly warrants the fee requested by Labaton (*i.e.*, $345,783.50 which represents Labaton's asserted lodestar for "settlement-improvement work alone"). Labaton Mot. at 2; *see also Rodriguez*, 688 F.3d at 658 (indicating that "'[t]he principles of restitution that authorize' the award of fees to objectors 'also require, however, that the objectors produce an improvement in the settlement

---

[8] It is also worth noting that Labaton's claims of contributions to the settlement class are somewhat dubious given that – as Plaintiffs point out – Labaton had not done much substantive work up to the time of settlement. Labaton had served some pre-arbitration notices in February 2024, entered into a tolling agreement with Kaiser in March 2024, participated in the first mediation with Judge Andersen in October 2024, and then made arbitration demands in December 2024. *See* Labaton Reply at 2-4. But there is no indication that Labaton engaged in any motion work or conducted any discovery (or even independent investigation).

[9] In its most recent status report, Labaton has somewhat refined its argument as to how it made a contribution worthy of compensation. *See* Docket No. 451 (Status Rpt. at 1, 5) (arguing that "[t]he completed reconciliation process [ordered by the Court] confirms the value of the procedures Objectors advocated for throughout preliminary approval"; "[t]he Court now has a cleaner, more reliable record").

worth more than the fee they are seeking; otherwise, they have rendered no benefit to the class'").

The Court, therefore, denies the fee application submitted by Labaton.

## II.   CONCLUSION

For the foregoing reasons, the Court grants Plaintiffs' motion for final approval. It also grants in part the motion for attorneys' fees, litigation expenses, and service awards. Specifically, the request for service awards and litigation expenses is granted in its entirety. However, the Court does not award the full fees requested; the fees awarded are $13 million. The Court denies Labaton's request for a share of these fees.

Within a week of the date of this order, Plaintiffs shall file a proposed order on final approval and fees, costs, and service awards consistent with the rulings made by the Court in this order.

This order disposes of Docket Nos. 401, 402, and 411.

**IT IS SO ORDERED**.

Dated: July 14, 2026

_____
EDWARD M. CHEN
United States District Judge

United States District Court
Northern District of California

19